# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 21-cv-02770-WJM-SKC

EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, AND INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
JOHN ELLIS BUSH,
ANDREW CAVANNA,
CAROLINE DECHERT,
EDWARD KENNEDY, JR.,
PAVITHRA MAHESH,
THOMAS SCULLY,
MARILYN TAVENNER,
SEAN TRAYNOR,
RICHARD ZORETIC,
WELSH, CARSON, ANDERSON & STOWE,
APAX PARTNERS, L.P.,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY, L.L.C.,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO., LLC, and
ROBERTS & RYAN INVESTMENTS, INC.,

      Defendants.

---

## DEFENDANTS' JOINT MOTION AND BRIEF TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

## **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS .............................................................................3

    A.    PACE. ...................................................................................................3

    B.    InnovAge....................................................................................................4

    C.    The Amended Complaint. ..........................................................................6

III.  ARGUMENT .................................................................................................9

    A.    Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5.....................9

        1.    Allegations of Corporate Mismanagement Do Not State a Claim for Securities Fraud.......................................................................9

        2.    The Offering Document Statements Are Not Actionable.........................10

            a.    General Statements Concerning InnovAge's Business Operations Are Nonactionable.......................................................11

            b.    Plaintiffs Do Not Adequately Allege that the Offering Document Statements Were False or Misleading When Made. ...............................................................................14

            c.    Plaintiffs Do Not Identify Any Material Omissions that Render the Offering Document Statements False or Misleading......................................................................20

        3.    Plaintiffs Fail to Plead Any Actionable Post-Offering Statements............23

a.      General Statements Concerning Staff Turnover Rates and
        Are Not Actionable. ..................................................................23

b.      The Post-Offering Statements Were Not False or
        Misleading When Made. ............................................................24

c.      Plaintiffs Do Not Identify Any Material Omissions that
        Render the Post-Offering Statements False or Misleading. ...........30

d.      Challenges to the Same Offering Statements and/or the
        SOX Certifications Related Thereto Must Fail. .............................31

4.      The Offering Documents Complied with Items 105 and 303 ...................32

5.      Plaintiffs Fail to Adequately Plead Scienter. ............................................34

a.      InnovAge's Announcement of Improvements to Its
        Platform Made Months After the Challenged Statements
        Does Not Support an Inference of Scienter. ..................................34

b.      The Corporate Positions of Hewitt and Gutierrez and Their
        Purported Access to Internal Reports Does Not Establish
        Scienter. ......................................................................................35

c.      Hewitt's and Welch's Departures from InnovAge Do Not
        Support a Strong Inference of Scienter. ........................................38

d.      The Absence of Alleged Motive Undercuts Plaintiffs'
        Attempt to Allege a "Strong Inference" of Scienter. .....................39

e.      The Audit Findings Do Not Support an Inference of
        Scienter. ......................................................................................40

      B.      The Securities Act Claims Should be Dismissed Because Plaintiffs Cannot

              Identify False or Misleading Material Statements or Omissions............................40

      C.      The Amended Complaint Fails to Establish Control Person Liability. .................42

            1.      Director Defendants. ....................................................................................42

            2.      WCAS and Apax...........................................................................................43

IV.    CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams* v. *Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ..................................................................21, 28, 43, 45

*Anderson* v. *Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) ..................................................................34, 36, 37, 40

*Andropolis* v. *Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007).................................................................10, 13

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009).............................................................................................9, 45

*Basic, Inc.* v. *Levinson*,
   485 U.S. 224 (1988)....................................................................................................11

*Chipman* v. *Aspenbio Pharma, Inc.*,
   2012 WL 4069353 (D. Colo. Sept. 17, 2012)..........................................................20

*In re Crocs, Inc. Sec. Litig.*,
   774 F. Supp. 2d 1122 (D. Colo. 2011)....................................................10, 17, 25

*Dinnen* v. *Kneen*,
   2017 WL 4163356 (D. Colo. Sept. 19, 2017)..........................................................14

*Dura Pharms., Inc.* v. *Broudo*,
   544 U.S. 336 (2005)......................................................................................................9

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)........................................................................................12

*Employees' Ret. Sys. of R.I.* v. *Williams Cos.*,
   889 F.3d 1153 (10th Cir. 2018) .............................................................................12, 21

*Ernst & Ernst* v. *Hochfelder*,
   425 U.S. 185 (1976)......................................................................................................34

*GFF Corp.* v. *Associated Wholesale Grocers, Inc.*,
   130 F.3d 1381 (10th Cir. 1997) ...................................................................................3

*Gillis* v. *QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016)...............................................................18, 27

*Gregory* v. *ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018)...........................................................................13

*Grossman* v. *Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ..........................................................11, 12, 14, 23

*Hampton* v. *root9B Techs., Inc.*,
   897 F.3d 1291 (10th Cir. 2018) ....................................................................26, 30

*Houser* v. *CenturyLink, Inc.*,
   513 P.3d 395 (Colo. Ct. App. 2022) ...........................................................................32

*Indiana Pub. Ret. Sys.* v. *Pluralsight, Inc.*,
   ---F.4th---, 2022 WL 3591140 (10th Cir. Aug. 23, 2022) ...........................13, 14, 41

*Indiana Pub. Ret. Sys.* v. *Pluralsight, Inc.*,
   2021 WL 1222290 (D. Utah Mar. 31, 2021) ..............................................................41

*Jiajia Luo* v. *Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020)................................................... *passim*

*In re Kosmos Energy Ltd. Sec. Litig.*,
   955 F. Supp. 2d 658 (N.D. Tex. 2013) ......................................................................45

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) .......................................................................12, 39

*Lewis* v. *YRC Worldwide Inc.*,
   2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) .........................................................22

*In re Liberty Tax Sec. Litig.*,
   435 F. Supp. 3d 457 (E.D.N.Y. 2020) .......................................................................23

*Lorusso* v. *Boulder Brands, Inc.*,
   2017 WL 4365180 (D. Colo. Mar. 1, 2017) ...............................................................19

*Maher* v. *Durango Metals, Inc.*,
   144 F.3d 1302 (10th Cir. 1998) .......................................................................42, 45

*McDonald* v. *Kinder–Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) .............................................................19, 21, 24

*Medina* v. *Clovis Oncology, Inc.*,
  215 F. Supp. 3d 1094 (D. Colo. 2017)............................................................43, 44

*In re Molson Coors Beverage Co. Sec. Litig.*,
  2020 WL 13499995 (D. Colo. Dec. 2, 2020)............................................................38

*Muncy* v. *InterCloud Sys., Inc.*,
  92 F. Supp. 3d 621 (E.D. Ky. 2015) ............................................................20

*Nardy* v. *Chipotle Mexican Grill, Inc.*,
  2019 WL 3297467 (D. Colo. Mar. 29, 2019) ............................................................17

*In re Netflix Sec. Litig.*,
  647 F. App'x 813 (9th Cir. 2016) ............................................................18, 24, 27

*Noble Asset Mgmt.* v. *Allos Therapeutics, Inc.*,
  2005 WL 4161977 (D. Colo. Oct. 20, 2005) ............................................................16, 20, 28

*Ong* v. *Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)............................................................16, 17

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008)............................................................22

*Papasan* v. *Allain*,
  478 U.S. 265 (1986)............................................................9

*In re Progress Energy, Inc.*,
  371 F. Supp. 2d 548 (S.D.N.Y. 2005)............................................................28, 30

*In re ProShares Trust Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)............................................................18

*Rubke* v. *Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ............................................................41

*Rumbaugh* v. *USANA Health Scis., Inc.*,
  2018 WL 5044240 (D. Utah Oct. 17, 2018) ............................................................35, 38

*Santa Fe Indus., Inc.* v. *Green*,
  430 U.S. 462 (1977)............................................................2, 10

*Silsby* v. *Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014)............................................................44

*Singh* v. *Cigna Corp.*,
     277 F. Supp. 3d 291 (D. Conn. 2017) ...................................................................28

*Singh* v. *Cigna Corp.*,
     918 F.3d 57 (2d Cir. 2019) ..............................................................................16, 28

*Slater* v. *A.G. Edwards & Sons, Inc.*,
     719 F.3d 1190 (10th Cir. 2013) ........................................................................3, 32

*Smallen* v. *The W. Union Co.*,
     950 F.3d 1297 (10th Cir. 2020) ......................................................................35, 37

*Sorkin, LLC* v. *Fischer Imaging Corp.*,
     2005 WL 1459735 (D. Colo. June 21, 2005).............................................22, 35, 37

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
     551 U.S. 308 (2007)........................................................................................34, 38

*In re Thornburg Mort., Inc. Sec. Litig.*,
     683 F. Supp. 2d 1236 (D.N.M. 2010) ...................................................................41

*United Food & Com. Workers Int'l Union Loc. 464A* v. *Pilgrim's Pride Corp.*,
     2022 WL 684169 (D. Colo. Mar. 8, 2022) .......................................................12, 14

*United Food & Com. Workers Union Loc. 880 Pension Fund* v. *Chesapeake
     Energy Corp.*,
     774 F.3d 1229 (10th Cir. 2014) ......................................................................31, 42

*Wolfe* v. *Aspenbio Pharma, Inc.*,
     2012 WL 4040344 (D. Colo. Sept. 13, 2012)........................................................12

*Wolfe* v. *Aspenbio Pharma, Inc.*,
     587 F. App'x 493 (10th Cir. 2014) .......................................................................36

*In re Zagg, Inc. Sec. Litig.*,
     797 F.3d 1194 (10th Cir. 2015) ...........................................................................35

**Federal Statutes**

15 U.S.C. § 78u-4 ...................................................................................................9, 11, 34

15 U.S.C. § 78u-5 ...........................................................................................................14

**Rules**

D.C.Colo.LCivR 7.1 ...........................................................................................................1

Fed. R. Civ. P. 8 ...................................................................................................................1

Fed. R. Civ. P. 9 .............................................................................................................1, 41

Fed. R. Civ. P. 12 .................................................................................................................1

**Regulations**

17 C.F.R. § 229.105 ........................................................................................................8, 32

17 C.F.R. § 229.303 ........................................................................................................8, 32

42 C.F.R. Part 460 ................................................................................................................3

42 C.F.R. § 460.150 ...........................................................................................................24

Defendants InnovAge Holding Corp. ("InnovAge" or "the Company"); Maureen Hewitt ("Hewitt") and Barbara Gutierrez ("Gutierrez") (the "Officer Defendants");[1] John Ellis Bush, Andrew Cavanna, Caroline Dechert, Edward Kennedy, Jr., Pavithra Mahesh, Thomas Scully, Marilyn Tavenner, Sean Traynor, and Richard Zoretic (the "Director Defendants");[2] and Welsh, Carson, Anderson & Stowe ("WCAS") and Apax Partners, L.P.[3] ("Apax") (altogether, "Defendants") move to dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Amended Complaint" or "Compl.") for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 8, 9(b), 12(b)(6); D.C.Colo.LCivR 7.1.[4]

I.    **PRELIMINARY STATEMENT**

Plaintiffs challenge optimistic statements about InnovAge's operations as materially false and misleading because audits at InnovAge's Sacramento and Colorado centers showed that InnovAge has not perfectly executed its business operations.  But flawed business execution or even internal mismanagement does not violate the securities laws.  Plaintiffs' claims would require perfection in operations and disclosure of every detail of a regulated business, and demand clairvoyance from company personnel.  That is not the law.  And in any event,

---

[1]    The Amended Complaint refers to the Officer Defendants and InnovAge, combined, as the "Exchange Act Defendants."  (Compl. ¶ 34.)

[2]    The Amended Complaint refers to the nine individual Director Defendants jointly with the Officer Defendants as the "Securities Act Individual Defendants."  (*Id.* ¶ 45.)  Some Director Defendants are also referred to as part of the "WCAS Director Defendants" or the "Apax Director Defendants" and, collectively, as the "Principal Shareholder Director Defendants." (*Id.* ¶ 46.)  Ultimately, only Counts III and V name the Director Defendants.

[3]    On April 1, 2021, Apax Partners, L.P. converted from a Delaware limited partnership to a Delaware limited liability company and is now known as Apax Partners US, LLC.

[4]    Counsel conferred about this motion via Zoom under Practice Standards for Civil and Criminal Matters, Standard III.D.1.  Plaintiffs' counsel did not agree to the relief sought.

InnovAge fully disclosed its operational risks and their potential impacts to its growth strategies, that deficiencies had been found in prior audits, and that future audits might also find deficiencies that could result in sanctions.

*First*, courts have long rejected similar attempts to convert claims of "internal corporate mismanagement" into violations of the securities laws.  *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 479 (1977).

*Second*, Plaintiffs do not allege any actionable misstatements or omissions.  Statements broadly related to InnovAge's activities, plans, and goals are not rendered false or misleading simply because InnovAge's operations were deficient in some respects.  In addition, the bulk of Plaintiffs' challenged statements—such as those concerning InnovAge's "patient-centered care delivery approach" and "robust compliance infrastructure"—are the type of generalized and optimistic statements that courts routinely hold are immaterial and not actionable because no reasonable investor would rely on them.  This is fatal to all of Plaintiffs' claims.

*Third*, Plaintiffs' securities fraud claims fail because they do not plead particularized facts giving rise to a strong inference of scienter.  Plaintiffs' scienter allegations are based on conclusory, immaterial, or unreliable allegations from confidential witnesses.  Plaintiffs also rely on InnovAge's disclosure in May 2022 (14 months after the IPO and six months after the last challenged statement) that "audit results ha[d] found gaps in our performance when compared against regulatory and our own expectations" and, as a result, it was launching various initiatives to address those issues.  But nothing in the May 2022 disclosure supports an inference that any of the challenged statements were knowingly false at the time they were made.

*Fourth*, Plaintiffs' control person liability claims must be dismissed because Plaintiffs fail

to demonstrate primary violations under the Securities Exchange Act of 1934 or the Securities

Act of 1933, and Plaintiffs fail to plead particular facts establishing that the Director Defendants,

WCAS, or Apax exercised actual control over any alleged primary violator.

Thus, this Court should dismiss with prejudice the Amended Complaint in its entirety.

## II.  STATEMENT OF FACTS[5]

### A.  PACE.

The Program of All-Inclusive Care for the Elderly ("PACE") is a Medicare/Medicaid

program that pays healthcare providers a flat monthly rate—the capitation payment—for all of a

patient's monthly needs, instead of paying for services rendered.  (Compl. ¶¶ 4, 72-73.)  PACE

providers are subject to stringent regulation by the federal Centers for Medicare & Medicaid

Services ("CMS") and state administrative agencies.  *See generally* 42 C.F.R. Part 460.

Unsurprisingly, the Offering Documents disclosed the broad scope of PACE regulations, which,

among other things, impose requirements relating to a provider's organizational structure,

governance, participant enrollment and disenrollment, provision of healthcare, and medical

records documentation.  (Ex. 1,[6] at 23-24.)[7]

---

[5]  These facts are drawn from the Amended Complaint, documents it incorporates by reference, InnovAge's public SEC filings, and similar documents of which the Court may otherwise take judicial notice.  (*See* Defendants' Request for Judicial Notice In Support of Joint Motion filed concurrently herewith ("Judicial Notice Request").)

[6]  All exhibits ("Ex.") are attached to the Declaration of Diane L. McGimsey filed concurrently herewith.  The Court may consider the exhibits without converting this Motion to a summary judgment motion (*see* Practice Standard III.D.3.) because they are incorporated in or integral to the Amended Complaint (*see Slater* v. *A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013); *GFF Corp.* v. *Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)), and/or are properly subject to judicial notice (*see* Judicial Notice Request).

[7]  On February 8, 2021, InnovAge filed its Registration Statement Under the Securities Act of 1933 on Form S-1, which was amended on February 24 and 26, 2021 and March 3, 2021 (the "Registration Statement," Ex. 1); and filed a Prospectus on March 5, 2021 ("Prospectus," Ex. 2;

PACE organizations undergo frequent and routine audits.  (Compl. ¶ 91.)  CMS conducts "Trial Period Audits" for the first three years of a PACE organization's contract, "Routine Audits" at least every two years, and "Focused Audits" when additional monitoring or auditing is determined to be required.  (*Id*.)  When an audit identifies deviations from PACE regulations, as is often the case, the auditing agency will issue corrective actions required ("CARs") and/or immediate corrective actions required ("ICARs").  (*Id.* ¶¶ 150-51.)  The PACE organization must then submit a Corrective Action Plan ("CAP") to remedy the noncompliance.  (Ex. 3, § 40.1.)  CMS publishes its audit results, which reflect that out of 193 audits of PACE organizations from 2017 to 2019, only *one* audit resulted in no CARs or ICARs.  (*See* Ex. 4.)

**B.     InnovAge.**

InnovAge is a healthcare company focused on providing all-inclusive care to seniors through PACE.  (Compl. ¶ 3.)  InnovAge operates a network of facilities and providers to deliver care to its participants, and also coordinates each participant's care to proactively manage medical risk and allow seniors to continue living in the community longer rather than in nursing homes.  (*Id*.)  InnovAge became a public company through a March 4, 2021 IPO.  (*Id.* ¶ 178.) The Offering Documents filed in advance of the IPO included extensive risk disclosures, including the risk of regulatory audits, the risk of noncompliance with federal and state laws, and risks related to InnovAge's scalability, growth strategy, and business operations:

- "We face inspections, reviews, audits and investigations under federal and state government programs and contracts.  These audits could require corrective actions or have adverse findings that may negatively affect our business . . . ."  (Ex. 1, at 20.)

---

and altogether, the "Offering Documents").  (*See* Compl. ¶ 241.)

- "There can be no assurance that a PACE organization will not be randomly selected or targeted for review by CMS or that the outcome of such a review will not result in a material adjustment in our revenue and profitability . . . ."  (*Id.* at 5.)

- "CMS regularly audits our performance . . . . [O]ur failure to comply with the federal and state laws applicable to our business may result in . . . CMS imposed sanctions (including suspension or exclusion from participation in government programs) . . . ."  (*Id.* at 24.)

- "We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by growing companies . . . such as . . . hiring, integrating, training and retaining skilled personnel . . . ."  (*Id*. at 8.)

- "Our growth strategy involves a number of risks . . . including that: . . . we may not be able to hire sufficient numbers of physicians and other clinical staff . . . ."  (*Id.* at 9.)

- "If we fail to manage our growth effectively, we may be unable to execute our business plan [or] maintain high levels of service . . . ."  (*Id*. at 10.)

Underscoring these points, the Offering Documents disclosed that InnovAge had been found to have violated PACE regulations concerning "compliance with regulatory requirements, participant quality of care, care plan development and implementation . . . clinicians acting outside of their scope of practice, and other issues" in the past, and that there may be future adverse findings.  (*Id.* at 23-24.)  They also warned that a "lack of availability of clinical personnel . . . has become a significant operating issue facing all healthcare providers, which situation has been further exacerbated by the COVID-19 pandemic."  (*Id*. at 13.)

After the IPO, InnovAge repeated and expanded upon these disclosures in its quarterly reports, again specifically highlighting issues relating to staffing shortages and compliance risks.

(*E.g.*, Ex. 6, at 4-5 (noting difficulties hiring healthcare professionals "causing certain of our centers to be understaffed or staffed with personnel that requires training" and impacting the Company's ability to adhere to applicable laws and regulations).)

### C.    The Amended Complaint.

Plaintiffs filed the Amended Complaint on June 21, 2022 on behalf of a putative class of all purchasers of InnovAge common stock between March 4, 2021 and December 22, 2021 (the "Class Period").  (Compl. ¶ 5.)  The Amended Complaint asserts claims under (1) Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act") against InnovAge and the Officer Defendants; (2) Sections 11 and 12(a) of the Securities Act of 1933 (the "Securities Act") against InnovAge, the Officer Defendants, the Director Defendants, and/or the 11 underwriter defendants; (3) Section 20(a) of the Exchange Act against the Officer Defendants, Apax, and WCAS; and (4) Section 15 of the Securities Act against the Officer Defendants, the Director Defendants, Apax, and WCAS.  (*Id.* ¶¶ 26-62, 304-380.)

Plaintiffs' claims relate to governmental audits at InnovAge's Sacramento and Colorado centers that identified certain deficiencies in InnovAge's provision of care, resulting in the suspension of new enrollments at certain of InnovAge's facilities.  After the IPO, on March 10, 2021, InnovAge received a letter from the Colorado Department of Health Care Policy & Financing ("HCPF") relaying a complaint HCPF had received concerning the Company's Thornton, Colorado facility and directing InnovAge "to conduct a root cause analysis" concerning the issues.  (*Id.* ¶¶ 180-81.)  In May 2021, CMS commenced a routine audit of InnovAge's newly-opened Sacramento facility.  (*Id*. ¶ 194.)  In May and June 2021, respectively, Colorado regulators and CMS commenced focused audits of InnovAge's Colorado facilities.  (*Id.*

¶¶ 11, 194; Ex. 7, at 8.)  On September 17, 2021, CMS notified InnovAge that it was suspending

new enrollments at its newly-opened Sacramento center based on its audit findings.  (Compl.

¶ 11.)  On December 23, 2021, InnovAge announced that CMS would suspend new enrollments

at its Colorado centers based on deficiencies detected in an audit.  (*Id.* ¶ 12; Ex. 8.)

Plaintiffs allege that certain "Defendants" falsely touted numerous "facts" concerning

InnovAge's business, including having:  (1) a "patient-centered care delivery approach";

(2) "individualized care plan[s]" for participants; (3) "standardized and streamlined [InnovAge's]

operations across markets" and "invest[ed] in dedicated, well-staffed teams"; (4) "a robust

compliance infrastructure and team"; (5) "a long track record of successfully managing medical

risk"; (6) "transitioned much of [InnovAge's] care to in-home and telehealth services" during the

COVID-19 pandemic; (7) a "technology suite [that] supports [InnovAge's] ability to deliver

consistent, high quality care"; (8) "in-home care capabilities [that] enable participants to live

safely in their homes"; (9) an "expansion playbook" that includes "an efficient, uniform

operating model"; (10) "demonstrated an ability to scale successfully"; (11) "demonstrated [an]

ability to reduce avoidable utilization of high-cost care settings"; and (12) "developed strong

relationships with Medicare and Medicaid agencies."  (Compl. ¶¶ 241-42.)  The Amended

Complaint also challenges statements concerning InnovAge's "organic growth" and staffing, and

the initiation and results of the Sacramento, Colorado, and New Mexico audits.  (*Id.* ¶¶ 246-61.)[8]

The Amended Complaint generally alleges that these statements were false and

---

[8]     The statements reproduced in Amended Complaint paragraph 241 were made in the
Offering Documents and are challenged under both the Securities Act and Exchange Act.  The
remaining statements were made after the IPO, and are challenged only under the Exchange Act.

misleading when made because certain patients at certain InnovAge facilities did not receive medically necessary services in a timely manner and did not receive effective coordinated care or required assessments, and InnovAge lacked adequate staffing and training at certain facilities.

Plaintiffs also claim InnovAge "failed to disclose" that (1) "for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care"; (2) InnovAge expected its centers to be audited, and therefore there was a "heightened risk" the audits would result in sanctions; (3) prior audits had identified deficiencies; (4) staffing levels were "dangerously low" at some centers, and requests to increase clinical and home care staff were denied; (5) staff were allegedly directed to "conceal evidence of deficiencies" during audits; (6) by May 10, 2021, regulators "had begun or were expected to soon begin audits" of InnovAge's Sacramento and Colorado facilities and there was "a significant and heightened risk" the audits would result in sanctions and would compromise InnovAge's ability to expand; and (7) CMS suspended most trial period and routine audits due to the COVID-19 pandemic and reprioritized its resources on audits that addressed "instances of noncompliance where the health and/or safety of beneficiaries are at serious risk."  (*Id.* ¶¶ 242, 247, 249, 251, 255, 260.)

Lastly, Plaintiffs allege that the Offering Documents did not include information required by Items 105 and 303 of Regulation S-K (17 C.F.R. §§ 229.303, 229.105) because InnovAge "failed to disclose that the Company's enrollment growth strategy presented a significant uncertainty, and made investment in InnovAge risky, given that the strategy had resulted in widespread deficiencies in quality of care and created a known uncertainty and risk that the audits would result in costly [sanctions] compromising InnovAge's revenue" (Compl. ¶ 245).[9]

_____

[9]     The Amended Complaint also challenges the "Certification Pursuant to Section 302 of

### III.    ARGUMENT[10]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  Although courts "must take all the factual allegations in the complaint as true, [courts] are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan* v. *Allain*, 478 U.S. 265, 286 (1986).

### A.    Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) made with scienter; (3) on which the plaintiff relied; and that (4) proximately caused the plaintiff's loss in connection with the purchase or sale of securities. *See Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).  Securities fraud claims are subject to rigorous pleading requirements.  A plaintiff must specify each statement alleged to have been misleading, the reasons why it was misleading, and facts giving rise to a strong inference that the defendant acted with scienter.  *See* 15 U.S.C. §§ 78u–4(b)(1), (2).

Plaintiffs' Section 10(b) claims fail for three reasons:  the Amended Complaint (1) impermissibly relies on a theory of corporate mismanagement; (2) does not plead any material misrepresentation or omission of fact; and (3) does not adequately plead scienter.

### 1.    Allegations of Corporate Mismanagement Do Not State a Claim for Securities Fraud.

The Supreme Court long ago held that a plaintiff cannot bootstrap allegations of

---

Sarbanes-Oxley Act of 2002" executed by the Officer Defendants in connection with certain of InnovAge's subsequent securities filings.  (*See* Compl. ¶¶ 250(e), 256(b), 261(b).)

[10]     A summary of the challenged statements and the reasons why the statements are not actionable is attached hereto as Appendix A.

corporate mismanagement into a claim for securities fraud by alleging that the mismanagement was not disclosed.  *Santa Fe*, 430 U.S. at 479-80; *see also In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1147 (D. Colo. 2011); *Andropolis* v. *Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 683 (D. Colo. 2007).  For example, in *Crocs*, plaintiffs alleged that Crocs failed to update its data management systems to account for the company's rapid growth, which "resulted in problems managing manufacturing, inventory, sales, distribution and assessment of current and future demand," and that defendants fraudulently misled investors by failing to disclose these conditions.  774 F. Supp. 2d at 1126-30.  The court rejected this argument, concluding that the allegations merely described corporate mismanagement, not securities fraud.  *Id*. at 1146-47.

This rule forecloses Plaintiffs' claims here.  The Amended Complaint's allegations rest almost exclusively on the Company's purported failure to disclose the deficiencies subsequently identified in the Colorado and Sacramento audits.  The Amended Complaint does not identify any guarantee that InnovAge's systems had been, and would continue to be, universally effective, instead arguing that general statements describing InnovAge's business are rendered misleading by the supposedly undisclosed deficiencies.  (*See, e.g.*, Compl. ¶ 242(g) (statement that InnovAge has a "technology suite [that] supports [its] ability to deliver consistent, high-quality care to [its] participants at scale" is false because InnovAge allegedly had not adequately captured certain information in its records).)  As in *Crocs*, this is nothing more than an attempt to bootstrap a claim for corporate mismanagement into a securities violation and should be rejected.

## 2.    The Offering Document Statements Are Not Actionable.

The PSLRA requires that Plaintiffs identify (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) if an allegation

regarding the statement is made on information and belief, all facts on which that belief is formed.  *See* 15 U.S.C. § 78u-4(b)(1); *Grossman* v. *Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) ("[A] plaintiff must set forth . . . why the disputed statement was untrue or misleading *when made*.") (quotations omitted) (emphasis in original).  Moreover, a misstatement or omission is material only if it would likely be deemed significant by a reasonable investor in light of the "total mix" of publicly available information.  *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988).

Plaintiffs challenge 12 statements from the Offering Documents under the Exchange Act (Compl. ¶¶ 241-42 (the "Offering Document Statements")).  (*See* Appx. A, at A1-A3.)  Each of the statements is either not false or misleading, or is immaterial as a matter of law.

### a.   General Statements Concerning InnovAge's Business Operations Are Nonactionable.

Eleven of the 12 Offering Document Statements challenged by the Amended Complaint are general statements by InnovAge concerning its business operations, staffing levels, growth and scalability prospects, risk and compliance management, and relationships with related regulators:  the Patient-Centered Care Statement, the Individualized and Coordinated Care Statement, the Standardized and Well-Staffed Operations Statement, the Robust Compliance Statement, the Successful Medical Risk Management Statement, the Technology Statement, the Home Care Statement, the Expansion Model Statement, the Scalability Statement, the Virtuous Cycle Statement, and the Government Relationships Statement (collectively, the "Optimistic Statements").  (Compl. ¶ 241(a)-(e), (g)-(l).)[11]

None of the Optimistic Statements is actionable because none is material.  "Information

---

[11]    The twelfth statement is the COVID Continuity of Care Statement.  Section III.A.2.b. explains why it is not actionable.

is material only if a reasonable investor would consider it important in determining whether to buy or sell stock." *Employees' Ret. Sys. of R.I.* v. *Williams Cos.*, 889 F.3d 1153, 1167 (10th Cir. 2018) (quotations omitted).  But the Optimistic Statements are "so vague, [and] so lacking in specificity that no reasonable investor could find them important." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (quotations omitted).

For example, in *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), the Second Circuit addressed statements similar to the Patient-Centered Care, Individualized and Coordinated Care, Expansion Model, Standardized and Well-Staffed Operations, Robust Compliance, Successful Medical Risk Management, Home Care, and Scalability Statements.  The plaintiff challenged statements that JP Morgan's "risk management processes are highly disciplined and designed to preserve the integrity of the risk management process," and that it "set the standard for integrity." *Id.* at 205-06.  The court held these statements were "merely generalizations regarding JPMC's business practices" and "precisely the type of 'puffery'" that courts find "inactionable" because they were "too general to cause a reasonable investor to rely upon them" and "could not[] amount to a guarantee that its choices would prevent failures in its risk management practices." *Id.* at 206.  This is consistent with precedent in this Circuit that finds "generalized statements of optimism" nonactionable. *Grossman*, 120 F.3d at 1119; *see, e.g.*, *United Food & Com. Workers Int'l Union Loc. 464A* v. *Pilgrim's Pride Corp.*, 2022 WL 684169, at *1, 4-5 (D. Colo. Mar. 8, 2022) ("high-quality innovative products," "efficient operations," "strong relationships with its key customers," and "results-oriented corporate culture" are nonactionable); *Wolfe* v. *Aspenbio Pharma, Inc*., 2012 WL 4040344, at *9 (D. Colo. Sept. 13, 2012) ("[E]nthusiastic but vague characterizations of a

product or process are not sufficient to state a claim.") (quotations omitted).

Similarly here, the Optimistic Statements are nonactionable generalized, vague, and optimistic characterizations that InnovAge:  has a "patient-centered care delivery approach [that] meaningfully improves the quality of care our participants receive," "deliver[s] coordinated, high quality care," "ha[s] a long track record of successfully managing medical risk," has "capabilities [that] enable our participants to live safely in their homes," has "a robust compliance infrastructure and team," has taken "a disciplined approach to site selection . . . [and] a concerted effort to recruit and develop talent," has "standardized and streamlined [its] operations across markets" and "invested meaningfully in the corporate infrastructure," and has "demonstrated an ability to scale successfully."  (Compl. ¶ 241.)  They are too vague to convey any specific level of care or to offer assurances that InnovAge perfectly manages medical risk in every instance. *See, e.g.*, *Indiana Pub. Ret. Sys.* v. *Pluralsight, Inc.*, ---F.4th---, 2022 WL 3591140, at *7 (10th Cir. Aug. 23, 2022) ("[P]ositive generalizations about a company's performance will typically not give rise to liability under section 10(b); rather, to be actionable, the statements must be grounded in concrete metrics or other objectively verifiable data."); *Andropolis*, 505 F. Supp. 2d at 686 (omission of fact that some officers violated code of ethics did not make statement about adoption of code misleading).  Indeed, several statements not only fit the well-established definition of puffery, but also strongly echo precise phrases courts have found nonactionable.

The **Technology Statement** is in the same category.  *See Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (statement that defendant's "technology . . . provides [defendant] with competitive advantages" held not actionable).

-13-

The **Virtuous Cycle Statement** relates to forward-looking unquantified growth driven by vague, potential improvements.  *See Pluralsight*, 2022 WL 3591140 at *11, 13-14 ("ab[ility] to drive substantial increases in the productivity and effectiveness" of, and having "plan to grow," sales force are "unactionable optimism and puffery"); *Dinnen* v. *Kneen*, 2017 WL 4163356, at *6 (D. Colo. Sept. 19, 2017) ("Statements regarding expected growth . . . and other predictions related to fiscal success are regularly held to be non-actionable puffery.").[12]

The **Government Relationships Statement** is akin to the "generic expressions of optimism associated with a corporation's . . . 'strong relationships with its key customers,'" that the court in *United Food* held to be not actionable.  2022 WL 684169, at *5.

As to each Optimistic Statement, no investor could reasonably rely on such broad and general statements not rooted in any objective data sources in making an investment decision.

          **b.**      **Plaintiffs Do Not Adequately Allege that the Offering Document Statements Were False or Misleading When Made.**

The Amended Complaint fails to adequately plead facts indicating that nine of the 12 Offering Document Statements were false or misleading when made.  As explained below, there is no nexus between these statements, which describe InnovAge's business in the most general of terms, and the alleged facts that Plaintiffs claim render these statements false or misleading.

**Patient-Centered Care Statement.**  Plaintiffs allege this statement is false and misleading because CMS audits revealed deficiencies with the provision of covered services, such as certain participants not receiving all covered services.  (Compl. ¶ 242(a).)  These

---

[12]      This statement is also not actionable as a forward-looking statement because it is accompanied by cautionary statements about InnovAge's future financial and business results (*see, e.g.*, Ex. 1, at 8-10).  *See Grossman*, 120 F.3d at 1120-22; *see also* 15 U.S.C. § 78u-5(i)(1).

deficiencies do not make the statement false or misleading.  The statement generally describes InnovAge's "patient-centered care delivery approach."  It does not promise perfect compliance with the applicable regulations or InnovAge's own operating procedures.  Nor could any investor reasonably interpret it as such in light of prior audit results and Company disclosures that audits had in the past and may in the future identify deficiencies in connection with "compliance with regulatory requirements, participant quality of care, care plan development and implementation . . . and other issues."  (Ex. 1, at 23.)

**Individualized and Coordinated Care, Standardized and Well-Staffed Operations, Successful Medical Risk Management, COVID Continuity of Care, and Home Care Statements.**  Plaintiffs claim these statements are false and misleading because in May 2022, Mr. Blair—who became CEO of InnovAge in January 2022—allegedly admitted that InnovAge "had not 'standardiz[ed] the process of [its] interdisciplinary care teams,'" "had failed to ensure adequate 'timeliness of scheduling and coordinating care with providers outside the centers,'" and "had failed to sufficiently maintain its 'home care network and reliability,' [and] 'efficiency and reliability of transportation for [its] participants . . . .'"  (Compl. ¶ 242.)  Plaintiffs misconstrue the May 2022 statements.  Mr. Blair did not admit that InnovAge "failed" to do these things, but rather made clear his belief that InnovAge "possesses a sturdy foundation," and announced these areas as initiatives intended to "strengthen[]" and "improve[]" InnovAge's platform.  (Ex. 9, at 5-6.)  InnovAge's decision to launch initiatives to improve its business operations in 2022 does not make these statements false when made over a year earlier.  *See Jiajia Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 412 (S.D.N.Y. 2020) (rejecting view that company "can only adopt new [compliance measures] only at peril of a securities lawsuit").

Further, the statements accurately describe the way InnovAge has designed its business to operate.  Plaintiffs do not dispute this, but contend that the statements are false because InnovAge did not perfectly execute its operations as designed.  (*E.g.*, Compl. ¶ 242(a)-(c), (e), (f), (h).)  But no reasonable investor would construe these descriptions as suggesting that the Company would perfectly execute all of its business practices, particularly when disclosures revealed InnovAge had previously been found to have violated PACE regulations and warned of the potential for future such findings.  *See Singh* v. *Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (dismissing securities action arising from CMS audit where disclosures were "framed by acknowledgements of the complexity and numerosity of applicable regulations," "suggest[ing] caution (rather than confidence) regarding the extent of [defendant's] compliance"); *Noble Asset Mgmt.* v. *Allos Therapeutics, Inc.*, 2005 WL 4161977, at *12 (D. Colo. Oct. 20, 2005) (defendant's "positive characterizations of the [drug's] test results" not material in light of risk disclosure that company "might not be able to demonstrate [the drug's] efficacy").

Courts have rejected similar attempts to plead securities fraud based on allegations that a company had not perfectly executed its operations.  In *Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018), for example, the plaintiffs challenged a statement that Chipotle's "quality assurance department establishes and monitors our quality and food safety programs for our supply chain.  Our training and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety in the restaurants."  *Id.* at 219.  The plaintiffs claimed it was false and misleading because Chipotle failed to disclose that Chipotle "did not adequately monitor [its] food safety programs," "failed to live up to its own food safety standards," ignored internal audit reports, and conducted

deficient internal audits. *Id.* In dismissing the complaint, the court noted that the plaintiffs did "not allege that Chipotle failed to undertake such endeavors, but merely that Chipotle failed to do so 'adequately,' or that Chipotle 'failed to live up to its own food safety standards,' or that Chipotle's food-safety auditing system was 'inherently deficient.'" *Id.* at 232. As a result, the court held that the "allegations do not conflict with Defendants' statements regarding the food-safety programs and procedures that Chipotle had in place, but merely quibble with Chipotle's execution of those programs and procedures." *Id.*

Likewise, in *Nardy* v. *Chipotle Mexican Grill, Inc.*, 2019 WL 3297467 (D. Colo. Mar. 29, 2019), a court in this District rejected a similar attempt to plead securities fraud based on the defendant's failure to perfectly execute its operations. In *Nardy*, the plaintiffs alleged Chipotle's statements about implementing new food safety protocols were misleading because internal audits showed some restaurants were failing their food safety audits, and that Chipotle had reduced its staffing and training, which impeded its ability to implement the new protocols. *Id.* at *10-12. The Court rejected this argument, holding that "even assuming a percentage of Chipotle's restaurants were failing the [internal] Audits, and further assuming those failures were an indication of a total lack of implementation, other aspects of the new food safety protocols had indisputably been implemented." *Id*. Here, the challenges to the Individualized Coordinated Care, Standardized and Well-Staffed Operations, Successful Medical Risk Management, COVID Continuity of Care, and Home Care Statements fail for the same reason. *See Crocs*, 774 F. Supp. 2d at 1143 ("The Complaint does not suggest that Crocs was, in fact, not taking the steps it said it was taking to meet demand, [but] suggests that Crocs was not doing these things well and should have disclosed more fully its difficulties," which was insufficient for securities fraud).

-17-

Plaintiffs' challenge to the Standardized and Well-Staffed Operations Statement also fails because the Offering Documents contained clear disclosures about actual and potential staffing shortages and the challenges posed by such shortages. *See, e.g.*, *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (when registration statement warns of exact risk that later materialized, "a [s]ection 11 claim will not lie as a matter of law"). In particular, the Offering Documents disclosed that "[i]n some markets, the lack of availability of clinical personnel . . . has become a significant operating issue . . . which situation has been further exacerbated by the COVID-19 pandemic." (Ex. 1, at 13.) They also identified the risk that "we may not be able to hire sufficient numbers of physicians and other clinical staff." (*Id.* at 9.) With these explicit disclosures, the alleged omission of further details about staffing shortages does not render the Standardized and Well-Staffed Operations Statement materially misleading. *See Jiajia Luo*, 465 F. Supp. 3d at 409-10 (warning about company's compliance difficulties meant "no reasonable investor could infer that [the company's] compliance efforts were particularly effective").

**Technology Statement.** Plaintiffs contend this statement was false and misleading because InnovAge allegedly admitted in May 2022 that it had not ensured that all of its medical records were documented completely. (Compl. ¶ 242(g).) Whether InnovAge perfectly documented its medical records, however, is completely unrelated to the challenged statement that InnovAge has a "technology suite [that] supports [its] ability to deliver consistent, high-quality care to [its] participants at scale," and thus does not make it false or misleading. *See, e.g.*, *In re Netflix Sec. Litig.*, 647 F. App'x 813, 815 (9th Cir. 2016) (alleged misstatement must "affirmatively create[] an impression of a state of affairs that differs in a material way from the one that actually exists"); *Gillis* v. *QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 597 (S.D.N.Y. 2016)

(no actionable misstatement where alleged fact "does not contradict [defendant's] statements").

**Expansion Model and Scalability Statements.**  The Scalability Statement that "[w]e have demonstrated an ability to scale successfully" was an accurate statement of historical fact and cannot give rise to an actionable claim.  *See McDonald* v. *Kinder–Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) ("[T]he accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future."); *Lorusso* v. *Boulder Brands, Inc.*, 2017 WL 4365180, at *13 (D. Colo. Mar. 1, 2017) (noting plaintiffs' failure to allege facts "suggesting that any of the challenged historical statements were not accurate reporting of historic successes . . . .").  Plaintiffs nonetheless allege that these statements are false and misleading in light of "admissions" in May 2022 that the Company allegedly "needed a 'transformation' to ensure that InnovAge was 'well positioned for scalable and sustainable growth,'" and that InnovAge "had not ensured the 'near-term operational execution' and 'mid-to long-term capability development' necessary to ensure the Company was 'well positioned to scalable, sustainable long-term growth . . . .'"  (Compl. ¶ 242(i), (j).)

As Plaintiffs acknowledge, however, "InnovAge transformed itself from a small, regional nonprofit into a for-profit company operating 16 centers in five states," and "InnovAge doubled its enrollment and revenue from approximately 3,155 participants and $231 million in 2016 to 6,400 participants and $567.2 million in 2020."  (*Id.* ¶ 6.)  The Scalability Statement was accurate when made, and InnovAge was under no duty to supplement it.

The statements are also not actionable because InnovAge expressly warned of its growth strategy risks.  *See Jiajia Luo*, 465 F. Supp. 3d at 453 ("When a registration statement warns of the exact risk that later materialized, a [securities] claim will not lie as a matter of law.") (citation

omitted).  InnovAge did in fact disclose that its "growth strategy presented a significant

uncertainty" (Compl. ¶ 245; *see* Ex. 1, at 8-10), and that if the Company "fail[s] to manage [its]

growth effectively, [it] may be unable to execute [its] business plan [or] maintain high levels of

service and participant satisfaction" (Ex. 1, at 10).  The Risk Factors also disclosed that

InnovAge's "growth strategy may not prove viable," and "historical and recent financial and

business results may not be representative of what they may be in the future."  (*Id.* at 8.)

**c.      Plaintiffs Do Not Identify Any Material Omissions that Render the Offering Document Statements False or Misleading.**

Plaintiffs also contend that 11 of the 12 Offering Document Statements are false and

misleading because the Company omitted to disclose that "for years before the IPO," InnovAge

allegedly provided substandard care in certain areas and expected to be subject to regulatory

audits, such that there was a heightened risk the audits would result in sanctions.  *See* Section

II.C.  (Compl. ¶ 242(a)-(e), (g)-(l).)  Those contentions fail for multiple reasons.

*First*, the challenged statements are not rendered false or misleading by the alleged

omissions because the "securities laws do not require disclosure of information that is readily

available in the public domain."  *Chipman* v. *Aspenbio Pharma, Inc.*, 2012 WL 4069353, at *5

(D. Colo. Sept. 17, 2012) (quotations omitted); *see Noble Asset Mgmt.*, 2005 WL 4161977, at *7

("[C]oncealed information must be information known to the defendants that is not otherwise

available to the investing public."); *see also Muncy* v. *InterCloud Sys., Inc.*, 92 F. Supp. 3d 621,

637 (E.D. Ky. 2015) ("Courts do not hesitate to dismiss securities fraud claims when information

a plaintiff suggests was misleading or omitted was actually publicly disclosed.").

Notably, the Amended Complaint refers to pre-IPO audit results that are public and

available to investors.  Plaintiffs acknowledge that the results of the 2017 to 2019 audits

-20-

requiring CARs and ICARs were "public records." (Compl. ¶ 150.) Specific data that Plaintiffs

tout in Paragraphs 150-151 are readily accessible too. (*See* Ex. 4.) Moreover, the Amended

Complaint draws almost all of its specific factual allegations about historical deficiencies in

California from a 2019 whistleblower complaint (the "Whistleblower Complaint") that was

public as of April 2, 2020 (Compl. ¶¶ 143-52; *see* Ex. 10) and in Colorado from the Colorado

Department of Public Health & Environment's audits that are also contemporaneously released

to the public (*id.* ¶¶ 158-61; *see* Ex. 5).

     *Second*, the Amended Complaint fails to adequately allege a nexus between the omitted

information and challenged statements. "Disclosure is required . . . only when necessary to make

statements made, in the light of the circumstances in which they were made, not misleading."

*Employees' Ret. Sys. of R.I.*, 889 F.3d at 1164 (quotations omitted). This inquiry asks whether

"the omitted fact is material to the statement in that it alters the meaning of the statement" that

was made. *McDonald*, 287 F.3d at 998. As explained in Section III.A.2.b., general statements

about InnovAge's operations are not rendered misleading by the specific audit deficiencies

because the statements do not represent or imply that the deficiencies would never occur.

     *Third*, the allegations concerning the supposedly omitted information do not satisfy the

PSLRA's heightened pleading standard. Plaintiffs cannot rely on the "factual" allegations from

their confidential witnesses or *The Capitol Forum* articles to establish that the alleged omissions

rendered the challenged statements false or misleading because the sources are not sufficiently

reliable. "[P]leading the misleading nature of a defendant's statements" through confidential

witnesses should be "based on concrete information from . . . people who were in a position to

know the truth of the allegations." *Adams* v. *Kinder-Morgan, Inc.*, 340 F.3d 1083, 1102 (10th

Cir. 2003).  Thus, "assessing the particularity of the plaintiffs' allegations entails an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  *Sorkin, LLC* v. *Fischer Imaging Corp.*, 2005 WL 1459735, at *6 (D. Colo. June 21, 2005) (quotations omitted).

The Amended Complaint relies on six confidential former employees, at least five of whom were not employed during the Class Period (all but FE-4), and one whose dates of employment are not even alleged at all (FE-4).  (Compl. ¶¶ 66-71.)  These facts alone render the confidential witnesses unreliable.  *See Lewis* v. *YRC Worldwide Inc.*, 2020 WL 1493915, at *7 (N.D.N.Y. Mar. 27, 2020) (confidential witnesses employed before purported class period cannot support allegation scheme took place during period).

In addition, FE-1, FE-2, FE-3, FE-4, and FE-6 are low-level employees and/or locally sited to either California or Colorado facilities and therefore lack sufficient knowledge to support broad allegations of "widespread and systemic deficiencies and substandard quality of care" across InnovAge's 16 centers in five states.  (Compl. ¶¶ 6, 66, 68, 69, 71, 142.)  FE-5 and FE-6 also cannot be relied upon because Plaintiffs fail to allege their responsibilities with any particularity or to detail the kind of information to which they had access.  (*Id.* ¶¶ 70-71.)

For the same reasons, Plaintiffs cannot rely on confidential current or former employee statements in *The Capitol Forum* articles quoted in the Amended Complaint.  "[A]rticles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (quotations omitted).  Here, *The Capitol Forum* articles contain

nothing more than generalized undetailed hearsay from anonymous sources.  (*See, e.g.*, Compl. ¶ 117 (quotes from "former enrollment employee"); ¶¶ 120, 192, 203 (quotes from "current InnovAge employee[s]"); ¶ 184 (quote from "operators of assisted living homes"); ¶ 203 (quote from "former employees in human resources").)  The allegations lack sufficient particularity to assess the witnesses' bases of knowledge, access to information, reliability, or even the time period about which they are talking—let alone how they support the allegation that the challenged statements were false or misleading at the time they were made.

### 3.    Plaintiffs Fail to Plead Any Actionable Post-Offering Statements.

The Amended Complaint challenges 12 statements made after InnovAge's IPO under the Exchange Act (*id.* ¶¶ 246-260 (the "Post-Offering Statements")).  (*See* Appx. A, at A3-A5.) These statements concern drivers of InnovAge's growth, its ability to address staffing shortages, and ongoing audits, and are either immaterial or not adequately alleged to be false or misleading.

### a.    General Statements Concerning Staff Turnover Rates and Are Not Actionable.

At least one of the 12 Post-Offering Statements is a nonactionable, "general statement[] of corporate optimism." *Grossman*, 120 F.3d at 1119; *see* Section III.A.2.a.  In particular, InnovAge's statement that it "has done an excellent job of really ensuring that we've kept our [staff] turnover rates down" and has been "very successful as compared to other long-term care organizational results" (Compl. ¶ 248(b)) is nonactionable because "it is a simple and generic assertion about the success of the [team] and not a description of [its] work in confident detail." *In re Liberty Tax Sec. Litig.*, 435 F. Supp. 3d 457, 468 (E.D.N.Y. 2020) (quotations omitted).

> **b.** **The Post-Offering Statements Were Not False or Misleading When Made.**

Eleven of the 12 Post-Offering Statements are not actionable because Plaintiffs fail to adequately allege that they were false or misleading when made.

**Statements Concerning Organic Growth.**  Plaintiffs allege three statements concerning organic growth (Compl. ¶¶ 246, 248(a), 252) were false and misleading because the growth "exacerbated systemic deficiencies and unmet healthcare needs" and was not "organic" because it included enrollment of participants without stable housing and regulators had begun or were set to begin audits that would later limit InnovAge's ability to expand, and Hewitt allegedly refused requests to increase staffing (*id.* ¶¶ 247, 249(a), 253).  These statements are not rendered false or misleading by any of these alleged facts because there is no connection between what was said and the allegedly true facts.  *See Netflix*, 647 F. App'x at 815.  Further, the disclosure of accurate historic growth figures, or other statements about historical results, do not create a duty to disclose other less favorable facts.  *See McDonald*, 287 F.3d at 998.

The alleged enrollment of participants in temporary housing likewise does not render the statements false or misleading.  The statements accurately disclose that InnovAge's growth was due to participant enrollments.  And although the Amended Complaint alleges that an unidentified employee stated that InnovAge used to have a rule that participants needed to have stable housing (Compl. ¶¶ 120-21), such participants are not necessarily ineligible under PACE regulations.  The Amended Complaint cites 42 C.F.R. § 460.150(c)(1) (¶¶ 82, 120), which requires individuals to "be able to live in a community setting,"—*i.e.*, not a nursing or hospital facility.  The cited regulations say nothing about participants living in temporary housing.  Even assuming they were ineligible, Plaintiffs fail to allege that a sufficient number of them were

enrolled to make the organic growth statements false or misleading.  *Cf., e.g.*, *Crocs*, 774 F. Supp. 2d at 1144 (allegation that company had "large quantities" of unsaleable inventory did not make statement that it had "high volume" of high-quality inventory false or misleading because complaint did not allege "large quantities" amounted to a material percentage of inventory).

Finally, InnovAge had already repeatedly disclosed that its growth strategy and the success of its business model were uncertain.  *See* Sections II.B., III.A.2.b.[13]

**Staffing Statements.**  Plaintiffs allege four statements about InnovAge coping with staffing shortages (Compl. ¶¶ 248(b), 250(b), 254(a), 259(a)) are false and misleading because InnovAge "failed to ensure proper staffing levels," had "dangerously low" clinical staff, "acknowledged internally that some of its centers were understaffed and that many participants lacked PCPs," and denied requests to add additional staff (*id.* ¶¶ 249(b), 251(b), 255(a), 260(a)).

InnovAge repeatedly disclosed the fact of staffing shortages in the Offering Documents and subsequent public filings.  (*See* Sections II.B., III.A.2.b.; *see, e.g.*, Ex. 7, at 4.)  Considering these disclosures, no reasonable investor could interpret the Company's statements about its efforts to ensure adequate staffing levels as a guarantee that it was succeeding.  *See Jiajia Luo*, 465 F. Supp. 3d at 409-10.  This is also true of the statement that InnovAge was "fully staffed" (Compl. ¶ 250(b)), which was made in the context of discussing expenses relating to the COVID-19 pandemic, and was simply clarifying that InnovAge had not laid off staff as a result of COVID-19, and its staffing expenses had thus not been reduced.  The same is true of the

---

[13]    The Court should not credit the allegation that Hewitt "refused requests to increase the 'capacity within existing centers,'" as the Amended Complaint does not allege the source of the allegation.  (Compl. ¶ 249(a).)

statement that the Company has "been able to supplement with temporary labor in order to maintain appropriate staffing levels" (*id.* ¶ 259(a)), which described efforts the Company had undertaken to address staffing shortfalls, and was not a guarantee they would succeed.[14]

Further, Hewitt's staffing statement about keeping turnover rates down—which Plaintiffs misquote (*id.* ¶ 248(b))—was an expression of opinion:  "I think InnovAge has done an excellent job of really ensuring that we've kept our turnover rates down."  (Ex. 18, at 11.)  The Amended Complaint does not allege that Hewitt did not genuinely hold this belief.  *See Hampton* v. *root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018) (statements of opinion "are *not* material misstatements *unless* they inaccurately represent the speakers' beliefs concerning then-present factual conditions.") (quotations omitted) (emphasis in original).

Finally, the Amended Complaint fails to adequately allege the statement that InnovAge has been "very successful as compared to other long-term care organizational [turnover] results" is false.  The Amended Complaint contains no allegation about the turnover rates of "other long-term care organization[s]," and thus no allegation that the statement is false.  (Compl. ¶ 248(b).)

**Deficient Participant Assessments and Care Plans Statement.**  The Amended Complaint alleges that the May 2021 statement that InnovAge "[r]ecently . . . became aware that certain of [its] centers failed to timely complete a portion of these new participant assessments and care plans," and that InnovAge is "working diligently to remedy this issue," is false and misleading because InnovAge failed to disclose certain historical audit deficiencies, and because "regulators had begun or were expected to soon begin audits."  (*Id.* ¶¶ 250(c), 251(c).)  As

---

[14]     Hewitt's qualification of this statement—"[i]mportantly, our guidance for fiscal year 2022 reflects our expectation that the labor market continues to remain tight"—further underscores that it cannot be read as a guarantee that the issues were resolved.  (Ex. 11, at 6.)

explained in Sections II.B. and III.A.2.b., c., InnovAge's historical audit deficiencies and the potential for future audits were disclosed in the Offering Documents and were public knowledge.

**Maintaining and Growing Relationships with Government Payors Statement.**  The Amended Complaint alleges the statements "[m]aintaining, supporting and growing these relationships [with government payors] . . . is critical to our long-term success" and "[o]ur model is aligned with the interests of our government payors" are false and misleading because InnovAge "'failed to recognize and process complaints as grievances.'"  (*Id.* ¶¶ 250(d), 251(d).)  But the alleged failure to process grievances has nothing to do with the subject of the statements—InnovAge's views on the importance of its relationships with Medicare and Medicaid and the alignment of interests—and therefore does not render the statements false or misleading.  *See, e.g.*, *Netflix*, 647 F. App'x at 815; *Gillis*, 197 F. Supp. 3d at 597.

**September Audit Statement.**  Plaintiffs challenge various statements concerning ongoing audits made by Hewitt during a September 21, 2021 earnings call, including that "audits are a regular occurrence in our industry," that "there have been no immediate corrective actions identified in the preliminary findings" of the Colorado audits, and the suggestion that the Colorado audits were different from the Sacramento audit, where enrollment had just been suspended.  (Compl. ¶¶ 210, 254(b), 255(b).)  The Amended Complaint alleges these statements are false and misleading because the preliminary findings identified similar deficiencies, internal sources suggested they may have been similar, and CMS's audit policies allegedly show the Colorado audits were more serious than Hewitt suggested.  (*Id.* ¶ 255(b).)

*First*, Plaintiffs cannot rely on the allegation that "management 'also told staff that CMS had found similar issues in a separate audit of some of InnovAge's operations in California,'"

because *The Capitol Forum* article on which Plaintiffs rely does not sufficiently identify the purported speaker.  *See Adams*, 340 F.3d at 1102.

 *Second*, Plaintiffs do not allege any fact to demonstrate that the statement concerning audits—"given the nature of our business and the participants we serve, audits are a regular occurrence in our industry"—is false or misleading.  (Ex. 19, at 8.)[15]  The Amended Complaint does not allege that audits are not "a regular occurrence," and in fact alleges the opposite:  that PACE providers are subject to routine audits.  (Compl. ¶ 91.)  Moreover, InnovAge was under no obligation to disclose that "CMS had suspended most trial period and routine audits" due to the pandemic (*id.* ¶ 255(b)) because CMS's policy was publicly available.  *See In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 553-54 (S.D.N.Y. 2005) (company not required to disclose public information "or [that] which constitutes generally applicable laws and regulations."); *Noble Asset Mgmt.*, 2005 WL 4161977, at *7.

 *Third*, the allegation that there were preliminary findings similar to the Sacramento audit does not render the statement that there had been "no immediate corrective actions identified" false or misleading.  *Fourth*, even assuming the Amended Complaint adequately alleges the preliminary findings identified the same deficiencies, InnovAge was under no obligation to disclose findings that were preliminary and subject to change.  *See Singh* v. *Cigna Corp.*, 277 F. Supp. 3d 291, 311 (D. Conn. 2017), *aff'd*, 918 F.3d 57 (2d Cir. 2019) ("[A] company need not disclose all communications with a regulator even where the regulator has notified the company about its operation's deficiencies . . . .") (quotations omitted).

---

[15] Plaintiffs selectively quote from this statement to imply that the statement itself related to the specific audits that were later discussed.  As the complete statement demonstrates, it did not.

*Finally*, the Amended Complaint fails to adequately allege Hewitt's suggestion that the Colorado and Sacramento audits were "different" is untrue.  Hewitt pointed out numerous differences between the audits, none of which Plaintiffs challenge as untrue, including that (1) the Sacramento audit began as a routine audit, whereas in Colorado, there were "three surveys going on"; (2) the Colorado audits were related to a complaint; and (3) Sacramento was "a startup" facility with a "census [that] is much lower," whereas Colorado was more well established and had a much higher census.  (Ex. 19, at 20-21.)  In addition, Hewitt's statements must be assessed together with her admonition in the same earnings call that "we can't give you any guidance around Colorado at this time."  (*Id.* at 14.)

**November Audit Statements.**  The Amended Complaint alleges the statement that "[i]t's not unusual for [CMS] to utilize the [enforcement] departments within their agency to review matters" is false and misleading because CMS's public Audit Guide indicates that, in certain cases, the audit conditions are referred to the enforcement group to determine if an enforcement action is warranted.[16]  (Ex. 11, at 21; Compl. ¶¶ 259(c), 260(c).)  Plaintiffs' own allegations demonstrate the statement is true:  the Amended Complaint acknowledges that the Oversight and Enforcement Group "'oversees, coordinates and conducts the audits of all PACE organizations.'"  (Compl. ¶ 260(c).)  Further, Hewitt's statement must be read in full; namely, that it is "not an uncommon practice per se."  (Ex. 11, at 21.)  Plaintiffs also ignore that Hewitt did disclose that

---

[16]     Plaintiffs misquote the statement, which reads:  "CMS has the ability to refer issues or surveys to [the compliance and enforcement division] . . . .  It's not unusual for [CMS] to utilize the departments within their agency to review matters.  So that's not an uncommon practice per se . . . there's been no information as far as the agencies are intending to suspend or otherwise curtail our programs or impose other sanctions. We just don't know at this point." (Ex. 11, at 21.)

the referral was "for review and possible further action."  (*Id.* at 8.)  Finally, the Audit Guide describing the potential significance of a referral to enforcement is publicly available.  (Compl. ¶ 260(c).)  InnovAge thus had no obligation to disclose. *See Progress*, 371 F. Supp. 2d at 553-54.

The statement "Colorado is a little bit different than Sacramento" is also not actionable. (Compl. ¶ 259(c).)  The statement reads in full:  "I do think Colorado is a little bit different than Sacramento, and I'm going to ask [Chief Medical Officer Welch] to touch base on that."  (Ex. 11, at 21.)  Welch then stated:  "We have no indication of what the agency is going to do.  And we're going to continue to collaborate with them and provide any information that they ask us." (*Id.* at 22.)  Even assuming this can be read as Hewitt actually asserting an articulable belief, Hewitt was expressing her opinion when making this statement, which the Amended Complaint fails to allege was not genuinely held.  *See Hampton*, 897 F.3d at 1299.

**New Mexico Audit.**  The Amended Complaint alleges the statement that InnovAge would "begin a routine audit in New Mexico that will be handled remotely" was false because the audit allegedly had "'already been going on for several weeks'" when the statement was made.  (Compl. ¶¶ 259(b), 260(b).)[17]  It does not explain why the precise time the audit began is material, nor does it allege the disclosure of the audit's nature was inaccurate.  Since the duration of any audit is not fixed, there is no reason the precise time it begins would be material.

c.     **Plaintiffs Do Not Identify Any Material Omissions that Render the Post-Offering Statements False or Misleading.**

The Amended Complaint alleges the same basic information allegedly omitted from the

---

[17]     The Amended Complaint also appears to challenge the statement "[f]or context, there were less than 200 participants in our Sacramento center as of the beginning of this month" in the same paragraph (*id.* ¶ 259(b)), but Plaintiffs fail to allege why this statement is false or misleading, instead copying and pasting the irrelevant allegations from ¶ 255(b) into ¶ 260(b).

Offering Documents was also omitted by the Officer Defendants and InnovAge from the Post-Offering Statements.  These arguments fail for the same reasons as explained in Section III.A.2.c., but are even weaker with respect to the Post-Offering Statements because the Whistleblower Complaint and many of *The Capitol Forum* articles on which Plaintiffs rely (*e.g.*, Exs. 12-17) were published before the Post-Offering Statements were made.  For example, the Amended Complaint relies on a May 10, 2021 *The Capitol Forum* article to allege that "at some of InnovAge's centers the number of clinical staff was 'dangerously low.'"  All of the staffing statements were made on or after the date this article was published.  Thus, the allegedly omitted facts were already part of the "total mix of information."[18]  *United Food & Com. Workers Union Loc. 880 Pension Fund* v. *Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014).

> **d.** **Challenges to the Same Offering Statements and/or the SOX Certifications Related Thereto Must Fail.**

Plaintiffs challenge for identical reasons certain of the same Offering Document Statements in the 3Q21 Form 10-Q (Compl. ¶ 251(a)), 2021 Form 10-K (*id.* ¶ 257(a)), and 1Q22 Form 10-Q (*id.* ¶ 261(a)); and challenge for identical reasons the same Deficient Participant Assessments and Care Plans Statement from the 3Q21 Form 10-Q and the 2021 Form 10-K (*id.* ¶ 257(a)).  These challenged statements are inactionable for the reasons set forth above.  Further, Plaintiffs' challenges to the Sarbanes-Oxley certifications in certain SEC filings (*id.* ¶¶ 251(e), 257(b), 261(b)) must necessarily fail because Plaintiffs have failed to allege with sufficient particularity that any statements in those documents were false or misleading.

---

[18]     Plaintiffs do not allege all of the dates *The Capitol Forum* articles were published.  At minimum, the Amended Complaint relies on articles published in March, April 23, May 10, May 27, July 15, August 26, September 22, and November 11, 2021.  The Post-Offering Statements were made on May 10 and 11, September 21 and 22, and November 9 and 10, 2021.

### 4.    The Offering Documents Complied with Items 105 and 303.

Plaintiffs' allegation that the Offering Documents failed to disclose information required by Items 105 and 303 of Regulation S-K is likewise deficient.  (Compl. ¶ 244.)  Item 105 required the Offering Documents to include "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a).  Item 105 "creates liability where the registrant knew, as of the time of the offering, that (1) a risk factor existed; (2) the risk factor could adversely affect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor."  *Houser* v. *CenturyLink, Inc.*, 513 P.3d 395, 401 (Colo. Ct. App. 2022) (quotations omitted).  Item 303 required that the Offering Documents "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  This "duty to disclose arises 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'"  *Slater*, 719 F.3d at 1197 (citation omitted).

Plaintiffs allege the Offering Documents "failed to disclose that [InnovAge's] enrollment growth strategy presented a significant uncertainty, and made investment in InnovAge risky, given that the strategy had resulted in widespread deficiencies in quality of care and created a known uncertainty and risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue."  (Compl. ¶ 245.)  To the contrary, the Offering Documents were replete with disclosures that precisely addressed this risk.

*First*, the Offering Documents expressly disclose the possibility that InnovAge's "growth

strategy presented a significant uncertainty." (*Id.*)  InnovAge identified as a Risk Factor that "[i]f we fail to manage our growth effectively, we may be unable to execute our business plan, maintain high levels of service and participant satisfaction or adequately address competitive challenges." (Ex. 1, at 10.)  The disclosure explained that "[w]e have experienced, and may continue to experience, rapid growth and organizational change, which has placed, and may continue to place, significant demands on our management and our operational and financial resources." (*Id.*)  The disclosure then explained that "[i]f we fail to effectively manage our anticipated growth and change or fail to ensure that the level of care and services provided by our employees complies with regulatory and contractual requirements, the quality of our services may suffer." (*Id.*)  The Risk Factors also contained sections disclosing that InnovAge's "growth strategy may not prove viable," and that its "historical and recent financial and business results may not be representative of what they may be in the future." (*Id.* at 8.)

*Second*, the Risk Factors contained a detailed discussion of InnovAge's "[r]isks related to regulation." (*Id.* at 14-21.)  It explained that "federal and state manuals, guidance, coverage policies, and PACE contracts also impose complex and extensive requirements upon our operations" (*id.* at 16), and InnovAge "face[s] inspections, reviews, audits and investigations . . . " (*id.* at 20).  At two points in this section alone, the Offering Documents listed the possible consequences if InnovAge failed to comply with PACE regulations, including "enrollment sanctions that may impede [its] ability to expand." (*Id.* at 21; *see id.* at 16-17, 24.)

*Third*, the Risk Factors repeatedly disclosed the existing and potential staffing challenges with which the Amended Complaint takes issue.  (*See* Section III.A.2.b., 3.b.; Ex. 1, at 8-10.)

*Finally,* while the allegedly omitted information was plainly disclosed, even were this not

the case, Plaintiffs' claims would still fail because, as explained next, the Amended Complaint fails to allege any such omission was knowing.

> **5.      Plaintiffs Fail to Adequately Plead Scienter.**

To plead scienter, a plaintiff must, as to each defendant and as to each challenged statement, "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The Supreme Court has defined scienter in the context of Section 10(b) as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To satisfy the scienter requirement, the Tenth Circuit has held that a plaintiff must plead that defendants "(1) acted in an extreme departure from the standards of ordinary care and (2) presented a danger of misleading buyers or sellers that was known to the defendants or so obvious that the defendants must have been aware of the danger." *Anderson* v. *Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016) (quotations omitted). In addition, the inference of scienter cannot be "merely 'reasonable' or 'permissible,'" but rather "must be cogent and compelling," such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).

> **a.      InnovAge's Announcement of Improvements to Its Platform Made Months After the Challenged Statements Does Not Support an Inference of Scienter.**

Plaintiffs contend that InnovAge's announcement in May 2022 that "audit results ha[d] found gaps in [the Company's] performance when compared against regulatory and [its] own expectations," and that InnovAge was therefore making enhancements to its platform gives rise

to a strong inference of scienter.  (Compl. ¶¶ 267-68.)  The fact of discovering and

acknowledging deficiencies, however, does not give rise to a strong inference of scienter.

*See In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015) ("[T]he implementation of

the [new] policy . . . [is] at most an acknowledgment that the company identified a better way of

doing things moving forward, not an indicator that fraudulent intent existed at the time the

alleged omissions occurred."); *Sorkin*, 2005 WL 1459735, at *8 ("[T]he Company's

acknowledgment of past accounting errors is not an admission of a scheme to defraud the

investing public," and "[m]anagement's adoption of a [new practice] does not show that

management's prior choices were fraudulent or reckless."); *Rumbaugh* v. *USANA Health Scis.,*

*Inc.*, 2018 WL 5044240, at *9 (D. Utah Oct. 17, 2018) ("Disclosures made after the class period

are not sufficient to show that a defendant knew facts during the class period.  Similarly, a

company's acknowledgment of a problem does not support an inference of scienter.  Nor is an

inference of scienter supported by self-remediation.") (citations omitted).

> **b.    The Corporate Positions of Hewitt and Gutierrez and Their
> Purported Access to Internal Reports Does Not Establish Scienter.**

Plaintiffs have not pled with particularity facts that constitute strong circumstantial

evidence that either Hewitt or Gutierrez had knowledge of, or recklessly disregarded, any of the

alleged facts that purportedly rendered their public statements false or misleading at the time

they were made.  Instead, Plaintiffs improperly argue that Hewitt and Gutierrez must have

known about, or been deliberately reckless in failing to detect, the issues with regulatory

compliance, staffing, and the provision of care described in the Amended Complaint simply by

virtue of their positions.  (Compl. ¶¶ 273-75.)  These are precisely the kind of non-particularized

allegations that courts routinely reject.  *See, e.g.*, *Smallen* v. *The W. Union Co.*, 950 F.3d 1297,

1310 (10th Cir. 2020) ("While [the regulatory agreement and complaint] highlight the wrongdoing of [the company's] agents and indicate some of the company's executives knew about ongoing violations, neither document provides particularized facts tying the Individual Defendants to these violations or otherwise showing they were aware of ongoing illegality and widespread disciplinary failures during the Class Period."); *Anderson*, 827 F.3d at 1245 (courts "cannot infer scienter based only on a defendant's position in a company or involvement with a particular project").

Nor do the purported statements by confidential witnesses support an inference of scienter.  Plaintiffs cite FE-3's assertion that an internal audit in 2016 (five years before the IPO) "revealed deficiencies" at InnovAge, and that "InnovAge's executives had repeatedly been made aware of the shortfall in providing services."  (Compl ¶¶ 144, 147, 276.)  But "these [descriptions of reports by confidential witnesses] do not contribute to a cogent and compelling inference of scienter" because "[t]he witness accounts do not adequately describe the contents of the . . . reports allegedly sent to" Hewitt or Gutierrez.  *Anderson*, 827 F.3d at 1240.  In any event, deficiencies in 2016 or 2017 do not show statements made in 2021 were knowingly false or misleading when made.  *See id.* at 1239-40 (meeting months before the class period began indicating production delays did not establish defendants "knew during the class period that their progress reports were inaccurate"); *Wolfe* v. *Aspenbio Pharma, Inc*., 587 F. App'x 493, 498 (10th Cir. 2014) (remark made a year-and-a-half before first challenged statement "provide[d] us with no basis for inferring that the[] problems [discussed] continued eighteen months later").

The allegation that FE-1, a low-level worker employed for five months, "sent [a 2019] email notifying executives that InnovAge's practices were leading to high employee turnover

and poor patient outcomes" (Compl. ¶¶ 66, 154, 276), also does not support an inference that

Hewitt and Gutierrez were on notice of alleged systemic failures in providing care years later,

particularly since the email was sent after FE-1 resigned.  *Cf. Sorkin*, 2005 WL 1459735, at *6.

The testimony of FE-2—who did not report to Hewitt or Gutierrez—that CMO Melissa

Welch "knew the number of outstanding orders" and VP of Clinical Operations Michelle

Blanton "knew that labs were being missed, orders were not being followed up on, and patients

were not getting the specialty care" (Compl. ¶¶ 66, 164-67, 276) does not establish that any of

this alleged information was ever passed on to Hewitt or Gutierrez.  *See Smallen*, 950 F.3d at

1308 n.6 (dismissing confidential witness reports where there were "no allegations [the

witnesses] directly reported to any of the Individual Defendants . . . much less informed them

[that the company's] compliance systems were failing").  In addition, FE-2's description of a

November 2020 call with doctors and nurse practitioners, allegedly attended by Hewitt, lacks

sufficient particularity to support a strong inference of scienter, as "mere attendance at meetings

does not contribute to an inference of scienter."  *Id.* at 1307.  The Amended Complaint does not

allege FE-2 even attended this call, or describe what was discussed during it, except that "CMO

Welch . . . said nothing about being aware or in support of [medical staff's] concerns," and

Hewitt "denied ever being aware of the issues."  (Compl. ¶¶ 167, 276.)

Finally, the allegation that "Maria Zamora, a former Regional Executive for California,

repeatedly asked Defendant Hewitt if InnovAge could 'pause enrollment for a few months to

allow us to build a better network'" (*id.* ¶¶ 147, 276), does not support an inference of scienter

because the Amended Complaint does not (1) allege when these requests were made (*see*

*Anderson*, 827 F.3d at 1245 (rejecting witness account where complaint "does not say when the

-37-

confrontation . . . took place")); or (2) explain what was conveyed to support this request (*Rumbaugh*, 2018 WL 5044240, at *8 ("In the few instances in which a [confidential witness] alleged some connection to an individual defendant, [they] nonetheless failed to provide a sufficiently particularized account of what the defendants must have known.")).  As alleged, it is not even clear that Zamora offered a reason that InnovAge might need a "better network."  *Cf. Tellabs*, 551 U.S. at 326 ("omissions and ambiguities count against inferring scienter").

### c.   Hewitt's and Welch's Departures from InnovAge Do Not Support a Strong Inference of Scienter.

Similarly, the fact that Hewitt and Welch left InnovAge following the suspension of enrollment at InnovAge's Colorado facilities (Compl. ¶ 278) does not support a strong inference of scienter.  Executive departures will not support an inference of scienter "unless the plaintiff alleges that the resignations were 'numerous,' 'uncharacteristic' . . . or were accompanied by 'suspicious circumstances.'"  *Rumbaugh*, 2018 WL 5044240, at *9 (citation omitted).  Absent such allegations, "an inference of scienter will never be as compelling as the inference that the resignation was due to unrelated personal or business reasons."  *Id.* (quotations omitted).  The Amended Complaint relies solely on the temporal proximity of these departures to the suspension of enrollment to suggest they were suspicious, which is insufficient to support an inference of fraud.  *See, e.g.*, *id.* (allegation that executive "abruptly resigned" insufficient to support inference of scienter); *In re Molson Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *11 (D. Colo. Dec. 2, 2020) ("Absent factual allegations connecting [a departure] to the alleged fraud, [the] departure at best gives rise to only a weak inference of scienter.").

-38-

### d. The Absence of Alleged Motive Undercuts Plaintiffs' Attempt to Allege a "Strong Inference" of Scienter.

Failing to plead any plausible motive to commit fraud "counts against [an inference] of scienter." *Level 3*, 667 F.3d at 1346.  Plaintiffs contend that Hewitt and Gutierrez were "highly motivated to inflate the Company's share price and maintain the illusion of an exponentially growing company to enrich themselves," citing transaction bonuses and cash awards Hewitt and Gutierrez allegedly received.  (Compl. ¶ 279.)  This is chronologically flawed.  Plaintiffs' allegation that Hewitt and Gutierrez were paid approximately $35 million and $7.5 million in cash, respectively, in connection with option cancellations in 2020—well before the IPO—does not demonstrate a motive to inflate the Company's share price a year later, when the challenged statements were made.[19]  To the extent Hewitt and Gutierrez received additional compensation in 2021, the Amended Complaint does not allege it was anything other than the "type of incentive-based compensation . . . [that] does not ordinarily indicate scienter." *Level 3*, 667 F.3d at 1346.

The Amended Complaint also argues Hewitt and Gutierrez had an incentive to emphasize InnovAge's historical success because "InnovAge's 'track record of profitable growth' [was] critical to analysts and investors who sought to value the Company."  (Compl. ¶¶ 269-72.)  But this incentive does not show any motive for personal financial gain, and "general motives for management to further the interests of the corporation fail to raise an inference of scienter." *Level 3*, 667 F.3d at 1346 (corporate officers' incentive to improve company "is not, absent unusual circumstances, a motive to commit fraud.") (citation omitted).[20]

---

[19]   All but two months and four days of Hewitt's and Gutierrez's compensation during the two-year period covered by Paragraph 279's chart was earned *pre*-IPO while InnovAge was a private company, rendering their alleged motive to inflate the stock price implausible.

[20]   In any event, this allegation does not support a strong inference of scienter because the

e.       **The Audit Findings Do Not Support an Inference of Scienter.**

Finally, Plaintiffs allege that unspecified "Defendants" "repeatedly omitted key information about the ongoing audits" and "repeatedly mischaracterized the nature and severity of the audits."  (Compl. ¶ 277.)[21]  The Amended Complaint fails to allege any such omission was knowing or reckless.[22]  The generic suggestion that "Defendants" mischaracterized "the nature and severity of the audits" (*id.* ¶ 277) at most shows that InnovAge was "overly optimistic and failed to give adequate weight to financial red flags," which is not sufficient to establish scienter. *Anderson*, 827 F.3d at 1238 (finding scienter allegations inadequate where "the plaintiffs suppl[ied] little reason to suspect malevolence rather than benign optimism").[23]

B.       **The Securities Act Claims Should be Dismissed Because Plaintiffs Cannot Identify False or Misleading Material Statements or Omissions.[24]**

"There can be no liability under section 11 or 12(a)(2) of the Securities Act unless the plaintiff can identify, within the four corners of the offering documents, some false or misleading

---

Company made only three Post-Offering Statements related to growth (Compl. ¶¶ 246, 248(a), 252), and each was accompanied by substantial risk disclosures (*see* Sections II.B., III.A.2.b.).

[21]    The paragraph that follows ¶ 277 is numbered 156.  Defendants assume this is a mistake and cite to ¶ 277 when referring to either.

[22]    The scienter allegations appear to suggest InnovAge omitted that Colorado "generates 50% of the Company's revenue" (Compl. ¶ 277), when in fact the Offering Documents contained a risk disclosure specific to this issue.  (*See* Ex. 1, at 9 ("We conduct a significant percentage of our operations in the State of Colorado . . . . For the fiscal year ended June 30, 2020, 29.4% of our total revenues were derived from contracts with government agencies in the State of Colorado.").)  It is not clear from where the Amended Complaint derived its 50% figure, but the Amended Complaint does not allege the revenue figures InnovAge reported are inaccurate.

[23]    Similarly, the implication that Hewitt acted with scienter because she made "misleading statements" about the audits is circular and attempts to conflate falsity with scienter.

[24]    Plaintiffs allege claims under Securities Act § 11 against InnovAge and the Securities Act Individual Defendants, and under § 12(a)(2) against InnovAge.  (Compl. ¶¶ 349-69.)

material statement or omission." *In re Thornburg Mort., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1249 (D.N.M. 2010). It is not enough for the statement or omission to merely be false; it must also be material, *i.e.*, "a reasonable person would consider it important in determining whether to buy or sell securities." *Id.* at 1250 (quotations omitted).

Moreover, although the Tenth Circuit has not ruled on the applicability of Rule 9(b) to Securities Act claims that sound in fraud, a court in this Circuit recently adopted the analysis of other Courts of Appeals and applied Rule 9(b)'s heightened pleading standard to Securities Act claims that sound in fraud. *Indiana Pub. Ret. Sys.* v. *Pluralsight, Inc.*, 2021 WL 1222290, at *5 (D. Utah Mar. 31, 2021);[25] *see also Rubke* v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009). A complaint sounds in fraud where it "employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act." *Rubke*, 551 F.3d at 1161; *see Pluralsight*, 2021 WL 1222290, at *5 (same).

That is true here: the Securities Act claims are based on the same 12 Offering Document Statements and the same falsity allegations as the Exchange Act claims. (*Compare* Compl. ¶¶ 241-42 (explaining why statements were false and misleading under Exchange Act), *with id.* ¶¶ 327-28 (making substantively identical allegations about Securities Act claims).) Plaintiffs thus must "state with particularity the circumstances constituting fraud."[26] Fed. R. Civ. P. 9(b).

---

[25]   On appeal, the Tenth Circuit declined to address the question whether Rule 9(b) applied to Plaintiffs' Sections 11 and 12(a)(2) claims because the parties did not adequately brief the issue. *Pluralsight*, ---F.4th---, 2022 WL 3591140, at *26 n.18.

[26]   The Amended Complaint's "disclaim[er]" of "any allegations of fraud or intentional misconduct in connection with" the Securities Act claims (Compl. ¶ 322) does not change this conclusion (*see, e.g., Jiajia Luo*, 465 F. Supp. 3d at 408 n.7 ("Plaintiffs cannot avoid Rule 9(b) with their generic disclaimer of 'any allegation of fraud, recklessness or intentional misconduct.'"); *see also Pluralsight*, 2021 WL 1222290, at *5).

-41-

Plaintiffs' claims regarding the 12 Offering Document Statements under the Securities Act fail for the same reason they fail under Section 10(b):  the Offering Document Statements are either too vague to be material, or are not false or misleading.  (*See* Section III.A.2.)  The heightened pleading standard is not necessary for that result, but it cements the outcome.

### C.   The Amended Complaint Fails to Establish Control Person Liability.

The Amended Complaint asserts claims under Exchange Act § 20(a) against the Officer Defendants and Defendants WCAS and Apax, and Securities Act § 15 against the Securities Act Individual Defendants and Defendants WCAS and Apax.  (Compl. ¶¶ 313-20, 370-81.)  "[T]he control person provisions of § 15 and § 20(a) are interpreted the same."  *Maher* v. *Durango Metals, Inc*., 144 F.3d 1302, 1305 n.7 (10th Cir. 1998).  Under either provision, "to state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  *Id*.  At the outset, both sets of claims fail because, per above, Plaintiffs have not pled a primary violation of either the Securities Act or the Exchange Act.  *See United Food*, 774 F.3d at 1233.

Even if Plaintiffs had alleged a primary violation, they failed to allege particular facts establishing that the Director Defendants, WCAS, or Apax exercised actual control over any alleged primary violator.  Plaintiffs must allege facts indicating the defendant had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *Maher*, 144 F.3d at 1305-06 (quotations omitted).  The Amended Complaint points to no such facts.

### 1.   Director Defendants.

Plaintiffs allege that the Director Defendants were involved in the everyday business of

the Company, but do not allege a single fact to support this conclusory allegation other than

citing their positions, post-public offering, as directors of InnovAge. (*E.g.*, Compl. ¶¶ 36-44

(alleging directors "exercised substantial control over the operations of InnovAge" "by virtue of

[their] position[s]").) Membership on the board of directors does not make one a "control

person." *See Adams*, 340 F.3d at 1008. Plaintiffs must also show "that the person individually

exerted control or influence over the day-to-day operations of the company." *Id.* ("[S]imply

[being] a member of the board of directors" "does not suffice to support an allegation that the

person is a control person" without allegations of control over day-to-day operations).

Plaintiffs come nowhere close to meeting this standard. Here, the Complaint offers only

one allegation to support the notion that the directors did more to exercise control than hold their

positions:  allegedly, certain Director Defendants signed the Offering Documents. (Compl. ¶¶ 1,

347, 372.) However, that allegation has been routinely rejected as a basis for control person

liability. *See, e.g.*, *Medina* v. *Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1134 (D. Colo. 2017)

(director's "power to sign or not sign the relevant registration statement" not enough to meet

control person standard). Moreover, the allegation is erroneous:  as is readily apparent, none of

the Director Defendants signed the Offering Documents. (*See* Ex. 1, at 34.)

### 2.     WCAS and Apax.

Likewise, Plaintiffs have not alleged sufficient facts showing WCAS's or Apax's

"control" under Section 20(a) or Section 15. To begin, Plaintiffs' ownership allegations[27]

---

[27]     The Amended Complaint notes, "WCAS and Apax beneficially own approximately 86% of InnovAge's common stock" and "'together control the vote of all matters submitted to a vote of our shareholders, which enables them to control the election of the members of the Board and all other corporate decisions.'" (Compl. ¶ 378.) The Amended Complaint also alleges "Apax entered into an agreement with WCAS to acquire a 49% stake in InnovAge. In connection with

contradict the Offering Documents.  Apax and WCAS are not shareholders of the Company.

The July 2020 agreement to acquire a stake in the company was entered into by Ignite

Aggregator LP, not Defendant Apax.  Ignite GP, Inc., not Defendant Apax, serves as the general

partner of Ignite Aggregator LP.  None of Ignite Aggregator LP's partnership interests are held

by Defendant Apax.  (*See* Ex. 1, at 28 n.1; 31.)  Similarly, the Registration Statement identifies

the "WCAS Investor" as a collective of entities that does not include WCAS.  Moreover, the

section of the Registration Statement titled "Principal Shareholders" explains that a majority of

InnovAge stock is owned by TCO Group Holdings, L.P., to which Ignite Aggregator LP and the

equity holders of TCO Group Holdings, Inc. previously contributed their entire equity interests

in InnovAge.  (*Id.* at 27.)  TCO Group Holdings, L.P. is in turn controlled by a series of LPs and

LLCs, none of which is named as a defendant.  (*See id.* at 28 n.1.)  Indeed, the Registration

Statement identifies Ignite Aggregator LP as the "Apax Investor," and the "WCAS Investor" is a

collective of other entities.  Neither Apax nor WCAS is a shareholder.

     Even if Apax and WCAS were shareholders, that allegation would not state a claim.

A minority shareholder is not a control person, even if the shareholder has the power to appoint a

minority of directors to the board, absent an allegation the shareholder actually exercised some

day-to-day control.  *See Medina*, 215 F. Supp. 3d at 1132-33 (dismissing claims against minority

shareholder with board representation); *Silsby* v. *Icahn*, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014)

(minority stock ownership and ability to appoint minority of board insufficient to allege control).

Even if any of the Director Defendants had exerted the kind of day-to-day control contemplated

---

that agreement, Apax and WCAS agreed to cause the Company to effect the IPO."  (*Id.* ¶ 28.)

in Section 20(a) or Section 15 (and none is alleged), it would not mean that the shareholders who designated those directors exercised control.  Nor is it enough to allege that two distinct shareholders, who each allegedly hold a minority position, collectively "controlled a majority of the voting power."  *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 675-76 (N.D. Tex. 2013) ("The Consolidated Complaint is also devoid of any allegations of the Shareholder Defendants' control over [the Company] aside from their stock ownership and the fact that they designated their own employees as directors on the [Company's] board.").

Beyond the allegation that the two entities agreed as investors at arm's length to take InnovAge public, the Amended Complaint is devoid of any non-conclusory allegation as to control.  The Amended Complaint fails to allege that either entity exercised any control in the day-to-day operations of the Company, as required under *Adams* and *Maher*.  Instead, Plaintiffs sprinkle vague and conclusory allegations of control into the Amended Complaint without providing any details.  (*See, e.g.*, Compl. ¶ 113 (WCAS "caus[ed] InnovAge to assume new debt"); *id*. ¶ 380 (WCAS and Apax "participated in the management of InnovAge's operations").)  Such conclusory allegations deserve no weight.  *Iqbal*, 556 U.S. at 681.  Moreover, the Amended Complaint does not explain how ownership of InnovAge was divided after the IPO, making it impossible to evaluate the post-offering claims as to control.  The Court should thus dismiss the control person claims against the Director Defendants, Apax, and WCAS.

IV.    **CONCLUSION**

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated:           September 13, 2022

SULLIVAN & CROMWELL LLP

By:  /s/ *Karen Patton Seymour*
Karen Patton Seymour
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 291-9307
seymourk@sullcrom.com

Diane L. McGimsey
Ryan J. Nielsen
1888 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800
mcgimseyd@sullcrom.com
nielsenr@sullcrom.com

*Counsel for InnovAge Holding Corp.,*
*Maureen Hewitt, Barbara Gutierrez, John*
*Ellis Bush, Andrew Cavanna, Caroline*
*Dechert, Edward Kennedy, Jr., Pavithra*
*Mahesh, Thomas Scully, Marilyn Tavenner,*
*Sean Traynor, Richard Zoretic, Apax*
*Partners, L.P., and Welsh, Carson,*
*Anderson & Stowe*

WILMER CUTLER PICKERING HALE
AND DORR LLP

By:  /s/ *John Walsh*
John Walsh
1225 17th Street, Suite 2600
Denver, CO 80202
Telephone: (720) 274-3154
Facsimile: (720) 274-3133
john.walsh@wilmerhale.com

Matthew Benedetto
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5323
Facsimile: (213) 443-5400
matthew.benedetto@wilmerhale.com

*Counsel for InnovAge Holding Corp.*

-46-

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2022, I electronically filed a true and correct copy of the foregoing **DEFENDANTS' JOINT MOTION AND BRIEF TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties via the CM/ECF system.

*/s/ Ryan J. Nielsen*
Ryan J. Nielsen