# Exhibit 2

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-252853**

## *16,666,667 shares*



## *Common stock*

This is an initial public offering of InnovAge Holding Corp. We are selling 16,666,667 shares of our common stock.

Prior to this offering, there has been no public market for the common stock. The initial public offering price is $21.00 per share. Our common stock has been approved for listing on the Nasdaq Global Select Market under the symbol "INNV."

We are an "emerging growth company" as defined under the federal securities laws, and as such, we have elected to comply with certain reduced reporting requirements for this prospectus and may elect to do so in future filings.

**See "Risk Factors" beginning on page <u>28</u> to read about factors you should consider before buying shares of our common stock.**

Immediately after this offering, our principal shareholders, Apax Partners and Welsh, Carson, Anderson and Stowe (collectively, our "Principal Shareholders"), will beneficially own, through TCO Group Holdings, L.P., the investment vehicle of the Principal Shareholders, approximately 87% of our common stock (or 86% of our outstanding common stock if the underwriters' option to purchase additional shares is exercised in full). As a result, we expect to be a "controlled company" within the meaning of the corporate governance standards of Nasdaq. See "Management—Controlled Company Status."

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per share | Total |
| --- | --- | --- |
| Initial public offering price | $21.00 | $350,000,007 |
| Underwriting discount(1) | $ 1.26 | $ 21,000,000 |
| Proceeds, before expenses, to InnovAge Holding Corp. | $19.74 | $329,000,007 |

(1)    See "Underwriting (Conflicts of Interest)" for a description of compensation payable to the underwriters.

We have granted the underwriters the option for a period of 30 days after the date of this prospectus to purchase up to an additional 2,500,000 shares of our common stock at the initial public offering price less the underwriting discount.

The underwriters expect to deliver the shares of common stock against payment in New York, New York on March 8, 2021.

### J.P. Morgan      Barclays      Goldman Sachs & Co. LLC      Citigroup

### Baird          William Blair          Piper Sandler          Capital One Securities

### Loop Capital Markets          Siebert Williams Shank          Roberts & Ryan

**Prospectus dated March 3, 2021.**

Exhibit 2 page 1 of 29

# Table of contents

| | Page |
|---|---|
| **Prospectus summary** | **1** |
| **Risk factors** | **28** |
| **Forward-looking statements** | **65** |
| **Market and industry data** | **67** |
| **Use of proceeds** | **68** |
| **Dividend policy** | **69** |
| **Capitalization** | **70** |
| **Dilution** | **72** |
| **Selected consolidated financial data** | **74** |
| **Management's discussion and analysis of financial condition and results of operations** | **77** |
| **Business** | **112** |
| **Management** | **139** |
| **Executive compensation** | **146** |
| **Principal shareholders** | **155** |
| **Certain relationships and related party transactions** | **158** |
| **Description of certain indebtedness** | **161** |
| **Description of capital stock** | **165** |
| **Shares eligible for future sale** | **172** |
| **Material U.S. federal income tax consequences to non-U.S. holders** | **174** |
| **Underwriting (Conflicts of interest)** | **179** |
| **Legal matters** | **192** |
| **Experts** | **192** |
| **Where you can find more information** | **192** |
| **Index to consolidated financial statements** | **F-1** |

We and the underwriters have not authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. We and the underwriters take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may provide you. We are offering to sell, and seeking offers to buy, shares of common stock only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the common stock.

For investors outside of the United States, neither we nor any of the underwriters have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. You are required to inform yourselves about, and to observe any restrictions relating to, this offering and the distribution of this prospectus outside of the United States.

**Through and including March 28, 2021 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription**.

i

Exhibit 2 page 2 of 29

adjustments), administrative or executive orders and government funding restrictions, all of which may materially adversely affect the PACE rates at which we are compensated for our services. Budget pressures can lead federal and state governments to reduce or place limits on reimbursement rates and payment structures under PACE. Implementation of these and other types of measures has in the past and could in the future result in substantial reductions in our revenue and operating margins. The Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") and the Consolidated Appropriations Act, 2021, temporarily suspended the Medicare sequestration payment adjustment from May 1, 2020 through December 31, 2020, which would have otherwise reduced payments to PACE programs by 2%, but extended sequestration through 2030. We cannot predict what other deficit reduction, other payment reduction or budget enforcement initiatives may be proposed by Congress, whether Congress will attempt to restructure or suspend sequestration or the impact sequestration, other payment reductions or budget enforcement initiatives may have on our business.

Each year, CMS establishes the Medicare PACE benchmark payment rates by county for the following calendar year. Because a substantial portion of our revenue is through the PACE program, any negative changes to the PACE benchmark payment rates could have a material adverse effect on our business, results of operations, financial condition and cash flows. In addition, our PACE revenues may become volatile in the future, which could have a material adverse impact on our business, results of operations, financial condition and cash flows.

Reductions in reimbursement rates could have a material, adverse effect on our financial condition and results of operations or even result in rates that are insufficient to cover our operating expenses. For example, our external provider costs are driven by rates set by Medicare and Medicaid, which are outside of our control and may be negotiated in a manner unfavorable to us. Additionally, any delay or default by state governments in funding our capitated payments could materially and adversely affect our business, financial condition and results of operations.

Recent legislative, judicial and executive efforts to enact further healthcare reform legislation have caused the future state of reforms under the Affordable Care Act (the "ACA") and many core aspects of the current U.S. healthcare system to be unclear. While specific changes and their timing are not yet apparent, enacted reforms and future legislative, regulatory, judicial, or executive changes, particularly any changes to the PACE program, could have a material adverse effect on our business, results of operations, financial condition and cash flows.

***Our records and submissions to government payors may contain inaccurate or unsupportable information regarding risk adjustment scores of participants, which could cause us to overstate or understate our revenue and subject us to repayment obligations or penalties.***

The claims and encounter records that we submit to government payors impact data that support the Medicare RAF scores attributable to participants. These RAF scores determine the payment we are entitled for the provision of medical care to such participants. The data submitted to CMS is based on diagnosis codes and medical charts that our employed, contracted, and noncontracted providers identify, record and prepare. CMS may periodically audit PACE organizations' risk adjustment submissions. The submission of inaccurate, incomplete or erroneous data could result in inaccurate revenue and risk adjustment payments, which may be subject to correction or retroactive adjustment in later periods. This corrected or adjusted information may be reflected in financial statements for periods subsequent to the period in which the revenue was recorded. We might also need to refund a portion of the revenue that we received, which refund, depending on its magnitude, could have a material adverse effect on our business, results of operations, financial condition and cash flows. Historically, these true-up payments typically occur between May and August, but the timing of these payments is determined by CMS, and we have neither visibility nor control over the timing of such payments. From time to time, we may experience reconciliation issues as government payors modify or adopt new systems which may be reflected as provision for bad debt in our financial statements.

30

Exhibit 2 page 3 of 29

If CMS seeks repayment from us for payment adjustments as a result of its audits, we could also be subject to liability for penalties for inaccurate or unsupportable RAF scores provided by us or our providers. In addition, we could be liable for penalties to the federal government under the False Claims Act (the "FCA") that range from $5,500 to $11,000 (periodically adjusted for inflation) for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim. Most recently, on June 19, 2020, the Department of Justice issued a final rule announcing adjustments to FCA penalties, under which the per claim penalty range increases to a range from $11,665 to $23,331 for penalties assessed after June 19, 2020, so long as the underlying conduct occurred after November 2, 2015. There is a high potential for substantial penalties in connection with any alleged FCA violations.

Elements of the risk adjustment mechanism continue to be challenged, reevaluated, and revised by the U.S. Department of Justice, the HHS Office of the Inspector General ("HHS OIG"), and CMS. For example, CMS has indicated that payment adjustments will not be limited to errors identified in the sampled population, but that the error rate identified in the sample may also be extrapolated to all risk adjusted payments made under the PACE contract being audited. CMS has described its audit process as plan-year specific and stated that it will not extrapolate audit results for plan years prior to 2011. Because CMS has not stated otherwise, there is a risk that payment adjustments made as a result of one plan year's audit would be extrapolated to prior plan years after 2011. In addition, proposed regulations relating to the Risk Adjustment Data Validation Audit ("RADV audit") and extrapolation methodology have been outstanding since 2018 and may result in additional changes in recoupments arising from RADV audits.

There can be no assurance that a PACE organization will not be randomly selected or targeted for review by CMS or that the outcome of such a review will not result in a material adjustment in our revenue and profitability, even if the information we submitted to CMS is accurate and supportable. Substantial changes in the risk adjustment mechanism, including changes that result from enforcement or audit actions, could materially affect our capitated reimbursement.

***Non-renewal or termination of capitation agreements with government payors could have a material adverse effect on our business, results of operations, financial condition and cash flows.***

Under most of our capitation agreements with government payors, the state is generally permitted to adjust certain terms of the agreements from time to time. If a government payor exercises its right to adjust certain terms of the agreements, we are generally allowed a period of time to object to such adjustment. If we enter into capitation contracts with unfavorable economic terms, or a capitation contract is adjusted to include unfavorable terms, we could suffer losses with respect to such contract. In addition, some states in which we operate undergo periodic reconciliations with respect to enrollments that present a risk to our business, results of operations, financial condition and cash flows.

Our contracts with government payors may be terminated to the extent that state or federal funds are not appropriated at sufficient levels to fund our contracts or PACE programs in general. Certain of our contracts are terminable immediately upon the occurrence of certain events. Government payors may terminate, suspend or cancel our contracts, in whole or in part, for cause in the event of our noncompliance with the terms, conditions or responsibilities under the contracts, or if we are debarred or suspended from providing services by state or federal government authorities. CMS may also impose sanctions for noncompliance with regulatory or contractual requirements, including the suspension of enrollment of participants, the occurrence of which would adversely affect our operating results and our ability to pursue our growth strategies. If any of our contracts with government payors are terminated or if the government payors seek to renegotiate their contract rates with us, we may suffer a significant loss of revenue, which may adversely affect our operating results.

***State and federal efforts to reduce healthcare spending could adversely affect our financial condition and results of operations.***

Most of our participants are dually-eligible, meaning they are qualified for coverage under both Medicare and Medicaid when enrolled in our PACE program, and nearly all our revenue is derived from government

31

Exhibit 2 page 4 of 29

payors. Medicaid is a joint federal and state funded program for healthcare services for the low income as well as certain higher-income individuals who qualify for nursing home level of care. Under broad federal criteria, states establish rules for eligibility, services and payment. PACE programs are administered at the state level and are financed by both state and federal funds. Medicaid spending has increased rapidly in recent years, becoming a significant component of state budgets. This, combined with slower state revenue growth, has led both the federal government and many states to institute measures aimed at controlling the growth of Medicaid spending, and in some instances reducing aggregate Medicaid spending. Due to budget constraints, including those resulting from the COVID-19 pandemic, we may experience negative Medicaid capitated rate payment pressure from certain states where we operate, such as Colorado, where we conduct a significant percentage of our operations.

In addition, as part of past attempts to repeal, replace or modify the ACA and as a means to reduce the federal budget deficit, there have in recent years been congressional efforts to move Medicaid from an open-ended program with coverage and benefits set by the federal government to one in which states receive a fixed amount of federal funds, either through block grants or per capita caps, and have more flexibility to determine benefits, eligibility or provider payments. If those changes are implemented, we cannot predict whether the amount of fixed federal funding to the states will be based on current payment amounts, or if it will be based on lower payment amounts, which would negatively impact those states that expanded their Medicaid programs in response to the ACA. We expect state and federal efforts to reduce healthcare spending to continue for the foreseeable future.

### *A pandemic, epidemic or outbreak of an infectious disease in the United States or worldwide, including the ongoing outbreak of COVID-19, could adversely affect our business.*

The severity, magnitude and duration of the current COVID-19 pandemic is uncertain and rapidly changing. Because of our business model, the full impact of the COVID-19 pandemic may not be fully reflected in our results of operations and overall financial condition until future periods. Additionally, any future pandemic, epidemic or outbreak of an infectious disease may adversely affect our business if one of the geographies we serve is affected by the outbreak, particularly at the onset of any such outbreak before response protocols have been developed. Specifically, if our participants fall ill due to an outbreak, we may experience a high level of unexpected deaths, increased costs, and other effects, including a loss of revenue, negative publicity, litigation and inquiries from government regulators.

Adverse market conditions resulting from the spread of the virus that causes COVID-19 could materially and adversely affect our business and the value of our common stock. Numerous state and local jurisdictions, including all markets where we operate, have imposed, and others in the future may impose, travel bans and restrictions, "shelter-in-place" orders or shutdowns, quarantines, curfews, executive orders and similar government orders and restrictions for their residents to control the spread of the virus that causes COVID-19. Such orders or restrictions have resulted in largely remote operations at our headquarters and centers, work stoppages among some vendors and suppliers, slowdowns and delays, travel restrictions and cancellation of events and have restricted the ability of our front-line outreach teams to host and attend community events, among other effects, thereby significantly impacting our operations. In addition, the COVID-19 virus disproportionately impacts older adults, especially those with chronic illnesses, which describes many of our participants.

The COVID-19 pandemic has significantly and temporarily increased demand for our telehealth and in-home offerings. The telehealth market is relatively new, and it is uncertain whether it will achieve and sustain high levels of demand, consumer acceptance and market adoption. Although our pivot to telehealth services has been a useful tool for providing remote care during the COVID-19 pandemic, the COVID-19 pandemic has limited our ability to provide in-person care. If our participants do not perceive the benefits of telehealth services, or if our services are not competitive, it could have a material adverse effect on our business, financial condition or results of operations. Similarly, individual and healthcare industry concerns or negative publicity regarding participant confidentiality and privacy in the context of telehealth could limit market acceptance of such healthcare services. In addition, some of our participants may lack access

32

Exhibit 2 page 5 of 29

to telehealth devices, such as cell phones and/or computers, or may be unable to use the telehealth technology on their own. Because some of our participants may not be comfortable with a team member coming to their home to deliver face-to-face care or entering with a device to assist with using our telehealth services, participants may be reluctant to seek necessary care given their inability to use telehealth services, coupled with preference to stay at home due to the risks of the COVID-19 pandemic. This could have the effect of deferring healthcare costs that we will need to incur at later periods and may also affect the health of participants who defer treatment, which may cause our costs to increase in the future. Further, as a result of the COVID-19 pandemic, we may experience slowed growth or a decline in new participants.

Due to the COVID-19 pandemic, we may not be able to document the health conditions of our participants as completely as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual participant. Participants with higher RAF scores necessitate larger capitated payments, and those with lower RAF scores necessitate smaller capitated payments. Medicare requires that a participant's health issues be documented annually regardless of the permanence of the underlying causes. Historically, this documentation was required to be completed during an in-person visit with a participant, but CMS is now allowing documentation of conditions identified during qualifying telehealth visits with participants. However, given the disruption caused by the COVID-19 pandemic and the limitations relating to assessing the health needs of our participants through telehealth services described above, it is unclear whether we will be able to document the health conditions of our participants as comprehensively as we have historically, which may adversely impact our revenue in future periods. See "Risk Factors—Risks Related to Our Business—Our records and submissions to government payors may contain inaccurate or unsupportable information regarding risk adjustment scores of participants, which could cause us to overstate or understate our revenue and subject us to repayment obligations or penalties."

On March 27, 2020, the CARES Act was signed into law. The CARES Act provides for $100.0 billion in funding for healthcare providers, including hospitals on the front lines of the COVID-19 pandemic, and subsequent COVID-19 economic relief legislation authorized additional funding to be distributed to healthcare providers. The state of Pennsylvania enacted Act 24 of 2020 ("Act 24"), which allocates $10.0 million in federal CARES Act funding to Managed Long Term Care Organizations to cover COVID-19 related costs. Our Pennsylvania centers were granted $1.0 million of funding from Act 24. As of June 30, 2020, we recognized $0.7 million of such funds and for the six months ended December 31, 2020, we recognized the remaining funds of $0.3 million. As a result of receiving this funding, we may be subject to audits and oversight by the federal government and Pennsylvania regulators, and there is no guarantee that the funds we received could not be subject to recoupment. Recipients are not required to repay these funds, provided that they attest to and comply with certain terms and conditions, including not using funds received to reimburse expenses or losses that other sources are obligated to reimburse, as well as certain audit and reporting requirements.

As of June 30, 2020, we incurred $3.5 million of COVID-19 related costs, and for the six months ended December 31, 2020, we incurred an additional $2.4 million of COVID-19 related costs. We expect our COVID-19 related expenses to continue to increase, which could have a material adverse effect on our business, results of operations, financial condition and cash flows.

The extent and continued impact of the COVID-19 pandemic on our business will depend on certain developments, including: the duration and spread of the outbreak; government responses to the pandemic, including responses to state budget shortfalls; the impact on our participants and enrollment; the availability, effectiveness and receipt of vaccines by our participants and our employees; the impact on participant, industry or employee events; and the effect on our supply chains, all of which are uncertain and cannot be predicted. Because of our business model, the full impact of the COVID-19 pandemic may not be fully reflected in our results of operations and overall financial condition until future periods.

To the extent the COVID-19 pandemic adversely affects our business and financial results, it may also have the effect of amplifying many of the other risks described in this "Risk Factors" section, including but not

33

Exhibit 2 page 6 of 29

limited to those relating to our ability to raise additional capital or generate sufficient cash flows necessary to fulfill our obligations under our existing indebtedness or to expand our operations.

***We began operating as a for-profit company in 2016 and have limited operating history as a for-profit company. Accordingly, our historical and recent financial and business results may not be representative of what they may be in the future.***

We were originally formed in 2007 as a not-for-profit company and converted to a for-profit company in 2016. Due to our relatively limited operating history as a for-profit company, our historical and recent financial and business results may not be representative of what they may be in the future. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by growing companies in rapidly changing and highly regulated industries, such as determining appropriate investments for our limited resources, competition from other providers, acquiring and retaining participants, hiring, integrating, training and retaining skilled personnel, unforeseen expenses and challenges in forecasting accuracy. Although we have successfully expanded our footprint outside of Colorado and our other existing geographies and intend to continue to expand into new geographies, we cannot provide assurance that any new centers we open, centers that we acquire, or new geographies we enter will be successful. If we are unable to increase participant enrollment, successfully manage our external provider costs or successfully expand into new geographies, our revenue and our ability to sustain profitability could be impaired. If we make acquisitions to expand our footprint, we may experience operational difficulties or challenges with integrating and realizing the benefits of such acquisitions and we may need to expend resources to ensure such centers are operating in compliance with regulatory and contractual requirements, as well as any corrective action plans. Additional risks include, but are not limited to, our ability to effectively manage growth, process, store, protect and use personal data in compliance with governmental regulations and contractual obligations and manage our obligations as a provider of healthcare services under Medicare, Medicaid and PACE. If our assumptions regarding these and other similar risks and uncertainties, which we use to plan our business, are incorrect or change as we gain more experience operating a for-profit business or due to changes in our industry, or if we do not address these challenges successfully, our operating and financial results could differ materially from our expectations and our reputation and business could suffer materially.

We expect to continue to increase our headcount and to hire or contract with more physicians, nurses and other specialized medical personnel in the future as we grow our business and open or acquire new centers. We will need to continue to hire, train and manage additional qualified information technology, operations and marketing staff, and improve and maintain our technology and information systems to properly manage our growth. If our new hires perform poorly, if we are unsuccessful in hiring, training, managing and integrating these new employees, if we are not successful in retaining our existing employees, or if we are unable to provide the care and services that our participants require in compliance with regulatory requirements our business may be adversely affected.

***Our growth strategy may not prove viable, and we may not realize expected results.***

Our business strategy is to grow rapidly by expanding our network of centers and is significantly dependent on adding center capacity in our existing markets, expanding into new geographies by developing de novo centers, executing on tuck-in acquisitions, recruiting new participants and directly contracting with government payors, such as Medicare and Medicaid. We seek growth opportunities both organically and through acquisitions, the availability and success of which may be impacted by factors outside of our control. Our ability to grow organically depends upon a number of factors, including recruiting new participants, finding suitable geographies that have aging populations and viable rate structures, entering into government payor arrangements in new jurisdictions, ensuring compliance with regulatory and contractual requirements, identifying appropriate facilities, purchasing facilities or obtaining leases, completing build-outs of new facilities within proposed timelines and budgets and hiring members of our IDTs and other employees. We cannot guarantee that we will be successful in pursuing our growth strategy. If we fail to evaluate and execute new business opportunities properly, we may not achieve anticipated benefits and may incur increased costs.

34

Exhibit 2 page 7 of 29

Our growth strategy involves a number of risks and uncertainties, including that:

- we may not be able to successfully enter into contracts with government payors and/or other healthcare providers on terms favorable to us or at all. In addition, we compete for government payor relationships with other potential players, some of whom may have greater resources than we do. This competition may intensify due to the ongoing consolidation in the healthcare industry, which may increase our costs to pursue such opportunities;

- we may not be able to recruit or retain a sufficient number of new participants to execute our growth strategy, and we may incur substantial costs to recruit new participants and we may be unable to recruit a sufficient number of new participants to offset those costs;

- we may not be able to identify optimal target markets for our de novo centers, have difficulty entering into our prioritized list of markets, or the de novo centers we build may require more capital than expected and not yield anticipated returns;

- we may not be able to hire sufficient numbers of physicians and other clinical staff, particularly on account of heightened demand for healthcare platforms on account of the COVID-19 pandemic;

- when expanding our business into new states, we may be required to comply with laws and regulations that may differ from states in which we currently operate; and

- we may have difficulty identifying appropriate acquisition targets, or make investments in acquisitions that we are unable to effectively integrate, involve associated risks or liabilities that we are unable to uncover in advance, or that require greater resources than anticipated (see "Risk factors —Risks related to our business—Security breaches, loss of data and other disruptions have in the past and could in the future compromise sensitive information related to our business or our participants, or prevent us from accessing critical information and expose us to liability, and could adversely affect our business and our reputation.").

There can be no assurance that we will be able to successfully capitalize on growth opportunities, which may negatively impact our business model, revenues, results of operations and financial condition.

### *If we are unable to attract new participants, our revenue growth will be adversely affected.*

To increase our revenue, our business strategy is to expand the number of centers and participants in our network. In order to support such growth, we must continue to recruit and retain a sufficient number of new participants both within our existing centers and in new centers. Our ability to do so depends in large part on the success of our sales and marketing efforts, which are subject to various federal and state laws and regulations that impact marketing. We are focused on frail, dual-eligible senior population and face competition from other healthcare providers and payors in the recruitment of potential participants. Therefore, we must demonstrate that our services provide a viable solution for potential participants. If we are unable to convince the frail, dual-eligible senior population of the benefits of the InnovAge Platform or if potential or existing participants prefer the healthcare provider model of one of our competitors, we may not be able to effectively implement our growth strategy, which depends on our ability to attract new participants. Participant enrollment for PACE is ongoing each month and require states to verify eligibility, a process which can result in delays in enrollment. Our inability to identify and recruit new eligible participants and retain existing participants would harm our ability to execute our growth strategy and may have a material adverse effect on our business operations and financial position.

### *We conduct a significant percentage of our operations in the State of Colorado and, as a result, we are particularly susceptible to any reduction in budget appropriations for our services or any other adverse developments in that state.*

For the fiscal year ended June 30, 2020, 29.4% of our total revenues were derived from contracts with government agencies in the State of Colorado. Accordingly, any reduction in Colorado's budgetary appropriations for our services, whether as a result of fiscal constraints due to recession, emergency situations

35

Exhibit 2 page 8 of 29

such as the COVID-19 pandemic, changes in policy or otherwise, could result in a reduction in our capitated fee payments and possibly the loss of contracts. We recently completed negotiations relating to the capitated fee rates with government payors in the State of Colorado, which resulted in a low-single digit rate decrease applicable for the fiscal year ending June 30, 2021. This rate decrease was the result of COVID- 19-related budget pressure borne by the State of Colorado.

***If we fail to manage our growth effectively, we may be unable to execute our business plan, maintain high levels of service and participant satisfaction or adequately address competitive challenges.***

We have experienced, and may continue to experience, rapid growth and organizational change, which has placed, and may continue to place, significant demands on our management and our operational and financial resources. For example, we completed our conversion from a not-for-profit to a for-profit organization in 2016. Additionally, our organizational structure may become more complex as we expand our operational, financial and management controls, as well as our reporting systems and procedures as a public company. We may require significant capital expenditures and the allocation of valuable management resources to grow and evolve in these areas. We must effectively increase our headcount, ensure our personnel have the necessary licenses and competencies and continue to effectively train and manage our employees. We will be unable to manage our business effectively if we are unable to alleviate the strain on resources caused by growth in a timely and successful manner. If we fail to effectively manage our anticipated growth and change or fail to ensure that the level of care and services provided by our employees complies with regulatory and contractual requirements, the quality of our services may suffer, which could negatively affect our brand and reputation, harm our ability to attract and retain participants and employees and lead to the need for corrective actions.

In addition, as we expand our business, it is important that we continue to maintain high levels of patient service and satisfaction. As our participant base continues to grow, we will need to expand our services and personnel to provide personalized participant care. If we are not able to continue to provide high quality healthcare that meets PACE requirements and generates high levels of participant satisfaction, our reputation, as well as our business, results of operations and financial condition would be adversely affected.

***The healthcare industry is highly competitive.***

We compete directly with national, regional and local providers of healthcare for participants and clinical providers. We also compete directly with payors and other alternate managed care programs for participants. There are many other companies and individuals currently providing healthcare services, many of which have been in business longer and/or have substantially more resources. Given the regulatory environment, there may be high barriers to entry for PACE providers; however, since there are relatively modest capital expenditures required for providing healthcare services, there are less substantial financial barriers to entry in the healthcare industry generally. Other companies could enter the healthcare industry in the future and divert some or all of our business. Our ability to compete successfully varies from location to location and depends on a number of factors, including the number of payors who run competitive programs in the local market, our local reputation for quality participant care, the commitment and expertise of our medical staff or contracted health care providers, our local service offerings and community programs, the cost of care in each locality, and the physical appearance, location and condition of our centers. If we are unable to attract participants to our centers our revenue and profitability will be adversely affected. Some of our competitors may have greater brand recognition and be more established in their respective communities than we are, and may have greater financial and other resources than we have. Further, our current or potential competitors may be acquired by third parties with greater available resources. Competing providers may also offer different programs or services than we do, which, combined with the foregoing factors, may result in our competitors being more attractive to our current participants, potential participants and referral sources. Furthermore, while we budget for routine capital expenditures at our centers to keep them competitive in their respective markets, to the extent that competitive forces cause those expenditures to increase in the future, our financial condition may be negatively affected. In addition, our contracts with

36

Exhibit 2 page 9 of 29

government payors are not exclusive for PACE programs in California, and competitors in California could seek to establish contracts with the state Medicaid agency and CMS to serve PACE eligibles in our service areas. For example, the service area for our Sacramento, California center, opened July 1, 2020, overlaps with an existing PACE program in the region. Additionally, as we expand into new geographies, we may encounter competitors with stronger local community relationships or brand recognition, which could give those competitors an advantage in attracting new participants. Individual physicians, physician groups and companies in other healthcare industry segments, some of which have greater financial, marketing and staffing resources, may become competitors in providing health care services, and this competition may have a material adverse effect on our business operations and financial position.

***Our presence is currently limited to Colorado, California, New Mexico, Pennsylvania and Virginia, and we may not be able to successfully establish a presence in new geographic markets.***

We currently operate in Colorado, California, New Mexico, Pennsylvania and Virginia, and we recently announced plans to begin providing our services in Florida and Kentucky. For the fiscal year ended June 30, 2020, a majority of our revenue was driven by our businesses in Colorado. As a result, our exposure to many of the risks described herein are not mitigated by a diversification of geographic focus. To continue to expand our operations to other regions of the United States, we will have to devote resources to identifying and exploring such perceived opportunities. Thereafter, we will have to, among other things, recruit and retain qualified personnel, develop new centers and establish new relationships or contracts with physicians and other healthcare and services providers. In addition, we will be required to comply with laws and regulations of states that may differ from the ones in which we currently operate, and could face competitors with greater knowledge of such local markets. We anticipate that further geographic expansion will require us to make a substantial investment of management time, capital and/or other resources. There can be no assurance that we will be able to continue to successfully expand our operations in any new geographic markets.

***Our overall business results may suffer from an economic downturn.***

During periods of high unemployment, including as a result of the COVID-19 pandemic, governmental entities often experience budget deficits as a result of increased costs and lower than expected tax collections. These budget deficits at federal, state and local government entities have decreased, and may continue to decrease, spending for health and human service programs, including Medicare, Medicaid, PACE and similar programs, which represent nearly all of the payor sources for our centers.

***Security breaches, loss of data and other disruptions have in the past and could in the future compromise sensitive information related to our business or our participants, or prevent us from accessing critical information and expose us to liability, and could adversely affect our business and our reputation.***

In the ordinary course of our business, we create, receive, maintain, transmit, collect, store, use, disclose, share and process (collectively, "Process") sensitive data, including protected health information ("PHI") and other types of personal data or personally identifiable information (collectively, "PII" and, together with PHI, "PHI/PII") relating to our employees, participants and others. We also Process and contract with third-party service providers to Process sensitive information, including PHI/PII, confidential information and other proprietary business information. We manage and maintain PHI/PII and other sensitive data and information using our on premise systems, and we plan to implement cloud-based computing center systems in the future. Third-party service providers that serve our participants may Process PHI/PII data either in their own on-site systems, at managed or co-located data centers, or in the cloud.

We are highly dependent on information technology networks and systems, including the internet, to securely Process PHI/PII and other sensitive data and information. Security breaches of this infrastructure, whether ours or of our third-party service providers, including physical or electronic break-ins, computer viruses, ransomware, attacks by hackers and similar breaches, and employee or contractor error, negligence or malfeasance, have occurred in the past, and have in the past and could in the future, create system

37

Exhibit 2 page 10 of 29

In addition, our operational and financial results will experience some variability depending upon the time of year in which they are measured. For example, medical costs vary seasonally depending primarily on the weather because certain illnesses, such as the influenza virus, are far more prevalent during colder months of the year. We typically expect to see higher levels of per-participant medical costs in the second and third quarters of our fiscal year.

***Our use of "open source" software could adversely affect our ability to offer our services and subject us to possible litigation.***

We may use open source software in connection with our services. Companies that incorporate open source software into their technologies have, from time to time, faced claims challenging the use of open source software and/or compliance with open source license terms. As a result, we could be subject to suits by parties claiming ownership of what we believe to be open source software or claiming noncompliance with open source licensing terms. Such litigation could be costly and time consuming, divert the attention of management, and the outcomes may not be favorable. While the use of open source software may reduce development costs and speed up the development process, it may also present certain risks that may be greater than those associated with the use of third-party commercial software. For example, open source software is generally provided without any warranties or other contractual protections regarding infringement or the quality of the code, including the existence of security vulnerabilities.

***We lease approximately half of our centers and may experience risks relating to lease termination, lease expense escalators, lease extensions and special charges.***

We currently lease approximately half of our centers. Our leases are typically on terms ranging from four to 15 years, with multiple extension options. Each of our lease agreements provides that the lessor may terminate the lease, subject to applicable cure provisions, for a number of reasons, including the defaults in any payment of rent, taxes or other payment obligations or the breach of any other covenant or agreement in the lease. If a lease agreement is terminated, there can be no assurance that we will be able to enter into a new lease agreement on similar or better terms or at all.

Our lease obligations often include annual fixed rent escalators ranging between 2% and 3%. These escalators could impact our ability to satisfy certain obligations and financial covenants. If the results of our operations do not increase at or above the escalator rates, it would place an additional burden on our results of operations, liquidity and financial position.

As we continue to expand and have leases with different start dates, it is likely that some number of our leases will expire each year. Our lease agreements often provide for renewal or extension options. There can be no assurance that these rights will be exercised in the future or that we will be able to satisfy the conditions precedent to exercising any such renewal or extension. In addition, if we are unable to renew or extend any of our leases, we may lose all of the facilities subject to that master lease agreement. If we are not able to renew or extend our leases at or prior to the end of the existing lease terms, or if the terms of such options are unfavorable or unacceptable to us, our business, financial condition and results of operation could be adversely affected.

Leasing facilities pursuant to binding lease agreements may limit our ability to exit markets. For instance, if one facility under a lease becomes unprofitable, we may be required to continue operating such facility or, if allowed by the landlord to close such facility, we may remain obligated for the lease payments on such facility. We could incur special charges relating to the closing of such facility, including lease termination costs, impairment charges and other special charges that would reduce our profits and could have a material adverse effect on our business, financial condition or results of operations.

Our failure to pay the rent or otherwise comply with the provisions of any of our lease agreements could result in an "event of default" under such lease agreement and also could result in a cross default under other lease agreements and agreements for our indebtedness. Upon an event of default, remedies available to our landlords generally include, without limitation, terminating such lease agreement, repossessing and reletting

42

Exhibit 2 page 11 of 29

the leased properties and requiring us to remain liable for all obligations under such lease agreement, including the difference between the rent under such lease agreement and the rent payable as a result of reletting the leased properties, or requiring us to pay the net present value of the rent due for the balance of the term of such lease agreement. The exercise of such remedies could have a material adverse effect on our business, financial position, results of operations and liquidity.

***If certain of our suppliers do not meet our needs, if there are material price increases on supplies, if we are not reimbursed or adequately reimbursed for medical products we purchase or if we are unable to effectively access new technology or medical products, it could negatively impact our ability to effectively provide the services we offer and could have a material adverse effect on our business, results of operations, financial condition and cash flows.***

We have significant suppliers that may be the sole or primary source of products critical to the services we provide, or to which we have committed obligations to make purchases, sometimes at particular prices. If any of these suppliers do not meet our needs for the products they supply, including in the event of a product recall, shortage or dispute, and we are not able to find adequate alternative sources, or if we experience material price increases from these suppliers that we are unable to mitigate, it could have a material adverse impact on our business, results of operations, financial condition and cash flows. In addition, the technology related to the products critical to the services we provide is subject to new developments which may result in the availability of superior products. If we are not able to access superior products or new medical products, including biopharmaceuticals or medical devices, on a cost-effective basis or if suppliers are not able to fulfill our requirements for such products, including PPE, we could face attrition with respect to our participants or health care providers and other personnel and other negative consequences which could have a material adverse effect on our business, results of operations, financial condition and cash flows.

***Our corporate culture has contributed to our success, and if we cannot maintain this culture as we grow, we could lose the innovation, creativity and teamwork fostered by our culture and our business may be harmed.***

We believe that our culture has been and will continue to be a critical contributor to our success. We expect to continue to hire additional personnel as we expand, and we believe our corporate culture has been crucial in our success and our ability to attract highly skilled personnel. If we do not continue to develop our corporate culture or maintain and preserve our core values as we grow and evolve, we may be unable to foster the innovation, curiosity, creativity, focus on execution, teamwork and the facilitation of critical knowledge transfer and knowledge sharing we believe we need to support our growth. Moreover, liquidity available to our employee shareholders following this offering could lead to disparities of wealth among our employees, which could adversely impact relations among employees and our culture in general. Our anticipated headcount growth and our transition from a private company to a public company may result in a change to our corporate culture, which could harm our business.

***Competition for physicians and other clinical personnel or other factors could increase our labor costs and adversely affect our revenue, profitability and cash flows.***

Our operations are dependent on the efforts, abilities and experience of our physicians and clinical personnel. We compete with other healthcare providers, primarily hospitals and other facilities, in attracting physicians, nurses and medical staff to support our centers, and recruiting and retaining qualified management and support personnel responsible for the daily operations of each of our centers. In some markets, the lack of availability of clinical personnel, such as nurses and mental health professionals, has become a significant operating issue facing all healthcare providers, which situation has been further exacerbated by the COVID-19 pandemic. This shortage may require us to continue to enhance wages and benefits to recruit and retain qualified personnel or to contract for more expensive temporary personnel. For the years ended June 30, 2019 and 2020 and the six months ended December 31, 2019 and 2020, our total center-level employee costs represented 20.7% and 19.1%, respectively, and 19.7% and 18.0%, respectively, of our revenue. We also depend on the available labor pool of semi-skilled and unskilled workers in each of the markets in which we operate.

43

Exhibit 2 page 12 of 29

If our labor costs increase, we may not be able to offset these increased costs. Because the vast majority of our revenue consists of prospective monthly capitated, or fixed, payments per participant, our ability to pass along increased labor costs is limited. In particular, if labor costs rise at an annual rate greater than our net annual consumer price index basket update from Medicare, our results of operations and cash flows will likely be adversely affected. Any union activity at our centers that may occur in the future could contribute to increased labor costs. Certain proposed changes in federal labor laws and the National Labor Relations Board's modification of its election procedures could increase the likelihood of employee unionization attempts. Although none of our employees are currently represented by a collective bargaining agreement, to the extent a significant portion of our employee base unionizes, it is possible our labor costs could increase materially. Our failure to recruit and retain or contract with qualified management and medical personnel, or to control our labor costs, could have a material adverse effect on our business, prospects, results of operations and financial condition.

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the PACE program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our integrated healthcare services model;

- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs of providing services;

- adversely affecting our ability to market our products or services through the imposition of further regulatory restrictions or guidelines regarding the manner in which plans and providers market to PACE enrollees; or

- adversely affecting our ability to attract and retain participants.

***Our centers may be negatively impacted by pandemics, such as the COVID-19 pandemic, weather and other factors beyond our control.***

Our results of operations may be adversely impacted by adverse conditions affecting our centers, including severe weather events such as tornadoes, hurricanes and widespread winter storms, earthquakes, public health concerns such as contagious disease outbreaks, epidemics and pandemics, such as the COVID-19 pandemic, violence or threats of violence or other factors beyond our control that cause disruption in provision of participant services, displacement of our participants, employees and care teams, or force certain of our centers to close temporarily. Our insurance coverage may not compensate us for losses that may occur in the event of an earthquake or other significant natural disaster. In certain geographic areas, we have a large concentration of centers that may be simultaneously affected by pandemics, such as the COVID-19 pandemic, adverse weather conditions or other events. Our future operating results may be adversely affected by these and other factors that disrupt the operation of our centers.

# Risks related to regulation

***If we fail to adhere to all of the complex government laws and regulations that apply to our business, we could suffer severe consequences that could have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price.***

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Medicare, Medicaid, and PACE statutes and regulations;

- federal and state anti-kickback laws, which prohibit, among other things, the knowing and willful offer, payment, solicitation or receipt of any bribe, kickback or remuneration, whether in cash or in

44

Exhibit 2 page 13 of 29

kind, for referring an individual, in return for ordering, leasing, purchasing or recommending or arranging for or to induce the referral of an individual or the ordering, purchasing or leasing of items or services covered, in whole or in part, by federal healthcare programs, such as Medicare and Medicaid, or by any payor;

- the federal Ethics in Patient Referral Act ("Stark Law"), which, subject to limited exceptions, prohibits physicians from referring Medicare or Medicaid patients to an entity for the provision of certain "designated health services" if the physician or a member of such physician's immediate family has a direct or indirect financial relationship (including an ownership interest or a compensation arrangement) with an entity, and prohibit the entity from billing Medicare or Medicaid for such "designated health services";

- state self-referral prohibition statutes, which generally follow the federal self-referral prohibition statute, but may apply to a smaller subset of financial relationships with physicians or a different set of services;

- the federal civil and criminal false claims laws, including the FCA and associated regulations, which impose civil and criminal penalties through governmental, whistleblower or qui tam actions, on individuals or entities for, among other things, knowingly submitting false or fraudulent claims for payment to the government or knowingly making, or causing to be made, a false statement in order to have a claim paid. When an entity is determined to have violated the FCA, the government may impose civil fines and penalties ranging from $11,665 to $23,331 for each false claim, plus treble damages, and exclude the entity from participation in Medicare, Medicaid and other federal healthcare programs;

- state false claims laws, which generally follow the FCA and apply to claims submitted to state healthcare programs, and state health insurance fraud laws that impose penalties for the submission of false or fraudulent claims by providers to commercial insurers or other payors of healthcare services;

- the federal Civil Monetary Penalties Statute and associated regulations, which impose civil fines for, among other things, the offering or transfer of remuneration to a Medicare or state healthcare program beneficiary if the person knows or should know such remuneration is likely to influence the beneficiary's selection of a particular provider or supplier of services reimbursable by Medicare or a state healthcare program, unless an exception applies, and which authorize assessments and program exclusion for various forms of fraud and abuse involving the Medicare and Medicaid programs;

- the federal health care fraud statute and its implementing regulations, which created federal criminal laws that prohibit, among other things, executing or attempting to execute a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters;

- federal and state laws regarding the Processing, protection, retention or destruction of health information or PHI/PII (e.g., HIPAA, CCPA) and the storage, handling, shipment, disposal and/or dispensing of pharmaceuticals and blood products and other biological materials, and many other applicable state and federal laws and requirements;

- state and federal statutes and regulations that govern workplace health and safety;

- federal and state laws and policies that require healthcare providers to maintain licensure, certification or accreditation to provide services to patients or to enroll and participate in the Medicaid programs, to report certain changes in their operations to the agencies that administer these programs and, in some cases, to re-enroll in these programs when changes in direct or indirect ownership occur;

- federal and state scope of practice and other laws pertaining to the provision of services by qualified health care providers; and

- federal and state laws pertaining to the provision of services by nurse practitioners and physician assistants in certain settings, including physician supervision of those services.

45

Exhibit 2 page 14 of 29

Some of the relevant laws, regulations and agency interpretations in states with corporate practice of medicine restrictions have been subject to limited judicial and regulatory interpretation. State laws or regulations prohibiting the corporate practice of medicine may contemplate the employment of physicians by certain types of entities, but may not provide a specific exemption for PACE organizations. State laws and regulations are subject to change. Regulatory authorities and other parties may assert that our employment of physicians in some states means that we are engaged in the prohibited corporate practice of medicine. If this were to occur, we could be subject to civil and/or criminal penalties, our agreements with physicians could be found legally invalid and unenforceable (in whole or in part) or we could be required to restructure our arrangements with respect to the physicians that care for our participants, in each case in one or more of the jurisdictions in which we operate. Any of these outcomes may have a material adverse effect on our business, results of operations, financial condition, cash flows and reputation.

***Our use, disclosure, and other Processing of PHI/PII is subject to HIPAA, CCPA and other federal and state privacy and security regulations, and our failure to comply with those laws and regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, a material adverse effect on our participant base and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, disclosure, destruction, retention, privacy, confidentiality, security, availability, integrity and other Processing of PHI/PII. These laws and regulations include HIPAA. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with whom such covered entities contract for services.

HIPAA requires covered entities, such as ourselves, and their business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

HIPAA imposes mandatory penalties for certain violations. Under a notice of enforcement discretion issued by the Trump Administration, penalties for violations of HIPAA and its implementing regulations start at $100 (not adjusted for inflation) per violation and are not to exceed $50,000 (not adjusted for inflation) per violation, subject to a cap of $1.5 million (not adjusted for inflation) for violations of the same standard in a single calendar year. However, a single breach incident can result in violations of multiple standards. It is not clear if President-Elect Biden's Administration will continue to use these annual penalty limits or if the incoming Administration will revert to a $1.5 million cap (not adjusted for inflation) for each category of HIPAA violation. HIPAA also authorizes state attorneys general to file suit on behalf of their residents. Courts may award damages, costs and attorneys' fees related to violations of HIPAA in such cases. While HIPAA does not create a private right of action allowing individuals to sue us in civil court for violations of HIPAA, its standards have been used as the basis for duty of care in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI.

In addition, HIPAA mandates that the Secretary of HHS conduct periodic compliance audits of HIPAA covered entities and business associates for compliance with the HIPAA Privacy and Security Standards. It also tasks HHS with establishing a methodology whereby harmed individuals who were the victims of breaches of unsecured PHI may receive a percentage of the civil monetary penalty fine paid by the violator.

HIPAA further requires that individuals be notified of any unauthorized acquisition, access, use or disclosure of their unsecured PHI that compromises the privacy or security of such information, with certain exceptions related to unintentional or inadvertent use or disclosure by employees or authorized individuals. HIPAA specifies that such notifications must be made "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." If a breach affects 500 individuals or more, it must be

49

Exhibit 2 page 15 of 29

reported to HHS without unreasonable delay, and in no case later than 60 calendar days after discovery, and HHS will automatically investigate the breach and post the name of the entity on its public breach portal. If a breach involves fewer than 500 people, the covered entity must record it in a log and notify HHS at least annually. Breaches affecting more than 500 residents in the same state or jurisdiction must also be reported to the local media.

In addition to HIPAA, numerous other federal and state laws and regulations protect the confidentiality, privacy, availability, integrity and security of PHI/PII. State statutes and regulations vary from state to state, and these laws and regulations in many cases are more restrictive than, and may not be preempted by, HIPAA and its implementing rules. These laws and regulations are often uncertain, contradictory, and subject to changing or differing interpretations, and we expect new laws, rules and regulations regarding privacy, data protection, and information security to be proposed and enacted in the future. For example, the CCPA provides certain exceptions for PHI, but is still applicable to certain PII we Process in the ordinary course of our business. The effects of the CCPA are wide-ranging and afford consumers certain rights with respect to PII, including a private right of action for data breaches involving certain personal information of California residents. The California voters also passed, on November 3, 2020, the California Privacy Rights Act, or CPRA, which will come into effect on January 1, 2023, and will expand the rights of consumers under the CCPA and create a new enforcement agency. As new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current processes. Changing our processes could be time consuming and expensive, and failure to implement required changes in a timely manner could subject us to liability for non-compliance. Consumers may also be afforded a private right of action for certain violations of privacy laws. This complex, dynamic legal landscape regarding privacy, data protection, and information security creates significant compliance issues for us and potentially restricts our ability to Process data and may expose us to additional expense, adverse publicity and liability. While we believe we have implemented data privacy and security measures in an effort to comply with applicable laws and regulations, and we have implemented measures to require our third-party service providers to maintain reasonable data privacy and security measures, we cannot guarantee that these efforts will be adequate, and we may be subject to cybersecurity, ransomware or other security incidents. Further, it is possible that laws, rules and regulations relating to privacy, data protection, or information security may be interpreted and applied in a manner that is inconsistent with our practices or those of our third-party service providers. If we or these third parties are found to have violated such laws, rules or regulations, it could result in regulatory investigations, litigation awards or settlements, government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws and regulations could cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

We also publish statements to our participants that describe how we handle and protect PHI. If federal or state regulatory authorities or private litigants consider any portion of these statements to be untrue, we may be subject to claims of deceptive practices, which could lead to significant liabilities and consequences, including, without limitation, costs of responding to investigations, defending against litigation, settling claims, and complying with regulatory or court orders. Any of the foregoing consequences could seriously harm our business and our financial results.

*We face inspections, reviews, audits and investigations under federal and state government programs and contracts. These audits could require corrective actions or have adverse findings that may negatively affect our business, including our results of operations, liquidity, financial condition and reputation.*

As a result of our PACE contracts with CMS and state government agencies, state licenses, and participation in Medicaid, we are routinely subject to, or may be subject to in the future, various governmental inspections, reviews, audits, requests for information and investigations to verify our compliance with requirements of these programs and applicable laws and regulations, assess the quality of the services we are providing to our participants, and evaluate the accuracy of the risk adjustment data we have submitted to the government.

50

Exhibit 2 page 16 of 29

We also periodically conduct internal audits and reviews of our regulatory compliance. An adverse inspection, review, audit, request for information or investigation could result in:

- refunding amounts we have been paid by the government;

- state or federal agencies imposing corrective action plans, fines, penalties, training, policies and procedures, and other requirements or sanctions on us;

- temporary suspension of payments;

- debarment or exclusion from participation in federal health care programs;

- self-disclosure of violations to applicable regulatory authorities;

- damage to our reputation;

- the revocation of a facility's license;

- enrollment sanctions that may impede our ability to expand; and

- loss of certain rights under, or termination of, our contracts with government payors.

We may be required to refund amounts we have been paid and/or pay fines and penalties as a result of these inspections, reviews, audits, requests for information and investigations. If adverse inspections, reviews, audits, requests for information or investigations occur and any of the results noted above occur, it could have a material adverse effect on our business and operating results. Furthermore, the legal, document production and other costs associated with complying with these inspections, reviews, audits, requests for information or investigations could be significant.

## Risks related to our indebtedness

***Our existing indebtedness could adversely affect our business and growth prospects.***

As of December 31, 2020, we had $299.3 million outstanding under the Term Loan Facility and none outstanding under the Revolving Credit Facility, each of which is governed by the Credit Agreement (as defined herein). We anticipate entering into a new $75.0 million New Term Loan Facility and $100.0 million New Revolver in connection with the consummation of this offering and expect to repay all outstanding indebtedness under our existing Term Loan Facility and terminate our existing Credit Agreement. Our indebtedness, or any additional indebtedness we may incur, could require us to divert funds identified for other purposes for debt service, impairing our liquidity position. If we cannot generate sufficient cash flow from operations to service our debt, we may need to refinance our debt, dispose of assets or issue equity to obtain necessary funds. We do not know whether we will be able to take any of these actions on a timely basis, or on terms satisfactory to us or at all.

Our indebtedness and the cash flow needed to satisfy our debt have important consequences, including:

- limiting funds otherwise available for financing our capital expenditures and pursuing our growth strategies by requiring us to dedicate a portion of our cash flows from operations to the repayment of debt and the interest on this debt;

- making us more vulnerable to rising interest rates; and

- making us more vulnerable in the event of a downturn in our business.

Our level of indebtedness may place us at a competitive disadvantage to our competitors that are not as highly leveraged. Fluctuations in interest rates can increase borrowing costs. Increases in interest rates may directly impact the amount of interest we are required to pay and reduce earnings accordingly. In addition, developments in tax policy, such as the disallowance of tax deductions for interest paid on outstanding indebtedness, could have an adverse effect on our liquidity and our business, financial conditions and results of operations. See "Description of Certain Indebtedness."

51

Exhibit 2 page 17 of 29

centers generate compelling long-term unit economics and robust internal rates of return. The placement of our centers in attractive locations is critical to our success. We regularly conduct zip code level analyses and convene focus groups with potential participants and caregivers to identify service areas with attractive concentrations of PACE eligibles and select optimal sites for our centers. We prioritize service areas with populations that include more than 4,000 potential participants within a 60-minute drive of a center. We have demonstrated the portability of our platform across different geographies and have a prioritized list of target markets that we believe are optimal environments to launch the InnovAge Platform. Our approach to de novo developments includes building centers to our experience-based specifications, with flexibility for future center expansion factored into the blueprints where possible.

*Execute tuck-in acquisitions*

We believe we are the logical acquiror in a fragmented market made up of mostly small local operators. Over the past two fiscal years, we have acquired and integrated three PACE organizations, expanding into one new state and four new markets through those acquisitions. We maintain discipline in our approach to purchase price for acquisitions and have executed on multiple types of transactions, including turnarounds. We work closely with key constituencies, including local governments, health systems and senior housing providers, to ensure participants continue to receive high quality care. By bringing acquired organizations under the InnovAge Platform, we are able to realize significant revenue growth and improve operational efficiency and care delivery post-integration. We believe there is a robust landscape of potential tuck-in acquisitions to supplement our organic growth, and that our known track record for improving and integrating acquired businesses while continuing to prioritize patient care positions us as the acquirer of choice in this market.

*Reinvest in the InnovAge Platform to optimize performance*

We believe that our ongoing investment in the InnovAge Platform drives greater efficiency across our business, creating a virtuous cycle that allows us to continue growing. Our platform is the largest in among PACE providers and one of the most geographically diverse. We plan to continually invest in technology improvements and seek to unlock new insights through enhanced data analytics capabilities that will advance our care model. We believe our investments will ultimately result in better health outcomes and lower medical costs for participants. As we continue to reduce medical costs, we expect to generate incremental savings that can be reinvested to support continuous improvement of the InnovAge Platform.

## Regulation

Our operations are subject to extensive federal, state and local governmental laws and regulations. These laws and regulations require us to meet various standards relating to, among other things, arrangement and provision of covered health care services to our participants, operation and management of PACE centers, dispensing of pharmaceuticals, personnel qualifications, maintenance of proper records, and quality assurance programs. If any of our operations are found to violate applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension, termination or exclusion of our participation in government payor programs;
- loss of our licenses required to operate healthcare facilities or administer prescription drugs in the states in which we operate;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the Stark Law, federal Anti-Kickback Statute, Civil Monetary Penalties Law, the FCA and/or state analogs to these federal enforcement authorities, or other regulatory requirements;
- enforcement actions by governmental agencies and/or state law claims for monetary damages by patients or employees who believe their PHI/PII has been impermissibly used or disclosed or not

127

Exhibit 2 page 18 of 29

properly safeguarded, or their rights with respect to PHI/PII have been protected, in violation of federal or state health privacy laws, including, for example and without limitation, HIPAA, CCPA, and the Privacy Act of 1974;

- mandated changes to our practices or procedures that significantly increase operating expenses or decrease our revenue;

- imposition of and compliance with corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our business practices which could lead to potential fines, among other things;

- termination of various relationships and/or contracts related to our business, including joint venture arrangements, contracts with government payors and real estate leases;

- changes in and reinterpretation of rules and laws by a regulatory agency or court, such as state corporate practice of medicine laws, that could affect the structure and management of our business;

- negative adjustments to government payment models including, but not limited to, Medicare Parts C and D and Medicaid; and

- harm to our reputation, which could negatively impact our business relationships, the terms of government payor contracts, our ability to attract and retain participants and physicians, our ability to obtain financing and our access to new business opportunities, among other things.

We expect that our industry will continue to be subject to substantial regulation, the scope and effect of which are difficult to predict. Our activities could be subject to investigations, audits and inquiries by various government and regulatory agencies with whom we contract at any time in the future. See "Risk Factors—Risks Related to Regulation."

### Federal and State Regulation of PACE Providers

We are subject to a complex array of federal and state laws, regulations, and guidance, including legal requirements directly applicable to PACE providers as well as Medicare and Medicaid laws and regulations. These laws impose requirements relating to our organizational structure, governance, fiscal soundness, marketing activities, participant enrollment and disenrollment, charges to participants, provision of healthcare and other services to participants, care planning activities, service delivery settings and maintenance of centers, participant rights, employment and contractual arrangements with health care providers and other staff, quality assessment and performance improvement activities, participant grievances and appeals, medical records documentation, compliance program activities, and other aspects of our operations and financing. As a PACE provider that provides qualified prescription drug coverage, we are also subject to requirements applicable to Medicare Part D plan sponsors.

As a PACE provider, we and our centers are subject to routine audits by CMS and state agencies, which have in the past and may in the future result in the identification of deficiencies in connection with our compliance with regulatory requirements, participant quality of care, care plan development and implementation, grievance and appeal processes, clinicians acting outside of their scope of practice, and other issues. We expect these audits to continue in the future. In addition to risks associated with audits of our current centers, we also face risks associated with new centers that we may acquire in the future, which may not have developed the same compliance and quality infrastructure that we currently have in place. Issues identified through these audits can result in corrective action plans, civil monetary penalties, enrollment suspensions, and other financial penalties and enforcement actions, in addition to loss of our contracts with CMS and state agencies.

The regulations and contractual requirements applicable to PACE providers are complex and subject to change, making it necessary for us to invest significant resources in complying with these requirements. Routine scrutiny through federal and state government audits, oversight and enforcement and the highly technical regulatory scheme mean that our compliance efforts in this area will continue to require significant

128

Exhibit 2 page 19 of 29

resources. CMS regularly audits our performance to determine our compliance with CMS's regulations and our contracts with CMS and to assess the quality of the services we provide to our participants. Whether identified through these audits or other avenues, our failure to comply with the federal and state laws applicable to our business may result in significant or material retroactive adjustments to and/or withholding of capitation payments, fines, criminal liability, civil monetary penalties, requirements to make significant changes to our operations, CMS imposed sanctions (including suspension or exclusion from participation in government programs), loss of contracts, or cessation of our services.

### Licensing Laws

We, our healthcare professionals, and our centers are subject to various state and local licensure and certification requirements in connection with our provision of health care and other services. Specifically, in some of the states in which we operate, we are required to maintain licensure as an adult day health center, home health or home care provider, diagnostic and treatment center, pharmacy provider, and/or other type of facility, and our employed physicians and other clinicians also must be licensed or certified, as applicable, in the states in which they are providing services. We, our healthcare professionals and our centers are also subject to a variety of other state laws and regulations, relating to, among other things, the quality of medical care, equipment, privacy of health information, physician relationships, personnel and operating policies and procedures. In addition to state requirements, we and/or our healthcare professionals are in some cases subject to federal licensing and certification requirements, such as certification or waiver under the Clinical Laboratory Improvement Amendments of 1988 for performing limited laboratory testing and Drug Enforcement Administration registration for writing prescriptions for controlled substances. In addition, certain of the states where we currently operate or may choose to operate in the future regulate the operations and financial condition of risk bearing providers. These regulations can include capital requirements, licensing or certification, governance controls and other similar matters. While the states in which we operate do not currently impose these regulations on entities solely bearing risk under the PACE program, these states or states that we expand into may in the future seek to license or otherwise regulate our operations and financial solvency.

Failure to comply with federal, state and local licensing and certification laws, regulations and standards could result in a variety of consequences, including cessation of our services, loss of our contracts, prior payments by government payors being subject to recoupment, requirements to make significant changes to our operations, or civil or criminal penalties. We routinely take the steps we believe are necessary to retain or obtain all requisite licensure and operating authorities. While we endeavor to comply with federal, state and local licensing and certification laws and regulations and standards as we interpret them, the laws and regulations in these areas are complex, changing and often subject to varying interpretations. For example, in Pennsylvania, the statutes that pertain to the employment of health care practitioners by health care facilities do not explicitly include a PACE organization in the list of health care facilities by which a health care practitioner may be employed. Any failure to satisfy applicable laws and regulations could have a material adverse impact on our business, results of operations, financial condition, cash flows and reputation.

### Corporate Practice of Medicine

The laws and regulations relating to our operations vary from state to state and some states in which we operate prohibit general business corporations, such as us, from practicing medicine, controlling physicians' medical decisions or engaging in some practices such as splitting professional fees with physicians. In certain states, we currently contract with physicians to provide healthcare services that are required to be provided by licensed physicians. While we believe that we are in substantial compliance with state laws prohibiting the corporate practice of medicine, other parties may assert that we could be engaged in the corporate practice of medicine. Were such allegations to be asserted successfully before the appropriate judicial or administrative forums, we could be subject to adverse judicial or administrative penalties, certain contracts could be determined to be unenforceable and we may be required to restructure our contractual arrangements.

129

Exhibit 2 page 20 of 29

The consequences associated with violating corporate practice of medicine laws vary by state and may result in physicians being subject to disciplinary action, as well as to forfeiture of revenues from government payors for services rendered. For lay entities, violations may also bring both civil and, in more extreme cases, criminal liability for engaging in medical practice without a license. Some of the relevant laws, regulations and agency interpretations in states with corporate practice of medicine restrictions have been subject to limited judicial and regulatory interpretation. In limited cases, courts have required companies to divest or reorganize structures deemed to violate corporate practice restrictions. Moreover, state laws are subject to change. Any allegations or findings that we have violated these laws could have a material adverse impact on our reputation, business, results of operations and financial condition.

See "Risk Factors—Risks Related to Our Business—Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws could subject us to penalties or require a restructuring of our business."

### *Federal Anti-Kickback Statute*

The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration, directly or indirectly, in cash or kind, to induce or reward either the referral of an individual for, or the purchase, order or recommendation of, any good or service, for which payment may be made under federal and state healthcare programs such as Medicare and Medicaid.

Federal criminal penalties for the violation of the federal Anti-Kickback Statute include imprisonment, fines and exclusion of the provider from future participation in federal healthcare programs, including Medicare and Medicaid. Violations of the federal Anti-Kickback Statute are punishable by imprisonment for up to ten years, fines of up to $100,000 per kickback or both. Larger fines can be imposed upon corporations under the provisions of the U.S. Sentencing Guidelines and the Alternate Fines Statute. Individuals and entities convicted of violating the federal Anti-Kickback Statute are subject to mandatory exclusion from participation in Medicare, Medicaid and other federal healthcare programs for a minimum of five years in the case of criminal conviction. Civil penalties for violation of the Anti-Kickback Statute include up to $104,330 in monetary penalties per violation, repayments of up to three times the total payments between the parties to the arrangement and potential exclusion from participation in Medicare and Medicaid. Court decisions have held that the statute may be violated even if only one purpose of remuneration is to induce referrals. The ACA amended the federal Anti-Kickback Statute to clarify the intent that is required to prove a violation. Under the statute as amended, the defendant does not need to have actual knowledge of the federal Anti-Kickback Statute or have the specific intent to violate it. In addition, the ACA amended the federal Anti-Kickback Statute to provide that any claims for items or services resulting from a violation of the federal Anti-Kickback Statute are considered false or fraudulent for purposes of the FCA.

The federal Anti-Kickback Statute includes statutory exceptions and regulatory safe harbors that protect certain arrangements. These exceptions and safe harbors are voluntary. Business transactions and arrangements that are structured to comply fully with an applicable safe harbor do not violate the federal Anti-Kickback Statute. However, transactions and arrangements that do not satisfy all elements of a relevant safe harbor do not necessarily violate the law. When an arrangement does not satisfy a safe harbor, the arrangement must be evaluated on a case-by-case basis in light of the parties' intent and the arrangement's potential for abuse. Arrangements that do not satisfy a safe harbor may be subject to greater scrutiny by enforcement agencies.

We enter into several arrangements that could potentially implicate the Anti-Kickback Statute if the requisite intent were present, such as:

- *Joint Ventures.*   To prove the concept of our ability to work with not-for-profits, we operate one of our centers under a joint venture with a not-for-profit healthcare provider. Although we do not expressly seek to enter into new joint ventures, it is possible that the government payor landscape in certain

130

Exhibit 2 page 21 of 29

*Additional provisions*

Awards granted under the 2021 Plan may not be transferred in any manner other than by will or by the laws of descent and distribution, or as determined by the Compensation, Nominating and Governance Committee. Unless otherwise restricted by our Compensation, Nominating and Governance Committee, awards that are non-ISOs or SARs may be exercised during the lifetime of the participant only by the participant, the participant's guardian or legal representative or a family member of the participant who has acquired the non-ISOs or SARs by a permitted transfer. Awards that are ISOs may be exercised during the lifetime of the participant only by the participant or the participant's guardian or legal representative.

In the event of a change of control (as defined in the 2021 Plan), the Compensation, Nominating and Governance Committee may, in its discretion, provide for any or all of the following actions: (i) awards may be continued, assumed or substituted with new rights, (ii) awards may be purchased for cash equal to the excess (if any) of the price per share of common stock paid in the change in control transaction over the aggregate exercise price of such awards, (iii) outstanding and unexercised stock options and stock appreciation rights may be terminated prior to the change in control (in which case holders of such unvested awards would be given notice and the opportunity to exercise such awards), or (iv) vesting or lapse of restrictions may be accelerated. All awards will be equitably adjusted in the case of the division of stock and similar transactions.

## Director compensation

The following table presents the total compensation for each non-Principal Shareholder person who served as a non-employee member of our Board during Fiscal 2020. Representatives of our Principal Shareholders receive no compensation for service as directors and, consequently, are not included in this table. We also reimbursed our non-employee directors for their business expenses incurred in connection with their performance of services.

| Name | Fees earned or paid in cash(1) ($) | Option awards(2) ($) | Total ($) |
|---|---|---|---|
| Ted Kennedy, Jr. | 100,000 | 127,293 | 227,293 |
| Marilyn Tavenner | 100,000 | 127,293 | 227,293 |
| Peter Thomas | 40,000 | 84,862 | 124,862 |

(1) We paid meeting fees to the directors set forth in the table above for attending meetings of our Board, as follows: (i) $25,000 per meeting to each of Mr. Kennedy and Ms. Tavenner and (ii) $10,000 per meeting to Mr. Thomas. Mr. Thomas ceased serving on our Board on September 21, 2020.

(2) Amounts in this column reflect the aggregate grant date fair value of the option grants, computed in accordance with FASB ASC Topic 718, made to Messrs. Kennedy and Thomas and Ms. Tavenner on September 19, 2019. With respect to the performance-vesting options granted to Messrs. Kennedy and Thomas and Ms. Tavenner, the amounts reported in this column assume that the highest level of performance conditions were achieved. Please see Note 13 of our audited financial statements for Fiscal 2020 for additional information regarding the assumptions used in calculating the grant date fair value of these option grants.

The options generally have the same vesting terms as described above for our named executive officers. As of the end of Fiscal 2020, each of Mr. Kennedy and Ms. Tavenner held 150 options and Mr. Thomas held 100 options. In connection with Apax's investment in the Company in July 2020, each director's options were accelerated (to the extent then unvested), and each vested option was thereafter cancelled in exchange for a cash payment in an amount equal to the excess of (i) the per share consideration paid in the investment transaction, over (ii) the exercise price of the option.

## Non-employee director compensation policy

We do not currently have a formal policy with respect to compensating our non-employee directors for service as directors. Following the completion of this offering, we will implement a formal policy pursuant to which our non-employee directors will be eligible to receive compensation for service on our Board and committees of our Board.

154

Exhibit 2 page 22 of 29

# Principal shareholders

The following table sets forth information about the beneficial ownership of our common stock as of March 3, 2021 and as adjusted to reflect the sale of the common stock in this offering, for

- each person or group known to us who beneficially owns more than 5% of our common stock immediately prior to this offering;

- each of our directors and director nominees;

- each of our Named Executive Officers; and

- all of our directors, director nominees and executive officers as a group.

Each shareholder's percentage ownership before the offering is based on common stock outstanding as of March 3, 2021. Each shareholder's percentage ownership after the offering is based on common stock outstanding immediately after the completion of this offering. We have granted the underwriters an option to purchase up to 2,500,000 additional shares of common stock. Certain of our executive officers and directors hold equity interests in TCO Group Holdings, L.P. pursuant to its limited partnership agreement. The foregoing persons have neither a controlling interest in TCO Group Holdings, L.P. nor direct or indirect voting or dispositive power with respect to the common stock of Innovage Holding Corp. held of record by TCO Group Holdings, L.P.

Beneficial ownership for the purposes of the following table is determined in accordance with the rules and regulations of the SEC. These rules generally provide that a person is the beneficial owner of securities if such person has or shares the power to vote or direct the voting thereof, or to dispose or direct the disposition thereof or has the right to acquire such powers within 60 days. Except as disclosed in the footnotes to this table and subject to applicable community property laws, we believe that each shareholder identified in the table possesses sole voting and investment power over all common stock shown as beneficially owned by the shareholder.

155

Exhibit 2 page 23 of 29

Unless otherwise noted below, the address of each beneficial owner listed on the table is c/o InnovAge, 8950 E. Lowry Boulevard, Denver, Colorado 80230. Beneficial ownership representing less than 1% is denoted with an asterisk (*).

| | Shares beneficially owned prior to this offering | | Shares beneficially owned after this offering | | | |
| | | | No exercise of underwriters' option | | Full exercise of underwriters' option | |
| Name of beneficial owner | Number of Shares | Percentage | Number of Shares | Percentage | Number of Shares | Percentage |
|---|---|---|---|---|---|---|
| **5% Stockholders:** | | | | | | |
| TCO Group Holdings, L.P. (1) | 116,520,612 | 100% | 116,520,612 | 87% | 116,520,612 | 86% |
| **Directors, Director Nominees and Named Executive Officers:** | | | | | | |
| Maureen Hewitt | — | — | — | — | — | — |
| Barbara Gutierrez | — | — | — | — | — | — |
| Gina DeBlassie | — | — | — | — | — | — |
| Jeb Bush | — | — | — | — | — | — |
| Andrew Cavanna | — | — | — | — | — | — |
| Caroline Dechert | — | — | — | — | — | — |
| Ted Kennedy, Jr. | — | — | — | — | — | — |
| Pavithra Mahesh | — | — | — | — | — | — |
| Thomas Scully | — | — | — | — | — | — |
| Marilyn Tavenner | — | — | — | — | — | — |
| Sean Traynor | — | — | — | — | — | — |
| Richard Zoretic | — | — | — | — | — | — |
| **All executive officers, directors and directors nominees as a group (14 individuals)** | — | —% | — | —% | — | —% |

(1) Represents 116,520,612 shares of common stock held by TCO Group Holdings, L.P., which is the legal name of the investment vehicle of the Principal Shareholders and the other existing holders, including certain directors and members of management. Voting and dispositive power with respect to the common stock held by TCO Group Holdings, L.P. is exercised by a committee of limited partners (the "LP Board"), pursuant to a delegation of authority from its limited partners. The LP Board is to be comprised of up to seven persons with six persons currently serving, including Maureen Hewitt, our President and Chief Executive Officer, Caroline Dechert, Thomas Scully and Sean Traynor (the "WCAS Designees") and Andrew Cavanna and Pavithra Mahesh (the "Apax Designees"). The LP Board exercises its voting and dispositive power by majority vote, so long as one WCAS Designee and one Apax Designee comprise the majority.

The limited partners of TCO Group Holdings, L.P. may control the voting and dispositive power with respect to the common stock if each of Ignite Aggregator LP (the "Apax Investor") and Welsh, Carson, Anderson & Stowe XII, L.P. ("WCAS XII"), Welsh, Carson, Anderson & Stowe XII Delaware, L.P. ("WCAS XII-D"), Welsh, Carson, Anderson & Stowe XII Delaware II, L.P. ("WCAS XII-DII"), Welsh, Carson, Anderson & Stowe XII Cayman, L.P. ("WCAS XII-C"), WCAS XII Co-Investors LLC ("WCAS XII-Co"), WCAS Management Corporation and WCAS Co-Invest Holdco, L.P. (collectively, the "WCAS Investor") consents to a change to the delegation of authority described above. The general partner of each of WCAS XII and WCAS XII-DII is WCAS XII Associates LLC ("WCAS XII Associates"). The general partner of each of WCAS XII-D and WCAS XII-C is WCAS XII Associates Cayman, L.P. The general partner of WCAS XII Associates Cayman, L.P. is WCAS XII Associates. The managing members of WCAS XII Associates is Thomas A. Scully, Sean Traynor, Anthony deNicola, D. Scott Mackesy, Brian Regan, Michael Donovan, Eric Lee, Christopher Hooper, Christopher Solomon, Edward Sobol, Gregory Lau, Frances Higgins, Nicholas O'Leary, Jonathan Rather and Ryan Harper (collectively, the "WCAS GP"). The general partner of WCAS Co-Invest Holdco, L.P. is WCAS Co-Invest Associates LLC. The managing members of each of WCAS XII-Co and WCAS Co-Invest Associates, LLC is the WCAS GP. Anthony deNicola, D. Scott Mackesy, Jonathan Rather, Brian Regan, Michael Donovan and Eric Lee ("WCAS Board") comprise the board of directors of WCAS Management Corporation.

Ignite Aggregator LP, or the Apax Investor, is a Delaware limited partnership. Ignite GP, Inc., a Delaware corporation, serves as the general partner of Ignite Aggregator LP. Ignite Aggregator LP's partnership interests are held by Apax X GP Co. Limited on behalf of Apax X EUR

156

Exhibit 2 page 24 of 29

Case No. 1:21-cv-02770-WJM-SBP    Document 74-2    filed 09/13/22    USDC Colorado
pg 26 of 30

LP, Apax X (Guernsey) USD AIV LP and Apax X USD LP (collectively, the "Apax X Fund"). Apax X GP Co. Limited, a company incorporated in Guernsey, acts as the investment manager and is responsible for the decision-making on behalf of the Apax X Fund. The directors of Apax X GP Co. Limited are Simon Cresswell, Andrew Guille, Martin Halusa, Paul Meader and David Staples.

Each of the foregoing entities and the individuals, as a result, and by virtue of the relationships described above, may be deemed to share beneficial ownership of the shares owned by TCO Group Holdings, L.P. Each of the foregoing entities and individuals disclaim beneficial ownership of the shares held of record by TCO Group Holdings, L.P. except to the extent of his, her or its pecuniary interest. The business address of TCO Group Holdings, L.P. is c/o Apax Partners, L.P., 601 Lexington Avenue, 53rd Floor, New York, New York, and its telephone number is (212) 753-6300, and c/o Welsh, Carson, Anderson and Stowe, 599 Lexington Avenue, Suite 1800, New York, New York 10022, and its telephone number is (212) 893-9500.

157

Exhibit 2 page 25 of 29

$0.3 million. The CARES Act also provides for the temporary suspension of the automatic 2% reduction of Medicare claim reimbursements (sequestration) for the period of May 1, 2020 through March 31, 2021.

### Recent Accounting Pronouncements

### Revenue Recognition

In May 2014, the Financial Accounting Standards Board (FASB) issued ASU 2014-09 *Revenue from Contracts with Customers* (ASU 2014-09), which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. The guidance will replace most existing revenue recognition guidance when it becomes effective. Subsequent to the issuance of ASU 2014-09, the FASB also issued several updates related to ASU 2014-09 including deferring its adoption date. As per the latest ASU 2020-05, issued by the FASB, the entities who have not yet issued or made available for issuance the financial statements as of June 3, 2020 can defer the new guidance for one year. This guidance is effective for the annual reporting period beginning July 1, 2020, and interim reporting periods within the annual reporting period beginning July 1, 2021. The guidance permits two methods of adoption: retrospectively to each prior reporting period presented (full retrospective method), or retrospectively with the cumulative effect of initially applying the guidance recognized at the date of initial application (modified retrospective method). The Company plans on applying the modified retrospective method of adoption for this guidance. The Company is in the process of evaluating the impact that the pronouncement will have on the consolidated financial statements.

### Leases

In February 2016, the FASB issued ASU 2016-02, Leases ("Topic 842") which outlines a comprehensive lease accounting model and supersedes the current lease guidance. The new guidance requires lessees to recognize almost all of their leases on the balance sheet by recording a lease liability and corresponding right-of-use assets for all leases with lease terms greater than 12 months. It also changes the definition of a lease and expands the disclosure requirements of lease arrangements. As per the latest ASU 2020-05 issued by FASB, the entities who have not yet issued or made available for issuance the financial statements as of June 3, 2020 can defer the new guidance for one year. The Company will be adopting this guidance for the annual reporting period beginning July 1, 2022, and interim reporting periods within the annual reporting period beginning July 1, 2023. This will require application of the new accounting guidance at the beginning of the earliest comparative period presented in the year of adoption. The Company is in the process of evaluating the impact that the pronouncement will have on the consolidated financial statements.

### Financial Instruments

In April 2019, the FASB issued ASU 2019-04, Codification Improvements to Topic 326, Financial Instruments — Credit Losses, Topic 815, Derivatives and Hedging, and Topic 825, Financial Instruments, which requires entities to use a current expected credit loss ("CECL") model to measure impairment for most financial assets that are not recorded at fair value through net income. Under the CECL model, an entity will estimate lifetime expected credit losses considering available relevant information about historical events, current conditions and supportable forecasts. The CECL model does not apply to available-for-sale debt securities. This guidance also expands the required credit loss disclosures and will be applied using a modified retrospective approach by recording a cumulative effect adjustment to retained earnings as of the beginning of the fiscal year of adoption. The ASU is effective for private companies to fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. The Company will adopt this guidance for the annual and interim reporting periods beginning July 1, 2023. The Company has not determined the effect of the standard on its ongoing financial reporting.

### Non-employee awards

In June 2018, the FASB issued ASU 2018-07, *Compensation — Stock Compensation: Improvements to Nonemployee Share-Based Payment Accounting (ASU 2018-07), which simplifies the accounting for share-based payments granted to nonemployees for goods and services. The effective date for this amendment for private*

F-9

Exhibit 2 page 26 of 29

*companies is for fiscal years beginning after December 15, 2019, and for interim periods for fiscal years beginning after December 15, 2020. The Company will be adopting this guidance for the annual reporting period beginning July 1, 2020, and interim reporting periods within the annual reporting period beginning July 1, 2021. The Company has not determined the effect of the standard on its ongoing financial reporting.*

### Note 3: Equity

*Equity owner transaction*

TCO Group Holdings, Inc., Ignite Aggregator LP ("Purchaser"), and the equity holders of TCO Group Holdings, Inc. ("Sellers") entered into a Securities Purchase Agreement (the "Agreement"), which was effective July 27, 2020. Under the terms of the Agreement, the Sellers sold a portion of their equity interest to Ignite Aggregator LP. The Purchaser and the Sellers contributed their equity interests in the Company to a newly formed Limited Partnership, TCO Group Holdings, L.P. (the "LP") resulting in the Company being wholly owned by the LP.

The Company entered into a Third Amended and Restated Credit Agreement (the "Credit Agreement"), see Note 8 for further discussion. A portion of the proceeds from the Credit Agreement were used by the Company to repurchase 16,095,819 shares of its common stock for $77.6 million which was recognized as Treasury stock.

Additionally, as part of the Agreement, the Company executed an Option Cancelation Agreement (the "Cancelation Agreement") which canceled the Company's common stock option awards of 16,994,975 which were granted under the 2016 Incentive Plan for $74.6 million, which resulted in a settlement of the awards. Vesting of the contingent performance-based awards was not deemed probable at the time of the settlement resulting in the settlement of the contingent performance-based awards being recorded as Corporate, general and administrative. Vesting of the time vesting awards was deemed probable at the time of the settlement resulting in a portion of the settlement of the time vesting awards being recorded as Corporate, general and administrative and the remainder being recorded as a reduction to Additional paid-in capital. Of the total settlement, $42.2 million was recorded as Corporate, general and administrative and $32.4 million was recorded as a reduction to Additional paid-in capital. The Cancelation Agreement resulted in the option holders receiving the same amount of cash that they would have received had they exercised their options, participated in the repurchase described above and sold their remaining shares.

As part of the transaction, the Company incurred $22.6 million in transaction costs, of which $13.1 million was recognized as Corporate, general and administrative and $9.5 million was recognized as a distribution to owner as the costs were paid on behalf of the owners.

*Investment*

On October 15, 2020 Finback Pace, LP contributed $20 million for an investment in TCO Group Holdings, L.P., which in turn contributed the funds to the Company.

### Note 4: Variable Interest Entity

The Company's operations also include a Senior Housing unit that primarily includes the accounts of Continental Community Housing (CCH), the general partner of PWD; a 0.01% partnership interest each in PWD and SH1, both of which were organized to develop, construct, own, maintain, and operate certain apartment complexes intended for rental to low-income elderly individuals aged 62 or older.

PWD is a VIE, but the Company is not the primary beneficiary. The Company does not have the power to direct the activities that most significantly impact the economic performance of PWD. Accordingly, the Company does not consolidate PWD. PWD is accounted for using the equity method of accounting and is recorded in Equity method investments in the accompanying consolidated balance sheets. The equity

F-10

Exhibit 2 page 27 of 29

earnings of PWD are insignificant. The balance of the Company's investment in PWD is $0.8 million which represents the maximum exposure to loss.

SH1 is a VIE. The Company is the primary beneficiary of SH1 and consolidates SH1. The Company is the primary beneficiary of SH1 as it has the power to direct the activities that are most significant to SH1 and has an obligation to absorb losses or the right to receive benefits from SH1. The most significant activity of SH1 is the operation of the housing facility. The Company has provided a subordinated loan to SH1 and has provided a guarantee for the convertible term loan held by SH1.

The following table shows the assets and liabilities of SH1 as of December 31, 2020 and June 30, 2020:

*In thousands (000's)*

| Assets/Liabilities | December, 31 2020 | June 30, 2020 |
|---|---|---|
| Cash and cash equivalents | $ 451 | $ 435 |
| Accounts receivable | 1 | 1 |
| Prepaid expenses and other | 17 | 7 |
| Property, plant and equipment, net | 10,272 | 10,501 |
| Deposits and other, net | 383 | 376 |
| Accounts payable and accrued expenses | 260 | 199 |
| Current portion long-term debt | 39 | 38 |
| Noncurrent liabilities | 454 | 454 |
| Long-term debt, net of debt issuance costs | 3,847 | 3,901 |

## Note 5: Nonconsolidated Entities

The Company has two nonconsolidated equity method investments, PWD, see Note 4 for further discussion, and InnovAge California Pace-Sacramento, LLC ("InnovAge Sacramento").

On March 18, 2019, in connection with the formation of InnovAge Sacramento, the joint venture with Adventist Health System/West ("Adventist") and Eskaton Properties, Incorporated ("Eskaton"), the Company contributed $9.0 million in cash and land valued at $4.2 million for a 59.9% membership interest in the joint venture, InnovAge Sacramento. Further, Adventist contributed $5.8 million in cash and Eskaton contributed $3.0 million in cash for membership interests of 26.41% and 13.69%, respectively. While the Company holds a majority interest, InnovAge Sacramento does not meet the criteria for consolidation in the Company's consolidated financial statements as it is a voting interest entity and the Company does not have a controlling voting interest. Therefore, it is accounted for based on the equity method. No additional contributions were made during the six months ended December 31, 2020 and 2019, see Note 18 for further discussion.

The InnovAge California PACE-Sacramento LLC Limited Liability Company Agreement (the JV Agreement) includes numerous provisions whereby, if certain conditions are met, the joint venture may be required to purchase, at fair market value, certain members' interests or certain members' may be required to purchase, at fair market value, the interests of certain other members. As of December 31, 2020, none of the conditions specified in the JV Agreement had been met.

In connection with this joint venture, TCO Group Holdings, Inc. issued warrants (the Sacramento Warrants) to purchase 5% of its issued and outstanding equity interests to Adventist Health System/West at a par value of $0.001 per share and an exercise price equal to the fair market value per share at the time of exercise of this warrant. The Sacramento Warrants fully vest on the exercise date, which is defined as the date on which Adventist has made aggregate capital contributions in an amount greater than $25 million to one or more joint venture entities in which Adventist and TCO hold equity (the Investment Threshold). At

Exhibit 2 page 28 of 29

TABLE OF CONTENTS



## *16,666,667 Shares*

## Prospectus

| **J.P. Morgan** | **Barclays** | **Goldman Sachs & Co. LLC** | **Citigroup** |
|---|---|---|---|
| **Baird** | **William Blair** | **Piper Sandler** | **Capital One Securities** |
| **Loop Capital Markets** | | **Siebert Williams Shank** | **Roberts & Ryan** |

March 3, 2021.

**Through and including March 28, 2021 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.**

Exhibit 2 page 29 of 29