# Exhibit 7

Table of Contents

---

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

**(Mark One)**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended June 30, 2021**
**or**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number: 001-40159**



**InnovAge Holding Corp.**
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **81-0710819** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| **8950 E. Lowry Boulevard** | **80230** |
| **Denver, CO** | **(Zip Code)** |
| **(Address of Principal Executive Offices)** | |

**(844) 803-8745**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Securities Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | INNV | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

Securities registered pursuant to Section 12(g) of the Securities Act: **None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | |
|---|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ | | |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The registrant was not a public company as of the last business day of its most recently completed second fiscal quarter, and therefore, cannot calculate the aggregate market value of its common stock held by non-affiliates as of such date.

As of September 20, 2021, there were 135,516,513 shares of the registrant's common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's proxy statement for the 2021 Annual Meeting of Shareholders are incorporated by reference in Part III of this Annual Report on Form 10-K to the extent described therein.

Exhibit 7 page 1 of 10

Table of Contents

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **PART I** | | I-1 |
| Item 1. | Business | I-1 |
| Item 1A. | Risk Factors | I-22 |
| Item 1B. | Unresolved Staff Comments | I-58 |
| Item 2. | Properties | I-58 |
| Item 3. | Legal Proceedings | I-58 |
| Item 4. | Mine Safety Disclosures | I-59 |
| | | |
| **PART II** | | II-60 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | II-60 |
| Item 6. | Selected Financial Data | II-61 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | II-61 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | II-81 |
| Item 8. | Financial Statements and Supplementary Data | II-82 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | II-115 |
| Item 9A. | Controls and Procedures | II-115 |
| Item 9B. | Other Information | II-115 |
| | | |
| **PART III** | | III-116 |
| Item 10. | Directors, Executive Officers and Corporate Governance | III-116 |
| Item 11. | Executive Compensation | III-116 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | III-116 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | III-116 |
| Item 14. | Principal Accounting Fees and Services | III-116 |
| | | |
| **PART IV** | | IV-117 |
| Item 15. | Exhibits, Financial Statement Schedules | IV-117 |
| Item 16. | Form 10-K Summary | IV-119 |
| | Signatures | |

1

Exhibit 7 page 2 of 10

Table of Contents

In addition, as part of past attempts to repeal, replace or modify the ACA and as a means to reduce the federal budget deficit, there have in recent years been congressional efforts to move Medicaid from an open-ended program with coverage and benefits set by the federal government to one in which states receive a fixed amount of federal funds, either through block grants or per capita caps, and have more flexibility to determine benefits, eligibility or provider payments. If those changes are implemented, we cannot predict whether the amount of fixed federal funding to the states will be based on current payment amounts, or if it will be based on lower payment amounts, which would negatively impact those states that expanded their Medicaid programs in response to the ACA. We expect state and federal efforts to reduce healthcare spending to continue for the foreseeable future.

*A pandemic, epidemic or outbreak of an infectious disease in the United States or worldwide, including the ongoing outbreak of COVID-19, could adversely affect our business.*

The severity, magnitude and duration of the current COVID-19 pandemic is uncertain and rapidly changing. Because of our business model, the full impact of the COVID-19 pandemic may not be fully reflected in our results of operations and overall financial condition until future periods. Additionally, any future pandemic, epidemic or outbreak of an infectious disease may adversely affect our business if one of the geographies we serve is affected by the outbreak, particularly at the onset of any such outbreak before response protocols have been developed. Specifically, if our participants fall ill due to an outbreak, we may experience a high level of unexpected deaths, increased costs, and other effects, including a loss of revenue, negative publicity, litigation and inquiries from government regulators.

Even though to date, the COVID-19 pandemic has not materially adversely impacted our revenue or expenses, adverse market conditions resulting from the COVID-19 pandemic may materially and adversely affect our business and the value of our common stock. Numerous state and local jurisdictions, including some markets where we operate, have and could continue to impose, and others in the future may impose, travel bans and restrictions, "shelter-in-place" orders or shutdowns, quarantines, curfews, executive orders and similar government orders and restrictions for their residents to control the spread of the virus that causes COVID-19. Such orders or restrictions have resulted in largely remote operations at our headquarters and centers, work stoppages among some vendors and suppliers, slowdowns and delays, travel restrictions and cancellation of events and have restricted the ability of our front-line outreach teams to host and attend community events, among other effects, thereby significantly impacting our operations. In addition, the COVID-19 virus disproportionately impacts older adults, especially those with chronic illnesses, which describes many of our participants.

The COVID-19 pandemic has significantly increased demand for our telehealth and in-home offerings. The telehealth market is relatively new, and it is uncertain whether it will achieve and sustain high levels of demand, consumer acceptance and market adoption. By June 2021, we fully opened all our centers and transitioned to a predominantly in-person, center-based care model, supplemented by telehealth. We expect telehealth care delivery to remain a part of our ongoing care model. If our participants do not perceive the benefits of telehealth services, or if our services are not competitive, it could have a material adverse effect on our business, financial condition or results of operations. Similarly, individual and healthcare industry concerns or negative publicity regarding participant confidentiality and privacy in the context of telehealth could limit market acceptance of such healthcare services. In addition, some of our participants may be unable to use the telehealth technology on their own. Because some of our participants may not be comfortable with a team member coming to their home to deliver face-to-face care or entering with a device to assist with using our telehealth services, participants may be reluctant to seek necessary care given their inability to use telehealth services, coupled with preference to stay at home due to the continuing risks of the COVID-19 pandemic. This could have the effect of deferring healthcare costs that we will need to incur at later periods and may also affect the health of participants who defer treatment, which may cause our costs to increase in the future.

Due to the COVID-19 pandemic, we may not be able to document the health conditions of our participants as completely as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual participant. Participants with higher RAF scores necessitate larger capitated payments, and those with lower RAF scores necessitate smaller capitated payments. Medicare requires that a participant's health issues be documented annually regardless of the permanence of the underlying causes. Historically, this documentation has been required to be completed during an in-person visit with a participant, but due to COVID-19 and going forward, CMS is now allowing documentation of conditions identified during qualifying telehealth visits with participants. Thus far, we have been able to document the health conditions of our participants during telehealth visits as

28

Exhibit 7 page 3 of 10

Table of Contents

well as we did during in-person visits prior to COVID-19; however, any issues with documenting such conditions could adversely impact Medicare RAF scores and our resulting revenue for future periods. See "Risk Factors—Risks Related to Our Business—Our records and submissions to government payors may contain inaccurate or unsupportable information regarding risk adjustment scores of participants, which could cause us to overstate or understate our revenue and subject us to repayment obligations or penalties."

The COVID-19 pandemic temporarily forced our centers to close or to perform operations remotely reducing our frequent in-person contact with participants and exacerbated difficulties to hire additional healthcare professionals, causing certain of our centers to be understaffed or staffed with personnel that requires training. The general lack of in-person interaction and the reduction in healthcare personnel, and specifically, trained personnel, has impacted and may continue to impact our ability to adhere to the complex government laws and regulations that apply to our business. PACE regulators require that new participants be assessed within a period of 30 days from enrollment to our programs and for us to provide them a personalized care plan. In the third quarter of 2021, we became aware that certain of our centers had failed to timely complete a portion of these participant assessments and care plans. We have implemented improvement plans and continue to work diligently and monitor our progress in remediating this issue. Failure to conduct assessments or produce care plans within the required period of time may subject us to suspension of new enrollment or restrict enrollment at the affected centers and other centers in the affected state. These or future violations of these requirements or other government laws or regulations could result in significant consequences that may have a material adverse effect on our business, results of operations, financial condition and cash flows.

On March 27, 2020, the CARES Act was signed into law. The CARES Act provided for $100.0 billion in funding for healthcare providers, including hospitals on the front lines of the COVID-19 pandemic, and subsequent COVID-19 economic relief legislation authorized additional funding to be distributed to healthcare providers. The state of Pennsylvania enacted Act 24 of 2020 ("Act 24"), which allocated $10.0 million in federal CARES Act funding to Managed Long Term Care Organizations to cover COVID-19 related costs. Our Pennsylvania centers were granted $1.0 million of funding from Act 24. During the year ended June 30, 2020, we recognized $0.7 million of such funds as a reduction of expense within our consolidated statement of operations, with the remaining $0.3 million recognized during the year ended June 30, 2021. As a result of receiving this funding, we may be subject to audits and oversight by the federal government and Pennsylvania regulators, and there is no guarantee that the funds we received could not be subject to recoupment. Recipients are not required to repay these funds, provided that they attest to and comply with certain terms and conditions, including not using funds received to reimburse expenses or losses that other sources are obligated to reimburse, as well as certain audit and reporting requirements.

As of June 30, 2021, we incurred $8.3 million of COVID-19 related costs, $4.8 million of which related to the year ended June 30, 2021. It is uncertain whether our COVID-19 related expenses will continue to increase, which could have a material adverse effect on our business, results of operations, financial condition and cash flows.

The extent and continued impact of the COVID-19 pandemic on our business will depend on certain developments, including: the duration and spread of the outbreak, including virus variants; government responses to the pandemic, including responses to state budget shortfalls; the impact on our participants and enrollment; the availability, effectiveness and receipt of vaccines by our participants and our employees; the impact on participant, industry or employee events; and the effect on our supply chains, all of which continue to be uncertain and are difficult to fully predict. Because of our business model, the full impact of the COVID-19 pandemic may not be fully reflected in our results of operations and overall financial condition until future periods.

***We began operating as a for-profit company in 2016 and have limited operating history as a for-profit company. Accordingly, our historical and recent financial and business results may not be representative of what they may be in the future.***

We were originally formed in 2007 as a not-for-profit company and converted to a for-profit company in 2016. Due to our relatively limited operating history as a for-profit company, our historical and recent financial and business results may not be representative of what they may be in the future. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by growing companies in rapidly changing and highly regulated industries, such as determining appropriate investments for our limited resources, competition from other providers, acquiring and retaining participants, hiring, integrating, training and retaining skilled

29

Exhibit 7 page 4 of 10

Table of Contents

personnel, unforeseen expenses and challenges in forecasting accuracy. Although we have successfully expanded our footprint outside of Colorado and our other existing geographies and intend to continue to expand into new geographies, we cannot provide assurance that any new centers we open, centers that we acquire, or new geographies we enter will be successful. If we are unable to increase participant enrollment, successfully manage our external provider costs or successfully expand into new geographies, our revenue and our ability to sustain profitability could be impaired. If we make acquisitions to expand our footprint, we may experience operational difficulties or challenges with integrating and realizing the benefits of such acquisitions and we may need to expend resources to ensure such centers are operating in compliance with regulatory and contractual requirements, as well as any corrective action plans. Additional risks include, but are not limited to, our ability to effectively manage growth, process, store, protect and use personal data in compliance with governmental regulations and contractual obligations and manage our obligations as a provider of healthcare services under Medicare, Medicaid and PACE. If our assumptions regarding these and other similar risks and uncertainties, which we use to plan our business, are incorrect or change as we gain more experience operating a for-profit business or due to changes in our industry, or if we do not address these challenges successfully, our operating and financial results could differ materially from our expectations and our reputation and business could suffer materially.

We expect to continue to increase our headcount and to hire or contract with more physicians, nurses and other specialized medical personnel in the future as we grow our business and open or acquire new centers. We will need to continue to hire, train and manage additional qualified information technology, operations and marketing staff, and improve and maintain our technology and information systems to properly manage our growth. If our new hires perform poorly, if we are unsuccessful in hiring, training, managing and integrating these new employees, if we are not successful in retaining our existing employees, or if we are unable to provide the care and services that our participants require in compliance with regulatory requirements our business may be adversely affected.

***Our growth strategy may not prove viable, and we may not realize expected results.***

Our business strategy is to grow rapidly by expanding our network of centers and is significantly dependent on adding center capacity in our existing markets, expanding into new geographies by developing de novo centers, executing on tuck-in acquisitions, recruiting new participants and directly contracting with government payors, such as Medicare and Medicaid. We seek growth opportunities both organically and through acquisitions, the availability and success of which may be impacted by factors outside of our control. Our ability to grow organically depends upon a number of factors, including recruiting new participants, finding suitable geographies that have aging populations and viable rate structures, entering into government payor arrangements in new jurisdictions, ensuring compliance with regulatory and contractual requirements, identifying appropriate facilities, purchasing facilities or obtaining leases, completing build-outs of new facilities within proposed timelines and budgets and hiring members of our IDTs and other employees. We cannot guarantee that we will be successful in pursuing our growth strategy. If we fail to evaluate and execute new business opportunities properly, we may not achieve anticipated benefits and may incur increased costs.

Our growth strategy involves a number of risks and uncertainties, including that:

- we may not be able to successfully enter into contracts with government payors and/or other healthcare providers on terms favorable to us or at all. In addition, we compete for government payor relationships with other potential players, some of whom may have greater resources than we do. This competition may intensify due to the ongoing consolidation in the healthcare industry, which may increase our costs to pursue such opportunities;

- we may not be able to recruit or retain a sufficient number of new participants to execute our growth strategy, and we may incur substantial costs to recruit new participants and we may be unable to recruit a sufficient number of new participants to offset those costs;

- we may not be able to identify optimal target markets for our de novo centers, have difficulty entering into our prioritized list of markets, or the de novo centers we build may require more capital than expected and not yield anticipated returns;

30

Exhibit 7 page 5 of 10

Table of Contents

- we may not be able to hire sufficient numbers of physicians and other clinical staff, particularly on account of heightened demand for healthcare platforms on account of the COVID-19 pandemic;

- when expanding our business into new states, we may be required to comply with laws and regulations that may differ from states in which we currently operate; and

- we may have difficulty identifying appropriate acquisition targets, or make investments in acquisitions that we are unable to effectively integrate, involve associated risks or liabilities that we are unable to uncover in advance, or that require greater resources than anticipated (see "Risk factors—Risks Related to Our Business-Security breaches, loss of data and other disruptions have in the past and could in the future compromise sensitive information related to our business or our participants, or prevent us from accessing critical information and expose us to liability, and could adversely affect our business and our reputation.").

There can be no assurance that we will be able to successfully capitalize on growth opportunities, which may negatively impact our business model, revenues, results of operations and financial condition.

*If we are unable to attract new participants, our revenue growth will be adversely affected.*

To increase our revenue, our business strategy is to expand the number of centers and participants in our network. In order to support such growth, we must continue to recruit and retain a sufficient number of new participants both within our existing centers and in new centers. Our ability to do so depends in large part on the success of our sales and marketing efforts, which are subject to various federal and state laws and regulations that impact marketing. We are focused on frail, dual-eligible senior population and face competition from other healthcare providers and payors in the recruitment of potential participants. Therefore, we must demonstrate that our services provide a viable solution for potential participants. If we are unable to convince the frail, dual-eligible senior population of the benefits of the InnovAge Platform or if potential or existing participants prefer the healthcare provider model of one of our competitors, we may not be able to effectively implement our growth strategy, which depends on our ability to attract new participants. Participant enrollment for PACE is ongoing each month and require states to verify eligibility, a process which can result in delays in enrollment. Our inability to identify and recruit new eligible participants and retain existing participants would harm our ability to execute our growth strategy and may have a material adverse effect on our business operations and financial position.

*We conduct a significant percentage of our operations in the State of Colorado and, as a result, we are particularly susceptible to any reduction in budget appropriations for our services or any other adverse developments in that state.*

For the fiscal year ended June 30, 2021, 26.0% of our total revenues were derived from contracts with government agencies in the State of Colorado. Accordingly, any reduction in Colorado's budgetary appropriations for our services, whether as a result of fiscal constraints due to recession, emergency situations such as the COVID-19 pandemic, changes in policy or otherwise, could result in a reduction in our capitated fee payments and possibly the loss of contracts. In fiscal year 2021, we experienced a low single digit rate decrease as a result of COVID-19 related budget pressure borne by the State of Colorado. In June 2021, we completed negotiations relating to the capitated fee rates with government payors in the State of Colorado, which resulted in a mid-single digit rate increase applicable for the fiscal year ended June 30, 2021.

*If we fail to manage our growth effectively, we may be unable to execute our business plan, maintain high levels of service and participant satisfaction or adequately address competitive challenges.*

We have experienced, and may continue to experience, rapid growth and organizational change, which has placed, and may continue to place, significant demands on our management and our operational and financial resources. For example, we completed our conversion from a not-for-profit to a for-profit organization in 2016. Additionally, our organizational structure may become more complex as we expand our operational, financial and management controls, as well as our reporting systems and procedures as a public company. We may require significant capital expenditures and the allocation of valuable management resources to grow and evolve in these areas. We must effectively increase our headcount, ensure our personnel have the necessary licenses and

31

Exhibit 7 page 6 of 10

Table of Contents

Penalties for violations of the corporate practice of medicine vary by state and may result in physicians being subject to disciplinary action, as well as forfeiture of revenues from payors for services rendered. For business entities, such as us, violations may also bring both civil and, in more extreme cases, criminal liability for engaging in medical practice without a license.

Some of the relevant laws, regulations and agency interpretations in states with corporate practice of medicine restrictions have been subject to limited judicial and regulatory interpretation. State laws or regulations prohibiting the corporate practice of medicine may contemplate the employment of physicians by certain types of entities, but may not provide a specific exemption for PACE organizations. State laws and regulations are subject to change. Regulatory authorities and other parties may assert that our employment of physicians in some states means that we are engaged in the prohibited corporate practice of medicine. If this were to occur, we could be subject to civil and/or criminal penalties, our agreements with physicians could be found legally invalid and unenforceable (in whole or in part) or we could be required to restructure our arrangements with respect to the physicians that care for our participants, in each case in one or more of the jurisdictions in which we operate. Any of these outcomes may have a material adverse effect on our business, results of operations, financial condition, cash flows and reputation.

***Our use, disclosure, and other Processing of PHI/PII is subject to HIPAA, CCPA and other federal and state privacy and security regulations, and our failure to comply with those laws and regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, a material adverse effect on our participant base and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, disclosure, destruction, retention, privacy, confidentiality, security, availability, integrity and other Processing of PHI/PII. These laws and regulations include HIPAA. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with whom such covered entities contract for services.

HIPAA requires covered entities, such as ourselves, and their business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

HIPAA imposes mandatory penalties for certain violations. Under a notice of enforcement discretion issued by HHS in 2019, penalties for violations of HIPAA and its implementing regulations start at $100 (not adjusted for inflation) per violation and are not to exceed $50,000 (not adjusted for inflation) per violation, subject to a cap of $1.5 million (not adjusted for inflation) for violations of the same standard in a single calendar year. However, a single breach incident can result in violations of multiple standards. HIPAA also authorizes state attorneys general to file suit on behalf of their residents. Courts may award damages, costs and attorneys' fees related to violations of HIPAA in such cases. While HIPAA does not create a private right of action allowing individuals to sue us in civil court for violations of HIPAA, its standards have been used as the basis for duty of care in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI.

In addition, HIPAA mandates that the Secretary of HHS conduct periodic compliance audits of HIPAA covered entities and business associates for compliance with the HIPAA Privacy and Security Standards. It also tasks HHS with establishing a methodology whereby harmed individuals who were the victims of breaches of unsecured PHI may receive a percentage of the civil monetary penalty fine paid by the violator.

HIPAA further requires that individuals be notified of any unauthorized acquisition, access, use or disclosure of their unsecured PHI that compromises the privacy or security of such information, with certain exceptions related to unintentional or inadvertent use or disclosure by employees or authorized individuals. HIPAA specifies that such notifications must be made "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." If a breach affects 500 individuals or more, it must be reported to HHS without unreasonable delay, and in no case later than 60 calendar days after discovery, and HHS will automatically investigate the breach and post the name of the entity on its public breach portal. If a breach involves fewer than 500 people, the covered entity

44

Exhibit 7 page 7 of 10

Table of Contents

must record it in a log and notify HHS at least annually. Breaches affecting more than 500 residents in the same state or jurisdiction must also be reported to the local media.

In addition to HIPAA, numerous other federal and state laws and regulations protect the confidentiality, privacy, availability, integrity and security of PHI/PII. State statutes and regulations vary from state to state, and these laws and regulations in many cases are more restrictive than, and may not be preempted by, HIPAA and its implementing rules. These laws and regulations are often uncertain, contradictory, and subject to changing or differing interpretations, and we expect new laws, rules and regulations regarding privacy, data protection, and information security to be proposed and enacted in the future. For example, the CCPA provides certain exceptions for PHI, but is still applicable to certain PII we Process in the ordinary course of our business. The effects of the CCPA are wide-ranging and afford consumers certain rights with respect to PII, including a private right of action for data breaches involving certain personal information of California residents. The California voters also passed, on November 3, 2020, the California Privacy Rights Act, or CPRA, which will come into effect on January 1, 2023, and will expand the rights of consumers under the CCPA and create a new enforcement agency. As new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current processes. Changing our processes could be time consuming and expensive, and failure to implement required changes in a timely manner could subject us to liability for non-compliance. Consumers may also be afforded a private right of action for certain violations of privacy laws. This complex, dynamic legal landscape regarding privacy, data protection, and information security creates significant compliance issues for us and potentially restricts our ability to Process data and may expose us to additional expense, adverse publicity and liability. While we believe we have implemented data privacy and security measures in an effort to comply with applicable laws and regulations, and we have implemented measures to require our third-party service providers to maintain reasonable data privacy and security measures, we cannot guarantee that these efforts will be adequate, and we may be subject to cybersecurity, ransomware or other security incidents. Further, it is possible that laws, rules and regulations relating to privacy, data protection, or information security may be interpreted and applied in a manner that is inconsistent with our practices or those of our third-party service providers. If we or these third parties are found to have violated such laws, rules or regulations, it could result in regulatory investigations, litigation awards or settlements, government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws and regulations could cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

We also publish statements to our participants that describe how we handle and protect PHI. If federal or state regulatory authorities or private litigants consider any portion of these statements to be untrue, we may be subject to claims of deceptive practices, which could lead to significant liabilities and consequences, including, without limitation, costs of responding to investigations, defending against litigation, settling claims, and complying with regulatory or court orders. Any of the foregoing consequences could seriously harm our business and our financial results.

***We face inspections, reviews, audits and investigations under federal and state government programs and contracts. These audits could require corrective actions or have adverse findings that may negatively affect our business, including our results of operations, liquidity, financial condition and reputation.***

As a result of our PACE contracts with CMS and state government agencies, state licenses, and participation in Medicaid, we are routinely subject to, or may be subject to in the future, various governmental inspections, reviews, audits, requests for information and investigations to verify our compliance with requirements of these programs and applicable laws and regulations, assess the quality of the services we are providing to our participants, and evaluate the accuracy of the risk adjustment data we have submitted to the government.

As previously disclosed, on May 26, 2021, the Colorado Department of Health Care Policy & Financing ("HCPF") and the Colorado Department of Public Health and Environment ("CDPHE") initiated a joint audit of our Colorado PACE centers, and on June 21, 2021, CMS also initiated a separate focused desk audit of our Colorado PACE program. We received preliminary findings from CMS and HCPF/CDPHE in July 2021 and expect to receive final reports from the agencies in early 2022. With respect to these three audits, to date, none of the agencies have indicated that they intend to suspend or otherwise curtail our programs, and we have not been notified of corrections that are

45

Exhibit 7 page 8 of 10

Table of Contents

required to be implemented prior to issuance of the final reports. However, we cannot guarantee the outcome of these audits until we receive the respective final reports from each agency.

In addition, as previously disclosed, on May 10, 2021, CMS began a routine, scheduled audit of our Sacramento, California center. On September 17, 2021, we were notified that CMS had determined to suspend new enrollments at our Sacramento center based on deficiencies detected in the audit related to participant quality of care. The suspension will remain in effect until CMS determines that we have remediated the deficiencies to its satisfaction. We are currently working to develop a corrective action plan. In addition, we have a right to provide a written rebuttal and/or request a hearing to appeal CMS' decision. At this time, we are assessing these options and cannot guarantee the outcome of this process. If CMS is not satisfied with proposed or implemented corrective actions, we could be subject to additional sanctions.

Inspections, reviews, audits, requests for information or investigations with adverse findings, can result in:

- temporary or permanent enrollment sanctions in the affected center(s);

- refunding amounts we have been paid by the government;

- state or federal agencies imposing corrective action plans, fines, penalties, training, policies and procedures, and other requirements or sanctions on us;

- temporary suspension of payments;

- debarment or exclusion from participation in federal health care programs;

- self-disclosure of violations to applicable regulatory authorities;

- damage to our reputation;

- the revocation of a facility's license; and

- loss of certain rights under, or termination of, our contracts with government payors.

We may be required to refund amounts we have been paid and/or pay fines and penalties as a result of these inspections, reviews, audits, requests for information and investigations. Any of the results noted above could have a material adverse effect on our business and operating results. Furthermore, the legal, document production and other costs associated with complying with these inspections, reviews, audits, requests for information or investigations could be significant.

**Risks Related to Our Indebtedness**

***Our existing indebtedness could adversely affect our business and growth prospects.***

As of June 30, 2021, we had total outstanding debt of (i) $75.0 million principal amount under the Term Loan Facility (as defined in Note 10 to the consolidated financial statements), (ii) $2.4 million principal amount under the convertible term loan. Our indebtedness, or any additional indebtedness we may incur, could require us to divert funds identified for other purposes for debt service, impairing our liquidity position. If we cannot generate sufficient cash flow from operations to service our debt, we may need to refinance our debt, dispose of assets or issue equity to obtain necessary funds. We do not know whether we will be able to take any of these actions on a timely basis, or on terms satisfactory to us or at all.

Our indebtedness and the cash flow needed to satisfy our debt have important consequences, including:

46

Exhibit 7 page 9 of 10

Table of Contents

- limiting funds otherwise available for financing our capital expenditures and pursuing our growth strategies by requiring us to dedicate a portion of our cash flows from operations to the repayment of debt and the interest on this debt;

- making us more vulnerable to rising interest rates; and

- making us more vulnerable in the event of a downturn in our business.

Our level of indebtedness may place us at a competitive disadvantage to our competitors that are not as highly leveraged. Fluctuations in interest rates can increase borrowing costs. Increases in interest rates may directly impact the amount of interest we are required to pay and reduce earnings accordingly. In addition, developments in tax policy, such as the disallowance of tax deductions for interest paid on outstanding indebtedness, could have an adverse effect on our liquidity and our business, financial conditions and results of operations.

We expect to use cash flow from operations to meet current and future financial obligations, including funding our operations, debt service requirements and capital expenditures necessary to grow and maintain our businesses. The ability to make these payments depends on our financial and operating performance, which is subject to prevailing economic, industry and competitive conditions and to certain financial, business, economic and other factors beyond our control.

***We may not be able to generate sufficient cash flow to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under such indebtedness, which may not be successful.***

Our ability to make scheduled payments or to refinance outstanding debt obligations depends on our financial and operating performance, which will be affected by prevailing economic, industry and competitive conditions and by financial, business and other factors beyond our control. We may not be able to maintain a sufficient level of cash flow from operating activities to permit us to pay the principal, premium, if any, and interest on our indebtedness. Any failure to make payments of interest and principal on our outstanding indebtedness on a timely basis would likely result in penalties or defaults, which would also harm our ability to incur additional indebtedness.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or seek to restructure or refinance our indebtedness. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. In the absence of such cash flows and resources, we could face substantial liquidity problems and might be required to sell material assets or operations to attempt to meet our debt service obligations. If we cannot meet our debt service obligations, the holders of our indebtedness may accelerate such indebtedness and, to the extent such indebtedness is secured, foreclose on our assets. In such an event, we may not have sufficient assets to repay all of our indebtedness.

***We may be unable to refinance our indebtedness.***

We may need to refinance all or a portion of our indebtedness before maturity. There can be no assurance that we will be able to obtain sufficient funds to enable us to repay or refinance our debt obligations on commercially reasonable terms, or at all.

***The terms of the Credit Agreement restrict our current and future operations, particularly our ability to respond to changes or to take certain actions.***

The Credit Agreement contains a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to engage in acts that may be in our long-term best interests, including restrictions on our ability to:

- incur additional indebtedness or other contingent obligations;

47

Exhibit 7 page 10 of 10