# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 21-cv-02770-WJM-SKC

EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, and INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

 Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
JOHN ELLIS BUSH,
ANDREW CAVANNA,
CAROLINE DECHERT,
EDWARD KENNEDY, JR.,
PAVITHRA MAHESH,
THOMAS SCULLY,
MARILYN TAVENNER,
SEAN TRAYNOR,
RICHARD ZORETIC,
WELSH, CARSON, ANDERSON & STOWE,
APAX PARTNERS, L.P.,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY LLC,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO. LLC,
ROBERTS & RYAN INVESTMENTS, INC.

 Defendants.

(Caption continues on following page)

**LEAD PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS THE
AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Glossary of Terms and Abbreviations ...................................................................................... iii

Introduction .......................................................................................................................... 1

Argument .............................................................................................................................. 5

I.   The Complaint Adequately Alleges the Offering Documents Contained Untrue Statements
     and Material Omissions ................................................................................................. 5

     A.   The Offering Documents misled investors about InnovAge's care model, growth
          strategy, and regulatory compliance ..................................................................... 5

          1.   The Care Model Statements were false because InnovAge's care model "failed
               substantially" to provide adequate and compliant care ...................................... 6

          2.   The Growth Strategy Statements were false and misleading because InnovAge was
               never capable of scalable growth ..................................................................... 14

          3.   The Complaint adequately alleges facts attributed to InnovAge employees and
               investigative news articles ............................................................................... 16

          4.   Defendants remaining arguments opposing falsity are unavailing ...................... 20

     B.   Defendants violated their duty to disclose the known risk that InnovAge's growth
          strategy materially threatened its revenue ............................................................ 24

II.  The Complaint Adequately Allges the Post-Offering Statements were False and Misleading ..... 26

     A.   Defendants continued to mislead investors about InnovAge's growth strategy, staff
          shortages, and regulatory compliance ................................................................... 26

          1.   Statements about InnovAge's growth strategy were false because its enrollment was
               neither "organic" nor driven by "capacity" ..................................................... 26

          2.   Statements about staff shortages and turnover were false because InnovAge
               suffered from critical staff shortages resulting from its unsustainable growth ......... 29

          3.   Statements about InnovAge's regulatory violations were false because it had never
               remedied systemic and ongoing deficiencies .................................................... 31

          4.   Statements about government relationships were false because InnovAge repeatedly
               violated regulatory standards and concealed evidence from auditors ................... 32

     B.   After regulators released initial audit findings, Defendants misled investors by
          minimizing the significance of the audits .............................................................. 33

     C.   Defendants Hewitt and Gutierrez falsely certified that InnovAge's SEC filings were not
          false or misleading ............................................................................................ 38

     D.   Defendants fail to meaningfully dispute that the Post-Offering Statements omitted
          facts that rendered them misleading ..................................................................... 38

III. The Complaint Adequately Pleads Scienter ................................................................... 39

A.  Defendants knew about and had access to information that contradicted their statements............................................................................................40

B.  InnovAge's admissions support the inference that Defendants' statements were knowingly or recklessly false when made..................................................42

C.  Resignations by InnovAge's most senior executions support an inference of scienter ........43

D.  Motive and opportunity do not need to be alleged, but further support an inference of scienter..............................................................................................44

E.  Holistic analysis of the facts alleged compels the finding that scienter is adequately alleged ...................................................................................................45

IV.  The Complaint Adequately Alleges Control Person Claims ............................................45

V.  The Complaint Adequately Alleges Securities Act claims ..............................................47

Conclusion ............................................................................................................................50

## GLOSSARY OF TERMS AND ABBREVIATIONS[1]

| Term | Definition |
|------|-----------|
| Apax | Defendant Apax Partners |
| Apax Director Defendants | Defendants Cavanna and Mahesh |
| Apax Transaction | The July 27, 2020, transaction between InnovAge, Apax Partners, and WCAS that precipitated the IPO. |
| BBA | Balanced Budget Act of 1997 |
| Census | The capitated participants for whom a provider is financially responsible for total healthcare costs. |
| CAP | Corrective Action Plan |
| CAR | Corrective Action Required |
| CDPHE | Colorado Department of Public Health & Environment |
| Complaint | Amended Class Action Complaint for Violation of the Federal Securities Laws, ECF No. 54 |
| CMO | Chief Medical Officer |
| CMP | Civil Money Penalty |
| CMS | Center for Medicare & Medicaid Services |
| DHCS | Department of Health Care Services of the State of California |
| DOJ | U.S. Department of Justice |
| Dual Eligible | An individual entitled to both Medicare Part A or Part B and some form of Medicaid benefit |
| EMR | Electronic Medical Records |
| HCPF | Colorado Department of Health Care Policy & Financing |
| FFS | Fee-for-service |

[1] All other capitalized terms, unless otherwise defined, have the meaning ascribed to them in the Complaint. All citations to "¶__" refer to paragraphs in the Complaint; "Pls. Ex." refers to exhibits to the Declaration of Jan E. Messerschmidt in Support of Lead Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws ("Pls. Decl."), filed concurrently with this brief; "Mot." refers to Defendants' Joint Motion and Brief to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 73 ("Motion"); "Defs. Ex." refers to exhibits to the Declaration of Diane L. McGimsey in support of the Motion, ECF No. 75; "Underwriters' Mot." refers to Underwriter Defendants' Motion & Brief to Dismiss Amended Class Action Complaint for Violations off the Federal Securities Laws, ECF No. 75; and "Defs. Req. Judicial Notice" refers to Request for Judicial Notice in Support of Joint Motion to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 76; and "Response to Request for Judicial Notice" refers to Lead Plaintiffs' Response to Defendants' Request for Judicial Notice in Support of Joint Motion to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws, filed concurrently herewith.

| ICAR | Immediate Corrective Action Required |
|---|---|
| IDT | Interdisciplinary Team |
| NPA | National PACE Association |
| Officer Defendants | Defendants Maureen Hewitt and Barbara Gutierrez |
| PAC | Participant Advisory Committee |
| PACE | Programs of All-Inclusive Care for the Elderly |
| PCP | Primary Care Physician or Provider |
| PMPM | Per member, per month |
| QAPI | Quality Assessment and Performance Improvement Plan |
| RCA | Root Cause Analysis |
| SAA | State Administering Agency |
| SDR | Service Delivery Request |
| WCAS | Welsh, Carson, Anderson & Stowe |
| WCAS Director Defendants | Defendants Dechert, Traynor, and Scully |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2U, Inc. Securities Class Action,*
   2021 WL 3418841 (D. Md. Aug. 5, 2021) ..........................................................................30

*Adams v. Kinder-Morgan,*
   340 F.3d 1083 (10th Cir. 2003) ..................................................................................*passim*

*In re Amgen Inc. Securities Litig.,*
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................................35

*Anderson v. Spirit Aerosystems Holdings, Inc.,*
   827 F.3d 1229 (10th Cir. 2016) ............................................................................... 41, 42

*Andropolis v. Red Robin Gourmet Burgers,*
   505 F. Supp. 2d 662, 686 (D. Colo. 2007) ........................................................................21

*In re Apple Inc. Securities Litig.,*
   2020 WL 2857397 (N.D. Cal. June 2, 2020) ...................................................................28

*In re Bofi Holding, Inc. Securities Litig.,*
   2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ...................................................................21

*Bond v. Clover Health Investments, Corp.,*
   2022 WL 602432 (M.D. Tenn. Feb. 28, 2022) ...................................................................25

*Boston Ret. System v. Uber Techs., Inc.,*
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ............................................................. 24, 44

*Brendon v. Allegiant Travel Co.,*
   412 F. Supp. 3d 1244 (D. Nev. 2019) ...............................................................................43

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
   752 F.3d 173 (2d Cir. 2014) ............................................................................................21

*Correa v. Liberty Oilfield Services,*
   548 F. Supp. 3d 1069 (D. Colo. 2021) .............................................................19, 26, 46

*In re Crocs, Inc. Securities Litigation,*
   774 F. Supp. 2d 1122 (D. Colo. 2011) ..............................................................................12

*Cutler v. Kirchner,*
   696 Fed. Appx. 809 (9th Cir. 2017) ..................................................................................16

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009) ..................................................................................20, 21, 44

*Epstein v. World Acceptance Corp.,*
   203 F. Supp. 3d 655 (D.S.C. 2016) ...................................................................................43

*In re Equifax Inc. Securities Litig.,*
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) .............................................................................19

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................................21

*In re Friedman's, Inc. Securities Litig.*,
  385 F. Supp. 2d 1345 (N.D. Ga. 2005) .............................................................................48

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
  2022 WL 716653 (D. Utah Mar. 9, 2022) ..........................................................15, 24, 35, 39

*In re Gohealth, Inc. Securities Litig.*,
  2022 WL 1136576 (N.D. Ill. Apr. 18, 2022) ....................................................................46

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018) ................................................................................22

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ...................................................................................................... 47, 48

*Indiana Pub. Ret. System v. Pluralsight, Inc.*,
  2021 WL 1222290 (D. Utah Mar. 31, 2021) ................................................................. 25, 42

*Indiana Pub. Ret. System v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ......................................................................................*passim*

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ...............................................................................................41

*Jiajia Luo v. Sogou*,
  465 F. Supp. 3d 393 (S.D.N.Y. 2020) ................................................................................12

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  2022 WL 2114628 (S.D.N.Y. June 13, 2022) ..............................................................*passim*

*In re Level 3 Commun., Inc. Securities Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ................................................................................... 20, 42

*Lewis v. YRC Worldwide*,
  2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) .................................................................18

*Maher v. Durango Metals, Inc.*,
  144 F.3d 1302 (10th Cir. 1998) .........................................................................................45

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ..............................................................................................30

*McDonald v. Kinder–Morgan, Inc.*,
  287 F.3d 992 (10th Cir. 2002) ...........................................................................................27

*Medina v. Clovis Oncology, Inc.*,
  215 F. Supp. 3d 1094 (D. Colo. 2017) ..............................................................................47

*Meitav Dash Provident Funds and Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*,
  2022 WL 377415 (N.D. Okla. Jan. 7, 2022) .....................................................................17

*Meyer v. Jinkosolar Holdings*,
  761 F.3d 245, 251 (2d Cir. 2014) ...................................................................................*passim*

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
   761 F.3d 1109 (10th Cir. 2014) .................................................................................. 31, 38

*In re Micro Focus Int'l Plc Sec. Litig.*,
   2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020) ...................................................................18

*In re Molycorp, Inc. Secs. Litig.*,
   157 F. Supp. 3d 987 (D. Colo. 2016) ................................................................................49

*In re Molycorp, Inc. Securities Litig.*,
   2015 WL 1514712 (D. Colo. Mar. 30, 2015).....................................................................49

*In re Myriad Genetics, Inc.*,
   2021 WL 977770 (D. Utah Mar. 16, 2021).............................................................13, 29, 43, 45

*Nardy v. Chipotle Mexican Grill*,
   2019 WL 3297467 (D. Colo. Mar. 29, 2019)......................................................................12

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)................................................................................45

*Noble Asset Management v. Allos Therapeutics*,
   2005 WL 4161977 (D. Colo. Oct. 20, 2005) ......................................................................12

*Okemos Home, LLC v. LGF Produce, LLC*,
   2019 WL 12248966 (D. Colo. Mar. 27, 2019).....................................................................22

*Oklahoma Firefighters Pension and Ret. System v. Lexmark Intl., Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)..................................................................................44

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)..........................................................................................................36

*Ong v. Chipotle Mexican Grill*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018)................................................................................12

*In re Oppenheimer Rochester Funds*,
   838 F. Supp. 2d 1148 (D. Colo. 2012) ..............................................................................47

*Oregon Laborers Employers Pension Tr. Fund v. Maxar Techs. Inc.*,
   2020 WL 5500458 (D. Colo. Sept. 11, 2020) ............................................................. 5, 9, 36

*Panther Partners v. Ikanos Comms.*,
   681 F.3d 114 (2d Cir. 2012)..............................................................................................25

*Peace Officers' Annuity and Benefit Fund of Georgia v. DaVita Inc.*,
   372 F. Supp. 3d 1139 (D. Colo. 2019) .........................................................................*passim*

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ..........................................................................................23

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..........................................................................................22

*In re Rhythms Securities Litig.*,
   300 F. Supp. 2d 1081 (D. Colo. 2004) ..............................................................................19

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ................................................................................................47

*Schwartz v. Celestial Seasonings, Inc.,*
    124 F.3d 1246 (10th Cir. 1997) ..........................................................................................48

*SEC v. GenAudio Inc.,*
    32 F.4th 902 (10th Cir. 2022) .......................................................................................*passim*

*SEC v. Mahabub,*
    343 F. Supp. 3d 1022 (D. Colo. 2018) ...............................................................................13

*SEC v. Woodruff,*
    778 F. Supp. 2d 1073 (D. Colo. 2011) ................................................................................27

*In re Signet Jewelers Ltd. Sec. Litig.,*
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) .............................................................. 34, 36

*Silsby v. Icahn,*
    17 F. Supp. 3d 348 (S.D.N.Y. 2014) ..................................................................................47

*Singer v. Reali,*
    883 F.3d 425 (4th Cir. 2018) ................................................................................................9

*Singh v. Cigna Corp.,*
    277 F. Supp. 3d 291 (D. Conn. 2017) ................................................................................36

*Singh v. Cigna Corporation,*
    918 F.3d 57 (2d Cir. 2019) .......................................................................................... 11, 12

*Slater v. A.G. Edwards & Sons, Inc.,*
    719 F.3d 1190 (10th Cir. 2013) ................................................................................... 24, 26

*Smallen v. The W. Union Co.,*
    950 F.3d 1297 (10th Cir. 2020) ..........................................................................................42

*Snyder v. Beam Techs., Inc.,*
    2021 WL 4947295 (D. Colo. Aug. 16, 2021)......................................................................39

*Sorkin, LLC v. Fischer Imaging Corp.,*
    2005 WL 1459735 (D. Colo. June 21, 2005) .....................................................................43

*Stratte-McClure v. Morgan Stanley,*
    776 F.3d 94 (2d Cir. 2015) .................................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ...................................................................................................... 39, 45

*In re Tufin Software Techs. Ltd. Securities Litig.,*
    2022 WL 596861 (S.D.N.Y. Feb. 25, 2022) ......................................................................18

*In re Ultrafem Inc. Sec. Litig.,*
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)..................................................................................48

*United Food and Com. Workers Intl. Union Loc. 464A v. Pilgrim's Pride Corp.,*
    2022 WL 684169 (D. Colo. Mar. 8, 2022) ........................................................................23

*United States v. Gordon,*
   710 F.3d 1124 (10th Cir. 2013) ........................................................................9

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.,*
   495 F. Supp. 3d 622 (N.D. Ill. 2020) ..............................................................48

*Wilkof v. Caraco Pharm. Laboratories, Ltd.,*
   2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ...............................................24

**INTRODUCTION**

InnovAge was one of the five worst performing IPOs in 2021. In March of that year, Defendants took InnovAge public, telling investors that the Company was a "proven success" with a "track record of profitable growth" and a "demonstrated" ability to "scale successfully" while "consistently delivering high-quality care." Only six months later, state and federal auditors revealed the truth: InnovAge was not a proven success, but a demonstrable failure, failing its frail, elderly participants so severely that many died under the Company's care. So serious were these deficiencies that regulators imposed extreme sanctions, suspending enrollment at nearly all of InnovAge's centers and paralyzing the Company's sole source of revenue—suspensions that remain in effect to this day. By December 2021, just nine months after the IPO, InnovAge's stock price had plummeted by 78%.

InnovAge is a healthcare company that provides services under the Program for All-Inclusive Care for the Elderly ("PACE"), offering all-inclusive, coordinated healthcare for frail, nursing-home eligible seniors in exchange for a fixed, monthly fee paid by Medicaid and Medicare. For decades, PACE programs had been operated by nonprofits that reinvested their slim margins to optimize delivery of care. But in 2016, InnovAge became the first for-profit PACE provider, supported by an investment from Defendant WCAS, a private equity firm who publicly declared its goal to take InnovAge public in as few as four years.

Remarkably, InnovAge and WCAS met that aggressive target. From 2016 to 2020, InnovAge displayed unparalleled growth, doubling its total number of participants and growing to twice the size of its closest competitor. In March 2021, Defendants took InnovAge public, hailing its meteoric growth as having "proven" the Company's ability to execute their care model and "demonstrated" their ability to "scale successfully." InnovAge's business model thus created a "virtuous cycle," Defendants claimed, evoking Jeff Bezos' iconic business model for Amazon, ensuring consistent, repeatable, and

flywheel-like growth and positioning the Company to seize on an untapped $200 billion annual market, with little competition. The IPO was a success. Within days the Company reached a valuation of $3.5 billion—17 times larger than WCAS's investment just four years earlier.

Unbeknownst to investors, though, InnovAge's business model was driven by a relentless pursuit of enrollment growth at the expense of elder health and regulatory compliance. This growth over-whelmed the Company's clinical staff with burgeoning caseloads and exacerbated staff departures, resulting in scheduling delays and unmet patient needs. At the same time, InnovAge's byzantine elec-tronic medical records systems and inadequate training crippled the Company's ability to provide co-ordinated 24-hour care by a team of physicians, nurses, pharmacists, social workers, and specialists. In the years before the IPO, government audits and internal reviews consistently identified systemic deficiencies in InnovAge's care delivery that violated regulatory standards. Yet InnovAge continued to prioritize enrollment growth, going so far as to enroll homeless patients to keep its participant numbers increasing and to generate monthly payments for services that were unlikely to ever be pro-vided, while ignoring complaints from staff that InnovAge's practices were improper, unsafe, and unethical.

At the time of the IPO, InnovAge knew about the systemic care deficiencies. Indeed, in the months before the Company went public, dozens of doctors and nurses pleaded with the CEO, Chief Medical Officer, and other senior executives to slow enrollment and invest in the capacity, staff, and resources necessary to provide adequate and compliant care. But while InnovAge ignored the growing chorus of complaints from its staff, state and federal regulators began taking notice. Just days after the IPO, Colorado regulators notified InnovAge that it had received complaints of "dangerously low" numbers of clinical staff at some of the Company's centers. Indeed, InnovAge itself notified partici-pants and staff that certain centers were so understaffed that participants lacked a primary care

physician, an essential and mandatory member of every PACE care team. One center's problems were so severe that outside providers called the center "effectively nonoperational."

Spurred by these complaints, state and federal regulators launched rare, coordinated audits of InnovAge's Sacramento and Colorado centers in May and June 2021, reviewing the Company's treatment records over the previous year—both before and after the IPO. In response, InnovAge and its senior executives directed staff to obstruct the regulators by deleting records of service orders and referrals that were outstanding for more than six months. In September 2021, federal regulators publicly released the Sacramento audit findings. They found that InnovAge had "failed substantially" and was "substantially failing" to provide services in compliance with minimum standards and that these failures had, or were likely to, adversely affect participants' health. So serious were the violations that regulators took the rare step of immediately suspending enrollment in Sacramento. Investors were shocked by the news and InnovAge's stock price plummeted. To reassure investors, Defendants downplayed the significance of the Sacramento audit, telling investors that the deficiencies identified were not representative of the Company's operations.

But three months later, regulators released the results from their Colorado audits, identifying the same systemic deficiencies and suspending enrollment at all of InnovAge's Colorado centers—the heart of the Company's business and the source of more than half of the Company's revenue. InnovAge's stock price cratered, falling by 36% in a single day. Assailing the Company's lack of "credibility," analysts told investors they had been hoodwinked by the Company's reassurances about the audits. One week later, Defendant Hewitt—the Company's only CEO who the Offering Documents had hailed as a "visionary"—resigned effective immediately, with InnovAge's Chief Medical Officer departing soon after. In the following months, state and federal regulators' audits in New Mexico and California uncovered the same systemic deficiencies, and regulators denied the Company's

3

applications to open new centers in several other states.

In May 2022, the Company's new CEO, Patrick Blair, admitted that after assessing the Company's operations, InnovAge needed a complete "transformation" before the Company could ever hope to support the lifting of sanctions, let alone begin enrolling new participants. In detailing the "transformational actions" needed, Mr. Blair explained that the Company had failed to implement practices necessary to provide a consistent, scalable platform and coordinated, high-quality care—the very same practices that Defendants had told investors InnovAge had successfully executed for years.

In seeking dismissal, Defendants claim that InnovAge and its executives are guilty of only "flawed business execution" and "mismanagement" that merely fell short of "perfection." But no reasonable person could describe InnovAge's failures as merely "imperfect." Indeed, when investors learned the truth, InnovAge's stock price cratered by more than 75%. Defendants also contend that most of the statements in the Offering Documents were "vague" or "generalized" characterizations that no reasonable investor would find important. But each of the statements described InnovAge's specific practices for executing its entire—and only—business, which Defendants touted to investors as "critical" to its financial performance. So, Defendants can hardly argue now that "no reasonable investor" would find these statements to be important.

In the few instances when Defendants address the facts alleged, they ask the Court to simply ignore the facts, claiming that the allegations depend on "unreliable" sources. But the Complaint's mountain of detailed facts, including reports from government audits, accounts from dozens of former and current employees, and other documentary evidence all corroborate the same consistent and coherent story: InnovAge's care model and growth strategy was a catastrophic failure. Thus, Defendants violated the securities laws by telling investors that InnovAge's business model worked when they knew that it did not.

## ARGUMENT

### I.   The Complaint Adequately Alleges the Offering Documents Contained Untrue Statements and Material Omissions

The PSLRA requires plaintiffs "to plead falsity by specifying each allegedly misleading statement, the reason why the statement is misleading, and, if made on information and belief, all facts on which that belief is formed." *Peace Officers' Annuity and Benefit Fund of Georgia v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1149 (D. Colo. 2019) (Martinez, J.).[2] Courts must then evaluate whether "the facts alleged in a complaint, taken as a whole, support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Oregon Laborers Employers Pension Tr. Fund v. Maxar Techs. Inc.*, 2020 WL 5500458, at *10 (D. Colo. Sept. 11, 2020) (Martinez, J.) (quotations omitted; alterations adopted).

### A.   The Offering Documents misled investors about InnovAge's care model, growth strategy, and regulatory compliance

In the Offering Documents, Defendants touted InnovAge as having "proven our ability to execute our model" and "demonstrated an ability to scale successfully," ¶¶170, 177, providing detailed descriptions of the Company's specific practices for executing its care model and growth strategy, including twelve statements that the Complaint alleges were untrue statements and omitted material facts ("Offering Statements"). The Offering Statements fall under two general categories: (1) nine statements about InnovAge's execution of its care model and compliance practices, ¶¶241(a)-(h),(l) ("Care Model Statements"),[3] and (2) three statements about the Company's growth strategy, ¶¶241(i)-

---

[2] The PSLRA's pleading requirements apply only to claims brought under the Exchange Act. While Plaintiffs' falsity allegations satisfy any pleading standard, their claims under Sections 11 and 12(a)(2) of the Securities Act are not subject to Rule 9(b)'s heightened pleading standard because they do not sound in negligence, not fraud, as explained further below. *See infra* at 47-49 & n.38.

[3] The Care Model Statements are the Patient-Centered Care Statement, ¶241(a), Individualized and Coordinated Care Statement, ¶241(b), Standardized and Well-Staffed Operations Statement, ¶241(c), Robust Compliance Statement, ¶241(d), Successful Medical Risk Management Statement,

(k) ("Growth Strategy Statements").[4]

### 1. The Care Model Statements were false because InnovAge's care model "failed substantially" to provide adequate and compliant care

In the Offering Documents, Defendants hailed InnovAge's care model as a "proven" success, which enabled the Company to "deliver consistent, high-quality care to our participants at scale," telling investors this "consistent performance highlights the predictability of our model." ¶¶8, 10, 175, 241(g). The Company's care model, the "InnovAge Platform," consisted of two "key" components: (1) interdisciplinary teams (or IDTs), which were the "core of our comprehensive clinical model" and "design, manage and coordinate all aspects of each participant's customized care plan," with each IDT convening "at minimum, experts across 11 disciplines, from the primary care physician to the social workers, who are collectively responsible for manage all aspects of our participant's care," ¶173, and (2) a "community-based care delivery model," including the Company's centers, home care services, and technology suite, which "deliver comprehensive care to our participants in the most appropriate and cost-effective setting." ¶174. The Offering Documents supported this account with the seven Care Model Statements, which described InnovAge's specific practices for executing its care model to provide care and comply with regulatory standards. But in truth, InnovAge had "failed substantially" and was "substantially failing" to execute those practices, which was revealed by (1) government audits, (2) accounts by former employees and investigative news articles, and (3) the Company's own admissions.

First, unbeknownst to investors, from 2016 to 2020, internal and external audits had consistently

---

¶241(e), COVID Continuity of Care Statement, ¶241(f), Technology Statement, ¶241(g), Home Care Statement, ¶241(h), and Government Relationships Statement, ¶241(l).

[4] The Growth Strategy Statements are the Expansion Model Statement, ¶241(i), Scalability Statement, ¶241(j), and Virtuous Cycle Statement, ¶241(k).

identified systemic deficiencies and noncompliance in InnovAge's execution of its care model. ¶¶143-67. By the time of the IPO, in March 2021, these deficiencies had only worsened, with Colorado regulators notifying InnovAge just days after the offering that it had received complaints about Inno-vAge's Thornton, Colorado center, including that clinical staff numbers were "dangerously low" and were "not sufficient to meet the medical needs of the participants"; that InnovAge's leadership "received concerns from staff about caseload size" and "schedules" but that "the issue was not resolved"; that the Company failed to coordinate "follow up care" after "discharge from the hospital," that clinical staff did not actively "check on participants" who lived in residential care settings; and that these deficiencies had resulted in "acute medical issues" that should have been "preventable." ¶¶180-81. Complaints triggered rare, coordinated audits of InnovAge's Sacramento and Colorado centers by state and federal regulators, which began in May and June 2021, and which reviewed records related to care delivery and compliance from mid-2020 to mid-2021 ("2020-21 Audits"). ¶¶200-01, 225. In September and December 2021, regulators released the results of the 2020-21 Audits, which concluded that at the time of the IPO, InnovAge's Sacramento and Colorado centers had "failed substantially" and were "substantially failing" to provide adequate and compliant care, which "adversely affected" or "had the substantial likelihood of affecting" the health of is participants. ¶¶11, 210, 224-26. The "seriousness of these deficiencies," regulators concluded, "require[d] the suspension of any new enrollments" at InnovAge's Sacramento and Colorado centers. ¶¶210, 224. In imposing that severe sanction, the 2020-21 Audits identified systemic deficiencies, present in almost every aspect of the Company's care delivery practices, ¶¶210, 224-26, 241(a), 225, which directly contradicted the Offering Documents that had touted InnovAge's execution as a proven success:

| Offering Document Statements | Systemic deficiencies identified in 2020-21 Audits |
|---|---|
| "Our patient-centered care delivery approach *meaningfully improves* the quality of care our participants receive…" ¶241(a) | InnovAge failed "to provide all…covered services…necessary…*to improve and maintain participants' overall health status*." ¶242(a). |
| "Our IDTs develop an *individualized care plan specific to the needs of each participant*…" | InnovAge failed "*to implement, coordinate, and continuously monitor the plan of care*." ¶242(b). |
| …Our *high touch model* involves *daily interaction with our participants* across multiple settings… | InnovAge failed "to furnish care that met the needs of each participant *in all care settings 24 hours a day*." ¶242(b) |
| …This enables us to not only deliver *coordinated, high quality care,* but also to identify and *proactively manage changes to each participant's conditions*…" ¶241(b) | InnovAge failed "to ensure the interdisciplinary team *coordinated 24-hour care delivery*" and "to *remain alert to pertinent input concerning each participant*." ¶242(b). |
| "Because of our scale, *we have been able to invest in* dedicated, *well-staffed teams*…" ¶241(c) | InnovAge "*failed to ensure proper staffing levels*" and *this failure affected 100% of the participants reviewed.* ¶242(c). |
| 'We have a long track record of *successfully managing medical risk*…" ¶241(e) | InnovAge "*failed to manage their participants' medical situations and oversee their participants' use of medical specialists*." ¶242(b). |
| "Our *technology suite supports our ability to deliver* consistent, high-quality *care to our participants at scale.*" ¶241(g) | InnovAge "*failed to document the plan of care… in the participant's medical records*" and "*maintain a medical record that was complete, accurate, and available to all staff.*" |

Second, the findings of the 2020-21 Audits are corroborated by accounts from six former employees ("FEs") and 12 investigative news articles from *The Capitol Forum*, which both confirmed and elaborated on the severity, extent, and consequences of the deficiencies, including severe staff shortages, high caseloads, delayed care, and organizational dysfunction, ¶¶129-32, 138, 141, 147, 163-65, 166-67, 183-86, an inability of IDTs to coordinate care and develop individualized care plans for increasingly large caseloads, ¶¶133, 182, inadequate in-home care services and insufficient investment during the pandemic to ensure constant and coordinated care of a larger home-bound population, ¶¶136, 138-40, insufficient training for using electronic medical records, ¶¶164, 166, and that these deficiencies had resulted in substantial lapses in services, failures to diagnose life-threatening illnesses,

and even premature deaths, ¶134, 138, 183-85 187-9.

Third, InnovAge's senior executives admitted in internal communications and later publicly that the Company had failed to execute its care model in compliance with minimum regulatory standards. In March 2021, InnovAge notified staff and participants at its Thornton, Colorado center that its understaffing problems were so severe that many participants lacked a primary care provider, an essential and mandatory requirement. ¶88. Six months later, in September 2021, InnovAge's management notified its staff that the 2020-21 Audits showed deficiencies in its Sacramento and Colorado centers that required significant remediation efforts including, among other things, "ensuring IDT coordination of care delivery," "development and reevaluation of care plans in a timely manner," and "providing services that are accessible and adequate to meet the needs of participants." ¶208. And in a May 2022 earnings conference call, Defendant Gutierrez and Patrick Blair, who replaced Hewitt as CEO in January 2022, explained that the "root causes" of the deficiencies identified in the 2020-21 Audits included InnovAge's failures to "ensur[e] that our care plans are complete and kept timely," to "standardiz[e] the process of our interdisciplinary care teams," to "coordinat[e] care with providers outside the centers," to "fill[] critical personnel gaps at each of the centers," to "ensur[e] our medical records are documented with all the required data elements," and to sufficiently strengthen its "home care network and reliability." ¶¶238-39,242(a)-(c),(e),(g)-(h). These admissions directly contradicted the portrayal of InnovAge's execution of those same practices in the Offering Documents.

Once Defendants chose to tout InnovAge's execution of its care model in the Offering Documents, they undertook an "obligation to *speak truthfully*" and to provide "complete and non-misleading information." *Maxar,* 2020 WL 5500458, at *10 (Martinez, J.); *United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013). Defendants thus had to disclose that the Company was consistently failing to execute its care model in compliance with regulatory standards. *Singer v. Reali*, 883 F.3d 425, 440 (4th

Cir. 2018) (stating that once a company chose to "inform the market that it was" conducting certain business activities, its statements would be "utterly misleading" unless it disclosed problems in those activities). In seeking dismissal, Defendants ignore these adverse facts and argue that their statements touting InnovAge's care model in the Offering Documents were not false or misleading for three reasons, none of which have merit.[5]

First, Defendants claim that even though InnovAge had consistently failed to execute its care model, they did not mislead investors by touting that model as a "proven" success because they did not "promise perfect compliance" or that the Company "would perfectly execute all of its business practices." Mot. 15-16. But no reasonable investor would describe InnovAge's failures as merely falling short of "perfection." To the contrary, the Complaint alleges that InnovAge had "failed substantially" and was "substantially failing" to deliver adequate and minimally compliant care, which compromised the Company's sole source of revenue and paralyzed its ability to expand. Defendants cannot avoid liability by recasting a complete and substantial failure of InnovAge's entire business model as a mere lack of "perfection."

Nor can Defendants avoid liability by relying on the absence of "promises" or "guarantees." Mot. 10, 12-13, 15. Courts recognize that a company must speak both truthfully and forthrightly about its business and compliance practices. For example, in the widely cited decision in *Meyer v. Jinkosolar Holdings,* the Second Circuit addressed facts nearly identical to those here, holding that a company misleads investors if it makes statements that portray its business practices as "reasonably effective" when those practices are actually "failing to prevent substantial violations" of regulatory requirements. 761 F.3d

---

[5] Defendants do not dispute, and thus concede, that the Complaint adequately alleges that the Robust Compliance Statement, ¶241(d), and Government Relationships Statement, ¶241(l), were false and misleading. And as explained below, Defendants' argument that those statements are puffery is meritless. *See infra* at 20-23.

245, 251 (2d Cir. 2014). In *Jinkosolar,* the company's statements discussed its efforts to comply with Chinese environmental regulations, describing its "pollution-preventing equipment and 24–hour monitoring teams." *Id.* at 251-52. The Second Circuit held that those statements were adequately alleged to be false because "present and substantial" problems existed at the time the statements were made. *Id.* It did not matter that the statements "did not guarantee 100% compliance 100% of the time," the Second Circuit explained, because investors would be misled by the company's statements about its environmental practices if those practices were "then failing to prevent substantial" regulatory violations. *Id.* at 251.

*Jinkosolar* charts the correct course here. As in *Jinkosolar*, the Offering Documents touted InnovAge's execution of its care model by detailing the Company's practices for providing care. For instance, the Offering Documents described the Company's interdisciplinary teams that developed individualized care plans for each participant and coordinated 24-hour care. ¶241(b). But as the 2020-21 Audits found that at the time of the IPO, InnovAge had "failed substantially" to, among other failures, "ensure the interdisciplinary team coordinated 24-hour care delivery. ¶242(b). Thus, the Offering Statements misleadingly gave "comfort to investors" that InnovAge's practices for executing its care model were, at the very least, "reasonably effective" when they were "then failing" to meet minimum regulatory standards. *Jinkosolar,* 761 F.3d at 251-52; *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 2022 WL 2114628, at *7 (S.D.N.Y. June 13, 2022) (Rakoff, J.) (holding that statements describing regulatory compliance were actionable where company processes were "routinely failing to prevent substantial violations").

Defendants argue their statements are "general," seeking to rely on cases finding generic compliance statements to be nonactionable. But those cases only underscore why the Offering Statements were false and misleading. For instance, *Singh v. Cigna Corporation* held that statements that Cigna had

"established policies and procedures" for regulatory compliance were not actionable because they were "simple and generic assertions" that did not convey confidence in the "effectiveness" of the company's practices. 918 F.3d 57 (2d Cir. 2019). The court there distinguished Cigna's generic compliance statements from those in *Jinkosolar,* which detailed "24-hour monitoring teams" and "specific compliance equipment." *Id.* Unlike the "simple and generic assertions" in *Singh,* the Offering Statements, like those in *Jinkosolar,* described in detail InnovAge's care practices and 24-hour care coordination.[6] *See Karimi*, 2022 WL 2114628, at *9 (rejecting a similar argument and holding that the complaint adequately alleged that statements about bank's know-your-client processes and compliance were false).

Second, Defendants argue that Mr. Blair's May 2022 admissions do not show that the Offering Statements were false or misleading because he merely described "new" initiatives to "strengthen" or "improve" practices that were already adequate. Mot. 15.[7] But Mr. Blair's remarks about the Company's deficient practices made clear that InnovAge failed to execute the specific practices that the

---

[6] Defendants' other cited cases are likewise inapposite because they concerned generic compliance statements without allegations of ongoing compliance violations. *Jiajia Luo v. Sogou,* 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020) ("anodyne and conventional compliance" statements were "inadequate to satisfy *Jinkosolar* in the absence of" allegations of a pre-IPO compliance failure); *Ong v. Chipotle Mexican Grill*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (no allegations that Chipotle failed to undertake food safety and quality programming); *Nardy v. Chipotle Mexican Grill,* 2019 WL 3297467, at *11 (D. Colo. Mar. 29, 2019) (Daniel, J.) (no allegations of noncompliance with regulations or standards that Chipotle); *In re Crocs, Inc. Securities Litigation,* 774 F. Supp. 2d 1122, 1143 (D. Colo. 2011) (Brimmer, J.) (no allegations that Crocs was not taking the stated steps to meet demand); *Noble Asset Management v. Allos Therapeutics,* 2005 WL 4161977, at *12 (D. Colo. Oct. 20, 2005) (Matsch, J.) (company fully disclosed clinical trial results and warned of regulatory uncertainty).

[7] Defendants emphasize Mr. Blair's statement that InnovAge "possesses a sturdy foundation," but in the rest of that portion of his remarks, Mr. Blair explained that while in a *previous* earnings call he "communicated" his belief that InnovAge had a "sturdy foundation" and "potential," after "*more time in the business,*" it was "*also* clear that to enable a consistent, scalable platform, our capabilities…require enhancements and need to evolve." Defs. Ex. 9 at 6; ¶¶236, 267-68. Mr. Blair's remarks thus confirm that InnovAge had *not* developed a "consistent, scalable platform" by the time of the IPO. ¶¶170, 177, 271.

Offering Documents touted as a "proven" success.[8] *See supra* at 8-9.[9]

Third, Defendants argue that the Care Model Statements are not actionable because the Offering Documents included cautionary disclosures about previous compliance violations, staff shortages in the healthcare industry, and the risk that future audits would uncover regulatory violations. Mot. 15-16, 18. But cautionary disclosures about future risks can protect only "forward-looking" statements, not statements about existing facts. All the challenged statements were about historical or current facts and so the bespeaks-caution doctrine has no application. *See SEC v. GenAudio Inc.*, 32 F.4th 902, 929 (10th Cir. 2022) (explaining that the "bespeaks-caution" doctrine applies only to forward-looking statements). InnovAge's cautionary disclosures that InnovAge *might* face staff shortages or compliance problems *in the future* thus do not cure the misrepresentations that purported "to describe current practices, and so are not forward-looking statements." *Karimi*, 2022 WL 2114628, at *10.

Nor are the cautionary disclosures "sufficiently specific" to "nullify any potentially misleading effect." *SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1045 (D. Colo. 2018) (Martinez, J.) (citation omitted). Vague disclaimers that a "lack of availability of clinical personnel" affecting "all health care providers" or that InnovAge "might fail to implement its policies" cannot sufficiently cure the misinformation conveyed by descriptions of policies and procedures that InnovAge was then failing to execute in

---

[8] Nor would such "interpretive arguments," even if reasonable, be proper grounds "to support a motion to dismiss." *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *9 (D. Utah Mar. 16, 2021) (refusing to apply the defendant's "interpretation of the statements to grant a motion to dismiss").

[9] Defendants also argue that whether "InnovAge perfectly documented its medical records" is "completely unrelated" to the statement that InnovAge's "technology suite supports our ability to deliver consistent, high-quality care…at scale." Mot. 18-19. Not so. Defendants repeatedly told investors in the Offering Documents that InnovAge's technology systems were essential to provide coordinated, high-quality care to its participants. *See* Defs. Ex. 2 at 8, 10, 13. Indeed, Mr. Blair admitted that InnovAge's failure to "ensur[e] [that] our medical records are documented" was one of the "root causes" of the audit deficiencies. Defs. Ex. 9 at 26.

compliance with regulatory standards. *Karimi*, 2022 WL 2114628, at *10; *Jinkosolar*, 761 F.3d at 251 (noting that disclosing a business's peculiar risk of fire and the installation of a comprehensive sprinkler system while omitting that the system has been found to be inoperable misleads investors).

### 2. The Growth Strategy Statements were false and misleading because InnovAge was never capable of scalable growth

In the Offering Documents, Defendants also repeatedly touted InnovAge's "track record of profitable growth" and "demonstrated…ability to scale successfully." ¶¶170, 177. Multiple sources make clear that the three Growth Statements were false and misleading and confirmed that InnovAge never developed a scalable business model, its growth strategy was driven by management's prioritization of rapid enrollment growth at the expense of providing effective care to its participants, and uncontrolled and unsustainable growth had compromised its ability to provide adequate and compliant care.

For example, former and current InnovAge employees and articles published by *The Capitol Forum* confirm that InnovAge's growth strategy was driven by management's prioritization of rapid enrollment without regard to the Company's capacity to accommodate its growing population, ¶¶116-17; InnovAge engaged in improper, unsafe, and unethical enrollment practices, such as recruitment of homeless participants, ¶¶120-27; rapid enrollment growth overwhelmed clinical staff and resulted in severe staff shortages, high turnover, delayed and uncoordinated care, and adverse health consequences for its participants, ¶¶129-38, 162-63, 184-89; InnovAge's senior management continued to prioritize rapid enrollment despite consistent and widespread complaints from clinical staff about the lack of staff, processes, and resources necessary to accommodate the growing population, ¶¶139-41, and the resulting staff shortages, insufficient resources and organizational dysfunction had rendered multiple of InnovAge's centers "effectively non-operational," ¶205.

Further, in May 2022, Mr. Blair and Defendant Gutierrez admitted that InnovAge had never

developed a "consistent, scalable platform," explaining that the Company needed a complete "trans-

formation" before it would ever experience scalable growth, directly contradicting the Offering State-

ments:

| March 2021 Offering Statement | May 2022 InnovAge Admission |
|---|---|
| "The fundamental aspects of our expansion playbook include…*a concerted effort to recruit and develop talent...*" | InnovAge failed to "fill[] *critical personnel gaps* at each of the centers." ¶239. |
| "…*scalable underlying clinical technology*…" | InnovAge failed to "*ensur[e] our medical records are documented with all the required data elements*." ¶239 |
| "…and an *efficient, uniform operating model*." ¶241(i) | InnovAge failed to "*standardiz[e] the process of our interdisciplinary care teams*." ¶239 |
| "*We have demonstrated an ability to scale successfully*…" ¶241(j)[10] | InnovAge failed to ensure the "operational execution" necessary for "scalable, sustainable long-term growth." ¶242(i) |

As with their statements boasting about InnovAge's care model, once Defendants chose to tout

InnovAge's growth strategy as a "demonstrated" success, they needed to disclose adverse information

undermining that portrayal. *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *6 (D. Utah

Mar. 9, 2022) ("[A] statement that contains only favorable matters and omits all reference to unfavor-

able matters is as much a false representation as if all the facts stated were untrue"). Defendants,

though, argue that two of the three Growth Statements are not false or misleading for two reasons,

neither of which has merit.

First, Defendants argue the statement that InnovAge had "demonstrated an ability to scale suc-

cessfully" was "an accurate statement of historical fact," because the Offering Documents accurately

reported InnovAge's enrollment and revenue growth from 2016 to 2020. Mot. 19. But the term

---

[10] Defendants do not dispute, and thus concede, that the Complaint adequately alleges that the Virtuous Cycle Statement was false and misleading. As explained below, Defendants' arguments that the statement is otherwise nonactionable all fail. *See infra* at 22 & n.16.

"scalability" means the *capacity* to accommodate growth. *See Cutler v. Kirchner*, 696 Fed. Appx. 809, 814–15 (9th Cir. 2017) (explaining that the term "ready to scale" implied "that the system is prepared to handle a greater volume of transactions than it is currently dealing with"). Investors understood the statement that InnovAge "demonstrated an ability to scale successfully" to mean not only that InnovAge's enrollment had grown, but also that the Company could accommodate that growth without compromising its ability to deliver care and incurring significant costs. Indeed, that is precisely how analysts understood the Offering Documents. *See* ¶271 (analyst described InnovAge's "rapid growth" as "already profitable" with a "proven" and "repeatable, scalable model"). But in truth, InnovAge had not developed a "consistent, scalable platform" and rapid enrollment growth had crippled its ability to provide adequate and compliant care. ¶¶129-32, 133-36, 138-40, 141, 147, 163-66, 166-67, 182-89.

Second, Defendants argue that InnovAge "expressly warned of its growth strategy risks" and so their statements are not actionable. Mot. 19-20. This argument fails for the same reasons as Defendants' other arguments relying on "cautionary disclosures." *See supra* at 13. As Defendants concede (Mot. 19), the Scalability Statement purported to be a "statement of historical fact" and thus was not a forward-looking statement that cautionary disclosures can cure. *GenAudio Inc.*, 32 F.4th at 929. Nor do vague disclaimers that InnovAge's growth strategy "may not prove viable" negate in "a detailed and specific manner" the omitted information that rendered the statement misleading: InnovAge's growth strategy had proven to be unviable and had compromised its ability to provide adequate and compliant care. *See, e.g.*, ¶¶129-38, 162-63, 184-89.

### 3. The Complaint adequately alleges facts attributed to InnovAge employees and investigative news articles

Defendants argue that the Court should refuse to credit every allegation attributed to six former InnovAge employees ("FEs") or articles published by *The Capitol Forum*, because "the sources are not

sufficiently reliable." Mot. 21. But this argument flouts Tenth Circuit precedent and mischaracterizes the allegations. In *Adams v. Kinder-Morgan*, the Tenth Circuit rejected a "per se rule" that plaintiffs must identify the source for every allegation in a complaint, explaining that the PSLRA does not require plaintiffs to allege "the name of the employee who provided plaintiffs with facts" or "the internal title of the internal report relied upon by the plaintiffs." 340 F.3d 1083 (10th Cir. 2003). Instead, plaintiffs need only allege facts that are detailed enough "to support a reasonable belief that the defendant's statements identified were false or misleading." *Id.* In deciding whether a plaintiff meets this standard, the Tenth Circuit instructed that courts must apply a "common-sense, case-by-case approach" not "per se" rules, evaluating the "facts alleged as a whole." *Id.*

The Complaint alleges more than enough facts to meet this standard. In more than one hundred detailed paragraphs, the Complaint alleges consistent facts, based on undisputed reports by regulators, ¶¶150-52, 156-61, 210, 224-27, admissions by senior executives, ¶¶235-39, first-hand accounts from more than two dozen former and current InnovAge employees witnesses, ¶¶66-71, 116, 119, 121-22, 131, 144, 147, 153-54, 163-67, 183, 193, 221, internal emails and other written correspondence, ¶¶159, 180, 182, recordings of internal phone calls, ¶¶208-09, and a dozen investigative news articles published by *The Capitol Forum,* who conducted its own extensive independent investigation, ¶¶117-18, 120, 124-25, 127, 129-31, 133, 134, 136, 138-41, 184-89, 191-92, 201-09, 221. Each of these sources corroborated the same consistent and coherent story: InnovAge's care model and growth strategy was not a "proven" success, but a demonstrable failure, which had "failed substantially" to provide adequate and compliant care—and, ultimately, paralyzed the Company's only source of revenue. ¶¶66-71. *Meitav Dash Provident Funds and Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415, at *8–9 (N.D. Okla. Jan. 7, 2022) (crediting allegations attributed to former employees because "they were positioned to know the information provided, and despite defendants' arguments, they form a

plausible and coherent narrative"). Defendants do not even try to argue that *any* allegation is incon-sistent, implausible, or even doubtful. Instead, Defendants insist that the Court should ignore allega-tions attributed to the FEs and *The Capitol Forum* for other reasons, none of which have merit.

First, Defendants argue that the six FEs are not reliable because some were "not employed during the Class Period" and were "low-level employees" or "locally sited to either California or Colorado." That is absurd. The Class Period begins on the day of the offering when the Offering Documents were filed. Thus, to establish the falsity of the Offering Documents, Plaintiffs must rely, at least in part, on events preceding the Class Period. *In re Tufin Software Techs. Ltd. Securities Litig.*, 2022 WL 596861, at *7–8 (S.D.N.Y. Feb. 25, 2022) (crediting confidential witness who left the company before the IPO).[11] Further, most of the FEs served in senior management positions, responsible for overse-ing all operations in a center, state, or region, including an Area Medical Director for Colorado (FE-2), Regional Executive Director for California (FE-3), a Center Director (FE-4), and Regional Vice President of Human Resources for the East Coast (FE-5). ¶¶67-70. *Tufin Software*, 2022 WL 596861, at *7–8 (S.D.N.Y. Feb. 25, 2022) (rejecting argument that confidential witnesses were "low-level em-ployees" who could not "speak for [the company] as a whole"). And every FE allegation reflects events and circumstances the employees personally witnessed, including systemic and pervasive deficiencies in California and Colorado, which represented the vast majority of InnovAge's operations. ¶¶153-54 (FE-1); ¶¶119, 121-22, 164-67, 193 (FE-2); ¶¶144, 147 (FE-3); ¶¶119, 163, 165 (FE-4); ¶116 (FE-5);

---

[11] Defendants' only cited case does not suggest otherwise, holding that allegations about a com-pany's overcharge scheme which took place exclusively during the class period could not be supported by witnesses who were employed at the company years earlier. *Lewis v. YRC Worldwide*, 2020 WL 1493915, at *7 (N.D.N.Y. Mar. 27, 2020). Unlike *Lewis,* the falsity of the Offering Documents turns, in part, on the existence of ongoing and substantial violations at the time of the IPO. *Cf. In re Micro Focus Int'l Plc Sec. Litig.*, 2020 WL 5817275, at *8 (S.D.N.Y. Sept. 29, 2020) (declining to rely on allega-tions by a defendant's "former employees" where those allegations did not sufficiently establish that certain risks had materialized prior to the effective dates of the defendant's offering documents).

18

¶¶119, 121-22, 183 (FE-6).[12] *Correa v. Liberty Oilfield Services*, 548 F. Supp. 3d 1069, 1082 (D. Colo. 2021) (Brooke Jackson, J.) (holding that statements by former employees based in Texas supported reasonable inferences about company-wide trends, particularly given that "Texas was one of the largest fleet bases for the company").

Second, Defendants argue that *The Capitol Forum* articles are unreliable because they "contain nothing more than generalized undetailed hearsay from anonymous sources." Mot. 22-23.[13] But that is false. Each allegation attributed to *The Capitol Forum* includes significant detail identifying the basis for the witness's knowledge of the facts alleged, which are corroborated by other (often multiple) witness accounts, as well as documentary evidence, including internal emails and correspondence, ¶¶159, 180, 182, recordings of internal phone calls, ¶¶208-09, and statements by regulators, government spokespersons, and the ombudsman responsible for overseeing InnovAge's Colorado centers, ¶¶131, 221. *In re Equifax Inc. Securities Litig.*, 357 F. Supp. 3d 1189, 1235–36 (N.D. Ga. 2019) (refusing to discount allegations based on articles citing anonymous source because "[n]ews articles, which frequently rely upon unnamed sources, constitute reliable bases for allegations").

---

[12] Defendants also claim that the Complaint does not adequately allege FE-5's and FE-6's "responsibilities " or the "information to which they had access." Mot. 22. That is wrong. The Complaint alleges FE-5's title, dates of employment, and reporting supervisor, and that FE-5 participated in periodic calls with Defendant Hewitt. ¶70. Likewise, the Complaint alleges FE-6's title and dates of employment, and receipt of monthly emails about new enrollments. ¶¶71, 122.

[13] The only support that Defendants offer for this argument is that in five of the Complaint's thirty-three paragraphs referencing statements quoted by *The Capitol Forum*, the sources are described as a "former enrollment employee" or "former employees in human resources." Mot. 22-23. Identifying witnesses by their responsibilities does not render their statements "generalized undetailed hearsay" and is enough to show each witness's basis for knowing the facts alleged—the PSLRA requires nothing more. *In re Rhythms Securities Litig.*, 300 F. Supp. 2d 1081, 1089 (D. Colo. 2004) (Kane, J.) (holding that information attributed to sources described as an "employee who worked in the Operations Reporting Group" and a "technical support representative" were "sufficiently specific") (citing *Adams*, 340 F.3d at 1102).

### 4. Defendants remaining arguments opposing falsity are unavailing

#### a. The challenged statements are concrete and specific descriptions of existing facts, not vague or generalized puffery

None of the Offering Statements were expressions of "corporate optimism" or "puffery"—that is, "loosely optimistic statements that are so vague, so lacking in specificity" that "no reasonable investor could find them important." *Indiana Pub. Ret. System v. Pluralsight, Inc.*, 45 F.4th 1236, 1249 (10th Cir. 2022). To the contrary, the Offering Statements were concrete and specific statements detailing InnovAge's care delivery, compliance, and growth practices. *Karimi*, 2022 WL 2114628, at *6 (holding that statements were actionable "because they provide descriptions of the processes" used by the company to comply with regulatory obligations). "Each of these statements could have, and should have had, some basis in objective and verifiable fact." *In re Level 3 Commun., Inc. Securities Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (quotation omitted; alteration adopted). For instance, the Offering Documents touted the Company's care delivery practices required by PACE regulations, such as convening interdisciplinary teams, developing care plans, and coordinating 24-hour care. ¶241(b). Whether InnovAge executed those practices in compliance with regulatory standards is objectively verifiable—indeed, regulators concluded in the 2020-21 Audits that the Company's practices "failed substantially" to comply with minimum standards. *Pluralsight*, 45 F.4th at 1249 (statements are actionable if grounded "concrete metrics" or "other objectively verifiable data"); *Karimi*, 2022 WL 2114628, at *7 (holding compliance practice statements were actionable because company was "routinely failing to prevent substantial violations").

Defendants try to recast the Offering Statements as vague or generalized puffery by plucking out-of-context phrases from eight statements, claiming that their cherry-picked phrases are "similar" to statements that the Second Circuit found to be puffery in *ECA, Loc. 134 IBEW Joint Pension Tr. of*

*Chicago v. JP Morgan Chase Co.,* 553 F.3d 187 (2d Cir. 2009).[14] But Defendants cannot obtain dismissal by merely "taking a few of Plaintiffs' allegations out of context and labeling them as puffery." *In re Bofi Holding, Inc. Securities Litig.*, 2016 WL 5390533, at *9 (S.D. Cal. Sept. 27, 2016). Rather, in deciding the materiality of a statement, the Court must consider "the full context in which the statements are presented in the complaint." *Pluralsight*, 45 F.4th at 1251 n.3. None of the Offering Statements, considered in context, are remotely "similar" to the statements in *JP Morgan*, which involved abstract notions of ethics, responsibility, or integrity, such as that the company "set the standard for integrity." *Id.* at 206. In contrast, the Offering Statements described specific practices and are "juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent…procedures." *Freudenberg v. E*TRADE Fin. Corp.*, 712 F. Supp. 2d 171, 189–90 (S.D.N.Y. 2010) (distinguishing *JP Morgan* and concluding that statements describing the company's risk management, discipline, monitoring, and credit quality were not "puffery").[15]

Defendants' remaining arguments are no less convincing, contending that three of the Offering Statements "strongly echo precise phrases courts have found nonactionable." Mot. 13. But aside from containing certain words, like "technology" or "growth," none of the statements at issue in Defendants' cited cases remotely resemble those at issue. For example, in support of their argument that the

---

[14] Defendants' cherry-picking exercise excludes not only key context, but also entire sentences that the Complaint alleges were false. For example, Defendants quote the phrase "deliver[]s coordinated, high quality care," but exclude the sentence, "Our IDTs develop an individualized care plan specific to the needs of each participant." ¶241(b). Similarly, Defendants quote the phrase "capabilities [that] enable our participants to live safely in their homes," but exclude the sentence "We directly deliver or manage all skilled and unskilled care a participant may require to live independently at home." ¶241(h).

[15] Defendants cite *Andropolis v. Red Robin Gourmet Burgers,* but in that case, the court concluded that adoption of code of ethics was not actionable because "a code of ethics is inherently aspirational." 505 F. Supp. 2d 662, 686 (D. Colo. 2007). And here, none of the Offering Statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

Technology Statement is puffery, Defendants cite *Gregory v. ProNAi Therapeutics Inc.*, but the statement at issue in that case merely listed the word "technology" in a series of other generic terms, like "knowledge" and "experience." 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018). Here, the Technology Statement conveyed that InnovAge's "technology suite" supported its "ability to deliver consistent, high-quality care to our participants at scale" because it enabled care providers to track patients' medical history and follow up care, when in fact, records management was an admitted disaster for the Company. ¶¶9, 144-45, 208, 239. *See Okemos Home, LLC v. LGF Produce, LLC*, 2019 WL 12248966, at *5 (D. Colo. Mar. 27, 2019) (Krieger, J.) (holding that statement that company's greenhouse was "using the latest technology" was actionable because it conveyed that the greenhouse "was capable of accommodating" certain methods for growing leafy greens, when, in fact, "the greenhouse was not suitable for growing leafy greens at all"). Similarly, Defendants claim that the Virtuous Cycle Statement is not actionable because it "relates to forward-looking unquantified growth" driven by "vague, potential improvements." Mot. 14. But unlike Defendants' cited cases, which concerned explicitly forward-looking and aspirational statements about a "plan to grow" or "expected growth," the Virtuous Cycle Statement is phrased in the past and present tense—with language like "we *have demonstrated* "and "we *have created*"—purporting to describe InnovAge's successful creation and demonstrated execution of a repeatable, scalable business model. *Karimi*, 2022 WL 2114628, at *10 (holding that a statement that purported to describe the company's "current practices" was not a "forward-looking statement").[16]

---

[16] In a cursory footnote, Defendants also claim that the Virtuous Cycle Statement is not actionable because it is a forward-looking statement "accompanied by cautionary statements" about "future financial and business results." Mot. 14 n.12. But as noted above, the Virtuous Cycle Statement is not forward-looking and thus is not protected by cautionary disclosures. *GenAudio*, 32 F.4th at 929. And even if parts of the statement could be construed as forward-looking, that still would not cure the non-forward-looking portions of the statement. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) (explaining that in "mixed statements...the non-forward-looking statements are not protected by the safe harbor").

Defendants argue that the Government Relationships Statement is "akin" to statements referring to "strong relationships with its key customers" found not actionable in *United Food and Com. Workers Intl. Union Loc. 464A v. Pilgrim's Pride Corp.*, 2022 WL 684169, at *1 (D. Colo. Mar. 8, 2022) (Moore, J.). But in *Pilgrim's Pride*, Judge Moore concluded that a chicken producer's participation in a bid-rigging scheme did not disprove statements that the company had "strong relationships with its customers." *Id.* at *5. Here, InnovAge's only customers—state and federal governments—repeatedly identified systemic deficiencies in providing adequate and compliant care, InnovAge failed to remedy those problems, which were exacerbated by the rapid growth in enrollment, and then repeatedly obstructed and concealed evidence from regulators to prevent exposure of their noncompliance. ¶¶149-50, 190-94.

> **b. Defendants fail to show that any investor was aware of the alleged omitted facts**

Defendants contend that the Offering Documents were not misleading by omission because certain information was supposedly "public and available to investors," including the number of "corrective actions" identified in CMS audits in 2017 and 2019, reports of inspections conducted in 2019 by Colorado regulators, and allegations in the Whistleblower Complaint about deficiencies from 2016 to 2019. Mot. 20-21. But this "truth-on-the-market" defense—that those omissions cannot deceive investors because the omitted information was already known to the market—does not justify dismissal for two reasons.

First, a "truth-on-the-market" defense presumes that information already known to the market is reflected in a company's stock price. *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996). For that reason, a truth-on-the-market defense is unavailable for statements made in an IPO, such as the Offering Documents here, because the stock price is set privately and does not necessarily reflect all

publicly available information. *Boston Ret. System v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020).

Second, a truth-on-the-market defense is seldom grounds for dismissal at the pleading stage because it requires a showing that "the truth was transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." *Gelt Trading*, 2022 WL 716653, at *5. "Because that inquiry is 'intensely fact-specific,' it is 'rarely an appropriate basis for dismissing'" a case at the motion-to-dismiss stage. *Id.* Defendants do not come anywhere close to meeting their burden, arguing only that certain information was "public and available to investors." Mot. 20-21. But the mere fact that information was "public and could be accessed" does not imply that it was indisputably known to the market, much less that it was transmitted with the "intensity and credibility" necessary to neutralize the misleading effect of the Offering Documents. *Wilkof v. Caraco Pharm. Laboratories, Ltd.*, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) (rejecting argument that dismissal was warranted because FDA reports documenting the company's noncompliance "were public and could be accessed by shareholders"). Indeed, as Plaintiffs explain in their response to Defendants' request for judicial notice, Defendants fail to show that most of these documents were even "publicly available" at the time of the IPO. *See* Response to Request for Judicial Notice at pp. 4-6.

## B. Defendants violated their duty to disclose the known risk that InnovAge's growth strategy materially threatened its revenue

Defendants also separately violated Items 303 and 105 of Regulation S-K by failing to disclose known trends, uncertainties, and risks that were (1) "presently known to management" and (2) "reasonably likely to have material effects on the registrant's financial condition or results of operations." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013). Defendants do not dispute,

and thus concede, that the Complaint adequately alleges that InnovAge's growth strategy was reasonably likely to materially impact the Company's financial condition. *See* ¶¶244-45. Instead, Defendants argue that the Offering documents adequately disclosed the information required by Items 303 and 105 and, even if they did not, the Complaint does not allege that "any such omission was known." Mot. 32-34; Underwriters' Mot. 6-7. Neither argument has merit.

First, Items 303 and 105 require not only the identification of trends or risks in a company's business, but also that the company "reasonably expects" those trends or risks to have a material unfavorable effect on revenues. *Indiana Pub. Ret. System v. Pluralsight, Inc.*, 2021 WL 1222290, at \*25 (D. Utah Mar. 31, 2021), *aff'd in part and rev'd in part on other grounds,* 45 F.4th 1236 (10th Cir. 2022). To satisfy this requirement, a company must do more than include "generic cautionary language"; it must provide a "discussion and analysis" that specifically explains "the manner in which" the trend or risk "might reasonably be expected to have a material impact on future revenue." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015); *see also Panther Partners v. Ikanos Comms.,* 681 F.3d 114, 122 (2d Cir. 2012) (disclosure that products "frequently contain defects and bugs" and that the company has and may experience product defects could not satisfy Item 303). Here, the Offering Documents' generic risk disclosures about InnovAge's growth strategy do not satisfy Item 303, because they did not disclose—much less provide a "discussion and analysis"—that InnovAge reasonably expected its growth strategy to have a material and unfavorable effect on revenue. *Bond v. Clover Health Investments, Corp.*, 2022 WL 602432, at \*22 (M.D. Tenn. Feb. 28, 2022) (holding that plaintiffs adequately alleged that healthcare company, whose revenue depended "almost entirely" on Medicare, violated Item 105 by failing to disclose its history of legal and regulatory violations).

Second, Items 105 and 303 do not, as Defendants wrongly claim, require that Plaintiffs allege that an "omission was known" to specific Defendants. Mot. 33-34; Underwriters' Mot. 6-7. Rather, Items

105 and 303 require only that a trend or risk was "presently known to management," not that it was known to any individual defendant. *See Slater,* 719 F.3d at 1197. Here, the Complaint alleges facts establishing that InnovAge's management knew about the risks associated with the Company's growth strategy. *Correa.,* 548 F. Supp. 3d at 1082 (holding that trend was known to management because at least one former employee stated he was told about the trend by a district manager and a vice president of operations). That is enough to support a claim under Section 11.[17]

## II. The Complaint Adequately Allges the Post-Offering Statements were False and Misleading

### A. Defendants continued to mislead investors about InnovAge's growth strategy, staff shortages, and regulatory compliance

#### 1. Statements about InnovAge's growth strategy were false because its enrollment was neither "organic" nor driven by "capacity"

In May and September 2021, Defendant Hewitt repeatedly touted InnovAge's "organic growth," reiterating the narrative that the Company's growth was "driven by increasing participant enrollment and capacity within existing centers." ¶¶246, 248(a), 252. These statements were false and misleading because (1) InnovAge's growth was not driven by "capacity within existing centers," but by a strategy that prioritized growth without regard to capacity, (2) the Company's historical growth was not "organic" because it relied on improper enrollment and disenrollment practices; (3) Defendant Hewitt and other senior executives had refused requests to increase the capacity necessary to provide adequate and compliant care; and (4) state and federal regulators had begun or were scheduled to begin audits because of noncompliance that placed the participants' health at serious risk. ¶¶247, 249(a), 253. Defendants argue that these statements were not false or misleading for three main reasons, none of which have merit.

---

[17] In any event, the Complaint alleges more than enough facts showing that InnovAge and Defendants Hewitt and Gutierrez knew about the risks associated with the Company's growth strategy. *See* Section III.

First, Defendants assert, without further explanation, that there is "no connection between what was said and the allegedly true facts." Mot. 24.[18] But the Complaint specifically alleges why each statement was false. *See, e.g.,* ¶¶247, 249(a), 253. In each statement, Defendant Hewitt conveyed that InnovAge's growth strategy remained viable and was driven by "capacity within existing centers," reassuring investors that "organic growth" would soon return to levels seen before the Covid-19 pandemic. Indeed, that is exactly how analysts understood Hewitt's remarks. *See, e.g.,* ¶199 (analysts issued reports explaining that "we were encouraged by building referral momentum and early signs that enrollment growth has returned to levels prior to the late-2020 COVID case surge"). But, in truth, Hewitt knew that InnovAge's growth strategy had proven to be a colossal failure and that historical growth was never "organic" but instead was driven by improper enrollment and disenrollment practices, and a growth strategy that prioritized enrollment without regard to capacity. ¶¶116-17, 120-27, 139-41, 129-38, 162-63, 184-89, 205.[19]

Second, Defendants argue that the enrollment of participants who were homeless or otherwise lacked stable housing did not render the statements misleading, because Hewitt's statements "accurately disclose that InnovAge's growth was due to participant enrollments." Mot. 24. But because

---

[18] Defendants also argue that the Court should not credit the allegation that Hewitt "refused requests to increase the 'capacity within existing centers,'" because the Complaint does not allege the source of the allegation. Mot. 25 n.13. But the PSLRA does not require Plaintiffs to identify the sources for its allegations. *Adams,* 340 F.3d at 1102. And in any event, the Complaint is replete with allegations that Hewitt and other senior executives denied or ignored repeated requests to increase capacity. *See, e.g.,* ¶¶122, 141, 147

[19] Defendants also argue (at 24) that disclosure of "accurate historic growth figures" does not create a duty to disclose "other less favorable facts," citing *McDonald v. Kinder–Morgan, Inc.,* 287 F.3d 992, 998 (10th Cir. 2002). But *McDonald* is inapplicable, because Hewitt did not make an "accurate reporting of historic successes" because her statements misled investors into believing that InnovAge's growth resulted from a viable growth strategy and scalable business model. *SEC v. Woodruff,* 778 F. Supp. 2d 1073, 1087 (D. Colo. 2011) (explaining that *McDonald* did not apply to alleged to statements that misled investors into believing that the company's reported growth was driven by monthly sales, not other sources).

PACE providers receive monthly payments for each participant, PACE regulations require that the participants meet certain eligibility requirements, specifically that the provider can ensure constant and coordinated care—a standard that InnovAge could not meet for homeless participants. ¶120. That is why InnovAge's employees repeatedly complained to the Company's management that enrolling homeless participants was improper, unethical, and unsafe. ¶¶82-84, 119-23.[20] Hewitt also did not merely tell investors that InnovAge was enrolling more participants, she touted the Company's pur-portedly "organic growth." As many courts have recognized, touting "organic" growth requires a company to disclose that its practices "were not, in fact, organic." *In re Apple Inc. Securities Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020). As this Court has explained, statements about business strategy and growth are misleading if they fail to disclose that the growth was driven by improper, unethical, and unsafe practices. *DaVita*, 372 F. Supp. 3d at 1152 (holding that plaintiffs adequately pled that growth statements were misleading because the growth was driven by an illegitimate plan to steer patients to certain insurance plans).

Lastly, Defendants contend that the growth-related statements were not false because InnovAge disclosed that its growth strategy was "uncertain." But this argument fails for the same reasons as Defendants' other arguments relying on "cautionary disclosures," *see supra* at 13, because generic cautionary disclosures about future risks do not cure misrepresentations about InnovAge's past and cur-rent practices. *Karimi*, 2022 WL 2114628, at *10 (statements that "describe current practices" are not

---

[20] Plaintiffs do not need to allege, as Defendants wrongly claim (at 24-25), that the recruitment of homeless participants was, in fact, a violation of PACE regulations or that "a sufficient number" of homeless participants were enrolled. *DaVita*, 372 F. Supp. 3d at 1152 (explaining that to plead that healthcare company's statements about growth were false and misleading, plaintiffs did not need to plead "the illegality or impropriety" of the company's patient-steering practices or that "any patient was in fact steered," because it was enough to plead that the company "publicly attributed success to other factors, while fully cognizant that it had a policy of directing…patients to private insurance")

"forward-looking statements").

### 2. Statements about staff shortages and turnover were false because InnovAge suffered from critical staff shortages resulting from its unsustainable growth

Defendants also repeatedly reassured investors that any turnover and staff shortages resulted from industry-wide challenges equally affecting all healthcare providers, including due to the COVID-19 pandemic. *See* ¶¶248(b), 250(b) ("Fully Staffed Statement"), 254(a), 254(a). These statements were false and misleading because, in fact, InnovAge's staffing problems were due to working conditions and growth strategy causing high turnover and an inability to fill positions that would "ensure proper staffing levels." *See, e.g.,* ¶¶129-38, 139-41, 162-63, 184-89, 205. 249(b). Defendants argue that these statements are not false or misleading for four reasons, none of which have merit.

First, Defendants argue that no investor could interpret statements about its efforts to ensure adequate staffing "as a guarantee that it was succeeding." But securities liability is not limited to guarantees and promises. *Jinkosolar,* 761 F.3d at 251-52 (holding falsity of statements was adequately alleged even though the statements "did not guarantee 100% compliance 100% of the time"). And statements describing business practices are misleading if those practices, like InnovAge's staffing efforts, are "then failing." *See id.*

Defendants also claim that their statement that InnovAge's "internal care delivery costs remained largely the same as we remained fully staffed to execute on our participants' care plans, albeit through a different mix of care settings" was not false because it was "simply clarifying that InnovAge had not laid off staff because of COVID-19." Mot. 25. But Defendants cannot obtain dismissal by offering their own self-serving interpretation of their statements. *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *9 (D. Utah Mar. 16, 2021) (the Court cannot "apply [Defendants'] interpretation of the statements to grant a motion to dismiss"). Nor would Defendants' alternative interpretation make the statement

any less false and misleading. Investors understood the statement to mean that InnovAge was, in fact, sufficiently "fully staffed" to provide adequate and compliant care to its participants. But, in truth, at the time of the statements, InnovAge was suffering from staff shortages that were so severe that some centers were "effectively non-operational," ¶250, and the Company's staff failed to routinely check on its home-bound participants during the Covid-19 pandemic, resulting in adverse health consequences, including at least one death, ¶¶131, 138.

Second, Defendants argue that InnovAge disclosed "the fact of staffing shortages" in the Offering Documents and subsequent public filings. Mot. 25. But this argument fails for the same reasons as Defendants' other arguments relying on cautionary disclosures, *see supra* at 13, because none of the statements are forward-looking and generic warnings about future risks are meaningful enough to cure the misrepresentations. *In re 2U, Inc. Securities Class Action*, 2021 WL 3418841, at *16 (D. Md. Aug. 5, 2021) ("general warnings that merely highlighted the obvious downsides" of growth insufficient to cure misrepresentations because "they did not specifically warn of any actual data that cast doubt on [the] business model and growth plans").

Third, Defendants contend that Defendant Hewitt's statement during the May 2021 earnings call that InnovAge had done an "excellent job of really ensuring that we've kept our turnover rates down" is nonactionable because it is a "simple and generic assertion" about "the success of the team and not a description of its work in confident detail."[21] Mot. 23. But Hewitt's statement "went well above puffery" because it "was a direct response to an analyst's inquiry." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006). Further, investors would have understood Hewitt's specific statements about a "low voluntary turnover rate" to mean that the statements were "grounded in

---

[21] Defendants attribute the statement to "InnovAge" but Defendant Hewitt made the statement during the May 2021 earnings call. ¶248(b).

concrete metrics." *Pluralsight*, 45 F.4th at 1249 (explaining that statements are actionable if "grounded in concrete metrics or other objectively verifiable data").

Fourth, Defendants claim that Hewitt's statement about turnover rates was an "opinion" because Hewitt prefaced her statement with the words "I think." But the Tenth Circuit has explained that "issuers cannot avoid liability by liberally sprinkling prefatory labels throughout a prospectus or simply tacking them onto everything they say." *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1120 (10th Cir. 2014) ("'We think,' 'We believe,' or 'In our opinion' may…suggest an opinion follows, [but] it doesn't guarantee it."). And here, Hewitt's statement responded to an analyst's question about "the capacity" of clinical staff to keep pace with "participant growth." Defs. Ex. 18 at 11. Hewitt's response reassured investors that the staffing was sufficient and could accommodate future growth, when, in fact, staff shortages were so severe at the time of the statement that some of InnovAge's centers was "effectively non-operational" ¶205. Whether Hewitt "subjectively believed" in the statement is beside the point, because "[t]he securities laws impose a personal obligation on corporate executives," like Defendant Hewitt "to sufficiently ground their communications in facts." *GenAudio Inc.*, 32 F.4th at 924.

### 3. Statements about InnovAge's regulatory violations were false because it had never remedied systemic and ongoing deficiencies

In its May 2021 Form 10-Q, InnovAge disclosed that "recently," the Company had learned that some of its centers failed to "timely complete…new participant assessments and care plans" in compliance with PACE regulations that require InnovAge to conduct assessments of new participants within 30 days of enrollment and to develop individualized care plans, adding that it was "working diligently to remedy this issue." ¶250(c). This statement was false and misleading because investors would have understood the statement to mean that InnovAge had only recently learned of this

regulatory violation, that it was unaware of any similarly significant violations or deficiencies, and that the Company worked "diligently" to remedy known violations. But, in truth, internal and external audits since as early as 2016 had consistently identified InnovAge's systemic failure to timely complete participant assessments and develop care plans and the Company failed to remedy those deficiencies, which had substantially worsened by the May 2021 Form 10-Q.[22]

### 4. Statements about government relationships were false because InnovAge repeatedly violated regulatory standards and concealed evidence from auditors

In its May 2021 Form 10-Q, InnovAge stated that "[m]aintaining, supporting, and growing" InnovAge's relationships with government payors is "critical to our long-term success" and "[o]ur model is aligned with the interests of our government payors." ¶250(d). This statement was false and misleading because it conveyed that InnovAge took reasonably effective steps to comply with its contractual and regulatory obligations, and was forthcoming, transparent, and honest in its dealings with regulators—the Company's only customers and source of 99% of the Company's revenue. But, in truth, InnovAge consistently violated regulatory standards, failed to remedy identified deficiencies, and directed its staff to obstruct and conceal evidence from government auditors, including as recently as in May 2021. ¶¶149, 165, 190-94, 277. Defendants ignore these facts, instead arguing that InnovAge's failure to process grievances has nothing to do with its government relations. Mot. 27. But that failure is just one of many facts supporting falsity and was a consistently identified deficiency that InnovAge failed to remedy. ¶250(d). Falsity is thus adequately alleged. *DaVita,* 372 F. Supp. 3d at 1153.

---

[22] Defendants argue that this statement was not false because "InnovAge's historical audit deficiencies and the potential for future audits were disclosed in the Offering Documents and were public knowledge." Mot. 26-27. But this argument fails for the same reason as Defendants' other arguments relying on cautionary disclosures. *See supra* at 13; *Jinkosolar,* 761 F.3d at 251 (disclosure that noncompliance with regulations "may be very costly" did not cure "the failure to disclose then-ongoing and serious pollution violations.").

**B.  After regulators released initial audit findings, Defendants misled investors by minimizing the significance of the audits**

By September 10, 2021, InnovAge had received feedback from the 2020-21 Audits, notifying staff in a Zoom call held that day about the deficiencies that had been identified in Colorado and Sacramento, and providing guidance for improvement. ¶209. In the Zoom training call, a recording of which was obtained by *The Capitol Forum*, management outlined their goals for responding to the deficiencies identified in Colorado and explained that CMS had found similar issues in a separate audit of some of InnovAge's operations in California: "As you can see, California and Colorado pretty much have the same areas of opportunities for improvement." *Id.*. One week later, in a letter addressed to Hewitt, CMS notified InnovAge that its audit of the Sacramento center had revealed systemic deficiencies so severe that CMS concluded InnovAge had "failed substantially" and was "substantially failing" to provide its participants "medically necessary items and services" and that "those failures adversely affected (or have the substantial likelihood of adversely affecting) its participants." ¶210. Because of the "seriousness" of the deficiencies identified, CMS took the rare step of suspending enrollment at the Sacramento center. ¶210. Following the public disclosure of the Sacramento audit findings, Defendants tried to minimize and downplay the significance of the audit, misleading investors into believing that deficiencies identified were minor and did not suggest systemic problems at other centers.

*September Audit Statements*. In a September 2021 earnings call to discuss InnovAge's fourth quarter 2021 financial results, Defendant Hewitt tried to minimize the Sacramento audits, telling investors that "audits are a regular occurrence in our industry" and that "[we] have and continue to work collaboratively with regulators as we seek to constantly improve our processes and outcomes to better serve our participants and their families." ¶254(b). This statement was false and misleading, because

audits were not "a regular occurrence" at that time due to CMS's suspension of auditing activities during the COVID-19 pandemic, which limited audits to infection control concerns or "instances of noncompliance" that placed the "health" of participants "at serious risk." ¶¶93, 255(b).

An analyst asked whether the Colorado audits, which were still pending at that time, could also "result in a freeze" as the Sacramento audit had. Defs. Ex. 19 at 14. Defendant Hewitt obfuscated by saying that they did "not have the outcome of the Colorado [audits]," "can't give you any guidance around Colorado at this time," and that they did not "have any knowledge" that the Sacramento and Colorado audits were "related." ¶254(b). Later, another analyst asked about similarities between the Sacramento and Colorado centers and whether there was a "risk" that the Colorado audits would result in a "similar outcome." Defs. Ex. 19 at 20. In response, Defendant Hewitt continued to downplay the Sacramento audit findings, telling investors that the Sacramento and Colorado audits were "two different kinds of surveys," "two different things," and "very different things." ¶¶254(b), 255(b); *see also* Defs. Ex. 19 at 21. These statements misled investors into believing that the Sacramento audits were minor and did not suggest company-wide problems, when, in truth, Defendants knew that the Colorado audits had identified the same systemic deficiencies that had been identified in Sacramento. ¶¶208-09. Indeed, the next day, analysts reiterated the bullish assessments about InnovAge, reporting that the Sacramento audits required "straightforward fixes" and that "we don't see this situation as representative of [InnovAge's] operations as a whole." ¶214. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (concluding that analyst reactions reflected that their understanding was influenced by the company's statements and thus supported falsity).

Defendants make no convincing arguments about why these statements are not false or misleading. First, Defendants contend that the statement that "audits are a regular occurrence in our industry" was not false or misleading because the Complaint "does not allege that audits are not 'a regular

occurrence.'" Mot. 28.[23] But that is false. Audits were not "a regular occurrence" in the PACE industry at that time. ¶¶93, 254-5(b). Defendants claim that they were not required to disclose that CMS had suspended auditing activities during the Covid-19 pandemic because the policy was "publicly available." Mot. 28. But the "mere fact" that this policy had been posted on CMS's "website" or "was made public, is not enough to shield Defendants from liability," particularly at the motion-to-dismiss stage. *In re Amgen Inc. Securities Litig.*, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) (holding that same regarding FDA documents on the agency's website). Nor do Defendants show that the policy was transmitted to the market with the "intensity and credibility sufficient to effectively counter-balance" Hewitt's "one-sided representations" that the audits were "routine." *Gelt Trading*, 2022 WL 716653, at *5 (explaining that "the investing public places a heavy emphasis on the pronouncements of corporate insiders").

Next, Defendants argue that Plaintiffs cannot rely on the September 10 Zoom call because the Complaint "does not sufficiently identify the purported speaker." But the Complaint alleges the date of the call, the topics discussed, specific statements made during the call, and that *The Capitol Forum* had "obtained a recording" of the call. ¶208; *see also* Defs. Ex. 16. The PSLRA requires nothing more. *Adams*, 340 F.3d at 1102 (holding that the PLSRA does not require plaintiffs to identify the source of allegations).

Finally, Defendants argue that Hewitt's repeated statements that the Colorado and Sacramento audits were "different" were not false because the Complaint does not allege that various "differences" mentioned by Hewitt were "untrue." Mot. 29. But even if Hewitt's reasons for the differences between

---

[23] Defendants claim that Plaintiffs erroneously claimed this statement pertained to specific audits (Mot. 28 n.15) but that is precisely what the statement said: the sentence immediately preceding the statement in question reads, "I will now provide a brief update on the status of our audits *in Sacramento and Colorado.*" Defs. Ex. 7 at 8 (alteration adopted).

the two audits were all technically accurate, Hewitt's statements were still misleading because they conveyed an overall impression that the Sacramento audit findings did not suggest the likely outcome of the Colorado audits. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) (explaining that "literal accuracy is not enough," because "[a]n issuer must as well desist from misleading investors by saying one thing and holding back another"). Analyst reactions make clear they were misled by these statements, with one analyst later explaining that "we did not anticipate [the Colorado audits] would progress to freezes, but rather a corrective action plan," because of "commentary from management." ¶228. *See Signet Jewelers,* 2018 WL 6167889, at *13 (explaining that analyst reactions support falsity). Defendants also claim that they were not required to disclose "preliminary" audit findings showing that the Colorado audits had identified the same systemic deficiencies present in Sacramento.[24] But once Hewitt chose to affirmatively reassure investors that the Sacramento and Colorado audits were "different," she undertook an obligation to "speak fully and truthfully" by disclosing that the Company knew that the audits had identified the same systemic problems. *Maxar*, 2020 WL 5500458, at *10.[25]

---

[24] Defendants cite *Singh v. Cigna Corp.* for the proposition that InnovAge was "not required to disclose all communication with a regulator," Mot. 28, but that case supports Plaintiffs not Defendants. *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 312 (D. Conn. 2017) (explaining that "the existence of 'ongoing and substantial' violations of regulations that are left undisclosed can lead to a material misstatement or omission" but concluding no violations were alleged to be ongoing at the time of the statements at issue). Defendants also argue that "preliminary findings similar to the Sacramento audit" did not render the statement that there had been "no immediate corrective actions identified" false or misleading. Mot. 28. But this statement must be viewed in the context of the rest of Hewitt's remarks, which as noted above analysts clearly understood to mean that the initial findings from the Colorado audits did not indicate problems similar to those identified in the Sacramento audits. ¶213; Defs. Ex. 8-9.

[25] Defendants claim that Hewitt's statements "must be assessed together with her admonition in the same earnings call that 'we can't give you any guidance around Colorado at this time.'" Mot. 29. But even that statement was itself false because the Company knew that the audits had identified the same systemic and pervasive problems in Colorado that were found in Sacramento and she chose to respond to the analysts' questions on that subject.

36

*November Audit Statements.* Two months later, on a November 9, 2021, earnings call, Hewitt continued to minimize the significance of the Sacramento audits, telling investors that "[f]or context, there were less than 200 participants in our Sacramento center as of the beginning of this month." ¶¶217, 259(b). After Hewitt disclosed that CMS had referred the Colorado audits to the agency's compliance and enforcement division ("DCE"), analysts asked whether the referral was "expected" or "a normal part of the process or if there was something that caused it to be referred." ¶¶218-19, 259(c); *see also* Defs. Ex. 11 at 20. In response, Hewitt downplayed the referral as "not unusual" and "not an uncommon practice," adding that "there's been no information as far as the agencies are intending to suspend or otherwise curtail o[u]r programs or impose other sanctions" and that "I do think Colorado is a little bit different than Sacramento." ¶¶218-19, 259(c); *see also* Defs. Ex. 11 at 21. Hewitt's statements were false and misleading because they mislead investors into believing that the deficiencies identified in Sacramento did not suggest company-wide problems. Likewise, Hewitt's statements misled investors into believing that CMS's referral of the Colorado audits to DCE was "not unusual," when, in fact, cases are referred to DCE only when "deficiencies are serious enough to escalate directly to the enforcement activity stage" or when "core compliance deficiencies remain unresolved." ¶260(c).

Defendants argue that Hewitt's statement that "Colorado is a little bit different than Sacramento" is not actionable because Hewitt prefaced the statement with the words "I think."[26] But as discussed above, attaching prefatory labels like "I think" does not automatically transform a statement into an

---

[26] Defendants also argue that Defendant Hewitt's statement that the CMS referral to DCE was "not unusual" was not false because the CMS's Medicare Oversight and Enforcement Group ("MOEG") "oversees, coordinates and conducts the audits of all PACE organizations." Mot. 29 (citing ¶260). But Defendants confuse two separate divisions of CMS. As the Complaint explains, while MOEG generally oversees audits of all PACE programs, "in certain cases, 'conditions noted in the audit may be referred the Division of Compliance Enforcement (DCE),'" which is responsible only for enforcement determinations. ¶260(c).

opinion. *MHC Mut. Conversion Fund*, 761 F.3d at 1120. And an "opinion" is still actionable because Hewitt omitted facts that made the statement misleading. *GenAudio,* 32 F.4th at 925 ("Statements of opinion are indeed actionable if the speaker omits material facts that make the statements misleading").

During the November 2021 earnings call, Hewitt also disclosed that InnovAge would "begin a routine audit in New Mexico that will be handled remotely." ¶259(b). This statement was false and misleading because New Mexico regulators confirmed to *The Capitol Forum* that by that time, the audit had "already been going on for several weeks." ¶260(b). Defendants argue that this statement was immaterial because the "duration of any audit is not fixed, there is no reason the precise time it begins would be material." Mot. 30. But the "abnormal length" of an audit reflected the severity and extent of deficiencies identified; the New Mexico spokesperson told *The Capitol Forum* that "while the Albuquerque center was scheduled to have a routine audit, CMS 'started earlier this year due to what's been going on in other states.'" Defs. Ex. 17 (Nov. 11 TCF article) at 1.

## C. Defendants Hewitt and Gutierrez falsely certified that InnovAge's SEC filings were not false or misleading

Defendants concede that if the Court finds that they made any false statements in their quarterly or annual SEC filings during the Class Period, ¶¶250-51, 256-57, 261-62, then the Sarbanes-Oxley certifications filed by Defendants Hewitt and Gutierrez in connection with those filings are also false. Mot. 31. Because the Court should find multiple false statements in the SEC filings, it should also find the certifications to be false.

## D. Defendants fail to meaningfully dispute that the Post-Offering Statements omitted facts that rendered them misleading

Defendants argue that the same information omitted from the Offering Documents was also omitted from the Post-Offering Statements, and that in neither scenario did the omission render the

statements false and misleading. The omission of the same information renders the statements false and misleading, plus the Post-Offering Statements omitted additional facts, including reports from regulators about "dangerously low" numbers of clinical staff at certain centers, ¶¶249(b), 251(b), 255(a), 260(a)); internal communications that some centers were understaffed and that participants lacked primary care physicians on their IDTs, ¶¶249(b), 251(b); audits by regulators had begun or were soon to begin in Sacramento and Colorado, ¶¶249(a)-(b). 251(b)-(d), 253, 255(a); efforts by Defendants and other senior InnovAge executives to obstruct and conceal evidence from government auditors, ¶251(d); and preliminary findings from the Colorado and Sacramento audits, ¶¶255(b). Defendants do not even care to mention these omitted facts, let alone substantively dispute that they rendered the Post-Offering Statements misleading. Plaintiffs have adequately pled that the Post-Offering Statements were false and misleading. *Snyder v. Beam Techs., Inc.*, 2021 WL 4947295, at *16 (D. Colo. Aug. 16, 2021) (Wang, M.J.) (explaining that when a defendant "raises no substantive argument explaining" allegations are "insufficient," dismissal on those grounds is not warranted).[27]

## III. The Complaint Adequately Pleads Scienter

Scienter may be established by showing recklessness, which is "akin to conscious disregard." *Pluralsight, Inc.*, 45 F.4th at 1259. A complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

---

[27] Defendants also argue that the truth-on-the-market defense is even "stronger" for the Post-Offering Statements, because some of *The Capitol Forum* articles were "published" before the Post-Offering Statements were made. As Plaintiffs explain in their response to Defendants' Request for Judicial Notice, Defendants cannot show that any of *The Capitol Forum* articles were publicly available at the time of the challenged statements, much less that the information in the articles was indisputably known to the market in a manner that overcame Defendants' deception. *Gelt Trading*, 2022 WL 716653, at *5.

324 (2007). In making this determination, the Court must first "accept all well-pleaded factual allega-

tions in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Plu-*

*ralsight*, 45 F.4th at 1261 (quotation omitted). Then, the Court must determine "whether *all* of the facts

alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual alle-

gation, scrutinized in isolation, meets that standard." *DaVita*, 372 F. Supp. 3d at 1153. The detailed

allegations, when considered together, give rise to a strong inference of scienter.[28]

### A. Defendants knew about and had access to information that contradicted their statements

It is undisputed that Defendant Hewitt and other senior executives like CMO Welch knew about

the results of audits and inspections before the IPO from 2017 to 2020. ¶¶152, 154, 193, 276.[29] These

audits consistently revealed systemic and pervasive deficiencies that InnovAge failed to remedy and

which, by the time of the IPO, had worsened to such a serious extent that regulators suspended en-

rollment at InnovAge centers across the country. ¶¶224-25. Hewitt and Gutierrez also confirmed that

they, and other senior executives such as CMO Welch, closely monitored regulatory audits, repeatedly

detailing the status of audits to analysts and investors. ¶¶212-13, 217-19, 254, 259, 282. *Pluralsight*, 45

F.4th at 1264 (noting that knowledge of falsity may be adequately pleaded where executives "repeat-

edly described" that information "to analysts and investors"). During the Class Period, Hewitt and

Gutierrez, along with other senior executives such as CMO Welch, also knew that regulators received

complaints about, among other things, "dangerously low" numbers of clinical staff and "high turno-

ver." ¶¶180-82. They also knew that those complaints had triggered regulatory audits of InnovAge's

---

[28] Defendants do not address whether the Complaint alleges scienter for their violations of Regulation S-K. These arguments are waived.

[29] *See also* PACE, 2020 Audit Overview, https://www.cms.gov/files/document/2020-pace-audit-overview.pdf ("Notification of the engagement letter is sent to the PACE organization's CEO - CMS Administrator Contact designated in HPMS.")

centers in Colorado and California. ¶¶201, 254. Yet Hewitt and Gutierrez continued to downplay and minimize the significance of audits they knew would find that InnovAge was operating well below regulatory standards. *See, e.g., Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (denials contribute to inference of scienter).

Defendants' knowledge of ongoing and substantial regulatory violations at the time of their statements is further corroborated by former and current employees' statements, as well as documentary evidence obtained by *The Capitol Forum*, including repeated and consistent complaints to CMO Welch about the urgent need to increase staffing, ¶¶201-05, 163, CMO Welch's receipt of real-time reports via email about the number of outstanding orders for specialty and other types of care, ¶¶164, 203, and a telephonic meeting just three months before the IPO with Defendant Hewitt, CMO Welch, other executives, and 40 doctors and nurse practitioners who reported that the Company's inadequate staffing levels were resulting in missed labs and unfilled specialty care orders, ¶167.[30] Further, multiple former and current employees confirmed that CMO Welch and other senior executives directed staff to obstruct and conceal evidence from government auditors both before and during the Class Period. ¶¶165, 191, 193-94.

Defendants attempt to diminish the severity of these allegations by impugning the credibility of three of the six FEs. Mot. 36-38. But as discussed above, the Complaint alleges the job titles, tenure at the company, and facts showing the basis for personal knowledge of the facts alleged. ¶¶66-71. The PSLRA requires nothing more. *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th

---

[30] Defendants dispute that Hewitt denied repeated requests from the former Regional Executive for California to "pause enrollment to allow us to build a better network," claiming that the Court can ignore the allegation because the Complaint did not specify when the requests were made, what exactly the request was based on, or why InnovAge needed a better network. Mot. 37. But the PSLRA does not require Plaintiffs to plead those facts what's more, the allegations are entirely consistent with systemic deficiencies that regulators identified. *Adams,* 340 F.3d at 1102.

Cir. 2016) (noting that at the motion-to-dismiss stage, courts must "accept the truth of the witnesses' accounts as pleaded in the complaint and do not assess the witnesses' credibility"). Relying on *Anderson*, Defendants claim that allegations about their receipt of reports or attendance at meetings is not sufficient, but the Tenth Circuit later distinguished *Anderson* explaining that it is limited to its specific facts, which involved complex projections about particular aspects of massive projects lending to a finding that defendants were at most negligent for "failing to put together a great volume of puzzle pieces." *See Pluralsight*, 45 F.4th at 1263-64 (discussing *Anderson* and *Level 3*).[31] Here, as in *Pluralsight,* it is "reasonable to infer" that Defendants were aware of information that related to a "key business metric" that the executives "repeatedly represented [they] monitored, and that [they] regularly reported to investors and analysts." *Id.* at 1264. These allegations create a strong inference of scienter, including as part of the holistic analysis. *Adams*, 340 F.3d at 1106 (defendant's position as "president and chief executive officer" was relevant to holistic analysis).

**B. InnovAge's admissions support the inference that Defendants' statements were knowingly or recklessly false when made**

Defendants argue that the admissions by Defendant Gutierrez and Mr. Blair do not support scienter. Mot. 34-35. That is wrong. In *Pluralsight*, the Tenth Circuit held that belated acknowledgment of a problem supports an inference that the defendant "knew he had materially misrepresented" information during the class period and rejected the argument that such statements were merely nonculpable hindsight. *Pluralsight,* 45 F.4th at 1263. Defendants, likewise, try to recast Mr. Blair's and Defendant Gutierrez's admissions as mere shifts in policy or practice. Mot. 35. But the actual statements make clear that Mr. Blair and Defendant Gutierrez acknowledged that InnovAge required a

---

[31] Defendants also cite *Smallen v. The Western Union Company,* but that decision also relied mainly on *Anderson. See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1308 (10th Cir. 2020).

complete "transformation" before it would ever be able to operate "a consistent, scalable platform." ¶267. Mr. Blair's conclusion, after only a few months as CEO, that the Company would need "transformational actions" before it could even hope to create a business model that Defendants had touted for years prior as a "proven" success "support[s] the inference" that Defendants "knew [their] representation[s]…presented a danger of misleading investors, or at least that the danger was so obvious [they] must have known of it." *Pluralsight*, 45 F.4th at 1261.[32]

### C.  Resignations by InnovAge's most senior executives support an inference of scienter

Defendant Hewitt's and CMO Welch's sudden resignations after regulatory sanctions also supports an inference of scienter. Hewitt, InnovAge's only CEO, who the Offering Documents hailed as a "visionary," resigned just one week after CMS announced its suspension of enrollment at all Colorado centers. ¶¶32, 171, 228, 231, 278. The resignation followed reports by analysts that assailed InnovAge management's lack of "credibility," stating that their analysis had been skewed by management's assurances that the Colorado audits were different than the Sacramento audit. ¶13. Then, CMO Welch's resignation was announced just a few months later. These facts support an inference of scienter. *Myriad Genetics,* 2021 WL 977770, at *24 (resignations of "two prominent executives" that were "effective immediately" supported inference of scienter); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671-72 (D.S.C. 2016) (scienter supported by "the resignation of the Company's three most senior executive[s]"); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1263 (D. Nev. 2019) (COO's resignation "one week after" corrective disclosure supported inference of scienter).

---

[32] Defendants' cases are distinguishable because they are limited to specific circumstances not present here. *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *5 (D. Colo. June 21, 2005) (acknowledging accounting errors is not an admission of a scheme to defraud because "accounting irregularities, standing alone, are insufficient to state a securities fraud claim.")

**D. Motive and opportunity do not need to be alleged, but further support an inference of scienter**

While Plaintiffs need not plead motive or opportunity to establish scienter, it is alleged here and bolsters the strong inference of scienter. Hewitt and Gutierrez are "high-level corporate insiders, which gives rise to the presumption of an opportunity to commit fraud." *Oklahoma Firefighters Pension and Ret. System v. Lexmark Intl., Inc.*, 367 F. Supp. 3d 16, 36 (S.D.N.Y. 2019). To establish motive, "[the plaintiff] must allege that the corporate defendant or its officers 'benefitted in some concrete and personal way from the purported fraud,'" typically by alleging that corporate insiders "ma[de] a misrepresentation to sell their own shares at a profit." *JP Morgan*, 553 F.3d at 198. Here, as part of an agreement with WCAS to take InnovAge public, Apax invested in InnovAge in a deal that valued the Company at $950 million—nearly 500 times what WCAS paid for the Company four years earlier. ¶7. In connection with the Apax investment, Hewitt and Gutierrez received more than $35 million and $7.5 million in cash awards, respectively, consisting of "transaction bonuses," "option cancellation payments" for options that were cancelled because of the Apax investment, and additional payments "as an incentive to participate" in the option cancellation "in connection with Apax's investment in the Company." ¶¶32-33, 279.[33] *Pluralsight, Inc.*, 45 F.4th at 1267 (finding motive adequately alleged because "Defendants profited greatly from their stock sales" and "sold a significant portion of [their] holdings"). Hewitt's and Gutierrez's massive windfall was not the sort of "incentive-based compensation" that is common among executives, as Defendants wrongly claim. Mot. 39. Rather, Hewitt and

---

[33] Defendants claim that most of the payments that Hewitt and Gutierrez received in connection with the Apax transaction "was earned *pre*-IPO while InnovAge was a private company, rendering their alleged motive to inflate the stock price implausible." Mot. 39. But nothing in InnovAge's SEC filings disclose when Hewitt and Gutierrez *received* the payments, which were recorded on the Company's financial statements for fiscal year 2021. And at any rate, the offering price for InnovAge's stock was *necessarily* set privately before the IPO. *See Uber,* 2020 WL 4569846, at *6.

Gutierrez's "bonuses were tied to a specific goal"—the Apax transaction and the IPO—and thus they both thus had "a specific motive to lie" to cooperate in the Apax investment and IPO because "doing so would allow them to reap a concrete benefit in the form of bonuses" amounting to more than 4300% and 1900% of their base salaries, respectively. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498–99 (S.D.N.Y. 2018) (holding that motive was adequately alleged where defendants had "a specific motive to lie about or manipulate patient enrollment numbers since doing so would allow them to reap a concrete benefit in the form of bonuses amounting to nearly 60% and 49% of their base salaries").

### E.  Holistic analysis of the facts alleged compels the finding that scienter is adequately alleged

In sum, when viewed holistically as required, the Complaint amply pleads scienter. Indeed, Defendants do not propose an alternative or competing explanation for their conduct. *Tellabs,* 551 U.S. at 323. And the Court need "not address arguments not actually raised and briefed by the parties." *DaVita,* 372 F. Supp. 3d at 1153. Because the Complaint alleges scienter for Defendants Hewitt and Gutierrez, as well as other executives, scienter is imputed to corporate defendant InnovAge. *Myriad Genetics,* 2021 WL 977770, at *18 (considering allegations about executives in deciding whether plaintiffs stated a claim against Myriad).

## IV.  The Complaint Adequately Alleges Control Person Claims

Under Section 15 of the Exchange Act and Section 20(a) of the Securities Act, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 (10th Cir. 1998). To allege control person liability under those sections, a plaintiff must establish (1) a primary violation of a securities law, and (2) "control" over the primary violator by the alleged controlling person. *Id.* The Complaint adequately alleges that the Director Defendants and Private Equity Defendants are

controlling persons.[34]

The Complaint alleges that the Director Defendants are controlling persons because they consented to be named as director nominees in the Offering Documents and were required to supervise the preparation and dissemination of the Offering Documents and ensure that they were accurate and complete.[35] *See Correa,* 548 F. Supp. 3d at 1084 (holding liable as control person a director who consented to being named as a Director Nominee or facilitated the IPO process). And the Complaint alleges that Defendant Scully was extensively involved in InnovAge's conversion to a for-profit company, its growth strategy, and its decision to go public. ¶¶5-7, 103-05, 107-09, 113-14, 123, 223.

Defendants' suggestion that the Complaint fails to allege that WCAS and Apax are control persons makes no sense. The Complaint quotes directly from the Offering Documents, which expressly state that InnovAge is "controlled" by WCAS and Apax.[36] According to the Offering Documents, Apax and WCAS "beneficially own…86% of our outstanding common stock" and "together will control the vote of all matters submitted to a vote of our shareholders." ¶378; *see* Prospectus at 1, 18. The Offering Documents state that "Our Principal Shareholders," that is, Apax and WCAS, "*control us*" and "*will have significant influence with respect to our management, business plans and policies.*" ¶378; Prospectus

---

[34] Defendants do not challenge, and thus concede, that the Complaint adequately alleges that the Officer Defendants are controlling persons.

[35] The Complaint does not, as Defendants wrongly suggest, allege that the Director Defendants "signed the Offering Documents." Rather, the Complaint alleges that the Director Defendants "signed a written consent to being named in the Offering Documents as an individual to become a director of the Company." ¶¶36-44. That is sufficient. *Correa,* 548 F. Supp. 3d at 1084.

[36] Defendants argue that the Complaint "does not explain how ownership of InnovAge was divided after the IPO, making it impossible to evaluate the post-offering claims as to control," but provide no authority for why such an evaluation is necessary, let alone required. Mot. 45; *In re Gohealth, Inc. Securities Litig.,* 2022 WL 1136576, at *3 (N.D. Ill. Apr. 18, 2022) (rejecting the argument that a complaint must allege that a defendant "alone exercised control" because "more than one entity may have requisite control under Section 15" and that two defendants "may have shared control does not foreclose Defendant's liability")

18. Finally, the Complaint alleges that five of the Company's board members are representatives from Apax and WCAS. ¶46.[37]

## V.   The Complaint Adequately Alleges Securities Act claims

Section 11 of the Securities Act "places a relatively minimal burden on a plaintiff" who "need only show a material misstatement or omission to establish [a] prima facie case," and "liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Likewise, Section 12(a)(2) of the Securities Act "provides essentially the same cause of action" as Section 11 "but applies it to persons who use material misstatements or omissions in a prospectus in an offer or sale of a security." *In re Oppenheimer Rochester Funds*, 838 F. Supp. 2d 1148, 1156-57 (D. Colo. 2012). Plaintiffs adequately alleged their claims under Section 11 and Section 12(a)(2) consistent with Tenth Circuit precedent and none of the Underwriter Defendants' arguments have merit.

Plaintiffs' claims against the Underwriter Defendants are not, as those defendants wrongly claim, subject to Rule 9(b)'s heightened pleading standard. Underwriters' Mot. 2-5, 14-15. While courts disagree about whether Rule 9(b) should apply to Securities Act claims that "sound in fraud," courts uniformly agree that Securities Act claims against underwriters are not subject to Rule 9(b) because such claims "sound in negligence"—including in cases cited by the Underwriter Defendants. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (cited at Underwriters' Mot. 4-5 & n.4, 7) (affirming

---

[37] Defendants claim that "[a] minority shareholder is not a control person…absent an allegation the shareholder actually exercised some day-to-day control," but none of Defendants' cases support that proposition—and unlike those cases, Apax and WCAS own 86% of InnovAge's stock and control a majority of the Board. *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1133 (D. Colo. 2017) (two defendants held just 6.7% and 2.5% of the company's stock and were each connected to just one board member); *Silsby v. Icahn*, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014) (defendant owned just 14.8% of the company's stock).

that Section 11 claims against company defendants were subject to Rule 9(b) while Section 11 claims against IPO underwriters were not subject to the heightened pleading requirements of Rule 9(b) because only the former claims sounded in fraud); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 637 (N.D. Ill. 2020) (same). The Tenth Circuit has agreed, holding that, whether or not Rule 9(b) applies to Securities Act claims "premised on fraud," it did not apply to Securities Act claims based on due diligence failures, like Plaintiffs' claims against the Underwriter Defendants. *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251-52 (10th Cir. 1997) ("[a]ssuming without deciding" that "Rule 9(b) scrutiny" applied to Securities Act claims sounding in fraud and finding that Rule 9(b) did not apply to Securities Act claim premised on failures to make "a reasonable investigation" of the offering materials).

This case is no different. The Underwriter Defendants are not named in the Exchange Act claims and the Complaint does not allege that the Underwriter Defendants participated in any fraudulent scheme. Instead, the Complaint alleges that the Underwriter Defendants failed to meet their due diligence duties. ¶¶338-48. 365. *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000) (holding that Rule 9(b) did not apply to claims against underwriters, because plaintiffs alleged the underwriters failed "to meet their due diligence duties," not that they "were involved in a fraudulent scheme"). In any event, the pleading standard makes no difference here, because Plaintiffs' allegations of the details surrounding the misrepresentations satisfy any pleading standard.[38]

---

[38] The Underwriter Defendants also claim that when a Securities Act claim "sounds in fraud, Rule 9(b) requires that the complaint plead specific facts that each defendant acted with scienter." Underwriters' Mot. 15. That is wrong. Neither Section 11 nor Section 12(a)(2) require plaintiffs to prove scienter. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 (1983). Rule 9(b)'s heightened pleading standard is just that—a pleading standard. Thus, even when courts find that Rule 9(b) applies to Securities Act claims, that only means that "the circumstances of the fraud be pleaded with particularity, it does not require scienter to plead Section 11 and 12 claims." *In re Friedman's, Inc. Securities Litig.*, 385 F. Supp. 2d 1345, 1366–67 (N.D. Ga. 2005).

Plaintiffs also have adequately pled standing as to their Section 12 statutory seller claims.[39] Plaintiffs submitted sworn certifications verifying the date, amount, and price of their stock purchases, and alleged that "Indiana purchased shares of InnovAge common stock in the Offering *from Defendant J.P. Morgan.*" *See* ECF Nos. 54-1, 2, 3; ¶24 (emphasis added). That is more than enough to establish standing for a Section 12(a)(2) claim at the motion to dismiss. *See In re Molycorp, Inc. Secs. Litig.*, 157 F. Supp. 3d 987, 1017 (D. Colo. 2016) (holding that standing was established through allegations identical to those asserted here that plaintiffs "purchased...shares [of] Molycorp common and preferred stock in the February and June 2011 Offerings pursuant to the February and June 2011 [p]rospectuses.").[40] Even so, Defendants argue that Plaintiffs lack standing because "*it is possible* that the underwriters sold to a broker" and not directly to Indiana (with the consequence that J.P. Morgan would not be a "seller" under the statute). Underwriters' Mot. at 10-12 (emphasis added). This was not pled in the Complaint and is pure speculation. At the motion to dismiss, the Court must "accept all factual allegations in the complaint as true." *Pluralsight*, 45 F.4th at 1248. Plaintiffs provided evidence of their purchases and alleged that they bought from J.P. Morgan in the offering, and that is sufficient.

The Underwriter Defendants' suggestion otherwise misrepresents the parties' communications, during which Underwriters' counsel tried to abuse this Court's conferral requirements for motions to dismiss. *See* Practice Standards for Civil and Criminal Matters ("Practice Standard") § III.D.1. In

---

[39] The Underwriter Defendants do not dispute Plaintiffs' standing to pursue a Section 11 claim. They contend that El Paso and San Antonio cannot pursue Section 12(a)(2) claims due to the timing of their stock purchases. Underwriters' Mot. at 11. This is of no moment because Indiana has standing and pleaded sufficient Section 11 and 12(a)(2) claims, and accordingly those claims survive the motions to dismiss.

[40] Moreover, Indiana's verified purchase of 4,500 shares at $21 per share confirms that it bought in the Offering, because InnovAge's stock never traded as low as $21 per share other than in the offering. *See* Pls. Ex. 1. Historical stock price data "is capable of ready and accurate determination" so judicial notice is proper. *In re Molycorp, Inc. Securities Litig.*, 2015 WL 1514712, at *2 (D. Colo. Mar. 30, 2015).

accordance with those requirements, Lead Counsel conferred with Underwriter' Counsel about their anticipated motion to dismiss. Pls. Decl. ¶ 10. During the call, Underwriters' Counsel raised their belief that Plaintiffs did not adequately allege they purchased shares from one of the Underwriter Defendants in the offering. *Id.*. Lead Counsel responded by noting that Plaintiffs submitted certifications of their purchases and alleged that Indiana had bought on the offering from J.P. Morgan in the Complaint, and confirmed that Lead Counsel was concurrently looking at documentary evidence confirming Indiana bought stock from J.P. Morgan in the Offering. *Id.* Underwriters' Counsel refused to accept that representation, insisting that Lead Counsel produce redacted account statements. *Id. See* Underwriters' Mot. 1 n.1, 12 n. 8. The purpose of the Court's conferral requirement is to avoid Rule 12 motions that "unreasonably delay the progress of civil litigation" by identifying problems that be easily "corrected by amendment." Practice Standards § III.D.1. But Underwriters' Counsel neither identified any "deficiencies" nor suggested any "corrections" that they believed could be made. Pls. Decl. ¶10. Instead, Underwriters' Counsel insisted that Plaintiffs' allegations were inaccurate without providing any basis, evidence, or explanation supporting that belief. *Id.* It is thus now clear that Underwriters' Counsel tried to exploit the Court's conferral requirement to extract pre-answer discovery and, after that effort failed, now try to misrepresent the parties' communications to cast doubt on well-pleaded allegations. The only question before the Court is whether Plaintiffs' allegations state a claim for relief—they do. Nothing further is required.

## CONCLUSION

For the reasons above, the Court should deny Defendants' Joint Motion to Dismiss and the Underwriter Defendants' Motion to Dismiss in their entirety.[41]

---

[41] Should the Court grant the Motions, in any part, Plaintiffs respectfully request leave to amend the complaint.

Date: November 14, 2022                    Respectfully submitted,

*/s/ Cecil E. Morris*

FAIRFIELD AND WOODS, P.C.
Jason B. Robinson
Cecil E. Morris
1801 California Street, Suite 2600
Denver, CO 80202
Tel.: (303) 830-2400
Fax: (303) 830-1033
jrobinson@fwlaw.com
cmorris@fwlaw.com

*Liaison Counsel for Lead Plaintiffs*

COHEN MILSTEIN SELLERS & TOLL
PLLC
Julie G. Reiser
S. Douglas Bunch
Jan E. Messerschmidt
1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Tel.: (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com

Manuel J. Dominguez
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel.: (561) 515-1400
Fax.: (561) 515-1401
jdominguez@cohenmilstein.com

*Lead Counsel for Lead Plaintiffs*

51

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November 2022, I electronically filed a true and correct copy of the foregoing Omnibus Opposition to Defendants' Motions to Dismiss Amended Class Action Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties via the CM/ECF system.

/s/ *Cecil E. Morris*
Cecil E. Morris