**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 21-cv-02770-WJM-SKC

EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, AND INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

     Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
JOHN ELLIS BUSH,
ANDREW CAVANNA,
CAROLINE DECHERT,
EDWARD KENNEDY, JR.,
PAVITHRA MAHESH,
THOMAS SCULLY,
MARILYN TAVENNER,
SEAN TRAYNOR,
RICHARD ZORETIC,
WELSH, CARSON, ANDERSON & STOWE,
APAX PARTNERS, L.P.,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY, L.L.C.,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO., LLC, and
ROBERTS & RYAN INVESTMENTS, INC.,

     Defendants.

---

**DEFENDANTS' JOINT REPLY IN SUPPORT OF JOINT MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

---

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   PLAINTIFFS FAIL TO STATE A SECTION 10(B) AND RULE 10B-5 CLAIM. ..........1

   A.   Plaintiffs Allege Corporate Mismanagement, Not Securities Fraud. .....................1

   B.   Plaintiffs Fail to Plead Any Actionable Offering Document Statements. ..............2

      1.   The Optimistic Statements Are Inactionable Generalizations
           Regarding InnovAge's Business Practices. ...............................................2

      2.   Plaintiffs Do Not Adequately Allege that the Offering Document
           Statements Were False or Misleading When Made. ...................................5

         a.   Plaintiffs Cannot Rely on the Audits, Purported Former
              Employee Statements, or InnovAge's May 2022
              Statements. ..................................................................................6

         b.   The "Care Model Statements" Were Not False or
              Misleading. ..................................................................................9

         c.   The "Growth Strategy Statements" Were Not False or
              Misleading. ................................................................................12

   C.   The Offering Documents Complied with Items 105 and 303. ............................13

   D.   Plaintiffs Fail to Plead Any Actionable Post-Offering Statements. .....................14

      1.   General Statements About Staff Turnover Rates Are Not
           Actionable. ........................................................................................14

-i-

2.    Plaintiffs Do Not Adequately Allege that the Post-Offering

Statements Were False or Misleading When Made. ................................. 15

E.    Plaintiffs Fail to Adequately Plead Scienter. ....................................................... 20

1.    Plaintiffs Fail to Allege Hewitt and Gutierrez Had Knowledge of

the Alleged Ongoing Compliance Violations. ......................................... 21

2.    InnovAge's Announcement of Improvements to Its Platform After

the Challenged Statements Does Not Support an Inference of

Scienter. .................................................................................................. 22

3.    Hewitt's and Welch's Departures from InnovAge Do Not Support

a Strong Inference of Scienter. ................................................................ 23

4.    The Absence of Alleged Motive Undercuts Plaintiffs' Attempt to

Plead a Strong Inference of Scienter. ...................................................... 23

III.    THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED. .................................. 24

IV.    PLAINTIFFS FAIL TO ESTABLISH CONTROL PERSON LIABILITY. ................... 24

V.    CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2U, Inc. Sec. Class Action*,
  2021 WL 3418841 (D. Md. Aug. 5, 2021) ...........................................................................16

*Adams* v. *Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ..............................................................................7, 8, 24, 25

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ....................................................................18

*Anderson* v. *Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir 2016) ....................................................................................... 21, 22

*Asay* v. *Pinduoduo Inc.*,
  2021 WL 3871269 (2d Cir. Aug. 31, 2021) ..................................................................... 11, 12

*Chipman* v. *Aspenbio Pharma, Inc.*,
  2012 WL 4069353 (D. Colo. Sept. 17, 2012) .......................................................................7

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014) .......................................................................................... 3, 11

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .....................................................................16

*In re Crocs, Inc. Sec. Litig.*,
  774 F. Supp. 2d 1122 (D. Colo. 2011) ........................................................................... 2, 12

*Crocs*, *Nardy* v. *Chipotle Mexican Grill, Inc.*,
  2019 WL 3297467 (D. Colo. Mar. 29, 2019) .......................................................................12

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...........................................................................................3, 4

*Einhorn* v. *Axogen, Inc.*,
  42 F.4th 1218 (11th Cir. 2022) ............................................................................................5

*Freudenberg* v. *E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................................4

*In re Gohealth, Inc. Sec. Litig.*,
  2022 WL 1136576 (N.D. Ill. Apr. 18, 2022) .......................................................................25

*Indiana Pub. Ret. Sys.* v. *Pluralsight*,
   45 F.4th 1236 (10th Cir. 2022) ...............................................................................*passim*

*Jiajia Luo* v. *Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020) ...................................................................................9

*Karimi* v. *Deutsche Bank Aktiengesellschaft*,
   2022 WL 2114628 (S.D.N.Y. June 13, 2022) ........................................................................3

*In re Kosmos Energy Ltd. Sec. Litig.*,
   955 F. Supp. 2d 658 (N.D. Tex. 2013) ................................................................................25

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ..................................................................................... 14, 15

*Matrixx Initiatives, Inc.* v. *Siracusano*,
   563 U.S. 27 (2011)..............................................................................................................11

*McDonald* v. *Kinder-Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) ................................................................................... 12, 16

*Meyer* v. *Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ...................................................................................... 11, 17

*In re Molson Coors Beverage Co. Sec. Litig.*,
   2020 WL 13499995 (D. Colo. Dec. 2, 2020) ......................................................................23

*In re Molycorp, Inc. Sec. Litig.*,
   157 F. Supp. 3d 987 (D. Colo. 2016) ...................................................................................7

*Noble Asset Mgmt.* v. *Allos Therapeutics, Inc.*,
   2005 WL 4161977 (D. Colo. Oct. 20, 2005) ................................................................. 7, 18

*Okemos Home, LLC* v. *LGF Produce, LLC*,
   2019 WL 12248966 (D. Colo. Mar. 27, 2019)................................................................4, 5

*Ong* v. *Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018) ................................................................................12

*Oregon Laborers Emps. Pension Tr. Fund* v. *Maxar Techs. Inc.*,
   2020 WL 5500458 (D. Colo. Sept. 11, 2020) .....................................................................11

*Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ...............................................................................................14

*Peace Officers' Annuity & Benefit Fund of Georgia* v. *DaVita Inc.*,
   372 F. Supp. 3d 1139 (D. Colo. 2019) ...................................................................15, 16, 18

*In re Progress Energy, Inc.*,
371 F. Supp. 2d 548 (S.D.N.Y. 2005) ............................................................ 10, 18

*Ramsey* v. *Sw. Corr. Med. Grp., Inc.*,
2019 WL 3252181 (D. Colo. July 19, 2019) ..........................................................6

*In re Rhythms Sec. Litig.*,
300 F. Supp. 2d 1081 (D. Colo. 2004) .............................................................8, 9

*Richman* v. *Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012) .................................................................20

*Santa Fe Indus., Inc.*, v. *Green*,
430 U.S. 462 (1977)..........................................................................................2

*SEC* v. *Woodruff*,
778 F. Supp. 2d 1073 (D. Colo. 2011) ................................................................16

*Singh* v. *Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019) ...............................................................................18

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020) .................................................................13

*Smallen* v. *The W. Union Co.*,
950 F.3d 1297 (10th Cir. 2020) .................................................................. 21, 22

*Sorkin, LLC* v. *Fischer Imaging Corp.*,
2005 WL 1459735 (D. Colo. June 21, 2005) ......................................................23

*Stratte-McClure* v. *Morgan Stanley.*
776 F.3d 94 (2d Cir. 2015) ...............................................................................14

*In re Thornburg Mortg., Inc. Sec. Litig.*,
824 F. Supp. 2d 1214 (D.N.M. 2011)..................................................................14

*In re Tufin Software Tech. Ltd. Sec. Litig.*,
2022 WL 596861 (S.D.N.Y. Feb. 25, 2022) .........................................................8

*United Food & Com. Workers Union Loc. 880 Pension Fund* v. *Chesapeake
Energy Corp.*,
774 F.3d 1229 (10th Cir. 2014) .................................................................. 7, 19

*United Food & Com. Workers Int'l Union Loc. 464A* v. *Pilgrim's Pride Corp.*,
2022 WL 684169 (D. Colo. Mar. 8, 2022) ...........................................................5

*In re Zagg, Inc. Sec. Litig.*,
797 F.3d 1194 (10th Cir. 2015) .........................................................................23

-vi-

**Other Authorities**

Fed. R. Civ. P. 9 ........................................................................................................................24

NASDAQ R. 5615(c)(1) .............................................................................................................25

Defendants respectfully submit this Joint Reply to Plaintiff's Opposition ("Opposition" or "Opp.") to Defendants' Joint Motion to Dismiss ("Motion" or "Mot.") the Amended Complaint.[1]

## I.   PRELIMINARY STATEMENT

Defendants' motion showed that Plaintiffs' claims rest on alleged corporate mismanagement, not securities fraud. The Opposition seeks to overcome this fundamental flaw by either improperly relying on documents outside of the Amended Complaint (*e.g.*, Opp. at 38 n.1, 40 n.29) or mischaracterizing the actual allegations in it. The Amended Complaint controls, not lawyer rhetoric. Plaintiffs have failed to plead any actionable misstatements or omissions or a strong inference of scienter, and their control person claims fail to allege the requisite control.

## II.   PLAINTIFFS FAIL TO STATE A SECTION 10(B) AND RULE 10B-5 CLAIM.

### A.   Plaintiffs Allege Corporate Mismanagement, Not Securities Fraud.

Plaintiffs' Opposition confirms that allegations of undisclosed mere mismanagement are the central basis for alleging the statements at issue were false and misleading: the "**Care Model Statements**" because InnovAge allegedly was "consistently failing to execute its care model"; the "**Growth Strategy Statements**" because it's growth allegedly was driven by prioritizing "rapid enrollment growth at the expense of providing effective care"; the post-IPO growth statements because of the same alleged growth strategy, enrollment practices, and capacity decisions; the staffing statements because of allegedly mismanaged "working conditions and growth strategy"; and the statements about government relationships because alleged mismanagement led to insufficient compliance and data mishandling. (Opp. at 9, 14, 26, 29, 32.)

Controlling law does not permit Plaintiffs to bootstrap allegations of corporate

---

[1]   Capitalized terms not defined herein have the same meaning as used in the Motion and Opposition. Defined and categorized statements are bolded for ease of reference.

mismanagement to a claim for securities fraud by alleging that the supposed mismanagement was not disclosed. *Santa Fe Indus., Inc.*, v. *Green*, 430 U.S. 462, 479 (1977). Relying on *Santa Fe*, the court in *In re Crocs, Inc. Securities Litigation*, 774 F. Supp. 2d 1122 (D. Colo. 2011), dismissed a complaint alleging that defendants misled investors by not disclosing their failures to adequately adapt business practices to rapid growth. *Id.* at 1126-30, 1146-47. Plaintiffs attempt to distinguish *Crocs* and similar authorities by arguing "they concerned generic compliance statements without allegations of ongoing compliance violations." (Opp. at 12 n.6.) But the *Crocs* plaintiffs *did* allege the operational issues were ongoing when the defendants spoke, and the court *still* held the facts "almost exclusively reveal mismanagement by Crocs, not fraud." *Crocs*, 774 F. Supp. 2d at 1145-46. Plaintiffs also assert *Crocs* differs because there were "no allegations that Crocs was not taking the stated steps to meet demand" (Opp. at 12 n.6), but the same is true here. Plaintiffs do not dispute that InnovAge employed the business practices it disclosed, but, like the *Crocs* plaintiffs, they say InnovAge "was *not doing these things well* and should have disclosed more fully its difficulties," which are classic hindsight claims of mismanagement. *Crocs*, 774 F. Supp. 2d at 1143 (emphasis added); (*see* Mot. at 9-10, 15-17.)

**B.      Plaintiffs Fail to Plead Any Actionable Offering Document Statements.**

**1.      The Optimistic Statements Are Inactionable Generalizations Regarding InnovAge's Business Practices.**

Plaintiffs argue that the **Optimistic Statements** are actionable and not mere puffery because their falsity may be verified by regulatory compliance. (Opp. at 20.) No challenged statement references compliance with specific regulations, nor does any commit to achieving a particular level of compliance.[2] These general statements are nonactionable. *See Indiana Pub.*

---

[2]      The closest any statement comes to referencing regulations is the **Robust Compliance**

*Ret. Sys.* v. *Pluralsight*, 45 F.4th 1236, 1254 (10th Cir. 2022) (statements about sales force size

and productivity could not be verified by referring to company's capacity, billing, and sales

quota records because statements did not "implicitly reference . . . [those] internal metrics.");

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)

("Plaintiffs' claim that these statements were knowingly and verifiably false when made does not

cure their generality, which is what prevents them from" being actionable at all.).[3]

Recognizing that the **Optimistic Statements** mirror those the court in *ECA, Local 134

IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009),

found to be nonactionable, Plaintiffs argue that *JP Morgan*'s statements differ because they

involved "abstract notions" of ethics or integrity, while the **Optimistic Statements** describe

practices "juxtaposed against" descriptions of InnovAge's allegedly inadequate procedures.

(Opp. at 21.) Plaintiffs misconstrue *JP Morgan*. There, the plaintiffs challenged specific

statements characterizing JPMorgan's risk management practices, including describing what its

processes were "designed" to do. 553 F.3d at 205-06. The **Optimistic Statements** here are even

less specific than *JP Morgan*'s. (*See*, *e.g.*, Compl. ¶¶ 241(a), (d); Mot. at 12-13.)[4] That the

**Optimistic Statements** are somehow "juxtaposed" against alleged compliance deficiencies also

does not matter. So too were the *JP Morgan* statements, where the complaint alleged that "[JP

---

**Statement**, but it focuses on InnovAge's compliance organization, not compliance with any
regulation, and Plaintiff does not challenge the composition of InnovAge's compliance team.
[3]    Plaintiffs' reliance on *Karimi* v. *Deutsche Bank Aktiengesellschaft*, 2022 WL 2114628
(S.D.N.Y. June 13, 2022), is misplaced. In *Karimi*, defendant provided detailed descriptions of
its "Know-Your-Client" processes. *Id.* at *2-3. Here, the statements merely provide a high-level
overview of how InnovAge operates without any details. (*See* Compl. ¶ 241(a)-(e), (g)-(l).)
[4]    Plaintiffs criticize Defendants for supposedly "cherry picking" phrases (Opp. at 21 &
n.14), but what Plaintiffs insist should be included are just more general descriptions of
InnovAge's operations, and the omitted phrases do not materially change the statements.

Morgan] did not conduct adequate due diligence as claimed in its statements on sound risk management." 553 F.3d at 195. *Freudenberg* v. *E\*Trade Financial Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010), also does not help Plaintiffs. In *Freudenberg*, plaintiffs challenged statements that the company "used discipline and conservatism in its risk management and monitoring of its loan portfolio," which the district court found actionable because plaintiffs alleged that defendants knowingly conducted virtually no due diligence when purchasing high-risk loans from troubled, subprime loan originators. *Id.* at 176, 187-90. Here, Plaintiffs do not allege that InnovAge did not actually adopt the general operational practices described in the **Optimistic Statements**, but rather that the practices were not carried out adequately. And considering the **Optimistic Statements** in context—together with InnovAge's disclosure of its operational risks and prior and potential future audit deficiencies—supports that no reasonable investor would rely on them as a guarantee that the practices were being carried out without error. (*See* Mot. 14-16.)

Plaintiffs misapply the law in arguing that the **Technology**, **Virtuous Cycle**, and **Government Relationships Statements** are actionable. (Opp. at 21-23.) Plaintiffs attempt to distinguish the nonactionable statement in *Gregory* v. *ProNAi Therapeutics Inc.* that "[our] technology . . . provide[s] [us] with competitive advantages," 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018), by arguing the **Technology Statement** conveyed that InnovAge's technology suite "enabled care providers to track patients' medical history and follow up care." (Opp. at 22.) But the **Technology Statement** states only that InnovAge's "technology suite supports our ability to deliver consistent, high-quality care to our participants at scale" (Compl. ¶ 241(g)) without specifying how—just as the *Gregory* statement does not say how the technology provides competitive advantages. For this reason, *Okemos Home, LLC* v. *LGF Produce, LLC*,

-4-

2019 WL 12248966 (D. Colo. Mar. 27, 2019), on which Plaintiffs rely, is inapposite. *Okemos* involved a statement that defendant was using the "latest technology" to support its growing methods. *Id.* at *5. Plaintiffs there alleged the technology was incapable of "support[ing]" the "growing methods" touted by the statement. *Id.* Here, Plaintiffs do not challenge whether the technology was suitable, just how successfully InnovAge used it, *i.e.* whether users accurately completed medical records managed with the technology. (*See* Compl. ¶¶ 144-45, 239, 242(g).)

As to the **Virtuous Cycle Statement**, it does not matter that the statement is phrased in the past and present tense. (*See* Opp. at 22.) The Court in *Pluralsight* found near-identical statements that "[w]e have [] been able to drive substantial increases . . . over time," "[w]e have significantly expanded our direct sales," and "[w]e built out some of the infrastructure around sales to scale" to be nonactionable puffery. *Pluralsight*, 45 F.4th at 1251-54.[5] And as to the **Government Relationships Statement**, Plaintiffs' attempt to distinguish *United Food & Commercial Workers International Union Local 464A* v. *Pilgrim's Pride Corp.*, 2022 WL 684169 (D. Colo. Mar. 8, 2022), misses the point. (Opp. at 22.) InnovAge's alleged failure to remedy government audit deficiencies is irrelevant to whether a reasonable investor would rely on a generic statement regarding InnovAge's relationships with government regulators. *United Food* held that no reasonable investor would rely on such a statement. 2022 WL 684169 at *5.

### 2. Plaintiffs Do Not Adequately Allege that the Offering Document Statements Were False or Misleading When Made.

Plaintiffs' central claim is that the **Offering Document Statements** were false because

---

5    Plaintiffs are wrong that the **Virtuous Cycle Statement** is not a forward-looking statement. (Opp. at 22 n. 16.) The **Virtuous Cycle Statement** "depends in part on present-tense observations" but nevertheless is "due safe-harbor protection . . . [because] the conclusion it supports is forward looking." *Einhorn* v. *Axogen, Inc.*, 42 F.4th 1218, 1223 (11th Cir. 2022).

Defendants "[told] investors that InnovAge's business model worked when they knew that it did

not." (Opp. at 4.)  Plaintiffs mischaracterize the statements, which merely described InnovAge's

business model and did not guarantee the model would work without flaws.  Plaintiffs cannot

rescue this mischaracterization by exaggerating the extent of the alleged deficiencies.  The

conduct Plaintiffs highlight has little to do with the challenged statements, and emphasizing

problems at InnovAge does not demonstrate the statements were false or misleading when made.

### a.    Plaintiffs Cannot Rely on the Audits, Purported Former Employee Statements, or InnovAge's May 2022 Statements.

Nearly all of Plaintiffs' falsity arguments fail because they are not based on allegations in

the Amended Complaint or reflect mischaracterizations and inadequately pled sources.

**Audit Results.**  *First*, Plaintiffs try to save their deficient pleading with the new claim

not found in the Amended Complaint, that the Sacramento and Colorado audits "found" that

deficiencies existed "at the time of the IPO," and that the audits reviewed records "from

mid-2020 to mid-2021."  (Opp. at 7, 11.)  Even if the Court considers this new claim—it should

not—Plaintiffs' argument fails because those audit results alone cannot support claims of

company-wide deficiencies.[6]  Unlike in *Correa* v. *Liberty Oilfield Services, Inc.*, Plaintiffs cite

no allegations about the extent to which those audit findings reflect InnovAge's operations as a

whole, including at the centers in New Mexico, Pennsylvania, Virginia and San Bernardino that

were not alleged to have been the subject of any audit sanctions.  *See* 548 F. Supp. 3d 1069, 1080

(D. Colo. 2021).  *Correa* also involved industry-wide developments that caused price changes,

---

[6]    A party violates WJM Revised Practice Standard III.D.1 when it "defends against a Rule 12(b)(6) motion to dismiss by asserting facts not alleged in the complaint."  *See Ramsey* v. *Sw. Corr. Med. Grp., Inc.*, 2019 WL 3252181, at *23 (D. Colo. July 19, 2019) (Martinez, J.).

not, as here, site-specific issues. *See id*.

*Second*, InnovAge's alleged historical deficiencies were publicly available to investors at the time of the **Offering Document Statements** through audit results and the Whistleblower Complaint. (Mot. at 20-21.) To disarm these public disclosures, Plaintiffs attempt to fabricate a "truth-on-the-market" issue (Opp. at 23-24) by citing irrelevant out-of-circuit cases. But the Tenth Circuit recognizes that public information like this is part of the total mix of information, *see United Food & Com. Workers Union Loc. 880 Pension Fund* v. *Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014)), and District of Colorado cases are equally clear that "securities laws do not require disclosure of information that is readily available in the public domain" and claims may be dismissed on that basis. *Chipman* v. *Aspenbio Pharma, Inc.*, 2012 WL 4069353, at *5 (D. Colo. Sept. 17, 2012); *see Noble Asset Mgmt.* v. *Allos Therapeutics, Inc.*, 2005 WL 4161977, at *7 (D. Colo. Oct. 20, 2005) (failure to disclose clinical trial guideline not misleading because guidelines were "published" and "available to the investing public").

**Statements from Former Employees/Unnamed Sources**. Plaintiffs misconstrue the standard for evaluating confidential witness allegations. (Opp. at 16-17.) While *Adams* v. *Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003), did not adopt a per se rule requiring a plaintiff to identify the source of all its allegations, when a complaint relies on confidential witnesses, a court must evaluate "the reliability of the sources from which the facts were obtained." *Id*. at 1099, 1102-03. As part of this inquiry, courts ask if such allegations are "based on concrete information from . . . people who were in a position to know the truth of the allegations." *Id*. at 1102; *see also In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1007 (D. Colo. 2016) (courts "treat with caution confidential witness statements").

-7-

Plaintiffs rely on *In re Tufin Software Technologies Ltd. Securities Litigation*, 2022 WL 596861 (S.D.N.Y. Feb. 25, 2022), to argue that the court may rely on statements from FE-1 and FE-3 even though *their employment ended long before the IPO* (in September 2017 and August 2019, respectively),[7] but *Tufin* is different. In *Tufin*, witnesses offered similar accounts about the time needed to execute a sales contract, and the court deemed statements from witnesses who worked before and after the operative period as corroborative of the account of a witness who worked during it. *Id.* at *7-8. By contrast, FE-1 and FE-3 offer distinct allegations about events that pre-date the IPO and are not corroborated by contemporaneous witnesses. (Compl. ¶¶ 66, 68, 69.) Further, in *Tufin* there were "no allegations suggest[ing] that [the witnesses'] knowledge is specific to their respective regional areas," 2022 WL 596861, at *8, whereas here Plaintiffs allege FE-1 and FE-6 were non-management employees with responsibilities specific to individual facilities (Compl. ¶¶ 66, 71), and likewise admit that the knowledge of FE-2, FE-3, FE-4, and FE-5 is necessarily specific to their particular "center, state, or region," whether California, Colorado, or the East Coast (Opp. at 18.)

Similarly, the unidentified sources referenced in *The Capitol Forum* articles should not be credited because the articles lack sufficient particularity to assess the witnesses' knowledge, access to information, reliability, or even the time period to which they refer.[8] *See Adams*, 240

---

[7]     FE-4's dates of employment are not even alleged. (Compl. ¶ 69.)

[8]     *In re Equifax Inc. Securities Litigation* does not hold that news articles are always reliable, but instead that "[c]ourt[s] [should] not discount the allegations based upon . . . [news] articles merely because they cite anonymous sources." 357 F. Supp. 3d 1189, 1236 (N.D. Ga. 2019). The articles there were deemed reliable because they provided corroborating sources with "direct knowledge" of the issue and for former employees, "provid[ed] both their positions and tenure." *Id.* And *In re Rhythms Securities Litigation*, 300 F. Supp. 2d 1081 (D. Colo. 2004) does not hold that vague job descriptions are sufficient. (Opp. at 19 n.13.) Plaintiff in *Rhythms* alleged the former employees witnessed or took part in the alleged conduct, allegations lacking

F.3d at 1102 ("Little weight would be accorded to a plaintiff's allegations that . . . stated that an unidentified employee working for the defendant believed that a certain corporate profit statement was misleading."). Although Plaintiffs say the articles include "significant detail" (Opp. at 19), the details largely derive from the same potentially unreliable sources and thus cannot properly corroborate Plaintiffs' claims. (*See* Mot. at 22-23.)[9]

**May 2022 Statements.** Statements made *14 months after the IPO* by a CEO appointed in January 2022 give no insight into the conditions that existed at the time of the challenged statements. Moreover, unlike in *In re Myriad Genetics, Inc.* (Opp. at 13 n.8), where defendants' interpretations of the challenged statements were "not at all clear from the . . . statements," 2021 WL 977770, at *9 (D. Utah Mar. 16, 2021), Mr. Blair's statements were clear: InnovAge "possesses a sturdy foundation" and the capabilities to address the audit deficiencies "exist within InnovAge today," but InnovAge simply had not performed to its own expectations. (Ex. 9, at 5, 7.) No "interpretive argument" is needed to confirm that Mr. Blair was not admitting wrongdoing at the time of the IPO but simply identifying areas for prospective improvement. *See Jiajia Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 412 (S.D.N.Y. 2020) (rejecting suggestion that company can "adopt new [compliance measures] only at peril of a securities lawsuit").

### b.    The "Care Model Statements" Were Not False or Misleading.

Plaintiffs argue that the **Care Model Statements** were false because, "unbeknownst to investors, from 2016 to 2020, . . . audits had consistently identified systemic deficiencies and

---

for employees quoted by *The Capitol Forum. Rhythms*, 300 F. Supp. 2d at 1088-89.
[9]     The insufficiently pled statements, from supposed witnesses, in Paragraphs 117-18, 124-25, 127, 129-31, 133-34, 136, 138-41, 184, 186-87, 192, 203, 205-07 and 209 of the Amended Complaint are hardly a small population, as Plaintiffs suggest. (Opp. at 19 n.13.)

noncompliance in InnovAge's execution of its care model," and by the time of the IPO, "these deficiencies had only worsened." (Opp. at 6-7.) *First*, the **Care Model Statements** do nothing except accurately describe InnovAge's business model generally—they do not say the practices were always effective. (*See* Mot. at 14-20; App. A.) Alleged deficiencies do not make them false or misleading. Moreover, no reasonable investor would view the **Care Model Statements** to imply a particular level of compliance when InnovAge also disclosed that its business model had not worked as designed in the past and may not work in the future. (*See* Mot. at 4-5, 14-20.) Plaintiffs try to sidestep the disclosures under the "bespeaks caution" doctrine (*see* Opp. at 13, 16), but Defendants do not rely on that doctrine. Instead, Defendants have shown that the total mix of available information at the time the statements were made defeats Plaintiffs' claims. *See In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) ("[T]here can be no omission where the allegedly omitted facts are disclosed.").

Plaintiffs argue that, even if the **Care Model Statements** accurately describe InnovAge's business, they were still misleading because there was "a complete and substantial failure of InnovAge's entire business model." (Opp. at 10.) But audit results at just some of InnovAge's centers do not demonstrate a complete failure of InnovAge's business model. Indeed, far from finding a Company-wide failure of all of InnovAge's practices, CMS permitted all of InnovAge's centers to continue operating, and centers in Pennsylvania, Virginia, New Mexico and San Bernardino to continue enrolling patients. (*See* Compl. ¶¶ 111-12.) Indeed, CMS has now lifted its enrollment sanction at the Sacramento center.[10] Thus, Plaintiffs' allegations at

---

[10]    *See* InnovAge Form 8-K (Nov. 22, 2022), https://investor.innovage.com/static-files/bb9554d0-6e3a-45a0-a526-47c1d19b7035.

most establish limited non-compliance with certain regulatory standards at certain centers at

certain times. But none of the **Care Model Statements** mention regulatory standards. If

Plaintiffs' argument were accepted, it would impose on public companies a free-standing duty to

disclose all regulatory violations, but that is not the law. *See, e.g.*, *Matrixx Initiatives, Inc*. v.

*Siracusano*, 563 U.S. 27, 44 (2011) (The securities laws "do not create an affirmative duty to

disclose any and all material information."); *City of Pontiac*, 752 F.3d at 184 ("[C]ompanies do

not have a duty to disclose uncharged, unadjudicated wrongdoing." (quotation omitted)).

 *Second*, Plaintiffs' reliance on *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir.

2014), is based on the faulty assertion that past deficiencies were unknown to investors. In

*Jinkosolar*, the Second Circuit held that the defendant's statements regarding its compliance

efforts were misleading because, unbeknownst to investors, compliance issues existed when the

statements were made. *See id*. at 251. Here, past deficiencies and potential future deficiencies

were fully disclosed both prior to and at the time of the IPO, including in the published CMS and

CDPHE audit results and July 2019 Whistleblower Complaint on which Plaintiffs rely. (*See* Ex.

4-5, 10; Compl. ¶¶ 143-51.)[11] Thus, this case is analogous to *Asay* v. *Pinduoduo Inc.*, 2021 WL

3871269, at *3 (2d Cir. Aug. 31, 2021). In *Asay*, plaintiffs challenged statements about

defendant's "strict" anti-counterfeiting measures, which measures were failing at the time of the

IPO. *Id*. at *2. The court rejected plaintiffs' argument that the statements were actionable under

*Jinkosolar* because the defendant had disclosed lawsuits claiming that products on its platform

---

[11]  *Oregon Laborers Emps. Pension Tr. Fund* v. *Maxar Techs. Inc.*, 2020 WL 5500458 (D.
Colo. Sept. 11, 2020), is inapposite for the same reason. In *Maxar*, this Court held that the
defendant's announcement that it was awarded a significant contract was misleading because it
did not also disclose that the contract "had significant contractual caveats that could allow [the
company] to be cut from the deal." *Id*. at *11. Here, the prior deficiencies were fully disclosed.

were counterfeit and had disclosed that its anticounterfeiting measures may not be successful. *Id.* at *3. InnovAge made similar cautionary disclosures here.

*Third*, Plaintiffs relegate to an unpersuasive footnote their discussion of *Crocs*, *Nardy* v. *Chipotle Mexican Grill, Inc.*, 2019 WL 3297467 (D. Colo. Mar. 29, 2019), and *Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018), suggesting these cases are "inapposite because they concerned generic compliance statements without allegations of ongoing compliance violations." (Opp. at 12 n.6.) But these cases involved statements no more generic than those Plaintiffs challenge and were likewise alleged to be rendered false by ongoing mismanagement. For example, the *Nardy* plaintiff alleged that "Chipotle was not in compliance with applicable safety regulations, and [its] food safety programs did not conform with applicable industry standards," but the court dismissed the securities claim because "Plaintiffs do not allege that [the programs] were not implemented at all; instead, they allege only that [they] were not effectively implemented as indicated in some of the audits." 2019 WL 3297467, at *10-12. Plaintiffs also suggest *Ong* and *Crocs* are different because, in those cases, there were "no allegations that [the companies] failed to undertake" the practices described in the challenged statements. (Opp. at 12 n.6.) But the Amended Complaint does not allege InnovAge failed to engage in the described practices—only that it did not do so well enough.

### c.    The "Growth Strategy Statements" Were Not False or Misleading.

Plaintiffs claim the "**Growth Strategy Statements**" were false and misleading because Defendants allegedly touted their growth strategy as successful and therefore needed to disclose "adverse information undermining that portrayal." (Opp. at 6 n.4, 15). Plaintiffs ignore the rule that "accurate reporting of historic successes does not give rise to a duty to further disclose

contingencies that might alter the revenue picture in the future." *McDonald* v. *Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002). And Defendants *did* disclose adverse growth strategy risks. (*See* Mot. at 4-5, 19-20, 32-33). *Gelt Trading, Ltd.* v. *Co-Diagnostics, Inc.* is thus inapt, as those defendants "attempted to paint a picture of a product for which everything was going right when [they] knew of evidence otherwise." 2022 WL 716653, at *6 (D. Utah Mar. 9, 2022).

To attack the **Scalability Statement**, Plaintiffs rely on an analyst's supposed interpretation of the Statement, as well as a Ninth Circuit case interpreting the term "scale." (*See* Opp. at 15-16). First, nothing in the undated report suggests the analyst was even interpreting the **Scalability Statement**. (Compl. ¶ 271); *In re Skechers USA, Inc. Sec. Litig*., 444 F. Supp. 3d 498, 521 (S.D.N.Y. 2020) (refusing to rely on "securities analysts' interpretations"). Second, how the Ninth Circuit interpreted "scale" in a different context is of no import here because InnovAge defined "scale" in the *very same* sentence as "expanding our model to a network of 16 centers in five states, which provided care for approximately 6,400 participants during the year ended June 30, 2020" (Compl. ¶ 241(j))—facts that Plaintiffs admit are accurate (*id*. ¶ 6).

### C.    The Offering Documents Complied with Items 105 and 303.

Plaintiffs argue Defendants "did not disclose" or discuss "that InnovAge reasonably expected its growth strategy to have a material and unfavorable effect on revenue." (Opp. at 25.) Not so. The Offering Documents describe InnovAge's growth strategy and enumerate six specific risks and uncertainties. (Ex. 1, at 8-9.) They then discuss, in detail, how those risks may materialize and negatively impact InnovAge's business, concluding that "[t]here can be no assurance that we will be able to successfully capitalize on growth . . . which may negatively impact our business model [and] revenues." (*Id*.) They also explain, "[i]f we fail to manage our

-13-

growth effectively, we may be unable to execute our business plan, maintain high levels of service and participant satisfaction or adequately address competitive challenges." (*Id.* at 10.)[12] This disclosure far exceeds what the Second Circuit indicated would be sufficient in Plaintiffs' authority, *Stratte-McClure* v. *Morgan Stanley*. 776 F.3d 94, 105-06 (2d Cir. 2015).[13]

Plaintiffs also wrongly assert that actual knowledge on the part of each defendant need not be alleged. (Opp. at 25-26.) Plaintiffs must "plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trends," which Plaintiffs did not do. *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1262 (D.N.M. 2011) ("Plaintiffs fail to differentiate between the Defendants, robbing their assertion of plausibility.").[14]

### D.    Plaintiffs Fail to Plead Any Actionable Post-Offering Statements.

#### 1.    General Statements About Staff Turnover Rates Are Not Actionable.

Plaintiffs argue that Hewitt "went well above puffery" by saying in response to an analyst that she thought InnovAge has done an "excellent job of really ensuring that we've kept our turnover rates down." (Opp. at 30-31.) That this opinion statement was made in response to an analyst does not make it actionable. The Tenth Circuit in *Pluralsight* rejected a challenge to Pluralsight's statement that it was "on pace" with hiring sales representatives, which was made

---

[12]    By only addressing growth strategy, Plaintiffs concede the Offering Documents' regulatory compliance and staffing discussions complied with Regulation S-K. (Mot. at 32-34.)
[13]    *Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012), is inapt. Plaintiffs there plausibly alleged that management "knew" of significant issues in the company's products that may impact the defendant's relationship with its two largest customers and result in the replacement of all chips previously sold to those customers, amounting to 72% of its prior year revenue, even though the risk disclosure made no mention of replacing previously sold products. *Id.* at 121-22. Here, it is not adequately alleged InnovAge knew enrollment would likely be suspended, and InnovAge did warn of such a risk.
[14]    *Correa* does not contradict *Thornburg*, as the *Correa* defendants did not contest that the trend in question was known to management. 548 F. Supp. 3d at 1081-83.

in response to an analyst's inquiry.   45 F.4th at 1254-55, 1257.  *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006), does not hold otherwise.  In *Makor*, the analyst inquiry was relevant because it framed the response; the analyst asked about a specific product, so the response was viewed as relating to that product, not defendants' products or practices generally.  *Id.* at 597.  Plaintiffs also claim Hewitt was responding to a question about clinical staff capacity (Opp. at 31), but that was the second of two questions:  The analyst first asked if labor challenges were impacting InnovAge, and Hewitt was answering the first question.  (Ex. 18, at 11.)  In any event, Hewitt did provide the factual basis that Plaintiffs demand.  (*Id.* at 4.)

### 2.  Plaintiffs Do Not Adequately Allege that the Post-Offering Statements Were False or Misleading When Made.

**Statements Concerning Organic Growth.**  Even though InnovAge's growth was attributable to increasing participants as stated, Plaintiffs rely on *Peace Officers' Annuity & Benefit Fund of Georgia* v. *DaVita Inc.*, 372 F. Supp. 3d 1139 (D. Colo. 2019), to argue that the statements are false because they "fail[ed] to disclose that the growth was driven by improper, unethical, and unsafe practices," like allegedly over prioritizing growth, enrolling participants in temporary housing, and Hewitt's alleged refusal to increase capacity.  (Opp. at 26, 28.)  But *DaVita's* challenged statement involved an alleged secret scheme directly at odds with the company's public statements, nothing like the growth statement here.  In *DaVita*, defendant stated that the ratio of patients with public versus private insurance was improving "in part due to improving economy," when it was actually due to a scheme to steer patients to private insurance, a practice in which defendant "expressly disclaimed" engaging.  372 F. Supp. 3d at 1151-52.  By contrast here, InnovAge's alleged practice of prioritizing growth and enrolling participants in temporary housing is entirely consistent with its statement that it was achieving organic growth

-15-

through increased enrollments, as contrasted with, for example, growth through acquisitions. And even if these growth methods were not "organic," Plaintiffs fail to allege Defendants were "fully cognizant" of "internal metrics [that] demonstrate" the alleged practices were of such significant attribution to growth that they would render the statements false or misleading. *Id.*[15]

Plaintiffs also contend the statements "conveyed that InnovAge's growth strategy remained viable" and "reassur[ed] investors" that growth would return to a certain level. (Opp. at 27.) Plaintiffs' interpretive liberties aside, accurately reporting historical growth does not give rise to a duty to disclose other less favorable facts. *See McDonald*, 287 F.3d at 998.[16] InnovAge had also repeatedly disclosed that its growth strategy was uncertain and "may not prove viable." (*See* Mot. at 4-5, 19-20.)[17] Plaintiffs rely on *In re 2U, Inc. Securities Class Action*, 2021 WL 3418841 (D. Md. Aug. 5, 2021), to argue that these growth disclosures do not "cure" any misleading omission. (Opp. at 30.) *2U* is distinguishable. The court there found that "rote, general" warnings about future risks given six months before the challenged statement could not cure defendant's omissions about declining enrollment because it was then "specifically projecting declining enrollment that contradicted [its] overwhelmingly favorable analysis." *Id.* at

---

[15]    The allegation that Hewitt refused requests to increase capacity is not sufficiently pled. Two of three paragraphs the Opposition cites (at 27 n.18) do not mention a denial by Hewitt, and the third is inadequate because it does not enable one to assess the credibility of the purported former employee who made the claim. (*See* Compl. ¶¶ 122, 141, 147; Mot. at 37-38.)

[16]    Plaintiffs say *McDonald* is inapplicable by tautologically arguing these reports of past growth "misled investors into believing that InnovAge's growth resulted from a viable growth strategy." (Opp. at 27 n.19.) The viability of InnovAge's growth strategy was not discussed, and reporting growth results does not imply they are sustainable. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6, 8 (S.D.N.Y. Mar. 29, 2016). And *SEC* v. *Woodruff*, 778 F. Supp. 2d 1073 (D. Colo. 2011), is inapplicable since that case concerned historical accounting statements that affirmatively misrepresented the sources of the company's growth. *Id.* at 1086-87.

[17]    Plaintiffs again pretend that Defendants are invoking the bespeaks caution doctrine. (Opp. at 28-29, 30.) This argument fails for the same reasons as above. (*See supra* at 10.)

*16. Here, there is no allegation that InnovAge had specific information showing that its growth strategy was not viable when the growth statements and accompanying warnings were made.

**Staffing Statements.** Plaintiffs next argue that InnovAge's staffing statements were false because staffing efforts were failing. (Opp. at 29.) InnovAge repeatedly disclosed staffing shortages in the Offering Documents and subsequent public filings. Thus, *Jinkosolar* again is inapposite because InnovAge's statements about its efforts to ensure adequate staffing levels—made with disclosures about ongoing staffing shortages and the possibility of future staffing issues—did not imply that the Company's efforts would necessarily be effective.

Also, Plaintiffs' theory that investors took the "fully staffed" statement "to mean that InnovAge was, in fact, sufficiently 'fully staffed' to provide adequate and compliant care to its participants" (Opp. at 30), ignores its full context, which was about "the distribution of expenses across expense categories" "as a result of the COVID-19 pandemic" (Compl. ¶ 250(b).) No reasonable investor would interpret this statement, made in the "Impact of COVID-19" section under "expenses,"[18] to be an assurance about staffing levels vis-a-vis patient care.

**Deficient Participant Assessments and Care Plans Statement.** Plaintiffs argue this statement is false because investors would have understood that InnovAge only recently learned of this issue and "that it was unaware of any similarly significant violations or deficiencies." (Opp. at 32.) Plaintiffs do not even respond to Defendants' argument that historical audit results, including findings of deficiencies, were public. (*See, e.g.*, Compl. ¶ 150 (CMS 2017-2019 audit results "public records").) Even if these results were not disclosed, Plaintiffs offer no support for

---

18      InnovAge Form 10-Q, at 54-55 (May 11, 2021), https://www.sec.gov/ix?doc=/Archives/ edgar/data/0001834376/000155837021006838/tmb-20210331x10q.htm

-17-

the claim that a reasonable investor would interpret a May 2021 statement about specific issues at "certain of [InnovAge's] centers" to mean no historical issues existed.  (Compl. ¶ 250(c).)

**Maintaining and Growing Relationships with Government Payors Statement.**
Plaintiffs cite no case to support their claim that InnovAge's views on the importance of its relationships with Medicare and Medicaid and aligning interests conveys anything about compliance.  (Opp. at 32.)  Plaintiffs cite *DaVita*, but *DaVita* does not address the type of statement at issue here.  Plaintiffs also do not address that the statement says nothing about InnovAge's interactions with Medicare and Medicaid, nor that the statement was made with InnovAge's disclosure that given the "complexity and numerosity of applicable regulations," investors should exercise "caution (rather than confidence) regarding the extent of [defendant's] compliance."  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019); (Ex. 1, at 22-24.)

**September Audit Statement.**  Plaintiffs ignore the *publicly available* CMS policies and the full context of Hewitt's statement to claim that "Defendants tried to minimize and downplay the significance of" the Colorado audit.  (Opp. at 33.)  *First*, CMS's limiting of audit activities during the COVID-19 pandemic does not render the statement "audits are a regular occurrence in our industry" false and misleading (Opp. at 33-34) because CMS's policy was publicly available. (*See* Mot. at 28); *Noble*, 2005 WL 4161977, at *7 (failing to disclose FDA guidance not misleading since it was "available to the investing public"); *Progress*, 371 F. Supp. 2d. at 553. Plaintiffs' reliance on *Amgen* and *Gelt* to rebut this fact is unavailing, as neither concerned generally applicable regulatory policies that were relied on by the plaintiff and widely available to the public.  *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *1, 15 (C.D. Cal. Aug. 4, 2014) ("briefing book" prepared for oncology committee meeting); *Gelt*, 2022 WL 716653, at *5

n.2; (*see also* Defs. Reply ISO Req. for Judicial Notice, at 2, 6.) Further, neither addressed the basic issue of whether the omitted but public information "would have significantly altered the total mix of information available to a reasonable investor." *United Food*, 774 F.3d at 1237-38.

*Second*, Plaintiffs cannot point to any allegations to support their claim that the remaining statements "misled investors into believing that the Sacramento audits were minor[,] did not suggest company-wide problems," or "did not suggest the likely outcome of the Colorado audits." (Opp. at 34, 36.) Plaintiffs rely on *In re Signet Jewelers Ltd. Securities Litigation* to argue a single analyst's interpretation of Hewitt's statement may render it misleading. But *Signet* held only that a third-party analyst's view that the defendant had understated reserves, when taken together with other facts indicating the same, gives rise to a plausible inference that the defendant's reserves were understated. 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018). Here, the supposed analyst interpretation does not corroborate other facts, and interpreting Hewitt's statements to suggest the Colorado audits' likely outcome is unreasonable given her warning that we "can't give you any guidance around Colorado at this time." (Compl. ¶ 254(b).)

*Finally*, the alleged September 10 statements that unidentified members of management "told staff that CMS had found similar issues in a separate audit . . . in California" and Colorado has "the same areas of opportunities for improvement" (*id*. ¶¶ 208-09) are not inconsistent with Hewitt's statement that the audits were different, and Hewitt made clear InnovAge could not give guidance on Colorado. Plaintiffs argue this was itself false because InnovAge knew the audits found the same "systemic and pervasive" issues in Colorado as in Sacramento. (Opp. at 36 n.25.) The September 10 statements on which Plaintiffs rely, however, relate to "areas . . .for improvement," not findings of significant deficiencies. (Compl. ¶ 209.) Even if the preliminary

findings indicated some similarities to Sacramento, these results were preliminary, and—as the CMS audit guidance cited by Plaintiffs (at 40 n.29) makes clear—"[t]hese findings [were still] subject to additional review and evaluation."[19]  Given the contingent nature of the preliminary findings, InnovAge had no duty to speculate about the Colorado audits' ultimate outcome. *See, e.g.*, *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2012).

**November Audit Statements.** *First*, Plaintiffs allege Hewitt's statement that it is "not unusual for [CMS] to utilize the departments within their agency to review matters" (Ex. 11, at 21) is false because CMS's "public" Audit Guide says that referrals to a specific department, DCE, indicates serious deficiencies. (Compl. ¶ 260(c).)  But Hewitt's statement was not about the DCE specifically, but rather discussed "utiliz[ing] the *departments*" in CMS generally. As the Motion points out (at 29), this statement is true. In addition, Hewitt transparently disclosed that the referral was "for review and possible further action." (Ex. 11, at 8.)  *Second*, Plaintiffs offer no facts to support their assertion that Hewitt's statement "I do think Colorado is a little bit different than Sacramento," was not Hewitt's reasonable and genuinely held belief. *See Hampton* v. *root9B Techs.*, Inc., 897 F.3d 1291, 1299 (10th Cir. 2018).  *Finally*, Plaintiffs have no alleged basis for why Sacramento's participant volume is false or misleading.

**New Mexico Audit.** Plaintiffs argue that the audit's start time is material since "the 'abnormal length' of an audit reflected the severity and extent of deficiencies." (Opp. at 38.) When the audit starts, however, does nothing to show its length if, as here, it had not yet ended.

E.        **Plaintiffs Fail to Adequately Plead Scienter.**

---

[19]        CMS, *2020 Programs of All-Inclusive Care for the Elderly (PACE) Audit Overview*, at 7 (Feb. 2020), https://www.cms.gov/files/document/2020-pace-audit-overview.pdf.

In arguing that they adequately alleged scienter, Plaintiffs focus on Hewitt's and Gutierrez's alleged states of mind regarding potential regulatory violations, not in making the challenged statements. This is yet another example of Plaintiffs' attempt to convert corporate mismanagement into securities fraud. Knowledge of the prior public audit results or disclosed potential for future deficiencies comes nowhere close to raising a strong inference of scienter.

### 1. Plaintiffs Fail to Allege Hewitt and Gutierrez Had Knowledge of the Alleged Ongoing Compliance Violations.

Plaintiffs' allegation that Hewitt and Gutierrez were aware of "ongoing and substantial regulatory violations at the time of their statements" is unsupported and conclusory. (Opp. at 41.) *First*, allegations relating to the knowledge of Welch or other unnamed "senior executives" are not sufficient to establish a strong inference of scienter as to Hewitt and Gutierrez. (Opp. at 40-42); *see Smallen* v. *The W. Union Co.*, 950 F.3d 1297, 1313 (10th Cir. 2020).

*Second,* the few specific allegations relating to Hewitt and Gutierrez are inadequate. Hewitt's alleged receipt of 2017 audit results (Compl. ¶ 152) does not establish Hewitt's scienter in 2021. *See Anderson* v. *Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239-40 (10th Cir 2016); *Smallen*, 950 F.3d at 1310. Nor does the fact that Hewitt and Gutierrez gave updates to analysts about the audits. (*See* Opp. at 41-42 (citing *Pluralsight*).) Unlike in *Pluralsight*, neither Hewitt nor Gutierrez represented to analysts that they had closely monitored the audits and specifically reviewed the details regarding the preliminary audit findings. *See* 45 F.4th at 1264.

*Third*, Plaintiffs cannot rely on their confidential witness allegations to establish scienter. The FE's did not report to Hewitt or Gutierrez and cannot speak to the issue of their states of mind, and the confidential witnesses were not in a position to know the facts alleged. *See Smallen*, 950 F.3d at 1308 n.6. Rather than address the deficiencies, Plaintiffs simply conclude

they have done enough, citing *Anderson*. (Opp. at 41-42.) But in *Anderson*, the court refused to rely on confidential witness statements where, like here: (1) it was not sufficiently alleged the information was conveyed to the executive; (2) the witness did not "adequately describe the contents of the . . . reports"; or (3) the reported events occurred "months before the class period" and so did not support scienter at the time of the challenged statements. 827 F.3d at 1239-41.[20]

*Fourth*, Plaintiffs incorrectly claim that Hewitt and Gutierrez's positions and access to information alone are enough. (Opp. at 42.) *Anderson* and *Smallen* make clear that (1) courts "cannot infer scienter based only on a defendant's position . . . or involvement with a particular project"; and (2) "mere attendance at meetings does not contribute to an inference of scienter." *Smallen*, 950 F.3d at 1307-08 (quoting *Anderson*, 827 F.3d at 1245-46). Plaintiffs argue *Pluralsight* "limited [*Anderson*] to its specific facts," and disregard *Smallen* since it relied on *Anderson*. (Opp. at 42 & n.31.) *Pluralsight* did no such thing. Rather, the court in *Pluralsight* merely explained the cases' factual differences. In *Anderson*, the reports, cost data, and project information given to executives did not clearly establish they "knew that the projects were unlikely to meet forecasts," whereas in *Pluralsight*, plaintiffs challenged "a single objectively verifiable data point," about information that the executive who made the statement "repeatedly represented he monitored" and later admitted was false. 45 F.4th at 1264. Counsel also "effectively conceded that [the executive] would have known the number." *Id*. at 1264 & n.13.

### 2.    InnovAge's Announcement of Improvements to Its Platform After the Challenged Statements Does Not Support an Inference of Scienter.

The subsequent decision to improve InnovAge's operations does not constitute an

---

[20]    Plaintiffs do not substantively address the Motion's argument (at 37-38) that Maria Zamora's statement is deficiently pled. (*See* Opp. at 41 n.30.)

admission of past fraud. *Pluralsight* does not hold otherwise. Whereas *Pluralsight* involved an executive's admittedly wrong statement, Mr. Blair's May 2022 statements announce only forward-looking improvements and say nothing about whether InnovAge's prior general statements were false or misleading. 45 F.4th at 1259, 1264 & n.13.[21]

### 3. Hewitt's and Welch's Departures from InnovAge Do Not Support a Strong Inference of Scienter.

Plaintiffs argue that the departures support an inference of scienter because they closely followed the Colorado enrollment suspension, and analyst suggestions that InnovAge needed to rebuild "credibility." (Opp. at 43.)[22] These facts do not "connect[] [the departures] to the alleged fraud." *In re Molson Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *11 (D. Colo. Dec. 2, 2020). *Myriad*, Plaintiffs' only in-Circuit case, forecloses their position, as it found that a key executive's resignation that was effective immediately and another executive's demotion four days later only "len[t] very modest scienter support." 2021 WL 977770, at *22.

### 4. The Absence of Alleged Motive Undercuts Plaintiffs' Attempt to Plead a Strong Inference of Scienter.

Recognizing that the Amended Complaint only alleges that Hewitt and Gutierrez received bonuses and cash awards in connection with the *July 2020* Apax transaction, Plaintiffs now argue that Hewitt and Gutierrez nevertheless had a "specific motive to lie" because the

---

[21] Plaintiffs do not address Defendants' case law on this point. *See In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015); *Rumbaugh* v. *USANA Health Scis.*, Inc., 2018 WL 5044240, at *9 (D. Utah Oct. 17, 2018). Plaintiffs try to distinguish *Sorkin, LLC* v. *Fischer Imaging Corp.*, 2005 WL 1459735 (D. Colo. June 21, 2005), on the grounds that it concerned accounting irregularities (Opp. at 43 n.32), but that is not true of *Zagg* and *Rumbaugh*.

[22] To try to fabricate a semblance of scienter, Plaintiffs falsely claim that Amended Complaint paragraph 13 alleges that analysts "stat[ed] that their analysis had been skewed by management's assurances that the Colorado audits were different than the Sacramento audit." (Opp. at 43.) Paragraph 13 contains no such allegations of skewed analyses.

compensation was tied to the "specific goal" of achieving the Apax transaction and IPO, and the payments may have been made after the IPO. (Opp. at 44-45.) Even accepting Plaintiffs' recharacterization of the payments does not establish motive because those "goals" were completed as of the IPO, at which point any supposed motive to inflate InnovAge's stock price disappeared. It also does not matter when the payments were made, because Plaintiffs allege they were made "[i]n connection with the July 2020 Apax transaction." (Compl. ¶ 279.)

## III.    THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED.

Plaintiffs do not substantively challenge that their Securities Act claims against all Defendants except the Underwriter Defendants sound in fraud and must satisfy Rule 9(b)'s heightened pleading standard. (Mot. at 41-42; Opp. at 47-50.) Their Securities Act claims regarding the Offering Document Statements fail for the reasons set out, *supra* Sections II.A-C.

## IV.    PLAINTIFFS FAIL TO ESTABLISH CONTROL PERSON LIABILITY.

"The assertion that a person was a member of a corporation's board of directors, without any allegation that [they] individually exerted control or influence over the day-to-day operations of the company" does not make one a control person. *Adams*, 340 F.3d at 1108. Plaintiffs do not contest this, but still argue the Director Defendants are control persons "because they consented to be named as director nominees in the Offering Documents." (Opp. at 46.) But if being a director is not sufficient, then neither is agreeing to become one. In Plaintiffs' only cited case (Opp. at 46 n.35), the director-defendants did not contest they were control persons, and the court did not address *Adams*. *See Correa*, 548 F. Supp. 3d at 1084.

Plaintiffs also argue that Director Defendant Scully was a control person since "the Complaint alleges he was extensively involved in InnovAge's conversion to a for-profit

company, its growth strategy, and its decision to go public." (Opp. at 46.) None of the allegations about Scully, which relate to Scully's pre-IPO activities, suggest he exercised day-to-day control over InnovAge at the time of the **Offering Document Statements**, much less that he controlled or had any input into them. (*See*, *e.g.*, Compl. ¶¶ 103, 105, 114.)

As to Apax and WCAS, Plaintiffs assert that the Offering Documents say InnovAge is controlled by WCAS and Apax as Principal Shareholders (Opp. at 46-47), but they ignore that (1) the Offering Documents make clear that the Principal Shareholders are not defendants Apax and WCAS, and (2) Apax and WCAS are not even InnovAge shareholders. (*See* Ex. 1, at 28 n.1, 31.) Also, Plaintiffs rely on Apax and WCAS's supposed combined stock ownership, but fail to allege any actual exercise of control over the day-to-day operations of the Company, as required by *Adams*. (*See* Mot. at 43-45.) Instead, Plaintiffs quote from InnovAge's Prospectus that it was "controlled" post-IPO. (Opp. at 46). Leaving to one side that the referenced "controllers" were not defendants Apax and WCAS, this simply indicated that InnovAge was a "controlled company" as defined by NASDAQ Rule 5615(c)(1) (Ex. 2, at 1), *i.e.* "more than 50% of the voting power for the election of directors is held by an individual, a group or another company." This does not establish that its shareholders (let alone non-shareholders Apax and WCAS) were "involved in [the Company's] operations (day-to-day or long-term), decisionmaking, or planning." *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 676 (N.D. Tex. 2013).[23]

## V.    CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

---

[23]    The Fifth Circuit's standard in *Kosmos Energy* aligns with the Tenth Circuit's standard in *Adams*. Plaintiffs' case (Opp. at 46 n.36) applied the conflicting Seventh Circuit test. *See In re Gohealth, Inc. Sec. Litig.*, 2022 WL 1136576, at *2 (N.D. Ill. Apr. 18, 2022).

Dated:        December 14, 2022

SULLIVAN & CROMWELL LLP

By: /s/ *Karen Patton Seymour*
Karen Patton Seymour
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 291-9307
seymourk@sullcrom.com

Diane L. McGimsey
Ryan J. Nielsen
1888 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800
mcgimseyd@sullcrom.com
nielsenr@sullcrom.com

*Counsel for InnovAge Holding Corp.,
Maureen Hewitt, Barbara Gutierrez, John
Ellis Bush, Andrew Cavanna, Caroline
Dechert, Edward Kennedy, Jr., Pavithra
Mahesh, Thomas Scully, Marilyn Tavenner,
Sean Traynor, Richard Zoretic, Apax
Partners, L.P., and Welsh, Carson,
Anderson & Stowe*

WILMER CUTLER PICKERING HALE
AND DORR LLP

By: /s/ *John Walsh*
John Walsh
1225 17th Street, Suite 2600
Denver, CO 80202
Telephone: (720) 274-3154
Facsimile: (720) 274-3133
john.walsh@wilmerhale.com

Matthew Benedetto
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5323
Facsimile: (213) 443-5400
matthew.benedetto@wilmerhale.com

*Counsel for InnovAge Holding Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2022, I electronically filed a true and correct copy of the foregoing **DEFENDANTS' JOINT REPLY IN SUPPORT OF JOINT MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties via the CM/ECF system.

*/s/ Ryan J. Nielsen*
Ryan J. Nielsen

-27-