# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **REGINALD T. ALLISON, individually and on behalf of all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 22 C 149** |
| **OAK STREET HEALTH, INC., et al.,** | ) ) | |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Reginald T. Allison filed suit against Oak Street Health, Inc., a company operating primary care centers, and against its CEO and CFO, two shareholders, several current and former board members, and several underwriters of the company's public offerings, on behalf of a class of individuals who acquired Oak Street common stock from August 6, 2020 through November 8, 2021 (the class period). Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund – Retirement Income, and Boston Retirement System (collectively, the Northeast Pension Funds) have been appointed to serve as the lead plaintiff.

The Northeast Pension Funds assert that Oak Street's marketing tactics violated the Anti-Kickback Statute (AKS) and the False Claims Act (FCA). The day after Oak Street revealed that its marketing practices were under investigation by the U.S. Department of Justice (DOJ) for potential violations of the FCA, the price of Oak Street's

stock fell by more than twenty percent.  The Northeast Pension Funds claim that the defendants' failure to disclose Oak Street's marketing practices violated sections 11, 12, and 15 of the Securities Act of 1933 and sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  The defendants have moved to dismiss all of the claims.  For the reasons stated below, the Court dismisses the section 11 and section 12 claims in part but otherwise denies the motion to dismiss.

**Background**

Oak Street is a healthcare company that operates primary care centers.  At all times relevant to this suit, Michael Pykosz was the CEO and Timothy Cook was the CFO of Oak Street (collectively, the individual defendants).  Newlight Partners LP, a private equity firm, and Newlight Harbour Point SPV, its investment vehicle housing Oak Street's stock (collectively, Newlight), and General Atlantic LLC, another private equity firm, and General Atlantic (OSH) Interholdco, L.P., its investment vehicle housing Oak Street's stock (collectively, General Atlantic), together owned approximately fifty-two percent, and later in the class period forty-eight percent, of Oak Street's stock.  The Court will refer to Newlight and General Atlantic as the private equity defendants.  Oak Street's registration statements during the class period stated that the private equity defendants "control the vote of all matters submitted to a vote of our shareholders," enabling them to control Oak Street's board election "and all other corporate decisions" and that, "for so long as the [private equity defendants] continue to own a significant percentage of our stock," they "will continue to have significant influence with respect to our management, business plans and policies."  Am. Compl. ¶¶ 207, 208.  The private equity defendants together designate half of the directors on Oak Street's board, and

2

General Atlantic designates one director "who shall have the tie-breaking vote." *Id.* ¶ 209 (quoting the "Sponsor Director Nomination Agreement").

Oak Street's primary care centers focus "exclusively on patients that are Medicare eligible." *Id.* ¶ 4.  One type of Medicare available for Medicare-eligible persons is Medicare Advantage.  Under Medicare Advantage, the Centers for Medicare & Medicaid Services (CMS) pays healthcare companies a set amount for each beneficiary enrolled in the plan each month.  For "at-risk" patients, Oak Street enters into agreements with healthcare companies offering Medicare Advantage plans to receive a percentage of their CMS payments in exchange for full responsibility for the beneficiary's medical costs.  *Id.* ¶ 42.  This provides Oak Street with average "annual revenue of $12,000" per at-risk patient.  *Id.* ¶ 48 (internal quotation marks omitted).  For other patients, Oak Street uses the traditional approach of submitting its bills for patient care to CMS to earn revenue on a fee-for-service basis, but the "at-risk patient base accounts for more than 97% of [Oak Street's] annual revenue." *Id.* ¶ 42.  Oak Street's business model requires "attract[ing] patients in existing and new markets in order to drive long-term value creation." *Id.* ¶ 49 (internal quotations marks omitted).  The individual defendants "were eligible to receive annual cash incentive awards" based on their ability to meet "at-risk patient count targets." *Id.* ¶ 172 (internal quotation marks omitted).

## A.    Oak Street's alleged marketing tactics

Oak Street's marketing to Medicare-eligible persons is regulated by the FCA and the AKS.  Any claims for payment submitted to CMS "that are tainted by AKS violations" can create liability under the FCA because the claims are considered false or

fraudulent.  *Id.* ¶ 53.  The AKS prohibits "offer[ing] or pay[ing] any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  *Id.* ¶ 54 (quoting the AKS). According to the complaint, "remuneration" includes referral fees or free transportation. *Id.* ¶ 55.  There is a safe harbor for referral fees that cover "the cost of operating the referral service," but it does not apply if the fee is based "on the volume or value of any referrals."  *Id.* ¶ 57 (quoting 42 C.F.R. § 1001.952(f)).  The Northeast Pension Funds allege that the safe harbor therefore does not include "referral fee[s] paid 'on a per-patient basis'" because that "is based on the volume of referrals."  *Id.* (quoting *United States v. George*, 171 F. Supp. 3d 810, 815 (N.D. Ill. 2016), *aff'd*, 900 F. 3d 405 (7th Cir. 2018)).  Similarly, there is a safe harbor for free transportation provided to "established patient[s]," but it does not apply to free transportation offered to prospective patients.  *Id.* ¶ 58 (alteration in original) (quoting 42 C.F.R. § 1001.952(bb)(1)(iv)).

The Northeast Pension Funds allege that to maintain Oak Street's valuation before and after the August 2020 initial public offering (IPO) during the period in which COVID-19 shutdowns had required it to "halt[] community outreach and other marketing initiatives" for new patients, "Oak Street engaged in overly-aggressive and improper patient acquisition and recruitment tactics."  *Id.* ¶¶ 64, 68.  Specifically, Oak Street began to pay external insurance agents and brokers $200 per patient for referrals as part of its Client Awareness Program and continued to market free transportation to prospective patients to induce them to join Oak Street.

4

These allegations are corroborated by statements from five confidential witnesses, who are former Oak Street employees.  For example, former employee 1 (FE1), a Community Relations Manager and later Outreach Executive for an Oak Street center in Philadelphia from October 2018 to January 2021, stated that "insurance agents were not used to 'educate' prospective patients, but instead were used to sign up as many people with Oak Street as possible because they were only being paid if they were able to 'provide a patient' to Oak Street."  *Id.* ¶ 79.  FE1 also stated that "the offer of free transportation was the main part of what sold prospective patients on Oak Street and the best way for outreach personnel 'to convince' prospective clients to go to Oak Street."  *Id.* ¶ 80.  Former employee 4 (FE4), another Outreach Executive for an Oak Street clinic in Indiana from January 2021 to August 2021, stated that an Outreach Executive and an insurance agent participated in "call blocks," during which the agent received $200 or $250 for each client they called that scheduled an initial visit with the Outreach Executive.  *Id.* ¶ 95.

**B.    Oak Street's public offerings and statements**

Oak Street's stock price at the time of the IPO, August 6, 2020, was twenty-one dollars per share.  It held a secondary public offering (SPO) on December 2, 2020, at which point the defendants priced the stock at forty-six dollars per share.  On February 10, 2021, Oak Street conducted another SPO at the price of fifty-six dollars per share. The last SPO in the class period was on May 26, 2021, in which the defendants priced Oak Street's stock at sixty-two dollars per share.

During this time, the Northeast Pension Funds allege, Oak Street and the individual defendants made a variety of statements about the company's marketing

tactics.  For example, registration statements in the offerings stated that Oak Street

"employ[s] a grassroots approach to patient engagement led by [its] Outreach team and

supplemented by more traditional marketing, including television, digital and social

media, print, mail and telemarketing."  *Id.* ¶¶ 101(b), 107(a), 110, 116(a).  The IPO

registration statement and prospectus also stated that Oak Street is "engaging

community partners, such as senior living facilities and faith-based organizations, to

obtain referrals of older adults who could benefit from our services and care model," *id.*

¶¶ 101(d), and the December and February SPOs contained similar statements.  The

complaint also identifies various statements regarding insurance agents and

transportation specifically, including that Oak Street's "fleet of over 100 green vans . . .

typically provide[s] patient transportation for our patients to get to and from our centers"

and that Oak Street partners with "insurance agents who will tell their clients about Oak

Street Health, which we believe results in the patient selecting us as their primary care

provider when they select an MA plan."  *Id.* ¶¶ 101(c), 103(a).

In its registration statements and 2020 annual report, Oak Street stated that it

"enter[s] into several arrangements that could potentially implicate the Anti-Kickback

Statute," explaining:

> The [Office of Inspector General] has expressed concern regarding the
> use of non-employed sales forces to recruit or facilitate the recruiting of
> patients or referrals, especially when the sales agent is compensated in a
> manner that provides rewards or incentives on a volume or value basis.
> Accordingly, commissions or per-patient based compensation
> methodologies are closely scrutinized by federal agencies.  We employ
> our own sales force and attempt to meet the Anti-Kickback Safe Harbor for
> Bona Fide Employment; however, in limited instances we use external
> companies to assist with certain aspects of these efforts, but only in
> arrangements that we believe do not violate the Anti-Kickback Statute or
> other applicable laws.

6

*Id.* ¶¶ 101(h), 107(a), 110, 111, 115 (emphasis omitted).  The Northeast Pension Funds refer to this as the defendants' "AKS statement," so the Court will as well.  *Id.*

**C.    Announcement of the DOJ investigation**

After the close of trading on November 8, 2021, Oak Street filed its quarterly report, which included a statement that the company had "received a civil investigation demand ('CID') from the United States Department of Justice."  *Id.* ¶ 129.  The report further stated that the DOJ was "investigating whether [Oak Street] may have violated the False Claims Act" and that the "CID requests certain documents and information related to [Oak Street]'s relationships with third-party marketing agents and related to [Oak Street]'s provision of free transportation to federal health care beneficiaries."  *Id.* During the earnings call the next day, an analyst asked if Oak Steet was "buying leads from third-party agents," to which Pykosz responded, "[w]e have a number of different patient acquisition channels, the vast majority of which we talked about are through our community-based marketing approach and then followed by our kind of central digital channels. . . .  So there's a number of different programs out there and things we do to get patients."  *Id.* ¶¶ 131–32 (alterations in original).  The price of Oak Street stock fell twenty percent on November 9, 2021, from forty-seven dollars per share to thirty-seven dollars per share.

On an analyst call later in November, Pykosz stated that "'we believe that the term third-party agents' from the CID 'refers to insurance agents and advisers,' and 'we have engaged, and we pay these agents'" through a program that operated "over the past year or so."  *Id.* ¶ 135.  Subsequent news articles from *The Capitol Forum* reported on Oak Street's relationships with insurance agents.

7

In February 2022, Oak Street filed its 2021 annual report with the SEC. This report contained the AKS statement as in prior statements. There was, however, a difference. Instead of stating, as in prior statements, that Oak Street "use[s] external companies to assist with certain aspects of these efforts, but only in arrangements that we believe do not violate the [AKS]," the report now stated that Oak Street "use[s] external companies to assist with certain aspects of these [sales] efforts and attempt to structure to meet the Personal Services Safe Harbour. In doing so, we believe that these arrangements do not violate the [AKS]." *Id.* ¶ 139 (alterations in original) (emphasis omitted). Oak Street also added that "the provision of free or discounted items, services or other renumeration [sic] in connection with patient recruitment has been scrutinized by OIG. We attempt to structure any offer or actual transfer of renumeration [sic] to prospective or current patients in a manner consistent with applicable exceptions." *Id.* (emphasis omitted). The price of Oak Street stock continued to decline after this, trading at less than eighteen dollars per share at the time the operative complaint was filed.

## Discussion

The Northeast Pension Funds claim that the defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934 through omissions and misrepresentations of two of Oak Street's marketing practices: (1) providing referral payments of $200 per patient to insurance agents and (2) offering free transportation to prospective patients. The defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

In deciding a motion to dismiss for failure to state a claim, the court must accept

8

as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2019). To survive a motion to dismiss, a plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bissessur v. Ind. Univ. Bd. Of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In addition to the Rule 12(b)(6) standard, the "[h]eightened pleading requirements" of Federal Rule of Civil Procedure 9(b) "apply to complaints alleging fraud." *See Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019). Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b) requires a plaintiff to provide precision and some measure of substantiation to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (internal quotation marks omitted). In other words, "a plaintiff must plead the who, what, when, where, and how of the alleged fraud." *Id.* (internal quotation marks omitted).

Furthermore, the Private Securities Litigation Reform Act of 1995 (PSLRA) imposes additional pleading requirements in securities fraud cases. *See Cornielsen*, 916 F.3d at 598–99. The PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the

9

required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

## A.    Section 10(b) claim

The Northeast Pension Funds claim that Oak Street and the individual defendants violated section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. The elements of a claim under section 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  The defendants contend that the Northeast Pension Funds have not adequately alleged a material misrepresentation or omission, scienter, and loss causation.  The Court considers these elements in turn.

### 1.    Material misrepresentations or omissions

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor . . . ."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  A misleading statement is material "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted).

#### A.    Statements about Oak Street's marketing practices

The Northeast Pension Funds allege that the defendants' statements about Oak Street's patient acquisition strategies were misleading because they "omitted [Oak

Street]'s improper payments to insurance agents for referrals and its marketing and provision of free transportation to prospective patients."  Pls.' Resp. Br. at 15.  They allege in their complaint a variety of misleading statements made by the defendants regarding Oak Street's marketing practices.  For example, the defendants stated that Oak Street "employ[s] a grassroots approach to patient engagement led by our Outreach team and supplemented by more traditional marketing;" "engag[es] community partners, such as senior living facilities and faith-based organizations, to obtain referrals;" and "ask[s] [insurance agents] for referrals, making them introduce us to people that need our care."  Am. Compl. ¶¶ 101(b), 101(d), 106(b) (emphasis omitted).  The defendants described how Oak Street's "multichannel marketing strategy" allows it to "scale the number of centers on our platform rapidly and fill them with any interested patients we attract."  *Id.* ¶ 101(a).  When an analyst asked how much "recruiting of the MA plan members" is "driven internally . . . versus given to you by intermediaries like the MA plans or brokers," Pykosz stated:

> [T]he vast majority of our patients come through our efforts.  We love when insurance advisers or health plan is going to -- we call it push those patients.  And we'll take as many as we can get.  But . . . there's a lot of limits on what they can actually do . . . .  So we get most of our patients from meeting people in the community one by one . . . .

*Id.* ¶ 117(b) (emphasis omitted).  Regarding transportation specifically, the Northeast Pension Funds emphasize the defendants' statement that Oak Street has a "fleet of over 100 green vans" that "typically provide patient transportation for our patients to get to and from our centers."  *Id.* ¶ 103(a) (emphasis omitted).  They also reference defendants' statement in the IPO registration that the cost of care financial metric "include[d] the costs we incur to operate our centers, including . . . patient

11

transportation" but not "any expenses associated with sales and marketing activities incurred at the local level to support our patient growth strategies." *Id.* ¶ 101(g) (emphasis omitted). The Northeast Pension Funds contend that these statements created a duty to disclose that Oak Street paid insurance agents $200 per patient and offered free transportation to prospective patients because the statements "plac[e] their patient acquisition strategies and tactics directly at issue." Pls.' Resp. Br. at 14.[1]

"Mere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995); *see also Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."). "Disclosure is required," however, "when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (alteration in original) (quoting 17 C.F.R. § 240.10b–5(b)); *see also Stransky*, 51 F.3d at 1331 ("If one speaks, he must speak the whole truth."); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth.").

---

[1] The defendants argue that certain marketing statements identified in the complaint are "non-actionable puffery." Defs.' Opening Mem. at 22. But the defendants do not argue, nor does the Court find, that any of the statements analyzed in this section are immaterial puffery. *See Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (observing that the materiality determination "is a highly fact-dependent analysis" and describing puffery as "vague" and "devoid of any substantive information"); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007) (holding that "a direct response to an analyst's inquiry" "went well beyond puffery"). Because the Court holds that the statements in this section satisfy the first element of the Northeast Pension Funds' section 10(b) claims, the Court need not address whether other statements alleged in the complaint falling within the same category of marketing statements are puffery.

"[C]ompanies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45.

If the Northeast Pension Funds are correct that Oak Street's practice of paying agents on a per-patient basis would violate the AKS (and although the defendants contest that Oak Street engaged in this practice, they do not meaningfully defend the practice's legality at this stage of the proceedings), then they have adequately alleged that by describing the success of Oak Street's marketing strategy and choosing to tell the market that it paid insurance agents for referrals, the defendants were obligated to disclose the practice. *See Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (holding that, where a surgical procedure required a specific coding category for reimbursement by law, "by choosing to inform the market that it was training surgeons on how to obtain reimbursements" after a change in the law required a new category, "the Company was obliged to further disclose its fraudulent reimbursement scheme, i.e., its instructions to surgeons to unlawfully code" under the prior category); *Holwill v. AbbVie Inc.*, No. 18 C 6790, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020) ("Defendants' alleged statements attributing Humira's success to AbbVie's sales and marketing practices and programs implicated AbbVie's allegedly unlawful kickback scheme, . . . and were thus misleading to the extent that they omitted material information regarding the details of the allegedly unlawful kickback scheme."). Similarly, the defendants chose to explain that Oak Street provided patient transportation but omitted that the company's marketing strategy also relied on offering transportation to *prospective* patients, which the Northeast Pension Funds allege is specifically disallowed by the AKS. The Northeast Pension Funds have sufficiently alleged that these additional facts were necessary to make the defendants'

statements not misleading and accordingly have adequately alleged that the defendants' statements about Oak Street's marketing practices contained material omissions.

The defendants contend that "the securities laws 'do not impose [] a duty upon publicly traded corporations to confess to uncharged, unadjudicated claims of wrongdoing.'"  Defs.' Opening Mem. at 13 (alteration in original) (quoting *Heavy & Gen. Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *15 (N.D. Ill. May 24, 2022)).  Though this might be right, it misses the point.  The statements cited by the Northeast Pension Funds are not misleading because Oak Street was independently required to disclose the existence of the DOJ investigation or confess to violating the AKS, but rather because the statements omitted the fact that Oak Street engaged in the two specific practices alleged to be illegal.

*Societe Generale Securities Services, GmbH v. Caterpillar, Inc.*, No. 17 C 1713, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018), a case the defendants rely on, illustrates this distinction.  In *Caterpillar*, the defendants disclosed the alleged wrongful conduct— the company's tax position—stating that they believed it complied with the tax laws and were cooperating with the government's investigation.  *Id.* at *2, 6.  Even though the conduct was disclosed, the plaintiffs argued that the defendants "omitted material information regarding the substantial risk" stemming from the investigation.  *Id.* at *1. Thus, the plaintiff "essentially argue[d] that [the defendants] should have admitted a securities or tax law violation while the investigations were ongoing," which the court held the securities laws did not require.  *Id.* at 6.  In this case, the defendants did *not* disclose the conduct that is alleged to violate the AKS.  Instead, they conveyed that Oak

14

Street complied with the AKS without disclosing the specific marketing practices that the

Northeast Pension Funds allege "drastically increased the risks investors faced and

concealed that [Oak Street]'s legal practices were insufficient to attract sufficient

patients."  Pls.' Resp. Br. at 15.  Thus, the alleged omission is the fact that Oak Street

paid agents on a per-patient basis and offered free transportation to prospective

patients, which Oak Street could have disclosed without "confess[ing] to uncharged"

AKS violations.  *Fifth Third*, 2022 WL 1642221, at \*15.  That Oak Street could have

disclosed these practices without confessing to AKS violations is demonstrated by the

fact that the defendants still "do[] not concede" "that these 'tactics' were wrongful."

Defs.' Opening Mem. at 12.

### b.    Statements about compliance

The defendants next contend that their statements could not be misleading

because "Oak Street specifically cautioned about the extent of its regulatory oversight

and the risk of government investigations."  Defs.' Opening Mem. at 13.  The

defendants highlight their statements that, for example, Oak Street operated "in a

highly-regulated industry" and that it "endeavor[s] to comply with all legal requirements"

but "any failure to do so could have a material adverse impact on our business."  *Id.* at

8.  The defendants also emphasize their oft-repeated AKS statements.  The Northeast

Pension Funds argue that the defendants' AKS statements contained material

omissions and "reinforced the misleading impression [defendants'] statements touting

[Oak Street]'s patient acquisition tactics created."  Pls.' Resp. Br. at 17.

The Northeast Pension Funds have sufficiently alleged that the defendants' AKS

statements were misleading and that the statements did not satisfy the defendants' duty

15

to disclose its marketing practices.  Courts have rejected the "argument that such general warnings effectively satisfy the duty to disclose specific illegal activities."  *Singer*, 883 F.3d at 442; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.").  As the Second Circuit explained, "[o]ne cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors."  *Meyer*, 761 F.3d at 251.  Similarly, in this case, the defendants disclosed that "[t]he OIG has expressed concern" specifically regarding "per-patient based compensation methodologies," and that Oak Street "use[s] external companies" but only in "limited instances" that the defendants "believe do not violate the [AKS]."  Pls.' Resp. Br. at 17–18 (emphasis omitted) (quoting Am. Compl. ¶ 101(h)).  But because this disclosure omitted that Oak Street, according to the Northeast Pension Funds, pays its agents on precisely a "per-patient bas[is]," the Northeast Pension Funds have adequately alleged that this disclosure is misleading to investors.  *Id.*  The Northeast Pension Funds have also sufficiently alleged that the nondisclosure of payments to agents *on a per-patient basis* and providing free transportation to *prospective* patients would "substantially affect a reasonable investor's calculations of [the] probability" that Oak Street committed AKS violations.  *Meyer*, 761 F.3d at 251.

*Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), cited by the defendants, is inapposite.  In that case, the court held that "a reasonable investor would not rely on"

16

the defendant's statements of "satisfactory compliance" where the representations were "simple and generic" and "framed by acknowledgements of the complexity and numerosity of applicable regulations," such that the "statements seem[ed] to reflect [the defendant]'s uncertainty as to the very possibility of maintaining adequate compliance . . . in light of complex and shifting government regulations."  *Id.* at 63–64.  In this case, the defendants' AKS compliance statement is more detailed, including specific references to forms of compensation.  For the defendants' more general assertions of compliance, *Singh* does not suggest that those statements satisfy the defendants' duty to disclose, but rather that those general assertions themselves are not actionable assurances of compliance.  *Id.*[2]  But the Northeast Pension Funds do not base their section 10(b) claim on those more general compliance assertions.

The defendants also contend that the AKS compliance statement cannot be misleading because it is a non-actionable opinion.  "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."  *Omnicare*, 575 U.S. at 186.  But "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion."  *Id.* at 188.  The Northeast

---

[2] The defendants also contend that the Northeast Pension Funds "do not 'adequately allege a systemic organizational disregard for compliance'" because the referral program accounted for only ten percent of Oak Street's new patients in 2021.  Defs.' Opening Mem. at 15 (citing *In re Carnival Corp. Sec. Litig.*, 2022 U.S. Dist. LEXIS 58526, at *56 (S.D. Fla. Mar. 30, 2022)).  *In re Carnival* considered the circumstances in which "generic statements about regulatory compliance" could nonetheless be actionable under *Singh*.  *In re Carnival*, 2022 U.S. Dist. LEXIS 58526, at *52.  Because the defendants' AKS statements are not generic and the Northeast Pension Funds "do[] not depend on mere generic assertions of legal compliance to establish [Oak Street]'s duty to disclose," *In re Carnival* is inapplicable.  *Singer*, 883 F.3d at 442.

Pension Funds have adequately alleged that the AKS statement, by stating that per-patient payments were "closely scrutinized," implied the fact that paying agents on a per-patient basis was not one of the "arrangements" Oak Street employed.  *See id.* at 189 ("[I]f a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omissions clause creates liability."); *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").  Even if this fact were not conveyed, as discussed below in addressing the scienter element, the Northeast Pension Funds have also sufficiently alleged that the defendants "knew payments based on referral volume and the offering and providing of free transportation violated the AKS," rendering their contrary opinion actionable.  Pls.' Resp. Br. at 19; *see* Am. Compl. ¶¶ 157–162; *Omnicare*, 575 U.S. at 184 ("[T]he statement about legal compliance . . . would falsely describe her own state of mind if she thought her company was breaking the law.").

> c.    **Items 303 and 105**

"Item 303(a)(3)(ii) of Regulation S–K . . . provides that registration statements and annual 10–K reports must reveal any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Gallagher*, 269 F.3d at 810; *see* 17 C.F.R. § 229.303(b)(2)(ii).  Similarly, Item 105 of Regulation S–K requires "a discussion of the material factors that make an investment in the registrant

or offering speculative or risky."  17 C.F.R. § 229.105(a).  The Northeast Pension Funds

allege that the defendants' failure to disclose the two improper marketing tactics violated

Items 303 and 105, "provid[ing] a separate basis for § 10(b) liability."  Pls.' Resp. Br. at

24.

The Seventh Circuit has not yet decided whether Items 303 and 105 impose a

duty to disclose that, when violated, can give rise to fraud under the Exchange Act.

Other circuits are divided on the issue.  *Compare Stratte-McClure v. Morgan Stanley*,

776 F.3d 94, 101 (2nd Cir. 2015) ("Item 303's affirmative duty to disclose in Form 10–

Qs can serve as the basis for a securities fraud claim under Section 10(b)."), *with*

*Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019) ("Item 303 imposes

a more sweeping disclosure obligation than Rule 10b-5, such that a violation of the

former does not *ipso facto* indicate a violation of the latter."), *In re NVIDIA Corp. Sec.*

*Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose

for purposes of Section 10(b) and Rule 10b–5."), *and Oran v. Stafford*, 226 F.3d 275,

288 (3rd Cir. 2000) (Alito, J.) (concluding that a violation of Item 303 "does not

automatically give rise to a material omission under Rule 10b–5.").  This Court

continues to "find[] the Second Circuit's reasoning in *Stratte-McClure* compelling," and

the defendants do not suggest any reason for the Court to reconsider its position.  *Twin*

*Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *7 (N.D. Ill. Feb.

5, 2020) (Kennelly, J.).

The defendants contend that the Items 303 and 105 claims fail because they

disclosed the uncertainty of AKS violations.  As explained above, the Northeast Pension

Funds have adequately alleged that the defendants' risk disclosures were insufficient by

omitting Oak Street's allegedly unlawful practices of paying agents for referrals on a per-patient basis and offering free transportation to prospective patients.

The defendants also argue that the Items 303 and 105 allegations fail because the Northeast Pension Funds did not adequately allege "actual knowledge."  Defs.' Opening Mem. at 24; *see Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) ("Plaintiffs . . . satisfy the Item 303 knowledge requirement by pleading, with some specificity, facts establishing that defendants had actual knowledge of the purported trend.") (alterations accepted) (internal quotation marks omitted); *Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022) ("To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business.").  In disputing this element, both parties rely on their scienter arguments. Because the Court finds below that the Northeast Pension Funds have adequately alleged knowledge for scienter purposes, they have satisfied the requirement to allege actual knowledge for Item 303 purposes as well.

Lastly, the defendants briefly contend that the Northeast Pension Funds failed to allege that the uncertainties were "reasonably likely" to have a "material" impact.  Defs.' Opening Mem. at 24 (quoting 17 C.F.R. § 229.303(b)(2)(ii)).  This argument fails, as the Northeast Pension Funds allege that the practices could result in civil or criminal penalties and Oak Street's exclusion from Medicare, which would compromise its business.  *See* Am. Compl. ¶¶ 60–61, 126; *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (holding that an alleged unlawful contract "worth a fraction of [the company's] yearly revenues" could nevertheless be material because it created the

risk of "significant civil and even criminal liability" and "debarment from other government contracts altogether").  Moreover, "'the determination of materiality requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts' . . .; thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (alterations accepted) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

The Northeast Pension Funds have accordingly sufficiently alleged Items 303 and 105 violations, providing another basis for their section 10(b) claim.

### 2.    Scienter

For a section 10(b) claim, scienter "means an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Cornielsen*, 916 F.3d at 601 (7th Cir. 2019) (internal quotation marks omitted); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989) ("[T]he scienter requirement is satisfied by a showing of reckless conduct defined as a highly unreasonable omission, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.") (alterations accepted) (internal quotation marks omitted).

As previously noted, the PSLRA's pleading standard requires the plaintiffs' allegations to support a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  To assess whether the plaintiffs have alleged a strong inference of scienter, the Court asks: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007).  The "plaintiffs must create a strong inference of scienter with respect to *each individual defendant*."  *Cornielsen*, 916 F.3d at 602 (internal quotation marks omitted).  To establish Oak Street's scienter, both parties agree that the Court looks to the individual defendants' scienter.  *See Tellabs*, 513 F.3d at 708 ("To establish corporate liability for a violation of Rule 10b–5 requires looking to the state of mind of the individual corporate official or officials who make or issue the statement . . . .") (alterations accepted) (internal quotation marks omitted).

The defendants contend that the Northeast Pension Funds' allegations do not support a strong inference of scienter because "[t]he far more compelling inference" is that the defendants believed their marketing tactics did not violate the AKS.  Defs.' Opening Mem. at 26.  The Northeast Pension Funds contend that the defendants had "a motive to conceal the improper patient acquisition tactics" and that their repeated statements about patient acquisition strategies and AKS compliance compels an inference that they "knew about what they spoke of."  Pls.' Resp. Br. at 28–32.

First, the Northeast Pension Funds' allegations that the defendants had motive support a strong inference of scienter.  "[P]ersonal financial gain may weigh heavily in favor of a scienter inference . . . ."  *Tellabs*, 551 U.S. at 325.  The individual defendants directly benefited from the allegedly unlawful marketing tactics because they "were eligible to receive annual cash incentive awards" in 2020 and 2021 based on their assessed performance against "at-risk patient count targets" set by Oak Street's board.  Am. Compl. ¶ 172.  The defendants cite *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012), for the

22

proposition that these allegations are insufficient to show scienter.  In *Zimmer*, the Seventh Circuit rejected the plaintiffs' contention that scienter could be inferred from top managers' "incentive to make [the company] look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options" because "[a] similar assertion could be made about every firm in the world."  *Id.  Zimmer* is inapposite because the Northeast Pension Funds allegations in this case are significantly more detailed and directly tie the defendants' incentive awards to the concealment of Oak Street's patient acquisition tactics.  *See Flynn v. Exelon Corp.*, No. 19 C 8209, 2021 WL 1561712, at *10 (N.D. Ill. Apr. 21, 2021) ("Plaintiffs pled motive, including that the bribery scheme was worth millions of dollars to the Company and each individual Defendant stood to gain from the scheme."); *Holwill*, 2020 WL 5235005, at *5 (holding that the plaintiffs' allegations that the defendants' "compensation was tied directly" to the company's flagship drug sales provided motive for the alleged kickback scheme, supporting an inference of scienter).[3]

Moreover, the defendants' repeated statements about Oak Street's marketing practices and AKS compliance support an inference that the defendants knowingly concealed the allegedly improper practices.  The Northeast Pension Funds allege that the defendants' statements that there are "a lot of limits on what [insurance agents] can actually do" and that "per-patient based compensation methodologies are closely scrutinized by federal agencies" indicate an awareness of the limitations imposed by the AKS on their marketing practices.  Am. Compl. ¶¶ 152, 154.  They also allege that Oak

---

[3] Because the Court finds these allegations sufficient to allege the defendants' motive, there is no need to resolve whether the defendants' stock sales also suggest that the defendants had motive.

Street's patient acquisition tactics were "critical to Oak Street achieving profitability."
Pls.' Resp. Br. at 33–34; *see, e.g.*, Am. Compl. ¶ 65 ("[F]inancial analysts . . . provided a
post-IPO price target . . .[that] assumed membership growth would nearly double from
2020 to 2022, and the analysts identified '[a]t-risk membership growth' as a key
'investment driver[].'"), ¶ 149 ("Oak Street exceeded the mid-point of its quarterly at-risk
patient guidance by only around 1%, confirming that all patient acquisition strategies . . .
were material and imperative to meeting investor expectations.").  The Northeast
Pension Funds further allege that the fact that these practices violated the AKS was
"obvious" and that the defendants acknowledged that the "AKS specifically prohibited
paying for referrals and providing remuneration to prospective patients" in statements
and in Oak Street's Code of Conduct.  Pls.' Resp. Br. at 32–33 (citing Am. Compl.
¶¶ 56, 159).  This supports a strong inference of scienter, especially given the Northeast
Pension Funds allegation that, when asked to "unpack" Oak Street's use of brokers, the
defendants were "relunctan[t] to delve into details."  *Id.* at 32 (citing Am. Compl.
¶¶ 106(c), 117(b)); *see Singer*, 883 F.3d at 443 (holding that the plaintiffs alleged
scienter where "the Complaint reflects that the illegality of the fraudulent reimbursement
scheme was obvious," and "[t]hat the Company knew the law . . . by its public
acknowledgment of the . . . reimbursement issues," especially since "if the Company
believed that the System could still lawfully" continue as is, "it certainly would have said
so"); *Holwill*, 2020 WL 5235005, at *5 ("Defendants' numerous statements regarding
AbbVie's sales and marketing practices and programs, and the importance that
Defendants placed on those practices and programs to AbbVie's and Humira's growth
and success[,] constitute strong circumstantial evidence that Defendants had detailed

24

information regarding AbbVie's sales and marketing practices and programs, especially given Defendants' reluctance to delve into the details.").

The defendants' response that the Northeast Pension Funds are improperly invoking the "'core operations' doctrine," which "applies 'only where the operation in question constitute[s] nearly all of a company's business,'" is unpersuasive.  Defs.' Reply Br. at 16 (quoting *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at \*13 (N.D. Ill. Jan. 12, 2021)).  The court in *Baxter* noted that "[a]lthough the 'core operations' inference generally will not establish a strong inference of scienter by itself, it 'can be one relevant part of a complaint' supporting that inference."  *Baxter*, 2021 WL 100457, at \*13 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784–85 (9th Cir. 2008)).  In this case, the Northeast Pension Funds are not relying exclusively on the core operations inference that the defendants can be "assumed to know of facts critical to [Oak Street]'s core operations or to an important transaction that would affect [Oak Street]'s performance," but also on the defendants' specific statements about Oak Street's marketing practices that indicate knowledge.  *Id.*  Moreover, the Seventh Circuit has indicated that the core operations inference applies where the practices "are a significant part of [a company]'s financial picture."  *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018); *see also Baxter*, 2021 WL 100457, at \*13 (applying the "significant part" test from *Kohl's* to determine whether a "core operations" inference is appropriate).  Although the defendants cite the allegation in the amended complaint that the referrals accounted for less than 10% of new patients in 2021, the Northeast Pension Funds explain in the same paragraph of the amended complaint why the referrals are nevertheless a significant aspect of Oak Street's

25

business.  Am. Compl. ¶ 149.

In sum, the inference that the defendants intentionally misled investors by concealing Oak Street's allegedly unlawful marketing practices is "cogent and at least as compelling as" the defendants' opposing inference that they acted unintentionally, believing that their marketing tactics did not violate the AKS.  *Tellabs*, 551 U.S. at 324. The Court accordingly finds that the Northeast Pension Funds have sufficiently alleged a strong inference of scienter.[4]

The defendants' contention that the Northeast Pension Funds' failure to allege "reports, conversations, or meetings" involving the defendants' AKS violations "requires dismissal," Defs.' Opening Mem. at 27, lacks merit.  *Hill v. The Tribune Co.*, 2006 WL 2861016, at *11 (N.D. Ill. Sept. 29, 2006), cited by the defendants for this proposition, does not hold that allegations of specific reports, conversations, or meetings demonstrating the defendants' knowledge are required to plead a strong inference of scienter.  Moreover, the Supreme Court has subsequently held that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre" and that the Court "must assess all the allegations holistically."  *Tellabs*, 551 U.S. at 324, 326.

### 3.    Loss causation

The loss causation element requires a plaintiff "to establish that the price of the securities they purchased was 'inflated'—that is, it was higher than it would have been

---

[4] Because the Court finds these allegations sufficient to plead scienter, the Court does not need to resolve the parties' disputes regarding the inferences to be drawn from the former employees' allegations and Oak Street's "other misconduct" alleged in the amended complaint.  Pls.' Resp. Br. at 34.

without the false statements—and that it declined once the truth was revealed."

*Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015); *see also*

*Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) ("[P]laintiffs must

show both that the defendants' alleged misrepresentations artificially inflated the price of

the stock and that the value of the stock declined once the market learned of the

deception.").  Pleading loss causation is "not meant to impose a great burden upon a

plaintiff," and a plaintiff need only "provide a defendant with some indication of the loss

and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*,

544 U.S. 336, 347 (2005); *see also Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico

Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) ("Whether the

connection between [the] misleading statements and the alleged corrective disclosures

may ultimately be found too attenuated at a later stage in litigation is a highly fact

intensive inquiry that need not be reached at this point.").

The defendants contend that "the announcement of an investigation, standing

alone, is insufficient to establish loss causation."  Defs.' Opening Mem. at 35 (quoting

*Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014)).  The Ninth Circuit

subsequently held, however, that "an investigation can form the basis for a viable loss

causation theory if the complaint also alleges a subsequent corrective disclosure by the

defendant."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (internal

quotation marks omitted); *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1206

(9th Cir. 2020) (holding that allegations that an article disclosed both that the defendant

"had been the subject of a formal SEC investigation" and "the falsity of [the defendant]'s

prior statement," and that this "revelation caused [the defendant]'s stock price to drop,"

27

were sufficient to allege loss causation).  "[T]here is no requirement that a corrective disclosure take a particular form or be of a particular quality," rather, "[i]t is the exposure of the fraudulent representation that is the critical component of loss causation." *Amedisys, Inc.*, 769 F.3d at 325 (internal quotation marks omitted).

The Northeast Pension Funds have adequately pled loss causation by alleging that Oak Street's stock price dropped the same day that Oak Street announced that the DOJ was investigating its "relationships with third-party marketing agents" and "provision of free transportation to federal health care beneficiaries."  Am. Compl. ¶¶ 13–14.  The disclosure is significant, therefore, not because "it simply put[] investors on notice of a *potential* future disclosure of fraudulent conduct," *Loos*, 762 F.3d at 890, but rather because it started "a series of partial corrective disclosures" revealing the alleged misrepresentations, *Amedisys*, 769 F.3d at 326.  The Northeast Pension Funds allege that the disclosure of the investigation "began to reveal the improper conduct," that was further disclosed in the defendants' subsequent statements and public reports. Pls.' Resp. Br. at 39 (citing Am. Compl. ¶¶ 131, 135–140).  Because the Northeast Pension Funds "set[] forth specific allegations of a series of partial corrective disclosures, joined with the subsequent fall in [Oak Street's] stock value, and in the absence of any other contravening negative event, [they] have complied with *Dura's* analysis of loss causation." *Amedisys*, 769 F.3d at 326.

The defendants again contend that Oak Street's marketing tactics had already been disclosed, so the only new information disclosed to the market was the DOJ investigation.  The amended complaint belies this contention, however.  The Northeast Pension Funds allege that subsequent disclosures revealed that Oak Street paid agents

28

on a per-patient basis and offered transportation to prospective patients, which had not previously been disclosed.  *See, e.g.*, Am. Compl. ¶¶ 130–134, 137–142.  For example, the Northwest Pension Funds allege that the defendants' 2021 annual report disclosed, for the first time, that Oak Street "attempt[ed] to structure" its use of insurance agents "to meet the Personal Services Safe Harbour" and "attempt[ed] to structure any offer or actual transfer of renumeration [sic] to prospective or current patients in a manner consistent with applicable exceptions."  *Id.* ¶ 139.  Moreover, if "the full truth had reached the market despite any shortcomings in [the defendants'] cautionary statements," "it is hard to understand the sharp drop in the price of [Oak Street's] stock." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004), *as amended* (Sept. 3, 2004).  And, in any event, "[a] 'truth-on-the-market' defense is available in principle, . . . but not at the pleading stage."  *Id.*; *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 n.11 (2013) ("Proof . . . that news of the truth had entered the market and dissipated the effects of prior misstatements[] is a matter for trial . . . ."); *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 490 (N.D. Ill. 2021) ( "[T]o the extent the defendants' [loss causation] argument is that investors were aware of the truth and that therefore their allegedly misleading statements were immaterial, that argument is inappropriate at the pleading stage.") (Kennelly, J.).

In sum, the Court concludes that the Northeast Pension Funds have stated a viable section 10(b) claim.

**B.    Securities Act claims**

The Northeast Pension Funds claim that Oak Street, Oak Street's directors, the underwriters, and the individual defendants violated section 11 of the Securities Act and

29

that those defendants along with the private equity defendants violated section 12(a)(2) of the Securities Act.  Section 11 of the Securities Act makes it unlawful for a registration statement to "contain[] an untrue statement of a material fact or omit[] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).  Section 12(a)(2) of the Securities Act creates liability for "a prospectus or oral communication" that "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77*l*(a)(2).  The Northeast Pension Funds allege that the defendants' same statements underlying its section 10(b) claim violate sections 11 and 12(a)(2).  The parties dispute whether Rule 9(b) applies to these claims, but there is no need to resolve this because the Court has already determined that the Northeast Pension Funds have alleged material omissions satisfying Rule 9(b)'s pleading requirements.

The defendants contend that the section 11 claim still must be dismissed because the Northeast Pension Funds failed to allege that they have standing under the statute.  In addition to lack of statutory standing, the defendants contend that the section 12(a)(2) claim must be dismissed for the additional reason that the Northeast Pension Funds failed to allege that the individual defendants and the private equity defendants were statutory sellers.

### 1.    Section 11 claim

Section 11 provides a cause of action for "any person acquiring" a security issued under a misleading registration statement.  15 U.S.C. § 77k(a).  Thus, plaintiffs

meet the requirements to sue under section 11 only if they "purchased shares in the offering made under the misleading registration statement" or "can trace their shares back to the relevant offering."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).

The defendants contend that the Northeast Pension Funds' allegation that the additionally named plaintiff, City of Dearborn Police & Fire Revised Retirement System (Dearborn), "purchased shares of Oak Street common stock in the Company's IPO, December 2020 Offering, and February 2021 Offering," Am. Compl. ¶ 26, is insufficient to allege statutory standing.  The defendants cite *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 669 (N.D. Ill. 2020), *aff'd sub nom. National Elevator Industry Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022), for the proposition that this allegation is merely a "formulaic recitation of that element."  In *Conagra*, however, the plaintiffs alleged that they "acquired Conagra shares pursuant and/or traceable to the Offering Documents for the SPO."  *Id.* at 669.  The court held that "general allegations of traceability, without more, are insufficient," relying on two circuit court cases holding similarly.  *Id.*; *see In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016) ("[T]raceability is an element of a Section 11 claim.  And, almost by definition, a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a 'formulaic recitation' of that element.") (citation omitted); *Century*, 729 F.3d at 1108 ("Standing alone, the conclusory allegation that plaintiffs 'purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering' does not allow us to draw a reasonable inference about anything because it is devoid of factual

content.").  The First Circuit observed, however, that "[t]he plaintiffs could have met this bar by pleading that they 'purchased their shares directly in the secondary offering itself.'"  *Ariad*, 842 F.3d at 756 (quoting *Century*, 729 F.3d at 1106).

In this case, the Northeast Pension Funds have alleged that Dearborn purchased shares "in" the offerings, not "traceable to" the offerings.  *See* Am. Compl. ¶ 26.  This allegation is sufficient to allege statutory standing for section 11 purposes.  Although this allegation was found insufficient in *Conagra*, the court in that case noted that the plaintiffs "continued to rely on th[eir] more general allegation" of traceability at oral argument.[5]  *Conagra*, 495 F. Supp. 3d at 670 n.19.

With respect to the May 2021 SPO, however, the Northeast Pension Funds have not alleged that any named plaintiff purchased shares in this offering.  Instead, the amended complaint states that "Dearborn purchased shares of Oak Street common stock in the Company's IPO, December 2020 Offering, and February 2021 Offering," and that "Dearborn and/or members of the Class acquired Oak Street's stock in the IPO, the December 2020 Offering, February 2021 Offering, and/or May 2021 Offering."  Am. Compl. ¶¶ 26, 269.  The reasonable inference from these allegations is that only potential class members, not a named plaintiff, purchased shares in the May SPO.

Although the Northeast Pension Funds contend that they "are representing a putative class containing individual members who can be shown at a later stage to have standing," Pls.' Resp. Br. at 41, a plaintiff "cannot represent a class of whom they are

---

[5] The court in *Conagra* also observed that the SPO "accounted for only around 4% of the total outstanding Conagra stock."  *Conagra*, 495 F. Supp. 3d at 671.  The parties agree in this case that each SPO accounted for thirty-three percent of Oak Street's outstanding stock, further limiting the applicability of *Conagra*.

not a part," *Bailey v. Patterson*, 369 U.S. 31, 32–33 (1962).  Therefore, to plead a section 11 claim, "it is not enough that plaintiffs seek damages only for a class that has standing; at least one named plaintiff must be a member of that class—that is, a named plaintiff must have purchased shares traceable to the challenged offering."  *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003); *see also Conagra*, 495 F. Supp. 3d at 670 (rejecting the argument "that even if the named plaintiffs do not have individual standing, they are entitled to produce at class certification additional plaintiffs who do have individual standing" as "not consistent with Seventh Circuit precedent"); *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 891–92 (N.D. Ill. 2004) ("The fact that they have filed a class action lawsuit that includes putative class members who did purchase the relevant securities does not confer the necessary standing in this case because none of those putative class members is a named plaintiff.").

The Court accordingly grants the motion to dismiss Northeast Pension Funds' section 11 claim with respect to the May SPO but denies the motion with respect to the Northeast Pension Funds' section 11 claims for misrepresentations in the registration statements from the IPO, December SPO, and February SPO.

### 2.    Section 12(a)(2) claim

Similar to section 11 claims, section 12(a)(2) provides a cause of action only "to the person purchasing such security from" the offeror or seller.  15 U.S.C. § 77*l*(a)(2). Section 12(a)(2)'s standing requirement is stricter than section 11, however, because it is insufficient for plaintiffs to allege that they purchased the stock "traceable to" an offering.  *See Water Island Event-Driven Fund, LLC v. Trib. Media Co.*, 39 F.4th 402,

406 (7th Cir. 2022) ("'[T]raceable to' means in the aftermarket, and thus outside the scope of § 12."). To determine if this requirement is met, the Court "ask[s] whether the complaint adequately alleges that at least some of the plaintiffs bought from" the seller. *Id.* (holding that the plaintiffs satisfied this requirement where "the complaint alleges that 'Morgan Stanley sold Tribune common stock pursuant to Offering Materials directly to Plaintiffs and other members of the class'"). "The Supreme Court has made the categorically narrow nature of [s]ection 12 liability clear and limited it only to 'the buyer's immediate seller; remote purchases are precluded from bringing actions against remote sellers.'" *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 847 (N.D. Ind. 2018) (quoting *Pinter v. Dahl*, 486 U.S. 622, 643 n.21 (1988)).

The defendants contend that the Northeast Pension Funds' section 12(a)(2) claim must be dismissed because they failed to allege that they "purchased shares directly from any [d]efendant" and that any defendants "solicited or sold Oak Street securities to any [p]laintiff." Defs.' Opening Mem. at 40–41. The Northeast Pension Funds contend that the allegation from the amended complaint that "Dearborn and/or members of the Class acquired Oak Street's stock in" the offerings, Am. Compl. ¶ 269, is sufficient because they "need only 'allege that Plaintiffs purchased shares in connection with the offerings'" and they "are not required to identify the specific defendant from whom they purchased the shares." Pls.' Resp. Br. at 42 (alterations accepted) (quoting *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 832 (S.D.N.Y. 2017)). But this allegation does not answer the question that the Seventh Circuit has instructed to ask—namely, whether any plaintiffs "bought from" the defendants. *Water Island*, 39 F.4th at 406. Courts in this district have required plaintiffs

34

to allege that they purchased directly from the defendants; the Court agrees with these rulings.  *See Conagra*, 495 F. Supp. 3d at 672 ("Plaintiffs' allegations that the City plaintiffs 'purchased shares in the SPO,' are insufficient to plausibly plead that the City plaintiffs purchased shares directly from the underwriters.") (citation omitted); *Shah*, 348 F. Supp. 3d at 848 ("[S]elling to just anyone is not enough.  In order to plead a plausible [s]ection 12 claim, a plaintiff must allege that the defendant sold to plaintiffs, and that has not been alleged.").

For a similar reason, the Court agrees with the defendants that the Northeast Pension Funds have not adequately alleged that the individual defendants and the private equity defendants are statutory sellers.  Defendants are only liable under section 12(a)(2) if they "pass title or directly solicit or offer to the plaintiff."  *Daniels v. Blount Parrish & Co.*, 113 F. App'x 174, 176 (7th Cir. 2004) (citing *Pinter*, 486 U.S. at 642).  The Northeast Pension Funds concede that neither the individual defendants nor the private equity defendants passed title, and they argue instead that they solicited the purchase.  But "[t]o count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer."  *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003).  The Northeast Pension Funds have not alleged that any of these defendants communicated directly with any plaintiffs.  Although they contend that the individual defendants "participated in the preparation of, and signed" the statements, Pls.' Resp. Br. at 43, "neither involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status," *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st

35

Cir. 1996) (citing *Pinter*, 486 U.S. at 651 & n.27).  Without more details regarding "the role played by the . . . [d]efendants in the solicitation of the securities at issue," the Northeast Pension Funds have not alleged that these defendants are statutory sellers. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 720 (S.D.N.Y. 2013) (internal quotation marks omitted).

Because the Northeast Pension Funds have not alleged the statutory requirements, the Court dismisses the section 12(a)(2) claim.

## C.    Control person liability

The Northeast Pension Funds additionally claim that the individual defendants and private equity defendants violated section 15 of the Securities Act and section 20(a) of the Exchange Act.  Both section 15 and section 20(a) "set out 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the securities violations committed by another." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994).  The defendants first contend that the claims should be dismissed because the Northeast Pension Funds have failed to allege a primary violation of the Securities Act and Exchange Act.  *See Pugh v. Trib. Co.*, 521 F.3d 686, 693 (7th Cir. 2008) ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5."); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 901 n.14 (4th Cir. 2014) ("We dismiss the § 15 claim because the complaint fails to state a claim under the predicate Securities Act provisions.").  Because the Court has determined that the Northeast Pension Funds have adequately alleged their section 10(b) of the Exchange Act claim

36

and section 11 of the Securities Act claim with respect to the IPO, December SPO, and February SPO, the Court denies the defendants' motion to dismiss on this ground.

Regarding the private equity defendants specifically, the defendants contend that both claims should be dismissed because the Northeast Pension Funds failed to allege that the private equity defendants were control persons.  The Seventh Circuit has established a two-part test for determining control person liability: (1) "the 'control person' needs to have *actually* exercised general control over the operations of the wrongdoer," and (2) "the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability."  *Donohoe*, 30 F.3d at 911–12.  "Determination of whether an individual defendant is a 'controlling person' under section 20(a) is a question of fact that cannot be determined at the pleading stage."  *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *14 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.) (internal quotation marks omitted).  The parties again dispute whether Rule 9(b) applies, but the Court need not decide that issue because even assuming it does, the Northeast Pension Funds' allegations are sufficient.

The Northeast Pension Funds contend that the private equity defendants "exercised control over Oak Street and had power to influence and control . . . the content and dissemination of the various statements" that the Northeast Pension Funds allege are misleading.  Pls.' Resp. Br. at 44.  The amended complaint states that together the private equity defendants held 52.4 percent of Oak Street's common stock, providing them control over "the vote of all matters submitted to a vote of [Oak Street's] shareholders" and "enabl[ing] them to control the election of the members of the Board

37

and all other corporate decisions."  Am. Compl. ¶ 286.[6]  After the February SPO, the

private equity defendants' "stock ownership fell below 50% for the first time," but Oak

Street's annual report stated that the private equity defendants "will still be able to

significantly influence the composition of our Board and the approval of actions requiring

shareholder approval" and "will continue to have significant influence with respect to our

management, business plans and policies."  *Id.* ¶ 287.  The Northeast Pension Funds

further allege that the private equity defendants control Oak Street's board through an

agreement that allows each defendant to nominate three directors—such that six out of

twelve directors are designated by the private equity defendants—and allows General

Atlantic to designate a director to "have the tie-breaking vote."  *Id.* ¶ 288.  These

allegations are sufficient to plead that the private equity defendants exercised actual

general control.  *See In re Gohealth, Inc. Sec. Litig.*, No. 20 C 5593, 2022 WL 1136576,

at *3 (N.D. Ill. Apr. 18, 2022) (holding that the plaintiffs sufficiently alleged that the

defendant exercised actual control where "[t]he Registration Statement state[d] that [the

defendant and others] possessed the ability to:  control matters requiring stockholder

approval; control the amendment of the certificate of incorporation or bylaws; control

---

[6] The defendants contend that this allegation from the amended complaint quoting Oak Street's IPO registration statement "is mandated by the NYSE based on the [private equity defendant]'s *holdings*" and therefore is "largely irrelevant in determining whether the complaint alleges control person liability."  Defs.' Reply Br. at 24 (quoting *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 676-677 (N.D. Tex. 2013)).  The court in *Kosmos Energy*, however, observed that only the "statement that it was a controlled company under NYSE rules is largely irrelevant," not that the entire registration statement should be disregarded.  *Kosmos Energy*, 955 F. Supp. 2d at 677 (noting that "the Court takes notice of the entirety of the Registration Statement").  The Northeast Pension Funds have alleged more facts indicating control beyond just the "statement that it was a controlled company under NYSE rules."  *Id.*

significant corporate transactions; and appoint members of the Company's board that may be affiliated with [the defendant and others]").

The defendants contend that *Fulton County Employees Retirement System v. MGIC Investment Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012), "is exactly on point and requires dismissal." Defs.' Reply Br. at 24. In that case, the alleged control party held forty-six percent of the alleged controlled entity, another entity held an "equally matched" forty-six percent, and the alleged controlled entity's managers held "the balance of power (the last 8%)." *MGIC*, 675 F.3d at 1051. The Seventh Circuit observed that "[t]he point of such equal positions is to prevent both [entities] from exercising unilateral control" and thus held that "it would be inappropriate to hold [the alleged control party] liable under § 20(a) for statements made by managers of a different firm that [it] could not control without the assent of a third party holding an equally large bloc." *Id.* This reasoning is not applicable in this case because the defendants acknowledge that the private equity defendants do not share equal ownership to prevent unilateral control; rather, "General Atlantic held roughly 34.3% to 28.5% of Oak Street's common stock" and "Newlight held roughly 22.6% to 18.8%." Defs.' Opening Mem. at 43–44. Instead of Oak Street being able to "operate as it pleased" "[u]nless [General Atlantic and Newlight] agreed," *MGIC*, 675 F.3d at 1051, General Atlantic specifically had the power to designate a tie-breaking director. *MGIC* is therefore inapposite and does not preclude control person liability in this case.

The defendants argue that the Northeast Pension Funds have failed to allege "particularized facts showing that either [private equity defendant] had the power to exercise specific control over Oak Street's public statements." Defs.' Opening Mem. at

39

45.  But the Northeast Pension Funds have alleged that the private equity defendants' stock ownership and control of Oak Street's board provide them with "significant influence with respect to [Oak Street]'s management, business plans and policies."  Am. Compl. ¶ 287.  Specifically, the amended complaint states that the private equity defendants "were provided with or had unlimited access to copies of[] the Company's public filings and other statements . . . and had the ability to prevent the issuance of the statements or cause the statements to be corrected."  *Id.* ¶ 210.  Further, partners at both private equity defendants signed the registration statements at issue and the 2020 annual report.  *Id.*  These allegations are sufficient to allege specific control.  *See In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1022 (N.D. Ill. 2004) (holding that substantially similar allegations were sufficient).  And they are significantly more detailed than the allegations rejected in the case relied on by the defendants.  *Cf. Brasher v. Broadwind Energy, Inc.*, No. 11 C 991, 2012 WL 1357699, at *12 (N.D. Ill. Apr. 19, 2012) (holding that allegations that the alleged control party held "47.7 percent of [the company's] stock" and "influences [the company's] affairs significantly" were insufficient to plead specific control).  The Court accordingly denies the defendants' motion to dismiss the sections 15 and 20(a) claims with respect to the private equity defendants.

### Conclusion

For the foregoing reasons, the Court grants the defendants' motions to dismiss with respect to the Northeast Pension Funds' section 12(a)(2) claim and section 11 claim based on misrepresentations from the May 2021 SPO, but the motion is otherwise denied [dkt. no. 57].  Defendants are directed to answer the complaint within twenty-

40

eight days of this order.  The parties are directed to confer and attempt to agree upon a discovery and pretrial schedule to propose to the Court.  A joint status report including a proposal, or alternative proposals if the parties cannot agree, is to be filed on February 24. 2023.  A telephonic status hearing is set for March 6, 2023 at 9:00 a.m., using call-in number 888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 10, 2023

41