# Exhibit A

Case No. 1:21-cv-02770-WJM-SBP   Document 91-1   filed 04/10/23   USDC Colorado
pg 1 of 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

IN RE: ALIBABA GROUP HOLDING LTD.
SECURITIES LITIGATION.

------------------------------------x

MEMORANDUM DECISION
AND ORDER

20 Civ. 9568 (GBD)

GEORGE B. DANIELS, District Judge:

Plaintiffs Salem Gharsalli, Laura Ciccarello, Dineshchandra Makadia, and Yan Tongbiao (collectively, "Plaintiffs") bring this action against Alibaba Group Holding Limited ("Alibaba" or "the Company"), Jack Ma, Maggie Wu, and Daniel Zhang (collectively, "Defendants"), pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, and Section 20(a).[1] (*See* Consol. Am. Compl. ("CAC"), ECF No. 55.) Defendants moved to dismiss pursuant to Rule 12(b)(1), Rule 12(b)(2), and Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b). (ECF Nos. 60–62.) Defendants' motion to dismiss this action as to Defendant Ma is GRANTED. Defendants' motion to dismiss Plaintiffs' Ant claims in Counts One and Two against all Defendants is GRANTED. Defendants' motion to dismiss Plaintiffs' Exclusivity Practices claims in Counts One and Two is DENIED.

## I.   FACTUAL BACKGROUND

Plaintiffs bring this federal securities action against Alibaba, Jack Ma, Daniel Zhang, and Maggie Wu, on behalf of all investors (the "Class") who purchased or otherwise acquired Alibaba American Depositary Shares ("ADSs") between July 9, 2020 and December 23, 2020, inclusive

---

[1] This Court refers to Alibaba, Wu, and Zhang's memorandum of law in support of their motion to dismiss as "Alibaba Defs.' Br." (ECF No. 61); to Plaintiffs' memorandum of law in opposition to the Alibaba Defendants' motion as "Pls.' Alibaba Opp." (ECF No. 74); to Plaintiffs' opposition to Ma's memorandum as "Pls.' Ma Opp." (ECF No. 75); and to Ma's reply in support of his motion as "Ma Def. Reply" (ECF No. 78.)

(the "Class Period"). (CAC ¶ 1.) During the Class Period, Ma was an Alibaba board member. (*Id.* ¶¶ 12, 53–54.) Defendant Zhang served as Alibaba's Chief Executive Officer ("CEO"). (*Id.* ¶ 41.) Defendant Wu served as Alibaba's Chief Financial Officer ("CFO"). (*Id.* ¶ 42.) All Defendants were members of the Alibaba Partnership. (*Id.* ¶ 53.)

## A. Alibaba's Business

Alibaba is the largest e-retailer in the world and operates multiple online marketplaces including Alibaba.com, Taobao.com, and Tmall.com. (CAC ¶ 2.) Alibaba is headquartered in the People's Republic of China ("China" or "PRC"), and its ADSs trade on the New York Stock Exchange ("NYSE"). (*Id.* ¶¶ 45, 376.)

Alibaba's business is regulated by multiple PRC regulatory agencies, including the State Administration for Market Regulation ("SAMR"), which enforces China's e-commerce and anti-monopoly laws ("AML"). (*Id.* ¶ 4.) During the Class Period, Alibaba employed exclusivity practices which "required or coerced merchants to sell exclusively on Alibaba platforms" and punished merchants who sold on competitor platforms. (*Id.* ¶ 5.) In November 2019, the SAMR instructed Alibaba and other internet companies that certain exclusivity practices violated PRC law. (*Id.* ¶¶ 6–7.) In July 2020, Alibaba signed an agreement with the SAMR pledging that it would "not force platform operators to conduct 'exclusive cooperation'" and would "not impose any unreasonable restrictions or make any unreasonable requirements on the selections of platforms by the operators." (*Id.* ¶ 8–10.) Plaintiffs allege that, despite this pledge, and unbeknownst to investors, Alibaba required merchant exclusivity throughout the Class Period.

In addition, Alibaba owns a 33% equity interest in Ant Group Co., Ltd. ("Ant" or "Ant Group"), a financial technology company known for operating Alipay, a mobile and online payment platform. (*Id.* ¶ 11.) Ant was spun off from Alibaba in 2011, but Alibaba's 33% stake in the Group made Alibaba Ant Group's "controlling shareholder" throughout the Class Period.

(*Id.* ¶¶ 11–12.) Alibaba also described Ant as "an unconsolidated related party of Alibaba" in SEC filings. (*Id.* ¶ 274.) On July 20, 2020, Alibaba announced in a 6–K that Ant Group was preparing for an initial public offering ("Ant IPO") in a joint listing on Stock Exchanges in Hong Kong ("HKSE") and Shanghai. (*Id.* ¶¶ 15–16.) In that announcement, Alibaba noted that the IPO was expected to occur on November 5, 2020, but cautioned investors that "there can be no assurance as to if and when [the Ant IPO] will be completed." (*Id.* ¶¶ 165, 274, 276.) Alibaba subscribed to buy an estimated $7.5 billion in additional Ant shares as part of the Ant IPO. (*Id.*)

On November 2, 2020, officials from multiple PRC regulatory agencies and the People's Bank of China met with Defendant Ma and two Ant executives. (*Id.* ¶ 203.) That same day, PRC regulators released draft regulation which changed online micro-lending rules applicable to Ant's online loan business. (*Id.* ¶ 203, fn. 110.) The following day, Alibaba announced that the Ant IPO had been suspended because Ant "may not meet listing qualifications or disclosure requirements due to material matters relating to the regulatory interview of its ultimate controller, executive chairman and [CEO] by the relevant regulators." (*Id.* ¶ 204.) Alibaba's ADSs declined by 8% later that day. (*Id.* ¶ 24.) One week later, on November 10, 2020, the SAMR published draft rules to curtail anti-competitive practices on online platforms, affecting Alibaba's business policies. (*Id.* ¶ 123.) That day, Alibaba's ADSs fell by 8.26%. (*Id.* ¶ 125.)

On December 23, 2020, the SAMR announced an investigation into Alibaba's antitrust practices. (*Id.* ¶ 130.) Upon news of this announcement, the price of Alibaba's ADSs fell approximately 13%. (*Id.* ¶ 131.) In April 2021, months after the Class Period had ended, the SAMR's investigation concluded that Alibaba had violated the AML and imposed a $2.8 billion penalty. (*Id.* ¶¶ 133, 142.) As part of its findings, the SAMR concluded that Alibaba had employed illegal merchant exclusivity practices since 2015. (*Id.* ¶¶ 136, 138–39.)

3

### B. Alleged Misstatements

Plaintiffs allege that, during the Class Period, Defendants violated federal securities laws by making numerous misstatements about the Ant IPO (the "Ant claim") and about Alibaba's antitrust risk and exclusivity practices (the "Exclusivity Practices claim") that artificially increased the stock price and eventually caused financial loss to the Class.  (*Id.* ¶¶ 97–104.) These alleged misstatements and omissions occurred in Alibaba's SEC filings, in a 2020 Investor Day presentation, and in Ant's pre-IPO prospectuses filings on the HKSE.

For their Exclusivity Practices claim, Plaintiffs identify numerous statements as materially misleading, including disclosures that described Alibaba's "prior" use of exclusive partnerships, when Alibaba had continued to require merchant exclusivity unbeknownst to regulators and investors. Plaintiffs also identify as materially misleading statements which attributed Alibaba's financial success to its "value proposition" to merchants, rather than disclosing that revenue growth was due, at least in part, to its continued exclusivity requirements.  Plaintiffs also allege that Defendants' statement that Alibaba believed in the legality of such practices was materially misleading.  (*Id.* ¶¶ 261–69.)  For their Ant claim, Plaintiffs allege that Alibaba's disclosures and Ant's pre-IPO filings were materially misleading because they concealed material regulatory risks, particularly those around Ant's ownership structure and online lending and banking regulations. (*Id.* ¶¶ 274–77, 281–86, 290–92, 296–308.)

## II.    LEGAL STANDARDS

### A. Standing Under Section 10(b)

To sue under Section 10(b), Plaintiffs must have "at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975). "Under the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities about which a misstatement was made."

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 84 (2d Cir. 2022) (citing *Blue Chip Stamps*, 421 U.S. at 723)). "Stockholders do not have standing to sue under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004). "Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold the securities about which the misstatements were made." *Frutarom*, 54 F.4th at 88.

### B. Rule 12(b)(2) Lack of Personal Jurisdiction

The plaintiff has the burden of establishing personal jurisdiction over the defendant. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). To determine whether personal jurisdiction over a defendant exists, "a court may consider materials outside the pleadings, but must credit plaintiffs' averments of jurisdictional facts as true." *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 566–67 (S.D.N.Y. 2012). However, the court is neither required to "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (citation omitted), nor must it "accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (citation omitted). "In deciding a pretrial motion to dismiss for lack of personal jurisdiction, the court has considerable discretion." *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 251 (S.D.N.Y. 2013) (cleaned up).

Section 27 of the Exchange Act governs personal jurisdiction in securities cases and permits exercising personal jurisdiction to the extent permitted by the Fifth Amendment and requires minimum contacts be established with the United States as a whole, as opposed to the forum state. *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013); 15 U.S.C. § 78 (a)(a).

Thus, the court must consider whether exercising personal jurisdiction is consistent with "due process protections established under the United States Constitution." *Licci*, 732 F.3d at 168.

The due process analysis consists of two discrete components: "the minimum contacts inquiry and the reasonableness inquiry." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010) (quotation marks omitted). Under the minimum contacts inquiry, courts "must determine whether the defendant has sufficient minimum contacts with the forum . . . to justify the court's exercise of personal jurisdiction." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 453 (S.D.N.Y. 2005) (citing *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). For this inquiry, a court evaluates the "quality and nature" of the defendant's contacts with the forum. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" "such that [the defendant] should reasonably anticipate being haled into court there." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 767 (S.D.N.Y. 2017) (citations omitted). "Although a defendant may not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, jurisdiction is proper where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum." *Straub*, 921 F. Supp. 2d at 253–54 (quoting *Burger King*, 471 U.S. at 480) (cleaned up).

Once the court is satisfied that a defendant has sufficient contacts with the forum to justify the exercise of personal jurisdiction, it must then determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether

6

it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloé*, 616 F.3d at 164 (quoting *Int'l Shoe*, 326 U.S. 310 at 316). If the court determines that a defendant lacks the requisite contacts, it need not consider the reasonableness prong. *See e.g., Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568–69 (2d Cir. 1996) (citation omitted).

### C. Rule 12(b)(6) Failure to State a Claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

A district court first reviews a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.* In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

### D. Rule 9(b) Heightened Pleading Standard and the PSLRA.

Allegations of fraud, including securities fraud, must satisfy the heightened pleading requirements of FRCP 9(b) and the PSLRA. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under Rule 9(b), a complaint alleging

7

securities fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In particular, "the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quotation omitted). Additionally, the PSLRA expands upon Rule 9(b) by requiring the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (citation omitted).

### E. Section 10(b) of the Securities Exchange Act of 1934 and Corresponding Rule 10b–5(b).

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe," 15 U.S.C. § 78j(b). Under Rule 10b–5(b), it is unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5. To prevail on a Section 10(b) and Rule 10b–5 claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation omitted). The materiality requirement requires a substantial likelihood that the disclosure of the omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

8

### F.  Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person" directly liable under the Act. 15 U.S.C. § 78t(a).  To establish a *prima facie* case of control person liability pursuant to Section 20(a), a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).  Primary liability under Section 10(b) is a prerequisite to a control person liability claim. *See Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

### III.    PLAINTIFFS LACK STANDING TO CHALLENGE STATEMENTS ABOUT ANT

Plaintiffs assert a claim against Alibaba and Ma for alleged misstatements made in Ant Group's pre-IPO disclosures and in Alibaba's SEC filings.  (CAC ¶¶ 20–21.)

Plaintiffs concede that they did not purchase or sell Ant securities but maintain that they have standing to challenge disclosures about Ant because "Ant and Alibaba are highly related companies" and "Alibaba's value is directly and materially linked to Ant's value." (Pls.' Ma Opp. at 16).  Defendants argue that this Circuit requires Plaintiffs to have been purchasers or sellers of securities about which a misstatement was made to have standing to sue under Section 10(b) and move to dismiss for lack of standing under Rule 12(b)(1).  (Ma Def. Reply at 8).

Defendants are correct.  The Second Circuit's decision in *Frutarom* makes clear that the purchaser-seller rule requires plaintiffs to have bought or sold the security about which a misstatement was made to have standing to sue under Section 10(b).  *Frutarom*, 54 F.4th at 86.  The challenged disclosures were not about Alibaba—the company in which Plaintiffs purchased

or sold stock. Instead, they related to Ant's IPO, business, and regulatory environment. (CAC ¶¶ 278–308); *see Frutarom*, 54 F.4th at 89 ("Plaintiffs did not purchase the securities about which misstatements were made, so they did not have standing to sue under Section 10(b) or Rule 10b–5.") While Ant and Alibaba may have been "highly related," *Frutarom* makes clear that "Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold the securities about which the misstatements were made." *Frutarom*, 54 F.4th at 88.

Plaintiffs therefore lack standing to sue Ma or Alibaba based on alleged misstatements about Ant. Accordingly, Plaintiffs' Ant IPO claims against Ma and Alibaba are dismissed for lack of standing.[2]

## IV.   THIS COURT LACKS PERSONAL JURISDICTION OVER MA FOR PLAINTIFFS' SECTION 10(b) AND 20(a) CLAIMS

To establish personal jurisdiction over Ma, this Court employs a two-step inquiry. First, the Court must determine whether there is a "statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013) (citation omitted). Second, this Court must consider whether exercise of personal jurisdiction over Ma is consistent with constitutional due process principles. The due process analysis has two discrete components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry. *Chloé*, 616 F.3d at 164.

Plaintiffs identify a valid statutory basis to consider the exercise personal jurisdiction over Ma: Section 27 of the Exchange Act. "Under Section 27, there are three recognized bases for exercising jurisdiction over a foreign defendant: where the defendant does business in the forum,

---

[2] Because Plaintiffs' scheme liability claims under Rule 10b–5(a) and (c) were predicated on Alibaba's liability for misstatements and omissions about Ant, those claims are likewise dismissed.

does an act in the forum,' or 'causes an effect in the forum by an act done elsewhere." *Braskem*, 246 F. Supp. 3d at 766–67 (citation and quotation marks omitted).

The determinative factor is whether exercise of personal jurisdiction over Ma would accord with constitutional due process. To satisfy minimum contacts, Plaintiffs must demonstrate that their claim "'arises out of, or relates to [Ma's] contacts with the forum . . . [and that he] purposefully availed [him]self of the privilege of doing business in the forum and could foresee being haled into court there.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)); *Straub*, 921 F. Supp. 2d at 252.

Plaintiffs argue that Ma "engaged in conduct that was designed to violate United States securities regulations" in order to support finding minimum contacts. *Straub*, 921 F. Supp. 2d at 248. Plaintiffs' primary theory of liability is that Ma "has always controlled and continues to control Alibaba" and caused Alibaba to perpetrate a fraud aimed at deceiving U.S. investors.[3] (Pls.' Ma Opp at 2, 10–11; CAC ¶ 313.) Specifically, Plaintiffs allege that (1) Ma was responsible for appointing Alibaba's Board Members, (2) several Board Members were indebted to him, and (3) Ma was able to "seize licenses" to retain "substantial holdup leverage over Alibaba[.]" (CAC ¶¶ 2–3, 28, 56, 239–40.) Plaintiffs also argue that this Court has personal jurisdiction over Ma because entities controlled by Ma sold Alibaba ADS on the NYSE during the Class Period. (Pls.' Ma Opp. at 8–9.)

Defendant Ma co-founded Alibaba and served in several executive roles before announcing his retirement in 2019. (*Id.* at 2; CAC ¶ 54.) During the Class Period, Ma was Alibaba's single largest individual investor, owning 4.8% of Alibaba's stock. (CAC ¶¶ 62–63.) During the Class

---

[3] Plaintiffs also contend this Court may exercise personal jurisdiction over Ma for failing to disclose information regarding the Ant IPO in Alibaba's own filings. (Pls.' Ma Opp. at 1, 3.) As discussed above, *supra* Section III, Plaintiffs lack standing to challenge Alibaba's disclosures regarding the Ant IPO because they were not purchasers or sellers of Ant securities.

11

Period, Ma was an Alibaba Board Member and a member of its Partnership, "a group of a few dozen employees with tremendous power over the company's board and leadership." (*Id.* ¶ 54 (citation omitted).) Plaintiffs argue that "by virtue of Ma's ownership interest and contractual rights," Ma had "the power to influence and control, and did influence and control, directly or indirectly, the decision–making of the Company, including the content and dissemination of the of the various statements which Plaintiffs contend are false and misleading." (*Id.* ¶ 404.)

Critical, however, is what Plaintiffs do not allege. Plaintiffs do not allege, concretely, that Ma "played *any* role in making, proposing, editing or approving" Alibaba's public filings in the United States.[4] *Braskem*, 246 F. Supp. 3d at 770 (no minimum contacts where complaint "does not allege, concretely, that [defendant] played any role in making, proposing, editing, or approving [company's] public filings in the United States.").

Plaintiffs emphasize Ma's involvement on Alibaba's Board and on its Partnership committee, but it is well-established that "[a] person's status as a board member is not alone sufficient to establish jurisdiction." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 802 (S.D.N.Y. 2018) (quotation omitted). "Indeed, absent any alleged role in preparing false financial statements[,] the exercise of jurisdiction . . . exceeds the limits of due process." *Id.* (quoting *Sharef*, 924 F. Supp. 2d at 548 (cleaned up)). "As various courts have held, a conclusory statement that a foreign defendant caused an issuer to making false and misleading filings is not enough to support personal jurisdiction." *Braskem*, 246 F. Supp. 3d at 770.

Plaintiffs' sweeping allegations regarding Ma's control over Alibaba are insufficient to establish personal jurisdiction. *See Parmalat*, 376 F. Supp. 2d at 454 ("the Due Process Clause is made of sterner stuff than a mere allegation of control[.]"); *In re Aegean Marine Petroleum*

---

[4] As noted above, Plaintiffs lack standing to challenge Defendants' Ant-related statements. *See supra* Section III. Those statements therefore cannot serve as basis for establishing personal jurisdiction over Ma.

*Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 136 (S.D.N.Y. 2021). These allegations are a "far cry" from concrete factual pleadings which allege "specific facts making the foreign defendant accountable for an issuer's allegedly actionable corporate statements." *Id.* (citing *Braskem*, 246 F. Supp. 3d at 769–70.)

Plaintiffs next argue that Ma is subject to personal jurisdiction "due to his misleading statements and deceptive acts that foreseeably affected U.S. shareholders." (Pls.' Ma Opp. at 9.) The Second Circuit relies on the "effects test" to determine whether it can exercise specific jurisdiction over a defendant whose "conduct that forms the basis of the controversy occurs entirely out–of–forum," and whose "only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Tarsavage v. Citic Tr. Co., Ltd.*, 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014). "Pursuant to the effects test, 'the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum.'" *Aegean*, 529 F. Supp. 3d at 135 (quoting *Tarsavage*, 3 F. Supp. 3d at 145) (citing *Licci*, 732 F.3d at 173). "[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013).

There is no support for the proposition that Ma directed his conduct toward the United States. To the extent that the complaint alleges that Ma engaged in a "scheme to defraud Chinese regulators" regarding the Ant IPO or Alibaba's exclusivity practices, those actions were entirely outside of the United States and were directed towards China. (CAC ¶ 360); *Aegean*, 529 F. Supp. 3d at 137–38. Ma's role in Ant or Alibaba's fraudulent scheme aimed at PRC regulators was therefore not "conduct expressly aimed at the United States." *Aegean*, 529 F. Supp. 3d at 138 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

13

Finally, Plaintiffs allege that Ma is subject to personal jurisdiction because entities controlled by Ma sold ten million shares of Alibaba ADSs during the Class Period while in possession of material nonpublic information. (Pls.' Ma Reply at 8–9.) While it is undisputed that this Court has personal jurisdiction over Ma for Plaintiffs' insider trading claim, *see Aegean*, 529 F. Supp. 3d at 140, it is well-established that a "plaintiff must establish the court's jurisdiction with respect to each claim asserted." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original); *Aegean*, 529 F. Supp. 3d at 135. As Plaintiffs conceded at oral argument, personal jurisdiction as to their insider trading claim does not provide personal jurisdiction for Plaintiffs' other claims. (*See* Transcript of Oral Argument ("Tr."), ECF No. 81, at 55:19–22.) Accordingly, Plaintiffs' Section 10(b) and 20(a) claims against Ma are dismissed for lack of personal jurisdiction.[5]

## V.    PLAINTIFFS FAILED TO SUFFICIENTLY ALLEGE AN INSIDER TRADING CLAIM AGAINST MA

Plaintiffs allege that Ma traded Alibaba ADSs on the NYSE while in possession of material nonpublic information, in violation of Rule 10b–5 and Rule 10b5–1. (Pls.' Ma Opp. at 8, 36, 43, CAC ¶¶ 366–69.) On September 30 and October 1, 2020, three entities controlled by Ma sold $10 million in shares of Alibaba ADSs while allegedly in possession of material nonpublic information regarding Alibaba. (*Id.* ¶ 366–69.) Plaintiffs further argue that Ma's trades "were timed to coincide with Alibaba's statements touting the value of Ant during its Investor Day." (Pls.' Ma Opp. at 2, 36–37.) In addition, the trades "were substantial in volume," comprising 20% and 31%, respectively, of Alibaba ADSs traded on the NYSE those days. (*Id.* at 9, fn. 13.) Defendants contend that Plaintiffs have failed to allege that Ma was in possession of material nonpublic

_____

[5] In light of the finding that Ma lacked sufficient minimum contacts with the United States, this Court has no occasion to consider the due process reasonableness factors.

information when he sold 1% of his Alibaba holdings in accordance with his Rule 10b5-1 retirement plan. (Ma Def. Reply at 28; Ma Def. Mem. at 24, fn. 19.)

Under the "classical theory" of insider trading liability, Section 10(b) and Rule 10b–5 are violated "when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651–52 (1997). Thus, "a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him." *Chiarella v. United States*, 445 U.S. 222, 227, (1980). "[I]f disclosure is impracticable or prohibited by business considerations or by law, the duty is to abstain from trading." *SEC v. Obus*, 693 F.3d 276, 285 (2d Cir. 2012). "To establish an insider trading claim . . . it is sufficient to prove that they traded their corporation's securities 'while knowingly in possession of the material nonpublic information.'" *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (quoting *United States v. Rajaratnam*, 719 F.3d 139, 159 (2d Cir. 2013)) (citation and quotation marks omitted).

Plaintiffs have not plausibly alleged that Ma knowingly possessed material nonpublic information regarding Alibaba's exclusivity practices when he sold Alibaba ADSs on September 30, 2020 and October 1, 2020. As discussed above, *supra* Section IV, Plaintiffs have failed to plausibly allege that Ma's position as an Alibaba board member would have meant he was aware of Alibaba's exclusivity practices and would have known that the truth differed from what Alibaba told investors. Plaintiffs have therefore failed to plausibly allege that Ma traded while in possession of material nonpublic information about Alibaba. Accordingly, Plaintiffs' Rule 10b–5 and Rule 10b5–1 insider trading claims against Ma are dismissed.

## VI.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SECURITIES FRAUD AGAINST ALIBABA, WU, AND ZHANG

### A.  Material Misstatements

"In order to state claims pursuant to section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, a plaintiff must allege, *inter alia*, that the defendant engaged in a material misrepresentation or omission." *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) (citing *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)).  The Exchange Act "requires that the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001) (quotation marks omitted).  Plaintiffs cannot merely state that the statements are false or misleading, "they must demonstrate with specificity why and how" they are so.  *Rombach*, 355 F.3d at 174.  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (quotation marks omitted).

Many of Plaintiffs' Exchange Act claims relate to the omission of material information, as opposed to an affirmative misstatement of fact.  In contrast to a misstatement, "'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" *Id.* (quoting *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 267 (2d Cir. 1993)).  "A fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in [making investment decisions]." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994).  "[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44.  "Disclosure is required . . . only when necessary 'to make statements made, in the light of the

16

circumstances under which they were made, not misleading.'" *Id.* at 44 (quoting 17 C.F.R. § 240.10b–5(b)).

Plaintiffs allege that the following disclosures about Alibaba's exclusivity practices were materially false or misleading:[6] (i) Alibaba's statement describing its "prior" use of exclusivity arrangements (CAC ¶ 253; Pls.' Alibaba Opp. at 1, 14–16); (ii) statements attributing Alibaba's revenue growth to its value proposition for merchants, omitting its continued reliance on exclusivity (CAC ¶¶ 256, 261, 265; Pls.' Alibaba Opp. at 19–20); (iii) Alibaba's statement that it "believe[d] that our business practices do not violate anti-monopoly or unfair competition laws" ("belief statement") (CAC ¶ 255(b); Pls.' Alibaba Opp. at 11); and (iv) Alibaba's risk disclosures regarding antitrust risk. (CAC ¶¶ 253, 255; Pls.' Alibaba Opp. at 17–19.)

Defendants contend that Alibaba's exclusivity practices were well-known to investors and the public and had been "subject to public challenge for years." (Alibaba Defs.' Mem. at 5–7.) Defendants also assert that Alibaba had disclosed to investors that its exclusivity practices were under scrutiny by PRC regulators. For example, in documents filed with the SEC during the Class Period, Alibaba disclosed to investors that "[o]n several recent occasions . . . the SAMR has indicated its view that . . . arrangements seen as exclusivity arrangements, may constitute violation of the anti-monopoly . . . laws. The SAMR also indicated its intention of initiating investigations into these arrangements."[7] (Alibaba FY 2020 20-F at 39; Alibaba Defs.' Mem. at 9.)

---

[6] Because Plaintiffs lack standing to challenge disclosures about Ant, *see supra* Section III, this Court has no occasion to consider whether those statements were materially false or misleading.

[7] On a Rule 12(b)(6) motion to dismiss, courts may consider "legally required public disclosure documents filed with the [SEC], and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

17

### i.   "Prior" Use of Exclusivity Practices Statement

Plaintiffs argue that Alibaba's characterization of its "prior" and "narrowly deployed" use of exclusivity practices was materially misleading because Alibaba was utilizing exclusivity practices which were "deeply engrained" when the statement was made.  (CAC ¶ 255(e); Pls.' Alibaba Opp. at 1, 14–15.)  The challenged disclosure states that the AML "provides a private right of action" and that some of Alibaba's "competitors, business partners and customers[] have [initiated] and may continue . . . initiating private litigation that targets our prior and current business practices, such as. . . our *alleged prior narrowly deployed exclusive partnerships*." (Alibaba FY 2020 20-F at 39 (emphasis added).)  Defendants contend that Plaintiffs "misconstrue" the disclosure, which they argue was referring to absolute exclusivity practices, not the narrower traffic-for-exclusivity practices that the SAMR concluded Alibaba had engaged in.  (Alibaba Defs.' Mem. at 19.)

Plaintiffs are correct that a reasonable investor could plausibly believe that Alibaba's description of its "prior" exclusivity practices meant that Alibaba was no longer requiring exclusivity from merchants at all.  *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) ("The omission of adequate disclosure affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed], and therefore it is actionable.") (citation and quotation marks omitted).  Similarly, a reasonable investor would be interested in knowing that Alibaba continued to require exclusivity, and would view that fact, if known, as altering the "total mix" of information made available about Alibaba's practices. *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988); *Time Warner*, 9 F.3d at 268.

Contrary to Defendants' assertion that Alibaba had publicly defended its exclusivity practices and that their use was "widely covered," the statements Defendants identify were made months and years before Alibaba's July 2020 disclosure describing its "prior" use of exclusivity

18

arrangements. (Alibaba Defs.' Mem. at 18–20; Tr. 50-14:21.) Further, Alibaba had signed an agreement with the SAMR in July 2020 pledging that it would "not force platform operators to conduct 'exclusive cooperation'" and would "not impose any unreasonable restrictions or make any unreasonable requirements on the selections of platforms by the operators." (CAC ¶ 8.) Defendants' disclosure therefore "affirmatively created an impression of a state of affairs" regarding exclusivity that differed materially from the reality that existed. *Alstom*, 406 F. Supp. 2d at 453. Plaintiffs have therefore plausibly alleged that Alibaba's statement regarding its "prior" use of exclusivity partnerships was materially misleading.

### ii.    Growth and Revenue Statements

Next, Plaintiffs allege that Alibaba's disclosures attributing revenue growth to its value proposition for merchants, rather than disclosing their continued reliance on merchant exclusivity practices, were materially false and misleading. (Pls.' Alibaba Opp. at 19–20; CAC ¶¶ 256, 261, 265.) In a footnote, Defendants argue that Plaintiffs have not explained how Alibaba's practices rendered these "general statements" false or misleading. (Alibaba Defs.' Br. at 20, fn. 13.)

"[S]ecurities laws do not impose on corporations a general, free-standing duty to disclose uncharged illegal conduct." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 661 (S.D.N.Y. 2017) (citing *Pontiac*, 752 F.3d at 184). However, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). "[A] duty to disclose can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *Rosi v. Aclaris Therapeutics, Inc.*, No. 19 Civ. 7118 (LJL), 2021 WL 1177505, at *15 (S.D.N.Y. Mar. 29, 2021) (quoting *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 441 (S.D.N.Y. 2018)) (internal citation omitted). "[A] company's statements become actionable if the

company attributes its success to a particular cause without also disclosing the unlawful activity that contributed to that success." *Das*, 332 F. Supp. 3d at 808.

Here, Plaintiffs argue that Alibaba "put the source of its success at issue" when it made statements attributing Alibaba's core commerce to merchant growth and retention but failed to disclose that part of its success was due to continued use of exclusivity practices. (Pls.' Alibaba Opp. at 19–20.) In Plaintiffs' telling, "[h]aving chosen to speak about specific features of its business model" regarding merchant retention, Alibaba "had an obligation to ensure its statements were both accurate and complete, even if it lacked an independent duty to discuss the information in the first place." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017) (quoting *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015)) (internal quotation marks and citation omitted).

Plaintiffs have sufficiently alleged that Alibaba's characterization of their "prior" use of "exclusive partnerships" rendered their financial statements on growth and merchant retention materially misleading. (CAC ¶¶ 256–57, 261–62). Taken together, a reasonable investor could conclude that Alibaba had stopped requiring merchant exclusivity, and that its reported growth was due to organic retention, not exclusivity. Once Alibaba spoke on the issue, it had "a duty to tell the whole truth"—that these trends were due, at least in part, to the Company's ongoing, undisclosed use of merchant exclusivity. *Meyer*, 761 F.3d at 250. A reasonable investor would view that fact, if known, as altering the "total mix" of information available about Alibaba's business. *Basic*, 485 U.S. at 232; *Time Warner*, 9 F.3d at 268.

### iii.     Belief Statement

In 2020, Alibaba warned investors that "[a]lthough we believe that our business practices do not violate anti-monopoly or unfair competition laws . . . there can be no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have

20

adopted." (CAC ¶ 253.) Plaintiffs argue that Defendants could not have honestly believed that its exclusivity practices were legal because Alibaba had been warned by the SAMR that such practices were illegal, had signed a commitment pledging that it would not require exclusivity, and nevertheless continued to require exclusivity. (Pls.' Alibaba Opp. at 1, 11–12.) Plaintiffs emphasize that the SAMR later determined that Alibaba's exclusivity practices violated the AML and imposed a substantial fine. (CAC ¶¶ 10, 253.) Defendants contend that Alibaba's disclosure is an inactionable statement of opinion, and that Alibaba publicly defended its exclusivity practices because it genuinely believed in their legality. (Alibaba Defs.' Mem. at 15–16.)

The Supreme Court has held that liability for making a false statement of opinion may lie if: (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact [the speaker] supplied were untrue"; or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 209–10 (quoting *Omnicare, Inc., v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–87, 195 (2015). "In determining whether a statement of opinion is misleading based on a failure to disclose facts underlying the opinion, "[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189). "To make this showing, a plaintiff must identify particular (and material) facts going to the basis for the defendant's opinion." *Inv. Tech.*, 251 F. Supp. 3d at 618 (citing *Omnicare*, 575 U.S. at 189) (cleaned up). These may include "knowledge [the defendant] did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. "In other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b–5 may follow."

21

*Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). The Second Circuit has noted that the Supreme Court's example of an issuer's statement of belief that its conduct is lawful is "particularly instructive," because "[s]uch a statement does not imply that the issuer's conduct is, in fact, lawful, but only that the issuer has conducted a meaningful inquiry and has a reasonable basis upon which to make such an assertion." *Tongue*, 816 F.3d at 214.

Here, Plaintiffs emphasize that Alibaba omitted the critical context that it was continuing to employ certain exclusivity practices despite contrary representations to investors and regulators. Plaintiffs further argue that Defendants' omission of that material fact rendered their opinion statement materially misleading and actionable under *Omnicare*.

While Alibaba disclosed the regulatory warning it had received and cautioned that investigatory action was possible, it omitted the material fact that it was not in compliance with the commitment pledge it had signed, nor with the representation it made to investors regarding "prior" use of exclusivity. The opinion statement is therefore plausibly alleged to be misleading when read fairly and in context. *Omnicare*, 575 U.S. at 189. Moreover, Alibaba's continued use of exclusivity practices, contrary to its public representations and commitments, indicates that Defendants may not have a reasonable basis upon which to assert that their conduct was legal. *Tongue*, 816 F.3d at 214. Plaintiffs have therefore plausibly alleged that Alibaba's belief statement regarding the legality of its exclusivity practices was materially false or misleading.

### iv.    Risk Disclosures

For the same reasons, Plaintiffs plausibly allege that Alibaba's risk disclosures were materially misleading. Plaintiffs emphasize that Alibaba omitted the material fact that it was continuing to rely on exclusivity practices when discussing the possible risk of adverse regulatory action by the SAMR. As discussed above, once Alibaba spoke on possible investigations into its exclusivity practices, it had a duty to disclose the material omitted fact that it was continuing to

engage in such practices, contrary to its representations to regulators and investors. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (a duty to disclose an omitted fact may arise when there is "a corporate statement that would otherwise be inaccurate, incomplete, or misleading.") (citation and quotation marks omitted); *Time Warner*, 9 F.3d at 267. Plaintiffs have therefore plausibly alleged that Alibaba's risk disclosures were materially false or misleading.

## B. Scienter

"A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Importantly, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 486 (S.D.N.Y. 2021). In this case, Plaintiffs have sufficiently alleged conscious misbehavior or recklessness as to Wu and Zhang.

### i. Motive and Opportunity

"A complaint has sufficiently alleged motive and opportunity to commit fraud if it pleads facts showing that the defendant benefited in some concrete and personal way from the purported fraud . . . While the opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer, general motives common to most corporate officers do not constitute 'motive' for the purpose of establishing scienter." *Francisco v. Abengoa, S.A.*, No. 15 Civ. 6279 (ER), 2021 WL 4136899, at *22 (S.D.N.Y. Sept. 10, 2021) (citations omitted). Instead, "[m]otive is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *JP Morgan Chase Co.*, 553 F.3d at 198.

23

### ii.  Conscious Misbehavior and Recklessness

To establish scienter via strong circumstantial evidence of conscious misbehavior or recklessness, "the inference of scienter from the facts alleged 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *In re Aphria, Inc. Sec. Litig.*, No. 18 Civ. 11376 (GBD), 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) at *7 (quoting *Tellabs*, 551 U.S. at 314)). "Plaintiffs must show conduct by defendants that is at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (citation omitted).

Although there is no all–encompassing list of the allegations that would be sufficient to plead recklessness, examples that suffice include defendant "knew facts or had access to information suggesting that their public statements were not accurate ... [or] ... failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309). "To be sure, Plaintiff[s] must do more than allege that the [individual defendants] had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, to establish scienter." *Aphria*, 2020 WL 5819548, at *9 (citation and quotation marks omitted).

Plaintiffs rely on several facts to raise a strong inference that Wu and Zhang acted with scienter. Plaintiffs allege that Wu, Alibaba's CFO, and Zhang, Alibaba's CEO and former COO, were familiar with or had access to documents demonstrating that Alibaba was continuing to utilize

24

merchant exclusivity during the Class Period, contrary to its disclosures. Because merchant exclusivity was "Alibaba's standard method of business practice" it was reflected within numerous internal business documents, including Alibaba's written merchant agreements, which Plaintiffs allege that both Wu and Zhang would have been familiar with or had access to. (*See* Tr. 49:11–22) ("The SAMR report makes clear that Alibaba had widely required exclusivity in its written merchant agreements . . . It was embedded within Alibaba's platform rules, and it was also embedded within its data algorithms it used to run its platforms."). Plaintiffs argue that Wu "would have been familiar with what was in Alibaba's merchant agreements for its core merchants because that was how Alibaba derived the vast majority of its revenue." (*Id.* 49-50:23–1.) Indeed, the SAMR investigation ultimately concluded that Alibaba's exclusivity requirements "were explicit components of Alibaba's customer agreements since 2015." (CAC ¶ 379; Tr. 49:11–13.) It is at least as compelling an inference that Wu and Zhang had access to such foundational information given their positions at Alibaba. *See Aphria*, 2020 WL 5819548, at *9. Plaintiffs have plausibly alleged that Wu and Zhang would have known or had access to facts indicating that Alibaba continued to engage in exclusivity practices, contrary to its representations to investors.

Because exclusivity is alleged to be Alibaba's standard practice, from which it derived the vast majority of its revenue, Wu and Zhang would have known that Alibaba had not abandoned a critical business practice. (CAC ¶ 47); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) "[Defendants] were CFO and CEO of a multinational corporation, and as such, were required to be aware of the Company's financials."). Plaintiffs have plausibly alleged an inference of scienter for Wu and Zhang under the "conscious misbehavior or recklessness" prong.

25

In addition, Wu and Zhang's scienter may be imputed to Alibaba, due to their senior positions within the Company. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."); *Aphria*, 2020 WL 5819548, at *9.

### C. Loss Causation

"Although Plaintiffs have adequately alleged [] material misstatements and [] Defendants' scienter as to those statements, they still must plead loss causation, which requires them to allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *BioScrip*, 95 F. Supp. 3d at 733 (quoting *Suez Equity Invs., L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). Plaintiffs may do so either by alleging (a) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;" or (b) that "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Barclays*, 750 F.3d at 232–33 (quotation omitted) (cleaned up).

Plaintiffs' theory of loss causation flows from the November 10, 2020 and December 23, 2020 drops in Alibaba's stock price. The November 10 stock drop occurred in connection with the SAMR's publication of guidelines impacting Alibaba's e-commerce business. (CAC ¶ 125; Pls.' Alibaba Opp. at 34.) The December 23 stock drop occurred after Chinese authorities announced an antitrust investigation into Alibaba regarding its exclusivity practices. (CAC ¶ 130; Pls.' Alibaba Opp. at 34–35.) Plaintiffs argue that the drops satisfy loss causation under both a corrective disclosure theory and a materialization of the risk theory. (Pls.' Alibaba Opp. at 33–35.)

Defendants contend that Plaintiffs have not pled loss causation, as "the stock movement was caused by new events relating to risks that were disclosed and well-known." (Alibaba Defs.' Mem at 3.) Defendants argue that the November 10, 2020 drop was due to an intervening

26

regulatory development, not the materialization of an undisclosed risk. (*Id.* at 24–25.) Defendants argue that the December 23, 2020 does not constitute a corrective disclosure, as Alibaba's ongoing exclusivity practices were "already 'known to the market,'" and Alibaba had disclosed to investors that the SAMR might initiate investigations related to such practices. (*Id.* at 24–25) (quoting *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).

Defendants are correct that the November 10, 2020 announcement and stock drop does not constitute a corrective disclosure. The fact that the SAMR published new regulations impacting Alibaba's exclusivity practices did not purport to reveal a "then-disclosed fact with regard to the *specific misrepresentations* alleged in the complaint." *Omnicom*, 597 F.3d at 511. "An allegation that the value of a stock declined following the public announcement of 'bad news' does not, by itself, demonstrate loss causation." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008) (citation and quotation marks omitted). Plaintiffs' materialization of an undisclosed risk argument also fails. The promulgation of new regulations was not the materialization of an undisclosed risk, because Alibaba had repeatedly warned investors of such a possibility.

As to the December 23, 2020 stock drop, SAMR's investigation announcement indicated that it was examining whether Alibaba had used illegal exclusivity practices. (Pls.' Alibaba Opp. at 34–35; CAC ¶ 130.) The SAMR initiated its investigation "amid reports that Alibaba had engaged in monopolistic conduct such as placing unreasonable restrictions on merchants or other users of its platforms." (CAC ¶ 130). Upon announcement of the SAMR's investigation, the price of Alibaba's ADSs fell approximately 13% at close of trading on December 23, 2020. (*Id.* ¶ 131.)

Courts in this Circuit have found that the announcement of a governmental investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify

27

as a partial corrective disclosure. *Bristol Myers Squibb*, 586 F. Supp. 2d at 164; *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) (citation omitted). Here, the December 23 investigation announcement did not conclusively reveal that Alibaba's statements regarding exclusivity were inaccurate, but it was the first announcement in a series of disclosures which would ultimately reveal to the market that Alibaba had used exclusivity practices during the Class Period. Indeed, while Alibaba may have warned investors of the possibility of a regulatory investigation, the Company had described its "prior" use of exclusivity practices and had even signed a commitment letter with the SAMR that it would not engage in certain merchant exclusivity practices—which the SAMR ultimately found it had continued to employ. (CAC ¶¶ 116–17, 375, 379.)

As such, Plaintiffs have plausibly alleged that this announcement "was not an isolated event in itself, but was the 'tip of the iceberg'—the first in a series of revelations" which would ultimately expose Alibaba's continued reliance on exclusivity. *Bristol Myers Squibb*, 586 F. Supp. 2d at 165. Drawing all reasonable inferences in Plaintiffs' favor, it is plausible that the announcement of an investigation into Alibaba's exclusivity practices "marked the first in a series of corrective disclosures" that would reveal to the market that Alibaba had engaged in illegal exclusivity practices despite contrary disclosures. *Id.* Accordingly, Plaintiffs have adequately pled loss causation as to the December 23, 2020 stock drop at this stage.[8] Defendants' motion to dismiss is DENIED as to Plaintiffs' Exclusivity Practices claims in Count One.

---

[8] Defendants argue that intervening events, such as new regulations, broke the chain of causation. (Alibaba Defs.' Mem. at 24-25.)  While it is "unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss[.]'" *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) (quoting *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)).

## VII.    ITEM 303 CLAIMS

To plausibly allege a violation of Item 303 of SEC Regulation S–K, 17 C.F.R. 229.303(a)(1) ("Item 303"), a plaintiff must identify a trend or uncertainty that "was already known and existing," to the defendant, and allege that "the trend or uncertainty . . . was reasonably likely to have a material impact" on the registrant's financial condition or results of operations. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *Stratte-McClure*, 776 F.3d at 106. "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report . . . It is not enough that it should have known of the existing trend, event, or uncertainty." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).

Plaintiffs argue that Alibaba's failure to disclose its continued merchant exclusivity practices constitutes a violation of Item 303, because this practice was a "known trend or uncertainty" that put the Company at risk of civil monetary penalties via adverse regulatory action. (CAC ¶¶ 244–51; Pls.' Alibaba Opp. at 20-21.)  As discussed, Alibaba openly disclosed general industry trends regarding the SAMR's increasing scrutiny of exclusivity practices and warned of the possibility of an investigation into Alibaba.  However, Alibaba failed to disclose that it was continuing to require exclusivity, contrary to what it had disclosed to both investors and regulators, which materially increased the possibility of adverse regulatory action. *Stratte-McClure*, 776 F.3d at 103.  Plaintiffs have sufficiently alleged that this trend was reasonably likely to have a material impact on Alibaba's financial condition, as SAMR's penalty for AML violations was up to 10% of all sales. (CAC ¶ 148.)  Indeed, the resulting fine was substantial, constituting "about 14% of Alibaba's FY 2020 net income" and "4% of Alibaba's 2019 sales." (*Id.*)  As to knowledge, the Complaint's allegations support a strong inference that the Defendants knew about Alibaba's ongoing use of exclusivity practices and that the Company could be implicated and fined by the

29

SAMR for such practices. *SAIC,* 818 F.3d at 95. Defendants' motion to dismiss is therefore DENIED as to Plaintiffs' Item 303 claims.

### VIII.   SECTION 20(a) CONTROL PERSON LIABILITY

Plaintiffs allege that the Individual Defendants violated Section 20(a) of the Securities Exchange Act. To state a claim under Section 20(a), a plaintiff must allege facts showing: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns,* 493 F.3d at 108. Plaintiffs allege that Wu and Zhang are controlling persons. (CAC ¶ 397.)  As explained above, Plaintiffs have sufficiently alleged a primary violation of Rule 10b–5 and Section 10(b) by a controlled person, Alibaba. Thus, Plaintiffs have pled the first element of control person liability. *See Inv. Tech.,* 251 F. Supp. 3d at 624–25.

As to the second element, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Tronox, Inc., Sec. Litig.,* 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011) (quoting *CompuDyne Corp. v. Shane,* 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006)). Nevertheless, courts have held that an officer's control as to financial statements, for example, is sufficiently pleaded if the officer has signed financial statements containing materially false or misleading statements. *See Inv. Tech.,* 251 F. Supp. 3d at 624-25; (citing *In re Virtus Inv. Partners, Inc. Sec. Litig.,* 195 F.Supp.3d 528, 542 (S.D.N.Y. 2016)). Here, Zhang and Wu, as CEO and CFO, respectively, spoke on Alibaba's behalf and signed relevant SEC filings, financial statements, and other disclosures. (*See, e.g.,* CAC ¶¶ 19, 253, 261, 265–66.) These allegations are sufficient at this stage to show that they exercised control over Alibaba. *See Inv. Tech.,* 251 F. Supp. 3d at 625; *Virtus,* 195 F. Supp. 3d at 543. Accordingly, Plaintiffs have pleaded the second element of control person liability as to Wu and Zhang.

As to the third element, Plaintiffs "must plead at a minimum particularized facts establishing a controlling person's conscious misbehavior or recklessness in the sense required by Section 10(b)." *See In re ShengdaTech, Inc. Sec. Litig.*, No. 11 Civ. 1918 (LGS), 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (collecting cases). As explained above, Plaintiffs adequately allege that Zhang and Wu acted with knowledge that the actionable statements were not accurate, satisfying the culpable participation element. *See Virtus*, 195 F. Supp. 3d at 542. Defendants' motion to dismiss is therefore DENIED as to Plaintiffs' Section 20(a) claims in Count Two against Wu and Zhang.

## IX.   CONCLUSION

Defendants' motion to dismiss this action as to Defendant Ma is GRANTED. Defendants' motion to dismiss Plaintiffs' Ant claims in Counts One and Two against all Defendants is GRANTED. Defendants' motion to dismiss Plaintiffs' Exclusivity Practices claims in Counts One and Two is DENIED. The Clerk of Court is ordered to close the open motion at ECF No. 60.

Dated: New York, New York
      March 22, 2023

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

31