# Exhibit A

2023 WL 5419147
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

NEW ENGLAND CARPENTERS GUARANTEED
ANNUITY AND PENSION FUNDS, Lead Plaintiff-Appellant,
Stanley Newmark, Irving Lichtman Revocable Living Trust,
Jupiter Capital Management, Plaintiff-Movant-Appellants,
Sharon Albano, Individually and On Behalf of All Others
Similarly Situated, Consolidated-Plaintiff-Movant-Appellant,
John Sachetti, Individually and On Behalf of All Others Similarly Situated, Consolidated-Plaintiff,
Joel Rubel, Individually and On Behalf of All Others Similarly Situated, Plaintiff,
v.
Donald T. DECARLO, Susan C. Fisch, Abraham Gulkowitz, George
Karfunkel, Jay J. Miller, Consolidated-Defendants-Appellees,
AmTrust Financial Services, Inc., Barry D. Zyskind, Ronald E. Pipoly, Jr., BDO USA,
LLP, RBC Capital Markets, LLC, UBS Securities LLC, Citigroup Global Markets Inc.,
Keefe, Bruyette & Woods, Inc., Morgan Stanley & Co. LLC, Defendants-Appellees.

Docket No. 20-1643-cv
|
August Term, 2020
|
Argued: June 4, 2021
|
Decided: August 23, 2023

**Synopsis**
**Background:** Investors filed putative class action against publicly traded property and casualty insurer, corporate officers, board members, outside auditor, and multiple underwriters of insurer's sale of securities, claiming violation of Securities Act by alleged misstatements of insurer's financial condition and results in registration statements and prospectus and claiming violation of § 10(b) of Securities Exchange Act and Rule 10b-5, after insurer restated five years of its financial results to correct significant errors in its annual and quarterly reports filed with Securities and Exchange Commission (SEC). The United States District Court for the Southern District of New York, Lewis A. Kaplan, J., 2020 WL 2787117, granted defendants' motion to dismiss for failure to state claim. Investors appealed.

**Holdings:** The Court of Appeals, Lohier, Circuit Judge, held that:

[1] restated financial statements related to warranty contract revenue contained statements of opinion actionable against insurer, officers, and directors under Securities Act registration statement provision;

[2] restated financial statements related to bonus payments contained statements actionable against insurer, officers, and directors under Securities Act registration statement provision;

**New England Carpenters Guaranteed Annuity and Pension..., --- F.4th ---- (2023)**
2023 WL 5419147

[3] certifications regarding financial statements were statements of opinion not actionable against insurer, officers, and directors under Securities Act registration statement provision;

[4] scienter was not plausibly alleged for § 10(b) and Rule 10b-5 claims against insurer, officers, and directors;

[5] in matter of first impression, investors had standing to pursue Securities Act prospectus claims against underwriters; and

[6] materiality was not plausibly alleged for § 10(b) and Rule 10b-5 claims against auditor.

Affirmed in part, vacated in part, and remanded.

West Headnotes (41)

**[1]**    **Federal Courts** 🔑 Pleading

**Federal Courts** 🔑 Dismissal for failure to state a claim

Court of Appeals reviews de novo the district court's dismissal for failure to state a claim, accepting all factual allegations as true and drawing all reasonable inferences in favor of the appellants.

**[2]**    **Securities Regulation** 🔑 False Statements or Omissions;  Accuracy

The Securities Act requires that companies issuing securities make a full and fair disclosure of information in connection with a public offering. Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77*l*(a)(2).

**[3]**    **Securities Regulation** 🔑 Purpose

The Securities Act aims to protect investors and to achieve a high standard of business ethics in the securities industry. Securities Act of 1933 § 1 et seq., 15 U.S.C.A. § 77a et seq.

**[4]**    **Securities Regulation** 🔑 Persons entitled to sue or recover

**Securities Regulation** 🔑 Persons Liable

The Securities Act permits purchasers of a public company's securities to sue the company and certain corporate officers for any material misstatements or for the omission of material information in the company's registration statements filed with the Securities and Exchange Commission (SEC). Securities Act of 1933 §§ 11, 12, 15 U.S.C.A. §§ 77k(a), 77*l*(a)(2).

**[5]**    **Securities Regulation** 🔑 Persons entitled to sue or recover

**Securities Regulation** 🔑 Persons Liable

In the event of material misstatements or omission of material information in the company's registration statements, the Securities Act provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

2023 WL 5419147

**[6]    Securities Regulation** 🔑 Facts or opinions

In distinguishing a fact from an opinion under the federal securities laws, generally, a "fact" is thing done or existing or an actual happening, while an "opinion" is a belief, a view, or a sentiment which the mind forms of persons or things; a statement of fact expresses certainty about a thing, while a statement of opinion does not.

**[7]    Securities Regulation** 🔑 Facts or opinions

In distinguishing a fact from an opinion under the federal securities laws, statements of opinion often include qualifying language, like "I believe" or "I think," that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact.

**[8]    Securities Regulation** 🔑 Facts or opinions

If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist; where those alternatives exist, the speaker making the statement, expressing an opinion, can choose among them without running afoul of the federal securities provisions, and this is true even if most of the existing facts cut against the statement.

**[9]    Securities Regulation** 🔑 Facts or opinions

In distinguishing a fact from an opinion under the federal securities laws, an opinion may implicitly convey facts about how the speaker has formed the opinion or, otherwise put, about the speaker's basis for holding that view.

**[10]    Securities Regulation** 🔑 Facts or opinions

In the context of a securities transaction, a reasonable investor expects that opinion statements rest on some meaningful inquiry, fairly align with the information in the issuer's possession at the time, and do not reflect baseless, off-the-cuff judgments.

**[11]    Securities Regulation** 🔑 False Statements or Omissions; Accuracy

If a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then the issuer may be liable under the Securities Act's omissions clause even though the statements convey an opinion. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[12]    Securities Regulation** 🔑 False Statements or Omissions; Accuracy

Opinions are actionable, under the Securities Act provision prohibiting misstatements or omissions in registration statements, not only when the speaker did not hold the belief she professed, but also if the statement of opinion contains embedded statements of fact that are untrue, or the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

2023 WL 5419147

**[13]    Securities Regulation** 👉 False Statements or Omissions; Accuracy

The standard for opinion liability, under the Securities Act provision prohibiting misstatements or omissions in registration statements, presents no small task for an investor seeking to plead that an opinion is misleading. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[14]    Securities Regulation** 👉 False Statements or Omissions; Accuracy

Under the Securities Act provision prohibiting misstatements or omissions in registration statements, one of the more straightforward ways a statement of opinion may be actionable is if it contains an embedded statement of fact that is not true. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[15]    Securities Regulation** 👉 False Statements or Omissions; Accuracy

Under the Securities Act provision prohibiting misstatements or omissions in registration statements, an opinion may be false or misleading if the embedded fact is not one as to which reasonable minds can differ; this occurs where, for example, there is an accepted method for assessing whether the statement is true, but the statement is not justified by the accepted method and clearly contradicts the facts on which it purports to rest. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[16]    Securities Regulation** 👉 False Statements or Omissions; Accuracy

Statements of opinion are actionable as false or misleading, under the omission clause of the Securities Act provision prohibiting misstatements or omissions in registration statements, if the opinion omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement of opinion itself. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[17]    Securities Regulation** 👉 False Statements or Omissions; Accuracy

Under the Securities Act provision prohibiting misstatements or omissions in registration statements, the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[18]    Securities Regulation** 👉 False Statements or Omissions; Accuracy

Insurer's restated financial statements related to extended warranty contract revenue reported in historical consolidated financial statements were statements of opinion actionable against insurer, officers, and directors, under Securities Act registration statement provision, since restatements clarified that insurer's prior practice was to recognize most of that revenue upfront, but that it instead should have deferred recognition of warranty revenue over life of contract on straight-line basis, and insurer's representations about warranty revenue reported in its historical consolidated financial statements misled investors to conclude that it was aware of some historical evidence for recognizing warranty contract revenue on non-straight-line basis but allegedly in fact it was not. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[19]    Securities Regulation** 👉 False Statements or Omissions; Accuracy

Insurer's restated financial statements related to bonus payments reported in historical consolidated financial statements were actionable against insurer, officers, and directors, under Securities Act registration statement provision, even if they were statements of opinion; restatements admitted financial statements erroneously expensed discretionary bonuses in year that bonuses were paid rather than earned as insurer did not consider discretionary bonuses to be probable, but it was improbable that earned bonuses would not be paid, so insurer's statements of probability were not based on meaningful inquiry or fairly aligned with information in insurer's possession at that time, and there was no basis for insurer to state bonuses should be expensed in year they were paid instead of earned. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[20]    Securities Regulation** 🔑 False Statements or Omissions;  Accuracy

Sarbanes Oxley Act (SOX) certifications by insurer's executives as to accuracy of financial statements, their conformity with Generally Accepted Accounting Principles (GAAP), and effectiveness of insurer's disclosure controls and procedures were statements of opinion not actionable, under Securities Act provision prohibiting misstatements or omissions in registration statements; certifications about accuracy of financial reporting stated they were based on executive's knowledge, other certifications contained language conveying management's subjective judgments about insurer's internal controls, and insurer's change of opinion about internal controls did not mean original certified opinions were disingenuous. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a); 15 U.S.C.A. § 7241(a); 17 C.F.R. §§ 240.13a-14, 240.13a-15, 240.15d-15.

**[21]    Securities Regulation** 🔑 False Statements or Omissions;  Accuracy

A genuinely held opinion that turned out to be wrong is not necessarily actionable under the Securities Act provision prohibiting misstatements or omissions in registration statements. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[22]    Securities Regulation** 🔑 Manipulative, Deceptive or Fraudulent Conduct

To survive a motion to dismiss a § 10(b) and Rule 10b-5 securities fraud claim, plaintiff must allege that each defendant: (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[23]    Securities Regulation** 🔑 Scienter

Under the Private Securities Litigation Reform Act (PSLRA), a plaintiff must state with particularity facts giving rise to a strong inference that the defendant acted with scienter. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A).

**[24]    Securities Regulation** 🔑 Scienter, Intent, Knowledge, Negligence or Recklessness

Under § 10(b) and Rule 10b-5, scienter is a mental state embracing intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[25]    Securities Regulation** 🔑 Scienter

2023 WL 5419147

Under § 10(b) and Rule 10b-5, scienter may be established by alleging facts: (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[26] **Securities Regulation**  Scienter

Any allegation of conscious misbehavior or recklessness should be viewed holistically and together with the allegations of motive and opportunity to determine whether the § 10(b) and Rule 10b-5 securities fraud complaint supports a strong inference of scienter. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[27] **Securities Regulation**  Scienter

Under § 10(b) and Rule 10b-5, although the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity, the inference of scienter must be more than merely plausible or reasonable; it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[28] **Securities Regulation**  Scienter

Investors did not adequately allege that insurer, officers, and directors acted with scienter and, thus, failed to state § 10(b) and Rule 10b-5 securities fraud class action claims arising from insurer's restatement of five years of financial results to correct errors in financial reports filed with Securities and Exchange Commission (SEC); insurer's desire to sustain appearance of corporate profitability did not raise strong inference of scienter, officers' significant selloff of shares began several months before class period, magnitude of restatement and its five-year period did not provide strong circumstantial evidence of conscious misbehavior or recklessness, and accounting error was more plausibly explained by changes to guiding accounting principles or to insurer's negligence. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[29] **Securities Regulation**  Scienter, Intent, Knowledge, Negligence or Recklessness

The desire to sustain the appearance of corporate profitability is not itself the kind of incentive or motivation that raises an inference of scienter required to state a securities fraud claim, under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[30] **Securities Regulation**  Scienter, Intent, Knowledge, Negligence or Recklessness

For a securities fraud claim, under § 10(b) and Rule 10b-5, scienter based on conscious misbehavior requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[31] **Securities Regulation**  Scienter, Intent, Knowledge, Negligence or Recklessness

To establish scienter for a securities fraud claim, under § 10(b) and Rule 10b-5, recklessness entails an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

2023 WL 5419147

**[32]    Securities Regulation** ☞ Scienter, Intent, Knowledge, Negligence or Recklessness

Negligence, even in heightened form, is not sufficient to allege scienter required for a securities fraud action, under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[33]    Securities Regulation** ☞ Controlling persons

A control person claim under the Securities Exchange Act is necessarily predicated on a primary violation of securities law. Securities Exchange Act of 1934 § 20, 15 U.S.C.A. § 78t(a).

**[34]    Securities Regulation** ☞ Persons entitled to sue or recover

Plaintiff has standing to bring action against seller of security, under the Securities Act provision imposing liability on any person who offers or sells a security by means of a prospectus containing material misrepresentations or omissions, only if plaintiff is a person purchasing such security from them. Securities Act of 1933 § 12, 15 U.S.C.A. § 77*l*(a).

**[35]    Securities Regulation** ☞ Underwriters

Under the Securities Act provision imposing liability on any person who offers or sells a security by means of a prospectus containing material misrepresentations or omissions, a statutory seller may include an underwriter who successfully solicited the transfer of title from issuer to purchaser in exchange for some financial gain. Securities Act of 1933 § 12, 15 U.S.C.A. § 77*l*(a).

**[36]    Securities Regulation** ☞ Persons entitled to sue or recover
**Securities Regulation** ☞ Persons Liable

A purchaser of a security has standing to bring an action under Rule 10b-5a against underwriters, brokers, dealers, and non-issuer sellers for material misstatements about the security if those entities made material misstatements about the security, as long as the plaintiff purchased or sold the securities about which the misstatements were made. 17 C.F.R. § 240.10b-5.

**[37]    Securities Regulation** ☞ Persons entitled to sue or recover

Investors had standing to assert claims against underwriters for allegedly violating Securities Act provision imposing liability on any person who offered or sold security by means of prospectus containing material misrepresentations or omissions, since investors alleged that they purchased securities pursuant to pertinent offering documents or in relevant offerings underwritten by underwriters. Securities Act of 1933 § 12, 15 U.S.C.A. § 77*l*(a).

**[38]    Securities Regulation** ☞ Manipulative, Deceptive or Fraudulent Conduct

To state a securities fraud claim, under § 10(b) and corresponding Rule 10b-5, plaintiff must plead that defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to plaintiff. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[39]    Securities Regulation    👉 Pleading**

At the pleading stage, a securities fraud plaintiff satisfies the materiality requirement for § 10(b) and Rule 10b-5 claims by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[40]    Securities Regulation    👉 Materiality of violation**

A complaint claiming securities fraud in violation of § 10(b) and Rule 10b-5 may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[41]    Securities Regulation    👉 Conduct of accountants or attorneys**

Investors failed to adequately allege that misstatements in audit opinion of insurer's outside auditor regarding insurer's financial statements and system of internal controls over financial reporting were material, and thus, investors did not state securities fraud claims under § 10(b) and Rule 10b-5 against auditor, since investors failed to allege any link between auditor's misstatements in auditor opinion and material errors contained in insurer's Form 10-K submitted to Securities and Exchange Commission (SEC), and instead, audit statements were so general that reasonable investor would not have depended on them as guarantee. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Appeal from a judgment of the United States District Court for the Southern District of New York (Kaplan, J.)

**Attorneys and Law Firms**

Andrew S. Love (Susan K. Alexander, Robbins Geller Rudman & Dowd LLP, San Francisco, CA; Samuel H. Rudman, David A. Rosenfeld, Mark T. Millkey, William J. Geddish, Avital O. Malina, Robert D. Gerson, Vincent M. Serra, Robbins Geller Rudman & Dowd LLP, Melville, NY; Jeremy A. Lieberman, Pomerantz LLP, New York, NY; Thomas J. McKenna, Gainey McKenna & Egleston, New York, NY; Kim E. Miller, Kahn Swick & Foti, LLC, New York, NY, on the brief), Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiffs-Appellants.

Steven M. Farina (John S. Williams, Matthew J. Greer, on the brief), Williams & Connolly LLP, Washington, D.C., for Defendants-Appellees AmTrust Financial Services, Inc., Barry D. Zyskind, Ronald E. Pipoly, Jr., Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller.

Timothy E. Hoeffner (Jason D. Gerstein, Ludwig von Rigal, on the brief), McDermott Will & Emery LLP, New York, NY, for Defendant-Appellee BDO USA, LLP.

Gregg L. Weiner (Christopher Thomas Brown, Ropes & Gray LLP, New York, NY; William T. Davison, Ropes & Gray LLP, Boston, MA), Ropes & Gray LLP, New York, NY, for Defendants-Appellees Morgan Stanley & Co. LLC, Citigroup Global Markets Inc., UBS Securities LLC, RBC Capital Markets, LLC, and Keefe, Bruyette & Woods, Inc.

Before: LOHIER, NARDINI, Circuit Judges, and KOVNER, Judge.[*]

New England Carpenters Guaranteed Annuity and Pension..., --- F.4th ---- (2023)

2023 WL 5419147

**Opinion**

LOHIER, Circuit Judge:

**\*1**  When is a statement of opinion that reflects some subjective judgment nevertheless actionable under the federal securities laws?

On April 4, 2017, AmTrust Financial Services, Inc., one of the country's largest publicly traded property and casualty insurers, restated five years of its financial results to correct what it acknowledged were significant errors in its annual and quarterly reports filed with the Securities and Exchange Commission ("SEC"). Among other things, AmTrust disclosed that it had improperly recognized most of the expected revenue from certain extended warranty contracts at the start rather than over the life of the contracts. AmTrust also reported that it had improperly accounted for certain discretionary employee bonuses by treating the bonuses as expenses in the year they were paid rather than the year they were earned by employees.

AmTrust's restatement spurred the Appellants in this case, all investors in AmTrust securities,[1] to sue AmTrust, its officers (the "Officer Defendants," and, together with AmTrust, the "AmTrust Defendants"), members of its board of directors (the "Director Defendants"),[2] its former auditor,[3] and certain underwriters of AmTrust securities (the "Underwriter Defendants"),[4] for misstating the company's financial condition and results in violation of Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), and Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the corresponding Rule 10b-5.

The United States District Court for the Southern District of New York (Kaplan, J.) dismissed the third amended complaint (the "Complaint") under Federal Rule of Civil Procedure 12(b)(6), holding that none of the misstatements were actionable under the securities laws. We agree with the District Court's dismissal of the claims relating to most of the misstatements, and we therefore AFFIRM in substantial part. But as we explain below, we disagree with the District Court's dismissal of the Appellants' claims under Sections 11, 12(a)(2), and 15 of the Securities Act against AmTrust, its officers and directors, and the Underwriter Defendants related to AmTrust's accounting for revenue generated by its extended warranty contracts and the expenses associated with discretionary employee bonuses. We therefore VACATE the judgment insofar as it dismisses those claims and REMAND to the District Court for further proceedings consistent with this opinion.

**BACKGROUND**

**I. Factual Background**

**\*2**  The following facts, which we assume to be true for purposes of this appeal, are drawn from the Complaint and the documents it incorporates by reference. SeeLitwin v. Blackstone Grp., L.P., 634 F.3d 706, 708 (2d Cir. 2011).

AmTrust provides workers' compensation, commercial automobile insurance, general liability, and extended service and warranty coverage. As relevant to this appeal, AmTrust promotes and markets extended service plans ("ESPs")—essentially extended warranties. AmTrust receives two types of revenue from its ESP business. First, AmTrust and its subsidiaries sell contractual liability insurance to various retailers, covering the obligations that the retailers assume as part of the ESPs. Second, retailers pay AmTrust "for marketing and administrative services," including "call center services," related to the ESPs. Joint App'x 67, 82. During the relevant time, AmTrust "recognize[d] revenue related to promotion, marketing and administration services at the time of the sale of ESP[s]" but "defer[red] a portion of service revenue based upon an estimate of administrative services to be provided in future periods." Joint App'x at 82.

Starting in 2010, AmTrust made a number of acquisitions that fueled much of its corporate growth. The acquisition most relevant to this appeal closed in 2010, when AmTrust bought Warrantech, a publicly traded company focused on providing

2023 WL 5419147

ESPs and warranty programs for retailers, dealers, distributors, and manufacturers that became, after the acquisition, a core part of AmTrust's business. Prior to the acquisition, the SEC had investigated Warrantech's practice of recognizing the full amount of the revenue it received from its ESPs and other service contracts at the time the contract was entered and the initial sale of services commenced (we will at times refer to this as the "time-of-sale" approach). The SEC had instructed Warrantech instead to recognize the revenue generated by those contracts on a straight-line basis over the life of the contracts. Warrantech publicly announced that it would comply with the SEC's guidance, abandoned its time-of-sale approach, and revised its method of recognizing revenue relating to the ESPs. For reasons that are unclear, AmTrust, though aware of the SEC's prior guidance to the contrary, reverted back to the original time-of-sale approach after it acquired Warrantech.

From 2012 to 2016 the price of AmTrust stock, which traded on the NASDAQ Global Market, skyrocketed. The company's gross written premiums, a central measure of its financial condition, grew from $2.75 billion to $7.95 billion. Yet as early as 2013, financial commentators and analysts began speculating publicly about AmTrust's actual financial condition. One commentator reported that AmTrust may have used accounting gimmicks to inflate its earnings and net equity. A financial journal, Barron's, questioned AmTrust's accounting practices.

The bad press failed to slow AmTrust's growth. In November 2015 AmTrust filed a preliminary prospectus supplement and prospectus supplement with the SEC announcing an offer of 5 million shares of common stock (the "November 2015 Offering") pursuant to a registration statement filed on June 11, 2015 (the "2015 Registration Statement"). The transaction, underwritten by Defendants Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), occurred on November 11, 2015 and raised $320 million. In September 2016 AmTrust filed another preliminary prospectus supplement and prospectus supplement under the 2015 Registration Statement, this time announcing that the company planned to offer American depositary shares in a transaction (the "September 2016 Offering") underwritten by Morgan Stanley, UBS Securities LLC ("UBS"), RBC Capital Markets, LLC ("RBC"), and Keefe, Bruyette & Woods, Inc. ("KBW"). The prospectus supplement accompanying the September 2016 Offering incorporated by reference AmTrust's annual financial report on Form 10-K for the year ending December 31, 2015, its 10-Q report for the quarter ending March 31, 2015, and various other reports the company had previously filed with the SEC. The September 2016 Offering raised $278.2 million.

 *3  AmTrust's prospects took a turn for the worse in 2017. In February and March 2017 AmTrust announced that accounting errors had prompted it to delay the filing of its 10-K for the year ending December 31, 2016 and that it needed more time to complete its consolidated financial statements. On April 4, 2017, AmTrust finally filed its Form 10-K for 2016. The 2016 10-K included restated financial results for the years ending December 31, 2012, 2013, 2014, 2015, and 2016, as well as each interim period during 2015 and 2016. The restatement revealed that the company's income and earnings had been significantly overstated since 2012.[5]

The restatement identified two material accounting errors. First, according to a press release that AmTrust issued describing the errors, AmTrust had mistakenly relied on the "upfront recognition of a portion of warranty contract revenue associated with administration services, ... instead of deferring recognition of the revenue over the life of the contract." Joint App'x 208. In other words, AmTrust had "historically recognized the majority of revenue related to administrative services at the time of sale of ESP," but had "revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line basis over the term of the ESP contracts." Joint App'x 80. The second accounting error was that discretionary employee "bonuses ... were expensed in the year paid but ... should have been accrued [as an expense] in the year earned based on" accepted accounting standards. Joint App'x 208. The restatement also identified other "miscellaneous adjustments" to AmTrust's financial statements that the company concluded were not material.[6] Joint App'x 208.

## II. Procedural Background
The Appellants commenced this putative class action in March 2017, after AmTrust first publicly disclosed the accounting errors at issue in this case. Although there are two slightly different class periods during which the Appellants purchased AmTrust securities—the first between February 14, 2013 and April 10, 2017 (the "AmTrust Class Period") and the second between

2023 WL 5419147

March 3, 2014 and April 10, 2017, during which BDO served as AmTrust's outside auditor (the "BDO Class Period")—for our purposes, the distinction is immaterial. The Appellants eventually filed a second amended complaint asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77*o*, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The District Court dismissed the second amended complaint without prejudice, concluding for the most part that the alleged misstatements were nonactionable statements of opinion. The Appellants filed a third amended complaint (the operative complaint here), which the District Court also dismissed, largely for the same reasons, this time with prejudice.

**\*4** This appeal followed.

## DISCUSSION

**[1]** We review the District Court's dismissal under Rule 12(b)(6) denovo, accepting all factual allegations as true and drawing all reasonable inferences in favor of the Appellants. Olagues v. Icahn, 866 F.3d 70, 74 (2d Cir. 2017).

### I. The Securities Act Claims Against the AmTrust Defendants and the Director Defendants

**[2]    [3]    [4]** We begin with the Appellants' claims against the AmTrust Defendants and the Director Defendants under Sections 11 and 15 of the Securities Act, as well as their claims against AmTrust under Section 12(a)(2) of the Securities Act. The Act requires that companies issuing securities make a "full and fair disclosure of information" in connection with a public offering. Pinter v. Dahl, 486 U.S. 622, 646, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); seeFed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 98 (2d Cir. 2017). The Act aims to protect investors and to "achieve a high standard of business ethics in the securities industry." Lorenzo v. SEC, ⸺ U.S. ⸺, 139 S. Ct. 1094, 1103, 203 L.Ed.2d 484 (2019) (quotation marks omitted); see alsoSEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996). It thus permits purchasers of a public company's securities to sue the company and certain corporate officers for any material misstatements or for the omission of material information in the company's registration statements filed with the SEC.

**[5]** Section 11 of the Act, for example, provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... [may] sue.

15 U.S.C. § 77k(a); seeOmnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 179, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015). So "[i]n the event of such a misdeed, the statute provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). "Section 15, in turn, creates liability for individuals or entities that 'control[ ] any person liable' under section 11." Id.(quoting15 U.S.C. § 77*o*). And as relevant to this appeal, Section 12(a)(2) similarly imposes liability on any person who offers or sells a security by means of a prospectus containing material misrepresentations or omissions.[7]

**\*5** Appellants' principal challenge under the Securities Act relates to the two accounting errors described above that AmTrust identified in its restatement as materially affecting its reported income during the relevant time: (1) its recognition of revenue from administration services based on the time-of-sale approach; and (2) its decision to record discretionary bonus payments as expenses the year in which they were paid rather than the year in which the bonuses were actually earned.

Relying largely on the Supreme Court's decision in Omnicare and our decision in Fait v. Regions Financial Corp., 655 F.3d 105 (2d Cir. 2011), the District Court determined that AmTrust's financial statements reflected the exercise of subjective judgment and were thus non-actionable statements of opinion. Cf. Omnicare, 575 U.S. at 184, 135 S.Ct. 1318 (noting that an executive

2023 WL 5419147

who expressed "a view, not a certainty" "could not be liable for a false statement of fact"). We respectfully disagree with this particular conclusion of the very able and experienced District Judge, who did not have the benefit of our latest guidance in this area. SeeAbramson v. Newlink Genetics Corp., 965 F.3d 165 (2d Cir. 2020).

In Fait, we explained that "when a plaintiff asserts a claim under section 11 or 12 based upon a [defendant's alleged] belief or opinion ... liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." Fait, 655 F.3d at 110. But we have since recognized that the Supreme Court in Omnicare, which was decided after Fait, unequivocally "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." Abramson, 965 F.3d at 175. By pointing out that a statement of opinion, even if believed, may nonetheless be actionable if it contains a factual misstatement or is rendered misleading by the omission of material facts, Omnicare expanded the scope of issuer liability for statements of opinion. Nevertheless, Fait continues to guide us in distinguishing between a statement of fact and a statement of opinion in the first place.

 [6]    [7]   So what distinguishes a fact from an opinion under the federal securities laws? In general, a fact is "a thing done or existing or an actual happening," while an opinion is "a belief, a view, or a sentiment which the mind forms of persons or things." Omnicare, 575 U.S. at 183, 135 S.Ct. 1318 (quotation marks omitted). A statement of fact "expresses certainty about a thing," while a statement of opinion does not. Id. Statements of opinion often include qualifying language (like "I believe" or "I think") that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact. Seeid. at 183–84, 135 S.Ct. 1318.

But not all statements of opinion include such qualifying language. In Fait, for example, we held that unqualified estimates of goodwill and loan loss reserves were statements of opinion because the estimates were clearly "subjective ... rather than objective factual matters." Fait, 655 F.3d at 111 (quotation marks omitted). Certain statements address issues so plainly subjective, we reasoned, that the statement is one of opinion not just by virtue of the words used but also because of the nature of the information conveyed. In Fait, we characterized the inquiry as turning on whether the relevant statement reflects the speaker's determination of "a matter of objective fact" or instead expresses the speaker's judgment about a matter that lacks "any objective standard." Id. at 109–10 (quotation marks omitted). The latter statement, we said, is "inherently subjective." Id. at 113.

 *6   The rule we articulated in Fait was narrowly invoked in the context of estimates of goodwill and loan loss reserves, both of which we characterized as inherently requiring a substantial exercise of judgment. Estimates of goodwill "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed." Id. at 110. Absent "any objective standard such as market price that" the company "should have but failed to use in determining" the value of its assets, "an estimate of the fair value of those assets will vary depending on the particular methodology and assumptions used." Id. at 110–11. Likewise, in Omnicare, the Supreme Court described an opinion variously as a statement that "in ordinary usage ... does not imply ... definiteness ... or certainty," or as a statement that "rest[s] on grounds insufficient for complete demonstration." 575 U.S. at 183, 135 S.Ct. 1318 (quotation marks omitted).

 [8]   If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist. Where those alternatives exist, the speaker making the statement (expressing an opinion) can choose among them without running afoul of the federal securities provisions at issue here. SeeOmnicare, 575 U.S. at 189–90, 135 S.Ct. 1318 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts.") This is true even if most of the existing facts cut against the statement.

 [9]    [10]    [11]   But opinions lead double lives. Most obviously, as the Supreme Court clarified in Omnicare and our Court more recently observed in Abramson, an opinion may implicitly convey "facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." Omnicare, 575 U.S. at 188, 135 S.Ct. 1318. In the context of a securities transaction, a reasonable investor expects that opinion statements "rest on some meaningful ... inquiry," "fairly align[ ] with the information in the issuer's possession at the time," and do not "reflect baseless, off-the-cuff judgments," id. at 188–

2023 WL 5419147

90, 135 S.Ct. 1318; seeVirginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (noting that even "conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading"). If, for example, "a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," then the issuer may be liable under Section 11's omissions clause even though the statements convey an opinion. Omnicare, 575 U.S. at 189, 135 S.Ct. 1318. "By increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion..., Omnicare reduced the significance of district courts' classification of statements as those of fact or opinion." Abramson, 965 F.3d at 176.

[12]  [13]  Opinions are thus actionable under Section 11 of the Securities Act not only when "the speaker did not hold the belief she professed," Omnicare, 575 U.S. at 185–86, 135 S.Ct. 1318, but also if the statement of opinion contains embedded statements of fact that are untrue, or the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor, id. at 186–88, 135 S.Ct. 1318; seeAbramson, 965 F.3d at 175; Fait, 655 F.3d at 111 (noting that opinion "statements may be actionable if they misstate the opinions or belief held, or, in the case of statements of reasons, the actual motivation for the speaker's actions, and are false or misleading with respect to the underlying subject matter they address" (emphasis omitted)). The standard for opinion liability presents "no small task for an investor" seeking to plead that an opinion is misleading. Omnicare, 575 U.S. at 194, 135 S.Ct. 1318.

*7  [14]  [15]  So one of the more straightforward ways a statement of opinion may be actionable is if it contains an embedded statement of fact that is not true. In other words, the opinion may be false or misleading if the embedded fact is not one as to which reasonable minds can differ. This occurs where, for example, there is an accepted method for assessing whether the statement is true, but the statement is not justified by the accepted method and clearly contradicts the facts on which it purports to rest. Consider the following example from Abramson:

> A statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.' If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete 'statement of a material fact' ... can be proven false.

Abramson, 965 F.3d at 175.

[16]  [17]  Statements of opinion are also actionable as false or misleading under Section 11's omission clause if the opinion "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement[of opinion] itself." Omnicare, 575 U.S. at 188, 135 S.Ct. 1318; seeAbramson, 965 F.3d at 175 ("[P]laintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false."). "With respect to this [alternative] basis for challenging a statement of opinion, Omnicare held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." Abramson, 965 F.3d at 175.

Mindful of these background principles, we conclude that the Appellants have stated a claim under Section 11 of the Securities Act against the AmTrust Defendants and the Director Defendants based on AmTrust's past recognition of revenue for extended warranty contracts using the time of sale approach, as well as its practice of recording discretionary bonuses as expenses when they were paid rather than earned.[8] For the same reasons, we vacate the District Court's dismissal of the Appellants' Section 12(a)(2) claims against AmTrust arising from the same misstatements. SeeIn re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 359.

The Appellants claimed that the Defendants were also liable for improper reporting of acquisition costs, foreign exchange gains and losses, software costs, interest expenses, intercompany transactions, and other accounting-related statements. They do not challenge the District Court's dismissal of those claims on appeal, and we therefore affirm the judgment insofar as it dismissed the claims. We focus instead, as do the Appellants, on the claims relating to the extended warranty contracts and the bonuses.

### A. <u>The Extended Warranties</u>

**\*8  [18]**   We turn first to AmTrust's practice of recognizing "upfront" most of the revenue generated from its extended warranty contracts during the relevant time. In a March 2017 media release, AmTrust clarified that this revenue recognition practice was "based on the interpretation of ASC [Accounting Standards Codification] 605, Revenue Recognition, used in the previously filed financial statements related to multiple-element revenue recognition." Joint App'x 670. The company conceded, however, that it should have instead "deferr[ed] recognition of the revenue over the life of the contract."[9] Joint App'x 670. The restatement acknowledged that the time-of-sale approach resulted in material misstatements regarding AmTrust's income and revenue associated with the warranty contracts. Specifically, it explained:

> The Company has historically recognized the majority of revenue related to administration services at the time of the sale of ESP. However, the Company revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line basis over the term of the ESP contracts. This correction of an error, <u>which created an overstatement of service and fee income and an overstatement of other expenses that were also recognized upfront in current periods</u>, required a restatement of the Company's previously issued financial statements.

Joint App'x 568 (emphasis added).

On appeal, AmTrust describes its initial representations about the revenue related to administrative services for ESPs as statements of opinion, not fact, because its determination of when to recognize the revenue associated with ESPs was a subjective judgment call. In particular, AmTrust explains that its pre-restatement decision to recognize this revenue upfront was "based on its interpretation of the accounting guidance regarding 'multiple-element revenue recognition,' " including ASC 605-25-25-5. AmTrust Br. 31. ASC 605-25-25-5 governs when a "delivered item or items shall be considered a separate unit of accounting." Under that accounting standard, revenue from these multi-element arrangements (also known as bundled contracts or sales) can be recognized upon delivery only if the contracts or services "have value to the customer on a standalone basis." ASC 605-25-25-5(a), superseded by Accounting Standard Update No. 2014-09 (May 28, 2014). Lastly, AmTrust observes that a contract or service has "value on a standalone basis if [it is] sold separately by any vendor or the customer could resell [it] on a standalone basis." <u>Id.</u>

The company suggests that assessing value to the customer on a standalone basis — that is, determining whether the administrative services revenue received from vendors who administer the warranty programs is separable from revenue generated by the warranty coverage provided to customers — is an inherently subjective enterprise. The problem with this argument is that AmTrust has never actually contended that its customers can resell the administrative services associated with the warranty contracts at issue here on a standalone basis or that vendors are able to sell them separately. Nothing in the Complaint suggests that doing so is even possible, and although AmTrust maintains that there are other ways to determine a contract's "value on a standalone basis" under the services section of ASC 605 that require judgment calls, nothing in the text of ASC 605, including ASC 605-25-55-1, on which AmTrust also relies, refers to other methods for determining value.

**\*9**   In further support of their respective arguments, both the Appellants and AmTrust turn to ASC 605-20-25-3, which provides:

> [R]evenue from separately priced extended warranty or product maintenance contracts shall be deferred and recognized in income on a straight-line basis over the contract period except in those circumstances in which <u>sufficient historical evidence indicates</u> that the costs of performing services under the contract are incurred on other than a straight-line basis.

ASC 605-20-25-3 (emphasis added), superseded by Accounting Standards Update No. 2014-09 (May 28, 2014). On one hand, the Appellants suggest that ASC 605-20-25-3 establishes an objective standard that generally requires the recognition of this revenue on a straight-line basis. On the other hand, AmTrust defends the District Court's decision by relying on the exception contained in ASC 605-20-25-3, claiming that the determination of whether historical evidence is sufficient to permit non-

2023 WL 5419147

straight-line treatment is "a quintessential question of judgment" and that the standard is thus inherently subjective. AmTrust Br. 30–31.

For its part, the District Court concluded that the restated financial statements were non-actionable opinions because determining the sufficiency of historical evidence that would support incurring costs on a non-straight-line basis "inherently requires a subjective judgment as to whether the exception applies." Spec. App'x 89. As the District Court itself recognized, however, the determination that AmTrust's statements are opinion, not fact, is not necessarily the end of the analysis. Spec. App'x 42 ("The claim will survive ... if plaintiffs have alleged adequately that the statement was an untrue or misleading statement of opinion."); seeAbramson, 965 F.3d at 176.

The Appellants respond that they have alleged the objectively determinable absence of historical evidence necessary to support the non-straight-line accounting approach that AmTrust applied. See Joint App'x 152 ("ASC Topic No. 605 ... does not permit the method of recognition employed by AmTrust without historical evidence demonstrating the appropriateness of such method, historical evidence AmTrust acknowledges it never possessed."). AmTrust's reliance on the sufficiency of historical evidence to justify its accounting treatment, the Appellants contend, runs headlong into the Complaint's allegation, which at this stage we accept as true, that there was in fact no historical evidence to support its approach.

We agree with the Appellants that subjective judgments about the sufficiency of historical evidence to support a particular accounting treatment presuppose the existence of some historical evidence. Indeed, AmTrust now acknowledges that it should have recorded revenue for its warranty contracts on a straight-line basis in reliance on ASC 605-20-25-3. And no one disputes that GAAP permits time-of-sale recognition only if some historical evidence justified doing so. At the pleading stage, we think the alleged absence of such evidence, if accepted as true, means that AmTrust's representations about the warranty contract revenue reported in its historical consolidated financial statements misled investors to conclude that the company was aware of some historical evidence in support of recognizing the revenue on a non-straight-line basis, when in (alleged) fact it was not. In other words, AmTrust is plausibly alleged to have "sa[id] one thing and [held] back another." Omnicare, 575 U.S. at 192, 135 S.Ct. 1318.

 *10  We therefore conclude that AmTrust's financial statements relating to the warranty contract revenue reported in its historical consolidated financial statements were actionable statements of opinion under Section 11, and we vacate the District Court's dismissal of the Appellants' Section 11 claims against the AmTrust Defendants and the Director Defendants arising from those statements.

## B. The Discretionary Bonuses

 [19]   We turn next to AmTrust's practice of expensing certain discretionary employee bonuses in the year the bonuses were paid rather than the year the bonuses were earned.

According to the Complaint, in its restatement AmTrust "admitted that the financial statements it issued to investors during the relevant period were presented in violation of GAAP by failing to timely accrue compensation related expenses." Joint App'x 83. Specifically, AmTrust explained that:

> In prior years, the Company had expensed discretionary bonuses paid to its employees in the year the bonuses were paid because the Company did not consider the discretionary bonuses to be "probable," which is the standard required for accrual. Upon review of ASC 270, Interim Reporting, and ASC 450, Contingencies, management determined that its application was incorrect because, even though the bonuses were discretionary, the bonuses should have been estimated and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

Joint App'x 83.

2023 WL 5419147

The parties agree that ASC 450 applies to determine how to account for these bonuses. Under ASC 450-20-25-2, companies should expense costs when it is "probable" that a liability has been incurred and when "[t]he amount of loss can be reasonably estimated" within a range.[10] AmTrust asserts that its decision to expense bonuses in the period they were paid rather than earned in its previously issued consolidated financial statements is a classic exercise of subjective judgment. Suggesting to investors that it is not "probable" that the company would pay bonuses at a future time is, the company asserts, merely stating a non-actionable opinion. Even assuming without deciding that these are statements of opinion, we are not persuaded.

In our view, there is some reason to conclude that the Appellants have plausibly alleged that AmTrust's method of deferring the recognition of expenses related to bonuses until the bonuses were paid (thus delaying the charge to income) was objectively improper rather than an exercise of subjective judgment. In particular, the Appellants allege that AmTrust had a practice of paying bonuses. The Complaint thus plausibly alleges that there was no basis to conclude that the continued payment of earned bonuses was not "probable" and that such bonuses therefore could not be expensed when earned. There is no dispute that the bonuses at issue on appeal were earned during the relevant periods and, as AmTrust's restatement eventually acknowledged, that they should have been expensed during those periods. Although multiple accounting standards may have been relevant to determining when to expense a bonus, all of the standards in play here support the position that the bonuses should have been expensed in the year they were earned, not the year they were paid.[11] We are not aware of a GAAP provision on which AmTrust relied that suggests otherwise. And the fact that these GAAP standards, together or alone, are subject to misreading, misinterpretation, or misapplication, as happened here, does not necessarily mean that they entail an exercise of subjective judgment.

**\*11** But we do not need to decide whether these financial statements are statements of fact or, as AmTrust asserts, statements of opinion. See Abramson, 965 F.3d at 176. Even if they are statements of opinion (because, say, determining whether it is "probable" that the corporate officers would exercise their discretion to pay the bonuses at a future time is a matter of subjective judgment), we conclude that the statements are nonetheless actionable because the Complaint adequately alleges that it was improbable that the earned bonuses would not be paid. Accepting that allegation as true makes it quite plausible that the AmTrust Defendants did not base the company's statements of probability on a "meaningful ... inquiry," that their statements did not "fairly align[ ] with the information in the issuer's possession at the time," and that there was no basis for AmTrust to state that the bonuses should be expensed in the year they were paid rather than earned. Omnicare, 575 U.S. at 188-89, 135 S.Ct. 1318.

For these reasons, we conclude that the Complaint states a claim under Section 11 against the AmTrust Defendants and the Director Defendants arising from AmTrust's misrepresentation of reported income in its historical consolidated financial statements based on the erroneous accounting treatment relating to bonus payments.

## C. SOX Certifications by AmTrust Executives

**[20]** The remaining Section 11 claims against the AmTrust Defendants are a different matter. They rest on certifications by company executives regarding, among other things, the accuracy of AmTrust's financial reporting, its conformity with GAAP, and the effectiveness of AmTrust's disclosure controls and procedures. The District Court concluded that these certifications were non-actionable statements of opinion. We agree.

First, the Officer Defendants, Zyskind (the CEO) and Pipoly (the CFO), attested to (1) the accuracy of AmTrust's financial reporting, (2) the effectiveness of the company's disclosure controls and procedures, and (3) their disclosure of any weaknesses in internal controls over the company's financial reporting in certifications mandated by Section 302 of the Sarbanes Oxley Act ("SOX"), 15 U.S.C. § 7241(a); see also 17 C.F.R. §§ 240.13a-14, 240.13a-15, 240.15d-15. Their certifications about the accuracy of AmTrust's financial reporting, including that financial statements were prepared in conformity with GAAP, signal that they are opinions by stating that they are "based on [the] knowledge" of the officer. See Joint App'x 103–04, 153. There is no allegation that the opinion is actionable on the ground that it was not based on the officer's knowledge.[12] Similarly, we

2023 WL 5419147

conclude that the two other challenged SOX certifications relating to (1) disclosure controls and procedures, and (2) internal control over financial reporting contain language that conveys management's subjective judgments about the company's internal controls and thus constitute statements of opinion.

**[21]**   The Appellants point to allegations that AmTrust later reversed course and that its restatement acknowledged a failure of internal controls. The Appellants insist that the reversal compels the inference that the SOX certifications were not believed when made. But AmTrust's change of opinion, standing alone, does not mean that the original certified opinions were disingenuous.[13] Nor is a genuinely held opinion that "turned out to be wrong" necessarily actionable. Omnicare, 575 U.S. at 186, 135 S.Ct. 1318. In any event, as noted, the Complaint fails to adequately allege that the AmTrust executives who signed the certifications did not believe what they certified.

**\*12**   Finally, Appellants contend that the certifications were misleading because they falsely conveyed the existence of " 'some meaningful ... inquiry' " conducted by the certifying executives. Appellants' Br. 42 (quoting Omnicare, 575 U.S. at 188, 135 S.Ct. 1318). But here too, the Complaint fails to allege any facts that establish a lack of meaningful inquiry, other than the fact that the certification turned out to be wrong.

For these reasons, we affirm the District Court's dismissal of the Appellants' Section 11 claims relating to the SOX certifications.

## II. The Exchange Act Claims Against the AmTrust Defendants

**[22]    [23]**   The District Court also dismissed the Appellants' claims against the AmTrust Defendants under Section 10(b) of the Exchange Act and Rule 10b-5. To survive a motion to dismiss under these provisions, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007); seealsoInd. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016). Under the Private Securities Litigation Reform Act of 1995, moreover, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u–4(b)(2)(A).

**[24]    [25]    [26]    [27]**   In contrast to the Securities Act claims under Section 11, which do not require a showing of scienter,[14] the central question with respect to the Appellants' claims under the Exchange Act is whether the Complaint adequately "pleaded facts giving rise to a strong inference that the ... Defendants acted with 'scienter, a mental state embracing intent to deceive, manipulate, or defraud.' " In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Scienter may be established by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99; seeSet Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 78 (2d Cir. 2021). Any allegation of conscious misbehavior or recklessness should be "viewed holistically and together with the allegations of motive and opportunity" to determine whether the complaint supports a strong inference of scienter. Set Cap. LLC, 996 F.3d at 78. Although "the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity," Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996), the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314, 127 S.Ct. 2499; seealsoIn re Advanced Battery, 781 F.3d at 644; ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

**\*13  [28]**   Keeping that standard in mind, we agree with the District Court that the Complaint does not adequately allege that the AmTrust Defendants acted with scienter.

**[29]**   First, the Complaint does not adequately plead scienter based on the AmTrust Defendants' motive and opportunity to commit fraud. Urging otherwise, the Appellants rely on the AmTrust Defendants' financial incentives to keep share prices high and to fuel the company's acquisition strategy. But the desire to sustain "the appearance of corporate profitability" is not itself

the kind of incentive or motivation that raises an inference of scienter. Chill, 101 F.3d at 268. The Appellants also direct us to allegations that Pipoly and other top executive officers (but, notably, not Zyskind or the Board Defendants) sold a significant number of shares of AmTrust stock during the AmTrust Class Period. In doing so, however, the Appellants acknowledge that Pipoly's significant selloff began several months before the AmTrust Class Period, a fact that renders his stock sales during this class period less unusual. See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 355 (2d Cir. 2022).

[30] [31] Nor does the Complaint allege facts that provide "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. We have explained that "[s]cienter based on conscious misbehavior ... requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 158 (2d Cir. 2012) (quotation marks omitted). Recklessness, meanwhile, entails "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECA, 553 F.3d at 198 (quotation marks omitted). None of the facts alleged in the Complaint—including the "magnitude" of the restatement and the duration of the period it covered —satisfy these requirements. Joint App'x 213. In determining whether the AmTrust Defendants acted with scienter, it is not enough that it took a period of years for AmTrust to acknowledge its significant accounting errors.

[32] Finally, the Appellants argue that the AmTrust Defendants did not believe their accounting judgments regarding the early recognition of revenue on the administration-service fees connected to AmTrust's warranty program. The Appellants allege that AmTrust knew its accounting treatment was wrong because Warrantech, the company AmTrust acquired in 2010, announced in its Form 10-K for the year ended March 31, 2006, that it had changed its revenue-recognition practices regarding its warranty contracts in response to SEC guidance. In particular, the Complaint alleges that AmTrust must have known, or recklessly disregarded, that the SEC earlier had advised Warrantech that its time-of-sale approach was improper and that its warranty business compelled a straight-line revenue recognition approach. But we think that AmTrust's subsequent resort to a time-of-sale approach for the contracts, though wrong, is more plausibly explained by the changes to the guiding accounting principles since 2006 to which AmTrust points us, or to AmTrust's negligence.[15] See AmTrust Br. 42–44. Negligence, even in a "heightened form," is not sufficient to allege scienter. Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000).

*14 [33] For these reasons, we conclude that the Complaint fails to raise a strong inference of scienter, and we affirm the dismissal of the Appellants' claims against the AmTrust Defendants under Section 10(b) and Rule 10b–5.[16] We also affirm the District Court's corresponding dismissal of the Appellants' 'control person' claim under Section 20(a) of the Exchange Act because such a claim is "necessarily predicated on a primary violation of securities law." Rombach v. Chang, 355 F.3d 164, 177–78 (2d Cir. 2004).

### III. The Securities Act Claims Against the Underwriter Defendants

The Appellants also assert claims against the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act stemming from the two securities offerings made pursuant to AmTrust's 2015 Registration Statement. The first is AmTrust's November 2015 Offering, underwritten by Citigroup and Morgan Stanley, of 5 million shares of common stock pursuant to a preliminary prospectus supplement and a prospectus supplement. This preliminary prospectus supplement and prospectus supplement, together with the 2015 Registration Statement, incorporated by reference AmTrust's annual financial report for 2014 and quarterly financial reports for the first three fiscal quarters of 2015. The second offering is AmTrust's September 2016 Offering, underwritten by Morgan Stanley, RBC, UBS, and KBW, of 10 million depository shares pursuant to a preliminary prospectus supplement and a prospectus supplement that, together with the 2015 Registration Statement, incorporated by reference AmTrust's annual financial report for 2015 and quarterly financial reports for the first two quarters of 2016. Each of the relevant financial reports contained overstated income numbers arising from the time-of-sale approach for the warranty contracts and the improper expensing of bonuses.

[34] [35] [36] As a threshold matter, three of the Underwriter Defendants—Morgan Stanley, UBS, and KBW—contend that the Appellants lack standing to even assert Section 12 claims against them in connection with the September 2016 Offering

because the Complaint does not specifically allege that the Appellants purchased securities from those underwriters.[17] Under Section 12(a)(2), a plaintiff has standing to bring an action against the seller of a security only if the plaintiff is "the person purchasing such security from them." Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 344 (2d Cir. 1987) (quotation marks omitted); seealsoFreidus v. Barclays Bank PLC, 734 F.3d 132, 141 (2d Cir. 2013) ("In order to have standing under § 12(a)(2), ... plaintiffs must have purchased securities directly from the defendants."); 15 U.S.C. § 77*l*(a). A "statutory seller" may include an underwriter who successfully solicited the transfer of title from issuer to purchaser in exchange for some financial gain.[18] Morgan Stanley, UBS, and KBW assert that in a case involving multiple underwriters of a single offering, the purchaser of a security must in its pleadings specifically identify which underwriter sold the security at issue in order to have standing to sue that underwriter. We have not yet addressed this question.

 **\*15** **[37]**   We conclude that the Appellants have adequately established standing under Section 12(a)(2) by alleging that they purchased securities pursuant to the "pertinent offering documents" or in the relevant offerings underwritten by the defendants. In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011) (Kaplan, J.). Here, according to the Complaint, the Appellants bring their Section 12(a)(2) claims on their own behalf and on behalf of "other members of the Securities Act Class who purchased AmTrust common stock or [shares sold in connection with the September 2016 Offering] pursuant to the Prospectuses." Joint App'x 132 (emphasis added). We can reasonably infer from these allegations that the Appellants acquired securities from the Underwriter Defendants in connection with the September 2016 Offering. We are therefore satisfied that the allegations suffice to establish the Appellants' standing in this case. See, e.g., John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736–38 (2d Cir. 2017) (noting that "general factual allegations of injury may suffice" to establish standing, "for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim" (cleaned up)).

Turning to the merits, the District Court dismissed the Appellants' Section 11 and Section 12 claims against the Underwriter Defendants, concluding that the Appellants had "fail[ed] to allege any untrue or misleading statements of material fact or opinion with respect to those claims." Spec. App'x 73. In other words, the District Court dismissed these claims, which it described as "identical to those of the Securities Act claims asserted against the AmTrust [D]efendants," for effectively the same reasons it dismissed the claims against the AmTrust Defendants. Spec. App'x 73. For reasons we have already provided, we disagree with the District Court's conclusion that the reported income statements related to AmTrust's warranty contracts and its employee bonuses were non-actionable opinions. Insofar as the District Court dismissed the Appellants' claims under Section 11 and Section 12(a)(2) against the Underwriter Defendants arising from those two categories of statements, we vacate the dismissal and remand for further proceedings consistent with this opinion. As to any remaining claims against the Underwriter Defendants, we affirm the District Court's dismissal.

### IV. The Claims Against BDO, AmTrust's Outside Auditor

Finally, we address the Appellants' claims against AmTrust's outside auditor, BDO, under Section 11 of the Securities Act in connection with BDO's audit reports on AmTrust's financial statements and its system of internal controls over financial reporting for each of the years ended December 31, 2013–15, and under Section 10(b) of the Exchange Act and Rule 10b-5 in connection with its audit report for the year ending December 31, 2013 ("2013 Audit Opinion"), which was included in AmTrust's 2013 Form 10-K.

We begin with the Securities Act claims. Section 11 provides in relevant part that if "any part of the registration statement ... contained an untrue statement of material fact," anyone acquiring the associated security may sue "every accountant ... who has with his consent been named as having prepared or certified any part of the registration statement or ... any report or valuation which is used in connection with the registration statement." 15 U.S.C. § 77k(a)(4). BDO is thus responsible under Section 11 for any material inaccuracy in the AmTrust registration statements that it certified, or in financial reports incorporated in those statements. Id.; seeMiyahira v. Vitacost.com, Inc., 715 F.3d 1257, 1265 (11th Cir. 2013); Belizan v. Hershon, 495 F.3d 686, 692 (D.C. Cir. 2007); seealsoHerman & MacLean v. Huddleston, 459 U.S. 375, 381 n.11, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

New England Carpenters Guaranteed Annuity and Pension..., --- F.4th ---- (2023)
2023 WL 5419147

As BDO observes, the Appellants have not developed the argument in their opening brief challenging the District Court's dismissal of the Section 11 claim against BDO. The challenge, if it can be called that, appears in a footnote. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("[A]n argument made only in a footnote [i]s inadequately raised for appellate review."). Although the Appellants develop the argument somewhat in their reply brief, that is too little too late. See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant ... raised them in a reply brief."). We thus conclude that the Appellants' challenge to the dismissal of the Section 11 claim against BDO is abandoned, we affirm the District Court's dismissal of that claim, and we proceed to examine the Exchange Act claims against BDO.

**\*16** The Appellants contend that BDO is liable under Section 10(b) of the Exchange Act for the 2013 Audit Opinion, which stated that BDO had conducted its audit in accordance with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), and that the audit provided a reasonable basis for BDO to determine that AmTrust's financial statements were fairly presented. Joint App'x 246–47.

On its face, the 2013 Audit Opinion appears in the same guise as the SOX certifications that we have already concluded are non-actionable opinions. But the Complaint alleges some key facts that differentiate the audit opinion from those certifications. The Appellants allege that the BDO engagement partner on the audit, Richard J. Bertuglia, and another BDO partner, John W. Green, in fact failed to complete the necessary checks and audit work papers before issuing the audit opinion; that they signed several audit work papers without reviewing them; and that they failed to verify that all the necessary audit work was performed before issuing the opinion. The Appellants also allege that the SEC later found that (1) Bertuglia had violated the PCAOB standards by failing to supervise and exercise due professional care, properly examine journal entries for evidence of possible material misstatement due to fraud, or perform sufficient tests of internal controls and substantive audit procedures to support their final opinion, and (2) Green violated PCAOB standards by failing to perform the appropriate engagement quality review.

We agree with the District Court that the Appellants have adequately alleged that BDO's audit opinion contained potentially actionable misstatements of opinion because the Complaint "render[s] it plausible that Bertuglia," who signed the audit opinion, "disbelieved the statement that the audit was conducted in accordance with the relevant PCAOB standards." Spec. App'x 78. The Appellants have also adequately alleged that BDO's statement that it "believe[d] [its] audits provide a reasonable basis for [its] opinion," Joint App'x 246–47, would lead a reasonable investor to conclude that BDO had conducted "some meaningful ... inquiry," Omnicare, 575 U.S. at 188, 135 S.Ct. 1318, when in fact, according to the Complaint, BDO never conducted such an inquiry.

**[38] [39] [40]** But we also agree with the District Court that the Appellants' Section 10(b) and Rule 10b-5 claim against BDO must be dismissed because the Complaint does not adequately allege that the misstatement in BDO's 2013 Audit Opinion was material.

> To state a claim under § 10(b) and the corresponding Rule 10b–5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.

Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). "At the pleading stage, a plaintiff satisfies the materiality requirement ... by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Id. at 161–62; see Basic Inc. v. Levinson, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "[A] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino, 228 F.3d at 162 (quotation marks omitted); see Litwin, 634 F.3d at 717.

**\*17 [41]** As the District Court concluded, the Complaint fails to allege any link between BDO's misstatements in the 2013 Auditor Opinion and the material errors contained in AmTrust's 2013 Form 10-K. The audit statements to which the Appellants point were "so general" in this case "that a reasonable investor would not depend on [them] as a guarantee." ECA, 553 F.3d at 206. Appellants' "claim that these statements were knowingly and verifiably false when made does not cure their

New England Carpenters Guaranteed Annuity and Pension..., --- F.4th ---- (2023)

2023 WL 5419147

generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." SAIC, 818 F.3d at 97–98 (quotation marks omitted). We do not mean to suggest that audit opinions will always fail the materiality test because the statements they contain are too general for investors to rely on. Rather, in this case, as the District Court held, Appellants have failed "to allege any facts relevant to the way or ways in which BDO's failure to supervise, review, document, and perform in good faith the 2013 audit would have been significant to a reasonable investor in making investment decisions." Spec. App'x 79. We might have come to a different conclusion had such facts been alleged.

For these reasons, we affirm the District Court's dismissal of the Appellants' Exchange Act claims under Section 10(b) and Rule 10b-5 against BDO.

**CONCLUSION**

To summarize:

1. We vacate the dismissal of the Appellants' Section 11 claims against the AmTrust Defendants and the Director Defendants, the Section 12(a)(2) claims against AmTrust, and the Section 15 claims against the Officer Defendants and Director Defendants (Zyskind, Pipoly, DeCarlo, Fisch, Gulkowitz, Karfunkel, and Miller) relating to AmTrust's accounting for certain warranty contracts and bonuses.

2. We vacate the dismissal of the Appellants' claims under Section 11 and Section 12(a)(2) against the Underwriter Defendants relating to AmTrust's accounting for certain warranty contracts and bonuses.

3. We otherwise affirm the judgment of the District Court.

We have considered the Appellants' remaining arguments and conclude that they are without merit. Accordingly, for the reasons set forth above, the judgment of the District Court is AFFIRMED in part and VACATED in part, and the case is REMANDED for proceedings consistent with this opinion.

**All Citations**

--- F.4th ----, 2023 WL 5419147

Footnotes

*     Judge Rachel P. Kovner, of the United States District Court for the Eastern District of New York, sitting by designation.

1     The named plaintiffs are New England Carpenters Guaranteed Annuity and Pension Funds, Stanley Newmark, Irving Lichtman Revocable Living Trust, Jupiter Capital Management, Sharon Albano, John Sachetti, and Joel Rubel.

2     The Officer Defendants are Barry D. Zyskind (at all relevant times AmTrust's President and Chief Executive Officer ("CEO")) and Ronald E. Pipoly Jr. (at all relevant times AmTrust's Executive Vice President and Chief Financial Officer ("CFO")). The Director Defendants are Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller.

3     BDO USA, LLP ("BDO").

4     RBC Capital Markets, LLC, UBS Securities LLC, Citigroup Global Markets Inc., Keefe, Bruyette & Woods, Inc., and Morgan Stanley & Co. LLC.

5     To use the annual financial results for 2015 as an example, the errors meant that income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by 16.79 percent; income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by 17.04 percent; net income was

2023 WL 5419147

overstated by 11.56 percent; net income attributable to AmTrust common stockholders was overstated by 12.62 percent; diluted earnings per share was overstated by 12.45 percent; comprehensive income was overstated by 22.94 percent; and comprehensive income attributable to AmTrust Financial Services, Inc. was overstated by 23.55 percent. See Joint App'x 213–14.

6  Although the Appellants challenged other statements below, they do not press those arguments on appeal and, as a result, we do not consider them.

7  Section 12(a)(2) provides, in relevant part:

Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him ....

15 U.S.C. § 77*l*(a)(2).

8  The District Court dismissed the Appellants' control-person liability claim under Section 15 of the Securities Act against AmTrust's officers and directors because it found no primary liability under Section 11. Because we conclude that the Appellants have stated a claim for primary liability for the statements about the accounting treatment of warranty contracts and bonuses, we vacate the District Court's dismissal of the corresponding Section 15 claims against Zyskind, Pipoly, DeCarlo, Fisch, Gulkowitz, Karfunkel, and Miller and remand for further proceedings consistent with this opinion. See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 358 (noting that "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[ ] 11").

9  The Accounting Standards Codification ("ASC") is the "source of authoritative generally accepted accounting principles," commonly referred to as "GAAP," published by the Financial Accounting Standards Board ("FASB") "to be applied by nongovernmental entities" such as AmTrust. Financial Accounting Standards Board, Accounting Standards Codification: Overview and Background 105-10-05-1 (2020), https://asc.fasb.org/1943274/2147479442; see also Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016) (relying on FASB standards as a source of GAAP).

10  See also ASC 450-10-55-3 ("Amounts owed for services received... are not contingencies even though the accrued amounts may have been estimated; there is nothing uncertain about the fact that those obligations have been incurred.")

11  Under ASC 450-10-55, bonuses should have been expensed as incurred during the relevant period. ASC 710-10-25 likewise required AmTrust to expense an employee's right to be compensated when earned. And ASC 270 required the bonuses to be expensed as incurred in interim periods.

12  For the reasons discussed below, we disagree with the Appellants that the existence of the Warrantech SEC guidance letter demonstrates that the officers knew the financial reports were false or misleading or did not comply with GAAP, even with all reasonable inferences drawn in the Appellants' favor.

13  The Appellants reference in passing on appeal that the SOX certifications contained embedded statements of fact. See Appellants' Br. 41. We conclude that the argument is abandoned because the Appellants have failed to develop it. See Zhang v. Gonzales, 426 F.3d 540, 545 n.7 (2d Cir. 2005).

14  As we explained in Fait, "[w]hile issuers are subject to virtually absolute liability under section 11, the remaining potential defendants under sections 11 and 12(a)(2) [of the Securities Act] may be held liable for mere negligence." Fait, 655 F.3d at 109 (cleaned up). And "in contrast to claims brought pursuant to section 10(b) of the [Exchange Act], claims under sections 11 and 12 do not require allegations of scienter." Id.

15  The Appellants also call our attention to purported "red flags" in the form of press coverage criticizing AmTrust's accounting practices generally, although none of the press articles mentions the two central accounting issues that led to AmTrust's restatement. Given

2023 WL 5419147

the generality of these media reports, we are not persuaded that they support an inference of scienter that is at least as compelling as any opposing inference of nonfraudulent intent.

16     We have applied the holding in Omnicare to claims brought under Section 10(b) of the Exchange Act. SeeTongue v. Sanofi, 816 F.3d 199, 209–10 (2d Cir. 2016). Because, as we previously concluded, the Officer Defendants' certifications are nonactionable statements of opinion, we also affirm the dismissal of the Appellants' Section 10(b) claims based on these certifications. SeeCity of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67–68 (2d Cir. 2012) (noting that Section 10(b) and Section 11 claims "share a material misstatement or omission element").

17     The Underwriter Defendants do not challenge Appellants' standing to sue the underwriters of the November 2015 Offering—Citigroup and Morgan Stanley—or their standing to sue RBC for the September 2016 Offering.

18     In a similar vein, a purchaser of a security has standing to bring an action under Rule 10b–5a against underwriters (and brokers, dealers, and non-issuer sellers) for material misstatements about the security "if those entities made material misstatements about the security, as long as the plaintiff[ ] purchased or sold the securities about which the misstatements were made." Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd., 54 F.4th 82, 88 (2d Cir. 2022); seeIn re NYSE Specialists Sec. Litig., 503 F.3d 89, 102 (2d Cir. 2007).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.