**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-2770-WJM-SKC

EL PASO FIREMEN & POLICEMEN'S PENSION FUND,
SAN ANTONIO FIRE & POLICE PENSION FUND, and
INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others
similarly situated,

       Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY, L.L.C.,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO., LLC, and
ROBERTS & RYAN INVESTMENTS, INC.,

       Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT
MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

---

This securities fraud action arises out of alleged false and misleading statements made by Defendant InnovAge Holding Corp. ("InnovAge" or the "Company") and its former executives regarding InnovAge's business practices, the success of its growth strategy, and the potential impact of audits by government agencies in the highly regulated Program of All-Inclusive Care for the Elderly ("PACE") industry.  Lead

1

Plaintiffs El Paso Fireman & Policemen's Pension Fund, San Antonio Fire & Police Pension Fund, and Indiana Public Retirement System (collectively, "Lead Plaintiffs") bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and §78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5 (the "Exchange Act"), Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o (the "Securities Act"), on behalf of themselves and other purchasers of InnovAge securities.  (ECF No. 54.)  There are two putative classes in this action: (1) a class of all purchasers of InnovAge securities between March 4, 2021, and December 22, 2021, for claims brought under the Exchange Act; and (2) a class of all persons who purchased publicly traded common stock of InnovAge in or traceable to its March 4, 2021, initial public offering ("IPO").

Currently before the Court is Defendants InnovAge; Maureen Hewitt and Barbara Gutierrez (together, the "Officer Defendants"); John Ellis Bush, Andrew Cavanna, Caroline Dechert, Edward Kennedy, Jr., Pavithra Mahesh, Thomas Scully, Marilyn Tavenner, Sean Traynor, and Richard Zoretic (collectively, the "Director Defendants"); and Welsh, Carson, Anderson & Stowe ("WCAS") and Apax Partners, L.P.'s ("Apax") (altogether, "Defendants") Joint Motion and Brief to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Motion") pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6).  (ECF No. 73.)  For the reasons explained below, the Motion is granted in part and denied in part.

## I. BACKGROUND

The following factual summary is drawn from Lead Plaintiffs' Amended Class

Action Complaint for Violations of the Federal Securities Laws ("Amended Complaint") (ECF No. 54), except where otherwise stated.[1]  The Court assumes the factual allegations contained in the Amended Complaint are true for the purpose of deciding the Motion to Dismiss.  *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Lead Plaintiffs are pension funds operated to benefit public employees and retirees (*e.g.*, firefighters, police officers, and teachers and professors of public schools and universities) in Texas and Indiana.  (¶ 22–24.)[2]  Lead Plaintiffs purchased InnovAge common stock at artificially inflated prices in or traceable to the IPO.  (¶ 25.)

## A.    The Parties

InnovAge is a healthcare company focused on PACE services.  (¶ 26.)  InnovAge was incorporated as a nonprofit corporation in Colorado from May 2007 until May 2016.  (*See id.*)  In May 2016, it reincorporated as a Delaware for-profit corporation while maintaining its principal place of business in Colorado.  (*Id.*)  InnovAge accomplished this transition into a for-profit business model with assistance from WCAS, a private equity firm that bought a $196 million stake in the Company in May 2016.  (¶ 27.)  In July 2020, Apax, another private equity firm, and WCAS entered an agreement for Apax

---

[1] Defendants have also filed a separate Request for Judicial Notice in Support of Joint Motion to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws ("Request for Judicial Notice").  (ECF No. 76.)  Lead Plaintiffs filed a response to the Request for Judicial Notice.  (ECF No. 80.)  Lead Plaintiffs do not object to the Court taking judicial notice of the documents submitted by Defendants; however, they urge the Court to resist Defendants' attempts to use these documents to dispute well-pleaded facts in the Amended Complaint.  (*Id.* at 4.)  The Court takes notice of these documents pursuant to Federal Rule of Evidence 201.  Fed. R. Evid. 201(c)(2) ("The Court: . . . (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.").

[2] Citations to paragraph numbers, without more, *e.g.* (¶__), are to paragraphs in Lead Plaintiffs' Amended Complaint.  (ECF No. 54.)

to acquire a 49% stake in the Company and for the two firms to cause InnovAge to become a public company.  (¶ 28.)

Together, WCAS and Apax beneficially own approximately 86% of InnovAge's common stock, and therefore, control the vote of all matters subject to shareholder vote, including all matters relating to the members of the Company's Board of Directors.  (¶¶ 29, 378.)  Further, in connection with WCAS and Apax's plan to take InnovAge public, the Company entered into a Director Nomination Agreement, which provides WCAS and Apax the right to designate all nominees for election to the Board so long as they collectively own at least 40% of their original ownership stake.  (¶ 30.)  The Director Nomination Agreement also provides that WCAS and Apax retain the right to designate nominees proportional to their ownership stake, even if they reduce it to less than 40%, in addition to certain consent rights related to Board composition and size, so long as they retain at least 5% of their original ownership stakes.  (*Id.*)  Lead Plaintiffs, therefore, allege WCAS and Apax controlled the Company before, during, and after the IPO.  (¶ 31.)

Maureen Hewitt was the President and CEO and a Director of the Company from 2006 to January 1, 2021, when she resigned.  (¶ 32.)  Hewitt signed or authorized the signing of the Registration Statement (Form S-1) and Prospectus ("Offering Documents") filed with the SEC in connection with the IPO; and the 2021 Annual Report (Form 10-K) and certifications under Sections 302 and 906 of the Sarbanes–Oxley Act of 2002, 15 U.S.C. § 7241 and 18 U.S.C. § 1350 ("SOX"), in connection with the 2021 Annual Report and the Quarterly Report (10-Q) in the fourth quarter of 2021 ("Q4 2021 Quarterly Report"), all filed with the SEC.  (*Id.*)  Hewitt received over $35 million and an

award of stock options as compensation in connection with the IPO.  (*Id.*)

Barbara Gutierrez joined InnovAge in 2017 and was the CFO of InnovAge during all times relevant to this action.  (¶ 33.)  Gutierrez authorized the signing of the Offering Documents, the 2021 Annual Report, the Q4 2021 Quarterly Report, and the quarterly reports for the first three quarters of 2022 ("Q1 2022 Quarterly Report," "Q2 2022 Quarterly Report," and "Q3 2022 Quarterly Report," respectively), all filed with the SEC. (*Id.*)  Gutierrez received over $7 million and an award of stock options as compensation in connection with the IPO."  (*Id.*)

John Ellis "Jeb" Bush, Andrew Cavanna, Caroline Dechert, Edward "Ted" Kennedy, Jr., Pavithra Mahesh, Thomas Scully, Marilyn Tavenner, Sean Traynor, and Richard Zoretic are, and were at all relevant times, Directors of InnovAge.  (¶¶ 36–44.) Each "signed a written consent to being named in the Offering Documents as an individual to become a director of the Company[] and signed or authorized the signing of the 2021 Annual Report."  (*Id.*)  Several of the Director Defendants received compensation in connection with the IPO as follows: Bush, $50,000; Kennedy, more than $731,000; Tavenner, more than $736,000; Zoretic, more than $221,000.  (¶¶ 36, 39, 42, 44.)

## B.     PACE

PACE is a joint Medicare and Medicaid program that provides comprehensive, community-based medical and social services to certain elderly people.  (¶ 72.)  Rather than providers billing Medicare and Medicaid for specific medical services at the time of service, PACE organizations receive a fixed capitation payment, calculated on a per member, per month basis.  (*Id.*)  PACE participants have access to around-the-clock medical services.  (¶ 76.)  PACE capitation payments are pooled, and because that pool

5

is used to pay for participant's medical services, PACE organizations take on the risk that total medical expenses for participants will exceed the pooled capitation payments. (¶ 80–81.)

PACE organizations are highly regulated and subject to supervision by both the Centers for Medicare and Medicaid Services ("CMS") and State Administering Agencies ("SAAs").  (¶ 78.)  To provide PACE services, PACE programs must be approved by the state government and have an agreement with CMS and that state's SAA.  (¶ 79.)

To be eligible for enrollment in a PACE program, a participant must be:

1.  55 years of age or older;

2.  certified by the SAA to need the level of care required under the state Medicaid plan for coverage of nursing facility services;

3.  reside in the PACE organization's service area;

4.  be able to live in a community setting at the time of enrollment without jeopardizing his or her health or safety based on criteria set forth in the program agreement; and

5.  meet any additional program-specific eligibility conditions imposed under the PACE program agreement.

(¶ 82 (citing 42 C.F.R. § 460.150).)  CMS describes enrollment in a PACE program as "an intensive process."  (¶ 83.)  During enrollment, the PACE staff must explain to the potential participant and their representative (if they have one) the program's requirements, a list of employees who provide care, and the requirement that the PACE organization would be the participant's sole medical provider.  (*Id.*)  The potential participant must sign a release to permit the PACE organization to obtain necessary

medical, financial, and Medicare-eligibility information.  (*Id.*)  And the SAA must assess the potential participant to ensure a need for the level of care required by the state Medicaid plan for coverage of nursing facility services.  (*Id.*)  Moreover, the PACE organization must itself assess the potential participant to ensure care in a community setting is appropriate and that all requirements for PACE eligibility are met.  (¶ 84.)

Once enrolled, participants are assigned to an interdisciplinary team ("IDT") responsible for assessments, care planning, and care coordination.  (¶ 87.)  Each IDT must have a primary care provider to manage a participant's general health and use of medical specialists and inpatient care.  (¶ 88.)  The IDT must continually monitor assigned participants' physical and mental health and the effectiveness of their personalized plan of care.  (¶ 89.)

## C.   PACE Organization Monitoring, Auditing, and Compliance Enforcement

CMS and the SAA are responsible for ensuring that every PACE organization complies with state and federal law.  (¶ 91.)  They monitor and evaluate the organizational structure and policies of each PACE organization.  (*Id.*)  There are three types of audits performed by CMS and the SAA: (1) trial period audits performed annually during a PACE organization's initial, three-year trial period; (2) routine audits performed "as appropriate" (and at least every two years) following the conclusion of the trial period; and (3) focused audits performed if either CMS or the SAA determines that additional monitoring or auditing is required to identify noncompliance, operational deficiencies, or significant audit findings.[3]  (*Id.*)  On March 30, 2020, at the onset of the COVID-19 pandemic, CMS issued guidance announcing that it was temporarily shifting

---

[3] Trial period and routine audits are performed jointly by CMS and the SAA, while focused audits, being ad hoc, may be performed by these agencies independently.  (*See* ¶ 91.)

its focus from routine audit activities to investigating and resolving instances of noncompliance putting health or safety of participants at serious risk, and complaints alleging infection control concerns, including of COVID-19.  (¶ 93.)

CMS may also take enforcement action by imposing sanctions on a PACE organization, including suspending new enrollments or payments or civil money penalties.  (¶¶ 94–95.)  CMS will take this step when noncompliance is serious enough to require immediate enforcement action or when noncompliance fails to resolve after the PACE organization has been given appropriate notice and an opportunity to cure the noncompliance.  (¶ 94.)  CMS decides whether to suspend enrollment of Medicare-enrolled participants, and the SAA decides whether to suspend enrollment Medicaid-enrolled participants.  (¶ 98.)  The ultimate sanction, imposed if the PACE organization fails to correct deficiencies or comply substantially with the conditions for operating a PACE program, is termination of the PACE agreement with that organization.  (¶ 100.)

## D.        InnovAge and Its Business Model

InnovAge was founded as a Colorado non-profit in May 2007, a time when PACE organizations were not permitted to operate as for-profit businesses.  (¶¶ 101–04.)  In May 2015, CMS lifted the restriction on for-profit PACE organizations, and in 2016, the Colorado Attorney General approved InnovAge to operate as a for-profit business.  (¶¶ 104–15.)  On May 13, 2016, the Company completed its controversial conversion into the first for-profit PACE organization.  (¶¶ 105–06.)

Following this conversion, the Company pursued an aggressive strategy to increase enrollment in its program.  (¶¶ 106–07.)  Scully told the publication *Modern Healthcare* that while WCAS had not set a timeframe for receiving a return on its investment, he saw sufficient growth potential in the PACE market that taking the

Company public in as little as four years was not "out of the question."  (¶ 108.)  To accomplish these goals, InnovAge invested millions of dollars in branding and marketing, including advertisements and videos featuring Susan Sarandon.  (¶ 110.)

InnovAge's approach was a success.  Despite average quarterly enrollment growth of only 2.1% in the industry as a whole, the Company's enrollment grew 13% during its first year as a for-profit business.  (¶ 111.)  In each of the next four years, InnovAge continued to report outstanding results.  (*Id.*)  In 2019, Hewitt reported that its participant list had grown by 44.3% to 5,900 participants across 16 centers.  (¶ 112.)  By May 2019, InnovAge had taken on additional debt in order to pay WCAS a $66.1 million dividend, and by May 2020 WCAS began to implement an investment exit strategy by soliciting bids for a full or partial sale through a strategic acquisition or IPO.  (¶ 114.)  On July 3, 2020, it was reported that Apax had agreed to purchase a 49% stake in the Company in a deal that valued it at $950 million.  (*Id.*)

Former employees called the transition to a for-profit model a "turning point" for the Company, after which increasing enrollment took priority over everything—including providing quality care for participants.  (¶ 116.)  According to one former employee, when the Company was a non-profit, the enrollment and Medicaid eligibility departments "worked for the operations group," and when it became a for-profit, they "answered to the finance and investment group."  (¶ 117.)  Seven other former employees confirmed this account, with another stating that the expectation was to enroll as many people as possible.  (*Id.*)  This expectation was enforced and reinforced with high monthly quotas and potential bonuses for exceeding the quotas.  (¶ 118.)

In an effort to maintain its impressive enrollment growth, the Company began

targeting "populations of potential participants without regard to eligibility, safety, or the Company's capacity to adequately provide them with services."  (¶ 119.)  Three former employees described arrangements between the Company and the Colorado Coalition for the Homeless whereby InnovAge went to shelters, motels, and other locations to enroll people experiencing homelessness.  (*Id.*)  Enrolling participants without stable housing not only increases revenue from additional capitation payments, it increases margins because such participants use fewer services.  (*See id.*)  According to Lead Plaintiffs, this practice was in violation of federal regulations, and when ethical and legal concerns were raised to the Company's senior leaders, the concerns were ignored.  (¶¶ 119–22.)

The Company also engaged in other tactics to drive enrollment and prevent disenrollment.  (¶¶ 124–27.)  For instance, "current and former employees explained that to meet their enrollment quotas, business development employees routinely misrepresented the level of care the programs could provide to convince seniors to switch from their existing health plans to InnovAge's PACE programs."  (¶ 124.) InnovAge's efforts to prevent disenrollment included tactics "prohibited by PACE regulations."  (¶ 125.)  Multiple social workers formerly employed by the Company reported that they were instructed to convince participants not to disenroll and would receive pressure from their supervisors when they did file disenrollment paperwork after being instructed to do so by a participant.  (*Id.*)  One former employee reported that a center director offered a cash reward to an employee to keep a participant enrolled. (*Id.*)

## E.   Rapid Growth's Toll on InnovAge's Medical Services

The Company's intense focus on growing enrollment resulted in severe staff

shortages, high caseloads, scheduling delays, lack of coordination between providers, insufficient training, substandard medical care, and, ultimately, worse health outcomes for participants.  (¶ 115.)  These issues violated PACE regulations and increased the likelihood that the Company would be subject to enforcement action.  (*Id.*)

The surge in participants was not accompanied by a commensurate increase in clinical staff.  (¶128.)  Inadequate staffing led to delays in both primary care InnovAge would normally provide and outside appointments with specialists the Company arranges for participants as needed.  (¶ 129.)  Current and former InnovAge employees told *The Capital Forum* that "thousands" of outside referrals to specialists "were outstanding by more than 180 days."  (*Id.*)  Shelbie Engelking, the ombudsman established after the Company's for-profit conversion, told reporters that her office had gotten numerous complaints about a lack of dental and podiatry services.  (¶ 131.) Several former employees reported that InnovAge's cost-cutting measures even impacted its ability to provide prescription medications to participants on time.  (*Id.*) Delays in services can have serious adverse effects on participants' health.  (*Id.*)  These are but a few examples of the impact lack of staffing had on participants' care outlined in the Amended Complaint.  (*See* ¶¶ 132–36.)

The issues created by staff shortages were only exacerbated by the COVID-19 pandemic.  (¶ 137.)  When the pandemic forced the Company to close its centers, home care services became increasingly important.  (*Id.*)  One former employee said that InnovAge staff were supposed to call participants at least once a week to check in and ensure they had sufficient food and medication and were not experiencing any symptoms of COVID-19.  (¶ 138.)  According to that employee, however, InnovAge

failed to do this and, as a result, one participant had died alone on the floor only to be found a day or two later.  (*Id.*)  Even in the face of the additional challenges of providing home care services during the pandemic, the Company's senior management resisted increasing staff.  (¶¶ 139–41.)

**F.      Audits and Complaints About Substandard Care**

InnovAge's substandard care had been revealed years prior to the IPO by internal and external audits, complaints from participants and their families, and concerns raised by employees.  (¶ 142.)

A 2016 internal audit of the Sacramento, California, center found that InnovAge had failed to make hundreds of specialist appointments, and the delay in care had led to worsening, chronic, and acute medical outcomes.  (¶¶ 143–44.)  Another internal audit of the same center found "1,000 outstanding orders," including "many" that were more than a year outstanding.  (¶ 145.)  The internal audit found this situation carried "an 'extreme' risk level."  (*Id.*)  The results of the 2017 audit were provided to senior management, including Hewitt.  (¶ 146.)  Hewitt refused a former Regional Executive for California's "repeate[d]" requests to pause enrollment so that InnovAge could "build a better network."  (¶ 149.)  CMS audits from 2017 to 2019 also identified multiple issues requiring corrective or immediate corrective action.  (¶¶ 150–54.)

Similar issues were present at the Company's Colorado centers.  (¶ 155.)  In 2017, a CMS audit found several issues requiring immediate action, including failures to provide care and services according to participants' care plans and develop care plans for new participants within 30 days.  (¶ 156.)  A 2019 audit by the Colorado Department of Public Health & Environment ("CDPHE") found InnovAge had failed to properly document participants' medication and treatments.  (¶ 158.)  And a 2021 audit by the

Colorado Department of Health Care Policy and Financing resulted in it requiring InnovAge to enter a corrective action plan.  (¶ 159.)  Colorado regulators had also identified issues with the Company's home care services and documentation of adverse health events.  (¶¶ 161–62.)  Company employees expressed their concerns about the substandard care participants were receiving.  (¶¶ 163–64, 166–67.)

In November of 2020, InnovAge executives held a conference call with approximately 40 doctors and nurse practitioners.  (¶ 167.)  During the call Hewitt denied knowledge of the care issues identified by audits and employee complaints.  (*Id.*)

## G.    Allegedly False and Misleading Statements Prior to the IPO

Lead Plaintiffs allege the Offering Documents contained twelve materially false and misleading statements.  (¶ 241.)

### 1.    The Patient-Centered Care Statement

The Offering Documents contain the following statement, referred to by the parties as the "Patient-Centered Care Statement":

> Our patient-centered care delivery approach meaningfully improves the quality of care our participants receive, while keeping them in their homes for as long as safely possible and reducing over-utilization of high-cost care settings such as hospitals and nursing homes.

(¶ 241(a).)

Lead Plaintiffs allege this statement was false and misleading because InnovAge failed to provide all services determined necessary by the IDT, ensure access to specialists, and failed to manage participants' medical situations and use to specialists.  (¶ 242(a).)  Further, this statement was allegedly false because InnovAge failed to disclose that it had been providing substandard care for years, as revealed by internal and external audits, complaints from participants and their families, and concerns raised

13

by employees.  (*Id.*)  Defendants allegedly knew that CMS and SSAs would audit and monitor InnovAge and were thus aware of the risk of monetary penalties and suspension of enrollment.  (*Id.*)

>        2.      The Individualized and Coordinated Care Statement

The Offering Documents contain the following statement, referred to by the parties as the "Individualized and Coordinated Care Statement":

>        Our IDTs develop an individualized care plan specific to the
>        needs of each participant.  Our high touch model involves
>        daily interaction with our participants across multiple
>        settings.  This enables us to not only deliver coordinated,
>        high quality care, but also to identify and proactively manage
>        changes to each participant's conditions[.]

(¶ 241(b).)

Lead Plaintiffs allege this statement was false and misleading because the Company later admitted that it had not standardized the process of its IDTs planning and coordinating care and failed to ensure care was scheduled in a timely manner.  (¶ 242(b).)  They also allege the statement was false and misleading because CMS audits revealed numerous failures to properly reevaluate care plans, timely process requests for services, and document changes to care plans when made.  (*Id.*)  Further, they allege the statement fails to disclose the repeated failures in these area that were occurring and fails to disclose the risk these issues posed due to the expected audits by CMS and SSAs.  (*Id.*)

>        3.      The Standardized and Well-Staffed Operations Statement

The Offering Documents contain the following statement, referred to by the parties as the "Standardized and Well-Staffed Operations Statement":

>        We have standardized and streamlined our operations
>        across markets and have invested meaningfully in the

14

> corporate infrastructure needed to drive participant satisfaction, manage healthcare costs and improve clinical outcomes at scale.  Because of our scale, we have been able to invest in dedicated, well-staffed teams for all of our corporate and market-level functions.  As a result, our physicians can focus on providing care and are not as burdened with additional administrative demands.

(¶ 241(c).)

Lead Plaintiffs allege this statement was false and misleading because the Company later admitted that it had not standardized its process for IDTs to plan and coordinate care.  (¶ 242(c).)  Further, they allege it was misleading because the substandard care delivered by InnovAge at the Colorado and California centers had led to worse outcomes for patients, and the Company refused to invest in the staff and other resources necessary to provide adequate care "at scale."  (*Id.*)  Lead Plaintiffs allege the statement was false and misleading because an audit had found that InnovAge had failed to ensure proper staffing levels, which affected 100% of participants reviewed.  (*Id.*)  And they allege the statement is false and misleading because it failed to disclose the audit risks presented by its failure to properly staff its centers.  (*Id.*)

4.    The Robust Compliance Statement

The Offering Documents contain the following statement, referred to by the parties as the "Robust Compliance Statement":

> [W]e have a robust compliance infrastructure and team.

(¶ 241(d).)

Lead Plaintiffs allege this statement was false and misleading because InnovAge "failed to recognize and process complaints as grievances."  (¶ 242(d).)  Further, Defendants allegedly failed to disclose that audits had revealed "repeated and

15

significant deficiencies that were not remediated," that Defendants and senior

management "directed" staff to conceal evidence from auditors, that Defendants denied

repeated requests from employees to invest in necessary staff, and the audit risk

associated with these facts.  (*Id.*)

     5.    The Successful Medical Risk Management Statement

The Offering Documents contain the following statement, referred to by the

parties as the "Successful Medical Risk Management Statement":

> We have a long track record of successfully managing
> medical risk, driven by the strength of our operational
> playbook as well as our risk pool[.]

(¶ 241(e).)

Lead Plaintiffs allege this statement was false and misleading because the

Company later admitted that it had not standardized its process for IDTs to plan and

coordinate care.  (¶ 242(e).)  Further, they allege Defendants failed to disclose that

audits had revealed that its care model had caused participants to experience worse

health outcomes because they were not receiving or receiving delayed specialist care,

medical providers were carrying increased caseloads due to understaffing, staff were

undertrained, and many participants did not have a primary care provider.  (*Id.*)

     6.    The COVID Continuity of Care Statement

The Offering Documents contain the following statement, referred to by the

parties as the "COVID Continuity of Care Statement":

> [W]e have transitioned much of our care to in-home and
> telehealth services, while increasing participant visit volume
> and maintaining continuity of care.

(¶ 241(f).)

Lead Plaintiffs allege this statement was false and misleading because the

Company later admitted that it had failed to maintain its home care network and reliability and efficiency of participant transportation, and telephonic channel response times.  (¶ 242(f).)  They further allege Defendants failed to disclose the lack of investment in staff that led to these issues.  (*Id.*)

       7.    <u>The Technology Statement</u>

The Offering Documents contain the following statement, referred to by the parties as the "Technology Statement":

> Our technology suite supports our ability to deliver consistent, high-quality care to our participants at scale.

(¶ 241(g).)

Lead Plaintiffs allege this statement was false and misleading because the Company later admitted that it had failed to properly document participants' medical records.  (¶ 242(g).)  They further allege this statement is false and misleading because it failed to disclose these facts and the audit risk they created or that Defendants expected to be audited by federal and state regulators.  (*Id.*)

       8.    <u>The Home Care Statement</u>

The Offering Documents contain the following statement, referred to by the parties as the "Home Care Statement":

> Our in-home care capabilities enable our participants to live safely in their homes and avoid nursing homes to the extent safely possible.  We directly deliver or manage all skilled and unskilled care a participant may require to live independently at home.

(¶ 241(h).)

Lead Plaintiffs allege this statement was false and misleading because InnovAge later admitted that it had failed to sufficiently strengthen its home care network and

17

reliability, ensure coordination with outside providers was timely, ensure the reliability of the transportation provided to participants, and ensure timely telephonic responses. (¶ 242(h).) Further, Defendants allegedly failed to disclose this information and the associated audit risks. (*Id.*)

9.    The Expansion Model Statement

The Offering Documents contain the following statement, referred to by the parties as the "Expansion Model Statement":

> The fundamental aspects of our expansion playbook include . . . a disciplined approach to site selection, a targeted sales and marketing approach, a concerted effort to recruit and develop talent, scalable underlying clinical technology and an efficient, uniform operating model.

(¶ 241(i).)

Lead Plaintiffs allege this statement was false and misleading because Gutierrez later admitted that the Company needed a "transformation" before it could be "well positioned for scalable and sustainable growth for the long term." (¶ 242(i).) Further, CEO Blair allegedly admitted that InnovAge had not had the "near-term operational execution" and "mid- to long-term capability development" necessary for scalable and sustainable long-term growth. (*Id.*) Lead Plaintiffs also allege the statement's failure to disclose that audits had revealed InnovAge was providing substandard care and the associated audit risks render it false and misleading. (*Id.*)

10.    The Scalability Statement

The Offering Documents contain the following statement, referred to by the parties as the "Scalability Statement":

> We have demonstrated an ability to scale successfully[.]

(¶ 241(j).)

18

Lead Plaintiffs allege this statement was false and misleading for the same reasons as the Expansion Model Statement.  (¶ 242(j).)

11.   The Virtuous Cycle Statement

The Offering Documents contain the following statement, referred to by the parties as the "Virtuous Cycle Statement":

> [W]e have demonstrated our ability to reduce avoidable utilization of high-cost care settings, such as hospitals and nursing homes.  As a result, we create a surplus that can be used to invest in refining our care model and providing even greater social supports for our participants.  These investments further improve participants' experiences and health outcomes, which we believe will result in more savings that will drive our profitable growth.  The virtuous cycle we have created enables us to consistently deliver high-quality care, achieve high participant satisfaction and retention, and attract new participants.

(¶ 241(k).)

Lead Plaintiffs allege this statement was false and misleading for the same reasons as the Expansion Model Statement and the Scalability Statement.  (¶ 242(k).)

12.   The Government Relationships Statement

The Offering Documents contain the following statement, referred to by the parties as the "Government Relationships Statement":

> We have developed strong relationships with Medicare and Medicaid agencies through our participation in PACE[.]

(¶ 241(l).)

Lead Plaintiffs allege this statement was false and misleading because Defendants failed to disclose that audits identified repeated, significant deficiencies that were not remedied, Defendants and other senior leaders at the Company directed staff to conceal evidence from auditors, Defendants had denied repeated requests from

employees to increase staffing levels, and the Company expected to be audited, leading to an increased chance of sanctions. (¶ 242(l).)

13. <u>Omission of Required Disclosures</u>

In addition to these twelve allegedly false and misleading statements, Lead Plaintiffs allege the Offering Documents were false and misleading because they failed to disclose information required to be disclosed by Items 303 and 105 of Regulation S-K. (¶¶ 243–44.) Item 303 requires a description of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). And Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Lead Plaintiffs allege that in "negligent violation of Item 303 and Item 105, the Offering Documents failed to disclose that the Company's enrollment growth strategy presented a significant uncertainty, and made investment in InnovAge risky." (¶ 245.)

**H.   Allegedly False and Misleading Statements After the IPO**

Lead Plaintiffs also allege Defendants made multiple false and misleading statements after the March 2021 IPO. (¶¶ 246–261.)

1. <u>Q3 2021</u>

Lead Plaintiffs allege Defendants made nine false and misleading statements during the third quarter of 2021.

a.   *May 10, 2021 Press Release*

On May 10, 2021, InnovAge filed a Form 8-K with the SEC and issued a press release titled "InnovAge Announces Financial Results for the Fiscal Third Quarter Ended March 31, 2021." (¶ 246.) Gutierrez signed the Form 8-K. (*Id.*) The press

release contained the following statement, quoting Hewitt:

> We are seeing multiple growth drivers from our multi-faceted strategy coming from organic growth, and de novo locations in existing and new states.

(*Id.*)  Lead Plaintiffs allege this statement was false and misleading because the Company's rapid growth had exacerbated "systemic deficiencies" in InnovAge's medical services, the growth was not "organic" because it was driven by enrolling ineligible participants who lacked stable housing, and federal and state regulators had begun or were scheduled to begin audits that would uncover deficiencies and "would limit InnovAge's ability to expand" to new locations.  (¶ 247.)

b.    *May 10, 2021 Earnings Call*

Also on May 10, 2021, Hewitt and Gutierrez held a conference call to discuss the Company's third quarter results.  (¶ 248.)  During her opening remarks, Hewitt made the following statement:

> [InnovAge's] organic growth [is] driven by increasing participant enrollment and capacity within existing centers.

(¶ 248(a).)  Lead Plaintiffs allege this statement was false and misleading because Hewitt had refused to increase the "capacity within existing centers" necessary to provide participants with adequate care.  (*Id.*)  Further, Hewitt's statement failed to disclose that audits had revealed InnovAge's substandard care and the audit risks associated with that substandard care.  (*Id.*)

Later in the earnings call, in response to an analyst's question that Lead Plaintiffs describe as relating to "challenges with recruitment and retention of clinical staff," Hewitt responded with the following statement:

> InnovAge has done an excellent job of really ensuring that we've kept our turnover rates down [and has been] very

21

> successful as compared to other long-term care
> organizational results as well[.]

(¶ 248(b).)  Lead Plaintiffs allege this statement was false and misleading because an audit revealed the Company had failed to maintain proper staffing levels, which affected 100% of the participants reviewed.  (*Id.*)  They further allege this statement was false and misleading because InnovAge later admitted that it had failed to fill "critical personnel gaps at each of the centers."  (*Id.*)  Lead Plaintiffs also allege this statement was false and misleading because it failed to disclose persistent issues with understaffing, the impact of understaffing on participant health, and the regulatory risk associated with these facts.  (*Id.*)

      c.    *May 11, 2021 Quarterly Report*

On May 11, 2021, InnovAge filed its quarterly report for the third quarter with the SEC on Form 10-Q, which was signed by Hewitt and Gutierrez.  (¶ 250.)  Lead Plaintiffs allege the Q3 2021 Quarterly Report contains seven false and misleading statements. (*Id.*)  The first three statements are repetitions of the Patient-Centered Care Statement, Individualized and Coordinated Care Statement, and COVID Continuity of Care Statement contained in the Offering Documents.  (¶ 250(a).)

      (i)    The Fully Staffed Statement

The Q3 2021 Quarterly Report contains the following statement, referred to by the parties as the "Fully Staffed Statement":

> Our internal care delivery costs remained largely the same
> as we remained fully staffed to execute on our participants'
> care plans, albeit through a different mix of care settings.

(¶ 250(b).)  Lead Plaintiffs allege this statement was false and misleading because an audit had found that InnovAge "failed to ensure proper staffing levels," which impacted

100% of participants reviewed.  (¶ 251(b).)  And they allege the statement is false and misleading because it failed to disclose the audit risks presented by its failure to properly staff its centers.  (*Id.*)

> (ii)    The Deficient Participant Assessments and Care Plans Statement

The Q3 2021 Quarterly Report contains the following statement, referred to by the parties as the "Deficient Participant Assessments and Care Plans Statement":

> PACE regulators require that new participants be assessed within a period of 30 days from enrollment to our programs and for us to provide them a personalized care plan. Recently, we became aware that certain of our centers failed to timely complete a portion of these new participant assessments and care plans.  We are working diligently to remedy this issue.  Failure to conduct assessments or produce care plans within the required period of time may subject us to suspension of new enrollment or restrict enrollment at the affected centers and other centers in the affected state.

(¶ 250(c).)  Lead Plaintiffs allege this statement was false and misleading because Defendants failed to disclose the substandard care revealed by audits and the risk that future audits would result in penalties from regulators.  (¶ 251(c).)

> (iii)    Additional Statement Related to Government Relationships

The Q3 2021 Quarterly Report contains the following statement:

> Maintaining, supporting and growing these relationships [with government payors], particularly as we enter new geographies, is critical to our long-term success.  Our model is aligned with the interests of our government payors, as we drive better health outcomes for participants at lower costs and enhance participant satisfaction.

(¶ 250(d).)  Lead Plaintiffs allege this statement is false and misleading for the same reasons as the Robust Compliance Statement.  (¶ 251(d).)

23

(iv)     Sarbanes–Oxley Act Certification

The Q3 2021 Quarterly Report contains the following statement:

> [The Q3 2021 Quarterly Report] does not contain any untrue
> statement of a material fact or omit to state a material fact
> necessary to make the statements made[] not misleading
> with respect to the period covered by this report [and] the
> financial statements, and other financial information included
> in this report, fairly present in all material respects the
> financial condition, results of operations and cash flows of
> the registrant as of, and for, the periods presented in this
> report.

(¶ 250(e).)  Lead Plaintiffs allege this statement, made pursuant to Section 302 of SOX,

is false and misleading because the Q3 2021 Quarterly Report contained "numerous

false and misleading statements and omitted material facts," as outlined earlier in the

Amended Complaint.  (¶ 251(e).)

2.     Q4 2021

Lead Plaintiffs allege Defendants made fifteen false and misleading statements

during the fourth quarter of 2021.

a.     *September 21, 2021 Press Release*

On September 21, 2021, InnovAge filed a Form 8-K with the SEC and issued a

press release titled "InnovAge Announces Financial Results for the Fiscal Year and

Fourth Quarter Ended June 30, 2021." (¶ 252.)  Gutierrez signed the Form 8-K.  (*Id.*)

The press release contained the following statement, quoting Hewitt:

> [W]e continue to execute on our multi-faceted strategy of
> organic growth, de novo locations in existing and new states,
> and acquisitions.

(*Id.*)  Lead Plaintiffs allege this statement was false and misleading for the same

reasons as the statement in the May 10, 2021 Press Release.  (¶ 253.)

24

b.     *September 21, 2021 Earnings Call*

Also on September 21, 2021, Hewitt and Gutierrez held a conference call to discuss the Company's third quarter results.  (¶ 254.)  During this earnings call, Hewitt provided updates on several aspects of the Company's business.  (*Id.*)  With respect to employee turnover and staffing, Hewitt made the following statement:

> [A]pproximately 1200 of [the Company's approximately 1800] employees are clinical professionals and interact with our participants on a regular basis. . . . [M]anaging turnover and retention is challenging for all healthcare organizations, due to the limited supply of workers and the competitive environment in which we operate. . . . That being said, we continue to address staffing needs of the business by proactively utilizing strategies to minimize the impact on our business and to sourcing talent that varies by location and position.

(¶ 254(a).)  Lead Plaintiffs allege this statement was false and misleading for the same reasons as Hewitt's statement in response to the analyst's question during the May 10, 2021 earnings call.  (¶ 255(a).)

Hewitt then offered the following statement on the status of audits in Sacramento and Colorado:

> [A]udits are a regular occurrence in our industry. . . . We have and continue to work collaboratively with regulators as we seek to constantly improve our processes and outcomes to better serve our participants and their families. . . . [W]e do not have the outcome of the Colorado [audit and] can't give you any guidance around Colorado at this time[.]  [A]s soon as we know and there may be a question too, that maybe there's some relationship between Sacramento and Colorado . . . we don't have any knowledge that those two things are related.

(¶ 254(b).)  Lead Plaintiffs allege this statement was false and misleading because Hewitt's statement did not disclose that CMS had suspended most trial period and routine audits at that time due to the COVID-19 pandemic, instead focusing on audits

related to the spread of infectious diseases or "instances of noncompliance where the health and/or safety of beneficiaries are at serious risk." (¶ 255(b).) They further allege this statement was false and misleading because it did not disclose that: (1) the Company had already received the preliminary findings for all of the audits, which had all resulted in substantially the same findings; (2) the Company had already informed clinical staff of at least a dozen areas of improvement in Colorado centers, citing the results of CMS audits; (3) InnovAge informed staff in a training call that "California and Colorado pretty much have the same areas of opportunities"; (4) CMS conducts focused audits only under certain circumstances; and (5) CMS had suspended most audits, other than focused audits due to the COVID-19 pandemic. (*Id.*)

        c.    *September 22, 2021 Annual Report*

On September 22, 2021, InnovAge filed its annual report with the SEC on Form 10-K, which was signed by Hewitt, Gutierrez, and the Officer Defendants. (¶ 256.) Lead Plaintiffs allege the 2021 Annual Report contains twelve false and misleading statements. (*Id.*) The first eleven statements are repetitions of the Patient-Centered Care Statement, Standardized and Well-Staffed Operations Statement, Robust Compliance Statement, Successful Management of Medical Risk Statement, COVID Continuity of Care Statement, Technology Statement, Home Care Statement, Scalability Statement, Virtuous Cycle Statement, and Government Relationship Statement contained in the Offering Documents, and the Deficient Participant Assessments Statement and Care Plan Statement contained in the Q3 2021 Quarterly Report. (¶ 256(a).) The twelfth statement is a repetition of the SOX certification included in the Q3 2021 Quarterly Report.

3.    Q1 2022

Lead Plaintiffs allege Defendants made five false and misleading statements during the first quarter of 2022.

a.    *November 9, 2021, Earnings Call*

On November 9, 2021, Hewitt and Gutierrez held a conference call to discuss the Company's first quarter results.  (¶ 259.)  During this earnings call, Hewitt addressed several aspects of the Company's business.  (*Id.*)  With respect to staffing shortages, Hewitt made the following statement:

> [I]t is no secret that the healthcare sector has historically faced a shortage of licensed practical nurses, registered nurses, certified nursing assistants, and other frontline healthcare workers like drivers, and the COVID pandemic has not helped the situation.  The historical shortage of healthcare workers has long required us to think outside the box to fill our recruiting needs, and that adaptability is a strength that we continue to use as we grow our business. . . . We are also continuing to evaluate our recruiting competitiveness on an ongoing basis. We are experiencing longer lead times for recruiting new talent. . . . Our top priority is ensuring that we are appropriately staffed to care for our participants.  In markets where recruitment has been slower than anticipated, we have been able to supplement with temporary labor in order to maintain appropriate staffing levels.

(¶ 259(a).)  Lead Plaintiffs allege this statement was false and misleading for the same reasons as Hewitt's statements during the September 21, 2021 earnings call regarding the Sacramento and Colorado audits.  (¶ 260(a).)

Hewitt also provided an update on the status of audits in Sacramento and New Mexico and made the following statement:

> For context, there were less than 200 participants in our Sacramento center as of the beginning of this month. . . . Finally, we will begin a routine audit in New Mexico that will be handled remotely.

27

(¶ 260(b).)  Lead Plaintiffs allege this statement was false and misleading for the same reasons as Hewitts statements during the September 21, 2021 earnings call regarding the Sacramento and Colorado audits.  (¶ 260(b).)  Additionally, they assert this statement was false and misleading because a report published two days later revealed that the New Mexico audit had "already been going on for several weeks."  (*Id.*)

Later in the earnings call, Hewitt responded to an analyst's question about CMS's referral of the Colorado audit to its Division of Compliance and Enforcement.  (¶ 259(c).) In response, Hewitt made the following statement:

> [Referral is] not unusual [and the] Colorado [audit] is a little bit different than [the] Sacramento [audit].

(*Id.*)  Lead Plaintiffs allege this statement was false and misleading because CMS's public Audit Manual explains that referrals are made either when deficiencies are serious enough to merit immediate escalation or remain unresolved after the PACE organization has been given notice and an opportunity to correct the deficiencies.  (¶ 260(c).)  Therefore, the referral represented a significant risk that InnovAge would face financial penalties or an enrollment pause.  (*See id.*)

b.  *November 9, 2021 Quarterly Report*

On November 9, 2021, InnovAge filed its Q1 2022 Quarterly report with the SEC on Form 10-Q, which was signed by Hewitt and Gutierrez.  (¶ 261.)  Lead Plaintiffs allege the 2021 Annual Report contains two false and misleading statements.  (*Id.*)  The first statement was a repetition of the Government Relationship Statement.  (¶ 261(a).) And the second statement was a repetition of the SOX certification included in the Q3 2021 Quarterly Report and 2021 Annual Report.  (¶ 261(b).)

28

I.     **Impact on InnovAge's Stock Price**

During the September 21, 2021 earnings call, Hewitt disclosed that on

"September 17, we were notified the CMS has determined to freeze new enrollments at

our Sacramento center based on deficiencies detected in the audit."  (¶ 284.)  She

noted that the "freeze will remain in effect until we correct th[e] deficiencies [identified by

CMS] and we are working on developing a corrective action plan to submit to CMS."

(*Id.*)  She further disclosed that its Colorado centers had been "the subject of three

audits over the last several months conducted by the state and CMS," that the state

audit had "completed the onsite audit work on July 22" and given the Company

"preliminary findings at that time," that "CMS completed their audit work in Colorado on

July 8," and that the Company anticipated receiving CMS's report in "early 2022."  (*Id.*)

The price of InnovAge's common stock declined over 24% from $11.65 to $8.75 on

September 22, 2021, and fell another nearly 23% to $6.76 the next day.  (¶ 285.)

On December 23, 2021, InnovAge filed a Form 8-K with the SEC, signed by

Gutierrez.  (¶ 287.)  The filing disclosed,

> On December 22, 2021[,] InnovAge was notified that CMS
> had determined to suspend new enrollments at the
> Company's Colorado centers based on deficiencies detected
> in an audit that was conducted earlier this year, the final
> results of which have not yet been disclosed to the
> Company.

(*Id.*)  As a result of the enrollment freeze, InnovAge withdrew its guidance for fiscal year

2022.  (*Id.*)  The market's reaction to this news was harsh.  (¶ 288.)  The Company's

common stock price plummeted by almost 36% from $8.25 to $5.31 on December 23,

2021, with record high volume of more than 14 million shares.  (¶ 289.)  The price at the

end of trading on December 23, 2021, represented a decline of more than 54% from the

price at the end of trading on September 22, 2021.  (*See* ¶¶ 285, 289.)

**J.      Patrick Blair's Statements**

On January 3, 2022, Hewitt announced her resignation, effective January 1, 2022.  (¶ 231.)  The Board appointed Patrick Blair as President and CEO, effective immediately.  (*Id.*)  The early months of Blair's tenure included numerous disclosures; those most relevant to the Motion occurred on May 10, 2022.  On that date, Blair and Gutierrez hosted an earnings call with investors, during which Blair stated that the Company was undertaking a "significant transformation" to achieve "near-term operational execution and mid- to long-term capability development," which he described as "the core drivers of horizons necessary to comprehensively remediate the deficiencies identified in our recent audits" and the "foundational building blocks to ensure we're well positioned for scalable, sustainable long-term growth."  (¶ 235.)

He acknowledged that the audits had found "gaps in [the Company's] performance when compared against regulatory and [its] own expectations."  (¶ 236.)  With those gaps in mind, he announced eight "initiatives" that were "intended to support the remediation of audit identified deficiencies, and earn back the trust of all stakeholders."  (*Id.*)  Those initiatives were:

> (1)"filling critical personnel gaps at each of the centers," adding that "it all begins here"; (2) "standardizing the process of our interdisciplinary care teams who plan and coordinate and deliver care"; (3) "strengthening our home care network and reliability"; (4) "improving timeliness of scheduling and coordinating care with providers outside the centers"; (5) "improving our telephonic channel response times and closing critical communication loops"; (6) "improving the efficiency and reliability of transportation for our participants"; (7) "standardizing our wound care program across the enterprise"; and (8) "reducing documentation outside of the EMR."

(*Id.*)  During the call, in response to an analyst's question, Blair identified the following

"root causes" for the deficiencies found in the audits:

> [1] "ensuring our medical records are documented with all
> the required data elements"; [2] "ensuring that our care plans
> are complete and kept timely, a lot about training and people
> in process"; [3] "making sure that [the interdisciplinary] team
> is each day capturing input from all other team members.
> Whenever that information is available, it is been
> documented in the EMR or in other tools that feed the EMR";
> [4] "making sure that our service orders are being scheduled
> on a timely basis"; and [5] "making sure that when a
> participant or a caregiver requests a service that we are
> identifying that appropriately, and we are documenting it."

(¶ 239.)

## II. LEGAL STANDARD

### A.      Rule 12(b)(6) Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a

claim in a complaint for "failure to state a claim upon which relief can be granted."  In

reviewing a motion to dismiss under Rule 12(b)(6), the Court will "assume the truth of

the plaintiff's well-pleaded factual allegations and view them in the light most favorable

to the plaintiff."  *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177.  "[T]o withstand a motion

to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief

that is plausible on its face.'"  *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008)

(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("*Twombly*")).  This

means that "[t]he burden is on the plaintiff to frame a 'complaint with enough factual

matter (taken as true) to suggest' that he or she is entitled to relief.  'Factual allegations

must be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting

*Twombly,* 550 U.S. at 545 & 556).  A plaintiff "does not need detailed factual

allegations" but must plead more than merely "labels and conclusions" or "a formulaic

recitation of the elements of a cause of action."  *Id.*  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177 (quoting *Twombly*, 550 U.S. at 556).

## B.    Sections 11,12(a), and 15 of the Securities Act

To plead a claim under Section 11 of the Securities Act, a plaintiff must allege that (1) "any part of the registration statement . . . contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"; (2) the plaintiff acquired the security that the registration statement concerned; (3) the defendant is one of the five types of defendants identified by statute; and (4) damages.[4]  15 U.S.C. § 77k(a), (e).

Section 12(a) provides that any person who "offers or sell a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . shall be liable . . . to the person purchasing the security."  *Id.* § 77l(a)(2).  Therefore, to plead a claim under Section 12(a), a plaintiff must allege that (1) the defendant offered or sold a security; (2) by means of a prospectus of oral communication that contained a material false or misleading statement or omitted information necessary to make the statement not misleading; (3) the plaintiff purchased the security; and (4) damages.  *Id.*

---

[4] The categories relevant to resolution of the Motion are: "(1) every person who signed the registration statement; (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner."

§ 77l(a)(2), (b).

Section 15 provides that "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of [Title15] shall also be liable jointly and severally with and to the same extent as such controlled person . . . , unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."  15 U.S.C. § 77o.

## C.    Section 10(b), PSLRA, and Section 20(a)

"Section 10(b) of the Securities Exchange Act of 1934 . . . prohibits making any material misstatement or omission in connection with the purchase or sale of any security."  *Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  While not explicit in the statute, the courts have "long recognized" an implied private cause of action to enforce Section 10(b) and its implementing regulations.  *Id.*

While complaints in civil actions usually require a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), a plaintiff alleging a Section 10(b) claim bears a "heavy burden at the pleading stage," *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012).  A Section 10(b) complaint must allege that

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff

33

suffered damages as a result of his reliance.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") raised the pleading standard on the first and third elements of a federal securities fraud claim, namely, falsity and scienter, beyond what had been required by Rule 8(a) or Rule 9(b).[5] *Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *4 (D. Colo. Mar. 14, 2018); *Adams*, 340 F.3d at 1096 (recognizing the PSLRA pleading requirements for state of mind are more stringent than rule 9(b), so the "PSLRA supersedes [the] part of Rule 9(b)" allowing for general allegations of state of mind).

The PSLRA requires that a plaintiff plead falsity by specifying each allegedly misleading statement, the reason why the statement is misleading, and, if made on information and belief, all facts on which that belief is formed.  *Adams*, 340 F.3d at 1095.  For scienter, the complaint must state with particularity, for each act or omission, facts giving rise to a strong inference that the defendant acted with an intent to defraud or recklessness.  *Id.* at 1095–96, 1105.

Section 20(a) mirrors Section 15 of the Securities Act, providing liability for control persons for underlying violations of "any provision" of the Exchange Act.  15 U.S.C. § 78t(a).

**D.    Items 303 and 105**

Item 303 of Regulation S–K

requires disclosure in offering documents of, among other

---

[5] Prior to the passage of the PSLRA, Rule 9(b) governed securities fraud claims and required that "circumstances constituting fraud . . . be stated with particularity.  Malice, intent, knowledge and other condition of mind may be averred generally."  *Adams*, 340 F.3d at 1095 (quoting Fed. R. Civ. P. 9(b)).

things . . . any known trends or uncertainties that have had
or that the registrant reasonably expects will have a material
favorable or unfavorable impact on net sales or revenues or
income from continuing operations.  In interpreting the scope
of Item 303, courts have relied on guidance from the SEC,
which explains that a duty to disclose arises where a trend,
demand, commitment, event or uncertainty is both [1]
presently known to management and [2] reasonably likely to
have material effects on the registrant's financial condition or
results of operations.

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236,1269 (2022) (internal quotations
and citations omitted) (alterations in original).  "Item 105 requires that offering
documents contain 'under the caption "Risk Factors" a discussion of the material factors
that make an investment in the registrant or offering speculative or risky.'"  *Id.* at 1270
(quoting 17 C.F.R. § 229.105(a)).

## III. ANALYSIS

Defendants argue that the Amended Complaint fails to adequately plead (1) any
of the identified statements were materially false or misleading; (2) any identifiable
material omissions that render the statements false or misleading; (3) any failure to
comply with SOX or Items 303 and 105 of Regulation S-K; (4) scienter; and (5) control
liability.  (ECF No. 73 at 18–54.)  Therefore, they move the Court to dismiss the
Amended Complaint in its entirety with prejudice.  (*Id.* at 54.)

## A.    Allegations Relying on Confidential Witnesses

The Amended Complaint includes numerous allegations based on information
provided by six confidential former employees ("FEs") and investigative reports from the
*Capitol Forum*.  (*See generally* ECF No. 54.)  Defendants challenge reliance on these
sources under *Adams*, 340 F.3d 1083.

1.    <u>Former Employees</u>

"The rule in this circuit is that a plaintiff is not required to disclose the source of all of the information underlying the complaint."  *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *6 (D. Colo. June 21, 2005).  The weight given to allegations supported by confidential sources depends on whether the allegations include certain indicia of reliability:

> [Such] allegations may be objectively verifiable by the defendant without the necessity of the plaintiff divulging how he or she acquired such information.  Examples may include allegations of specific contract terms, the financial result of a transaction, or specific prevailing market conditions.  Allegations of facts such as these ordinarily will not require the plaintiff to disclose how he or she learned such information before a court may give weight to the substantive allegations of fraud.

*Adams*, 340 F.3d at 1102.  The Tenth Circuit emphasized that the "case-by-case approach" it adopted under the PSLRA's pleading requirements still "heighten[s] the standard for pleading securities fraud."  *Id.* at 1103.  Therefore, "the facts alleged in an information and belief complaint[6] will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading."  *Id.*

Defendants argue that the information provided by the confidential employees is unreliable for several reasons.  Chief among these is that five of the six individuals (FEs

---

6 The Amended Complaint does not contain the phrase "information and belief"; however, the Court is thoroughly convinced that *Adams*'s analysis applies in this instance.  Lead Plaintiffs tacitly concede as much by arguing the Amended Complaint passes muster under *Adams* without disclaiming its applicability.  (*See* ECF No. 79 at 27–30.)  Moreover, the introduction of the Amended Complaint clearly states that the allegations contained therein "are based upon the investigation undertaken by Lead Counsel."  (ECF No. 54 at 7.)  Complaints that "refe[r] to the investigation of their counsel as the basis for [its] allegations . . . [are] treat[ed] . . . as having been made on information and belief."  *Adams*, 340 F.3d at 1098.

1–3, 5–6) were employed prior to the class period and the sixth's (FE 4) dates of employment are unknown.  (ECF No. 73 at 31 (citing ¶¶ 66–71).)  They assert this "alone render[s] the confidential witnesses unreliable."  (*Id.* (*citing Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *7 (N.D.N.Y. Mar. 27, 2020)).)  Lead Plaintiffs respond that "the Class Period begins on the day of the offering when the Offering Documents were filed.  Thus, to establish the falsity of the Offering Documents, Plaintiffs must rely, at least in part, on events preceding the Class Period."  (ECF No.79 at 29 (citing *In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *7–8 (S.D.N.Y. Feb 25, 2022)).)

The facts of *Adams* are critical for parsing the question presented by Defendants' argument.  *Adams* is an Exchange Act case; therefore, the Tenth Circuit interpreted and applied the section of the PSLRA that applies to claims brought under that Act.  340 F.3d at 1086, 1094–1105.  As the Court explains below, *see infra* Part III.B, the section of the PSLRA that applies to claims under the Securities Act does not include the language imposing what the Tenth Circuit has described as a "heighten[ed] pleading standard" for pleading "an information and belief complaint."  *Adams*, 340 F.3d at 1103 (applying 15 U.S.C. § 78u–4(b)(1) rather than 15 U.S.C. § 77z-1).  *Adams*'s limitations on the weight to be given allegations based on confidential witnesses is expressly premised on the language of a statute that applies only to Lead Plaintiffs' Exchange Act claims.  *Id.* ("In sum, in this Circuit we will apply a common-sense, case-by-case approach in determining whether a plaintiff has alleged securities fraud with the particularity required by § 78u–4(b)(1) . . . .").

As for the Exchange Act claims to which *Adams* clearly applies, the Tenth Circuit

has clearly eschewed per se rules like the one Defendants urge regarding confidential former employees whose employment ended before the class period.  The touchstone of sufficient information and belief pleading via confidential witnesses is a wholistic review of the allegations' reliability.  *See id.*, 340 F.3d at 1102–03.  Defendants have identified no authority in the Tenth Circuit to support their argument, and the Court is not convinced by the reasoning of *Lewis*, which discusses a case that is not binding on this Court.  *Lewis*, 2020 WL 1493915 at *7 (distinguishing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)).  The Court will therefore decline to follow *Lewis*.

The Amended Complaint describes FE 1 as a social worker employed at the Company's San Bernadino Center for between five and six months in 2019.  (¶ 66.)  FE 1 generally describes the medical services available to participants at that center in the spring of 2019 as "inadequate."  (¶ 153.)  Specifically, FE 1 reports that there was only one pharmacist on staff for 800 patients, and that he or she sent an e-mail "notifying executives that InnovAge's practices were leading to high employee turnover and poor patient outcomes" on August 9, 2019.[7]  (¶¶ 153–54.)  The Court concludes these are specific statements are independently verifiable and can be relied upon without disclosing the identity of FE 1.  Presumably, the Company has access to business records that can: (1) confirm or refute the allegation that there was only one pharmacist for 800 patients in spring 2019; and (2) locate the e-mail FE 1 allegedly sent to four of its executives.  Therefore, the Court concludes the allegations based on information from FE 1 can be relied upon with respect to the Exchange Act claims.

---

[7] This e-mail was allegedly sent to "Defendant Hewitt; Maria Lozzano, Chief Operating Officer of Western Regional Operations; Claudia Estrada, Regional Director of the San Bernardino Clinic; and Cheryl Rice, Chief Operating Officer, Western Region."  (¶ 154.)

The Amended Complaint identifies FE 2 by job title, dates of employment, and manager.  (¶ 67.)  It contains specific allegations that thousands of orders for medical care for participants were never completed (¶ 164), CMO Melissa Welch received e-mails tracking the number of outstanding orders (*id.*), and Hewitt and other executives held a conference call in November 2020 (¶ 167).  These facts can be independently verified by the Company without disclosing FE 2's identity.  Therefore, the Court concludes the allegations based on information from FE 2 can be relied upon with respect to the Exchange Act claims.

FE 3 is identified by job title, center location, and dates of employment.  (¶ 68.) The Court finds it difficult to conclude that this information will not be enough for the Company to identify FE 3.  The allegations relying on FE 3 specifically reference a 2016 internal audit and its findings (¶ 144), "thousands of physician orders for medically necessary services" that were allegedly not carried out at a specific location (¶ 147), and a specific executive's repeated requests to pause enrollment (*id.*).  Even if the Company were not likely to identify FE 3 from the allegations in the Amended Complaint, it could independently verify these allegations.  Therefore, these allegations can be considered for the Exchange Act claims.

The Amended Complaint alleges that FE 4 was "an InnovAge Center Director," who "reported to Regional Vice President of Operations Brad Alley."  (¶ 69.)  The Amended Complaint alleges based on information from FE 4 that CDPHE came onsite to conduct an audit of InnovAge's Denver location, after which the Company "sent a cease-and-desist letter claiming that CDPHE didn't have authority to conduct an audit." (¶ 165.)  Given these objectively precise allegations, the Court easily concludes the

allegations based on information from FE 4 can be relied upon with respect to the Exchange Act claims.

FE 5 is described by job title, dates of employment, supervisor, and at least one job duty. (¶ 70.) Other than that, the Amended Complaint contains only a quote that for senior leadership, the "census [was] king." (¶ 116.) This allegation cannot be independently verified without identifying FE 5 and cannot be relied upon with respect to the Exchange Act claims.

The Amended Complaint alleges that FE 6 "worked for InnovAge as a physician in the Thornton, Colorado Center from July 2014 to December 2020." (¶ 71.) FE 6 is the basis for the allegation that the Company's Denver center was enrolling participants without stable housing who were "being put up by the Denver Housing Coalition at the Western Motor Inn and other hotels in Aurora and Commerce City, Colorado." (¶ 119.) FE 6 is also the basis for the allegation that physicians were informed by e-mail of new enrollments and not involved in the decision whether to enroll new participants. (¶ 122.) And FE 6 is the basis for the allegation that physicians at the Thornton, Colorado, center had approximately double the National PACE Association's recommended case load. (¶ 183.)   Each of these are independently verifiable without identifying FE 6. Therefore, the Court concludes the allegations based on information from FE 6 can be relied upon with respect to the Exchange Act claims.

The Court rejects Defendants' assertion that allegations based on the FEs must be ignored because they are "low-level" or "locally sited" or their specific responsibilities are not pleaded with particularity. (ECF No. 73 at 31.) They offer no legal authority for this position, which they spend merely two sentences arguing. (*Id.*)

With respect to whether the Court's parsing of allegations based on confidential former employees applies to Lead Plaintiffs' Securities Act claims, the Court is compelled, in part, by the reasoning in *Tufin*.  In that case, the court credited confidential statements for the purposes of a motion to dismiss because the confidential witnesses were employed "during the operative period" prior to the IPO spawned the claim.  *Tufin*, 2022 WL 596861, at *8.  Here, Lead Plaintiffs allege that the undisclosed risks "materialized" over a period of years prior to the IPO.  (*See generally* ECF No. 54.)

Moreover, Defendants cite no case supporting the proposition that the Court should apply the rigorous pleading requirements of Section 78u-4(b)(1) to a claim brought under the Securities Act.  Therefore, the Court will consider allegations based on the statements of the FEs for purposes of Lead Plaintiffs' Securities Act claims.

2.     *Capitol Forum* Articles

Defendants argue that for "the same reasons, Plaintiffs cannot rely on confidential current or former employee statements in the *Capitol Forum* articles quoted in the Amended Complaint."  (ECF No. 73 at 31 (citing *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008)).)  Defendants argue that "[t]he allegations lack sufficient particularity to assess the witnesses' bases of knowledge, access to information, reliability, or even the time period about which they are talking—let alone how they support the allegation that the challenged statements were false or misleading at the time they were made."  (*Id.* at 32.)

Using the standards set out above, the Court concludes that most of the anonymous statements contained in the *Capitol Forum* articles cannot be used with respect to the Exchange Act claims.  The exceptions are the following statements, which the Court finds have the requisite indicia of reliability to be relied upon in the

41

manner intended by the Tenth Circuit in *Adams*: (1) the statements attributed to ombudsman Shelbie Engelking[8] (¶ 131); (2) the statements purportedly contained in an April 2021 e-mail from the director of the Pueblo, Colorado, center (¶ 191); (3) the statements Welch[9] allegedly made during Zoom meetings and conference calls (¶¶ 201, 203); (4) the statements describing "management's operational goals" during a September 10, 2021 training call with Company staff (¶ 208–09); and (5) the statement attributed to "a spokesperson" for the New Mexico Human Services Department regarding the timing of that department's audit (¶ 221).

As for all other allegations of anonymous statements contained in reporting by the *Capitol Forum*, the Court finds that they do not meet the standards set forth in *Adams,* because they give little information about the source of the statements and are not independently verifiable by Defendants.  In arriving at this determination the Court notes that it has reviewed every paragraph referencing the *Capitol Forum*, wherein (other than the exceptions noted above) the sources are variously described as "[f]ormer employees," "former social workers," "other current and former employees," "a former senior medical employee," "a former vice president," "[o]ther current employees," and "the owner of one assisted living facility that contracted with InnovAge," among other similarly vague descriptions.  (*E.g.*, ¶¶ 118, 125, 129, 139, 141, 192, 205.)

To the extent paragraphs containing references to the *Capitol Forum*'s investigatory journalism do not rely on anonymous statements, the Court will treat them

---

[8] These statements from a March 2021 *Capitol Forum* article are, of course, not even anonymous; however, the Court lists them specifically for clarity.

[9] Like the Engelking statements, these statements are specifically attributed, though the source(s) of the information is apparently anonymous.  (*See* ¶¶ 201, 203.)

as it would any other allegation in a complaint.  Conclusory statements are not entitled to the assumption of truth; however, well pleaded factual assertions are so entitled. (*See* ECF No. 73 (quoting *Optionable*, 577 F. Supp. 2d at 690 ("[A]rticles should be credited only to the extent that other factual allegations [based on anonymous sources] would be—if they are sufficiently particular and detailed to indicate their reliability.") (alteration by the Court)).)

The Court also reiterates that the pleading standard announced by *Adams* applies only to Exchange Act claims.  *See supra*, Part III.B.1.

## B.    Material False or Misleading Statements

The PSLRA imposes "specific and more stringent pleading requirements on complaints alleging securities fraud under Section 10(b)."  *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1139 (D. Colo. 2011).  With respect to claims under the Exchange Act, the PSLRA requires that

> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).  A court must then evaluate whether "the facts alleged in a complaint . . . , taken as a whole, . . . support a reasonable belief that the defendant's

statements identified by the plaintiff were false or misleading." *Adams*, 340 F.3d at 1099.  In applying this standard, the Tenth Circuit has directed courts to evaluate six factors:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Id.*  After considering these enumerated factors and "measuring the nature of the facts alleged against these indicia, [if] a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements."  *Id.*

With respect to claims under the Securities Act, while the PSLRA still imposes certain requirements, it does not impose the particularity requirements that apply to claims under the Exchange Act.  *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1190 (D.N.M. 2010) (PLSRA's heightened pleading standard does not apply to Securities Act claims); *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (same); *see* 15 U.S.C. 77z-1.  Despite this oddity, the lowerr pleading standard applicable to Securities Act claims makes no difference in this action, because all statements the Court has found not to be actionable have been rejected for reasons other than the insufficiency of the material allegations with respect to falsity.

### 1.   <u>Offering Documents Statements</u>

Defendants argue "[e]ach of the [Offering Documents] statements is either not false or misleading, or is immaterial as a matter of law."  (ECF No. 73 at 20.)

a.   *Materiality*

Defendants argue each challenged statement in the Offering Documents other than the COVID Continuity of Care Statement is an immaterial, optimistic statement about the Company's business that is not actionable.  (*Id.* at 20–23.)  They argue such statements are immaterial because a reasonable investor would not consider them important in determining whether to buy or sell the Company's stock.  (*Id.* at 20–21 (quoting *Employees' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1167 (10th Cir. 2018).)

Defendants argue the Second Circuit has addressed (and found not actionable) statements "similar to the Patient-Centered Care, Individualized and Coordinated Care, Expansion Model, Standardized and Well-Staffed Operations, Robust Compliance, Successful Medical Risk Management, Home Care, and Scalability Statements."  (*Id.* at 21.)  In *Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), the Second Circuit reasoned that JP Morgan Chase's statements

> regarding its "highly disciplined" risk management and its standard-setting reputation for integrity.  Plaintiffs point to statements such as the assertion that JPMC had "'risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process,'; that it "'set the standard' for 'integrity,'"; and that it would "'continue to reposition and strengthen [its] franchises with a focus on financial discipline'" . . . [were] no more than "puffery" which does not give rise to securities violations.

*Id.* at 205–206 (citations omitted) (first and second alteration in original).  The Second Circuit further explained that such statements did not and could not "amount to a guarantee that its choices would prevent failures in its risk management practices."  *Id.* at 206.

45

The Tenth Circuit has also recognized that puffery is not actionable because no reasonable investor would rely upon vague, optimistic statements.  *Pluralsight*, 45 F.4th at 1249.  The Tenth Circuit has recently had occasion to reiterate the distinction between material misstatements and mere puffery.  In *Pluralsight*, the Tenth Circuit described its opinion in *Level 3* as "instructive," explaining that in *Level 3* "broad claims" about a company's integration efforts following recent acquisitions were puffery, but statements about "objectively verifiable matters of fact" were "potentially actionable."  *Id.* (quoting *Level 3*, 667 F.3d at 1340).  "Saying that a project is 'progressing well' is likely not actionable, but saying it is '90% done' potentially is."  *Id.*  Defendants rely upon *Pluralsight* to argue that various of the other statements in the Offering Documents are "too vague to convey any specific level of care or to offer assurances that InnovAge perfectly manages medical risk in every instance."  (ECF No. 73 at 22–23.)

Lead Plaintiffs respond that each challenged statement in the Offering Documents is a concrete and specific statement describing "InnovAge's care delivery, compliance, and growth practices."  (ECF No. 79 at 31 (citing *Karimi v. Deutsche Bank Aktiengellschaft*, 607 F. Supp. 3d 381, 393 (S.D.N.Y. 2022)).)  They distinguish the statements in the Offering Documents from those in *JP Morgan Chase*, which they describe as involving "abstract notions of ethics, responsibility, or integrity."  (*Id.* at 32.)  Instead, they assert the statements in the Offering Documents describe "specific practices," which they juxtapose with the Company's actual practices.  (*Id.* (citing *Freudenberg v. E*TRADE Fin. Corp.*, 712 F. Supp. 2d 171, 189–90 (S.D.N.Y. 2010)).)

The Court has carefully considered each of the challenged statements in the Offering Documents and found that the following statements are not actionable:

- The Patient-Centered Care Statement, which describes the Company's approach to care delivery and the impact of its care on patients in vague and general terms such as "meaningfu[l] improve[ment]," "as long as safely possible," and "reducing over-utilization of high-cost care settings" (¶ 241(a));

- The Standardized and Well-Staffed Operations Statement, which describes InnovAge's operations as "standardized and streamlined" and speaks of "meaningfu[l]" investment in corporate infrastructure that allows physicians to focus on caring for patients (¶ 241(c));

- The Robust Compliance Statement, which—at the risk of stating the obvious—describes InnovAge's compliance infrastructure and team as "robust" (¶ 241(d));

- The Successful Medical Risk Management Statement, which describes the Company's "long track record of successfully managing medical risk" and the reasons for that "success"[10] (¶ 241(e));

- The Technology Statement, which describes the Company's use of electronic recordkeeping to "support" its care delivery (¶ 241(g));

- The Expansion Model Statement, which describes various aspects of InnovAge's expansion strategy as "disciplined," "targeted," "concerted," "scalable," "efficient," and "uniform" (¶ 241(i));

- The Scalability Statement, which describes InnovAge as having a

---

[10] This statement is unlike the post-offering statements concerning the Company's rapid growth, which attribute that growth to a specific source. *See infra*, Part III.B.2.b.i. While "growth" is a concrete concept capable of objective verification, in the Court's view "success" is a vague and subjective term.

"demonstrated ability" to "scale successfully" (¶ 241(j));

- The Virtuous Cycle Statement, which describes the Company's ability to avoid unnecessary utilization of high-cost care, reinvest savings into its business to "further improve participants' experiences and health outcomes," and "drive profitable growth" by "consistently deliver[ing] high-quality care, achieve high participant satisfaction and retention, and attract new participants" (¶ 241(k)); and

- The Government Relations Statement, which describes the Company's relationships with "Medicare and Medicaid agencies" as "strong" (¶ 241(l)).

None of these statements "cross the line from corporate optimism and puffery to objectively verifiable matters of fact." *Level 3*, 667 F.3d at 1340. Unlike the statements in *Level 3* that the Tenth Circuit held were material, none of them use specific words capable of falsification. In *Level 3*, the defendants had represented that the "majority" of work had been completed, which was "ahead of plan" and "under budget"; that "85%, 90%" of certain efforts were "done"; and a "majority" or "most" of certain other efforts were "complete." *Id.* Each of these statements can be proven wrong or in conflict with reality at the time they were made: "most" and the "majority" mean more than 50%, specific percentages like 85% or 90% are self-evidently verifiable, and being "ahead of plan" and "under budget" are objectively verifiable when compared with a specific plan and budget.

In comparison, the statements the Court concludes are vague or puffery, do not contain words with similarly concrete and specific meanings. Rather, they represent information in subjective terms incapable of verification or falsification. In the Court's

view, there is no plainly obvious and objective meaning of the terms or phrases "meaningfully improve[d]" quality of care, "over utilization of high-cost care," "streamlined" operations, "robust" compliance measures, "disciplin[e]," "efficien[cy]," "succes[s]," "improve[d] . . . experiences and health outcomes," or "high participant satisfaction and retention."  And, therefore, unlike the statements in *Level 3*, these statements do not "cross the line" from optimism and puffery to material statements.  As such, each of these statements is not actionable.

       b.    *Adequacy of Allegations that Statements Were False or Misleading*

Defendants challenge the three remaining statements[11] as inadequately pleaded, specifically with respect to being false or misleading when made.  (ECF No. 73 at 23–29.)  They address these statements together.  (*Id.* at 24–27.)  In Defendants' view, statements made by Blair that seem to undercut the Individualized and Coordinated Care, COVID Continuity of Care, and Home Care Statements were not an admission that InnovAge had failed to do what it represented to investors, rather they only announced initiatives intended to strengthen and improve the Company's business.  (*Id.* at 24.)  They argue such initiatives do "not make these statements false when made over a year earlier."  (*Id.* (citing *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 412 (S.D.N.Y. 2020)).)

They further argue that "the [challenged] statements accurately describe the way InnovAge has designed its business to operate."  (*Id.* at 25.)  Moreover, they argue that to find these statements material, the Court must conclude a reasonable investor would take these statements as assurances that the Company would "perfectly execute all of

---

[11] Specifically, those statements are the Individualized and Coordinated Care, COVID Continuity of Care, and Home Care Statements.

its business practices, particularly when disclosures revealed InnovAge had previously

been found to have violated PACE regulations and warned of the potential for future

such findings." (*Id.* (citing *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019)).)

Defendants compare this action to *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d

199 (S.D.N.Y. 2018), where the court dismissed a claim of securities fraud alleging that

the following statement was false and misleading:

> [Chipotle's] quality assurance department establishes and
> monitors our quality and food safety programs for our supply
> chain.  Our training and risk management departments
> develop and implement operating standards for food quality,
> preparation, cleanliness and safety in the restaurants.

(ECF No. 73 at 25 (quoting *Ong*, 294 F. Supp. 3d at 219).)  The plaintiffs in that case

alleged this statement was false and misleading because Chipotle did not "adequately

monitor" its food safety programs, "failed to live up to its own food safety standards,"

ignored internal audit results, and conducting deficient internal audits.  (*Id.* (quoting

*Ong*, 294 F. Supp. 3d at 219).)  The court dismissed the complaint, reasoning that the

plaintiffs did not allege Chipotle failed to undertake the efforts described in the

statement and merely alleged Chipotle failed to do so "adequately."  (*Id.*)  Defendants

cite *Nardy v. Chipotle Mexican Grill, Inc.*, 2019 WL 3297467 (D. Colo. Mar. 29, 2019)

and *Crocs* as similar cases supporting dismissal.  (ECF No. 73 at 26.)

Defendants also urge that the Individualized and Coordinated Care and COVID

Continuity of Care Statements are not adequately alleged as false and misleading by

omission because: (1) the allegations rest on InnovAge's failure to disclose audit results

that were publicly available (2) the Amended Complaint fails to "adequately allege a

nexus between the omitted information and challenged statements"; and (3) the

allegations do not satisfy the PSLRA's heightened pleading standard because they rely

on confidential witnesses and the *Capitol Forum* articles.  (ECF No. 73 at 29–32.)  The second and third of these arguments rely entirely on other arguments the Court has already discussed.  (*Id.* at 30–32; *see supra*, Parts III.B.1.a, III.A.)

Lead Plaintiffs argue that "[o]nce Defendants chose to tout InnovAge's execution of its care model in the Offering Documents, they undertook an 'obligation to *speak truthfully'* and to provide 'complete and non-misleading information.'"  (ECF No. 79 at 20 (quoting *Or. Laborers Emp'rs Pension Trust Fund v. Maxar Tech. Inc.*, 2020 WL 5500458, *10 (D. Colo. Sep. 11, 2020) (emphasis in *Maxar*)).)  Therefore, because the Company chose to disclose information describing its business practices, it was obligated to also disclose that it was consistently failing to execute its care model in compliance with regulatory standards.  (*Id.* (citing *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018)).)

Lead Plaintiffs explain that Defendants' argument that the Amended Complaint seeks to impose liability for failing to perfectly execute the Company's business model misstates their legal theory.  They insist that the statements were false and misleading because they failed to disclose that the Company's failure to "deliver adequate and minimally compliant care . . . compromised the Company's sole source of revenue and paralyzed its ability to expand."  (*Id.* at 21.)  They argue that the Court should adopt the reasoning in *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), which held that statements that, while "technically true" can be misleading if they "comfort" investors that "reasonably effective steps [are] being taken to comply with applicable . . . regulations" when, in fact, those steps are "failing to prevent substantial violations."  (*Id.* at 21–23; *Jinkosolar*, 761 3d. at 251.)

With respect to Defendants' argument that Blair merely announced "new" initiatives to "strengthen" or "improve" the Company's practices, rather than admitting the practices were previously inadequate, Lead Plaintiffs respond that the remarks made clear that "InnovAge failed to execute the specific practices that the Offering Documents touted as a 'proven' success." (*Id.* at 23–24.)

As for Defendants' argument that certain statements are "not actionable because the Offering Documents included cautionary disclosures," Lead Plaintiffs respond that such disclosures can only protect "forward-looking" statements. (*Id.* at 24.) They further argue that the disclosures are not sufficiently specific to "nullify any potentially misleading effect." (*Id.* (quoting *SEC v. Mahabub*, 343 F. Supp. 1022, 1045 (D. Colo. 2018)).) "Vague disclaimers that a 'lack of availability of clinical personnel' affecting 'all health care providers' or that InnovAge 'might fail to implement its policies' cannot sufficiently cure the misinformation conveyed by descriptions of policies and procedures that InnovAge was then failing to execute in compliance with regulatory standards." (*Id.* at 24–25 (citing *Karimi*, 2022 WL 2114628, at *10).)

Lead Plaintiffs respond to Defendants' argument that the Individualized and Coordinated Care and COVID Continuity of Care Statements are not actionable because the audit results were public by asserting that the "truth-on-the-market" defense it evokes is (1) premised on the preexistence of an efficient market in a company's stock and (2) "seldom grounds for dismissal at the pleading stage" because it is fact intense. (ECF No. 34–35.)

Defendants argue in reply that the Court should ignore Lead Plaintiffs' characterization of certain audit results as a "fac[t] not alleged in the complaint." (ECF

No. 83 at 13 n.6 (quoting WJM Revised Practice Standard III.D.1).)  And they argue

that, even if the Court accepts that characterization—that the audits' findings were "at

the time of the IPO"—the Court should find that the results do no "support claims of

company-wide deficiencies."  (*Id.*)  They then recapitulate their arguments about the

"total mix" of information available to the investing public and the pleading requirements

of *Adams.*  (*Id.* at 14–16.)

After careful consideration, the Court concludes that the Individualized and

Coordinated Care, COVID Continuity of Care, and Home Care Statements are

adequately alleged as false and misleading.  Absent a duty to disclose, a corporation is

not required to disclose a fact merely because a reasonable investor would like to know

that fact.  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  However, "at the

moment the company chooses to speak, it takes upon itself the obligation to *speak*

*truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b)

claim."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphasis in

original); *United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013) (where a party

"*elects* to disclose material facts, he must speak fully and truthfully, and provide

complete and non-misleading information" (emphasis in original)).

The properly considered allegations in the Amended Complaint paint a picture of

a business under enormous regulatory risk.  Its sole source of revenue was the

capitation payments.  These payments came with strings (in the form of strict

regulations and frequent audits) attached, and the potential penalties for failing to

provide adequate care for participants included an involuntary pause of enrollment.

There simply can be no doubt that withholding information concerning facts that could

literally cap revenue in a business's largest market (plus an additional market) would "significantly alte[r] the total mix of information available" to investors. *United Food and Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014) (quoting *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013)).  Instead of revealing this information, the remaining challenged Offering Documents statements provide a rosy picture of the Company's business model, providing "comfort" to investors in a company at the frontier of for-profit PACE business.  *See Jinkosolar*, 761 3d. at 251.  Searching for ways to increase margin and pursuing meteoric growth using a theretofore untested business model is inherently risky—as such, comforting statements to potential investors are especially noteworthy in this context and therefore in this action.

At this stage, the Court rejects the assertion that the Individualized and Coordinated Care and COVID Continuity of Care Statements are not actionable because of publicly available information.[12]  The Tenth Circuit has explained that "an omission is material only if disclosure of what is omitted would 'significantly alter[ ] the total mix of information available'" to a reasonable investor.  *United Food*, 774 F.3d at 1233, 1238 (quoting *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013) (alteration in original)).  "[A] 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing."  *Id.* (quoting *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656–57 (4th Cir. 2004) (alteration in original).  Therefore, "[p]ublic documents are part of that total mix if an investor interested in a particular type of information about a

_____

[12] The Court notes Defendants' argument, though made in challenging falsity, is better aligned with the Tenth Circuit's case law considering materiality.

company would know of the existence of the record and could readily access it." *Id.* (citing *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993)).

While this language may prove useful to Defendants at a later stage, such arguments require an "intensely fact-specific" inquiry that is "rarely an appropriate basis for dismissing a § 10(b) complaint." *Gelt Trading, Ltd. V. Co-Diagnostics, Inc.* 2022 WL 716653, at *5 n.2 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).  Though the district court and Tenth Circuit had the benefit of a full record to conduct such an inquiry in *United Food*, at this early pleading stage of this litigation the Court does not have a similarly developed record before it.  *United Food*, 774 F.3d at 1232, 1234–39.

Therefore, the Court concludes the Individualized and Coordinated Care, COVID Continuity of Care, and Home Care Statements are adequately pleaded as materially false and misleading.

c.     *Items 105 and 303*

Defendants argue the Offering Documents fulfilled the disclosure requirements of Items 105 and 303 of Regulation S-K.  (ECF No. 73 at 41.)  Together, these regulations required the Offering Documents to include "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §§ 229.105(a), 229.303(b)(2)(ii).  Defendants contend the Offering Documents "were replete with disclosures that precisely addressed" the risks the Amended Complaint alleges were omitted.  For example, the

Risk Factors section of the Offering Documents contained, among others, the following disclosures:

- "If we fail to manage our growth effectively, we may be unable to execute our business plan, maintain high levels of service and participant satisfaction or adequately address competitive challenges."

- "We have experienced, and may continue to experience, rapid growth and organizational change, which has placed, and may continue to place, significant demands on our management and our operational and financial resources."

- "If we fail to effectively manage our anticipated growth and change or fail to ensure that the level of care and services provided by our employees complies with regulatory and contractual requirements, the quality of our services may suffer."

(ECF No. 74-1 at 11.)  The Risk Factors section also contains an extensive discussion of "[r]isks related to regulation."  (*Id.* at 15–22.)  This section included disclosures that InnovAge was subject to strict and complex regulation and audits, and that failure to comply with regulations could result in "enrollment sanctions that may impede [its] ability to expand."  (*Id.* at 22; *accord id.* at 24.)  Defendants argue the Risk Factors section also adequately disclosed "existing and potential staffing challenges."  (ECF No. 73 at 42 (citing ECF No. 74-1 at 9–11).)  Finally, Defendants argue that even if required information was omitted as alleged, the Amended Complaint fails to allege that any of the omissions were knowing.  (*Id.* at 42–43.)

Lead Plaintiffs argue the disclosures referenced above are "generic" and do not

56

comply with Regulation S-K.  (ECF No. 79 at 36.)  Moreover, they do not disclose—much less discuss and analyze—the fact that "InnovAge reasonably expected its growth strategy to have a material and unfavorable effect on revenue."  (*Id.*)  They also argue that they need only allege that the trends or risks were "presently known to management," not any particular individual in management.  (*Id.* at 36–37.)  They allege the Amended Complaint meets this bar, but do not cite to any particular paragraphs—leaving the task of deciphering this contention to the Court.  (*See id.*)

The Court finds the disclosures are not remotely close to being "generic."  They identify specific risks and uncertainties, give reasons why the disclosed facts present risks or uncertainties, and describe the precise sanction that led to the events underlying this action.  The Offering Documents even point out that the Company's business is concentrated in Colorado and that it is "particularly susceptible to any . . . adverse developments in that state."  (ECF No. 74-1 at 10.)  The Court, therefore, concludes the Offering Documents complied with Regulation S-K.[13]

2.    Post-Offering Statements

The Court considers only unique statements in this section of its Order.  For any allegedly false or misleading statements that are merely repetitions of challenged statements contained in the Offering Documents, the Court does not repeat the analysis it has just conducted.

---

[13] This ruling is not in conflict with the Court's ruling on the Individualized and Coordinated Care, COVID Continuity of Care, and Home Care Statements because the allegations relating to Regulation S-K focus on the risks and related disclosures stemming from "the Company's enrollment growth strategy," not the quality or nature of care provided.  (¶ 331.)

a.   *Materiality*

(i)   Staffing Statement

Defendants argue that "[a]t least one of the 12 Post-Offering Statements[14] Post-Offering Statements is a nonactionable, 'general statement of corporate optimism." (ECF No. 73 at 32 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).)  Specifically, they argue that Hewitt's statement during the May 10, 2021 earnings call that InnovAge had kept staff turnover down and was "very successful as compared to other long-term care organizational results" is not actionable for this reason.  (*Id.*)  The Court agrees.  Terms such as "down" and "very successful" are vague and subjective.  Therefore, they are not actionable.  *See supra*, Part III.B.1.a.

(ii)   New Mexico Audit Statement

Defendants argue Hewitt's statement during the November 9, 2021 earnings call that InnovAge would "begin a routine audit in New Mexico that will be handled remotely" is not adequately alleged as false because the Amended Complaint does not "explain why the precise time the audit began is material, nor does it allege the disclosure of the audit's nature was inaccurate."  (EFC No. 73 at 39.)  They continue that "[s]ince the duration of any audit is not fixed, there is no reason the precise time it begins would be material.

Lead Plaintiffs argue that the length of an audit signals its seriousness; therefore, by suggesting to investors that the audit had not yet begun, Hewitt could avoid disclosing the seriousness of the audit already underway in New Mexico.  (ECF No. 79

---

[14] Defendants identify twelve challenged post-offering statements, (*see* ECF No. 73-1 at 4–6); though the Court breaks them out somewhat differently in Part I.H, *supra*, the content of the statements is the same.

at 49.)  They also point out that in the same *Capitol Forum* article in which the spokesperson for the New Mexico Human Services Department confirmed the audit had begun "weeks" before the November 9, 2021 earnings call, the spokesperson added that CMS began its previously scheduled routine audit of InnovAge's Albuquerque center early "due to what's being going on in other states" (*i.e.*, Colorado and California).  (*Id.* (citing ECF No. 74-17 at 2).)

Despite Defendants' framing of their argument and its location in the Motion itself, it is really an argument about materiality.  Therefore, the Court addresses it under that framework.  The Court finds the Amended Complaint adequately alleges that this statement was material.  Though the Amended Complaint does not contain the allegation that deficiencies uncovered in other audits affected the New Mexico audit's timing, it is contained in an article the Amended Complaint incorporates by reference and is properly considered.  *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  The Court is satisfied that disclosing the special interest displayed by the New Mexico auditors would have significantly altered the total mix of information available to investors.

    b. *Adequacy of Allegations that Statements Were False or Misleading*

     (i) Statements Concerning Organic Growth

Defendants argue that the three statements[15] related to "organic growth" that Lead Plaintiffs challenge are not false and misleading as a matter of law.  (ECF No. 73 at 33.)  Lead Plaintiffs allege that these statements were false and misleading because the Company was sustaining its growth by enrolling participants without stable housing,

---

[15] Made in May and September of 2021.  *See supra*, Parts I.H.1, I.H.2.

which created a regulatory risk that endangered future growth.  (*Id.*; *e.g.*, ¶¶ 246–47, 249(a), 253.)  Defendants argue that the "statements accurately disclose that InnovAge's growth was due to participant enrollments."  (ECF No. 73 at 33.)  They also repeat their argument that these statements are not actionable because the allegedly withheld information was "already repeatedly [publicly] disclosed."  (*Id.* at 34.)

Lead Plaintiffs respond that Hewitt described the Company's growth as "organic" in each statement, despite knowing the growth was being driven by "improper enrollment and disenrollment practices, and a growth strategy that prioritized enrollment without regard to capacity."  (ECF No. 79 at 38.)  Rather than accurately describing the source of the Company's growth from increased enrollment, Lead Plaintiffs argue the statements misled investors by suggesting the Company was simply utilizing excess capacity in existing and new centers, when in reality, the growth was so significant that it impaired participants' quality of care and violated regulations.  (*Id.* at 37–38.)  These facts presented a risk that regulators would pause enrollment—the only method for InnovAge's continued growth.

The Court is not persuaded that the description of the enrollment and disenrollment practices described in the Amended Complaint as "organic" is false or misleading.  Both Hewitt's specific statements and analyst reactions to the Company's December 23, 2021 disclosures evidence that describing the Company's growth as "organic" is not a statement about enrollment practices.  Hewitt's statements in the September 21, 2021 press release identifies three kinds of growth InnovAge was pursuing: "organic growth, *de novo* locations in existing and new states, and acquisitions."  (¶ 252.)  A report by an unidentified J.P. Morgan analyst following the

December 23, 2021 disclosures described those disclosures as "call[ing] into question the company's ability to hit its organic and inorganic (both M&A and *de novo*) growth targets."  (¶ 288.)  While these statements categorize InnovAge's three growth strategies slightly differently, it is clear that Hewitt meant "organic growth" to mean increased enrollment in existing centers, and investors *understood* her statements in this way.  (*See* ¶ 271 (quoting an investment analyst describing the Company as having "substantial capacity to accelerate organic growth in its current centers . . . .").)  All of this is generally in accord with the Court's understanding that organic growth describes growth stemming from a company's normal business operations and inorganic growth describes growth from mergers with or acquisitions of other preexisting businesses.

But whether describing the Company's growth as "organic" is false and misleading does not decide actionability with respect to all of Hewitt's statements. When a company specifically attributes its business performance to a particular source, but the true source of that performance is something else, that statement is false and misleading.  *See Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1151–53 (D. Colo. 2019); *SEC v. Woodruff*, 778 F. Supp. 2d 1073, 1086–87 (D. Colo. 2011).  Only Hewitt's statements during the opening remarks of the May 10, 2021 earnings call attributes the Company's organic growth to a specific source: "increasing participant enrollment and capacity within existing centers." (*Compare* ¶ 248, *with* ¶ 246, *and* ¶ 252.)  Therefore, only that statement is potentially actionable.  And because the Amended Complaint contains numerous allegations that the sources of InnovAge's impressive growth were actually certain questionable enrollment practices, the Court concludes the falsity of this statement is sufficiently

alleged.[16]  (*E.g.*, ¶¶ 119–20.)

(ii)    Staffing Statements

Defendants argue the four post-offering statements "about InnovAge coping with staffing shortages" are not adequately alleged as false and misleading because the Company "repeatedly disclosed the fact of staffing shortages in the Offering Documents and subsequent public filings."  (ECF No. 73 at 34 (citing ¶¶ 248(b)[17], 250(b), 254(a), 259(a)).)  Given these disclosures, they argue no reasonable investor could understand the statements "as a guarantee" the Company was maintaining adequate staffing levels.  (*Id.*)  And they more generally argue that the Amended Complaint fails to sufficiently allege these statements were actually false.  (*Id.* at 34–35.)

Lead Plaintiffs respond that the statements do not need to be interpreted as guarantees to be false and misleading.  (ECF 79 at 40.)  And much like the statements relating to the Company's growth, they argue these statements are misleading because thy attributed staffing challenges to the COVID-19 pandemic, rather than their true sources: "working conditions and growth strategy causing high turnover and an inability to fill positions."  (*Id.* 40–41.)  They also urge that despite one statement being preceded by the phrase "I think," it is not a statement of opinion.  (*Id.* at 42 (citing *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1120 (10th Cir. 2014)).)

The Court concludes these statements are adequately alleged as false and

---

[16] To the extent the disclosures discussed in Part III.B.1.c, *supra*, may render these statements immaterial, a ruling to that effect is premature.  *See supra*, Part III.B.1.b.

[17] The Court has already found this statement is immaterial, *see supra*, Part III.B.2.a.i., and so addresses it no further.

62

misleading.  The statements represent that InnovAge was: (1) "fully" (*i.e.*, appropriately) staffed to execute participant care plans; (2) experiencing staffing issues due to a competitive environment typical of "all healthcare organizations"; and (3) facing staffing challenges as a result of a shortage of qualified healthcare workers due to historical trends and the pandemic but had supplemented with "temporary labor in order to maintain appropriate staffing levels."  (¶¶ 250(b), 254(a), 259(a).)  These statements are not guarantees, but they convey present information (over the course of several months) about the Company's staffing situation in a labor-intensive industry and the reasons for that staffing situation.  These statements contradict the allegations in the Amended Complaint setting out the real reasons for InnovAge's challenges staying appropriately staffed: poor working conditions and rapid enrollment growth beyond capacity.  (*E.g.*, ¶ 260.)  And to the extent these statements simply leave out information previously disclosed, they are comforting statements like those discussed in Part III.B.1.b.

(iii)    Deficient Participant Assessments and Care Plans Statement

With respect to the statement concerning failures at certain centers to complete the required participant assessments and care plans contained in the Q3 2021 Quarterly Report, Defendants argue only that the Company previously disclosed "historical audit deficiencies and the potential for future audits."  (ECF No. 73 at 35–36.) The Court rejects this argument, as it goes to materiality, and not the truthfulness of the statement.  *See supra*, Part III.B.1.b n.11.  This argument is also better left for a later stage of these proceedings upon a more complete factual record.

63

(iv)     Government Payors Statement

Defendants challenge the adequacy of the allegation that the statements in the Q3 2021 Quarterly report that ""[m]aintaining, supporting and growing these relationships [with government payors] . . . is critical to our long-term success and '[o]ur model is aligned with the interests of our government payors' are false and misleading because InnovAge 'failed to recognize and process complaints as grievances.'"  (ECF No. 73 at 36 (quoting ¶¶ 250(d), 251(d)) (alterations in original).)  According to Defendants, recognizing and processing complaints as grievances "has nothing to do with the subject of the statements."  (*Id.*)

Lead Plaintiffs argue that the statement that the Company's model was "aligned with the interests" of the government payors, "conveyed that InnovAge took reasonably effective steps to comply with its contractual and regulatory obligations, and was forthcoming, transparent, and honest in its dealings with regulators—the Company's only customers and source of 99% of the Company's revenue."  (ECF No.79 at 43.)

The Court agrees.  The Amended Complaint contains numerous facts alleging an uncooperative—and even obstructionist—relationship with government payors.  (*E.g.*, ¶¶ 165, 190, 192–94.)  Therefore, the Court concludes this statement is adequately alleged to be false and misleading.

(v)     September Audit Statements

Defendants argue that Hewitt's statements concerning ongoing audits during the September 21, 2021 earnings call were not false and misleading for five reasons: (1) the *Capitol Forum* article reporting that CMS had found similar results to those found in Colorado during an earlier audit of the Company's operations in California is unreliable because the article does not sufficiently identify its source; (2) the Amended Complaint

does not allege that audits are an uncommon occurrence, and CMS's pause in trial and routine audits was public information; (3) the fact that there were preliminary findings in Colorado similar to the Sacramento audit does not render the statement that no immediate corrective actions were identified false; (4) the Company was under no obligation to disclose preliminary audit findings that were subject to change; and (5) the Amended Complaint does not allege that Hewitt's statement that the Sacramento and Colorado audits were "different" was false.  (ECF No.73 at 36–38.)

Lead Plaintiffs respond: (1) the *Capitol Forum* article can be relied upon; (2) the mere public availability of information about CMS's modified audit practices on its website is insufficient to require dismissal at this stage; (3) the Company was in possession of preliminary results from the Colorado audit, which were substantially the same as the findings from the Sacramento audit that were negatively received by analysts; (4) it was misleading for Hewitt to reassure investors that they did not know the results of the Colorado audit when they were in possession of the preliminary results; and (5) Hewitt's technically true statements that the two audits were "different" is still misleading to investors based on the context of the analysts' questions that prompted the statements.  (ECF No. 79 at 45–47.)

With respect to the reliability of allegations premised on the *Capital Forum* article, the Court has already determined that the allegation related to Hewitt's September statements is sufficiently pleaded.  *See supra*, Part III.A.2.  Consistent with its other rulings in this Order, the Court will not find these statements to be not actionable as a matter of law simply because contradictory information was elsewhere available without the benefit of a full record.  *See, e.g., supra*, Part III.B.1.b.  Nor does the Court agree

that the Amended Complaint must allege that audits were uncommon for Hewitt's statements to be actionable.

The Court concludes, however, that Lead Plaintiffs have not sufficiently alleged that the statement that no immediate corrective actions had been yet identified was false.  The Court does not reach this conclusion based on Defendants' cited authority that "a company need not disclose all communications with a regulator even where the regulator has notified the company about its operation's deficiencies."  *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 311 (D. Conn. 2017).  The paragraph from which that statement is taken repeatedly cites *Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456 (S.D.N.Y. 2016), *vacated and remanded by*, 718 F. App'x 20 (2d Cir. 2017).  *Singh*, 277 F. Supp. 3d at 311.  In fact, *Singh* cites *Alibaba* for the proposition quoted by Defendants and the Court above.  *Id.*

A little more than two months after *Singh*, the Second Circuit vacated *Alibaba*, finding error in the district court's reasoning on this very issue.  718 F. App'x at 23 ("Accepting Plaintiffs' allegations as true, Defendants had a duty to disclose these facts, in a manner that accurately conveyed the seriousness of the problems Alibaba faced, so as not to render Defendants' public disclosures "inaccurate, incomplete, or misleading."")  Nevertheless, there is nothing in the Amended Complaint to suggest that the Company was already aware of "immediate corrective actions" resulting from the Colorado audit.  "Immediate Corrective Action Required" ("ICAR") is a term of art, (*see* ¶ 150), and there are no allegations that specifically identify what, if any, ICARs were identified in the preliminary findings of the Colorado audit or the Sacramento audit—to which Lead Plaintiffs allege the Colorado audit findings were "substantially the same."

(¶ 255(b).)

The statement that the Sacramento and Colorado audits were "very different things" is actionable, despite Defendants' arguments that the Company was under no obligation to disclose the audits' specific preliminary findings.  (*Id.*)  Nor is the Court convinced by Defendants' argument that the Amended Complaint need specifically allege that the two audits were not "different."[18]  This statement was made in the context of the Company's disclosure that its Sacramento center was subject to an involuntary enrollment freeze, resulting from a regulatory audit.  (¶ 284.)

Moreover, during the same earnings call, Hewitt disclosed that the Company was subject to three ongoing audits in Colorado, the core region of its business.  (*Id.*)  She distinguished the Colorado audits from the Sacramento audit as "very different" and specifically noted that the freeze was limited to the Sacramento center and did not even impact other centers in California.  (¶¶ 255(b), 286.)  These statements together implied that a freeze of enrollment in Colorado was unlikely, and at least one analyst interpreted these statements precisely that way.  (¶ 288.)  Coupled with the allegation that InnovAge was in possession of preliminary findings that were "substantially the same" as the findings that resulted in the Sacramento freeze, the Court finds that this statement is adequately alleged as false and misleading.  (¶ 255(b).)

(vi)    November Audit Statements

Defendants argue that Hewitt's statements about the Sacramento and Colorado audits during the November 9, 2021 earnings call are not adequately alleged as false and misleading for several reasons.  (ECF No. 73 at 38–39.)  They argue that the

---

[18] This argument causes the Court to wonder if, in Defendants' view, the only allegation that would make this statement false is the allegation that the audits were literally the same.

Amended Complaint itself undercuts the assertion that Hewitt's statement that audits are "not unusual" in the PACE business was false and misleading.  (*Id.* at 38.)  The Amended Complaint "acknowledges that [CMS's] Oversight and Enforcement Group 'oversees, coordinates[,] and conducts the audits of all PACE organizations.'"  (*Id.* (quoting ¶ 260(c)).)  They also explain that the statement must be considered in full context, including the qualifier that a referral is "not an uncommon practice per se" and that Hewitt did disclose that "further action" due to the referral was "possible."  (*Id.* at 38–39.)  They also point out that CMS's Audit Guide "describing the potential significance of a referral to enforcement is publicly available."  (*Id.* at 39.)

With respect to Hewitt's statement that the "Colorado [audit] is a little bit different than Sacramento," they stress that she prefaced this statement with the phrase "I think." (*Id.*)  Therefore, they argue the statement is a nonactionable statement of opinion.  (*Id.* (citing *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018)).)

Lead Plaintiffs respond that these statements are actionable because they "misled investors into believing that the deficiencies identified in Sacramento did not suggest company-wide problems."  (ECF No. 79 at 48.)  They argue that Defendants' reference to the Oversight and Enforcement Group is misdirected because the referral Hewitt was referencing was to the Division of Compliance and Enforcement, "which is responsible only for enforcement determinations."  (*Id.*)  They argue referrals to that division are only made when deficiencies are serious enough to potentially merit an enforcement action.  (*Id.* (citing ¶ 260(c)).)

As for the statement that the audits were "a little bit different," they argue that the Tenth Circuit has held that simply prefacing a statement with "[I] think," "[I] believe," or

"In [my] opinion . . . may usually suggest an opinion follows, [but] it doesn't guarantee it."  *MHC*, 761 F.3d at 1120.  Further, the Tenth Circuit has held that even an opinion is actionable if not consistent with the facts.  *SEC v. GenAudio Inc.*, 32 F.4th 902, 924 (10th Cir. 2022) ("[N]o matter how heartfelt their subjective beliefs, corporate executives . . . cannot make material representations to shareholders in disregard or contravention of obvious facts, nor can they find absolution in the failures of others to disabuse them of their magical thinking regarding obvious facts.").

After considering these arguments, the Court concludes that these statements are adequately alleged as false and misleading.  After Hewitt disclosed that the Colorado audits had been referred to the Division of Compliance and Enforcement, an analyst asked whether "there was something that caused it to be referred in the CMS review."  (ECF No. 74-11 at 21.)  Hewitt initially equivocated—saying both that referrals are "not unusual" and that the Company did not know if "the agencies are intending to suspend or otherwise curtail o[u]r programs or impose other sanctions."  (*Id.*)  But at the end of her response to this question, Hewitt said, "I do think Colorado is a little bit different than Sacramento . . . ."  (*Id.*)  This statement can only be understood as a reassurance that sanctions similar to those imposed on the Sacramento center were unlikely, and even if this were Hewitt's honest, personal opinion, it disregards the obvious and critical fact that the preliminary results of the Colorado centers yielded similar results as did the audit in Sacramento.  *See GenAudio Inc.*, 32 F.4th at 924.

c.   *Post-Offering Repetitions of Offering Document Statements and SOX Certifications*

Defendants argue that all challenged statements in certain SEC filings that are repetitions of challenged statements contained in the Offering Documents are not

actionable for the same reasons as when they were made in the Offering Documents. (ECF No. 73 at 40.)  Of the challenged statements that were repeated post offering, the Court has found all but the COVID Continuity of Care Statement and the Home Care Statement to be immaterial.  (*Compare* ¶ 251(a), *and* ¶ 257(a), *and* ¶ 261(a), *with supra*, Part III.B.1.a.)  For the same reasons articulated above, the Court finds the repetitions of these two statements are actionable, and the other statements it has already found to be immaterial are not.

**C.     Argument Specific to the Securities Act**

Defendants argue that the Securities Act claims should be dismissed because they sound in fraud and fail to meet the pleading requirements imposed by Rule 9(b). (ECF No. 73 at 49–51.)  Referencing the same arguments made with respect to materiality and falsity discussed in Part III.B.1.a and III.B.1.b of this Order, they argue "the Offering Document Statements are either too vague to be material, or are not false or misleading." (*Id.* at 51.)  Though Defendants readily concede that the Tenth Circuit has not ruled (as some courts have) that Rule 9(b) applies to Securities Act claims sounding in fraud, (*id.* at 50), Lead Plaintiffs do not respond to this argument and have, therefore, waived any opposition they may have to Rule 9(b)'s application.[19]  (ECF No. 79 at 58–59.)

In any event, the Court has already found that each of the Offering Document statements are either immaterial or meet the higher pleading standards imposed by the PSLRA.  Therefore, even though the Court applies Rule 9(b) to the Securities Act

---

[19] Lead Plaintiffs only contest the application of Rule 9(b) with respect to their Securities Act claims against other defendants, whose motion to dismiss will be ruled upon in a separate Order.  (*See* ECF No. 79 at 58–59.)

claims against Defendants, as a practical matter it makes no difference here.

Therefore, the Court concludes that Lead Plaintiffs have adequately pleaded Securities

Act claims based on the Individualized and Coordinated Care, COVID Continuity of

Care, and Home Care Statements.

**D.      Argument Specific to the Exchange Act: Scienter**

The only argument Defendants make specific to the Exchange Act claims is that

the Amended Complaint inadequately pleads scienter.  (*See* ECF No. 73 at 43–49.)

To establish scienter, Lead Plaintiffs must "state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind."  15

U.S.C. § 78u-4(b)(2)(A).  Scienter in this context requires "a mental state embracing

intent to deceive, manipulate, or defraud, or recklessness."  *Adams*, 340 F. 3d at 1105

(internal quotation marks omitted).  Recklessness is "conduct that is an extreme

departure from the standards of ordinary care, and which presents a danger of

misleading buyers or sellers that is either known to the defendant or is so obvious that

the actor must have been aware of it."  *City of Philadelphia v. Fleming Cos., Inc.*, 264

F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks omitted).

A court inquires "whether *all* of the facts alleged, taken collectively, give rise to a

strong inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 323 (2007) (emphasis in original).  The court "must take into account plausible

opposing inferences."  *Id.*  However, it will not allow allegations of "fraud by hindsight,"

*i.e.*, "allegations that defendants should have anticipated future events and made

certain disclosures earlier than they did."  *City of Philadelphia*, 264 F.3d at 1260.

1.    <u>Blair's May 2022 Comments</u>

Defendants argue Blair's statements on May 10, 2022, do not give rise to a strong inference of scienter.  (ECF No.73 at 44.)  They argue that is because all Blair's comments did was "acknowledg[e] deficiencies" and announce efforts to remedy them. (*Id.*)  Lead Plaintiffs argue that statements acknowledging pre-existing issues support the inference that an earlier statement was a known material misrepresentation.  (ECF No. 79 at 53 (quoting *Pluralsight*, 45 F.4th at 1263).)

Tenth Circuit law seemingly supports both views.  The Tenth Circuit has very clearly stated that "the implementation of [a new] policy . . . [is] at most an acknowledgment that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the alleged omissions occurred."  *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015).  It reaffirmed this rule in *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1248 (10th Cir. 2016).  In *Pluralsight*, however, the Tenth Circuit found that subsequent statements about sales staffing that contradicted an earlier statement supported the inference that the earlier statement was a knowing material misrepresentation.  45 F.4th at 1262–63.

Whatever tension there may be between these cases dissolves upon close consideration of their precise language and facts.  *In re Zagg* concerned a failure to disclose that the company's CEO, who owned an 18.9% share of its stock, had pledged half of his shares in a personal margin account.  797 F.3d at 1198.  This subjected those shares to potential forced sale (a margin call), should the company's stock price fall.  *Id.*  After a drop in the company's share price resulted in two margin calls, both of which the CEO disclosed, the company instituted a new policy prohibiting officers,

72

directors, and 10% shareholders from pledging its securities in margin accounts.  *Id.* at 1199.

In *Anderson*, the company was behind schedule on an important project and implemented "a recovery plan" to get the project back on schedule.  827 F.3d at 1247. In subsequent months, company management made several positive statements about the early progress of that project.  *Id.*  The court held that the implementation of the recovery plan was not suggestive of scienter with respect to the subsequent statements because there were no allegations that management knew the recovery plan would be incapable of success.  *Id.* at 1248.  Both of these cases involved management's identification and implementation of a "better way of doing things moving forward."  *Id.* (quoting *In re Zagg*, 797 F.3d at 1205).

In contrast, *Pluralsight* involved no such "better way."  In that case, the CEO of a company stated the company had "about 250" quota-bearing sales representatives as of January 16, 2019.  45 F.4th at 1250.  On July 31, 2019, he disclosed that the company was *then* at approximately 250 sales representatives but was "dozens" short of that target number at the end of 2018 and beginning of 2019, leading to low sales numbers as new hires got up to speed.  *Id.* at 1260.  When asked why this had not been disclosed earlier, he stated that the company was still hitting its sales targets.  *Id.*  In January 2020, he disclosed that the company "came out of 2018 going into 2019 with about 200 quota-bearing sales reps."  *Id.*

Despite the district court's conclusion that these subsequent statements were "nonculpable, hindsight expressions," the Tenth Circuit concluded they contributed to scienter.  *Id.* at 1260–63.  In so holding, it relied on the following facts: (1) low staffing in

the first quarter of 2019 could not result in low sales numbers until the second quarter due to long sales cycles; and (2) the CEO's repeated representations that the number of sales representatives was one of two "primary drivers" of the company's billings growth. *Id.* at 1262–63.  From this, the court held it was reasonable to infer that the CEO knew low staffing could impact future performance and hoped that sales performance could paper over staffing issues until they could be resolved.  *See id.* at 1260–63.

In the Court's view, *Pluralsight* is not a case about a "better way" of doing things. Rather, it is a case about subsequent statements revealing the existence of a problem, the reasons for not disclosing the problem at an earlier time, and the approximate time that the problem was likely to have been known.  Blair's statements are not analogous to those in *Pluralsight*.  While they do identify deficiencies in the Company's business, they do not reveal anything about when the deficiencies were known to Hewitt and Gutierrez or the reasons for the alleged false and misleading prior statements.  (*See* ¶¶ 235–39.)  Therefore, the Court concludes Blair's statements do not contribute to scienter and are at most "an acknowledgment that the company identified a better way of doing things moving forward."  *In re Zagg*, 797 F.3d at 1205.

2.     Access to Internal Reports

Defendants argue that Hewitt and Gutierrez's access to certain information as part of their duties does not support an inference of scienter. First, they argue that the allegations relating to their duties are "non-particularized."  (ECF No. 73 at 44–45 (citing *Smallen v. Then W. Union Co.*, 950 F.3d 1297, 1310 (10th Cir. 2020)).)  Such allegations, they assert, are "routine[ly] rejected" by courts.  (*Id.*)  Further, they argue that the allegations attributed to FEs 1–3 are unreliable, either because they too are generic (FE 3), or because they do not include allegations specifically stating that either

74

Hewitt or Gutierrez received the information described in those confidential witnesses' statements (FEs 1 and 2).  (*Id.* at 45–46.)  Finally, they argue a statement attributed specifically to Maria Zamora (requesting a pause in enrollment) cannot support and inference of scienter because the Amended Complaint does not allege when the request occurred or what Zamora said to support the request.  (*Id.* at 46–47.)

Lead Plaintiffs respond that it "is undisputed that Hewitt and other senior executives like CMO Welch knew about the results of audits and inspections before the IPO from 2017 to 2020."  (ECF No. 79 at 51.)  They argue the Amended Complaint also alleges that Hewitt and Gutierrez and other senior executives "closely monitored regulatory audits" and knew that regulators had received various complaints about staffing levels in InnovAge's centers.  (*Id.*)  In turn, they knew these complaints would result in audits, yet Hewitt and Gutierrez allegedly sought to downplay the significance of these audits.  (*Id.* at 51–52.)  They argue that these allegations are corroborated by statements from current and former employees and documentary evidence obtained by the *Capitol Forum*.  (*Id.* at 52.)  Despite Defendants' attempts to undermine the reliability of the allegations based on anonymous sources, Lead Plaintiffs argue these allegations can be considered for reasons already discussed.  (*Id.* at 53; *see also, supra*, Part III.A.)

Defendants' reply points out that "the specific allegations relating to Hewitt and Gutierrez" are either: (i) from years before the challenged statements; or (ii) too dissimilar from the allegations in *Pluralsight* to overcome their otherwise generic nature.[20]  (ECF No. 83 at 28.)

The Court has carefully considered these arguments and concludes that some

---

[20] The reply's other arguments are duplicative of those in the Motion.  (*See* ECF No. 83 at 28–29.)

allegations are indeed too general to contribute to scienter.  Allegations suggesting that Hewitt and Gutierrez were aware of certain issues years before the challenged statements were made contribute nothing to Lead Plaintiffs' desired inference of scienter.  *See Anderson*, 827 F.3d at 1240 (holding that a meeting that took place *months* before the class period began or the challenged statements were made did not show that defendants "knew during the class period that their [statements] were inaccurate").  Nor can they be assumed to know certain information just because they hold senior leadership positions.  *Smallen*, 950 F.3d at 1307–08 (quoting *Anderson*, 827 F.3d at 1245–46).

Lead Plaintiffs do point to several allegations of specific knowledge Hewitt had during the class period.  They allege that she knew of numerous complaints stemming from staffing issues at the Thornton, Colorado center that led to surprise audits of all of the Company's Colorado centers.  (¶¶ 180–82, 201.)  Therefore, the Court concludes Hewitt's access to the Company's internal information can contribute to scienter only with respect to statements concerning the Company's staffing.

3.   Leadership Departures

Defendants urge that the resignations of Hewitt and Welch after enrollment was suspended at the Company's Colorado centers does not support an inference of scienter.  (ECF No. 73 at 47.)  They argue the departures should be interpreted as offering nothing toward such an inference unless the Amended Complaint contains allegations connecting the departure to the fraud.  (*Id.*)

Lead Plaintiffs' argue the Amended Complaint contains such allegations, stating that though the Offering Documents hailed Hewitt as a "visionary," she resigned just one week after CMS announced its enrollment freeze of the Company's Colorado centers.

76

(ECF No. 79 at 54.)  They frame this resignation as following analyst "reports" assailing "InnovAge management's lack of 'credibility.'"  (*Id.* (quoting ¶ 13).)  Then "a few months" after Hewitt's resignation, Welch also resigned.  (*Id.*)

"Executive departures can strengthen an inference of scienter if they are numerous, uncharacteristic[,] or accompanied by suspicious circumstances."  *In re Molson Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *11 (D. Colo. Dec. 2, 2020) (Ebel, J.) (citing *Rumbaugh v. USANA Health Scis., Inc.*, 2018 WL 5044240, at *9 (D. Utah Oct. 17, 2018)).  Temporal proximity alone is not suspicious.  *Id.  But see In re Myriad Genetics, Inc.*, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021) (finding that a resignation and demotion lent "very modest scienter support "because they occurred only days apart and because Capone's resignation was unusual in that it was effective immediately with no successor identified").  A resignation that is effective immediately without a successor in place may be considered "unusual."  *See In re Myriad Genetics, Inc.*, 2021 WL 977770, at *22.

The balance of in-circuit precedent favors Defendants' position, which the Court adopts.  But because there is legal authority for the proposition that an immediate resignation without an evident replacement is "unusual," the Court finds Hewitt's resignation is "very modest" support for scienter.  *Id.*  Hewitt's resignation was not only effective immediately—it was retroactive when announced.  (¶ 231.)  And, as the allegations read, it appears the Board of Directors' decision to appoint Blair as her replacement was a reaction to Hewitt's resignation and not something in place beforehand.  (*Id.*)

In contrast, the Court finds no allegations other than temporal proximity

connecting Welch's resignation to the alleged fraud, and therefore, the Court gives this allegation no weight as it relates to inferring scienter.  *In re Molson Coors*, 2020 WL 13499995, at *11.

    4.   <u>Motive</u>

Defendants argue the existence of a motive for the alleged fraud is inadequately pleaded and, therefore, "counts against [an inference] of scienter."  (ECF No. 73 at 48 (quoting *Level 3*, 667 F.3d at 1346) (alteration in original).)  They argue that the Amended Complaint's theory that Hewitt and Gutierrez were motivated to inflate the price of the Company's stock because they were paid millions of dollars "in connection with option cancellations in 2020" is "chronologically flawed."  (*Id.*)  They assert that almost all of the compensation alleged to have motivated Hewitt and Gutierrez was earned pre-IPO, "rendering their alleged motive to inflate the stock price implausible." (*Id.* at 48 n.19.)  Further, to the extent there is any "additional compensation in 2021," they argue it was merely the "type of incentive-based compensation . . . [that] does not ordinarily indicate scienter." (*Id.* at 48 (quoting *Level 3*, 667 F.3d at 1346) (alteration in original).)[21]

Lead Plaintiffs argue that Hewitt and Gutierrez's "motive to lie" was that they stood to substantially benefit financially from the sale of their own shares.[22]  (ECF No. 79 at 55–56.)  They concede that these payments were earned as part of a plan set in motion prior to the IPO, when Apax made its 2020 investment.  (*Id.*)  But they

---

[21] Defendants' remaining argument relates to statements the Court has already concluded are not actionable. (*See* ECF No. 73 at 48, 48 n.20.)

[22] Technically, they were compensated for the cancellation of their options to purchase stock at predetermined prices.

emphasize that the transaction was part of a larger plan/process of taking the company public, and the value of the Company was necessarily set privately prior to the IPO. (*Id.*)

Though Defendants argue Lead Plaintiffs' "recharacterization" of the allegations in the Amended Complaint cannot overcome its chronological flaws, the Court disagrees.  The Court assumes the allegations in the Amended Complaint (as the Court must) that Hewitt and Gutierrez made concerted efforts to grow enrollment aggressively, even at the cost of participant wellbeing, in order to increase revenue and the Company's value.  While the Court does not see any allegations regarding the strike price of Hewitt and Gutierrez's options, it understands options generally—therefore, it is obvious that they had a motive to increase the valuation of the Company (whether set privately or publicly) because the difference between the strike price and the value of the Company's shares *is* their compensation.[23]

Given that backdrop, the Court finds it entirely reasonable to infer that after receiving massive compensation by increasing the Company's valuation, Hewitt and Gutierrez would have an incentive to conceal in public statements the allegedly improper methods used to achieve that valuation.  Therefore, the Court concludes Hewitt and Gutierrez's alleged motive to lie can contribute to an inference of scienter.

   5.   Audit Results

Defendants argue that the allegations in the Amended Complaint that they

---

[23] The nature of the "Option Cancelation Agreement" that resulted in the payments to Hewitt and Gutierrez is also described generally in the Company's Form S-1.  (ECF No. 74-1.) That document explains that the "Cancelation Agreement resulted in the option holders receiving the same amount of cash that they would have received had they exercised their options, participated in the repurchase described above[,] and sold their remaining shares."  (*Id.* at 31.)

"repeatedly omitted key information about ongoing audits" and "repeatedly mischaracterized the nature and severity of the audits" show, at most, that InnovAge was "overly optimistic," which is insufficient to establish scienter.  (ECF No. 73 at 49 (first quoting ¶ 277; then quoting *Anderson*, 827 F.3d at 1238).)

Lead Plaintiffs point to allegations that Defendants were in possession of audits from prior to the IPO that "consistently revealed systemic and pervasive deficiencies that InnovAge failed to remedy."  (ECF No. 79 at 51.)  They also point to allegations that Hewitt and Gutierrez specifically confirmed that they "closely monitored regulatory audits, repeatedly detailing the status of audits to analysts and investors."  (*Id.*)

The Court is not persuaded by the characterization in Lead Plaintiffs' argument that Hewitt and Gutierrez personally closely monitored audits in a way similar to the facts alleged *Pluralsight*.  The Court sees no allegations that they monitored audit findings more closely than was necessary to make disclosures to investors.  (*See Id.* (citing ¶¶ 212–13, 217–19, 254, 259, 282.)  For this reason, the Court views this case much more like *Level 3* and *Anderson* than *Pluralsight*, where the company's CEO "repeatedly represented he monitored, and that he regularly reported to investors and analysts" on a "single objectively verifiable data point that Pluralsight considered part of its key business metric."  45 F.4th at 1264.  While the Amended Complaint contains allegations that convincingly convey that the Company's "census" was *the* key business metric, that is not the argument Lead Plaintiffs make.  And while the Court can conceptually connect the dots the Amended Complaint draws—that audit risks present a risk to the health of the Company's census—that line of argument presupposes that Hewitt and Gutierrez knew the audits would result in an enrollment freeze.  *See*

*Anderson*, 827 F.3d at 1246.  The allegations in the Amended Complaint permit at most a "weak inference" that that was the case.  Therefore, the Court gives these facts no weight as it relates to an inference of scienter.  *See Molson Coors*, 2020 WL 13499995, at *11.

      6.   <u>Holistic Consideration of the Allegations of Scienter</u>

The Court has concluded that the following allegations of scienter are sufficiently pleaded in the Amended Complaint:

- Hewitt's knowledge of the complaints that led to the audits of the Company's Colorado centers, specifically as this issue related to statements about the Company's staffing;

- Hewitt's unusual departure without a replacement CEO already in place; and

- Hewitt and Gutierrez's motivation to lie about the Company's operations to attain and maintain a higher valuation.

From these facts, the Court concludes the Amended Complaint permits a strong inference of scienter only with respect to the post-offering staffing statements discussed in Part III.B.2.b.  That is because these two allegations only permit an inference that Hewitt and Gutierrez knowingly or recklessly misrepresented material facts to investors that is "at least as compelling as any nonculpable inference" with respect to those statements.  *Pluralsight*, 45 F.4th 1236.

Accordingly, with respect to the Exchange Act claims, the Court finds that only the post-offering staffing statements are adequately alleged.[24]

---

[24] The Court imputes this mental state to the Company, *see Pluralsight*, 45 F.4th at 1267–69, which is not challenged by Defendants.  (ECF No. 73 at 43–49; ECF No. 83 at 27–

E.      **Control Person Liability**

Defendants argue the Amended Complaint inadequately pleads control person liability against the Director Defendants, WCAS, and Apax.  (ECF No.73 at 51–54.) "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1270 (10th Cir. 2001) (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998) (alteration in original)).  Though Defendants assert the Amended Complaint is deficient as to both elements, the Court has just determined that the Amended Complaint has adequately pleaded primary violations of the Securities Act.  *See supra*, Parts III.C and III.D.  To adequately allege the second element, "the plaintiffs must point to facts which indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  *Adams*, 340 F.3d at 1108 (quoting *Maher*, 144 F.3d at 1305).

1.      Director Defendants

Defendants argue that Lead Plaintiffs "do not allege a single fact to support this conclusory allegation [that the Director Defendants were involved in the Company's everyday business] other than citing their positions, post-public offering, as directors of InnovAge."  (ECF No. 73 at 51–52.)  They point out that mere membership on a company's board of directors does not make someone a control person under Tenth Circuit law.  (*Id.* at 52.)  As to the Director Defendants, beyond mere membership,

31.)

Defendants argue the only allegation is that certain directors signed the Offering Documents.  (*Id.* (citing ¶¶ 1, 347, 372).)  But not only is this fact insufficient to establish that any director is a control person, they say, it is not even factually accurate.  (*Id.*)

Lead Plaintiffs argue they have adequately pleaded the Director Defendants were control persons because the Amended Complaint alleges that "they consented to be named as director nominees in the Offering Documents and were required to supervise the preparation and dissemination of the Offering Documents and ensure that they were accurate and complete."  (*Id.* (citing *Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 1069, 1084 (D. Colo. 2021)).)  They also point out that—specific to Scully—the Amended Complaint alleges he "was extensively involved in InnovAge's conversion to a for-profit company, its growth strategy, and its decision to go public."  (*Id.* (citing ¶¶ 5–7, 103–05, 107–09, 113–14, 123, 223.)).)

The Court is convinced by Defendants' arguments—particularly those made in their reply.  "The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person . . . ."  *Adams*, 340 F.3d at 1108.  And as Defendants point out, "if being a director is not sufficient, then neither is agreeing to become one." (ECF No. 83 at 31.)

While the Court acknowledges the decision in *Correa*, again, as Defendants say, that case did not cite *Adams*.  Instead, *Correa* only considers *Maher*, which sets out the two elements of control person liability.  In contrast, Defendants have specifically pointed the Court to *Adams* and the sentence quoted above, which specifically undercuts the argument that "being named as a Director Nominee or facilitat[ing] the

IPO process" alone is enough to be subject to joint and several liability under the securities laws.  (ECF No. 79 at 57.)  Therefore, the Court concludes Lead Plaintiffs have failed to adequately allege control person liability against the Director Defendants.

2.  <u>WCAS and Apax</u>

Defendants argue that the allegations relating to WCAS and Apax's ownership of the Company are factually incorrect.  They say

> Apax and WCAS are not shareholders of the Company.  The July 2020 agreement to acquire a stake in the company was entered into by Ignite Aggregator LP, not Defendant Apax. Ignite GP, Inc., not Defendant Apax, serves as the general partner of Ignite Aggregator LP.  None of Ignite Aggregator LP's partnership interests are held by Defendant Apax. Similarly, the Registration Statement identifies the "WCAS Investor" as a collective of entities that does not include WCAS.  Moreover, the section of the Registration Statement titled "Principal Shareholders" explains that a majority of InnovAge stock is owned by TCO Group Holdings, L.P., to which Ignite Aggregator LP and the equity holders of TCO Group Holdings, Inc. previously contributed their entire equity interests in InnovAge.  TCO Group Holdings, L.P. is in turn controlled by a series of LPs and LLCs, none of which is named as a defendant.  Indeed, the Registration Statement identifies Ignite Aggregator LP as the "Apax Investor," and the "WCAS Investor" is a collective of other entities. Neither Apax nor WCAS is a shareholder.

(ECF No. 73 at 53.)  They further argue that even if WCAS and Apax were shareholders, the Amended Complaint would not state a claim because neither is a majority shareholder.  (*Id.*)  They explain that a "minority shareholder is not a control person, even if the shareholder has the power to appoint a minority of directors to the board, absent an allegation the shareholder actually exercised some day-to-day control."  (*Id.*)  Nor, they say, is it sufficient to allege that multiple shareholders acting together collectively controlled a majority of the voting power.  (*Id.* at 54 (quoting *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 675–76 (N.D. Tex. 2013).)

84

Lead Plaintiffs respond that the Amended Complaint merely quotes the Offering Documents' statement that InnovAge is "controlled" by WCAS and Apax.  (ECF No. 79 at 57.)  The Offering documents disclose that WCAS and Apax beneficially own 86% of the Company's common stock and "together will control the vote of all matters submitted to a vote of [the Company's] shareholders."  (*Id.* (quoting ¶ 378).)  They also note that the Complaint alleges that five of the Company's board members are WCAS or Apax "representatives."  (*Id.* at 58 (citing ¶ 46).)

In their reply, Defendants argue the Offering Documents make clear that neither WCAS or Apax is one of the "Principal Shareholders" referenced as controlling the Company.  (ECF No. 83 at 32.)  They again insist that the Amended Complaint must allege facts sufficient to infer that WCAS and Apax were involved in the Company's day-to-day operations.  (*Id.*)

The central issue at hand is whether WCAS and Apax had "control" over InnovAge.  *Adams*, 340 F.3d at 1107.  "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.  This definition—which contains no reference to day-to-day operations—is capacious enough to embrace even the complex ownership structures employed by well-heeled investors, provided those ownership structures allow for control.  While *Adams* held that an individual director is not a control person unless they "individually exerted control or influence over the day-to-day operations of the company," this concept does not logically extend to all alleged control persons.  *Adams*, 340 F.3d at 1108.

What allegations are necessary to plead "control" is a contextual inquiry.  The power possessed by a single director by virtue of his or her position alone is not remotely comparable to, for example, a shareholder who controls appointment of 51% of the board and therefore controls 100% of votes taken by the board.  While a single director cannot with his or her individual vote alone necessarily "direct or cause the direction of the management and policies" of a corporation, he or she might be in a position to do so if involved in day-to-day operations.  And, he or she certainly would be in such a position if he or she were also the CEO or the CFO of a company sued for fraudulent financial reporting.  *See Adams*, 340 F.3d at 1108–09.

Importantly, *Adams* does not even suggest that "control or influence over day-to-day operations" is necessary to allege control in all contexts; rather that decision's analysis demonstrates that the necessary allegations depend on the context of the alleged fraud and the alleged controller's role.  *Id.* at 1108–09 (holding CFO was control person in case where alleged securities fraud "relate[d] specifically to official reports of the company's financial performance" despite that merely alleging his position in the company "would not likely be enough" in other circumstances).  Thus, the Court is thoroughly unconvinced by Defendants' attempt to narrow the scope of control person liability by requiring an additional "day-to-day operations" element for finding such liability, a requirement that the Tenth Circuit did not impose in *Adams.*  The Court will therefore decline Defendants' invitation that it do so here.

The context of this case is that 86% of the Company's voting stock was owned by TCO Group Holdings, L.P. ("TCO").  (ECF No. 74-1 at 28.)  "Voting and dispositive power with respect to the common stock held by [TCO] is exercised by a committee of

limited partners." (*Id.*) That committee, referred to as the "LP Board" in the S-1, "is to be comprised of up seven persons." (*Id.*) Of these seven people, three were designated by WCAS and two by Apax. (*Id.*) Because the LP Board "exercises the voting and dispositive power [of TCO] by majority vote," WCAS and Apax acting together could "cause the direction of the management and policies" of InnovAge without input from anyone else. (*Id.*; 17 C.F.R. § 230.405.) Not only that, should either WCAS or Apax disagree with one another about the direction of the Company, each wielded veto power. (ECF No. 74-1 at 28 ("The LP Board exercises its voting and dispositive power by majority vote, *so long as one WCAS Designee and one Apax Designee comprise the majority.*") (emphasis added).) Therefore, the Court without significant effort concludes the Amended Complaint adequately alleges control person liability against WCAS and Apax.

## IV. CONCLUSION

For the reasons set for above, the Court ORDERS as follows:

1.     Defendants' Joint Motion and Brief to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 73) is GRANTED IN PART AND DENIED IN PART as more fully set forth in this Order;

2.     All claims dismissed by this Order are DISMISSED WITHOUT PREJUDICE; and

3.     The parties are DIRECTED to jointly contact United States Magistrate Judge S. Kato Crews's chambers by no later than **December 27, 2023** to set a Scheduling Conference or such other proceeding as Judge Crews

deems appropriate to move this action forward.

Dated this 21st day of December, 2023.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge