**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 21-cv-02770-WJM-SKC

EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, and INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
JOHN ELLIS BUSH,
ANDREW CAVANNA,
CAROLINE DECHERT,
EDWARD KENNEDY, JR.,
PAVITHRA MAHESH,
THOMAS SCULLY,
MARILYN TAVENNER,
SEAN TRAYNOR,
RICHARD ZORETIC,
WCAS MANAGEMENT CORPORATION,
WCAS MANAGEMENT, L.P.,
WCAS MANAGEMENT, LLC,
APAX PARTNERS US LLC,
TCO GROUP HOLDINGS, L.P.,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY LLC,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO. LLC,
ROBERTS & RYAN INVESTMENTS, INC.

Defendants.

(*Caption continues on following page*)

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

GLOSSARY OF TERMS ....................................................................................................... 4

INTRODUCTION ............................................................................................................... 6

JURISDICTION AND VENUE ............................................................................................. 12

PARTIES ....................................................................................................................... 13

I.    Plaintiffs ............................................................................................................. 13

II.   Defendants .......................................................................................................... 13

      A.   Corporate Defendant ................................................................................. 13

      B.   Private Equity Defendants ......................................................................... 14

      C.   Officer Defendants ..................................................................................... 21

      D.   Director Defendants ................................................................................... 22

      E.   Underwriter Defendants ............................................................................. 27

III.  Relevant Nonparties ........................................................................................... 30

      A.   Former InnovAge Employees .................................................................... 30

FACTUAL BACKGROUND ............................................................................................... 31

I.    The Program of All-Inclusive Care for the Elderly ("PACE") ........................... 31

      A.   Government Approval and Funding of PACE Programs ............................ 33

      B.   Enrollment and Disenrollment of PACE Participants ............................... 35

      C.   Interdisciplinary Teams, Assessments, and Care Planning ....................... 37

      D.   Organization Monitoring, Auditing, and Compliance Enforcement .......... 38

      E.   Sanctions, Enforcement Action, and Termination .................................... 39

II.   InnovAge and Its Business Model ....................................................................... 42

      A.   Defendants Hewitt and Scully Lead Aggressive Lobbying Campaign to Transform
           InnovAge from a Regional Nonprofit to the First National For-Profit PACE
           Provider ..................................................................................................... 42

      B.   After Its For-Profit Conversion, InnovAge Implements Aggressive Enrollment
           Strategy in Relentless Pursuit of Revenue Growth ................................... 44

      C.   After Its For-Profit Conversion, InnovAge Became Singularly Focused on
           Enrollment ................................................................................................. 48

      D.   As Enrollment Surged, InnovAge's Centers Suffered from Severe Staff Shortages,
           High Caseloads, and Significant Delays and Lack of Contracts with Specialists ....... 53

      E.   For Years, Internal and External Audits Revealed the Widespread Dysfunction,
           Systemic Deficiencies, and Substandard Care at InnovAge's Centers in Every
           State ........................................................................................................... 59

           1.   California ............................................................................................ 59

2. Colorado.................................................................................................. 63

III. InnovAge Launches Successful IPO Based on Its Patient-Centered Care Model and Track Record of Enrollment Growth........................................................................ 68

IV. Unknown to Investors, Defendants Misrepresented InnovAge's Care Model and Growth Strategy.............................................................................................................. 73

A. Days after the IPO, Colorado Notifies InnovAge About Complaints of Staff Shortages, Caseload Size, Scheduling, and Inadequate Medical Care ........................ 73

B. InnovAge Orders Staff to "Clean Up" Evidence of Delays at Its Centers in Advance of Expected Audits of Colorado and Sacramento Facilities ........................ 79

C. Post-IPO, Defendants Continue to Represent That InnovAge's Patient-Centered Care Model Is the Key to Its Growth Strategy and Financial Performance................. 80

D. Colorado Regulators Begin Surprise Audit of InnovAge's Colorado Programs to Assess Staff Shortages, High Turnover, and Insufficient Medical Care...................... 83

E. After CMS Suspends Enrollment at InnovAge's Sacramento Center, Defendants Reassure Investors That the Problems Are Limited and Isolated ............................... 86

F. InnovAge's Stock Price Plummets after CMS and Colorado Suspend Enrollment at the Company's Colorado Centers ................................................................. 91

V. Subsequent Events.................................................................................................... 94

EXCHANGE ACT VIOLATIONS............................................................................................. 99

I. Materially False and Misleading Statements and Omissions During the Class Period........ 99

A. March 2021 Offering Documents ................................................................. 100

B. Third Quarter 2021 Press Release, Earnings Call, and Quarterly Report.................. 115

1. May 10, 2021 Press Release ............................................................... 115

2. May 10, 2021 Earnings Call ............................................................... 116

3. May 11, 2021 Quarterly Report........................................................... 118

C. Fourth Quarter 2021 Press Release, Earnings Call, and Annual Report.................... 123

1. September 21, 2021 Press Release........................................................ 123

2. September 21, 2021 Earnings Call........................................................ 124

3. September 22, 2021 Annual Report....................................................... 127

D. First Quarter 2022 Press Release, Earnings Call, and Quarterly Report ................... 129

1. November 9, 2021 Press Release and Earnings Call ................................. 129

2. November 9, 2021 Quarterly Report ..................................................... 134

II. Summary of Scienter Allegations................................................................................ 135

A. InnovAge's Admissions Establish Hewitt's and Gutierrez's Scienter....................... 136

B. InnovAge's Historical and Projected Enrollment Growth Was the Most Important Factor Informing the Company's Valuation .......................................................... 137

C.  InnovAge and the Officer Defendants Closely Monitored Reports on Enrollment Growth, Regulatory Compliance, Staffing, and Quality of Care ............................... 139

D.  Concealment and Obstruction of Government Audits ............................................. 141

E.  The Ouster or Resignations of InnovAge's Chief Executive Officer and Chief Medical Officer ....................................................................................... 141

F.  The Defendants Were Financially Motivated to Perpetrate the Fraud ...................... 142

G.  Defendants Hewitt's and Gutierrez's Scienter Is Imputed to the Company .............. 142

III.  Loss Causation and Economic Loss ................................................................... 143

IV.  Presumption of Reliance ................................................................................. 147

V.  Exchange Act Class Action Allegations ............................................................. 148

VI.  Inapplicability of the Statutory Safe Harbor and Bespeaks-Caution Doctrine .................. 150

VII.  Exchange Act Causes of Action ...................................................................... 151

Count I: Violation of Section 10(b) of the Exchange Act ...................................... 151

Count II: Violation of Section 20(a) of the Exchange Act ..................................... 153

SECURITIES ACT VIOLATIONS ................................................................................. 155

I.  False and Misleading Statements in the Offering Documents ........................................ 156

II.  Securities Act Class Action Allegations ............................................................. 171

III.  The Securities Act Defendants Failed to Conduct a Reasonable Investigation and Exercise Reasonable Care in Connection with the Offering ............................................. 173

IV.  Securities Act Causes of Action ...................................................................... 176

Count III: Violation of Section 11 of the Securities Act ...................................... 176

Count IV: Violation of Section 12(a)(2) of the Securities Act ............................... 178

Count V: Violation of Section 15 of the Securities Act ....................................... 180

PRAYER FOR RELIEF ............................................................................................. 184

JURY TRIAL DEMANDED ....................................................................................... 184

**GLOSSARY OF TERMS**

| Term | Definition |
| --- | --- |
| Apax Transaction | The July 27, 2020 transaction between InnovAge, Apax, and WCAS that precipitated the IPO. |
| BBA | Balanced Budget Act of 1997 |
| Census | The capitated participants for whom a provider is financially responsible for total healthcare costs. |
| CAP | Corrective Action Plan |
| CAR | Corrective Action Required |
| CDPHE | Colorado Department of Public Health & Environment |
| CMO | Chief Medical Officer |
| CMP | Civil Money Penalty |
| CMS | Center for Medicare & Medicaid Services |
| DHCS | Department of Health Care Services of the State of California |
| DOJ | U.S. Department of Justice |
| Dual Eligible | An individual entitled to both Medicare Part A or Part B and some form of Medicaid benefit |
| EMR | Electronic Medical Records |
| HCPF | Colorado Department of Health Care Policy & Financing |
| FFS | Fee-for-service |
| ICAR | Immediate Corrective Action Required |
| IDT | Interdisciplinary Team |
| NPA | National PACE Association |
| PAC | Participant Advisory Committee |
| PACE | Programs of All-Inclusive Care for the Elderly |
| PCP | Primary Care Physician or Provider |
| PMPM | per member, per month |
| QAPI | Quality Assessment and Performance Improvement Plan |
| RCA | Root Cause Analysis |
| SAA | State Administering Agency |
| WCAS | Welsh, Carson, Anderson & Stowe |

4

Lead Plaintiffs El Paso Firemen & Policemen's Pension Fund, San Antonio Fire & Police Pension Fund, and Indiana Public Retirement System (collectively, "Plaintiffs" or the "Texas and Indiana Pension Funds"), by and through counsel, bring two sets of claims in this action.[1] First, Plaintiffs bring claims under the Securities Exchange Act of 1934 ("Exchange Act") individually and on behalf of all persons who purchased or otherwise acquired InnovAge common stock between March 4, 2021 and December 22, 2021 ("Class Period"), and were damaged as a result. Plaintiffs allege that throughout the Class Period, Defendants made a series of materially false or misleading statements and omissions that they knew or recklessly disregarded were materially false or misleading at the time the statements were made. Second, Plaintiffs bring claims under the Securities Act of 1933 ("Securities Act") individually and on behalf of all persons who purchased the publicly traded common stock of InnovAge Holding Corp. ("InnovAge" or the "Company") in or traceable to the Company's initial public offering ("IPO" or "Offering"), conducted on March 4, 2021, and were damaged as a result. Plaintiffs allege that Defendants issued a materially inaccurate Registration Statement and Prospectus (defined below as the "Offering Documents") in connection with InnovAge's IPO. With respect to these claims, Plaintiffs disclaim any allegations of fraud and base their claims solely on strict liability and negligence.

Except as to allegations pertaining specifically to Plaintiffs, all allegations in this Complaint are based upon the investigation undertaken by Lead Counsel, which included, but was not limited to, the review and analysis of: (1) public filings made by InnovAge with the U.S. Securities and Exchange Commission ("SEC"); (2) press releases and other public statements issued by Defendants; (3) research reports issued by securities and financial analysts; (4) media

---

[1] To preserve all issues for appeal, Lead Plaintiffs amend this complaint only as to the identity of the Private Equity Defendants, and do not otherwise modify the allegations to conform with the Court's rulings on motion to dismiss.

5

and news reports and other publicly available information concerning InnovAge and Defendants; (5) transcripts of InnovAge's earnings and other conference calls with investors and analysts; (6) publicly available presentations, press releases, and interviews of InnovAge and its employees; (7) public reports by state and federal regulators about investigations and audits of InnovAge; (8) economic analyses; (9) other public documents readily obtainable on the internet; and (10) interviews with and information from former employees of InnovAge ("FEs"). Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only to Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery, including access to documents exclusively within the Defendants' custody or control, and other documents or materials provided to or prepared by state and federal regulators and third parties.

### INTRODUCTION

1.    This is a federal securities class action against InnovAge; its Chief Executive Officer ("CEO") Maureen Hewitt; its Chief Financial Officer ("CFO") Barbara Gutierrez; two private equity firms and InnovAge's principal shareholders, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC (together "WCAS"), Apax Partners US LLC ("Apax"), and an investment vehicle jointly controlled by WCAS and Apax, TCO Group Holdings, L.P.; the underwriters in the Company's IPO; and members of the Company's Board of Directors who signed Offering Documents.

2.    This case arises from what turned out to be one of the five worst-performing IPOs in 2021. In March of that year, Defendants took InnovAge public by boasting that the healthcare provider's meteoric growth over the previous four years resulted from a business model that provided comprehensive care for the most frail seniors in the United States. InnovAge claimed it had created a "virtuous cycle" of continued, flywheel-like growth in a virtually untapped $200

6

billion healthcare market. But in just eight months, government audits and investigative reporting revealed that InnovAge's growth resulted not because of its services for seniors, but at the expense of them.

3.    InnovAge operates as a healthcare company focused on providing all-inclusive medical and social services for certain frail seniors, most of whom are "dually eligible" for Medicare and Medicaid. The Company provides these services through the Program of All-Inclusive Care for the Elderly ("PACE"), funded by government payors, primarily Medicare and Medicaid, which comprises 99% of the Company's revenue. InnovAge receives a "capitated" payment—a fixed fee calculated on a per month, per participant basis—to manage the totality of a participant's medical care, overseen by a team of nurses, doctors, social workers, dieticians, drivers, counselors, and others. This holistic approach is intended to allow vulnerable seniors to stay in the community longer and more healthily, while avoiding expensive nursing homes.

4.    At the same time, state and federal governments are also said to save money, with monthly PACE payments averaging 15 percent lower than what Medicaid and Medicaid would ordinarily pay on a traditional, fee-for-service ("FFS") basis. Because the compensation is mostly fixed, the PACE programs pool the payments and then are encouraged to use the money wisely and effectively to avoid costly but preventable treatments that the programs would be otherwise required to cover. For example, while traditional Medicare will cover costly surgery to repair broken hips, PACE programs can use their funds to install inexpensive grab bars that might prevent falls in the first place.

5.    For more than four decades, the PACE model of care was provided almost exclusively by nonprofits, operating on slim margins that were reinvested into their programs. Defendant Hewitt, who served as InnovAge's CEO since 2006, claimed that InnovAge, then a nonprofit,

7

could turn PACE programs into a profitable enterprise, while accelerating the expansion of a successful program that was only available to a fraction of eligible seniors. To implement her vision, Hewitt partnered with Defendant Scully, the former Administrator of the Centers for Medicare and Medicaid Services ("CMS") under President George W. Bush and a general partner at Defendant WCAS, a private equity firm. Together, Defendants Hewitt and Scully successfully lobbied to change the federal law that barred for-profit PACE programs, overcoming opposition from other PACE providers—and even InnovAge's founders—who worried that for-profit status would sacrifice quality for greater margins. And in 2016, InnovAge formally converted to a for-profit company, aided by a $196 million investment by WCAS.

6.      From the very beginning, Defendant Scully said his goal was to get a return on WCAS's investment by growing InnovAge rapidly and taking the Company public in as few as four years. He succeeded. Led by Defendant Hewitt—whose vision for herself at the helm of a highly successful national company dovetailed with Scully's aggressive growth target—InnovAge transformed itself from a small, regional nonprofit into a for-profit company operating 16 centers in five states. In that timespan, InnovAge doubled its enrollment and revenue from approximately 3,155 participants and $231 million in 2016 to 6,400 participants and $567.2 million in 2020.

7.      With that staggering growth, which eclipsed that of any other PACE provider, Defendants Scully and WCAS decided that their growth targets had been met and the time was right to cash out on their investment. To do so, WCAS solicited other private equity firms to jointly sponsor an initial public offering, signing a July 2020 agreement with Defendant Apax, who bought a 49% stake in InnovAge in a deal that valued InnovAge at $950 million—representing a 480% increase over what WCAS had paid for the Company just four years earlier.

8

8.     Defendants WCAS and Apax, together with a syndicate of 11 underwriters, launched InnovAge's IPO in March 2021. To convince investors that InnovAge would be able to tap into the $200 billion market for growth, InnovAge claimed it was uniquely suited to "drive sustained, organic census growth." and could "improve participants' experiences and health outcomes." InnovAge assured investors that its business model enabled the Company to "consistently deliver high-quality care, achieve high participant satisfaction and retention, and attract new participants."

9.     Unbeknownst to investors, however, InnovAge executives had received internal audits and responded to calls with center directors and other medical staff who conveyed that InnovAge's rapid enrollment was overwhelming its ability to provide necessary healthcare across its facilities in three states. For years, InnovAge's singular focus on maximizing enrollment in its existing centers, without the necessary staff resources and specialist care network, had led to severe staff shortages, high caseloads, scheduling delays, lack of coordination by caregivers, insufficient training on using electronic medical records ("EMR"), and substandard medical care. In short, InnovAge was systemically causing participants to experience worse health outcomes. By the time of the IPO, it was clear that InnovAge created not a virtuous cycle, but a bottle neck of enrolled patients whose healthcare needs were unmet despite the fact that InnovAge received monthly payments for their participation.

10.     Rather than disclose that the Company's model for providing care was failing, InnovAge and Defendants told investors that they were not only "consistently deliver[ing] high-quality care," but also that the model could easily and successfully be scaled for continued growth: "[t]his consistent performance highlights the predictability of our model." Based on Defendants' false and misleading statements and omissions, Defendants priced InnovAge's stock price for the IPO at $21, rising to $24.20 by close of the first day of trading and to $25.98 within another week, with

9

an enterprise value of $3.75 billion—a nearly four-fold increase from just a year earlier. Meanwhile, as part of the July 2020 agreement to take the Company public, Defendants Hewitt and Gutierrez cashed out approximately $42 million of stock options and other compensation.

11.   Six months later, on September 17, 2021, CMS notified InnovAge that the agency was suspending enrollment at the Company's Sacramento, California center after its audit of the facility found that InnovAge "substantially failed" to "provide to its participants medically necessary items and services that are covered PACE services." InnovAge also revealed that, in May and June 2021, CMS and Colorado regulators had also conducted audits of all the Company's Colorado programs, while disclaiming that the problems identified in Sacramento were pervasive across InnovAge's facilities. On this news, from September 20 to 23, 2021, the price of InnovAge stock fell by more than 50% from $14 per share to $6.76.

12.   Three months later, on December 23, 2021, InnovAge announced that CMS and Colorado had decided to suspend enrollment at the Company's Colorado centers, responsible for more than 50% of the Company's revenue, based on deficiencies identified in their audits which had focused on patient care provided mostly or partially prior to the IPO. On this news, InnovAge's stock price plummeted by 36% from December 22 to 23, from $8.25 to $5.31, representing a 78% decline from all-time highs in March 2021.

13.   Analysts widely criticized InnovAge for having touted its track record of success. One noted that such pervasive issues in Colorado "call into question the [C]ompany's ability to hit its organic and inorganic (both M&A and de novo) growth targets." Another more critically concluded: "we note that based on the poor track record established in just nine months as a public company and our conversations with investors that there is significant work to be done for InnovAge to begin rebuilding credibility."

10

14. Additional sanctions followed in 2022 both from regulators and states rejecting InnovAge's expansion efforts. For example, Colorado's agencies and CMS confirmed that these and other problems were widespread in its facilities, concluding that InnovAge's Colorado centers' failure to ensure proper staffing levels affected 100% of the reviewed participants and that InnovAge failed to furnish care that met the needs of 74% of the participants reviewed.

15. During the Company's Q3 2022 earnings call after the Class Period, on May 10, 2022, President and CEO Patrick Blair admitted that after spending four months in his position as CEO, it was "clear that to enable a consistent, scalable platform, our capabilities as a provider and a payer, respectively, require enhancements and need to evolve." Blair announced a "portfolio remediation and transformation" program called "One InnovAge," that addressed three goals: (1) "creating operational excellence as a provider by formalizing a repeatable blueprint to deliver personalized, integrated, yet distributed care in our centers virtually and in home"; (2) "expanding our payer capabilities to ensure we're effectively managing the total cost and quality of care, and that our revenue accurately reflects the acuity of the populations we serve"; and (3) "strengthening enterprise functions to enable our centers to reach their full potential through robust talent management, data analytics, sales and marketing, and government relations, underpinned by a uniform way of working and success metrics."

16. Blair admitted that the "audit results have found gaps in our performance when compared against regulatory and our own expectations." These so-called gaps directly impacted the standard of care, and among them were eight categories of deficiencies: "critical personnel gaps at each of the centers," failure to standardize the "process of our interdisciplinary care teams who plan and coordinate and deliver care," "strengthening our home care network and reliability," deficient "timeliness of scheduling and coordinating care with providers outside the centers," "improving

our telephonic channel response times and closing critical communication loop," "improving the efficiency and reliability of transportation for our participants," "standardizing our wound care program across the enterprise," and "reducing documentation outside of the EMR."

17. As a result of Defendants' misconduct alleged, Plaintiffs and members of the Class purchased InnovAge stock at artificially inflated or maintained prices, and suffered significant damages.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c), Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 77aa. Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District, and the Company's corporate headquarters are located in this District.

21. In connection with the acts and conduct alleged in this Complaint, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange, the Nasdaq Stock Market.

**PARTIES**

## I.    Plaintiffs

22.    El Paso Firemen & Policemen's Pension Fund ("El Paso") is a $1.7 billion pension fund operated to benefit firefighters and police officers in El Paso, Texas.

23.    San Antonio Fire & Police Pension Fund ("San Antonio") is a $3.7 billion pension fund operated to benefit firefighters and police officers in San Antonio, Texas.

24.    Indiana Public Retirement System ("Indiana") is a $45.8 billion pension fund operated for the benefit of members and retirees of public universities, schools, municipalities, and state agencies in the State of Indiana. Indiana purchased shares of InnovAge common stock in the Offering from Defendant J.P. Morgan (as defined below).

25.    As set forth in the certifications and joint declaration previously filed with the Court (ECF Nos. 6-3, 6-4, 6-5), El Paso, San Antonio, and Indiana purchased shares of InnovAge common stock at artificially inflated prices in or traceable to the IPO, and suffered damages as a result of the violations of the federal securities laws alleged herein.

## II.    Defendants

### A.  Corporate Defendant

26.    **Defendant InnovAge** is a national healthcare company focused on providing Program of All-Inclusive Care for the Elderly ("PACE") services for frail seniors. First incorporated as a nonprofit corporation in Colorado in May 2007 as Total Community Options, Inc., the Company incorporated in Delaware in May 2016 as a for-profit corporation and changed its name to InnovAge. InnovAge maintains its principal executive offices in Denver, Colorado. InnovAge became a publicly traded company through an initial public offering conducted on March 4, 2021. The IPO was conducted pursuant to a registration statement that was filed with the SEC on

13

February 8, 2021 (as amended) (the "Registration Statement") and an incorporated prospectus dated March 5, 2021 (the "Prospectus") that registered 19,166,667 shares of InnovAge common stock for sale to the public. In the IPO, Defendant InnovAge (together with certain selling shareholders) sold 18,995,901 shares for gross proceeds of about $399 million before deducting underwriting discounts and commissions. The Company is the issuer of the shares sold in the IPO and its common stock trades on Nasdaq under the ticker symbol "INNV." As of June 14, 2021, InnovAge has over 135 million shares of common stock outstanding, owned by hundreds or thousands of investors.

### B.  Private Equity Defendants

27.   Welsh, Carson, Anderson & Stowe is a private equity firm formed in 1979 that focuses on investing in the technology and healthcare industries, primarily in the United States. Welsh, Carson, Anderson & Stowe has raised more than $40 billion in capital across 18 partnerships and has invested in more than 170 companies. In May 2016, Welsh, Carson, Anderson & Stowe bought a $196 million stake in InnovAge to provide financing for the Company's conversion from a nonprofit to a for-profit entity.

28.   Like many private equity firms, Welsh, Carson, Anderson & Stowe operates through a series of multiple, interconnected entities under common control and led by individuals identified on its website as General Partners, including WCAS Management Corporation and two other management entities that employ and compensate the people who work on behalf of Welsh, Carson, Anderson & Stowe:

a)  **Defendant WCAS Management Corporation** is a registered investment adviser that employs and compensates investment professionals, including WCAS's "partners," who serve as the officers, directors, and managers of WCAS Management Corporation, as well

14

as more junior investment professionals, whom the partners supervise and direct. WCAS Management Corporation is a party to the Director Nomination Agreement pursuant to which, in consideration of WCAS and Apax causing InnovAge to effect the IPO, InnovAge agreed to permit WCAS and Apax to to designate directors to InnovAge's Board. WCAS Management Corporation is primarily owned and controlled by a Board of Directors that at the time of the IPO was comprised of Anthony deNicola, D. Scott Mackesy, Jonathan Rather, Brian Regan, Michael Donovan, and Eric Lee ("WCAS Board"). In its most recent Form ADV, Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers, filed March 29, 2024, WCAS Management Corporation stated that it has 100 employees, 65 of whom perform investment advisory functions including research and portfolio management for pooled investment vehicles, and that it has over $15 million in regulatory assets under management in 22 pooled investment vehicles.

b) **Defendant WCAS Management, L.P.** is a Delaware limited partnership founded in 2017 and registered investment adviser. WCAS Management L.P. performs back-office and administrative services for WCAS. WCAS describes WCAS Management Corporation and WCAS Management, L.P. collectively as "the Firm," which, according to WCAS Management Corporation's most recent Form ADV, collectively conduct a single advisory business.[2] WCAS Management, L.P. is controlled by the WCAS Management Corporation

---

[2] In WCAS Management Corporation's Form ADV ("Form ADV"), Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers, filed March 29, 2024, WCAS Management filed an umbrella registration identifying WCAS Management, L.P. as a "relying adviser" which, together with WCAS Management Corporation, conduct a single advisory business. Form ADV: General Instruction 5.

Board and by WCAS's partners in their capacity as officers, directors, and limited partners and as managing members of Defendant WCAS Management, LLC.

c) **Defendant WCAS Management, LLC** is a Delaware limited liability company founded in 2017. It runs WCAS Management, L.P. in its role as the sole general partner of that entity.

29.    Defendants WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC are referred in this Complaint as the "WCAS Management Entities" or "WCAS."

30.    WCAS raises money from institutional and other investors and pools that money into investment vehicles called "funds" typically structured as limited partnerships. The WCAS Management Entities provide administrative services to the funds and, in turn, are paid management fees.

31.    WCAS uses each fund to acquire ownership positions in private companies known as "portfolio companies." In addition, through WCAS-controlled entities that serve as General Partners of a fund, WCAS generally receives a carried interest allocation of profits on distributions derived from the recapitalization or sale of the fund's ownership stakes in portfolio companies.

32.    Welsh, Carson, Anderson & Stowe XII, L.P. ("WCAS XII") is a Delaware limited partnership founded in 2008, which holds InnovAge stock along with other "parallel" funds controlled by WCAS ("WCAS XII Funds").[3] According to Form ADV, WCAS Management

---

[3] These parallel funds include three limited partnerships, Welsh, Carson, Anderson & Stowe XII Delaware, L.P. ("WCAS XII-D"), Welsh, Carson, Anderson & Stowe XII, Welsh, Carson, Anderson & Stowe XII Delaware II, L.P. ("WCAS XII-DII"), and Welsh, Carson, Anderson & Stowe XII Cayman, L.P. ("WCAS XII-C") (collectively with WCAS XII, the "WCAS XII Funds"), as well as WCAS Co-Invest Holdco, L.P., a co-investment holding company, and WCAS XII Co-Investors LLC, an employee and consultant co-investment vehicle.

Corporation and WCAS Management, L.P. sponsor or manage WCAS XII. The general partner of WCAS XII is WCAS XII Associates LLC ("WCAS XII Associates"), which makes investment and other decisions on the funds' behalf. WCAS's general partners control and direct WCAS XII Associates, and by extension the WCAS XII Funds, in their capacity as "managing members" of WCAS XII Associates and in their role as the officers, directors, and managers of the WCAS Management Entities, which serve as investment managers for the WCAS XII Funds.[4]

33. The entities that comprise WCAS all operate under a common identity and purpose. They use common trademarks "WCAS" and "Welsh, Carson, Anderson & Stowe," which are registered to Defendant WCAS Management Corporation; all operate from the same principal place of business, 599 Lexington Avenue, Suite 1800, New York, New York 10022; and share the same website, www.wcas.com. WCAS's General Partners serve as officers, directors, and managers of—and thus ultimately control—the WCAS Management Entities, and in turn, control the WCAS XII Funds.

34. **Defendant Apax Partners US LLC (formerly Apax Partners, L.P.) ("Apax")** is a global private equity advisory firm focusing on the technology, services, healthcare, and eConsumer industries. In July 2020, Apax entered into an agreement with WCAS to acquire a 49%

---

[4] The managing members of WCAS XII Associates are Defendants Thomas A. Scully and Sean Traynor, the WCAS Board, and WCAS General Partners Eric Lee, Christopher Hooper, Christopher Solomon, Gregory Lau, Frances Higgins, Nicholas O'Leary, and Ryan Harper (collectively the "WCAS General Partners"). WCAS XII Associates is the general partner of WCAS XII and one parallel fund, WCAS XII-DII. The remaining WCAS XII Funds have a different general partner, WCAS XII Associates Cayman, L.P., but WCAS XII Associates is in turn the general partner of—and controls—WCAS XII Associates Cayman, L.P. WCAS XII Associates is thus effectively the general partner of each of the WCAS XII Funds. The WCAS General Partners control WCAS XII Co-Investors LLC as its managing members and WCAS Co-Investment Holdco, L.P. as managing members of its general partner, WCAS Co-Invest Associates LLC.

stake in InnovAge. In connection with that agreement, Apax and WCAS agreed to cause the Company to effect the IPO.

35.    Like WCAS, Apax is comprised of an interconnected web of people and entities that, together, invest in and exercise control over its portfolio companies, including Ignite Aggregator LP, a Delaware limited partnership run by Apax and through which Apax invested in InnovAge. Apax and the entities it controls, including Ignite Aggregator LP, operate using the same principal office and place of business, 601 Lexington Avenue, 53rd Floor, New York, NY 10022. Ignite Aggregator LP is described in InnovAge's October 27, 2023 Proxy Statement filed on Schedule 14A as "the vehicle through which Apax Partners holds its investment in TCO Group Holdings" (described below).

36.    **Defendant TCO Group Holdings, L.P.**, is a shell entity formed by WCAS and Apax in July 2020, the month they signed their agreement to jointly sponsor InnovAge's IPO. It is the investment vehicle through which Apax and WCAS hold their investment InnovAge common stock and exercise their voting and dispositive power with respect to that stock.

37.    TCO Group Holdings, L.P. was created to facilitate WCAS and Apax's investments in InnovAge and is functionally an extension of them.  It uses WCAS and Apax's addresses at 599 Lexington and 601 Lexington, respectively. Its SEC filings are signed by WCAS and Apax general partners, including Thomas Scully and Jonathan Rather of WCAS and Andrew Cavanna and Jeremy Latham of Apax. WCAS and Apax run it via a committee of limited partners ("LP Board") comprised of up to seven persons with six persons serving at the time of the IPO, including Defendants Caroline Dechert, Thomas Scully, and Sean Traynor designated by WCAS, Defendants Andrew Cavanna and Pavithra Mahesh designated by Apax, and Defendant Maureen Hewitt of InnovAge.

18

38.    Together, WCAS, Apax, and TCO Group Holdings, L.P. are the "Private Equity Defendants."

39.    At all relevant times, the Private Equity Defendants have controlled InnovAge.

40.    According to the Company, Defendants WCAS and Apax "together control the vote of all matters submitted to a vote of our shareholders, which enables them to control the election of the members of the Board and all other corporate decisions." Further, the Company has explained that Defendants WCAS and Apax "have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers, decisions on whether to raise future capital and amending our charter and bylaws, which govern the rights attached to our common stock." As long as they retain their concentration of ownership, "the Principal Shareholders will be able to cause or prevent a change of control" of the Company or "a change in the composition" of the Company's Board and "could preclude any unsolicited acquisition" of InnovAge.

41.    In connection with WCAS's and Apax's agreement to undertake the IPO, InnovAge entered into a Director Nomination Agreement with Defendants WCAS and Apax that provides Defendants WCAS and Apax the right to designate "all of the nominees for election to our Board" for so long as Defendants WCAS and Apax collectively beneficially own at least 40% of their original ownership stake of the Company. Under the Director Nomination Agreement, if Defendants WCAS and Apax reduce their ownership of the Company, Defendants WCAS and Apax continue to retain the right to designate a certain number of nominees to the Company's Board proportionate to the amount of their ownership of the Company. The Director Nomination Agreement also provides for certain consent rights for each of Defendants WCAS and Apax so long as such stockholder owns at least 5% of their original ownership, including any increase in

the size of the Board. Additionally, the Director Nomination Agreement prohibits InnovAge from increasing or decreasing the size of its Board without the prior written consent of Defendants WCAS and Apax for so long as either of them holds at least 5% of the total outstanding voting power.

42. WCAS and InnovAge placed their InnovAge common stock in the investment vehicle TCO Group Holdings, L.P. 86% of InnovAge's common stock was held by WCAS and Apax. That majority ownership allowed them to control all votes put to InnovAge's shareholders. Voting and dispositive power with respect to that common stock was exercised by the LP Board – comprised of the same WCAS and Apax designees that also serve as directors on InnovAge's Board. Because the LP Board of TCO Group Holdings, L.P. exercises voting and dispositive power of TCO Group Holdings, L.P. by majority vote, WCAS and Apax acting together could cause the direction of the management and policies of InnovAge without input from anyone else. Should WCAS or Apax disagree, they each wielded veto power.

43. Because of their majority ownership stake and retention of voting power, WCAS and Apax had the power to control, and did control InnovAge before, during, and after the IPO. WCAS and Apax caused the Company to effect the IPO; directly participated in the management of InnovAge's operations, including its accounting and reporting functions; possessed and exercised the power and authority to control the contents of the Offering Documents; were privy to confidential information concerning InnovAge and its business, operations and financial statements, and strategy; and were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged, and approved or ratified these misstatements and omissions in violation of the federal

securities laws. WCAS and Apax, along with TCO Group Holdings, L.P., are liable for InnovAge's false statements and omissions pleaded under the Securities Act and the Exchange Act.

### C. Officer Defendants

44.    **Defendant Maureen Hewitt** ("Hewitt") was the President and Chief Executive Officer ("CEO"), and Director of the Company from 2006 to January 1, 2021, when she resigned from her positions as CEO and Director, effective immediately. Hewitt signed or authorized the signing of the Offering Documents and 2021 Annual Report filed with the SEC on Form 10-K ("2021 Annual Report"), as well as certifications under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 for the Annual Report on Form 10-K for 2021 ("2021 Annual Report") and the Quarterly Reports filed with the SEC on Form 10-Q for the Fourth Quarter of 2021 ("4Q 2021 Quarterly Report") and First Quarter of 2022 ("1Q 2022 Quarterly Report"). Hewitt received over $35 million in compensation in connection with the IPO, as well as an award of stock options.

45.    **Defendant Barbara Gutierrez** ("Gutierrez") is and was, at all relevant times, the Chief Financial Officer ("CFO") of the Company. Prior to joining InnovAge in 2017, Gutierrez was the Chief Financial Officer and Chief People Services Officer for Hero DVO, LLC, a healthcare practice management company. Gutierrez signed or authorized the signing of the Offering Documents, 2021 Annual Report, 4Q 2021 Quarterly Report, 1Q 2022 Quarterly Report, and Quarterly Reports filed with the SEC on Form 10-Q for the Second Quarter and Third Quarter of 2022 ("2Q 2022 Quarterly Report" and "3Q 2022 Quarterly Report," respectively). Gutierrez received over $7 million in compensation in connection with the IPO, as well as an award of stock options.

46.    Defendants Hewitt and Gutierrez are collectively referred to as the "Officer Defendants," and together with InnovAge are the "Exchange Act Defendants."

47.    The Officer Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of InnovAge's operations, including its accounting and reporting functions; possessed and exercised the power and authority to control the contents of the Offering Documents; and were privy to confidential information concerning InnovAge and its business, operations and financial statements, and strategy. The Officer Defendants were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged, and approved or ratified these misstatements and omissions in violation of the federal securities laws. The Officer Defendants are liable for InnovAge's false statements and omissions, as well as their own respective false statements and omissions, pleaded under the Securities Act and the Exchange Act.

### D. Director Defendants

48.    **Defendant John Ellis ("Jeb") Bush** is and was, at all relevant times, a Director of InnovAge. Bush signed a written consent to being named in the Offering Documents as an individual to become a director of the Company, and signed or authorized the signing of the Offering Documents and 2021 Annual Report. Bush served as the governor of Florida from 1999 to 2007. By virtue of his positions at InnovAge, Bush exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein. Bush received $50,000 in fees in connection with the IPO.

49.    **Defendant Andrew Cavanna** is and was, at all relevant times, a Director of InnovAge, and has served as chair of the Company's Board since June 2021. Cavanna signed a written consent to being named in the Offering Documents as an individual to become a director of the Company,

22

and signed or authorized the signing of the 2021 Annual Report. Cavanna has also served as a Partner of Defendant Apax and a member of its healthcare team since 2017. By virtue of his positions at InnovAge and Apax, Cavanna exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

50.   **Defendant Caroline Dechert** is and was, at all relevant times, a Director of InnovAge as a WCAS nominee. Dechert signed a written consent to being named in the Offering Documents as an individual to become a director of the Company, and signed or authorized the signing of the 2021 Annual Report. Dechert joined WCAS in 2012 and serves as a Principal in the healthcare group. By virtue of her positions at InnovAge and WCAS, Dechert exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

51.   **Defendant Edward ("Ted") Kennedy, Jr.** is and was, at all relevant times, a Director of InnovAge. Kennedy, Jr. signed a written consent to being named in the Offering Documents as an individual to become a director of the Company, and signed or authorized the signing of the 2021 Annual Report. Kennedy, Jr. is the son of former Senator Edward M. Kennedy of Massachusetts and nephew of President John F. Kennedy and Senator Robert F. Kennedy. Kennedy, Jr. received more than $731,000 in fees, option awards, and other compensation in connection with the IPO. By virtue of his position at InnovAge, Kennedy, Jr. exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

52.   **Defendant Pavithra Mahesh** is and was, at all relevant times, a Director of InnovAge as an Apax nominee. Mahesh signed a written consent to being named in the Offering Documents as

an individual to become a director of the Company, and signed or authorized the signing of the 2021 Annual Report. Mahesh joined Apax in 2018 and is a Principal on its healthcare team. By virtue of his position at InnovAge and Apax, Mahesh exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

53. **Defendant Thomas Scully** is and was, at all relevant times, a Director of the Company as a WCAS nominee. Scully signed a written consent to being named in the Offering Documents as an individual to become a director of the Company, and signed or authorized the signing of the 2021 Annual Report. Scully serves as a General Partner of Defendant WCAS Management Corporation. Earlier in his career, Scully served in the White House and Office of Management and Budget as Health Advisor to President George H.W. Bush from 1989 to 1993, and as the Administrator of CMS from 2001 to 2004 under President George W. Bush. By virtue of his positions at InnovAge and WCAS, Scully exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

54. **Defendant Marilyn Tavenner** is and was, at all relevant times, a Director of InnovAge. Tavenner signed a written consent to being named in the Offering Documents as an individual to become a director of the Company, and signed or authorized the signing of the 2021 Annual Report. Tavenner previously served as acting Administrator of CMS from 2011 to 2013 and Administrator from 2013 to 2015. From 2015 to 2018, Tavenner was President and Chief Executive Officer of America's Health Insurance Plans, a national association representing insurers. From 1981 to 2005, Tavenner worked at the Hospital Corporation of America ("HCA"), the largest for-profit healthcare company in the United States. Tavenner received more than

$736,000 in fees, option awards, and other compensation in connection with the IPO. By virtue of her position at InnovAge, Tavenner exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

55.   **Defendant Sean Traynor** is and was, at all relevant times, a Director of InnovAge as an WCAS nominee. Traynor signed a written consent to being named in the Offering Documents as an individual to become a director of the Company, and signed or authorized the signing of the 2021 Annual Report. Traynor joined WCAS in 1999 and currently serves as a General Partner of WCAS Management Corporation in the healthcare group. By virtue of his position at InnovAge and WCAS, Traynor exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

56.   **Defendant Richard Zoretic** is and was, at all relevant times, a Director of InnovAge. Zoretic signed a written consent to being named in the Offering Documents as an individual to become a director of the Company, and signed or authorized the signing of the 2021 Annual Report. Zoretic received more than $221,000 in fees and option awards in connection with the IPO. By virtue of his position at InnovAge, Zoretic exercised substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

57.   Defendants Scully, Bush, Cavanna, Dechert, Kennedy, Tavenner, Mahesh, Traynor, and Zoretic are referred to as the "Director Defendants," and together with the Officer Defendants, are the "Securities Act Individual Defendants."

58.   Defendants Cavanna, Dechert, Mahesh, Scully, and Traynor were appointed as Directors in accordance with the Director Nomination Agreement dated March 8, 2021 among InnovAge, WCAS, and Apax, with Dechert, Traynor, and Scully designated as WCAS Nominees ("WCAS Director Defendants") and Cavanna and Mahesh designated as Apax Nominees ("Apax Director Defendants" and, together with the WCAS Director Defendants, the "Principal Shareholder Director Defendants"). *See* Ex. A (Director Nomination Agreement).

59.   Because of their high-ranking positions and direct involvement in the everyday business of the Company, the Director Defendants directly participated in the management of InnovAge's operations, including its accounting and reporting functions, and possessed and exercised the power and authority to control the contents of InnovAge's Offering Documents. Further, because of their senior roles and direct involvement in the business of WCAS and Apax, the Principal Shareholder Director Defendants were directly involved in the Company's decision to conduct the IPO. The Director Defendants were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these misstatements and omissions in violation of the federal securities laws. The Director Defendants are liable for the false statements and omissions pleaded herein under the Securities Act.

60.   Each of the Securities Act Individual Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related to the Company. The Securities Act Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of InnovAge. By virtue of these duties, these officers and directors were required to supervise the

26

preparation of and dissemination of the Offering Documents, and ensure that they were accurate and complete.

61.   All of the Securities Act Individual Defendants were control persons of InnovAge within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of InnovAge and as senior executives or directors of InnovAge. The Securities Act Individual Defendants, at the time they held positions with InnovAge, were able to, and did, exercise substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

62.   As officers, directors, and/or controlling persons of a publicly held company and under the federal securities laws, the Securities Act Individual Defendants had a duty (a) to disseminate promptly complete, accurate, and truthful information with respect to InnovAge; (b) to correct any previously issued statements that had become materially misleading or untrue; and (c) to disclose any trends, events, and uncertainties that would materially affect InnovAge's earnings and present and future operating results, so that the market price of InnovAge's publicly traded securities would be based upon truthful and accurate information.

### E.  Underwriter Defendants

63.   **Defendant J.P. Morgan Securities LLC** ("J.P. Morgan") served as an underwriter for the Company's IPO and acted as a joint lead book-running manager for the Offering and representative of the underwriters.

64.   **Defendant Barclays Capital Inc.** ("Barclays") served as an underwriter for the Company's IPO and acted as a joint lead book-running manager for the Offering and representative of the underwriters.

27

65.  **Defendant Goldman Sachs & Co. LLC** ("Goldman Sachs") served as an underwriter for the Company's IPO and acted as a joint lead book-running manager for the Offering and representative of the underwriters.

66.  **Defendant Citigroup Global Markets Inc.** ("Citigroup") served as an underwriter for the Company's IPO and acted as a joint lead book-running manager for the Offering and representative of the underwriters.

67.  **Defendant Robert W. Baird & Co. Incorporated** ("Baird") served as an underwriter for the Company's IPO and acted as joint book-running manager of the Offering.

68.  **Defendant William Blair & Company, L.L.C.** ("William Blair") served as an underwriter for the Company's IPO and acted as joint book-running manager of the Offering.

69.  **Defendant Piper Sandler & Co.** ("Piper Sandler") served as an underwriter for the Company's IPO and acted as joint book-running manager of the Offering.

70.  **Defendant Capital One Securities, Inc.** ("Capital One") served as an underwriter for the Company's IPO and acted as joint book-running manager of the Offering.

71.  **Defendant Loop Capital Markets LLC** ("Loop Capital") served as an underwriter for the Company's IPO and acted as a co-manager of the Offering.

72.  **Defendant Siebert Williams Shank & Co., LLC** ("Siebert Williams") served as an underwriter for the Company's IPO and acted as a co-manager of the Offering.

73.  **Defendant Roberts & Ryan Investments, Inc.** ("Roberts & Ryan") served as an underwriter for the Company's IPO. and acted as a co-manager of the Offering.

74.  Defendants J.P. Morgan, Barclays, Goldman Sachs, Citigroup, Baird, William Blair, Piper Sandler, Capital One, Loop Capital, Siebert Williams, and Roberts & Ryan are collectively referred to hereinafter as the "Underwriter Defendants."

28

75.    The Underwriter Defendants sold and distributed shares in the IPO to the investing public pursuant to the Prospectus. The extent of the Underwriter Defendants' participation in the IPO was as follows:

| Name | Number of shares |
|---|---|
| J.P. Morgan Securities LLC | 4,488,334 |
| Barclays Capital Inc. | 3,388,333 |
| Goldman Sachs & Co. LLC | 3,388,333 |
| Citigroup Global Markets Inc. | 1,693,333 |
| Robert W. Baird & Co. Incorporated | 958,333 |
| William Blair & Company, L.L.C. | 958,333 |
| Piper Sandler & Co. | 958,333 |
| Capital One Securities, Inc. | 666,667 |
| Loop Capital Markets LLC | 55,556 |
| Siebert Williams Shank & Co., LLC | 55,556 |
| Roberts & Ryan Investments, Inc. | 55,556 |
| **Total** | 16,666,667 |

76.    In addition, the Underwriter Defendants were granted the option to purchase 2,500,000 additional shares of InnovAge stock. On March 12, 2021, the Underwriter Defendants exercised their options to purchase an additional 2,329,234 shares for sale to public investors.

77.    In connection with the IPO, including the underwriters' option, the Company issued and sold an aggregate of 18,995,901 shares of common stock at $21.00 per share, raising approximately $373.6 million in proceeds, net of underwriting discounts and commissions of $23.9 million and offering costs of $1.4 million.

### III.    Relevant Nonparties

#### A.  Former InnovAge Employees[5]

78.    Former Employee 1 ("FE-1") worked as a social worker at InnovAge's San Bernardino Center from March 2019 to August 2019. FE-1 conducted home visits, identified patient resources, and addressed patient problems in collaboration with other departments.

79.    FE-2 worked as an Area Medical Director at InnovAge from March 2019 to February 2021. In that role, FE-2 oversaw all physicians and nurse practitioners in InnovAge's six Colorado facilities. FE-2 reported to Regional Medical Officer Lynn Strange, who reported to Chief Medical Officer Melissa Welch who, in turn, reported to CEO Maureen Hewitt.

80.    FE-3 worked at InnovAge from September 2013 until September 2017 as a Center Director and Regional Executive Director. FE-3 oversaw and managed InnovAge's then new PACE center in San Bernardino, California. In June 2016, FE-3 was promoted to Regional Executive Director in charge of InnovAge centers in California. At one point during FE-3's tenure, FE-3 reported directly to the Chief Operating Officer whom FE-3 described as the "gatekeeper" to CEO Maureen Hewitt although FE-3 also occasionally had direct conversations with CEO Hewitt. FE-3 attended quarterly and regional meetings and reviewed quarterly reports, which were prepared internally and for state regulators.

81.    FE-4 was an InnovAge Center Director. FE-4 oversaw clinic operations, transportation, and human resources, among other responsibilities in the position of Center Director. FE-4 reported to Regional Vice President of Operations Brad Alley.

---

[5] All former employees are defined using gender neutral pronouns to protect their anonymity.

82. FE-5 worked as a Regional Vice President of Human Resources for the East Coast from August 2018 to August 2020. FE-5 reported to Chief People Officer Denise Triba and participated in periodic calls with CEO Maureen Hewitt.

83. FE-6 worked for InnovAge as a physician in the Thornton, Colorado Center from July 2014 to December 2020.

## FACTUAL BACKGROUND

### I. The Program of All-Inclusive Care for the Elderly ("PACE")

84. The Program of All-Inclusive Care for the Elderly ("PACE") is a joint Medicare and Medicaid program that provides comprehensive, community-based medical and social services to certain frail, elderly people, most of whom are dually eligible for Medicare and Medicaid benefits. First developed in the 1970s, PACE was designed as a novel approach to providing healthcare to frail elderly and disabled individuals. Instead of physicians billing Medicare or Medicaid on a fee-for-service ("FFS") basis, each time they treated a patient, PACE organizations receive a fixed monthly capitated payment for each patient—a lump-sum amount calculated on a per member, per month ("PMPM") basis.

85. Under the financing model, PACE organizations receive a set payment per enrollee, per month, also known as a "capitated" payment. The PACE organization benefits from a reliable, recurring stream of revenue but, like an insurance company, assumes the risk of all costs exceeding the monthly amount. This method encourages PACE organizations to keep the costs of care below the monthly capitated reimbursement amount, aligning the provider's financial interest with those of federal and state governments. At the same time, PACE organizations are incentivized to monitor their participants closely for worsening chronic conditions or other changes that, if left unattended, could lead to costly acute care needs. From the early 1970s to 1997, PACE organizations operated as Medicare demonstration projects. But in 1997, Congress passed the

31

Balanced Budget Act of 1997 ("BBA"), which established PACE as a permanent Medicare program.

86. In its modern form, the PACE program aims to provide a range of integrated preventive, acute care, and long-term care services to manage the often complex medical, functional, and social needs of the frail elderly, including, but not limited to, these services:

- Primary Care
- Hospital Care
- Medical Specialty Services
- Prescription Drugs
- Nursing Home Care
- Emergency Services
- Home Care
- Physical therapy
- Occupational therapy
- Adult Day Care
- Recreational therapy
- Meals
- Dentistry
- Nutritional Counseling
- Social Services
- Laboratory / X-ray Services
- Social Work Counseling
- Transportation

87. PACE operators serve individuals with a high level of need. On average, enrollees suffer from eight chronic conditions, and nearly fifty percent have dementia. PACE provides all Medicare- and Medicaid-covered services, centering care around adult day health centers, where participants receive a full-range of services. PACE center care teams consist of an interdisciplinary team, which includes physicians, nurses, physical and occupational therapists, a center manager, home care coordinator, dieticians, social workers, and others.

88. While participants are enrolled in a PACE organization, they must have access to necessary covered items and services 24 hours per day, 7 days a week. This around-the-clock service availability reflects the high level of care needed for PACE participants who may have conditions ranging from vascular disease, diabetes, congestive heart failure, chronic obstructive pulmonary disease, and major depressive and bipolar disorders. In addition, about one-third of

32

PACE participants need help with at least five or six activities of daily living ("ADL"), including dressing, bathing, transferring, toileting, eating, or walking.

89.    In a typical month, PACE participants require six prescription medications, seven visits to the PACE center, and 16 trips with PACE-provided transportation. The services provided by PACE organizations aim to meet the following core objectives:

- Enhance the quality of life and autonomy for frail, older adults;

- Maximize dignity of, and respect for, older adults;

- Enable frail, older adults to live in the community as long as medically and socially feasible; and

- Preserve and support the older adult's family unit.

### A. Government Approval and Funding of PACE Programs

90.    A PACE program is a three-way partnership among the federal government, a state government, and a PACE organization. The State Administering Agency ("SAA") and CMS have primary responsibility to ensure that every PACE organization maintains compliance with state and federal requirements, including by monitoring the effectiveness of organizational structure, procedures, protocols, and policies of each PACE organization. 42 C.F.R. §§ 460.30, 460.112; Audit Guide.

91.    To provide PACE services, PACE programs must be approved by the state government and the PACE organization "must have an agreement with CMS and the State administering agency." 42 U.S.C. § 460.30. The PACE agreement must include, among other things:

- a commitment to abide by federal, state, and local laws and regulations;

- a description of the participant grievance and appeals process;

- a statement of policies on eligibility, enrollment, and disenrollment;

- a description of the services available to participants; and

- a statement of the data that CMS and the state require it to collect.

42 C.F.R. § 460.32(a).

92.    PACE is financed by monthly Medicare and Medicaid prospective capitation payments, at rates specified in a PACE organization's program agreement which reflects the frailty of the enrollee relative to the general Medicare population. 42 C.F.R. § 460.180. For each participant, the monthly capitation payment "is a fixed amount, regardless of changes in the participant's health status." *Id*. § 460.180(b)(6).

93.    The Medicaid monthly capitation amount is a fixed amount that a PACE organization accepts "as payment in full for Medicaid participants." *Id.* §§ 460.182(b) and (c). A PACE organization assumes full financial risk for participant care "without limit on amount, duration, or scope of services." CMS PACE Manual, Ch. 1, § 30.4. Each month, a PACE organization combines enrollees' monthly capitation payments into a common pool. *See* CMS PACE Manual, Ch. 1, § 30.4. From the pool, a PACE organization pays for its participants' health care expenses, which are to include all medically necessary services. *Id*. InnovAge illustrated the economics underlying its business model in the following graphic:

34



**B. Enrollment and Disenrollment of PACE Participants**

94.   To be eligible for enrollment in a PACE program, an individual must be:

(1) 55 years of age or older;

(2) certified by the SAA to need the level of care required under the state Medicaid plan

for coverage of nursing facility services;

(3) reside in the PACE organization's service area;

(4) be able to live in a community setting at the time of enrollment without jeopardizing

his or her health or safety based on criteria set forth in the program agreement; and

(5) meet any additional program-specific eligibility conditions imposed under the PACE

program agreement.

42 C.F.R. § 460.150.

35

95. CMS describes "enrollment" as "an intensive process" during which a PACE organization's staff must make one or more visits to a potential participant's place of residence and the potential participant may make one or more visits to the PACE center. At a minimum, the intake process must include these activities:

- the PACE staff must explain the PACE program to the potential participant and representative, the program's requirements, a list of employees who furnish care, and the requirement that the PACE organization would be the participant's sole service provider;

- the potential participant must sign a release to allow the PACE organization to obtain his or her medical and financial information and eligibility status for Medicare and Medicaid; and

- the SAA must assess the potential participant, including any individual who is not eligible for Medicaid, to ensure that he or she needs the level of care required under the state Medicaid plan for coverage of nursing facility services.

96. In addition, the PACE organization must assess the potential participant to ensure that he or she can be cared for appropriately in a community setting and that he or she meets all requirements for PACE eligibility. This involves an assessment of the individual's care support network as well as the individual's health condition to determine whether his or her health or safety would be jeopardized by living in a community setting. The criterion for determining whether an individual is able to live safely in the community is established, and must be approved, by the state.

97. While eligibility to enroll in a PACE program is not restricted to a person who is either a Medicare beneficiary or Medicaid recipient, the applicant must sign a release to allow the PACE

organization to obtain his or her medical and financial information and eligibility status for Medicare and Medicaid.

98.  After a participant has been enrolled in a PACE program, the participant may be disenrolled in only three circumstances: (1) death; (2) voluntary disenrollment; and (3) involuntary disenrollment. Involuntary disenrollment is permitted only in specific circumstances, such as when the participant is later found to be ineligible.

### C.  Interdisciplinary Teams, Assessments, and Care Planning

99.  Each PACE participant must be assigned an interdisciplinary team ("IDT") responsible for assessments, care planning, and care coordination. *Id.* § 460.102. A PACE participant's interdisciplinary team must "promptly develop a comprehensive plan of care for each participant" and re-evaluate the plan of care "on at least a semi-annual basis." *Id*. § 460.106. IDTs are composed of members filling specific roles at each PACE center, to comprehensively assess and meet the individual needs of each participant.

100.  One required member of the IDT is the participant's primary care provider ("PCP"). PCPs are responsible for managing a participant's medical situations and overseeing a participant's use of medical specialists and inpatient care.

101.  The IDT must continuously monitor the participant's health and psychosocial status, as well as the effectiveness of the plan of care, through the provision of services, informal observation, input from participants or caregivers, and communications among members of the IDT and other providers in implementing the plan of care for a participant.

102.  Each IDT member is responsible for the following:

- regularly informing the IDT of the medical, functional, and psychosocial condition of each participant;

37

- remaining alert to pertinent input from other team members, participants, and caregivers; and

- documenting changes in a participant's condition in the participant's medical record consistent with policies established by the medical director.

### D. Organization Monitoring, Auditing, and Compliance Enforcement

103. The SAA and CMS have primary responsibility to ensure that every PACE organization maintains compliance with state and federal requirements, including through monitoring and evaluation of organizational structure, procedures, protocols, and policies of each PACE organization. The scope and frequency of monitoring by CMS and the SAA vary depending on how long a PACE organization has operated under an agreement with the state and federal government.

a) **Trial Period Audits.** During the first three years, PACE organizations operate in a "Trial Period," during which CMS, in cooperation with the SAA, conducts Trial Period Audits annually of a PACE organization to ensure compliance. 42 CFR § 460.190(a).

b) **Routine Audits.** At the conclusion of the trial period, CMS, in cooperation with the SAA continues to conduct reviews of a PACE organization, as appropriate, including at least one Routine Audit every two years that includes an onsite visit to the PACE organization.

c) **Focused Audits.** In addition to Trial Period and Routine Audits, CMS or the SAA may perform a Focused Audit if either agency determines that additional monitoring or auditing is required to identify issues of noncompliance, operational deficiencies, or significant audit findings. These audits may be announced, unannounced, onsite or offsite.

104. During any audit of a PACE organization, onsite visits may include review of participants' charts; interviews with staff, participants and caregivers, or contractors; observation

38

of program operations, including marketing, participant services, enrollment and disenrollment procedures, grievances, and appeals; and comprehensive assessment of an organization's fiscal soundness and the organization's capacity to furnish all PACE services to all participants. CMS audits typically take place during four phases over the course of six to nine months.

105. On March 30, 2020, at the onset of the COVID-19 pandemic, CMS issued guidance announcing it was reprioritizing certain scheduled audits, including Trial Period and Routine Audits of PACE organizations, until further notice. CMS explained that it would "continue its oversight of these organizations," but "will temporarily shift our oversight activities" from "routine audit activities" to "investigation and resolution" of: (1) instances of noncompliance where the health and/or safety of beneficiaries are at serious risk (for example, lack of access to critically needed health services or prescription drugs); and (2) complaints alleging infection control concerns, including COVID-19 or other respiratory illnesses.

### E.  Sanctions, Enforcement Action, and Termination

106. When compliance actions fail to achieve the desired result or an instance of non-compliance is especially egregious, CMS may take enforcement action and impose sanctions on the PACE organization. According to the CMS PACE Manual, enforcement activity begins when: (1) deficiencies are serious enough to escalate directly to the enforcement activity stage, and/or (2) core compliance deficiencies remain unresolved during the compliance activity stage after providing the PACE organization with the appropriate notice and opportunity to correct the deficiencies.

107. Enforcement actions (also known as "intermediate sanctions") include the following two categories of actions: (1) enrollment and/or payment suspensions, and (2) civil money penalties ("CMP").

39

108. Enrollment and payment suspensions are imposed for serious contractual deficiencies defined by statute and are designed to ensure the deficiencies which formed the basis for the sanction are corrected and not likely to recur. CMPs are also intended to be imposed for serious contractual deficiencies defined by statute and are designed to be punitive in nature. Depending on the particular deficiency and statutory basis for taking the action, CMS may impose both suspensions of enrollment and payment and a CMP.

109. There are specific violations for which CMS may impose sanctions on the PACE organization. 42 C.F.R. § 40. Those sanctionable violations are as follows:

a) the PACE organization fails substantially in furnishing the medically necessary items and services to the participant that are covered by PACE if the failure has adversely affected (or has a substantial likelihood of adversely affecting) the participant;

b) the PACE organization involuntarily disenrolls a participant in violation of 42 C.F.R. § 460.164;

c) the PACE organization discriminates on the basis of an individual's health status or need for health care services in the enrollment or disenrollment process, among Medicare beneficiaries or Medicaid recipients, or both, who are eligible to enroll in a PACE program;

d) the PACE organization engages in any practice that would reasonably be expected to have the effect of denying or discouraging enrollment, except as permitted by 42 C.F.R. § 460.150, by Medicare beneficiaries or Medicaid recipients whose medical condition or history indicates a need for substantial future medical services;

e) the PACE organization imposes premium charges on a participant enrolled under Medicare or Medicaid that is more than the allowable amount;

f)   the PACE organization misrepresents or falsifies information that is furnished to CMS or the state or to an individual or any other entity under Part 460;

g)   the PACE organization prohibits or restricts a covered healthcare professional, who is acting within their lawful scope of practice, from advising a participant (their patient) about the patient's health status, medical care, or treatment for the participant's condition or disease, regardless of whether the PACE program provides the benefits for that care or treatment;

h)   the PACE organization operates a physician incentive plan that does not meet the requirements of Section 1876(i)(8) of the Act; or

i)   the PACE organization employs or contracts with any individual who is excluded from participation in Medicare or Medicaid under Section 1128 or 1128A of the Act (or with any entity that employs or contracts with such an individual) for the provision of health care, utilization review, medical social work, or administrative services.

110. CMS may suspend enrollment of Medicare-enrolled participants as a sanction after notifying the PACE organization of the violation. The SAA determines whether suspension of enrollment should occur with respect to Medicaid-enrolled participants. A suspension or denial of payment remains in effect until CMS is satisfied that the PACE organization has corrected the cause of the violation and the violation is unlikely to recur.

111. There are certain violations for which CMS will impose a CMP, which may be imposed up to the maximum amount, depending on the type of violation, including discriminatory enrollment or disenrollment; excessive premiums, or misrepresentation or falsification of information.

112. Additionally, if a PACE organization does not substantially comply with its obligations, CMS or the SAA may terminate the PACE agreement, withhold payments until it corrects deficiencies, or condition the PACE agreement's continuation "upon the timely execution of a corrective action plan." *Id*. § 460.48, ultimately having the power to terminate the PACE program for cause. "For cause" termination includes a failure (1) to correct "significant deficiencies in the quality of care furnished to participants" or (2) to "comply substantially with conditions for a PACE program [under 42 C.F.R. Part 460]." *Id*. § 460.50(b). "For cause" termination also includes a PACE organization's inability to ensure its participant's health and safety. *Id*. § 460.50(a)(c).

## II.    InnovAge and Its Business Model

### A. Defendants Hewitt and Scully Lead Aggressive Lobbying Campaign to Transform InnovAge from a Regional Nonprofit to the First National For-Profit PACE Provider

*"You can make a lot of money if you don't spend any [on patient care].*
*That's why it was set up to be a nonprofit in the first place."*

113. Founded in May 2007 as a Colorado nonprofit corporation, InnovAge's stated purpose in its founding documents was to operate "exclusively for charitable, scientific and educational purposes," by planning, developing, implementing, and providing "comprehensive health care and other services for the benefit of persons in need of long-term care." Led by Defendant Maureen Hewitt, who has been InnovAge's CEO since its founding, InnovAge sought to accomplish that mission through growing its PACE programs in Colorado and later other states, including California and New Mexico, before expanding InnovAge facilities on the East Coast.

114. Defendant Hewitt, who became InnovAge's CEO in 2006, had a vision to operate InnovAge as a growing and successful business. Her view clashed with that of some of InnovAge's longtime employees, according to a November 11, 2021 article published by *MarketWatch*, entitled "Profits and Pain: Backed by D.C. power players and private equity, a healthcare provider

42

is under scrutiny for failing fragile seniors." For example, Dr. Alan Lazaroff, founder of the nonprofit PACE provider Total Longterm Care, Inc., which later became InnovAge, told *MarketWatch* that the not-for-profit structure was best suited for PACE programs. In exchange for a fixed monthly per-participant fee, PACE providers are required to cover all the healthcare needs of their participants, nursing home-eligible seniors who typically have six or nine chronic conditions, and who are predominantly eligible for both Medicare and Medicaid. "You can make a lot of money, if you don't spend any" on patient care, Lazaroff told *MarketWatch*. "That's why it was set up to be a nonprofit in the first place."

115. In 2013, Defendant Hewitt met Defendant Scully at a hotel in San Francisco. Scully later told *MarketWatch* that Hewitt told him that she was looking for "capital to expand her business offering comprehensive medical care to frail seniors through taxpayer-funded programs." Scully, who now specialized in healthcare investments at Defendant WCAS, a private equity firm, told Hewitt he would love to work with her. But Scully and WCAS were prohibited from providing InnovAge with capital under federal regulations, which barred PACE providers from operating as for-profit companies. Soon, Scully, who served as Administrator of CMS under President George W. Bush, lobbied Congress and federal officials to change the law. "'PACE is a wonderful thing' that should be available to many more seniors," Scully told *MarketWatch*. "I'm all about trying to make it bigger."

116. After his meeting with Hewitt, Scully recounted to *MarketWatch*, he contacted officials at CMS, which was then led by Director Defendant Tavenner, whom Scully described as a "good friend." By May 2015, just months after Tavenner stepped down from her government position, CMS lifted the restrictions on for-profit PACE providers, paving the way for InnovAge's

conversion to a for-profit company ready to receive capital investment from private equity firms like Defendant WCAS.

117. Over the following year, Scully continued to aggressively lobby on behalf of InnovAge to obtain approval by the Colorado Attorney General in 2016 to operate as a for-profit company in Colorado. InnovAge's conversion was controversial. Public commenters opposed the application out of concern that for-profit PACE providers would prioritize profits over patient care. "It may consider patients second and profits first," said Edwin Kahn, a lawyer who worked with the Colorado Center on Law and Policy, according to a December 6, 2015 article in the *Denver Post.* To assuage concerns raised by public commenters, the Colorado Attorney General imposed monitoring requirements to ensure that InnovAge continued to meet the requisite standard of care for its enrollees. For example, the Attorney General required InnovAge to fund an ombudsman position in the Colorado Department of Human Services for five years. By design, the ombudsman was to act as an advocate for patients at InnovAge facilities by receiving patient complaints and working with the patients to resolve them with InnovAge. In addition, the Attorney General mandated an assessment by an independent organization that was to review InnovAge's performance as a for-profit PACE provider three years after the Company's conversion.

**B. After Its For-Profit Conversion, InnovAge Implements Aggressive Enrollment Strategy in Relentless Pursuit of Revenue Growth**

> *"I'm saying this lovingly: PACE is like community co-op grocery stores,
> I'm hoping someday it becomes Whole Foods."*

118. On May 13, 2016, InnovAge became the first PACE organization to achieve for-profit status. In an August 20, 2016 article entitled "Private Equity Pursues Profits in Keeping the Elderly at Home," the New York Times noted InnovAge's aggressive expansion push, commenting: "No company has moved with more tenacity than InnovAge."

119. Defendants Hewitt and Scully continued to advance their shared vision for InnovAge's rapid growth. Defendants WCAS and Scully also believed the burgeoning senior population in the United States was and would continue to be a massive, untapped market for PACE programs that InnovAge was poised to capitalize upon—virtually without competition. "I'm saying this lovingly: PACE is like community co-op grocery stores," Scully later told Marketwatch. "I'm hoping someday it becomes Whole Foods."

120. By quickly capitalizing on that market, Defendant Scully aimed to take InnovAge public in as few as four years. "Welsh Carson hasn't set a timeframe for when it plans to get a return on the investment," Defendant Scully told Modern Healthcare, "but with the growth of the senior population and the market for PACE around the country, he said an initial public offering in four years or so wouldn't be out of the question." As MarketWatch would later report, "Scully, together with other former top officials at CMS, became instrumental in unleashing the private sector in PACE—and Scully's firm would be among the first in line to profit from it."

121. Aggressive increases in enrollment—often referred to as the Company's "census"—was the core focus of Defendants Hewitt's and Scully's growth strategy for InnovAge. InnovAge's only source of revenue was the "capitated" payments the Company received on a PMPM basis. While InnovAge's capitated revenue was a reliable and recurring source of funds, the payments were mostly fixed, averaging $7,900 a month or $95,000 a year. For InnovAge, the fastest and simplest way to grow revenue rested on a single goal: increase enrollment.

122. To recruit eligible participants, InnovAge invested millions in branding, advertising, and marketing, launching a brand campaign in 2015 with advertisements and videos featuring the actress Susan Sarandon that offered seniors a "Life on Your Terms." According to InnovAge's 2015 Annual Report, the brand campaign's launch "reached 21 million people through social

45

media and traditional media coverage" and "increased call volume to InnovAge by 23%, leading to a 53% increase in enrollments at the California PACE center."



123. For the next four years, InnovAge's aggressive recruitment efforts appeared to be an unmistakable success. According to the National PACE Association ("NPA"), an average PACE organization grows at the rate of three participants per month, with a national average quarterly growth rate of 2.1 percent. But in its first year as a for-profit company, InnovAge reported that the number of participants under its care had grown by 13% to 3,155, resulting in revenue growth of 15.5%. In each of the next four years, InnovAge reported similar, staggering growth rates that far exceeded any other PACE provider. By June 30, 2017, just one year after converting to a for-profit, InnovAge announced in its 2017 Annual Report that the Company had already become "the largest PACE provider based on participants served"—touting a 13.9% increase in participants in nine centers across four states, which had yielded a 16.7% increase in revenue. To continue this growth, InnovAge aggressively expanded by building new PACE centers (which InnovAge calls "de novo centers") and "strategic acquisitions" of existing centers operated by other providers. In 2018, InnovAge continued to report steady growth, announcing an 11.8% census increase to 4,102 participants in 16 centers across five states, with revenue growing by 17.2% to $319 million.

124. InnovAge's 2019 Annual Report touted the Company as "leading the way to expanding PACE." Continuing to call growth "a core focus for InnovAge," Defendant Hewitt announced eyepopping growth with its census increasing by 44.3% to 5,920 participants at 16 centers across the country. Defendant Hewitt reported that InnovAge had "doubled the number of participants entrusted to our care" through acquisitions of seven centers in Pennsylvania and Virginia, and with construction underway of a "de novo" site in Sacramento, California, together with an expansion of the San Bernardino center, Defendant Hewitt projected that InnovAge would serve 3,000 older adults in California, or 50% of its total existing number of participants.



125. InnovAge's explosive growth led WCAS to begin to extract returns on its investment by causing InnovAge to assume new debt and use the proceeds to pay a dividend to WCAS, which could then be distributed to its investors. For example, in May 2019, InnovAge upsized a term

loan facility from $75 million to $190 million, using a portion of the proceeds, along with existing cash, to pay $66.1 million in dividends to WCAS, representing approximately one-third of WCAS's initial $196 million investment in InnovAge just three years earlier. Defendant Scully later told MarketWatch that the $66.1 million dividend was the "second or third" dividend paid out to WCAS.

126. By early 2020, Defendants WCAS and Scully began to implement their exit strategy by soliciting bids for a full or partial sale of InnovAge through either a strategic acquisition or an initial public offering. On July 3, 2020, PEHub.com reported that Defendant Apax agreed to buy a stake in InnovAge from WCAS in a deal that valued the Company at $950 million, stating that WCAS accepted Apax's bid over an acquisition bid from UnitedHealthGroup Optum. Under the deal, Apax and WCAS jointly controlled InnovAge, with each owning 49 percent stakes. The deal's $950 million valuation of InnovAge represented a 480% increase from WCAS's investment in the Company just four years earlier.

### C.  After Its For-Profit Conversion, InnovAge Became Singularly Focused on Enrollment
*"Census is King."*

127. Unknown to investors in the IPO, InnovAge's fixation on rapid census growth had already led to disastrous results across InnovAge's centers. Plaintiff's investigation, along with investigative reporting by *The Capitol Forum*, a subscription-only investigative news organization, has revealed evidence of systemic mismanagement, substandard care, and worse health outcomes resulting from what current and former InnovAge employees described as a relentless push for enrollment growth to maximize revenue, which resulted in severe staff shortages, high caseloads, scheduling delays, lack of coordination by caregivers, insufficient training, and substandard medical care—all of which violated PACE regulations and placed the Company at heightened and

significant risk of regulatory sanctions, including suspension of enrollment, if identified during an audit by CMS or an SAA.

128. The Company's prioritization of enrollment growth at all costs began after InnovAge's for-profit conversion, which former employees called a "turning point" for the Company. With a for-profit model, WCAS's investment, and Defendant Scully's goal of an initial public offering in only four years, increasing enrollment in the program—and thus the PACE funding for the program—became the single, driving force for the Company. One former employee, FE-5, explained that for InnovAge and its senior leadership, "census is more important than anything. Census is king."

129. "One way to think of it is that before the switch," a former enrollment employee told *The Capitol Forum* in March 2021, "the enrollment and Medicaid eligibility departments worked for the operations group. After the change, we answered to the finance and investment group." Seven other former employees confirmed that account, with one employee explaining that "[t]he expectation" was "to enroll as many people as possible" and "to have the appearance" that InnovAge "was a profitable company, and a way to do that was to encourage enrollment."

130. To implement the Company's aggressive growth targets, InnovAge required business development employees to meet "high quotas for monthly enrollments and referrals to the program" and they "could receive bonuses for exceeding those numbers." Former employees told *The Capitol Forum* that "business development representatives are graded on an A-F scale based on how many referrals they made every month," which are "shared with the rest of the business development team, likely further pressuring them to hit their quotas." These quotas did not change during the pandemic, a former business development representative told *The Capitol Forum*, even though InnovAge representatives largely were no longer able to solicit new business in-person:

"When the pandemic started, we were still expected to generate the same number of referrals. They still wanted 26 referrals per business development representative per month, and 8 of those had to become enrollments. It was crazy."

131. In an effort to maintain the Company's aggressive enrollment growth, InnovAge began to target populations of potential participants without regard to eligibility, safety, or the Company's capacity to adequately provide them with services. For example, FE-2, FE-4, and FE-6 described arrangements the Company had with the Colorado Coalition for the Homeless through which InnovAge enrolled participants at homeless shelters, motels and other locations. FE-6 explained that InnovAge's Denver Center had enrollees who were homeless and being put up by the Denver Housing Coalition at the Western Motor Inn and other hotels in Aurora and Commerce City, Colorado. FE-4 explained that higher enrollments meant more money for InnovAge.

132. As discussed above, to be eligible for enrollment in a PACE program, an individual must "be able to live in a community setting at the time of enrollment without jeopardizing his or her health or safety," 42 C.F.R. § 460.150(c)(1), a requirement that PACE programs must verify with "one or more visits to a participant's place of residence," id. § 460.152(a). InnovAge initially had followed these regulations, former and current employees explained, but had disregarded them in pursuit of its efforts to increase enrollment, targeting homeless residents because they utilize less services than other participants. As one current InnovAge employee in Colorado explained to *The Capitol Forum*: "When I first started at InnovAge, there was a rule that to qualify you had to have stable housing. That's just not the case anymore, the guidelines and rules have deteriorated."

133. Former employees recounted that healthcare providers raised eligibility and safety concerns about the recruitment of homeless populations, but that the Company's leadership ignored the complaints. For example, according to FE-2, healthcare providers who worked in

50

Denver primarily alerted FE-2 to this arrangement because they recognized that stable housing was a requirement to be enrolled through PACE and healthcare providers were also concerned about conducting required evaluations at locations where they felt unsafe. And FE-6 said that physicians complained about the practice of enrolling homeless participants multiple times to medical leadership in 2019 and 2020, raising concerns about bringing on enrollees to whom InnovAge had no chance of providing much care, while receiving payments from the government as if the patients were being fully cared for.

134. Former employees confirmed that InnovAge's senior leadership was aware of the significant eligibility concerns with the Company's recruitment of homeless residents and other populations, but refused to alter the Company's tactics. For example, while InnovAge executives insisted internally that monthly team meetings were held to discuss whether new enrollees met PACE regulations, FE-6 noted that the physicians would receive an email before the end of the month indicating that enrollments had already occurred without ever having been discussed. FE-2 criticized this practice to Regional Medical Officer Strange, who said that she conveyed those concerns to Chief Medical Officer ("CMO") Melissa Welch. On or about January 29, 2021, FE-2 spoke with CMO Welch and conveyed the problems with inappropriate enrollment of homeless residents and Welch responded that she had informed Defendant Hewitt about the issue, including the risks posed to InnovAge staff.

135. Defendant Scully later confirmed that he and InnovAge's senior executives were aware of the Company's enrollment of homeless residents in a November 2021 interview with MarketWatch, claiming that the Colorado social services agency asked the Company to enroll those individuals, which Colorado regulators disputed, explaining that "the agency does not take a role in encouraging enrollment of individuals or groups in PACE."

136. For other populations of potential participants, current and former employees explained that to meet their enrollment quotas, business development employees routinely misrepresented the level of care the programs could provide to convince seniors to switch from their existing health plans to InnovAge's PACE programs. In particular, "[h]ome care presented to potential participants is extremely misleading and unquantifiable," one former business development representative told *The Capitol Forum*, "and once enrolled is often significantly less than what was expected, which led to significant inadequacies in the level of care needed versus what was actually provided."

137. InnovAge's aggressive enrollment tactics were coupled with equally aggressive strategies to prevent disenrollment. As discussed above, in the Offering Documents, InnovAge touted its "very low level of voluntary disenrollment" as evidence that "participants are highly satisfied with their care." But, in fact, InnovAge used overly aggressive tactics, including those prohibited by PACE regulations, to convince participants not to disenroll and retain the funding stream that came with them. For example, four former social workers told *The Capitol Forum* that "their departments were all tasked with talking participants out of disenrollment" and were directed to "[n]ever take the first 'no' for an answer." According to one of the former social workers, "[i]f we put the disenrollment paperwork in, we would get immediate pressure from management about it. They would put a lot of heat on us to stop the disenrollment and then they would want to set up a meeting" and "in the meeting, they will promise everything to participants, that things will get better, and would try to convince them to stay." Another former social worker explained, "InnovAge had us argue with people out of disenrolling all the time. A center director came into the office and offered someone $50 to keep a participant enrolled."

52

138. Federal PACE regulations and guidance, however, prohibit organizations from contacting "former participants who have disenrolled, or current participants who are in the process of disenrolling, as a means of re-enrolling or retaining these individuals." PACE Manual, Chapter 3 – Marketing Guidelines, § 60.1. Similarly, PACE regulations prohibit "[g]ifts or payments to induce enrollment, unless the gifts are of nominal value as defined in CMS guidance, are offered to all potential enrollees without regard to whether they enroll in the PACE program, and are not in the form of cash or other monetary rebates." 42 C.F.R. § 460.82(e)(3); see also PACE Manual, Chapter 3 – Marketing Guidelines, § 60.3.

139. According to former employees, InnovAge nonetheless employed these aggressive tactics to retain enrollment and the revenue that came with it. "It's just for the money," a former social worker at InnovAge's San Bernardino facility explained in an interview with *The Capitol Forum*. "That's why there is such pushback whenever anyone wants to disenroll. It can take months to get them a simple blood test or medication change, but once management knows they want to disenroll, it immediately becomes 'what can we do to keep them?'"

### D. As Enrollment Surged, InnovAge's Centers Suffered from Severe Staff Shortages, High Caseloads, and Significant Delays and Lack of Contracts with Specialists

*"I wish they were as aggressive on their staffing
as they are on enrolling participants."*

140. Although the number of participants surged at the Company's existing centers, the number of clinical staff, amount of resources, and access to specialists did not. Rather than invest in growing the capacity of centers to keep pace with enrollment, InnovAge focused its resources instead on hiring sales and marketing staff. As a result, clinical staff became more and more overwhelmed with the growing enrollment, leading to staff shortages, increasingly high caseloads,

53

significant delays in processing treatment orders, a lack of appointments with specialists and a failure to follow up on specialist-directed care.

141. "The amount of people that were being enrolled was taxing the system," a former Denver social worker told *The Capitol Forum*. "The number of patients versus the number of staff to meet patient needs in a timely manner was just not adequate." According to other current and former employees, *The Capitol Forum* reported, "[t]hese delays include both primary care that should be provided by InnovAge as well as outside appointments with specialists that InnovAge is supposed to arrange, and the employees said that thousands of these outside referrals to see specialists were outstanding by more than 180 days."

142. For example, although InnovAge is required to have contracts with third-party specialists to offer holistic care to patients, the contracts they had were woefully inadequate. As one current employee explained to *The Capitol Forum*, "we do not have enough specialists to satisfy our population. Nope I say that without any hesitation." Former employees complained that third-party contracts with primary care physicians, dentists, rehabilitation facilities and other services either did not exist or were too few to satisfy the demand for InnovAge's patients. One explained that "from a regulatory perspective, you have to provide that service. Period. You have taken the PACE funds and you have to figure out how to provide it."

143. The ombudsman established after InnovAge's for-profit conversion corroborated these accounts, telling *The Capitol Forum* in March 2021 that its offices received "complaints from patients that indicate that 'staffing at InnovAge facilities is a serious concern, and there is not enough staff.'" According to the ombudsman, Shelbie Engelking, her office had "been getting a lot of complaints about a lack of dental and podiatry services," adding that "InnovAge closed its inhouse dental facility for most of the last year because of Covid. If they can't provide it in house,

54

they are required to contract that service out, but patients and families are reporting they don't have enough contracts to provide the services that are needed." The significant delays and backlog resulted in serious adverse effects on InnovAge's participants' health. "The added amount of time it is taking to have dental work approved, not just scheduled, but approved, is just ridiculous," one employee explained. "[T]hese are people with no teeth or broken or lost dentures who are having a hard time eating, which leads to other issues. There is just a massive delay in care, and even once the SDR [Service Delivery Request] is processed or approved, whether something is then scheduled and they are seen, I don't know." Even meeting basic needs like delivery of prescriptions overwhelmed InnovAge. Several former employees told *The Capitol Forum* that patients experienced significant delays in receiving medication because InnovAge wanted to have the same drivers who delivered patients to daycare centers and other medical appointments also deliver medications. The drivers were tasked with picking people up, and those same drivers were the ones that InnovAge wanted delivering medication for the sake of cost efficiency," one former employee in California said, "but they didn't have the capacity and so were sometimes not able to deliver them on time. InnovAge didn't want to pay the extra cost to have the meds delivered by the pharmacy, which would have been more efficient and got the medications to participants on time consistently."

144. Remarkably, inadequate staffing had gotten so bad that at the San Bernardino, California facility, instead of offering the service that the government was paying InnovAge to handle, the director drafted a letter to enrolled patients asking that the patients themselves schedule outside specialty appointments. According to the letter, participants would receive authorizations from InnovAge by text or email to schedule their appointments and would communicate status updates and transportation needs to InnovAge on their own. A former InnovAge social worker expressed

55

total disbelief that InnovAge would even think of rolling out a program that shifted their responsibility to the patients and depended on geriatric capabilities for text messaging: "this is a geriatric population. What were they thinking?"

145. In addition, the growing number of participants resulted in an inability to effectively coordinate individualized care, undermining one of the foundational purposes of the PACE program and InnovAge's purported business model. As discussed above, PACE programs are required to use interdisciplinary teams ("IDTs") to oversee individualized care plans for each participant, but ITD members could not manage and coordinate their increasingly large caseloads. "No doctor or social worker was going in and writing actual participant goals in the care plan," one former social worker told *The Capitol Forum*. "The care plans were just prepopulated with generic goals for each participant, like 'will supply resources, monitor depression, etc.' Nothing was ever closed out. We would just meet every six months and change the date on the forms to make them look current."

146. In some cases, *The Capitol Forum* reported, the "delays in care are having unfortunate but preventable consequences for InnovAge patients," adding that "[o]ne former doctor at the Pueblo facility stated that they believed there were three premature deaths due to the patients' inability to see specialists or to organizational dysfunction, while other employees expressed their view that certain lapses in care resulted in patient death." The article added: "Literally, if it was life, limb, or eyesight the provider would have to personally escort the order through the system and follow up day after day to make sure it was fulfilled," a former doctor said, "otherwise, it sat on the pile."

147. InnovAge's home care services also fell far short of what PACE required. As discussed above, InnovAge is required to provide home care service if needed by its participants, and a home

care coordinator is required to be part of every patient's IDT. Home care can include everything from assisting a patient with activities of daily living such as helping to cook and use the bathroom to providing daily medications and physical therapy. The Offering Documents touted InnovAge's "in-home care capabilities," claiming that those services "enable our participants to live safely in their homes and avoid nursing homes to the extent safely possible."

148. But staff shortages, and the Company's reluctance to provide more labor-intensive services, had resulted in widespread substandard home and clinical care for its participants. A current InnovAge employee in Denver told *The Capitol Forum*, "home care is a big source of dissatisfaction because sales and marketing often promise that prospective enrollees can get seven hours a day, seven days a week." Instead, the current employee continued, "the most you can get is two or three hours, two or three times a week," even though InnovAge promises much more for its enrollees. A former InnovAge enrollment representative added that while InnovAge promised "all-inclusive care in one place," to receive "any home care you had to be in pretty dire need." Indeed, other employees told *The Capitol Forum* that participants who had had robust home healthcare would suffer major declines after enrolling in InnovAge because they received vastly fewer home services.

149. During the pandemic, home care services became increasingly important as the Company pivoted more towards home care after it had to close its centers. But InnovAge failed to increase its investment in those services or follow its own protocols when it came to care plans and checking in on participants.

150. For example, one former social worker told *The Capitol Forum*, "during the pandemic, InnovAge staff were supposed to call participants at least once a week to check in on them and make sure they had enough food, had enough medications, and weren't experiencing any

57

symptoms of Covid-19." Because InnovAge failed to do so, "[a]n individual had died, alone, on the floor. She was found on a Monday or Tuesday, and she had been dead for a day or two," one former employee said. "I checked her record, and someone at her InnovAge center had logged the three phone calls on the prior Friday, but there was no record of a welfare check being requested or conducted."

151. Despite the growing importance of home care services during the pandemic, however, InnovAge's senior management was resistant to hiring additional staff. "I tried to explain to the C-suite that providing home care takes at least twice as much work," a former senior medical employee told *The Capitol Forum*, "so we need to hire more people in order to provide what we say we are providing. But they said no. The entire pandemic, they were trying to bring in people from different departments to help with home care, using drivers to set up telemedicine calls, for example. They wanted to keep the same amount of people but do twice the work." A current rehab employee for InnovAge confirmed this account, after having been reassigned during the pandemic to do home care work. The employee and another colleague were asked to sign a document certifying that they had been trained in skills outside of rehab care, e.g., tasks typically assigned to a Certified Nursing Assistant, despite never having received any training.

152. Remarkably, rather than invest more in home care services, one former representative told *The Capitol Forum*, "InnovAge tried to cut home care because of the cost involved, saying that during the pandemic 'there was always the talk and we're giving them what they need, but it wasn't done. They continued to have meetings on how to reduce home care hours.'"

153. Indeed, a former vice president at InnovAge explained to *The Capitol Forum* that "low staffing levels were often at the core of InnovAge's problems" in areas other than home care as well. But "while they were tasked with projecting staffing needs for the organization based on

coming enrollment numbers, management rarely committed to hiring additional staff to meet those needs," the former vice president said. "I was in the enrollment meetings," the former vice president added, "they were doing everything they could to get participants in and I was there because it would mean a staffing project, what staffing would look like for that projection. They made a lot of promises that I knew personally they couldn't honor, but they'd talk about revenue, revenue, revenue and that we need money from the state. But I knew we didn't have the staff to take care of those participants. I wish they were as aggressive on their staffing as they are on enrolling participants."

### E. For Years, Internal and External Audits Revealed the Widespread Dysfunction, Systemic Deficiencies, and Substandard Care at InnovAge's Centers in Every State

*"A former Regional Executive for California repeatedly asked [Defendant] Hewitt if InnovAge could 'pause enrollment for a few months to allow us to build a better network?' Hewitt denied these requests."*

154. For years before the IPO, internal and external audits, along with complaints and concerns raised by employees, participants, and family members, had alerted InnovAge to the widespread and systemic deficiencies and substandard quality of care throughout its centers.

#### 1. California

155. For example, internal "mock audits" conducted by InnovAge's compliance department in 2016 and 2017 had revealed ongoing lapses in care since at least 2016, according to documents filed with a July 2019 whistleblower complaint ("Whistleblower Complaint"). The Whistleblower Complaint, filed under the federal False Claims Act by a former Chief Operating Officer at InnovAge in San Bernardino, attached an internal audit report sent to Chief Compliance Officer Lori Rothwell, which identified several instances of "actual or potential delay of treatment."

59

Specifically, the report indicated that hundreds of specialist appointments had not been made and the absence of specialist referrals led to worsening, chronic, and acute medical outcomes.

156. Other former employees confirmed the 2016 internal audit findings. According to FE-3, the 2016 internal audit also revealed deficiencies in documentation of medical records and care planning.

157. In addition, according to the Whistleblower Complaint, another mock audit of the San Bernardino facility in May 2017 revealed outstanding orders as requiring "immediate corrective action" for carrying an "extreme" risk level. The mock audit found that "scheduling is an urgent and large concern and is an ongoing concern since the last audit which was nine months ago," noting "1,000 outstanding orders of which, many are over a year outstanding." Further, the audit flagged "accurate and timely" communication of new orders as "Immediate Corrective Action Required" with an "extreme" risk level. Additionally, the mock audit flagged "Service Requests" as requiring corrective action because 40% of the service requests made lacked documentation in enrollees' electronic medical records. Indeed, half of the requests made did not document that the participant herself had not been notified of a denial of the request.

158. The results of the 2017 internal audit, according to the Whistleblower Complaint, were provided to InnovAge senior management, including Defendant Hewitt.

159. According to FE-3, the Executive Director of InnovAge's San Bernardino PACE center, acknowledged that, for years, InnovAge failed to carry out thousands of physician orders for medically necessary services. FE-3 reported that, according to the former Executive Director, InnovAge's executives had repeatedly been made aware of the shortfall in providing services. In fact, Maria Zamora, a former Regional Executive for California, repeatedly asked Defendant

60

Hewitt if InnovAge could "pause enrollment for a few months to allow us to build a better network?" Defendant Hewitt denied these requests.

160. In addition, at a September 26, 2017 San Bernardino Participant Advisory Committee ("PAC") meeting, PACE participants voiced concerns about medication delivery, according to minutes of the meeting attached to the Whistleblower Complaint. For example, one participant explained that he was running out of medications because InnovAge was not timely delivering the medication to him. The PAC meeting minutes further note: "The medication issues have been persistent since the start of the company. Medications need to be 100% accurate, InnovAge needs to make the right changes for the safety of the ppt. [patient]."

161. Worse than having inadequate systems for managing patients, according to the Whistleblower Complaint, "InnovAge knowingly withheld service request documentation from CMS during an audit. This documentation included the contents of a spreadsheet entitled Services Delivery Requests Record, which contained the following fields: participant name; the date a service request was received; the category of the request; a description of the request; whether and when the request was assessed; whether the request was approved or denied; when, if ever, the participant was notified of the decision; whether that notification was written or oral; and when, if ever, the requested service was provided."

162. Despite InnovAge's efforts to conceal evidence, however, CMS audits still identified significant deficiencies at InnovAge's California and Colorado centers, many of which echoed the findings by the Company's internal audits. According to CMS public records, the federal agency conducted at least seven audits of InnovAge centers from 2017 to 2019 that resulted in multiple findings of "corrective action required" ("CARs") and "immediate corrective action required" ("ICARs").

61

| PACE Organization Name | Audit Year | Audit Type | No. of CARs | No. of ICARs | Audit Score |
|---|---|---|---|---|---|
| Total Community Options, Inc. | 2019 | Routine | 11 | 3 | 3.4 |
| Total Community Options, Inc. | 2019 | Routine | 6 | 4 | 2.8 |
| Total Community Options, Inc. | 2019 | Routine | 8 | 2 | 2.4 |
| TCO Eastern Holdings, LLC | 2018 | Routine | 4 | 2 | 1.6 |
| Total Community Options, Inc. | 2018 | Routine | 9 | 3 | 3 |
| Total Longterm Care, Inc. (CA) | 2017 | Trial | 6 | 7 | **4** |
| Total Longterm Care, Inc. (CO) | 2017 | Routine | 8 | 9 | 5.20 |

163. CMS assigns each audited program an audit score, which is based on the total number of CARs and ICARs identified. In 2017, CMS audited 74 PACE programs, reporting that the average audit score was 2.4. The CMS audits of InnovAge's programs in California and Colorado, however, found audit scores of 4 and 5.2, respectively, placing both programs in the top 10 worst-performing by audit score for the 2017 period.

164. In September 2017, during the Executive Director's tenure at the San Bernadino center, CMS notified Defendant Hewitt and Chief Compliance Officer Lori Rothwell about the results of its August 2017 audit, which had "detected systemic conditions of non-compliance that require immediate corrective action." For some serious conditions, CMS required InnovAge to implement "immediate corrective action" within five days and develop a corrective action plan ("CAP") to correct the deficiencies identified and "prevent the issues from recurring." The areas identified by CMS included:

- timely notifying participants of decisions to approve or deny service;

- providing denial notifications that advised participants of their "right to appeal the denial" and how to do so as well as the specific reason for service denials;

- conducting in-person assessments or reassessments when required to do so; and

- ensuring that interdisciplinary team members conducted initial assessments upon enrollment and that they took part in care-planning.

165. The problems described in San Bernardino continued through at least the spring and summer of 2019. For example, FE-1, who worked as a social worker at InnovAge's San Bernardino center from March 2019 to August 2019, found transportation services and access to rehabilitation facilities and specialist appointments to be inadequate. FE-1 offered, by way of example, that there was only a single pharmacist on staff to serve 800 patients.

166. After resigning, on August 9, 2019, FE-1 sent an email notifying executives that InnovAge's practices were leading to high employee turnover and poor patient outcomes, which was sent to Defendant Hewitt; Maria Lozzano, Chief Operating Officer of Western Regional Operations; Claudia Estrada, Regional Director of the San Bernardino Clinic; and Cheryl Rice, Chief Operating Officer, Western Region.

### 2. Colorado

167. The same systemic deficiencies in California also permeated InnovAge's Colorado operations.

168. CMS conducted onsite audit fieldwork in Colorado from July 10 to 14, 2017, issuing a final report on November 9, 2017, concluding that InnovAge was noncompliant with certain PACE regulations and ordered InnovAge to take immediate corrective action for several audit conditions. CMS's findings included the following:

- InnovAge "failed to provide services that were accessible and/or adequate to meet the needs of its participants";

- InnovAge "failed to provide care and services in accordance with participants' approved care plans";

- InnovAge "failed to develop a comprehensive plan of care within 30 days of the participant's enrollment," including "initial assessments"; and

- InnovAge's "denial notifications failed to include the specific reason(s) for the denial in a clear and understandable manner."

169. CMS conducted another audit from April 1 to 12, 2019, issuing its final report on September 30, 2019. The 2019 audit report found multiple issues flagged as CARs and ICARs, including issues identified in the 2017 CMS audit that had not been remedied. In addition, CMS identified additional ICARs, including that InnovAge failed to ensure that required IDT members were "appropriately involved in creating and re-evaluating the care plan," finding that "2,515 participants did not have full IDT involved in the development and/or review of their care plans."

170. In addition to CMS audits, Colorado regulators also conducted audits, inspections, and reviews of InnovAge facilities. In January 2019, the Colorado Department of Public Health & Environment ("CDPHE") conducted an inspection of InnovAge's home care, finding that InnovAge "failed to create individualized Plans of Care which covered all pertinent medication and treatments for 3 of 3 consumer [patient] records reviewed." This documentation failure meant that patient files lacked pertinent diagnoses, identification of services that were furnished and coordinated, prognosis, rehabilitation potential, permitted activities, and instructions for discharge or referral.

171. In addition, the Colorado Department of Health Care Policy and Financing ("HCPF") also conducted audits and reviews of InnovAge's centers in Colorado. On March 1, 2021, just days before the IPO, HCPF sent Chief Operating Officer Gina DeBlassie a letter noting that HCPF conducted "an ongoing review" at InnovAge's Denver location from January 6 to 9, 2020, as well as a review of participant records from InnovAge's Aurora location, which resulted in HCPF

64

requesting that the Company submit a CAP. InnovAge's first and second CAP submissions were rejected by HCPF on November 24, 2020 and January 21, 2021, respectively. HCPF informed DeBlassie that it had received the Company's final supporting document for its third CAP on February 25, 2021 and had approved it on March 1, 2021. Under PACE regulations, InnovAge would have been required to implement the third CAP, with HCPF monitoring the implementation and effectiveness of corrective actions to determine whether adequate progress had been made on the CAP to release InnovAge from it, which would have occurred only after InnovAge fully implemented it.

172. In addition to audits of its PACE centers, CDPHE, which oversaw InnovAge's home care programs, had issued dozens of citations to InnovAge in the three years before the IPO, with many of the agency's citations corroborating the reports by InnovAge's current and former employees. The citations identified included lapses in coordination for home care patients, lack of service documentation, care plans not being updated or followed, failure of InnovAge staff to come to patients' homes, lack of training and background checks for new hires, and failure to report neglect and abuse or changes in patient status. During an inspection in January 2019, for example, CDPHE found that InnovAge "failed to create individualized Plans of Care which covered all pertinent medication and treatments for 3 of 3 consumer [patient] records reviewed." For each of those three patients, InnovAge failed to document "all pertinent diagnoses; including mental status, identification of any services furnished by other providers and how those services were coordinated, equipment required, frequency and duration of visits, prognosis, rehabilitation potential, functional limitations, activities permitted, instructions for timely discharge or referral and any other appropriate items."

173. Other inspections noted InnovAge's failure to accurately track adverse health events of patients, with auditors finding blank incident and occurrence logs after events. "On 1/14/19, a consumer fell from the top of the stairs inside of her home to the bottom. Emergency medical services ("EMS") was contacted, and family member took the consumer to urgent care," one inspection reads, and a "review of the QMP [Quality Management Program] binder, dated December 2017 to February 2019, revealed no evidence the consumer, family, or staff complaints or incidents were incorporated into the program in order to evaluate and implement systemic changes." Similarly, investigators found complaint logs that were also blank despite multiple complaints from program participants. CDPHE investigators also found instances when InnovAge failed to provide evidence of documentation of daily nursing visits. For example, CDPHE found that InnovAge nurses had failed to document that they had shown up at a patient's house to provide daily insulin injections on 14 different days between October and December of 2019. "There was no explanation to address how Consumer #7 received her blood sugar monitoring and insulin injection on the above dates and why the consumer had not received nursing services on those dates," the citation stated. For each of the citations listed above, InnovAge stated that it would remedy the issue through additional staff training and process improvements.

174. Former employees confirmed that the deficiencies identified in these audits, and which would be later identified by audits in 2021, were evident throughout InnovAge's Colorado centers. While Defendants and other senior leadership were aware of these problems as well, the former employees stated that no action was taken to respond to the growing problems.

175. For example, FE-4, a center director who oversaw clinic operations, transportation, and human resources, among other responsibilities, described inadequate staffing levels and the urgency of increasing staffing as the most consistent complaint from nurses and physicians.

66

176. Likewise, FE-2 complained to DeBlassie that from March 2019 to February 2021, InnovAge did not have contracts with critical specialists needed to provide patient care, including rheumatologists and gastroenterologists. As a result, follow-ups and consultations didn't occur, either because there was not a specialist or because the order for a follow up was not being tracked. FE-2, a former Area Medical Director, noted that "there was only one way to put in orders … once they were in the electronic system, the process has to work. But it wasn't working because people weren't trained to do it. There was no follow-up with the processes." As a result, FE-2 explained that thousands of "orders never got completed." Further, FE-2 reported that CMO Melissa Welch received "orders tracking reports" via email and knew the number of outstanding orders requiring follow-up care on a weekly basis, yet the numbers remained staggering.

177. As in California, InnovAge also sought to obstruct government audits and conceal evidence of deficiencies from the auditors. For example, FE-4 was present in December 2020 when CDPHE came onsite to conduct an audit of InnovAge's Denver center. To FE-4's surprise, rather than cooperate, InnovAge sent a cease-and-desist letter claiming that CDPHE didn't have authority to conduct an audit. After InnovAge learned of an upcoming CMS audit of the Company's Colorado clinics in 2020, VP of Clinical Operations Michelle Blanton advised FE-2 to direct InnovAge's doctors and nurse practitioners in Colorado to cancel orders for follow-up care that had not been met in over six months. FE-2 refused this direction and told Regional Medical Officer Strange that such instruction was wrong. Strange concurred that canceling orders was improper. However, CMO Welch sided with Blanton and reiterated that orders outstanding for over six months had to be canceled. FE-2 said that doctors and nurses called to say that to follow this instruction would put their medical licenses in jeopardy.

178. Further, FE-2 explained that the Company leadership was unwilling to improve the substandard care processes that were pervasive in InnovAge's medical care and clinical operations. That resulted in missing labs, failure to follow up on orders, a lack of specialty care providers, and staff who were untrained in the use of the Company's electronic medical record system. According to FE-2, it was common for physicians to have to pick up the slack on orders not being completed. Physicians would make their own appointments, follow up on labs they had ordered, and other similar tasks that were typically administrative jobs.

179. FE-2 told Blanton that labs were being missed, orders were not being followed up on and patients were not getting the specialty care prescribed. Nothing changed, except that Blanton later got promoted to VP of Compliance for InnovAge. FE-2 next went to Chief Operating Officer ("COO") Gina DeBlassie. Ultimately, InnovAge executives held a call in November 2020 with about 40 doctors and nurse practitioners. Defendant Hewitt, CMO Welch, and a few other executives participated. FE-2 reported that many of the medical staff who participated were distressed after the meeting because CMO Welch knew in great detail about these issues, but said nothing about being aware or in support of their concerns. Meanwhile, Defendant and CEO Hewitt denied ever being aware of the issues, which the participants found lacked credibility.

### III. InnovAge Launches Successful IPO Based on Its Patient-Centered Care Model and Track Record of Enrollment Growth

*"We're really just focused on the growth of the program,
both on a state and national level."*

180. On February 8, 2021, InnovAge filed the Registration Statement on Form S-1, which was subsequently amended on February 24 and 26 and March 3, offering 16,666,667 shares of the Company's common stock at a price of $21.00, the high end of an upwardly revised range of $20 to $21.

181. On the day of the IPO, Home Health Care News published an article that quoted Defendant Hewitt. "I think the IPO is notable in a couple ways," Defendant Hewitt told Home Health Care News. "One is that it increases capital. And the second piece has to do with awareness. I mean, this program has been around for many years, and now is the time for PACE to really be that household word for the alternative to nursing home care for that patient, and I think this is really going to help." Defendant Hewitt put both of these goals in terms of InnovAge's growth. "We're really just focused on the growth of the program, both on a state and national level," Hewitt added. "And also looking at the number of seniors that are available to come into the program."

182. The Offering Documents touted InnovAge as having "demonstrated an ability to scale successfully" and "proven our ability to execute our model in multiple geographies, as evidenced by the strength of our center-level performance across markets." InnovAge told investors that "scale and track record of success across geographies" showed that the Company was "well-positioned to capitalize on a significant market opportunity to provide care to frail, high-cost, dual-eligible seniors."

183. In support, InnovAge cited the Company's meteoric growth in the five years since it converted to a for-profit, crediting Defendant Hewitt's "vision to convert InnovAge from a not-for-profit entity to a for-profit entity" as allowing InnovAge "to increase our agility in the marketplace and access the required capital to grow our footprint nationally and reach more participants." In support, the Company cited InnovAge's enrollment growth since its for-profit conversion in 2016, stating that "the number of participants under our care grew 106.0%" and "total revenues grew 143%":



Total Participants at Fiscal Year End

184. The Offering Documents stated that InnovAge achieved this rapid growth by implementing its "patient-centered" business model—the "InnovAge Platform"—which consists of two key components: (1) IDTs; and (2) a "community-based care delivery model."

185. "Our IDTs are the core of our comprehensive clinical model," InnovAge stated. "They design, manage and coordinate all aspects of each participant's customized care plan." InnovAge stated that its "IDT structure is designed to enhance access to care for our participants and eliminate the information silos and gaps in care that often occur in traditional fee-for-service models." According to InnovAge, "Each IDT convenes, at [a] minimum, experts across at least 11 disciplines, from the primary care physician to the social worker, who are collectively responsible for managing all aspects of our participant's care.



186.  Along with the IDTs, InnovAge explained that its "multimodal" and "community-based
care delivery model" leverages the Company's "care centers, the participant's home, and telehealth
to deliver comprehensive care to our participants in the most appropriate and cost-effective setting,
while enabling participants to live in their homes and communities." Calling the InnovAge
platform a "higher touch care model" compared to "many of our peers," InnovAge stated that its
providers "interact with our participants daily across multiple settings" and that a representative
participant visits a PACE center "six times per month," receives daily in-home support, and has
24/7 virtual access to an IDT member. "Each care plan is individualized by the IDT to include a
set of interactions tailored to each participant's needs," which InnovAge claimed "results in high-
quality care and better outcomes for our participants."

187.  The Offering Documents presented the InnovAge platform as creating a healthcare model
"where all constituencies involved," including "participants, their families, providers and

71

government payors, "[w]in." By serving each of the stakeholders involved in a PACE program, the Offering Documents claimed that InnovAge's business model is a "virtuous cycle" that "enables us to consistently deliver high-quality care, achieve high participant satisfaction and retention, and attract new participants." By "continuing to drive medical cost savings over a growing participant census" and thereby "deliver an even greater surplus to our organization," InnovAge would purportedly be able "to invest in more participant programs, evolve our care model, enhance our technology and fund new centers."

188. InnovAge explained that its rapid growth provided the "scale" that "enables us to invest in targeted sales and marketing capabilities to improve awareness of our program among potential eligible participants, which accelerates census growth." According to the Company, it has taken "a multichannel approach to sales and marketing, relying on a mix of traditional provider referral sources in the community as well as leveraging targeted digital marketing." A chart in the Offering Documents depicted the "diverse mix of referral sources" for its participants:



189. Throughout the Offering Documents, InnovAge told investors that its "track record of profitable growth" had "proven our ability to execute our model in multiple geographies, as evidenced by the strength of our center-level performance across markets." In addition to growth at the Company's existing centers, InnovAge also claimed that it had "a successful track record of building de novo centers" as well as existing centers operated by other entities, pointing to its purported "known track record for improving and integrating acquired businesses."

190. The IPO was a success. The promise of InnovAge's purported track record of rapid growth and high-quality care was enticing to investors. In connection with the IPO, including the underwriters' option, the Company issued and sold an aggregate of 18,995,901 shares of common stock at $21.00 per share, raising approximately $373.6 million in proceeds, net of underwriting discounts and commissions of $23.9 million and offering costs of $1.4 million. InnovAge's stock opened on March 4 at $24.00 per share. InnovAge's market value rose to $3.2 billion on March 4 and to a high of $3.5 billion the following week, which was approximately 3.6 times its valuation by Defendants WCAS and Apax just months earlier. InnovAge stated in the Offering Documents that the Company would use the IPO proceeds to repay certain debt and for general corporate purposes, including working capital, operating expenses, and capital expenditures.

191. In the ensuing months, InnovAge continued to report rapidly rising revenue driven by its purported "multi-pronged strategy" consisting of increasing participant enrollment and capacity within existing centers.

## IV. Unknown to Investors, Defendants Misrepresented InnovAge's Care Model and Growth Strategy

### A. Days after the IPO, Colorado Notifies InnovAge About Complaints of Staff Shortages, Caseload Size, Scheduling, and Inadequate Medical Care

*"Clinical staff numbers are 'dangerously low.'"*

73

192. On March 10, 2021, InnovAge received a letter from HCPF, notifying the Company that it had received a complaint about its Thornton, Colorado facility concerning "the number of clinic staff and medical care" ("Thornton Center Complaint"). According to the letter, the Thornton Center Complaint highlighted the following issues:

- "There has been a high turnover rate of clinic staff since March 2020."

- "Clinic staff numbers are 'dangerously low.'"

- "lnnovAge Colorado PACE leadership received concerns from staff about clinic caseload size, schedules, and that providers had practiced 'unethically' but the issue was not resolved."

- "The number of clinic staff are not sufficient to meet the medical needs of the participants in the catchment area."

- "Acute medical issues were observed during several home visits prompting staff to contact the PACE clinic and EMS. The medical issues were described as 'preventable or not caught by primary care.' Issues included but were not limited to medication management, infection after surgery, pulmonary embolism, and failure to monitor participants who tested positive for COVID-19."

- "Follow up care was not provided to several participants after discharge from the hospital."

- "The Triage Process is unclear."

- "Clinic staff did not actively 'check on participants' who lived in residential care settings. lnnovAge Colorado PACE leadership told staff that if a participant lives in a residential care setting, the 'facility would notify us if something was wrong.'"

193. HCPF directed InnovAge to conduct a root cause analysis ("RCA") of each of the issues raised in the Thornton Center Complaint. Each RCA was required to address "all contributing

74

factors," the "actions taken," and "ongoing improvements to resolve the issue." HCPF ordered InnovAge to submit each RCA within 15 business days from the date of the letter, by March 31, 2021.

194. Internally, InnovAge quickly determined that many of the issues raised in the complaint to HCPF were accurate. Later in March 2021, senior leadership from the Thornton center— including the Medical Officer and Center Director—sent a letter to participants and caregivers for the Thornton location that appeared to confirm the shortages in clinical staff. In the letter, InnovAge acknowledged that while many of the Thornton center participants "may not have a formally assigned individual primary care provider (PCP) at this time, we are here for you," stating that the Company was "currently hiring new physicians and nurse practitioners and hope to provide new participant assignments beginning later this month."



InnovAge PACE – Thornton
445 E. 124th Ave.
Thornton, CO 80241

www.InnovAge.com

March 2021



Dear InnovAge Thornton PACE Participants/Caregivers,

Thank you for trusting us as we've adapted how we deliver care over these past several months. Since the pandemic, several of our Thornton PACE center primary care providers have changed. The PACE all-inclusive care model has the added benefit of providing you with a team of providers working together to meet your needs. The majority of the team providing your care continues to do so.

At InnovAge, we are very much a team. Our primary care providers, nurses, social workers, MAs, CNAs, schedulers, office staff, pharmacists, therapists, caregivers, and transportation teams are in regular communication on your behalf and to meet your needs. We want to reassure you that while you may not have a formally assigned individual primary care provider (PCP) at this time, we are here for you.

We are currently hiring new physicians and nurse practitioners and hope to provide new participant assignments beginning later this month and into early April. In the interim, our medical director, center director, and nursing vice president will oversee care to ensure all your needs are met.

Our InnovAge Thornton PACE team is actively working to triage concerns and issues based on urgency. If there is a clinical decision that needs to be made, a provider will do so. If an issue or needed communication requires a different discipline (such as social work or nursing), the communication will come from the required team member relative to the problem or concern.

Thank you again for your understanding as we navigate the challenges of COVID-19, and as we smoothly transition back to in-person care. Each of us within the InnovAge family, from provider to participant, is stronger together.

Sincerely,

Shannon Tapia, MD
Medical Officer

Missy Follak
Vice President, Nursing

Linda Whyte
Center Director

195. Former employees confirmed the staff shortages at the Thornton facility, explaining that the resulting high caseloads had led to substantial lapses in services. For example, FE-6 explained that InnovAge's Thornton Colorado Center lacked the number of schedulers necessary to get

timely care for patients. FE-6 noted that the National PACE Association documents that the average case load for PACE Centers is 75 to 80 participants per physician. However, InnovAge delegated responsibility for 150 participants to each full-time physician. FE-6 commented that it was wholly unsurprising that substantial service lapses would occur where each physician provider had two times the recommended caseload.

196. In addition, on April 23, 2021, *The Capitol Forum* published a report on InnovAge, entitled "InnovAge: Assisted Living Operators Voice Concerns Regarding Company's Management of Residents' Health, Cite Overwhelmed Staff, Lack of Proactive Care; Company Acknowledges Understaffing Issues in Letter to Patients." In the article, operators of assisted living homes that have InnovAge enrollees as residents "said they have a high amount of interaction with the [C]ompany's medical network and shared their belief that InnovAge has more patients than it has the capacity to care for."

197. The article further reported that one operator "who works with the Thornton facility" shared that "InnovAge's care team had missed a breast cancer diagnosis for one of their residents, with the condition only coming to light when their assisted living staff noticed a lump as they were bathing the resident. Even then, the operator said, InnovAge mishandled the treatment of the cancer." Additionally, according to the article, while two of the three operators said that their InnovAge residents had "occasionally seen an InnovAge doctor via a telehealth visit," the operator "who works with the Thornton facility, which disclosed to patients that it was lacking primary care physicians and nurse practitioners in March, said that their InnovAge residents had not seen a doctor in over a year."

198. These problems were not limited to the Thornton center, however. "I just think they are overrun," one assisted living operator who works with InnovAge's Lakewood facility told *The*

*Capitol Forum*. "I've talked to some of the case managers, and they told me they have well over 100 cases each. It's just a mind-boggling number. There just becomes a system breakdown when you are trying to deal with that many sick, elderly people at once."

199. In addition, *The Capitol Forum* further reported that according to the assisted living operators, "InnovAge staff appear to have shifted from providing the kind of proactive care that defines the PACE program towards more reactive care, likely due to the inability to provide such time-intensive care for such a large, high-need population." The article added: "They are lacking a proactive mindset in care," the Lakewood operator said, "they've fallen into the same mold as other reactive managed care organizations. They're probably now spending more money than they want dealing with critical care issues. It's a result of the mass load of cases that they have."

200. The Lakewood operator stated that this lack of proactive case management by InnovAge meant that there was little to no follow-up when staff suggested changes to residents' care plans: "We have asked for behavioral health interventions and those haven't gone anywhere. To do that, a psychologist, a geriatric psychiatrist, someone skilled in medication management for psychotropics, et cetera, they should all meet to discuss a new plan, because we want to make sure we're not just hitting them with a wall of medications. But I've never seen those requests go anywhere."

201. "Unless we report something, they aren't interested in looking for things to fix," the Loveland operator said, adding that, even when their residents went in to see doctors prior to the pandemic, "it's not a full physical by any means, they just meet with [a] doctor and have a couple of quick discussions if anything is hurting. Luckily, we have an owner who is a nurse practitioner that can see the signs and symptoms of problems. But unless there is a drastic incident, they [InnovAge] won't look into it."

78

**B. InnovAge Orders Staff to "Clean Up" Evidence of Delays at Its Centers in Advance of Expected Audits of Colorado and Sacramento Facilities**

*"We will need these cleaned up by the first week of May – I know this is aggressive but compliance is a major focus for all facilities right now – we cannot continue to have these orders outstanding."*

202. Rather than address the deficiencies identified in the Thornton Center Complaint, and by staff at other facilities, InnovAge's senior management—including CMO Welch—directed the Company's staff to "clean up" evidence that could be uncovered by audits.

203. For example, in an April 2021 email obtained by *The Capitol Forum*, the director of the Company's Pueblo, Colorado center instructed the staff to "clean up" a backlog of outstanding orders by deleting them from the facility's electronic medical records platform. "We will need these cleaned up by the first week of May – I know this is aggressive but compliance is a major focus for all facilities right now – we cannot continue to have these orders outstanding," the center director reportedly wrote. "If they need to be cancelled and re-ordered then so be it – regardless we cannot have orders out 180+ days." According to *The Capitol Forum*, the email indicated that 305 orders for care were outstanding by more than 180 days.

204. InnovAge's Pueblo center was not alone. Other current employees at InnovAge's other centers told *The Capitol Forum* "they had also been asked to 'clean up' their facility's backlog of old, outstanding orders."

205. Indeed, remarkably, the Pueblo center director's instruction was consistent with past and current practice by InnovAge and its senior management, including CMO Welch, who had repeatedly directed the Company's staff to conceal evidence from CMS and SAA auditors during audits of the Company's centers in California and Colorado. For instance, FE-2 explained that after InnovAge learned of an upcoming CMS audit of the Company's Colorado clinics—an audit that was expected to review unmet orders—VP of Clinical Operations Blanton advised FE-2 to

direct InnovAge's doctors and nurse practitioners in Colorado to cancel orders for follow-up care that had not been met in over six months. FE-2 refused this direction and told Regional Medical Officer Strange that such instruction was wrong, who concurred that canceling orders was improper. However, CMO Welch sided with Blanton and reiterated that orders outstanding for over six months had to be canceled. FE-2 said that doctors and nurses called to say that to follow this instruction would put their medical licenses in jeopardy.

206. InnovAge's effort to "clean up" evidence of deficiencies at its Colorado facilities "by the first week of May" anticipated routine audits of its California and Colorado centers by CMS and Colorado regulators in May and June 2021. On May 10 and June 21, 2021, CMS began the audit field work for audits of InnovAge's Sacramento, California center ("Sacramento Audit") and its Colorado centers ("Colorado Audits"), respectively. Under longstanding CMS guidance, InnovAge would have learned in advance about both audits by receiving an engagement letter from CMS, which is typically sent approximately 45 days before the audit fieldwork.

### C. Post-IPO, Defendants Continue to Represent That InnovAge's Patient-Centered Care Model Is the Key to Its Growth Strategy and Financial Performance

*"I think InnovAge has done an excellent job of really ensuring that we've kept our turnover rates down."*

207. On the first day of trading following the IPO, Defendant Hewitt spoke to the media to promote InnovAge's business model as the key to growing the PACE program around the country. In an interview with Home Healthcare News, Hewitt said, "I think the IPO is notable in a couple ways," explaining, "One is that it increases capital. And the second piece has to do with awareness. I mean, this program has been around for many years, and now is the time for PACE to really be that household word for the alternative to nursing home care for that patient, and I think this is really going to help." "We're really just focused on the growth of the program, both on a state and

national level," Hewitt added. "And also looking at the number of seniors that are available to come into the program."

208. In the months that followed the IPO, Defendants continued to press the narrative of InnovAge's focus on a "high-touch patient-centered care model" designed to "improve the quality of participant care, while reducing overutilization of high cost care settings," reinvestment "to drive greater efficiencies and optimize performance," and "organic growth" driven by "increasing participant enrollment and capacity within existing centers." Defendant Hewitt summarized this concept at the start of the Company's first earnings call on May 10, 2021:

> We contract directly with Medicare and Medicaid through the program of all inclusive care for the elderly, otherwise known as PACE, which is a risk bearing 100% globally capitated program. We operate a high-touch patient centered care model designed to improve the quality of participant care, while reducing over utilization of high cost care settings. Our care model benefits our participants, their families, government payers and providers. Our model keeps families together, both emotionally and financially, while the government saves money, as evidenced by the National Pace Association report, which found the cost of PACE care was approximately 13% lower than traditional care for a comparable Medicaid population.

209. Defendant Hewitt discussed the Company's performance in her opening remarks on the May 10, 2021 call, highlighting that "referrals returned to the levels experienced prior to the second wave of COVID," which "adversely impacted" enrollment growth due to an "increase in mortality" and a "temporary slowing of new participant referrals," and that "we have seen early indications that gross enrollments are in excess of pre-second wave levels."

210. Hewitt further emphasized InnovAge's "low voluntary turnover rate" and "three feet deep succession planning to ensure our team is always trained and ready." A Piper Sandler analyst asked Defendant Hewitt to comment on "the capacity" of InnovAge's clinical staff and whether "that needs to grow with participant growth." Hewitt responded that the Company "has done an excellent job of really ensuring that we've kept our turnover rates down" and has been "very

81

successful as compared to other long-term care organizational results as well." Hewitt made no mention of the severe shortages in clinical staff at its Thornton center, including a lack of primary care physicians for hundreds of participants, high turnover, that complaints about shortages and turnover had been raised with Colorado regulators, or that the Company expected to be audited about those issues that month.

211. Analysts credited Defendants' representations and remained bullish despite the Company's modest financial results. In response to InnovAge's third-quarter 2021 earnings release, William Blair issued a report entitled "First Quarter as a Publicly Traded Company Largely in Line With Expectations, Fiscal 2021 Guidance Feels Conservative," concluding that "[w]hile the per-member per-month (PMPM) fee trended lower than our expectations (which management attributed to geographic mix) and drove the miss, we were encouraged by building referral momentum and early signs that enrollment growth has returned to levels prior to the late-2020 COVID case surge." Similarly, that same day, Piper Sandler issued a report entitled "Growth Outlook Intact Despite Transitory Headwinds; Reiterate OW, $31 PT." Citing InnovAge and Defendant Hewitt's assurances about increased referrals, Piper Sandler stated, "We don't see a cause for concern in near term top line expectations given the transitory nature of covid-related headwinds that impacted net enrollment growth," adding that the Company's "FY4Q guidance implies a solid rebound in sequential enrollment growth, 3% at the midpoint, and revenues and EBITDA above consensus." Likewise, Barclays used a report entitled "F3Q21 In-Line with Expectations," which dismissed the slight decline in total number of participants, citing the Company's statements that the decrease was attributed to "an increase in mortality amongst participants and a temporary slowing of new participant referrals" resulting from an additional

COVID-19 wave, adding that they were reassured because "referrals had returned to levels seen prior to the additional covid wave."

### D. Colorado Regulators Begin Surprise Audit of InnovAge's Colorado Programs to Assess Staff Shortages, High Turnover, and Insufficient Medical Care

*"[T]he [C]ompany's PACE center in Thornton…is 'effectively non-operational.'"*

212. On May 26, 2021, just five days after CMS completed its onsite fieldwork for the Sacramento and Colorado Audits, regulators began an unannounced focused audit of the Company's Colorado programs ("Focused Audit"). As discussed above (¶¶ 91-100), focused audits are conducted if CMS or the SAA determines that additional monitoring or auditing is required to identify issues of noncompliance, operational deficiencies, or significant audit findings. The Focused Audit was conducted by HCPF, which oversees PACE programs in Colorado, and CDPPHE.

213. The Focused Audit took Defendants and InnovAge's senior management by surprise, according to *The Capitol Forum*, as Defendant Hewitt was notified only minutes before auditors arrived onsite at all Colorado clinics. In a Zoom call the day after the audit began, May 27, 2021, *The Capitol Forum* reported that CMO Welch acknowledged that the audit related to "complaints that may have gone to the state about some of the turnover of staff, in particular at Thornton."

214. In the ensuing months, the issues that were the focus of the Sacramento and Colorado Audits only worsened. For example, on July 15, 2021, *The Capitol Forum* published another report, entitled "InnovAge: Unfilled Positions Increased 55% Since May, According to TCF Analysis; HR Employees Point to Low Pay, High Workloads as Cause for Increased Turnover," which reported that over the previous months, Innovage "had a high rate of turnover among its medical staff," with "[a] Capitol Forum analysis of the [C]ompany's careers page" finding "that there are now 285 open positions at the [C]ompany, a 55% increase since May." Two former

83

employees, who worked in InnovAge's human resources department and left in the last year, told *The Capitol Forum* that 200 out of the 285 open positions were "medical jobs" and likely "positions that InnovAge needs to meet its current healthcare obligations rather than for any future growth."

215. *The Capitol Forum* further reported that on a recent internal call with staff to discuss the Company's vaccination rates, ongoing government audits, and recent media coverage, InnovAge management fielded several questions about high turnover. "We have such a quick turnover of MDs and practitioners," another InnovAge employee asked, "what can InnovAge do to keep them here longer?" In response, CMO Welch acknowledged that "we did see turnover in provider staffing, particularly towards the latter part of last year," but said that she worked closely with the hiring department every week and that "our goal is always to identify permanent staffing at every center, people who want to be with us over the long term, because longevity is something that is important to us in terms of our provider retention." But despite Welch's assurances, former employees in human resources told *The Capitol Forum* that "InnovAge was always playing catch up to fill the existing holes in the staff and prepare for future departures as well."

216. The next month, on August 26, 2021, *The Capitol Forum* published another report on InnovAge, entitled, "InnovAge: Company Requires Contractors to Direct Most Emergencies Towards PACE Centers Instead of 911, But Contractors Say Low Staffing of Centers Is Allowing Emergent Conditions to Worsen." The article reported that InnovAge required its contractors, including assisted living facilities, to route emergency calls through its PACE centers, rather than 9-1-1, but that the centers were "far too short staffed to adequately address emergent patient issues."

217. *The Capitol Forum* further reported that the owner of one assisted living facility that contracted with InnovAge "said that InnovAge residents at his facility mostly go to the [C]ompany's PACE center in Thornton, which he said is 'effectively non-operational.'"

218. On September 2, 2021, *The Capitol Forum* published another report, entitled "InnovAge: Government Audits Enter Fourth Month as Company Adjusts Some Practices," which reported that state and federal auditors continued to gather data on InnovAge's Colorado operations, including "understaffing issues and the [C]ompany's homecare offerings," as well as "InnovAge's ability to follow through on service delivery requests for medical care." Current employees told *The Capitol Forum* that "given the abnormal length of the audit as well as the areas of interest for the auditors, the employees say they believe the government has likely found several deficiencies."

219. Despite myriad deficiencies in care, one employee told *The Capitol Forum* that the Company "continued to pressure salespeople to enroll as many people as possible into the program, which employees have stated is a major cause of dysfunction at the [C]ompany." According to the employee, "'Speed the lead' is the new key term in sales," adding, "when they have a referral, they want an intake or referral meeting scheduled within hours of first contact. It really feels like they are pushing a used car mindset."

220. By September 10, 2021, InnovAge had obtained substantial feedback from the audits and began relaying guidance for improvement in a staff call that day. *The Capitol Forum* obtained a transcript of the call, arising from the Colorado Audits, which described management's operational goals in the following areas:

- ensuring IDT coordination of care delivery;

- ensuring primary care oversight of patient use of medical specialists;

- appropriate categorization of service determination requests;

85

- recognition of patient complaints as grievances;

- conducting initial and semi-annual in-person assessments as often as required;

- ensuring that all personnel and contractors that have direct participant contact act within their scope of authority and practice;

- maintenance of records that are complete, accurate, and available to staff;

- ensuring participants and caregivers are involved in the development and reevaluation of a participant's care plan;

- development and reevaluation of care plans in a timely manner;

- ensuring the IDT remains alert to pertinent input from other team members, caregivers, and participants;

- ensuring required IDT members are involved in creating and reevaluating care plans; and

- providing services that are accessible and adequate to meet the needs of participants.

221. During the training call, *The Capitol Forum* reported, management "also told staff that CMS had found similar issues in a separate audit of some of InnovAge's operations in California." According to *The Capitol Forum*, the speaker on the Zoom conference stated: "As you can see, California and Colorado pretty much have the same areas of opportunities for improvement."

### E. After CMS Suspends Enrollment at InnovAge's Sacramento Center, Defendants Reassure Investors That the Problems Are Limited and Isolated

*"Colorado is a little bit different than Sacramento."*

222. In a letter dated September 17, 2021, CMS informed the Company that a 2021 audit in Sacramento revealed InnovAge's failure to provide participants with medically necessary items and services covered under PACE. CMS sanctioned InnovAge Sacramento by halting all new enrollments. CMS wrote that the enrollment sanction would remain in effect until CMS was

86

satisfied that InnovAge Sacramento had corrected the causes of the violations and the violations were not likely to recur. CMS described the Company's care deficiencies as:

- failure to provide all Medicare and Medicaid-covered services, as well as other services determined necessary by the IDT to improve and maintain the participant's overall health status;

- failure to ensure accessible and adequate services to meet the needs of its participants;

- failure of the IDT to coordinate 24-hour care delivery and to remain alert to pertinent information from other team members, participants, and caregivers; and

- failure of InnovAge Sacramento's PCPs to manage their participants' medical situations and oversee their participants' use of medical specialists.

223. On September 21, 2021, InnovAge released its financial results for its first full fiscal year, filing its 2021 Annual Report with the SEC on Form 10-K, which disclosed the audits for the first time in a public filing. InnovAge's Annual Report, however, continued to tout the Company as a "leader with a track record of driving profitable growth at scale."



224. In an earnings call that day, Defendant Hewitt minimized the significance of the Sacramento Audit, stating that "audits are a regular occurrence in our industry," and "We continue to work collaboratively with regulators as we seek to constantly improve our processes and outcomes to better serve our participants and their families."

225. Even though InnovAge had obtained feedback from Colorado audits showing that the same deficiencies had been found at its Colorado centers, Defendant Hewitt then added, "This freeze is limited to our Sacramento center and does not extend to our San Bernardino center in California. For context, there were less than 200 participants at Sacramento as of the beginning of this month, we are committed to quality improvement and comprehensive care coordination at each of our centers." Indeed, despite InnovAge's extensive knowledge about the audit findings in Colorado, Defendant Hewitt stated on the call that "in Colorado, we have not received any direction from CMS or the state of Colorado to freeze or otherwise curtail our program" and "there have been no immediate corrective actions identified in the preliminary findings or to-date."

226. Analysts responded positively to Hewitt's reassuring statements, concluding that the Sacramento enrollment suspension was not a reason to be concerned. On September 22, 2021, Barclays reiterated its positive stance on InnovAge. Despite the fact that InnovAge's stock price was trading at $11.65 per share, nearly 50% lower than its IPO price in March 2021, Barclays estimated a price target for InnovAge stock of $22.00 per share. Importantly, notwithstanding InnovAge's mandatory enrollment freeze in Sacramento, InnovAge's management still claimed that issues would be resolved by the end of fiscal year 2022 and that its enrollment trajectory would "grow double digits." Likewise, on September 22, 2021, Piper Sandler only modestly lowered its target price for InnovAge, claiming after having considered InnovAge's frozen enrollments in Sacramento that the "circumstances and straightforward fixes (e.g., better documentation) should

88

not be completely overlooked." Piper Sandler went even further in defending InnovAge, claiming, "Clearly there were hiring and training flaws, but we don't see this situation as representative of INNV's operations as a whole."

227. On October 9, 2021, *The Gazette* published an article describing the audits. It quoted a former executive who referred to InnovAge's practices as "a horror show." InnovAge's spokesperson, Mark Corbae, disputed the executive's claim saying, "We take a measured and pragmatic approach to our growth strategy." He continued, "Our primary concern is the health and safety of our participants and staff in every market we serve. All of our participants have access to experts across at least 11 disciplines as required by ... regulations."

228. On November 9, 2021, InnovAge announced its financial results for the first quarter of fiscal 2022 and filed its quarterly report with the SEC on Form 10-Q. InnovAge and Defendants continued to tout the Company's enrollment-first strategy, despite the results from the Sacramento and Colorado Audits showing widespread deficiencies resulting from the growth in enrollment. In an earnings call that day, Defendant Hewitt continued to tout the Company's "growth strategy," stating that InnovAge remained "on track with the three de novo centers we expect to open in fiscal 2023, two in Florida, Tampa, and Orlando, and one in Louisville, Kentucky."

229. In addition, Defendant Hewitt provided an "update on the status of our audits in Sacramento and Colorado," but continued to minimize the significance of the sanctions for the Sacramento facility, stating that "for context, there were less than 200 participants in our Sacramento center as of the beginning of this month." Defendant Hewitt also disclosed that CMS would "begin a routine audit in New Mexico that will be handled remotely."

230. During the question-and-answer portion of the call, analysts pressed Defendants Hewitt and Gutierrez on the financial significance of the corrective actions needed for Sacramento. In

89

response, Defendant Gutierrez assured analysts that, "[a]t this point, we're not assuming any material change in the margins," adding:

> And the reason for that is we do have staffing ratios in our centers. And we are reviewing that and are closely reviewing that. But the changes that we've made are not materially different. It's just really trying to get those positions filled and supplement them.
>
> So not material changes to those assumptions. Melissa can answer better as it relates to documentation, but that, in large part, is a workflow as opposed to any kind of investment in people or systems. Although we are implementing a new EMR in the future, but that, in large part, is a workflow process improvement as opposed to a resource investment.

231. Analysts also pressed Defendant Hewitt on the significance of CMS's referral of the Colorado Audits to its compliance enforcement division, which Defendant Hewitt dismissed as "not unusual" and did not carry any implications about suspension of enrollment or the imposition of other sanctions, adding that "Colorado is a little bit different than Sacramento."

232. On November 9, 2021, Piper Sandler published an optimistic analyst report despite the fact that InnovAge's stock price was trading at $7.06 per share. Piper Sandler offered a neutral update on the Sacramento and Colorado Audits, essentially saying that there was no indication of what the CMS compliance outcome would be. By contrast, the analyst remained positive about InnovAge's plans for a new facility in a new state which "indicates that the audits are not spilling over into growth plans." The next day, Barclays offered an even more positive assessment of InnovAge's prospects, claiming that the market was overvaluing risks and that catalysts lay ahead. Barclays predicted the audits were "a normal course of ongoing business." Also on November 9, 2021, William Blair offered a more pessimistic view of the audits, explaining that Colorado makes up roughly 50% of InnovAge's revenue and noting that management had been unable to provide much of an update on "timing or expected outcomes." Nevertheless, William Blair remained optimistic that new facility openings remained a key component of InnovAge's growth strategy

90

and that InnovAge expected to have at least three new locations in fiscal year 2023 and another two in fiscal year 2024.

233. On November 11, 2021, *The Capitol Forum* reported that Defendant and CEO Hewitt had misrepresented the New Mexico audit in the most recent InnovAge earnings call. Although she had said that InnovAge would "begin a routine audit," in fact, and as confirmed by a spokesperson for the New Mexico Human Services Department, the New Mexico audit had been ongoing for several weeks already.

234. On November 13, 2021, *MarketWatch* came out with its own investigative story entitled, "Profits and Pain: Backed by D.C. power players and private equity, a healthcare provider is under scrutiny for failing fragile seniors." In the article, one patient's family said that InnovAge purports to provide "all-inclusive care" when in fact it should be described as "*all-inclusive neglect*." (emphasis added). According to the *MarketWatch* article, "vulnerable seniors have been brushed aside as InnovAge prioritized financial growth in recent years, people who have worked for the [C]ompany say."

235. In the same article, Defendant Scully minimized the significance of the Sacramento Audit, telling *MarketWatch* in an interview, "Apparently we got backed up in Sacramento and had some service issues and responded very poorly [to CMS's questions about it]."

F.  **InnovAge's Stock Price Plummets after CMS and Colorado Suspend Enrollment at the Company's Colorado Centers**

236. On December 22, 2021, Colorado and federal regulators suspended enrollment in InnovAge's Colorado programs after concluding that InnovAge failed to provide proper care: "CMS has concluded that InnovAge CO failed substantially to provide its participants with medically necessary items and services that are covered PACE services, which adversely affected (or had the substantial likelihood of adversely affecting) its participants. This determination was

91

made as a result of deficiencies discovered during a 2021 audit by CMS. Consequently, CMS has determined that the seriousness of these deficiencies requires the suspension of any new enrollments of Medicare beneficiaries into InnovAge CO."

237. The letter from CMS, sent to Defendant and CEO Hewitt, informed the Company that an audit conducted from June 21 to July 8, 2021 (meaning based on records of care that would have pre-dated the IPO) showed that InnovAge's Colorado center was "substantially failing to provide to its participants medically necessary items and services that are covered PACE services and that those failures adversely affected (or have the substantial likelihood of adversely affecting) its participants."

238. Notably, the deficiencies listed in the letter suspending Colorado enrollments are the same as those in the letter sent to the Company months earlier regarding its Sacramento location. Pursuant to the letter, the following deficiencies were identified: "(1) InnovAge CO failed to schedule or delayed scheduling appointments for necessary services (in some cases, for urgently needed services); (2) InnovAge CO failed to adequately follow-up on pertinent information, including diagnoses and recommendations from specialists; and (3) InnovAge CO's clinical staff failed to inform the IDT of important medical information for the IDT to evaluate the participant's condition." Additionally, InnovAge announced that HCPF would also be levying sanctions in conjunction with CMS on December 23, 2021 as to Medicaid-specific deficiencies.

239. As a result of the freeze in enrollments, on December 23, 2021, InnovAge withdrew its financial guidance for fiscal 2022 (ending June 30, 2022).

240. On December 23, 2021, Barclays downgraded InnovAge and lowered its price target from $22.00 per share to $6.50 per share. Barclays noted that the Colorado market was 47% of InnovAge's total enrollment and expressed surprise in the audit findings and sanctions, writing:

"we did not anticipate it would progress to freezes, but rather a corrective action plan." In fact, Barclays went further, blaming InnovAge's management for its misapprehension because management commentary indicated that "issues were related to members accessing follow-up care which has been an industry-wide issue during Covid." Cowen was even more pessimistic in its assessment. "The news today reflects a nearly worst-case scenario that we fear could have implications for INNV's future de novo and acquisition plans." Cowen expressed concerns about implications for InnovAge's future growth because "negative audit findings and subsequent publicity and reputational impact could negatively affect future state approvals of INNV as an approved PACE operator in new states." Piper Sandler also downgraded InnovAge on December 23, 2021. In doing so, it noted that the last PACE provider subject to an enrollment freeze was able to resume enrollments 11 months after the freeze began. William Blair also published a December 23, 2021 report that focused on the similarities between issues in Sacramento and Colorado and suggested that this means InnovAge likely has systemic issues in its approach to providing PACE care. It noted that issues at InnovAge's Colorado centers, a mature operation and the flagship for InnovAge, particularly ones of this magnitude "call into question the [C]ompany's ability to hit its organic and inorganic (both M&A and de novo) growth targets." Perhaps most telling, William Blair concluded: "we note that based on the poor track record established in just nine months as a public company and our conversations with investors that there is significant work to be done for InnovAge to begin rebuilding credibility."

241. InnovAge's stock price closed at $8.25 per share on December 22, 2021. It dropped to $5.31 per share on December 23, 2021, before falling to $4.71 on December 27, 2021, reflecting a cumulative decline of 47% in reaction to the news of frozen enrollments in Colorado requiring

93

financial guidance to be withdrawn. Overall, InnovAge was one of the five worst performing IPOs of 2021.

## V.   Subsequent Events

*"[A]udit results have found gaps in our performance when compared against regulatory and our own expectations…"*

242. The truth about the Company's failed business model and widespread deficiencies continued to emerge after December 2021.

243. On January 3, 2022, less than two weeks after CMS announced its suspension of enrollment for Colorado, Defendant Hewitt announced her resignation, effective January 1, 2022, after 15 years at the Company. InnovAge's Board of Directors appointed Patrick Blair as President and CEO, effective immediately.

244. On February 9, 2022, InnovAge issued a press release announcing financial results for the second quarter 2022 ("2Q 2022") and filed its quarterly report with the SEC on Form 10-Q for 2Q 2022 ("2Q 2022 Form 10-Q"). The 2Q 2022 Form 10-Q disclosed that in addition to CMS's suspension of enrollment at the Company's Colorado centers, HCPF "also determined to impose sanctions and suspended new enrollments at the Company's Colorado centers identifying certain deficiencies specific to Medicaid" and "in addition, as a result of their specific findings, CDPHE mandated that [the Company] retain a consultant for a period of 12 months to oversee our remediation efforts, and issued a $10,000 penalty." In addition, the 2Q 2022 Form 10-Q included the following additional disclosures about the Company's centers in other states, including results from audits, investigations, enrollment suspensions for existing centers, and canceled agreements for new centers:

a) On November 23, 2021, InnovAge received preliminary results for the CMS audit of the Company's Albuquerque, New Mexico center, which identified "certain deficiencies related to participant quality of care."

b) On January 7, 2022, the Department of Health Care Services of the State of California ("DHCS") informed InnovAge that it was suspending prior assurances that it would enter a PACE program agreement with InnovAge for *de novo* centers until existing correction plans were completed and enrollment sanctions lifted.

c) On February 9, 2022, InnovAge revealed that the State of Kentucky's Cabinet for Health and Family Services no longer intended to contract with InnovAge to be a PACE provider.

d) InnovAge also disclosed additional details about the civil investigative demand ("CID") the Company received from the Attorney General for the State of Colorado in July 2021, explaining that the CID was issued "under the Colorado Medicaid False Claims Act" and "the demand requests information and documents regarding Medicaid billing, patient services and referrals in connection with the Company's PACE program in Colorado."

e) In addition, in February 2022, InnovAge received a CID from the U.S. Department of Justice ("DOJ") "under the Federal False Claims Act on similar subject matter" as the CID in Colorado, which requested "information and documents regarding audits, billing, orders tracking, and quality and timeliness of patient services in connection with the Company's PACE programs in the states where the Company operates (California, Colorado, New Mexico, Pennsylvania, and Virginia)."

245. On May 10, 2022, InnovAge issued a press release announcing financial results for the third quarter 2022 ("Q3 2022") and filed its quarterly report with the SEC on Form 10-Q for Q3 2022 ("Q3 2022 Form 10-Q"). In the release, the Company announced that CMO Welch "has

95

announced her intent to pursue other opportunities" and "[t]o ensure a smooth transition, Dr. Welch will remain in her current role through mid-June," adding that "Dr. Ann M. Wells, an internist with over 20 years of practice who has been with the Company for over 3 years, will assume the role of interim CMO, while the Company completes its search for a permanent replacement."

246. The Q3 2022 Form 10-Q included the following additional disclosures about results from audits, enrollment suspensions for existing centers, and canceled agreements for new centers:

a) On February 14, 2022, CMS denied InnovAge's application to develop a previously announced PACE center in Terre Haute, Indiana, which was projected to open in fiscal year 2024, a decision InnovAge later disclosed to be "based on deficiencies detected during CMS' 2021 audits of our Sacramento and Colorado PACE programs."

b) In March 2022, CMS and DHCS began separate audits of InnovAge's San Bernadino, California center and later issued preliminary results, which as InnovAge later disclosed, identified "certain deficiencies related to participant provision of services, which can be categorized as care delivery and management, care coordination and documentation of care."

c) For the New Mexico audit, the Company provided additional details as to the deficiencies identified, explaining that they "can be categorized as care delivery and management, care coordination and documentation of care." InnovAge also explained that validation results were received in March 2022 and "in conjunction with providing validation results, the agency referred our case to the Compliance and Enforcement Division of CMS for review and possible further action."

96

d) InnovAge also stated that the Company has "committed to CMS and the Agency for Healthcare Administration in the State of Florida, that we will proactively pause remaining steps with respect to planned de novo centers in the State of Florida, to focus on remediating deficiencies raised in the audit processes."

247. After trading closed on May 10, 2022, CEO Patrick Blair and Defendant Gutierrez hosted an earnings call to discuss 3Q 2022 results. During that call, Blair announced that the Company was undertaking a "significant transformation" called "One InnovAge" to achieve "near-term operational execution and mid- to long-term capability development," which he described as "the core drivers of horizons necessary to comprehensively remediate the deficiencies identified in our recent audits" and the "foundational building blocks to ensure we're well positioned for scalable, sustainable long-term growth."

248. Blair explained that, with an additional three months of experience as CEO, he was in a "much better position" to "provide additional granularity on what must change" and he had gained "a more detailed understanding of identified audit deficiencies and associated root causes, but also the specific transformational actions required to support the lifting of sanctions." Blair explained that it was "clear that to enable a consistent, scalable platform, our capabilities as a provider and a payer require enhancements and need to evolve." Acknowledging that the "audit results have found gaps in our performance when compared against regulatory and our own expectations," Blair announced "eight initiatives" that were "intended to support the remediation of audit identified deficiencies, and earn back the trust of all stakeholders." Those eight initiatives are as follows:

(1) "filling critical personnel gaps at each of the centers," adding that "it all begins here";

97

(2) "standardizing the process of our interdisciplinary care teams who plan and coordinate and deliver care";

(3) "strengthening our home care network and reliability";

(4) "improving timeliness of scheduling and coordinating care with providers outside the centers";

(5) "improving our telephonic channel response times and closing critical communication loops";

(6) "improving the efficiency and reliability of transportation for our participants";

(7) "standardizing our wound care program across the enterprise"; and

(8) "reducing documentation outside of the EMR."

249. In addition, Blair explained that the "scorecard is mixed" regarding InnovAge's management of "provider networks and contracting to optimizing the costs, leveraging evidence-based guidelines and rigorously optimizing quality, value and utilization of services, ensuring we are paying external providers appropriately for bill procedures, and accurately matching risk-based payments with the acuity level of our participants, to name a few."

250. Blair acknowledged that the Company would not "continue to serve more PACE-eligible participants" until the "audit-identified deficiencies have been fully remediated and our operational processes are all in place at all centers." Recognizing "that some of our state partners were disappointed" in the Company, Blair stated, "it's our job to restore their trust and confidence," adding, "We're doing this through a commitment to transparency, responsiveness and accountability and I am highly encouraged by the collaboration and positive feedback from CMS and our state partners." Blair further stated that "[a]s a leadership team, we understand that we must do better," noting that "performance this quarter highlights the financial impact of not

98

growing our participant base, coupled with elevated direct and indirect costs that are largely attributable to COVID." Lastly, Blair noted that he expected there "to be net margin compression" in the "near term" until the Company "close[d] critical gaps and strengthen[ed] the foundation."

251. During the question-and-answer portion of the call, an analyst asked Blair to identify "the root cause" of the deficiencies identified and "the type of investments … that are going to be required to really solve … a root cause across the organization." Blair responded, in part, by identifying the following as "the root causes":

- "ensuring our medical records are documented with all the required data elements";

- "ensuring that our care plans are complete and kept timely, a lot about training and people in process";

- "making sure that [the interdisciplinary] team is each day capturing input from all other team members. Whenever that information is available, it is been documented in the EMR or in other tools that feed the EMR";

- "making sure that our service orders are being scheduled on a timely basis"; and

- "making sure that when a participant or a caregiver requests a service that we are identifying that appropriately, and we are documenting it."

## EXCHANGE ACT VIOLATIONS

### I. Materially False and Misleading Statements and Omissions During the Class Period

252. Defendants made a number of false and/or misleading statements or omissions throughout the Class Period. As detailed further below, these misstatements generally concerned: (1) InnovAge's progress and success in enrollment growth; (2) the fact that InnovAge's successful execution of their "patient-centered care delivery approach" was a driver of enrollment and revenue growth; (3) InnovAge's assurance that its rapid enrollment growth was coupled with

99

"meaningfully improv[ing] the quality of care" in compliance with PACE regulatory requirements; (4) the size of the PACE market that InnovAge could access; (v) the nature of the audits by state and federal agencies; and (5) InnovAge's guidance, which was expressly based on its purported historical census growth and the ability to grow enrollment and *de novo* center expansion.

### A. March 2021 Offering Documents

253. On February 2021, InnovAge filed the Registration Statement on Form S-1 ("Registration Statement") and Preliminary Prospectus with the SEC, and subsequently amended the Registration Statement on February 24 and 26, 2021 and March 3, 2021, filing a Prospectus on March 3, 2021 ("Prospectus" and collectively with the "Registration Statement" and all documents incorporated by reference, the "Offering Documents"). The Offering Documents included the following false and misleading statements:[6]

    (a) "***Our patient-centered care delivery approach meaningfully improves the quality of care our participants receive, while keeping them in their homes for as long as safely possible and reducing over-utilization of high-cost care settings such as hospitals and nursing homes***." ("Patient-Centered Care Statement").

    (b) "***Our IDTs develop an individualized care plan specific to the needs of each participant. Our high touch model involves daily interaction with our participants across multiple settings. This enables us to not only deliver coordinated, high quality care, but also to identify and proactively manage changes to each participant's conditions,*** which further supports our ability to more precisely report our participants'

---

[6] Plaintiffs allege that the statements in ***bold and italics*** within this Section were materially false, misleading, and/or omitted to disclose material information.

condition to obtain appropriate RAF scores." ("Individualized and Coordinated Care Statement").

(c) "*We have standardized and streamlined our operations across markets and have invested meaningfully in the corporate infrastructure needed to drive participant satisfaction, manage healthcare costs and improve clinical outcomes at scale. Because of our scale, we have been able to invest in dedicated, well-staffed teams for all of our corporate and market-level functions. As a result, our physicians can focus on providing care and are not as burdened with additional administrative demands*." ("Standardized and Well-Staffed Operations Statement").

(d) "Our regulatory expertise and de novo development engine differentiate us from other providers. Importantly, *we have a robust compliance infrastructure and team*." ("Robust Compliance Statement").

(e) "We are one of the few providers operating a globally capitated care model. *We have a long track record of successfully managing medical risk, driven by the strength of our operational playbook as well as our risk pool,* which is more diversified than other PACE organizations." ("Successful Medical Risk Management Statement").

(f) "As a result of the COVID-19 pandemic, *we have transitioned much of our care to in-home and telehealth services, while increasing participant visit volume and maintaining continuity of care.*" ("COVID Continuity of Care Statement").

(g) *"Our technology suite supports our ability to deliver consistent, high-quality care to our participants at scale*." ("Technology Statement").

(h) *"Our in-home care capabilities enable our participants to live safely in their homes and avoid nursing homes to the extent safely possible. We directly deliver or manage*

101

*all skilled and unskilled care a participant may require to live independently at home.*" ("Home Care Statement").

(i) "The fundamental aspects of our expansion playbook include deep regulatory knowledge, *a disciplined approach to site selection, a targeted sales and marketing approach, a concerted effort to recruit and develop talent, scalable underlying clinical technology and an efficient, uniform operating model*." ("Expansion Model Statement").

(j) "*We have demonstrated an ability to scale successfully*, expanding our model to a network of 16 centers in five states, which provided care for approximately 6,400 participants during the year ended June 30, 2020." ("Scalability Statement").

(k) "By proactively providing high-quality care and addressing risks related to social determinants of health, *we have demonstrated our ability to reduce avoidable utilization of high-cost care settings, such as hospitals and nursing homes. As a result, we create a surplus that can be used to invest in refining our care model and providing even greater social supports for our participants. These investments further improve participants' experiences and health outcomes, which we believe will result in more savings that will drive our profitable growth. The virtuous cycle we have created enables us to consistently deliver high-quality care, achieve high participant satisfaction and retention, and attract new participants*." ("Virtuous Cycle Statement").

(l) "*We have developed strong relationships with Medicare and Medicaid agencies through our participation in PACE* and believe we are well positioned to participate

102

in future direct contracting opportunities with government payors." ("Government Relationships Statement").

254. The statements set forth in ¶ 241 above were false and misleading when made for the following reasons:

(a) Defendants' statement set forth in ¶ 241(a) ("Patient-Centered Care Statement") was false and misleading because, as the CMS audits of InnovAge's Sacramento and Colorado centers confirmed, InnovAge failed "to provide all Medicare and Medicaid covered services, and services determined necessary by the IDT to improve and maintain participants' overall health status," "to ensure accessible and adequate services to meet the needs of its participants," "to furnish care that met the needs of each participant in all care settings 24 hours a day, every day of the year and failed to furnish services, including reasonable and timely access to specialists," and "to coordinate 24-hour care delivery and to track and share important information from other team members, participants, and caregivers," and its primary care providers "failed to manage their participants' medical situations and oversee their participants' use of medical specialists." Further, Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to

adequately train staff in how to use the Company's electronic medical records system; and a failure to assign a PCP to hundreds of patients in Colorado. Further, Defendants' statement was also false and misleading because they omitted to disclose that Defendants expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(b) Defendants' statement set forth in ¶ 241(b) ("Individualized & Coordinated Care Statement") was false and misleading because as the Company later admitted in May 2022, the Company had not "standardiz[ed] the process of our interdisciplinary care teams who plan and coordinate and deliver care" and had failed to ensure adequate "timeliness of scheduling and coordinating care with providers outside the centers." Further, Defendants' statement was also false and misleading because, as the CMS audits of InnovAge's Sacramento and Colorado centers confirmed, InnovAge failed "to ensure the interdisciplinary team coordinated 24-hour care delivery," "to conduct a reassessment on at least a semi-annual basis," "to reevaluate participants' plans of care on at least a semi-annual basis," "to bring Service Delivery Requests (SDR) to the Interdisciplinary Team (IDT), process SDRs timely, and provide an approved service as expeditiously as the participant's condition required," "to implement, coordinate, and continuously monitor the plan of care whether the services are furnished by PACE employees or contractors," "to conduct unscheduled reassessments for participants who experienced a change in status," "to document the plan of care, and any changes made to it, in the participant's medical records," and "to remain alert to pertinent input

104

concerning each participant." In addition, these statements were false and misleading because they omitted to disclose that (1) for years before the IPO, and across facilities in at least Colorado and California, InnovAge's IDTs failed to coordinate specialist care and provide follow-up care ordered by specialists and delayed treatments and services; and (2) internal and external audits identified repeated and uncorrected failures to conduct initial assessments upon enrollment and take part in planning care, conduct in-person assessments and reassessments when required to do so, provide care and services in accordance with approved care plans, develop a comprehensive plan of care within 30 days of enrollment; and assign a PCP to hundreds of participants in Colorado. Further, Defendants' statement was also false and misleading because they omitted to disclose that Defendants expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(c) Defendants' statement set forth in ¶ 241(c) ("Standardized and Well-Staffed Operations Statement") that InnovAge had "standardized and streamlined" the Company's "operations across markets" was false and misleading because as the Company later admitted in May 2022, InnovAge had not "standardiz[ed] the process of our interdisciplinary care teams who plan and coordinate and deliver care" and had not "standardize[d] our wound care program across the enterprise." Further, Defendants' statement set forth in ¶ 241(c) that the Company "invested meaningfully in the corporate infrastructure needed to drive participant satisfaction, manage healthcare costs and improve clinical outcomes at scale" was false and misleading without

105

disclosing that (1) for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and a failure to assign a PCP to hundreds of patients in Colorado; and (2) the Company refused to invest in the staff and resources necessary to adequately manage and improve healthcare costs and clinical outcomes for its existing participants and thus could not do so "at scale." In addition, Defendants' statement set forth in ¶ 241(c) that the Company has been "able to invest in dedicated, well-staffed teams for all of our corporate and market-level functions" and "[a]s a result, our physicians can focus on providing care and are not as burdened with additional administrative demands," was false and misleading because, as the HCPF audit of InnovAge's Colorado centers confirmed, InnovAge "failed to ensure proper staffing levels throughout the term of the Contract" and this failure affected 100% of the participants reviewed. Further, this statement was also false and misleading because, as the Company admitted in May 2022, InnovAge had failed to "fill[] critical personnel gaps at each of the centers," and because Defendants omitted to disclose that (1) for years before the IPO, and across facilities in at least Colorado and California, InnovAge had failed to maintain the number of clinical staff necessary to meet the medical needs of its participants, and understaffing at facilities caused providers to

106

carry high caseloads that prevented them from meeting the medical needs of the participants; (2) at some of InnovAge's centers, the number of clinical staff was "dangerously low" and was not sufficient to meet the medical needs of the participants; (3) Defendants had repeatedly denied requests from InnovAge's clinical staff to invest in additional clinical staff and resources while investing more and more funds to enroll additional participants, which only exacerbated the existing staff shortages; and (4) the Company expected state and federal regulators to audit its centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(d) Defendants' statement set forth in ¶ 241(d) ("Robust Compliance Statement") was false and misleading because, as the Sacramento and Colorado audits confirmed, InnovAge "failed to recognize and process complaints as grievances." This statement was also false and misleading because Defendants omitted to disclose that (1) for years, and across facilities in at least Colorado and California, internal and external audits identified repeated and significant deficiencies that were not remediated; (2) Defendants and senior leadership directed the Company's staff to conceal evidence of deficiencies from state and federal regulators during audits of InnovAge's centers; (3) Defendants denied repeated requests from its staff across its centers to invest in the staff and resources necessary to remediate deficiencies that violated PACE regulations and agreements; and (4) the Company expected state and federal regulators to audit its centers in connection with these and other issues and there was thus a significant and

107

heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(e) Defendants' statement set forth in ¶ 241(e) ("Successful Medical Risk Management Statement") that the Company had "a long track record of successfully managing medical risk, driven by the strength of our operational playbook" was false and misleading because, as the Company admitted in May 2022, InnovAge failed to "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," and because Defendants omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado.

(f) Defendants' statement set forth in set forth in ¶ 241(f) ("COVID Continuity of Care Statement") was false and misleading because, as the Company admitted in May 2022, InnovAge had failed to sufficiently maintain its "home care network and reliability," "efficiency and reliability of transportation for our participants," and "telephonic channel response times," and because Defendants omitted to disclose that they had not invested in the staff and resources necessary to meet the home care needs of InnovAge's participants.

(g) Defendants' statement set forth in set forth in ¶ 241(g) ("Technology Statement") was false and misleading because, as the Company admitted in May 2022, InnovAge had not ensured that its "medical records are documented with all the required data elements," that IDTs are "capturing input from all other team members" and "document[ing available information] in the EMR or in other tools that feed the EMR," and that "when a participant or a caregiver requests a service," the Company was "identifying that appropriately[] and … documenting it." Further, these statements are false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes due to high caseloads and a failure to adequately train staff in how to use the Company's electronic medical records system. Further, Defendants' statement was also false and misleading because they omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(h) Defendants' statement set forth in set forth in ¶ 241(h) ("Home Care Statement"). was false and misleading because, as the Company admitted in May 2022, it failed to sufficiently strengthen its "home care network and reliability," and failed to ensure the "timeliness of scheduling and coordinating care with providers outside the centers," the "efficiency and reliability of transportation for our participants," and adequate "telephonic channel response times." In addition, Defendants' statement was false and misleading because Defendants omitted to disclose that for years before the IPO, and

across facilities in at least Colorado and California, InnovAge provided substandard in-home care that led to worse health outcomes and refused to invest in the staff and resources necessary to ensure adequate in-home care during the COVID-19 pandemic. Further, Defendants' statement was also false and misleading because they omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(i) Defendants' statement set forth in set forth in ¶ 241(i) ("Expansion Model Statement") was false and misleading because, as Defendant Gutierrez admitted in May 2022, InnovAge needed a "transformation" before it could be "well positioned for scalable and sustainable growth for the long-term," and as CEO Blair admitted in May 2022, InnovAge had fallen short on the "near-term operational execution" and "mid- to long-term capability development" necessary to ensure the Company was "well positioned to scalable, sustainable long-term growth," most critically, by failing to "fill[] critical personnel gaps at each of the centers," "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," "ensur[e] our medical records are documented with all the required data elements," "ensur[e] that our care plans are complete and kept timely," and ensure adequate "training." Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist

110

care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado. Further, Defendants' statement was also false and misleading because they omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(j) Defendants' statement set forth in set forth in ¶ 241(j) ("Scalability Statement") was false and misleading because as Defendant Gutierrez admitted in May 2022, the Company needed a "transformation" to ensure that InnovAge was "well positioned for scalable and sustainable growth for the long-term," and as CEO Blair admitted in May 2022, InnovAge had not ensured the "near-term operational execution" and "mid- to long-term capability development" necessary to ensure the Company was "well positioned to scalable, sustainable long-term growth," and had failed to "fill[] critical personnel gaps at each of the centers," "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," sufficiently "strengthen[] our home care network and reliability," ensure adequate "timeliness of scheduling and coordinating care with providers outside the centers," ensure adequate "efficiency and reliability of transportation for our participants," "standardiz[e] our wound care program across the enterprise," "ensur[e] our medical records are

111

documented with all the required data elements," "ensur[e] that our care plans are complete and kept timely, a lot about training and people in process," "make sure that [the IDT] is each day capturing input from all other team members," "mak[e] sure that our service orders are being scheduled on a timely basis," and "mak[e] sure that when a participant or a caregiver requests a service that we are identifying that appropriately, and we are documenting it." Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado. Further, Defendants' statement was also false and misleading because Defendants omitted to disclose that they expected state and federal regulators to audit InnovAge's centers about these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(k) Defendants' statement set forth in set forth in ¶ 241(k) ("Virtuous Cycle Statement") was false and misleading because as Defendant Gutierrez admitted in May 2022, the Company needed a "transformation" to ensure that InnovAge was "well positioned for scalable and sustainable growth for the long-term," and as CEO Blair admitted in May

112

2022, InnovAge had not ensured the "near-term operational execution" and "mid- to long-term capability development" necessary to ensure the Company was "well positioned to scalable, sustainable long-term growth," and had failed to "fill[] critical personnel gaps at each of the centers," "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," sufficiently "strengthen[] our home care network and reliability," ensure adequate "timeliness of scheduling and coordinating care with providers outside the centers," ensure adequate "efficiency and reliability of transportation for our participants," "standardiz[e] our wound care program across the enterprise," "ensur[e] our medical records are documented with all the required data elements," "ensur[e] that our care plans are complete and kept timely, a lot about training and people in process," "make sure that [the IDT] is each day capturing input from all other team member," "mak[e] sure that our service orders are being scheduled on a timely basis," and "mak[e] sure that when a participant or a caregiver requests a service that we are identifying that appropriately, and we are documenting it." Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to

113

hundreds of patients in Colorado. Further, Defendants' statement was also false and misleading because Defendants omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(l) Defendants' statement set forth in set forth in ¶ 241(l) ("Government Relationships Statement") was false and misleading because Defendants omitted to disclose that (1) for years, and across facilities in at least Colorado and California, internal and external audits identified repeated and significant deficiencies that were not remediated; (2) Defendants and senior leadership directed the Company's staff to conceal and destroy evidence of health care referrals that had gone several months without any follow up from state and federal regulators; (3) Defendants denied repeated requests from InnovAge's staff across its centers to invest in the staff and resources necessary to remediate deficiencies that violated PACE regulations and agreements; and (4) the Company expected state and federal regulators to audit its centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

255. In addition to the misstatements and omissions set forth above, the Offering Documents were false and misleading because they failed to disclose material information that was required to be disclosed pursuant to the regulations governing their preparation.

256. Specifically, Item 303 of Regulation S-K required the Offering Documents to "[d]escribe any known trends or uncertainties that have had or that [the Company reasonably expects is] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. § 229.303(b)(2)(ii), and Item 105 of Regulation S-K required the Offering Documents to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. § 229.105.

257. In negligent violation of Item 303 and Item 105, the Offering Documents failed to disclose that the Company's enrollment growth strategy presented a significant uncertainty, and made investment in InnovAge risky, given that the strategy had resulted in widespread deficiencies in quality of care and created a known uncertainty and risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue (*see* ¶¶ 100-240).

## B. Third Quarter 2021 Press Release, Earnings Call, and Quarterly Report

### 1. May 10, 2021 Press Release

258. On <u>May 10, 2021</u>, InnovAge filed a Form 8-K with the SEC and published a press release entitled "InnovAge Announces Financial Results for the Fiscal Third Quarter Ended March 31, 2021." The Form 8-K was signed by Defendant Gutierrez. The press release reported that InnovAge earned net revenues of $156.3 million for the quarter, which was up 8% compared to $144.8 in the third quarter of 2020, and that census had grown to 6,655, up 5% year over year. The release quoted Defendant Hewitt as stating that the "InnovAge team delivered strong third quarter financial results" and "*[w]e are seeing multiple growth drivers from our multi-faceted strategy coming from organic growth, and de novo locations in existing and new states*."

115

259. The statement set forth in ¶ 246 above was materially false and misleading when made without disclosing that (1) InnovAge's rapid growth exacerbated systemic deficiencies and unmet healthcare needs across its centers; (2) rapid growth was not "organic" but instead based on enrolling participants who did not have stable housing; and (3) state and federal regulators had begun or were scheduled to begin audits of InnovAge's centers because of previously identified issues of non-compliance, operational deficiencies, or significant audit findings that would limit InnovAge's ability to expand into *de novo* locations, especially in new states.

### 2. May 10, 2021 Earnings Call

260. That same day, on <u>May 10, 2021</u>, Defendants Hewitt and Gutierrez held a conference call to discuss the 3Q 2021 results. During the call, Defendants made the following false and misleading statements:

    (a) During her opening remarks, Defendant Hewitt touted the Company's purported "***organic growth***," which Defendant Hewitt claimed was "***driven by increasing participant enrollment and capacity within existing centers***."

    (b) Responding to a question from Piper Sandler's analyst about challenges with recruitment and retention of clinical staff, Defendant Hewitt reiterated that "***InnovAge has done an excellent job of really ensuring that we've kept our turnover rates down***" and has been "***very successful as compared to other long-term care organizational results as well***":

261. The statements set forth in ¶ 248 above were materially false and misleading when made for the following reasons:

    (a) Defendant Hewitt's statement set forth in ¶ 248(a) above concerning InnovAge's historical growth and performance, and expected growth and performance for 2021,

116

was materially false and misleading when made because Defendant Hewitt had refused requests to increase the "capacity within existing centers" necessary to ensure adequate and compliant quality of care for "increasing participant enrollment." Defendant Hewitt's statement was also false and misleading because Hewitt omitted to disclose that for years before the IPO, and across facilities at least in Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado. Further, Defendant Hewitt's statement was also false and misleading because Hewitt omitted to disclose that state and federal regulators had begun or were expected to soon begin audits of InnovAge's Sacramento and Colorado facilities in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue and ability to expand *de novo* centers, especially in new states.

(b) Defendant Hewitt's statement set forth in ¶ 248(b) above was false and misleading because, as the HCPF audit of InnovAge's Colorado centers confirmed, InnovAge "failed to ensure proper staffing levels throughout the term of the Contract" and this failure affected 100% of the participants reviewed. Further, Hewitt's statement was

117

also false and misleading because, as the Company admitted in May 2022, InnovAge had failed to "fill[] critical personnel gaps at each of the centers." In addition, Hewitt's statement was false and misleading because Hewitt omitted to disclose that (1) InnovAge had acknowledged internally that some of its centers were understaffed and that many participants lacked PCPs on their IDTs; (2) for years before the IPO, and across facilities in at least Colorado and California, InnovAge had failed to maintain the number of clinical staff necessary to meet the medical needs of its participants, and understaffing at facilities caused providers to carry high caseloads that prevented them from meeting the medical needs of the participants; (3) at some of InnovAge's centers, the number of clinical staff was "dangerously low" and was not sufficient to meet the medical needs of the participants; (4) Defendants had repeatedly denied requests from InnovAge's clinical staff to invest in additional clinical staff and resources while investing more and more funds to enroll additional participants, which only exacerbated the existing staff shortages; and (5) state and federal regulators had begun or were expected to soon begin audits of InnovAge's Sacramento and Colorado facilities in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

### 3. May 11, 2021 Quarterly Report

262. On May 11, 2021, InnovAge filed its Quarterly Report with the SEC on Form 10-Q for the third quarter of 2021 ("3Q21 Form 10-Q"), signed by Defendants Hewitt and Gutierrez, which contained the following false and misleading statements:

(a) The 3Q21 Form 10-Q contained the same false and misleading Patient-Centered Care Statement (¶ 241(a)), Individualized and Coordinated Care Statement (¶ 241(b)), and COVID Continuity of Care Statement (¶ 241(f)) as in the Offering Documents.

(b) "Though the distribution of expenses across expense categories changed as a result of the COVID-19 pandemic, we did not experience material changes in our aggregate expenses. *Our internal care delivery costs remained largely the same as we remained fully staffed to execute on our participants' care plans, albeit through a different mix of care settings*." ("Fully Staffed Statement").

(c) "*PACE regulators require that new participants be assessed within a period of 30 days from enrollment to our programs and for us to provide them a personalized care plan. Recently, we became aware that certain of our centers failed to timely complete a portion of these new participant assessments and care plans. We are working diligently to remedy this issue. Failure to conduct assessments or produce care plans within the required period of time may subject us to suspension of new enrollment or restrict enrollment at the affected centers and other centers in the affected state.* These or future violations of these requirements or other government laws or regulations could result in significant consequences that may have a material adverse effect on our business, results of operations, financial condition and cash flows." ("Deficient Participant Assessments and Care Plans Statement").

(d) "Our economic model relies on our capitated arrangements with government payors, namely Medicare and Medicaid. We view the government not only as a payor but also as a key partner in our efforts to expand into new geographies and access more participants in our existing markets. *Maintaining, supporting and growing these*

119

*relationships, particularly as we enter new geographies, is critical to our long-term success. Our model is aligned with the interests of our government payors, as we drive better health outcomes for participants at lower costs and enhance participant satisfaction.* We believe this alignment of interests and our highly effective care model resonates with government payors and will result in continued opportunities to open and acquire centers."

(e) Defendants Hewitt and Gutierrez both signed a "Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002," in which each Defendant certified that the 3Q21 Form 10-Q "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, not misleading with respect to the period covered by this report*" and that "*the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*."

263. The Statements in ¶ 250 above were false and misleading when made for the following reasons:

(a) Defendants' Patient-Centered Care Statement, Individualized and Coordinated Care Statement, and COVID Continuity of Care Statement were false and misleading for the same reasons as set forth in ¶¶ 242(a), 242(b), 242(f).

(b) Defendant's statement set forth in ¶ 250(b) above was false and misleading because, as the HCPF audit of InnovAge's Colorado centers confirmed, InnovAge "failed to ensure proper staffing levels throughout the term of the Contract" and this failure affected 100% of the participants reviewed. Further, Defendants' statement was also false and

120

misleading because, as the Company admitted in May 2022, InnovAge had failed to "fill[] critical personnel gaps at each of the centers." In addition, Defendants' statement was false and misleading because Defendants omitted to disclose that (1) InnovAge had acknowledged internally that some of its centers were understaffed and that many participants lacked PCPs on their IDTs; (2) for years before the IPO, and across facilities in at least Colorado and California, InnovAge had failed to maintain the number of clinical staff necessary to meet the medical needs of its participants, and understaffing at facilities caused providers to carry high caseloads that prevented them from meeting the medical needs of the participants; (3) at some of InnovAge's centers, the number of clinical staff was "dangerously low" and was not sufficient to meet the medical needs of the participants; (4) Defendants had repeatedly denied requests from InnovAge's clinical staff to invest in additional clinical staff and resources while investing more and more funds to enroll additional participants, which only exacerbated the existing staff shortages; and (5) state and federal regulators had begun or were expected to soon begin audits of InnovAge's Sacramento and Colorado facilities in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(c) Defendants' statement set forth in ¶ 250(c) above was false and misleading because Defendants omitted to disclose that (1) for years before the IPO, and across facilities in at least Colorado and California, InnovAge had identified other significant deficiencies and substandard care that violated PACE regulations and its agreements with state and federal regulators in the following areas: participants not receiving necessary specialist

121

care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system' and failure to assign a PCP to hundreds of patients in Colorado; and (2) state and federal regulators had begun or were expected to soon begin audits of InnovAge's Sacramento and Colorado facilities in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(d) Defendants' statement set forth in ¶ 250(d) above was false and misleading because, as the Sacramento and Colorado audits confirmed, InnovAge "failed to recognize and process complaints as grievances." This statement was also false and misleading because Defendants omitted to disclose that (1) for years, and across facilities in at least Colorado and California, internal and external audits identified repeated and significant deficiencies that were not remediated; (2) Defendants and senior leadership directed the Company's staff to conceal evidence of deficiencies from state and federal regulators during audits of InnovAge centers; (3) Defendants denied repeated requests from InnovAge's staff across its centers to invest in the staff and resources necessary to remediate deficiencies that violated PACE regulations and agreements; and (4) the Company expected state and federal regulators to audit its centers in connection with these and other issues and there was thus a significant and heightened risk that the

122

audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(e) Defendants' statement set forth in ¶ 250(e) was false and misleading because as set forth above, the 3Q21 Form 10-Q contained numerous false and misleading statements and omitted material facts necessary to make the statements made within it not misleading and did not "fairly present in all material respects the financial condition [and] results of operations" for the Company.

## C. Fourth Quarter 2021 Press Release, Earnings Call, and Annual Report

### 1. September 21, 2021 Press Release

264. On <u>September 21, 2021</u>, InnovAge filed a Form 8-K with the SEC and published a press release entitled "InnovAge Announces Financial Results for the Fiscal Year and Fourth Quarter ended June 30, 2021." The Form 8-K was signed by Defendant Gutierrez. Regarding the Company's growth in 2021, Defendant Hewitt stated, "We believe the landscape for future growth remains robust and we are pleased with the amount of federal and state legislative activity that we have seen in 2021. This is an exciting time to be a PACE provider and *we continue to execute on our multi-faceted strategy of organic growth, de novo locations in existing and new states, and acquisitions*."

265. The statement set forth in ¶ 252 above was materially false and misleading when made without disclosing that (1) InnovAge's rapid growth exacerbated systemic deficiencies and unmet healthcare needs across its centers; (2) InnovAge did not have an "organic" growth strategy but rather enrolled participants who lacked stable addresses and pressured participants not to disenroll; and (3) state and federal regulators had begun or were scheduled to begin audits of InnovAge's centers because of previously identified issues of non-compliance, operational deficiencies, or

123

significant audit findings which would impact the Company's ability to get licenses in *de novo* locations, especially in new states.

### 2.    September 21, 2021 Earnings Call

266. That same day, on September 21, 2021, Defendants Hewitt and Gutierrez held a conference call to discuss InnovAge's fourth quarter 2021 financial results. In addition, Defendant Hewitt provided an update on the Company's "growth strategy," stating that InnovAge had selected sites and signed leases for three *de novo* centers—one in Kentucky and two in Florida— and that they "currently expect these three centers to open in fiscal year 2023."

(a) Defendant Hewitt then addressed employee turnover and staffing, acknowledging that they had "received a number of questions about this topic," reporting that the Company had "approximately 1800 employees, excluding contractors," and "***approximately 1200 of those employees are clinical professionals and interact with our participants on a regular basi***s." Acknowledging that "***managing turnover and retention is challenging for all healthcare organizations, due to the limited supply of workers and the competitive environment in which we operate***," Defendant Hewitt then claimed that InnovAge was addressing staffing needs "***proactively***," stating, "***That being said, we continue to address staffing needs of the business by proactively utilizing strategies to minimize the impact on our business and to sourcing talent that varies by location and position***."

(b) Defendant Hewitt then proceeded to "provide a brief update on the status of our audits in Sacramento and Colorado," which InnovAge had not previously disclosed, stating that "***audits are a regular occurrence in our industry***" and "***We have and continue to work collaboratively with regulators as we seek to constantly improve our processes***

*and outcomes to better serve our participants and their families*." Regarding similarities and differences between the Colorado and Sacramento audits, Defendant Hewitt stated that "*we do not have the outcome of the Colorado*" and "*can't give you any guidance around Colorado at this time*," but *"as soon as we know and there may be a question too, that maybe there's some relationship between Sacramento and Colorado … we don't have any knowledge that those two things are related*."

267. The statements set forth in ¶ 254 above were materially false and misleading for the following reasons:

(a) Defendant Hewitt's statement set forth in ¶ 254(a) above was false and misleading because, as the HCPF audit of InnovAge's Colorado centers confirmed, InnovAge "failed to ensure proper staffing levels throughout the term of the Contract" and this failure affected 100% of the participants reviewed. Further, Hewitt's statement was also false and misleading because, as the Company admitted in May 2022, InnovAge had failed to "fill[] critical personnel gaps at each of the centers." In addition, Hewitt's statement was false and misleading because Hewitt omitted to disclose that (1) InnovAge had acknowledged internally that some of its centers were understaffed and that many participants lacked PCPs on their IDTs; (2) for years before the IPO, and across facilities in at least Colorado and California, InnovAge had failed to maintain the number of clinical staff necessary to meet the medical needs of its participants, and understaffing at facilities caused providers to carry high caseloads that prevented them from meeting the medical needs of the participants; (3) at some of InnovAge's centers, the number of clinical staff was "dangerously low" and was not sufficient to meet the medical needs of the participants; (4) Defendants had repeatedly denied requests from

125

InnovAge's clinical staff to invest in additional clinical staff and resources while investing more and more funds to enroll additional participants, which only exacerbated the existing staff shortages; and (5) state and federal regulators had begun or were expected to soon begin audits of InnovAge's Sacramento and Colorado facilities in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(b) Defendant Hewitt's statement set forth in ¶ 254(b) above was false and misleading because Hewitt omitted to disclose that CMS had suspended most trial period and routine audits at the time because of the COVID-19 pandemic, reprioritizing its resources on audits that addressed either the spread of infectious diseases or "instances of noncompliance where the health and/or safety of beneficiaries are at serious risk (for example, lack of access to critically needed services or prescription drugs)." It was also materially misleading to state that "there have been no immediate corrective actions identified in the preliminary findings or to-date" without disclosing that (1) Defendants had already received the preliminary findings for all the audits, which showed that each of the audits had resulted in substantially the same findings; and (2) InnovAge had already notified physicians and clinical staff of at least a dozen areas of improvement in its Colorado facilities, citing issues found in the CMS audits of InnovAge's Colorado PACE program. It was materially misleading to state that the Colorado and Sacramento audits were "really two different kinds of surveys" and "very different things" without disclosing that (1) Defendants had already received the preliminary findings for all the audits, which showed that each of the audits had resulted in substantially the same

126

findings; (2) InnovAge had already notified physicians and clinical staff of at least a dozen areas of improvement in its Colorado facilities, citing issues found in the CMS audits of InnovAge's Colorado PACE program; (3) InnovAge informed staff in a training call regarding those areas of improvement that "California and Colorado pretty much have the same areas of opportunities"; (4) CMS conducts "focused audits" only when the agency "determines that additional monitoring or auditing is required due to identified issues of non-compliance, operational deficiencies or significant audit findings"; (5) CMS had suspended most trial period and routine audits at the time because of the COVID-19 pandemic, reprioritizing its resources on audits that addressed either the spread of infectious diseases or "instances of noncompliance where the health and/or safety of beneficiaries are at serious risk (for example, lack of access to critically needed services or prescription drugs).

### 3.  September 22, 2021 Annual Report

268. The next day, September 22, 2021, InnovAge filed with the SEC its annual report on Form 10-K for the full fiscal year 2021 ("2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants Hewitt and Gutierrez, and the Director Defendants, which contained the following materially false and misleading statements:

(a) the same Patient-Centered Care Statement (¶ 241(a)), Standardized and Well-Staffed Operations Statement (¶ 241(c)), Robust Compliance Statement (¶ 241(d)), Successful Management of Medical Risk Statement (¶ 241(e)), COVID Continuity of Care Statement (¶ 241(f)), Technology Statement (¶ 241(g)), Home Care Statement (¶ 241(h)), Scalability Statement (¶ 241(j)), Virtuous Cycle Statement (¶ 241(k)), and Government Relationship Statement (¶ 241(l)) as in the Offering Documents, and the

127

same Deficient Participant Assessments and Care Plans Statement (¶ 250(c)) as the 3Q21 Form 10-Q.

(b) In addition, Defendants Hewitt and Gutierrez both signed a "Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002," in which each Defendant certified that the 2021 Form 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, not misleading with respect to the period covered by this report***" and that "***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***."

269. Defendants InnovAge's, Hewitt's, Gutierrez's, and the Director Defendants' statements set forth in ¶ 256 above were false and misleading for the following reasons:

(a) Defendants' Patient-Centered Care Statement, Standardized and Well-Staffed Operations Statement, Robust Compliance Statement, Successful Management of Medical Risk Statement, COVID Continuity of Care Statement, Technology Statement, Home Care Statement,  Scalability Statement, Virtuous Cycle Statement, and Government Relationship Statement were false and misleading for the same reasons as set forth in ¶¶ 242(a), 242(c), 242(d), 242(e), 242(f), 242(g), 242(h), 242(j), 242(k), 242(l), and Defendants' Deficient Participant Assessments and Care Plans Statement was false and misleading for the same reasons set forth in ¶ 251(c).

(b) Defendants' statement set forth in ¶ 256(b) was false and misleading because, as set forth above, the 2021 Form 10-K contained numerous false and misleading statements and omitted material facts necessary to make the statements made within it not

misleading, and did not "fairly present in all material respects the financial condition

[and] results of operations" for the Company.

**D. First Quarter 2022 Press Release, Earnings Call, and Quarterly Report**

**1. November 9, 2021 Press Release and Earnings Call**

270. On November 9, 2021, InnovAge filed a Form 8-K with the SEC and published a press

release entitled "InnovAge Announces Financial Results for the Fiscal First Quarter ended

September 30, 2021." The Form 8-K was signed by Defendant Gutierrez. The press release quoted

Defendant Hewitt as stating: "We had a strong start to fiscal year 2022 providing high quality care

and services to approximately 6,990 participants, representing an increase of approximately 7.2%

year-over-year, including the Sacramento census which was not consolidated in the fiscal first

quarter of 2021.

271. That same day, Defendants Hewitt and Gutierrez held a conference call to discuss

InnovAge's first quarter 2022 financial results. In her opening remarks, Defendant Hewitt made

the following false and misleading statements:

(a) Defendant Hewitt addressed staff shortages, which she primarily attributed to "the

   historic shortage of healthcare workers" and "the COVID pandemic":

> As we mentioned on the last call, *it is no secret that the healthcare sector
> has historically faced a shortage of licensed practical nurses, registered
> nurses, certified nursing assistants, and other frontline healthcare
> workers like drivers, and the COVID pandemic has not helped the
> situation.*
>
> *The historical shortage of healthcare workers has long required us to
> think outside the box to fill our recruiting needs, and that adaptability is
> a strength that we continue to use as we grow our business.* To mitigate
> potential labor disruption, we have made wage adjustments for key
> positions throughout our centers, which we have factored into our fiscal
> year 2022 guidance. *We are also continuing to evaluate our recruiting
> competitiveness on an ongoing basis. We are experiencing longer lead
> times for recruiting new talent.*

129

As a result, we are focused on expanding our employee referral program, and we have developed our own pilot program in Colorado to train certified nursing assistants that we can then employ. ***Our top priority is ensuring that we are appropriately staffed to care for our participants. In markets where recruitment has been slower than anticipated, we have been able to supplement with temporary labor in order to maintain appropriate staffing levels.*** Importantly, our guidance for fiscal year 2022 reflects our expectation that the labor market continues to remain tight.

(b) Defendant Hewitt also provided an "update on the status of our audits in Sacramento and Colorado," stating, "We worked and continue to work collaboratively with our regulators as we seek to constantly improve our processes and outcomes to better serve our participants and their families":

In Sacramento, we submitted our corrective action plan last month, and we received an additional request for information in early November. We expect to provide the requested information in the next few weeks, and at that time, the corrective action plan will be under review by CMS and the state. We began implementing the proposed corrective actions even prior to submitting the plan. If and when CMS accepts the corrective action plan, they will then begin monitoring its execution and, if satisfied, will then allow the center to run unmonitored for an unspecified amount of time.

Once and if CMS is satisfied that the issues raised have been remediated and are not likely to reoccur, they may lift the freeze. While we can provide a general overview of the expected process, there is no standard time frame for these events to occur, and there is no guarantee that CMS will be satisfied with the corrective actions or will not impose additional sanctions. ***For context, there were less than 200 participants in our Sacramento center as of the beginning of this month.*** In Colorado, as previously indicated, the state and CMS completed their audit work in July.

And in October, we received validation results from CMS. In conjunction with the validation results, the agencies referred our case to the compliance and enforcement division of CMS for review and possible further action. With respect to the Colorado audits, to date, we have no indication of whether the agencies intend to freeze or otherwise curtail our program or impose other sanctions. Additionally, given the recent referral to the compliance and enforcement division, we do not have an indication of what further action, if any, the division may take.

We cannot guarantee the outcomes of these audits. ***Finally, we will begin a routine audit in New Mexico that will be handled remotely.*** We are committed to the quality improvement and comprehensive care coordination in each of our centers. We believe the audit process is

130

important to the integrity of the program, and each audit we undergo is an opportunity for us to improve the PACE program, improve our services, and ultimately, the outcomes of our participants.

(c) Responding to a question from Goldman Sachs's analyst about CMS's referral to its compliance and enforcement division, Defendant Hewitt stated that the referral was "***not unusual***" and did not carry any implications about suspension of enrollment or the imposition of other sanctions, adding that "***Colorado is a little bit different than Sacramento***."

272. The statements set forth in ¶ 259 above were materially false and misleading for the following reasons:

(a) Defendant's statement set forth in ¶ 259(a) above was false and misleading because, as the HCPF audit of InnovAge's Colorado centers confirmed, InnovAge "failed to ensure proper staffing levels throughout the term of the Contract," and this failure affected 100% of the participants reviewed. Further, Defendants' statement was also false and misleading because, as the Company admitted in May 2022, InnovAge had failed to "fill[] critical personnel gaps at each of the centers." In addition, Defendants' statement was false and misleading because Defendants omitted to disclose that (1) InnovAge had acknowledged internally that some of its centers were understaffed and that many participants lacked PCPs on their IDTs; (2) for years before the IPO, and across facilities in at least Colorado and California, InnovAge had failed to maintain the number of clinical staff necessary to meet the medical needs of its participants, and understaffing at facilities caused providers to carry high caseloads that prevented them from meeting the medical needs of the participants; (3) at some of InnovAge's centers, the number of clinical staff was "dangerously low" and was not sufficient to meet the medical needs of the participants; (4) Defendants had repeatedly denied requests from

131

InnovAge's clinical staff to invest in additional clinical staff and resources while investing more and more funds to enroll additional participants, which only exacerbated the existing staff shortages; and (5) state and federal regulators had begun or were expected to soon begin audits of InnovAge's Sacramento and Colorado facilities in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(b) Defendant Hewitt's statement set forth in ¶ 259(b) above was false and misleading because Hewitt omitted to disclose that CMS had suspended most trial period and routine audits at the time because of the COVID-19 pandemic, reprioritizing its resources on audits that addressed either the spread of infectious diseases or "instances of noncompliance where the health and/or safety of beneficiaries are at serious risk (for example, lack of access to critically needed services or prescription drugs)." It was materially misleading to state that the Colorado and Sacramento audits were "really two different kinds of surveys" and "very different things" without disclosing that (1) Defendants had already received the preliminary findings for all the audits, which showed that each of the audits had resulted in substantially the same findings; (2) InnovAge had already notified physicians and clinical staff of at least a dozen areas of improvement in its Colorado facilities, citing issues found in the CMS audits of InnovAge's Colorado PACE program; (3) InnovAge informed staff in a training call regarding those areas of improvement that "California and Colorado pretty much have the same areas of opportunities"; (4) CMS conducts "focused audits" only when the agency "determines that additional monitoring or auditing is required due to identified

132

issues of non-compliance, operational deficiencies or significant audit findings"; (5)

CMS had suspended most trial period and routine audits at the time because of the

COVID-19 pandemic, reprioritizing its resources on audits that addressed either the

spread of infectious diseases or "instances of noncompliance where the health and/or

safety of beneficiaries are at serious risk (for example, lack of access to critically

needed services or prescription drugs). Further, it was also untrue and materially

misleading to state that InnovAge "will begin a routine audit in New Mexico that will

be handled remotely," because two days after the earnings call, on November 11, 2021,

*The Capitol Forum* published a report, entitled "Innovage: CMS Currently Auditing

Albuquerque Center; California Suspends Medicaid Enrollments at Troubled

Sacramento Center," that reported that the New Mexico audit had "already been going

on for several weeks," citing a spokesperson for the New Mexico Human Services

Department.

(c) Defendant Hewitt's statement set forth in ¶ 259(c) above was false and misleading

because, as CMS explains in its public "Audit Guide," the Medicare Parts C and D

Oversight and Enforcement Group ("MOEG") "oversees, coordinates and conducts the

audits of all PACE organizations." But in certain cases, "conditions noted in the audit

may be referred to the Division of Compliance Enforcement (DCE)" and "DCE will

conduct an independent review of audit documentation to determine if an enforcement

action (Civil Money Penalty, sanction, or contract termination) is warranted." The

CMS PACE Audit Manual states that such enforcement activity begins in one of two

circumstances: (1) "deficiencies are serious enough to escalate directly to the

enforcement activity stage," or (2) "core compliance deficiencies remain unresolved

133

during the compliance activity stage after providing the PACE organization with the appropriate notice and opportunity to correct the deficiencies." "Enforcement actions" include two categories of actions: (1) enrollment and/or payment suspensions, and (2) civil money penalties ("CMPs"). As the Audit Manual explains: "Enrollment and payment suspensions are imposed for serious contractual deficiencies defined by statute and are designed to ensure the deficiencies which formed the basis for the sanction are corrected and not likely to recur."

### 2.  November 9, 2021 Quarterly Report

273. On November 9, 2021, InnovAge filed its Quarterly Report with the SEC on Form 10-Q for the first quarter of 2022 ("1Q22 Form 10-Q"), signed by Defendants Hewitt and Gutierrez, which contained the following false and misleading statements:

(a) Defendants' statements in the 1Q22 Form 10-Q contained the same Government Relationship Statement (¶ 241(l)) as the Offering Documents, which was false and misleading for the same reasons as set forth in ¶ 242(l).

(b) In addition, Defendants Hewitt and Gutierrez both signed a "Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002," in which each Defendant certified that the 1Q22 Form 10-Q "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, not misleading with respect to the period covered by this report*" and that "*the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*." This statement was false because as set forth above, the 1Q22 Form 10-Q contained numerous false and misleading

statements and omitted material facts necessary to make the statements made within it

not misleading and did not "fairly present in all material respects the financial condition

[and] results of operations" for the Company.

## II.    Summary of Scienter Allegations

274. As set forth above and further below, numerous facts demonstrate that the Exchange Act Defendants knew or were deliberately reckless in not knowing that Defendants' statements identified in Section I above were materially false or misleading when made. The scienter of InnovAge as a corporate entity is derived from the scienter of its executives, including, but not limited to, the Officer Defendants.

275. As alleged in this Complaint, Defendants Hewitt and Gutierrez have long determined InnovAge's strategies, decisions, and messaging to the investing public. Hewitt joined InnovAge in 2006 and, until that time, had served as the Company's only CEO until her resignation in January 2022. Gutierrez has served as the CFO of InnovAge since 2017.

276. In their respective roles as CEO (Hewitt) and CFO (Gutierrez), the Officer Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to InnovAge during the Class Period. Hewitt and Gutierrez signed or certified InnovAge's annual and quarterly reports filed with the SEC. *See* ¶¶ 250, 256, 261. In addition, Hewitt and Gutierrez attended conference calls and spoke on behalf of the Company throughout the Class Period. *See* ¶¶ 248-50, 254-55, 258-60. Since the IPO in 2021, Hewitt and Gutierrez signed or certified every annual and quarterly report filed with the SEC, including Sarbanes-Oxley certifications that attest to their knowledge of the veracity of the statements contained therein and reliability of internal controls. Hewitt and Gutierrez are also the only InnovAge employees who have answered analysts' questions on behalf of the Company during quarterly earnings calls.

135

277. Further, Defendants Hewitt and Gutierrez participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, Hewitt and Gutierrez were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions. They are therefore liable for the misrepresentations and omissions therein.

278. As the most senior executive officers of InnovAge, Hewitt and Gutierrez were privy to confidential and proprietary information concerning InnovAge and the effects of the Company's rapid growth. Each of them also: (i) had access to, *inter alia*, internal corporate documents and conversations with corporate officers and employees; (ii) attended management and Board meetings and meetings of committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, Hewitt and Gutierrez knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**A.  InnovAge's Admissions Establish Hewitt's and Gutierrez's Scienter**

279. During the Company's Q3 2022 earnings call after the close of the Class Period, on May 10, 2022, President and CEO Patrick Blair admitted that after spending four months in his position as CEO, it was "clear that to enable a ***consistent, scalable platform, our capabilities as a provider and a payer, respectively, require enhancements and need to evolve***." Blair announced a "portfolio remediation and transformation" program called "One InnovAge," that addressed three goals: (1) "creating operational excellence as a provider by formalizing a repeatable blueprint to deliver personalized, integrated, yet distributed care in our centers virtually and in home"; (2)

"expanding our payer capabilities to ensure we're effectively managing the total cost and quality of care, and that our revenue accurately reflects the acuity of the populations we serve"; (3) "strengthening enterprise functions to enable our centers to reach their full potential through robust talent management, data analytics, sales and marketing, and government relations, underpinned by a uniform way of working and success metrics."

280. Blair admitted that the "*audit results have found gaps in our performance when compared against regulatory and our own expectations*." These so-called gaps directly impacted and limited the level of care that patients received, yielding worse outcomes. Among them were eight categories of deficiencies: "critical personnel gaps at each of the centers," failure to standardize the "process of our interdisciplinary care teams who plan and coordinate and deliver care," "strengthening our home care network and reliability," deficient "timeliness of scheduling and coordinating care with providers outside the centers," "improving our telephonic channel response times and closing critical communication loop," "improving the efficiency and reliability of transportation for our participants," "standardizing our wound care program across the enterprise," and "reducing documentation outside of the EMR."

## B. InnovAge's Historical and Projected Enrollment Growth Was the Most Important Factor Informing the Company's Valuation

281. The inference of scienter is also bolstered by the importance of the representations at issue. As set forth above, ¶¶ 101-229, Defendants' statements touting InnovAge's "track record of profitable growth" were critical to analysts and investors who sought to value the Company during its IPO and after.

282. Analysts noted that because Medicare and Medicaid reimbursement rates did not increase substantially year to year, the Company's revenue growth depended almost entirely on growth in overall participants. For example, just after InnovAge's IPO on March 29, 2021, a Barclays analyst

137

initiated coverage with a report entitled "On PACE for Rapid Growth," explaining that "[w]e believe [Innovage] is poised for rapid growth as the largest participant" in PACE, projecting that the Company would continue to grow at a 20% compound annual growth rate ("CAGR") "mainly through new member growth, while growing EBITDA … at a similar ~20% CAGR over the same time period." The Barclays analyst went on to write: "[w]ith rate updates not a major factor in overall growth, InnovAge more typically drives revenue growth through gains in overall participants."

283. Many other analysts issued similar reports. For example, Piper Sandler's analyst initiated coverage with a report entitled "Picking up the PACE for Disruptive Senior Care," issuing a price target of $31, a 27% premium over the then-current trading price, citing the Company's "rapid growth" that was "already profitable" with a "proven model that generates center-level margins of 25%." Piper Sandler's analyst added that "we believe InnovAge has an opportunity to drive PACE participant growth through its repeatable, scalable model that enables seniors to avoid institutional care," concluding that "InnovAge is well-positioned to execute on its strategy" and repeating InnovAge's own phrase that it would continue to generate "organic growth." Similarly, William Blair's analyst initiated coverage with an "Outperform Rating," concluding that InnovAge was "squarely positioned in the cross hairs of attractive demographic growth" and "has substantial capacity to accelerate organic growth in its current centers and deepen its penetration of existing markets," supporting the "more than 20% top-line and EBITDA growth targets through fiscal 2026."

284. The importance and centrality of these subjects to InnovAge's business model support the inference that Defendants were, at minimum, deliberately reckless in making the false and misleading statements to investors that they did.

**C. InnovAge and the Officer Defendants Closely Monitored Reports on Enrollment Growth, Regulatory Compliance, Staffing, and Quality of Care**

285.  In their roles as CEO (Hewitt) and CFO (Gutierrez), the Officer Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep InnovAge's non-management directors apprised of the state of the Company's business, operations, and trends.

286. As discussed above, ¶¶ 101-229, monitoring and maximizing enrollment growth was critical to InnovAge's operations and growth because InnovAge could meaningfully increase its revenue and profit base only by adding at-risk patients.

287.  As leaders of InnovAge, Defendants Hewitt and Gutierrez determined business strategy and made and approved InnovAge's enrollment growth strategies and policies. In their roles, Hewitt and Gutierrez understood the importance of monitoring all participant acquisition strategies used by the Company to track their effectiveness.

288. Further, as noted above, former employees confirmed that the Officer Defendants also continuously received reports that documented the deficiencies in care, including internal and external audits, complaints by employees, participants, and family members, and other key metrics:

- The 2016 internal audit also revealed deficiencies in documentation of medical records and care planning. (FE-3)

- After resigning, on August 9, 2019, FE-1 sent an email notifying executives that InnovAge's practices were leading to high employee turnover and poor patient outcomes. This email was sent to Defendant and CEO Hewitt; Maria Lozzano, Chief Operating Officer of Western Regional Operations; Claudia Estrada, Regional Director

139

of the San Bernardino Clinic; and Cheryl Rice, Chief Operating Officer, Western Region. (FE-1)

- CMO Melissa Welch received "orders tracking reports" via email and knew the number of outstanding orders requiring follow-up care on a weekly basis, yet the numbers remained staggering. (FE-2)

- Michelle Blanton (VP of Clinical Operations) knew that labs were being missed, orders were not being followed up on, and patients were not getting the specialty care prescribed.  Nothing changed, except that Blanton was later promoted to VP of Compliance for InnovAge. (FE-2)

- InnovAge executives held a call in November 2020 with about 40 doctors and nurse practitioners.  CEO Hewitt, CMO Welch and a few other executives participated, and many of the medical staff who participated were distressed after the meeting because CMO Welch knew in great detail about these issues, but said nothing about being aware or in support of their concerns. Meanwhile, CEO Hewitt denied ever being aware of the issues, which the participants found lacked credibility. (FE-2)

- The Executive Director of InnovAge's San Bernardino PACE center acknowledged that, for years, InnovAge failed to carry out thousands of physician orders for medically necessary services and also delayed care for specialty services.  According to the former Executive Director, InnovAge's executives had repeatedly been made aware of the shortfall in providing services. In fact, Maria Zamora, a former Regional Executive for California, repeatedly asked Defendant and CEO Hewitt if InnovAge could "pause enrollment for a few months to allow us to build a better network?" Defendant Hewitt denied these requests.

140

### D.  Concealment and Obstruction of Government Audits

289. Defendants repeatedly omitted key information about the ongoing audits conducted by CMS and regulators in Colorado—the state that generates 50% of the Company's revenue—and then later, repeatedly mischaracterized the nature and severity of the audits. *See, e.g.*, ¶¶ 240-61. As described in more detail, *supra*, between March 4, 2021 and December 22, 2021, InnovAge filed numerous reports with the SEC, and the Officer Defendants otherwise spoke publicly about the Company's net revenues and growth purportedly attributed to InnovAge's successful track record of profitable growth.

156. Instead of promptly and fully disclosing the relevant facts, the Exchange Act Defendants continued to make false and misleading statements regarding the nature and severity of the audits. Specifically, in response to questions by investors and analysts, Defendants emphatically denied that the government audits were serious, instead mischaracterizing them as "routine audits" that are "a regular occurrence in our industry," and "an opportunity" for the Company "to improve the PACE program, improve our services, and ultimately the outcome of our participants."

### E.  The Ouster or Resignations of InnovAge's Chief Executive Officer and Chief Medical Officer

290. The terminations and resignations of senior executives immediately as the truth was revealed strengthens an inference of the Exchange Act Defendants' scienter. On November 12, 2021, InnovAge appointed Patrick Blair to serve as President. On January 3, 2022, just ten days after CMS and Colorado announced their imposition of sanctions and suspension of enrollment for all six of InnovAge's Colorado centers, the Company announced the resignation of Defendant Hewitt. Four months later, on May 15, the Company announced that CMO Welch would resign from her position in mid-June. The resignations of senior executives who led the Company's focus on rapid enrollment growth further support an inference of the Exchange Act Defendants' scienter.

141

**F.  The Defendants Were Financially Motivated to Perpetrate the Fraud**

291. Defendants Hewitt and Gutierrez were also highly motivated to inflate the Company's share price and maintain the illusion of an exponentially growing company to enrich themselves. In connection with the July 2020 Apax transaction that precipitated the IPO, InnovAge paid Defendants Hewitt and Gutierrez millions of dollars in transaction bonuses and cash awards. For example, the Company paid Defendants Hewitt and Gutierrez approximately $35 million and $7.5 million in cash, respectively, in exchange for the cancellation of stock options in connection with the Apax transaction. In addition, in 2021, the Company paid Defendant Hewitt a transaction bonus of $675,428, and in 2020, the Company paid Defendant Gutierrez a discretionary bonus of $50,000.

| Name and Position | Fiscal Year | Salary | Bonus | Option Awards | Other Compensation | Option Cancellation | Total |
|---|---|---|---|---|---|---|---|
| Maureen Hewitt, CEO | 2021 | 817,527 | 675,428 | 3,674,372 | 559,697 | 35,162,515 | 40,889,539 |
| | 2020 | 820,615 | 352,306 | — | 443,663 | 30,147 | 1,646,731 |
| Barbara Gutierrez, CFO | 2021 | 393,273 | 140,992 | 1,469,749 | 136,623 | 7,542,995 | 9,683,562 |
| | 2020 | 367,457 | 190,922 | 233,839 | 110,861 | 29,566 | 932,645 |

**G.  Defendants Hewitt's and Gutierrez's Scienter Is Imputed to the Company**

292. By virtue of their high-level positions as the most senior officers of the Company, participation in and awareness of InnovAge's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Section I, the knowledge or recklessness of Defendants Hewitt and Gutierrez concerning the Exchange Act Defendants' false or misleading statements is imputed to InnovAge. In addition, the knowledge or recklessness of other senior employees and managers, whether or not named herein, concerning the Company's push for enrollment at the expense of care, adequate staffing and an anemic specialist network, is also imputed to InnovAge. Accordingly, by no later than March 2021, prior to the start of the Class

142

Period, InnovAge knew about or recklessly disregarded its false and misleading statements about the Company's historic enrollment growth and compliance with PACE regulations.

### III.    Loss Causation and Economic Loss

293.  The fraud described herein was the proximate cause of declines in InnovAge's stock price and resulting losses suffered by the Class. Defendants' materially false and misleading statements and omissions artificially inflated and/or maintained the price of InnovAge stock. The artificial inflation in InnovAge's stock price was removed through a series of partial disclosures concerning the facts concealed and/or misrepresented by the misstatements and omissions, described below. These partial disclosures reduced the amount of inflation in the price of InnovAge's publicly traded stock, causing economic injury to Plaintiffs and other members of the Class.

294. Until CMS publicly disclosed the Sacramento audit in September 2021 by releasing its final report, Defendants' only disclosure about the audits was limited to a single mention by Defendant Hewitt at the June 9, 2021 Goldman Sachs 42nd Annual Global Healthcare Conference. At the conclusion of a 45-minute discussion with Goldman Sachs's analyst and Defendant Gutierrez, Defendant Hewitt offered a "brief update" on "ongoing audits" of InnovAge facilities, stating:

> So I just want to give a brief update on the ongoing audits that our organization has going on currently. So as you know, as a healthcare provider, we're highly regulated. It's a highly regulated industry and of course, our organization and employees are working hard and fully supporting the audits of our regulators. I wanna just make sure that everyone here so the CMS survey at our Sacramento Center is an ongoing and part of the annual process of a new center and there that it's required to undertake one year after opening. So it's kind of a usual and customary survey.
>
> There is a Colorado audit from the state of Colorado that's going on currently, that's with Health Care Policy and Finance. And at this time, we don't have any additional insight to that survey at this time. And of course, in cooperation with health care policy and finance, CMS notified us last week that they will be coming into the Colorado area. They'll be focusing on three areas of the organization: (1) Service

delivery requests, (2) appeals and grievances, (3) provisions of service and quality assessments.

And of course, in accordance with standard CMS and audit procedures, we have our initial meeting with CMS that'll be scheduled later this month. To discuss the objectives and expectations of the audit, but they're working together, so I just wanted to make sure that you all had that update as well.

295. Defendant Hewitt did not disclose, however, that the Colorado audit conducted by HCPF was a focused audit, that it was unannounced, or that the Company knew that the audit was based on a complaint about high turnover, dangerously low clinical staff numbers, scheduling, and insufficient medical care for its participants. Nor did Defendant Hewitt disclose that the Company knew that there was abundant evidence of those issues that would likely be revealed by the audit, raising the significant risk of costly corrective actions or, worse, suspension of enrollment at its facilities. Unsurprisingly, not a single analyst reported about or repeated news of these audits for months, reflecting that the information was not absorbed into the market. Rather, the stock price increased from $20.49 on June 9, 2021 to $20.98 on June 10, 2021.

296. On September 21, 2021, InnovAge held its Q4 2021 earnings call, during which Defendant Hewitt disclosed that on "September 17, we were notified the CMS has determined to freeze new enrollments at our Sacramento center based on deficiencies detected in the audit." Hewitt also disclosed, "[t]he deficiencies relate to failures to provide covered services, provide accessible and adequate services, manage participants' medical situations, and oversee use of specialists among others" and that "[t]he freeze will remain in effect until we correct these deficiencies and we are working on developing a corrective action plan to submit to CMS." In addition, Defendant Hewitt disclosed that the "PACE program in Colorado has been the subject of three audits over the last several months conducted by the state and CMS," that the state "completed the onsite audit work on July 22" and the Company "received preliminary findings at

that time," that "CMS completed their audit work in Colorado on July 8," and that the Company anticipated "receiving their report in early 2022."

297. In response to this news, the price of InnovAge's common stock declined over 24% from a close of $11.65 on September 21, 2021 to a close of $8.75 on September 22, 2021, with the price falling by another 22.74% to close at $6.76 the following day. This decline caused Plaintiffs and Class members to suffer losses as the artificial inflation in InnovAge's stock price was partially removed. The market connected the decline in InnovAge's stock price to the news of the outcome of the Sacramento audit and multiple Colorado audits disclosed on September 21, 2021. For example, Piper Sandler's analyst described the audit and enrollment freeze as "disappointing." Cowen's analyst anticipated that news of "a program audit CMS enrollment 'freeze'" would "represent an overhang on the shares given the ongoing CMS audit of INNV's Colorado PACE program that represents a far more material 30% of total company census."

298. Nevertheless, Defendants assured investors that the audits were "a regular occurrence in our industry" and no cause for concern, which minimized the market's reaction. Further, Defendant Hewitt downplayed the significance of the CMS freeze, stating that the "freeze is limited to the Sacramento center and does not extend to our San Bernardino center in California," adding "[f]or context" that "there were less than 200 participants at Sacramento as of the beginning of this month." Hewitt claimed that "[t]hese audits will continue to make our program better over the long-term." In addition, the Company offset the negative news by issuing 2022 full-year revenue guidance that it claimed would be comparable to its historical growth.

299. On December 23, 2021, the Company filed a Form 8-K with the SEC, signed by Defendant Gutierrez, in which Defendants disclosed, "On December 22, 2021 InnovAge was notified that CMS had determined to suspend new enrollments at the Company's Colorado centers

145

based on deficiencies detected in an audit that was conducted earlier this year, the final results of which have not yet been disclosed to the Company." Defendants additionally disclosed that, as a result of the freeze on enrollments, the Company was withdrawing its guidance for fiscal year 2022.

300. Analysts reacted negatively to InnovAge's December 23, 2021 disclosures. For example, Cowen's analyst described the news in a report that day as "a nearly worst-case scenario." Barclays' analyst noted in a report that same day that while they "first learned about sanctions freezing enrollment in Sacramento (200 members)" and "the investigation into CO," they "did not anticipate it would progress to freezes, but rather a corrective action plan," explaining that their "belief was predicated on commentary from management that the issues were related to members accessing follow-up care which has been an industry-wide issue during Covid across much of our payvidor coverage." Citing the news of the suspensions, J.P. Morgan's analyst reported that they were cutting their fiscal year 2022 price target by 40% to $6 from $10, explaining that InnovAge's "top-line growth is primarily driven by enrollment" and "the freeze indicates lower enrollment growth." William Blair's analyst concluded that "the similarities between the Colorado and Sacramento issues (such as insufficient access to specialists and lack of care coordination) suggest there are systemic issues with the [C]ompany's current infrastructure and approach to providing the type of holistic care required to participate in the PACE program," adding that "Colorado is InnovAge's flagship state and a mature operation, making the failure to meet regulatory standards a companywide issue as opposed to a single-center problem" and that "[p]roblems of this magnitude at established facilities also further call into question the company's ability to hit its organic and inorganic (both M&A and *de novo*) growth targets."

146

301. In response to this news, InnovAge's stock plummeted by 35.64% from a closing price of $8.25 on December 22, 2021 to a closing price of $5.31 on December 23, 2021, with record high volume of 14,188,300 shares—more than three times the last highest-volume trading day. This decline caused Plaintiffs and Class members to suffer losses as the artificial inflation in InnovAge's stock price was removed.

302. The declines in InnovAge's stock price were a direct and proximate result of the fraud described herein. The timing and magnitude of InnovAge's stock-price declines negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or InnovAge-specific facts unrelated to Defendants' fraudulent conduct.

## IV.  Presumption of Reliance

303. At all relevant times, the market for InnovAge common stock was efficient for the following reasons, among others:

    (a) InnovAge's stock met the requirements for listing, and was listed and actively traded on the Nasdaq Stock Market, a highly efficient and automated market;

    (b) as a regulated issuer, InnovAge filed periodic reports with the SEC and the Nasdaq Stock Market;

    (c) InnovAge regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

147

(d) InnovAge was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales forces and certain customers. Each of these reports was publicly available and entered the public marketplace.

304. As a result of the foregoing, the market for InnovAge common stock reasonably promptly digested current information regarding InnovAge from all publicly available sources and reflected such information in the price of InnovAge common stock. All purchasers of InnovAge common stock during the Class Period suffered similar injury through their purchases of InnovAge common stock at artificially inflated prices, and a presumption of reliance applies.

305. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

### V. Exchange Act Class Action Allegations

306. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of InnovAge between March 4, 2021 and December 22, 2021, inclusive, and who were damaged thereby (the "Exchange Act Class"). Excluded from the Class are Defendants; the officers and directors of InnovAge at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; Defendants' liability insurance carriers and any affiliates or subsidiaries thereof; and any entity in which Defendants or their immediate families have or had a controlling interest.

148

307. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, InnovAge shares were actively traded on the Nasdaq Stock Market.

308. As of June 17, 2022, InnovAge has over 135 million shares of common stock outstanding, owned by hundreds or thousands of investors. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least tens of thousands of members of the proposed Class. Class members who purchased InnovAge common stock may be identified from records maintained by InnovAge or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

309. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

310. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

311. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    (a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    (b) whether Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

    (c) whether Defendants acted with scienter; and

    (d) the proper way to measure damages.

149

312. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## VI.    Inapplicability of the Statutory Safe Harbor and Bespeaks-Caution Doctrine

313. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, the statements were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about, among other things, InnovAge's success in growing the number of enrolled PACE participants, the drivers of InnovAge's revenue growth, InnovAge's revenues and guidance, the nature of federal and state audits, InnovAge's compliance with regulatory requirements, and risks regarding reimbursement rates and the submission of false claims.

314. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding, among other things, InnovAge's success in growing the number of enrolled PACE participants, the drivers of InnovAge's revenue growth, InnovAge's revenues and guidance, the nature of federal and state audits, InnovAge's compliance with regulatory requirements, and risks regarding reimbursement rates and the submission of false claims. Given the then-existing

150

facts contradicting Defendants' statements, any generalized risk disclosures made by InnovAge were not sufficient to insulate Defendants from liability for their false or misleading statements.

315. To the extent that the statutory safe harbor does not apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of InnovAge who knew that the statement was false when made.

## VII.    Exchange Act Causes of Action

### Count I: Violation of Section 10(b) of the Exchange Act

### (Against All Exchange Act Defendants)

316. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

317. This Count is asserted on behalf of all members of the Exchange Act Class against Defendant InnovAge and the Officer Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

318. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

319. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements

of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of InnovAge common stock during the Class Period.

320. The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous practice and course of conduct that operated as a fraud and deceit upon Plaintiffs and the Exchange Act Class, and made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and did so intentionally or with deliberate recklessness, and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of InnovAge common stock, which were intended to, and did:

(a) deceive the investing public, including Plaintiffs and the Exchange Act Class, regarding, among other things, InnovAge's success in growing the number of enrolled PACE participants, the drivers of InnovAge's revenue growth, InnovAge's revenues and guidance, the nature of federal and state audits, InnovAge's compliance with regulatory requirements, and risks regarding reimbursement rates and the submission of false claims;

(b) artificially inflate and maintain the market price of InnovAge common stock; and

(c) cause Plaintiffs and other members of the Exchange Act Class to purchase InnovAge common stock at artificially inflated prices and suffer losses when the true facts became known.

321. Defendant InnovAge and the Officer Defendants are liable for all materially false or misleading statements made during the Class Period, as alleged above.

322. As described above, the Exchange Act Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of InnovAge stock, were either known to the Exchange Act Defendants or were so obvious that the Exchange Act Defendants should have been aware of them

323. Plaintiffs and the Exchange Act Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for InnovAge common stock, which inflation was removed from its price when the true facts became known. Plaintiffs and the Exchange Act Class would not have purchased InnovAge common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the Exchange Act Defendants' materially misleading statements.

324. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of InnovAge common stock during the Class Period.

**Count II: Violation of Section 20(a) of the Exchange Act**

**(Against the Officer Defendants and Private Equity Defendants)**

153

325. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

326. This count is asserted on behalf of all members of the Exchange Act Class against the Officer Defendants and Private Equity Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

327. The Officer Defendants and Private Equity Defendants acted as controlling persons of InnovAge within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

328. By reasons of their high-level positions of control and authority as the Company's most senior officers, the Officer Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Officer Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by InnovAge during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein. The Officer Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

329. Each of the Officer Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Officer Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by InnovAge during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein.

154

330. Throughout the Class Period, the Private Equity Defendants had control over InnovAge including by virtue of their majority ownership of the stock, thereby allowing them to control all votes put to InnovAge's shareholders, through their designees on InnovAge's Board, and through their control over the limited partnership board of TCO Group Holdings, L.P.

331. As set forth above, InnovAge violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

332. By virtue of their positions as controlling persons of InnovAge and as a result of their own aforementioned conduct, the Officer Defendants and Private Equity Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder, to Plaintiffs and the other members of the Exchange Act Class who purchased or otherwise acquired InnovAge securities. As detailed above, during their respective tenures, these Officer Defendants served as officers and directors of InnovAge and the Private Equity Defendants exercised control over InnovAge.

333. As a direct and proximate result of the conduct by the Officer Defendants and Private Equity Defendants, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases or acquisitions of InnovAge common stock.

### SECURITIES ACT VIOLATIONS

334. In this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons or entities who purchased InnovAge common stock in or traceable to the IPO and were damaged thereby.

335. Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims.

336. The Securities Act claims are based on statements made by InnovAge in connection with its IPO. InnovAge conducted the Offering pursuant to the Company's Registration Statement on Form S-1 ("Registration Statement") and Preliminary Prospectus filed with the SEC on February 8, 2021, as updated by amendments on February 24 and 26, 2021 and March 3, 2021, and a Prospectus dated March 3, 2021 ("Prospectus" and collectively with the "Registration Statement" and all documents incorporated by reference, the "Offering Documents").

337. As explained herein, the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and failed to make adequate disclosures required under the statute, rules, and regulations governing the preparation of public offering documents for securities.

338. To the extent that any challenged statement is construed as a statement of opinion, belief or projection made in connection with the Offering, any such statement is alleged to have been a materially misstated statement of opinion, belief or projection when made at and at the time of the Offering.

339. This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the Offering.

## I.    False and Misleading Statements in the Offering Documents

340. The Offering Documents included the following false and misleading statements:[7]

---

[7] Plaintiffs allege that the statements in ***bold and italics*** within this Section were materially false, misleading, and/or omitted to disclose material information.

(a) "*Our patient-centered care delivery approach meaningfully improves the quality of care our participants receive, while keeping them in their homes for as long as safely possible and reducing over-utilization of high-cost care settings such as hospitals and nursing homes*." ("Patient-Centered Care Statement").

(b) "*Our IDTs develop an individualized care plan specific to the needs of each participant. Our high touch model involves daily interaction with our participants across multiple settings. This enables us to not only deliver coordinated, high quality care, but also to identify and proactively manage changes to each participant's conditions,* which further supports our ability to more precisely report our participants' condition to obtain appropriate RAF scores." ("Individualized & Coordinated Care Statement").

(c) "*We have standardized and streamlined our operations across markets and have invested meaningfully in the corporate infrastructure needed to drive participant satisfaction, manage healthcare costs and improve clinical outcomes at scale. Because of our scale, we have been able to invest in dedicated, well-staffed teams for all of our corporate and market-level functions. As a result, our physicians can focus on providing care and are not as burdened with additional administrative demands*." ("Standardized and Well-Staffed Operations Statement").

(d) "Our regulatory expertise and de novo development engine differentiate us from other providers. Importantly, *we have a robust compliance infrastructure and team*." ("Robust Compliance Statement").

(e) "We are one of the few providers operating a globally capitated care model. *We have a long track record of successfully managing medical risk, driven by the strength of*

157

*our operational playbook as well as our risk pool,* which is more diversified than other PACE organizations." ("Successful Medical Risk Management Statement").

(f) "As a result of the COVID-19 pandemic, *we have transitioned much of our care to in-home and telehealth services, while increasing participant visit volume and maintaining continuity of care.*" ("Covid Continuity of Care Statement").

(g) *"Our technology suite supports our ability to deliver consistent, high-quality care to our participants at scale*." ("Technology Statement").

(h) *"Our in-home care capabilities enable our participants to live safely in their homes and avoid nursing homes to the extent safely possible. We directly deliver or manage all skilled and unskilled care a participant may require to live independently at home.*" ("Home Care Statement").

(i) "The fundamental aspects of our expansion playbook include deep regulatory knowledge, *a disciplined approach to site selection, a targeted sales and marketing approach, a concerted effort to recruit and develop talent, scalable underlying clinical technology and an efficient, uniform operating model*." ("Expansion Model Statement").

(j) "*We have demonstrated an ability to scale successfully*, expanding our model to a network of 16 centers in five states, which provided care for approximately 6,400 participants during the year ended June 30, 2020." ("Scalability Statement").

(k) "By proactively providing high-quality care and addressing risks related to social determinants of health, *we have demonstrated our ability to reduce avoidable utilization of high-cost care settings, such as hospitals and nursing homes*. *As a result, we create a surplus that can be used to invest in refining our care model and*

158

*providing even greater social supports for our participants. These investments further improve participants' experiences and health outcomes, which we believe will result in more savings that will drive our profitable growth. The virtuous cycle we have created enables us to consistently deliver high-quality care, achieve high participant satisfaction and retention, and attract new participants.*" ("Virtuous Cycle Statement").

(l) "*We have developed strong relationships with Medicare and Medicaid agencies through our participation in PACE* and believe we are well positioned to participate in future direct contracting opportunities with government payors." ("Government Relationships Statement").

341. The statements set forth in ¶ 327 above were false and misleading when made for the following reasons:

(a) Defendants' statement set forth in ¶ 327(a) ("Patient-Centered Care Statement") was false and misleading because, as the CMS audits of InnovAge's Sacramento and Colorado centers confirmed, InnovAge failed "to provide all Medicare and Medicaid covered services, and services determined necessary by the IDT to improve and maintain participants' overall health status," "to ensure accessible and adequate services to meet the needs of its participants," "to furnish care that met the needs of each participant in all care settings 24 hours a day, every day of the year and failed to furnish services, including reasonable and timely access to specialists," "to coordinate 24-hour care delivery and to track and share important information from other team members, participants, and caregivers," and its primary care providers "failed to manage their participants' medical situations and oversee their participants' use of

159

medical specialists." Further, Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado. Further, Defendants' statement was also false and misleading because they omitted to disclose that Defendants expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(b) Defendants' statement set forth in ¶ 327(b) ("Individualized & Coordinated Care Statement") was false and misleading because as the Company later admitted in May 2022, the Company had not "standardiz[ed] the process of our interdisciplinary care teams who plan and coordinate and deliver care" and had failed to ensure adequate "timeliness of scheduling and coordinating care with providers outside the centers." Further, Defendants' statement was also false and misleading because, as the CMS audits of InnovAge's Sacramento and Colorado centers confirmed, InnovAge failed "to ensure the interdisciplinary team coordinated 24-hour care delivery," "to conduct a

160

reassessment on at least a semi-annual basis," "to reevaluate participants' plans of care on at least a semi-annual basis," "to bring Service Delivery Requests (SDR) to the Interdisciplinary Team (IDT), process SDRs timely, and provide an approved service as expeditiously as the participant's condition required," "to implement, coordinate, and continuously monitor the plan of care whether the services are furnished by PACE employees or contractors," "to conduct unscheduled reassessments for participants who experienced a change in status," "to document the plan of care, and any changes made to it, in the participant's medical records," and "to remain alert to pertinent input concerning each participant." In addition, these statements were false and misleading because they omitted to disclose that (1) for years before the IPO, and across facilities in at least Colorado and California, InnovAge's IDTs failed to coordinate specialist care and provide follow-up care ordered by specialists and delayed treatments and services; and (2) internal and external audits identified repeated and uncorrected failures to conduct initial assessments upon enrollment and take part in planning care, conduct in-person assessments and reassessments when required to do so, provide care and services in accordance with approved care plans, develop a comprehensive plan of care within 30 days of enrollment; and assign a PCP to hundreds of participants in Colorado. Further, Defendants' statement was also false and misleading because they omitted to disclose that Defendants expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(c) Defendants' statement set forth in ¶ 327(c) ("Standardized and Well-Staffed Operations Statement") that InnovAge had "standardized and streamlined" the Company's "operations across markets" was false and misleading because as the Company later admitted in May 2022, InnovAge had not "standardiz[ed] the process of our interdisciplinary care teams who plan and coordinate and deliver care" and had not "standardize[d] our wound care program across the enterprise." Further, Defendants' statement set forth in ¶ 327(c) that the Company "invested meaningfully in the corporate infrastructure needed to drive participant satisfaction, manage healthcare costs and improve clinical outcomes at scale" was false and misleading without disclosing that (1) for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado; and (2) the Company refused to invest in the staff and resources necessary to adequately manage and improve healthcare costs and clinical outcomes for its existing participants and thus could not do so "at scale." In addition, Defendants' statement set forth in ¶ 327(c) that the Company has been "able to invest in dedicated, well-staffed teams for all of our corporate and market-level functions" and "[a]s a result, our physicians can focus on providing care and are not as burdened with

162

additional administrative demands," was false and misleading because, as the HCPF audit of InnovAge's Colorado centers confirmed, InnovAge "failed to ensure proper staffing levels throughout the term of the Contract" and this failure affected 100% of the participants reviewed. Further, this statement was also false and misleading because, as the Company admitted in May 2022, InnovAge had failed to "fill[] critical personnel gaps at each of the centers," and because Defendants omitted to disclose that (1) for years before the IPO, and across facilities in at least Colorado and California, InnovAge had failed to maintain the number of clinical staff necessary to meet the medical needs of its participants, and understaffing at facilities caused providers to carry high caseloads that prevented them from meeting the medical needs of the participants; (2) at some of InnovAge's centers, the number of clinical staff was "dangerously low" and was not sufficient to meet the medical needs of the participants; (3) Defendants had repeatedly denied requests from InnovAge's clinical staff to invest in additional clinical staff and resources while investing more and more funds to enroll additional participants, which only exacerbated the existing staff shortages; and (4) the Company expected state and federal regulators to audit its centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(d) Defendants' statement set forth in ¶ 327(d) ("Robust Compliance Statement") was false and misleading because, as the Sacramento and Colorado audits confirmed, InnovAge "failed to recognize and process complaints as grievances." This statement was also false and misleading because Defendants omitted to disclose that (1) for years, and

across facilities in at least Colorado and California, internal and external audits identified repeated and significant deficiencies that were not remediated; (2) Defendants and senior leadership directed the Company's staff to conceal evidence of deficiencies from state and federal regulators during audits of InnovAge's centers; (3) Defendants denied repeated requests from its staff across its centers to invest in the staff and resources necessary to remediate deficiencies that violated PACE regulations and agreements; and (4) the Company expected state and federal regulators to audit its centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(e) Defendants' statement set forth in ¶ 327(e) ("Successful Medical Risk Management Statement") that the Company had "along track record of successfully managing medical risk, driven by the strength of our operational playbook" was false and misleading because, as the Company admitted in May 2022, InnovAge failed to "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," and because Defendants omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating for specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients;

164

a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado.

(f) Defendants' statement set forth in set forth in ¶ 327(f) ("COVID Continuity of Care Statement") was false and misleading because, as the Company admitted in May 2022, InnovAge had failed to sufficiently maintain its "home care network and reliability," "efficiency and reliability of transportation for our participants," and "telephonic channel response times," and because Defendants omitted to disclose that they had refused to invest in the staff and resources necessary to meet the home care needs of InnovAge's participants.

(g) Defendants' statement set forth in set forth in ¶ 327(g) ("Technology Statement") was false and misleading because, as the Company admitted in May 2022, InnovAge had not ensured that its "medical records are documented with all the required data elements," that IDTs are "capturing input from all other team members" and "document[ing available information] in the EMR or in other tools that feed the EMR," and that "when a participant or a caregiver requests a service," the Company was "identifying that appropriately[] and … documenting it." Further, these statements are false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes due to a failure to adequately train staff in how to use the Company's electronic medical records system. Further, Defendants' statement was also false and misleading because they omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the

165

audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(h) Defendants' statement set forth in set forth in ¶ 327(h) ("Home Care Statement") was false and misleading because, as the Company admitted in May 2022, it failed to sufficiently strengthen its "home care network and reliability," and failed to ensure the "timeliness of scheduling and coordinating care with providers outside the centers," the "efficiency and reliability of transportation for our participants," and adequate "telephonic channel response times." In addition, Defendants' statement was false and misleading because Defendants omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard in-home care that led to worse health outcomes and refused to invest in the staff and resources necessary to ensure adequate in-home care during the COVID-19 pandemic. Further, Defendants' statement was also false and misleading because they omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(i) Defendants' statement set forth in set forth in ¶ 327(i) ("Expansion Model Statement") was false and misleading because, as Defendant Gutierrez admitted in May 2022, the Company needed a "transformation" to ensure that InnovAge was "well positioned for scalable and sustainable growth for the long-term," and as CEO Blair admitted in May 2022, InnovAge had not ensured the "near-term operational execution" and "mid- to long-term capability development" necessary to ensure the Company was "well

166

positioned to scalable, sustainable long-term growth," and had failed to "fill[] critical personnel gaps at each of the centers," "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," "ensur[e] our medical records are documented with all the required data elements," "ensur[e] that our care plans are complete and kept timely," and ensure adequate "training." Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado. Further, Defendants' statement was also false and misleading because they omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(j) Defendants' statement set forth in set forth in ¶ 327(j) ("Scalability Statement") was false and misleading because as Defendant Gutierrez admitted in May 2022, the Company needed a "transformation" to ensure that InnovAge was "well positioned for scalable and sustainable growth for the long-term," and as CEO Blair admitted in May

167

2022, InnovAge had not ensured the "near-term operational execution" and "mid- to long-term capability development" necessary to ensure the Company was "well positioned to scalable, sustainable long-term growth," and had failed to "fill[] critical personnel gaps at each of the centers," "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," sufficiently "strengthen[] our home care network and reliability," ensure adequate "timeliness of scheduling and coordinating care with providers outside the centers," ensure adequate "efficiency and reliability of transportation for our participants," "standardiz[e] our wound care program across the enterprise," "ensur[e] our medical records are documented with all the required data elements," "ensur[e] that our care plans are complete and kept timely, a lot about training and people in process," "make sure that [the IDT] is each day capturing input from all other team members," "mak[e] sure that our service orders are being scheduled on a timely basis," and "mak[e] sure that when a participant or a caregiver requests a service that we are identifying that appropriately, and we are documenting it." Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's EMR system; and failure to assign a PCP to hundreds of patients in

168

Colorado. Further, Defendants' statement was also false and misleading because Defendants omitted to disclose that they expected state and federal regulators to audit InnovAge's centers about these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(k) Defendants' statement set forth in set forth in ¶ 327(k) ("Virtuous Cycle Statement") was false and misleading because as Defendant Gutierrez admitted in May 2022, the Company needed a "transformation" to ensure that InnovAge was "well positioned for scalable and sustainable growth for the long-term," and as CEO Blair admitted in May 2022, InnovAge had not ensured the "near-term operational execution" and "mid- to long-term capability development" necessary to ensure the Company was "well positioned to scalable, sustainable long-term growth," and had failed to "fill[] critical personnel gaps at each of the centers," "standardiz[e] the process of our interdisciplinary care teams who plan and coordinate and deliver care," sufficiently "strengthen[] our home care network and reliability," ensure adequate "timeliness of scheduling and coordinating care with providers outside the centers," ensure adequate "efficiency and reliability of transportation for our participants," "standardiz[e] our wound care program across the enterprise," "ensur[e] our medical records are documented with all the required data elements," "ensur[e] that our care plans are complete and kept timely, a lot about training and people in process," "make sure that [the IDT] is each day capturing input from all other team member," "mak[e] sure that our service orders are being scheduled on a timely basis," and "mak[e] sure that when a participant or a caregiver requests a service that we are identifying that appropriately,

169

and we are documenting it." Defendants' statement was also false and misleading because they omitted to disclose that for years before the IPO, and across facilities in at least Colorado and California, InnovAge provided substandard care that led to worse health outcomes in the following areas: participants not receiving necessary specialist care; IDTs not coordinating specialist care and, as a result, failing to provide follow-up care ordered at specialist visits; delaying the provision of necessary treatments and services with no rationale for the delay; understaffing at facilities that caused providers to carry double the caseload of patients; a failure to adequately train staff in how to use the Company's electronic medical records system; and failure to assign a PCP to hundreds of patients in Colorado. Further, Defendants' statement was also false and misleading because Defendants omitted to disclose that they expected state and federal regulators to audit InnovAge's centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

(l) Defendants' statement set forth in set forth in ¶ 327(l) ("Government Relationships Statement") was false and misleading because Defendants omitted to disclose that (1) for years, and across facilities in at least Colorado and California, internal and external audits identified repeated and significant deficiencies that were not remediated; (2) Defendants and senior leadership directed the Company's staff to conceal evidence of deficiencies from state and federal regulators during audits of InnovAge's centers; (3) Defendants denied repeated requests from InnovAge's staff across its centers to invest in the staff and resources necessary to remediate deficiencies that violated PACE

170

regulations and agreements; and (4) the Company expected state and federal regulators to audit its centers in connection with these and other issues and there was thus a significant and heightened risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue.

342. In addition to the misstatements and omissions set forth above, the Offering Documents were false and misleading because they failed to disclose material information that was required to be disclosed pursuant to the regulations governing their preparation.

343. Specifically, Item 303 of Regulation S-K required the Offering Documents to "[d]escribe any known trends or uncertainties that have had or that [the Company reasonably expects is] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. § 229.303(b)(2)(ii), and Item 105 of Regulation S-K required the Offering Documents to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. § 229.105.

344. In negligent violation of Item 303 and Item 105, the Offering Documents failed to disclose that the Company's enrollment growth strategy presented a significant uncertainty, and made investment in InnovAge risky, given that the strategy had resulted in widespread deficiencies in quality of care and created a known uncertainty and risk that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue (*see* ¶¶ 240-61).

## II.    Securities Act Class Action Allegations

345. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of InnovAge in or traceable to the IPO, and who were damaged thereby (the "Securities Act

Class"). Excluded from the Securities Act Class are Defendants; the officers and directors of InnovAge at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; Defendants' liability insurance carriers and any affiliates or subsidiaries thereof; and any entity in which Defendants or their immediate families have or had a controlling interest.

346. The members of the Securities Act Class are so numerous that joinder of all members is impracticable. InnovAge shares were actively traded on the Nasdaq Stock Market. As of September 14, 2021, InnovAge had over 135 million shares of common stock outstanding, owned by hundreds or thousands of investors. Although the exact number of Securities Act Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members of the proposed Securities Act Class. Securities Act Class members who purchased InnovAge common stock may be identified from records maintained by InnovAge or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

347. Plaintiffs' claims are typical of Securities Act Class members' claims, as all members of the Securities Act Class were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

348. Plaintiffs will fairly and adequately protect Securities Act Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

349. Common questions of law and fact exist as to all Securities Act Class members and predominate over any questions solely affecting individual Securities Act Class members. Among the questions of fact and law common to the Securities Act Class are:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether Defendants made statements to the investing public in the Offering Documents that were inaccurate or omitted material facts; and

(c) the proper way to measure damages.

350. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Securities Act Class members is impracticable. Additionally, the damage suffered by some individual Securities Act Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

### III. The Securities Act Defendants Failed to Conduct a Reasonable Investigation and Exercise Reasonable Care in Connection with the Offering

351. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

352. Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants, and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a thorough verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the company's sales practices, revenue recognition practices, and other business practices that are important to its sales, revenues, and income; (3) a review of the auditor's management letters; (4) a review of items identified therein;

(5) a review of the company's SEC filings (particularly those incorporated by reference); (6) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (7) a review of the company's internal controls; (8) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (9) a review of critical non-public documents and records forming the basis for the company's assets, liabilities, earnings, contingent liabilities, and the company's potential negative trends (or lack thereof) as required to be disclosed under the securities laws.

353. Red flags uncovered through this process must then be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

354. A review of Company practices and compliance with PACE regulations, including prior audits conducted by CMS and SAAs, and InnovAge's responses to audit findings such as CAPs, would have revealed that there were systemic deficiencies in InnovAge's management, processes, and care of its participants in violation of PACE regulations. In fact, only one week before the Offering, InnovAge submitted its third proposed CAP to Colorado regulators for violations identified in a 2020 audit, after the agency had rejected InnovAge's second proposed CAP just one month earlier. Further, only six days after the Offering on March 10, 2021, InnovAge was ordered to submit root cause analyses for issues identified in a complaint about the Company's Thornton, Colorado center, including "dangerously low" staff numbers, case load size, and insufficient staff to meet the medical needs of the center's participants. Colorado's agencies and CMS would later conduct extensive audits of InnovAge's Colorado centers that confirmed that these and other

174

problems were widespread in its facilities, concluding that InnovAge's failure to ensure proper staffing levels affected 100% of the reviewed participants and that InnovAge had failed to furnish care that met the needs of 74% of the participants reviewed.

355. Given the stated importance of InnovAge's contracts with CMS and SAAs, which comprise 99% of the Company's revenue, it was incumbent upon the Securities Act Defendants to determine whether InnovAge was actually complying with those contracts and PACE regulations and could expect to continue to receive that revenue and whether its efforts to grow enrollment in its current facilities and obtain new contracts for programs in other regions would occur at the same pace as InnovAge claimed. Yet, none of the Securities Act Defendants made a reasonable investigation regarding InnovAge's compliance with PACE regulations and the adequacy of the services it was providing. By failing to investigate and ensure that Defendants' statements about InnovAge's services and quality of care were accurate and supported, the Securities Act Defendants did not possess reasonable grounds for the belief that the Company's statements regarding InnovAge's revenues, compliance with laws and regulations, penetration into the PACE market, and growth strategy were accurate and complete and not misstated in material respects.

356. The foregoing red flags should have caused the Underwriter Defendants and all Securities Act Defendants to conduct additional due diligence before drafting and disseminating the Offering Documents. By overlooking these red flags, the Securities Act Defendants negligently failed to conduct reasonable due diligence into the accuracy and completeness of the representations contained in the Offering Documents, and are liable for the misstatements and omissions contained therein.

357. Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

358. The Underwriter Defendants could not simply rely on InnovAge or on the work of InnovAge's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Further, as described above, InnovAge included unaudited results for reporting periods in 2021 in its Offering Documents.

359. Thus, the Underwriter Defendants must each conduct their own, independent (and reasonable) investigation. A reasonable investigation would have disclosed to the Underwriter Defendants that the Offering Documents contained material misstatements and omissions concerning the subjects noted above, including InnovAge's services, quality of care, and compliance with PACE regulations.

360. Similarly, the Securities Act Individual Defendants who signed the Registration Statement failed to conduct a reasonable investigation of the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. A reasonable investigation would have disclosed to the Securities Act Individual Defendants that the Offering Documents contained material misstatements and omissions concerning the subjects noted above.

361. These Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags" noted above.

## IV.   Securities Act Causes of Action

### Count III: Violation of Section 11 of the Securities Act

### (Against InnovAge, the Securities Act Individual Defendants, and the Underwriter Defendants)

362. Plaintiffs repeat and reallege each allegation contained above.

363. This Count is brought by Plaintiffs under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons and entities that purchased and otherwise acquired InnovAge common stock in connection with, and traceable to, the Offering, and does not sound in fraud.

364. The Offering Documents were inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed adequately to disclose material facts, as alleged above.

365. The Company is the registrant for the Offering. As issuer of the shares, InnovAge is strictly liable to Plaintiffs and to the members of the Securities Act Class for the misstatements and omissions in the Offering Documents.

366. As signatories of the Offering Documents, the Securities Act Individual Defendants were responsible for their contents and dissemination.

367. The Underwriter Defendants served as the underwriters for the Offering and each qualifies as the "underwriter" according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, each Underwriter Defendant participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents.

368. None of these Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, did not omit any material facts, and were not misleading.

369. These Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially untrue written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, *inter alia*, the facts alleged above.

177

By reasons of the conduct alleged, each of these Securities Act Defendants violated Section 11 of the Securities Act.

370. Plaintiffs and other members of the Securities Act Class acquired InnovAge common stock either in or traceable to the Offering.

371. Plaintiffs and the Securities Act Class have sustained damages. The value of InnovAge's common stock has declined substantially after and as a result of the alleged violations.

372. At the times when they purchased InnovAge common stock, Plaintiffs and the other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not have reasonably discovered those facts before InnovAge's subsequent announcements.

373. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based to the time of the filing of this action. Less than three years elapsed from the time when the securities upon which this claim is brought were *bona fide* offered to the public to the time of the filing of this action.

### Count IV: Violation of Section 12(a)(2) of the Securities Act
### (Against InnovAge and the Underwriter Defendants)

374. Plaintiffs repeat and reallege every allegation contained above.

375. This Count is brought by Plaintiffs under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all purchasers of InnovAge common stock in connection with, and traceable to, the Offering.

376. InnovAge and the Underwriter Defendants were sellers, offerors, and solicitors of sales of the securities offered using the Offering Documents in the Offering.

377. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material

178

facts. The actions of solicitation by InnovAge and the Underwriter Defendants included participating in the preparation and distribution of the false and misleading Offering Documents.

378. InnovAge and the Underwriter Defendants breached their duty owed to the purchasers of InnovAge common stock, including Plaintiffs and other Securities Act Class members, to make a reasonable and diligent investigation of the statements contained in the Offering Documents and to ensure that the statements were true and that the Offering Documents did not omit to state a material fact required to be stated in order to make the statements contained in the Offering Documents not misleading.

379. Plaintiffs and other members of the Securities Act Class purchased or otherwise acquired InnovAge securities in or traceable to the Offering. Plaintiffs and other members of the Securities Act Class did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

380. Plaintiffs, individually and representatively, offer to tender to InnovAge and the Underwriter Defendants those securities that Plaintiffs and other Securities Act Class members continue to own, on behalf of all members of the Securities Act Class who continue to own the securities, in return for the consideration paid for those securities together with interest on the amount owed to Plaintiffs and the Securities Act Class under Section 12(a)(2).

381. By reason of the conduct alleged in this Complaint, InnovAge and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Securities Act Class who hold InnovAge securities purchased in the Offering have the right to rescind and recover the consideration paid for their InnovAge shares and elect to rescind and tender their InnovAge securities to InnovAge and the Underwriter Defendants. Securities Act Class members who have sold their InnovAge common stock are entitled to rescissory damages.

179

382. Less than three years elapsed from the time when the securities upon which this claim is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based to the time of the filing of this action.

### Count V: Violation of Section 15 of the Securities Act
### (Against the Securities Act Individual Defendants and Apax Partners U.S. LLC)

383. Plaintiffs repeat and reallege every allegation contained above.

384. This Count is brought by Plaintiffs under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all purchasers of InnovAge common stock in connection with, and traceable to, the Offering.

385. Each of the Securities Act Individual Defendants and Defendant Apax Partners U.S. LLC was a control person of InnovAge by virtue of his or her position as a director or senior officer of the Company and/or through controlling appointments to InnovAge's board and thereby controlling the votes taken by the board, directing the management and policies of InnovAge, and exercising veto power over key decisions regarding InnovAge. Each of the Securities Act Individual Defendants and Apax Partners U.S. LLC was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on having signed the Offering Documents and having otherwise participated in the process that allowed the Offering to be completed.

386. Because of their high-ranking positions and direct involvement in the everyday business of the Company, the Director Defendants directly participated in the management of InnovAge's operations, including its accounting and reporting functions, and possessed and exercised the power and authority to control the contents of InnovAge's Offering Documents. Further, because of their senior roles and direct involvement in the business of WCAS and Apax, the Principal

Shareholder Director Defendants were directly involved in the Company's decision to conduct the IPO. The Director Defendants were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these misstatements and omissions in violation of the federal securities laws. The Director Defendants are liable for the false statements and omissions pleaded herein under the Securities Act.

387. Each of the Securities Act Individual Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related to the Company. The Securities Act Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of InnovAge. By virtue of these duties, these officers and directors were required to supervise the preparation of and dissemination of the Offering Documents, and ensure that they were accurate and complete.

388. All of the Securities Act Individual Defendants were control persons of InnovAge within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of InnovAge and as senior executives or directors of InnovAge. The Securities Act Individual Defendants, at the time they held positions with InnovAge, were able to, and did, exercise substantial control over the operations of InnovAge, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

389. As officers, directors, and/or controlling persons of a publicly held company and under the federal securities laws, the Securities Act Individual Defendants had a duty (a) to disseminate promptly complete, accurate, and truthful information with respect to InnovAge; (b) to correct any

181

previously issued statements that had become materially misleading or untrue; and (c) to disclose any trends, events, and uncertainties that would materially affect InnovAge's earnings and present and future operating results, so that the market price of InnovAge's publicly traded securities would be based upon truthful and accurate information.

390. The Officer Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of InnovAge's operations, including its accounting and reporting functions; possessed and exercised the power and authority to control the contents of the Offering Documents; and were privy to confidential information concerning InnovAge and its business, operations and financial statements, and strategy. The Officer Defendants were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged, and approved or ratified these misstatements and omissions in violation of the federal securities laws. The Officer Defendants are liable for InnovAge's false statements and omissions pleaded under the Securities Act, as well as their own.

391. According to the Company, Defendants WCAS and Apax beneficially own approximately 86% of InnovAge's common stock and are referred to as the "Principal Shareholders" and "together control the vote of all matters submitted to a vote of our shareholders, which enables them to control the election of the members of the Board and all other corporate decisions." Further, the Company has explained that Defendants WCAS and Apax "have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers, decisions on whether to raise future capital and amending our charter and bylaws, which govern the rights attached to our common stock." As long as they retain their concentration of ownership, "the Principal Shareholders will be able to cause or prevent

182

a change of control" of the Company or "a change in the composition" of the Company's Board and "could preclude any unsolicited acquisition" of InnovAge.

392. In connection with Defendants WCAS's and Apax's agreement to undertake the IPO, InnovAge entered into a Director Nomination Agreement with Defendants WCAS and Apax that provides Defendants WCAS and Apax the right to designate "all of the nominees for election to our Board" for so long as Defendants WCAS and Apax collectively beneficially own at least 40% of their original ownership stake of the Company. Under the Director Nomination Agreement, if Defendants WCAS and Apax reduce their ownership of the Company, Defendants WCAS and Apax continue to retain the right to designate a certain number of nominees to the Company's Board proportionate to the amount of their ownership of the Company. The Director Nomination Agreement also provides for certain consent rights for each of Defendants WCAS and Apax so long as such stockholder owns at least 5% of their original ownership stake of the Company, including with respect to any increase in the size of the Board.

393. Because of their majority ownership stake and retention of voting power, Defendants WCAS and Apax had the power to control, and did control InnovAge before, during, and after the IPO. Defendants WCAS and Apax caused the Company to effect the IPO; directly participated in the management of InnovAge's operations, including its accounting and reporting functions; possessed and exercised the power and authority to control the contents of the Offering Documents; were privy to confidential information concerning InnovAge and its business, operations and financial statements, and strategy; and were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged, and approved or ratified these misstatements and omissions in

183

violation of the federal securities laws. Defendants WCAS and Apax are liable for InnovAge's false statements and omissions pleaded under the Securities Act.

394. Defendants WCAS and Apax also created TCO Holdings Group, L.P. to act as the investment vehicle through which WCAS and Apax beneficially own InnovAge common stock and effectuate their control of InnovAge.

395. As a result of the foregoing, Plaintiffs and the other members of the Securities Act Class have suffered damages.

## PRAYER FOR RELIEF

396. Plaintiffs pray for relief and judgment as follows:

(a) declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the classes defined herein;

(b) awarding all damages and other remedies available under the Securities Act and the Securities Exchange Act in favor of Plaintiffs and all members of the classes against Defendants in an amount to be proven at trial, including interest thereon;

(c) awarding Plaintiffs and the classes their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Date: July 15, 2024                          Respectfully submitted,

*s/ Cecil E. Morris*

FAIRFIELD AND WOODS, P.C.
Cecil E. Morris
Adrian P. Castro
1801 California Street, Suite 2600
Denver, CO 80202
Tel.: (303) 830-2400
Fax: (303) 830-1033
cmorris@fwlaw.com
acastro@fwlaw.com

*Liaison Counsel for Lead Plaintiffs*

COHEN MILSTEIN SELLERS & TOLL
PLLC
Julie G. Reiser
Molly J. Bowen
Jan E. Messerschmidt
Brendan R. Schneiderman
1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
jreiser@cohenmilstein.com
mbowen@cohenmilstein.com
jmesserschmidt@cohenmilstein.com
bschneiderman@cohenmilstein.com

Carol V. Gilden
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel.: (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com

Manuel J. Dominguez
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel.: (561) 515-1400
Fax.: (561) 515-1401
jdominguez@cohenmilstein.com

*Lead Counsel for Lead Plaintiffs*

185

186

# Exhibit A

7/15/24, 5:04 PM                    sec.gov/Archives/edgar/data/1834376/000110465921033328/tm2037889d18_ex10-1.htm

EX-10.1 6 tm2037889d18_ex10-1.htm EXHIBIT 10.1

**Exhibit 10.1**

## DIRECTOR NOMINATION AGREEMENT

THIS DIRECTOR NOMINATION AGREEMENT (this "Agreement") is made and entered into as of March 8, 2021, by and among InnovAge Holding Corp., a Delaware corporation (the "Company"), Ignite Aggregator LP, a Delaware limited partnership (together with its affiliated investment entities, "Apax Partners"), Welsh, Carson, Anderson & Stowe XII, L.P., Welsh, Carson, Anderson & Stowe XII Delaware, L.P., Welsh, Carson, Anderson & Stowe XII Delaware II, L.P., Welsh, Carson, Anderson & Stowe XII Cayman, L.P., WCAS XII Co-Investors LLC, WCAS Management Corporation and WCAS Co-Invest Holdco, L.P. (together with Welsh, Carson, Anderson & Stowe XII, L.P., Welsh, Carson, Anderson & Stowe XII Delaware, L.P., Welsh, Carson, Anderson & Stowe XII Delaware II, L.P., Welsh, Carson, Anderson & Stowe XII Cayman, L.P., WCAS XII Co-Investors LLC, WCAS Management Corporation, "WCAS" and, together with Apax Partners, the "Sponsors"). This Agreement shall become effective (the "Effective Date") upon the closing of the Company's initial public offering (the "IPO") of shares of its common stock, par value $0.001 per share (the "Common Stock").

WHEREAS, as of the date hereof, the Sponsors collectively own a majority of the outstanding equity interests of TCO Group Holdings, L.P.;

WHEREAS, the Sponsors are contemplating causing the Company to effect the IPO;

WHEREAS, in consideration of the Sponsors agreeing to undertake the IPO, the Company has agreed to permit the Sponsors to designate persons for nomination for election to the board of directors of the Company (the "Board") following the Effective Date on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the parties to this Agreement agrees as follows:

1. Board Nomination Rights.

   (a) From the Effective Date, the Sponsors have the right to designate (i) all of the nominees for election to the Board for so long as the Sponsors collectively beneficially own at least 40% of the total number of shares of the Company's Common Stock collectively beneficially owned by the Sponsors upon completion of the IPO (including the underwriters' exercise of any option to purchase additional shares contemplated on the cover page of the prospectus relating to the IPO), as adjusted for any reorganization, recapitalization, stock dividend, stock split, reverse stock split or similar changes in the Company's capitalization (the "Original Amount"); (ii) 40% of the nominees for election to the Board for so long as the Sponsors collectively beneficially own less than 40% but at least 30% of the Original Amount; (iii) 30% of the nominees for election to the Board for so long as the Sponsors collectively beneficially own less than 30% but at least 20% of the Original Amount; (iv) 20% of the nominees for election to the Board for so long as the Sponsors collectively beneficially own less than 20% but at least 10% of the Original Amount; and (v) one (1) of the nominees for election to the Board for so long as the Sponsors collectively beneficially own at least 5% of the Original Amount (such persons, the "Nominees"). If TCO Group Holdings, L.P. is dissolved after IPO, then each of Apax Partners and WCAS will be permitted to nominate (A) up to three (3) Directors (as defined below) so long as it owns at least 25% of the Original Amount, (B) up to two (2) Directors so long as it owns at least 15% of the Original Amount and (C) one (1) Director so long as it owns at least 5% of the Original Amount. The Sponsors may assign such nomination rights to their Affiliates (as defined below).

(b) In the event that any Sponsor has nominated less than the total number of designees that such Sponsor shall be entitled to nominate pursuant to Section 1(a), such Sponsor shall have the right, at any time, to nominate such additional designees to which it is entitled, in which case, the Company and the Directors shall take all necessary corporation action, to the fullest extent permitted by applicable law (including with respect to fiduciary duties under Delaware law), to (x) enable such Sponsor to nominate and effect the election or appointment of such additional individuals, whether by increasing the size of the Board, or otherwise and (y) to designate such additional individuals nominated by such Sponsor to fill such newly created vacancies or to fill any other existing vacancies.

(c) The Company shall pay all reasonable out-of-pocket expenses incurred by any Nominee in connection with the performance of his or her duties as a Director and in connection with his or her attendance at any meeting of the Board.

(d) "Beneficially Own" shall mean that a specified person has or shares the right, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, to vote shares of capital stock of the Company. "Affiliate" of any person shall mean any other person controlled by, controlling or under common control with such person; where "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities, by contract or otherwise).

(e) "Director" means any member of the Board.

(f) No reduction in the number of shares of Common Stock that each Sponsor Beneficially Owns shall shorten the term of any incumbent Director. At the Effective Date, the Board shall be comprised of ten (10) members and the initial members shall be Maureen Hewitt, John Ellis Bush, Andrew Cavanna, Caroline Dechert, Edward Kennedy, Jr., Pavithra Mahesh, Thomas Scully, Marilyn Tavenner, Sean Traynor and Richard Zoretic. Andrew Cavanna and Pavithra Mahesh shall constitute the "Apax Nominees" and Caroline Dechert, Thomas Scully and Sean Traynor shall constitute the "WCAS Nominees." The Sponsors may change the respective individuals designated as such Apax Nominees and WCAS Nominees by providing notice to the Company.

2

(g) In the event that any Nominee shall cease to serve for any reason, the Sponsor that nominated such Nominee shall be entitled to designate such person's successor in accordance with this Agreement (regardless of each Sponsor's Beneficial Ownership of Common Stock at the time of such vacancy) and the Board shall promptly fill the vacancy with such successor nominee; it being understood that any such designee shall serve the remainder of the term of the Director whom such designee replaces.

(h) If a Nominee is not appointed or elected to the Board because of such person's death, disability, disqualification, withdrawal as a Nominee or for other reason is unavailable or unable to serve on the Board, the applicable Sponsor shall be entitled to designate promptly another Nominee and the director position for which the original Nominee was nominated shall not be filled pending such designation.

(i) So long as a Sponsor has the right to nominate at least one Nominee under this Section 1 or any such Nominee is serving on the Board, the Company shall maintain in effect at all times directors and officers indemnity insurance coverage reasonably satisfactory to the Sponsors, and the Company's Amended and Restated Certificate of Incorporation and Bylaws (each as may be further amended, supplemented or waived in accordance with its terms) shall at all times provide for indemnification, exculpation and advancement of expenses to the fullest extent permitted under applicable law.

(j) At any time that a Sponsor shall have any nomination rights under this Section 1, the Company shall not increase or decrease the number of Directors serving on the Board without the prior written consent of the Sponsors having such rights.

(k) At such time as the Company ceases to be a "controlled company" and is required by applicable law or Nasdaq (the "Exchange") listing standards to have a majority of the Board comprised of "independent directors" (subject in each case to any applicable phase-in periods), the Nominees shall include a number of persons that qualify as "independent directors" under applicable law and the Exchange listing standards such that, together with any other "independent directors" then serving on the Board that are not Nominees, the Board is comprised of a majority of "independent directors"; provided that at any time that a Sponsor shall have any nomination rights under this Section 1, (i) each such Sponsor shall be entitled to nominate at least one (1) Nominee who does not qualify as an "independent director" and (ii) the number of "independent directors" required to be nominated by any Sponsor pursuant to this provision shall not be greater than the number of Nominees required to be "independent directors" pursuant to this provision to be nominated by any other Sponsor with the right to nominate the same number of, or more, Nominees as such Sponsor; provided, however, in the event that the number of required "independent directors" is odd, the Sponsors agree to work in good faith to collectively nominate one such "independent director;" provided, further, however, that to the extent a mutually agreeable "independent director" cannot be agreed upon, that the Board shall have the right to expand its size by one and to nominate and appoint such required "independent director" to fill the resulting vacancy, provided that such nominee is acceptable to each Sponsor.

3

(l) At any time that a Sponsor shall have any nomination rights under this Section 1, the Company shall not take any action, including making or recommending any amendment to Company's Amended and Restated Certificate of Incorporation or Bylaws (each as may be further amended, supplemented or waived in accordance with its terms) that could reasonably be expected to adversely affect a Sponsor's rights under this Agreement, in each case without the prior written consent of the adversely affected Sponsor.

(m) Each Sponsor hereby agrees to be present in person or by proxy and vote or cause to be voted all Common Stock Beneficially Owned by such Sponsor at each annual or special meeting of the Company at which Directors of the Company are to be elected, in favor of, or to take all actions by written consent in lieu of any such meeting as are necessary, or other necessary action, to cause the election of the Nominees described in Section 1(a) in accordance with, and otherwise to achieve the composition of the Board and effect the intent of, the provisions of this Section 1.

(n) The Company recognizes that Nominees (i) will from time to time receive non-public information concerning the Company, and (ii) may share such information with other individuals associated with the Sponsor that designated such Nominee. The Company hereby irrevocably consents to such sharing. Each Sponsor agrees that it will keep confidential and not disclose or divulge to any third party any confidential information regarding the Company it receives from the Company or a Nominee, unless such information (x) is known or becomes known to the public in general, (y) is or has been independently developed or conceived by such Sponsor without use of the Company's confidential information or (z) is or has been made known or disclosed to such Sponsor by a third party without a breach of any obligation of confidentiality such third party may have; provided, however, that a Sponsor may disclose confidential information (I) to its Affiliates (other than portfolio companies), (II) to each of its and its Affiliate's (other than portfolio companies) attorneys, accountants, consultants, advisors and other professionals to the extent necessary to obtain their services in connection with evaluating the information, or (III) as may be required by law or legal, judicial or regulatory process or requested by any regulatory or self-regulatory authority or examiner, provided that such Sponsor takes reasonable steps to minimize the extent of any required disclosure described in this clause (III).

4

2.    **Company Obligations.** The Company agrees that prior to the date that each Sponsor and its Affiliates cease to Beneficially Own shares of Common Stock representing at least 5% of the Original Amount, (i) each Nominee is included in the Board's slate of nominees to the stockholders (the "Board's Slate") for each election of Directors; and (ii) each Nominee is included in the proxy statement prepared by management of the Company in connection with soliciting proxies for every meeting of the stockholders of the Company called with respect to the election of members of the Board (each, a "Director Election Proxy Statement"), and at every adjournment or postponement thereof, and on every action or approval by written consent of the stockholders of the Company or the Board with respect to the election of members of the Board. Each Sponsor will promptly report to the Company after such Sponsor ceases to Beneficially Own shares of Common Stock representing at least 5% of the total voting power of the Original Amount, such that Company is informed of when this obligation terminates. The calculation of the number of Nominees that each Sponsor is entitled to nominate to the Board's Slate for any election of Directors shall be based on the percentage of the Original Amount Beneficially Owned by each Sponsor immediately prior to the mailing to shareholders of the Director Election Proxy Statement relating to such election (or, if earlier, the filing of the definitive Director Election Proxy Statement with the U.S. Securities and Exchange Commission). Unless a Sponsor notifies the Company otherwise prior to the mailing to shareholders of the Director Election Proxy Statement relating to an election of Directors, the Nominees for such election shall be presumed to be the same Nominees currently serving on the Board, and no further action shall be required of any Sponsor for the Board to include such Nominees on the Board's Slate; provided that, in the event a Sponsor is no longer entitled to nominate the full number of Nominees then serving on the Board, such Sponsor shall provide advance written notice to the Company, of which currently servicing Nominee(s) shall be excluded from the Board's Slate, and of any other changes to the list of Nominees. If a Sponsor fails to provide such notice prior to the mailing to shareholders of the Director Election Proxy Statement relating to such election (or, if earlier, the filing of the definitive Director Election Proxy Statement with the U.S. Securities and Exchange Commission), a majority of the independent directors then serving on the Board shall determine which of the Nominees of such Sponsor then serving on the Board will be included in the Board's Slate. Furthermore, the Company agrees for so long as the Company qualifies as a "controlled company" under the rules of the Exchange the Company will elect to be a "controlled company" for purposes of the Exchange and will disclose in its annual meeting proxy statement that it is a "controlled company" and the basis for that determination. The Company and the Sponsors acknowledge and agree that, as of the Effective Date, the Company is a "controlled company." The Company agrees to provide written notice of the preparation of a Director Election Proxy Statement to the Sponsors at least 20 business days, but no more than 40 business days, prior to the earlier of the mailing and the filing date of any Director Election Proxy Statement.

3.    **Governance.**

(a)    **Protective Provisions.** Notwithstanding any other provision of this Agreement and to the fullest extent permitted by applicable law, in addition to the approval of the Directors, the following actions described in this Section 3(a) (collectively, the "Consent Matters") shall require the prior written consent of Apax Partners and/or WCAS as set out below:

i.    none of the following actions shall be taken by the Company, including any proposal by the Board to be put to the vote of the stockholders of the Company with respect thereto, without (A) the prior written consent of Apax Partners for so long as Apax Partners owns at least 5% of the Original Amount and (B) the prior written consent of WCAS for so long as WCAS owns at least 5% of the Original Amount (except as set forth in the proviso in Section 3(a)(I)):

5

I.  amending, altering or changing, or waiving any rights under, this Agreement, the organizational documents, including the Amended and Restated Certificate of Incorporation or the Bylaws of the Company, (which shall also be subject to Section 5) and/or the organizational documents of any subsidiary of the Company; provided that, notwithstanding the foregoing, for so long as Apax Partners or WCAS, as applicable, own any outstanding Common Stock, any amendment, alteration, or change to, or waiver under, other organizational documents, including the Amended and Restated Certificate of Incorporation or the Bylaws of the Company, and/or the organizational documents of any subsidiary of the Company that would adversely affect in any respect any rights specific to Apax Partners or WCAS shall (subject to applicable law) require the written consent of Apax Partners or WCAS, as applicable;

II.  authorizing or issuing any equity securities of the Company having rights, preferences or privileges that are superior or senior to the outstanding Common Stock (or any securities convertible or exchangeable therefor pursuant to their terms);

III.  any transaction with any stockholder or Affiliate of a stockholder or any Director or officer of the Company or any of its subsidiaries (other than employment agreements with officers not otherwise affiliated with a stockholder);

IV.  winding up the Company; and

V.  entering into any agreement with respect to the matters described in the foregoing clauses (I) through (IV) or taking any such action indirectly.

6

ii.  none of the following actions shall be taken by the Company, including any proposal by the Board to be put to the vote of the stockholders of the Company with respect thereto, without (A) the prior written consent of Apax Partners for so long as Apax Partners owns at least 20% of the Original Amount and (B) the prior written consent of WCAS for so long as WCAS owns at least 20% of the Original Amount:

    I.  the declaration or payment of any dividend or other distribution to the stockholders by the Company or redemption, repurchase or exchange (as applicable) of any equity securities of the Company;

    II.  issuing or granting any equity securities of the Company or its subsidiaries, other than grants under the Company's 2021 Omnibus Incentive Plan;

    III.  engaging in any mergers, acquisitions, business combinations or similar transactions or entering into any arrangements or agreements relating to joint ventures or strategic partnerships with a value of such transaction or arrangement exceeding $10.0 million; and

    IV.  entry by the Company into any agreement with respect to the matters described in the foregoing clauses (I) through (III) or taking any such action indirectly.

4.  Committees. From and after the Effective Date hereof until such time as each Sponsor and its Affiliates cease to Beneficially Own Common Stock representing at least 5% of the Original Amount, each Sponsor shall have the right to designate one member of each committee of the Board, provided that any such designee shall be a Director and shall be eligible to serve on the applicable committee under applicable law or listing standards of the Exchange, including any applicable independence requirements (subject in each case to any applicable exceptions, including those for newly public companies and for "controlled companies," and any applicable phase-in periods). Any additional members shall be determined by the Board. Nominees designated to serve on a Board committee shall have the right to remain on such committee until the next election of Directors, regardless of the number of shares of Common Stock the Sponsor Beneficially Owns following such designation. Unless a Sponsor notifies the Company otherwise prior to the time the Board takes action to change the composition of a Board committee, and to the extent the applicable Sponsor Beneficially Owns the requisite percentage of the Original Amount for such Sponsor to nominate a Board committee member at the time the Board takes action to change the composition of any such Board committee, any Nominee currently designated by the applicable Sponsor to serve on a committee shall be presumed to be re-designated for such committee.

7

5.    <u>Amendment and Waiver</u>. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by the Company and each Sponsor owning at least 5% of the Original Amount, or in the case of a waiver, by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law. The Sponsors shall not be obligated to nominate all (or any) of the Nominees they are entitled to nominate pursuant to this Agreement for any election of Directors but the failure to do so shall not constitute a waiver of their rights hereunder with respect to future elections; <u>provided</u>, <u>however</u>, that in the event a Sponsor fails to nominate all (or any) of the Nominees it is entitled to nominate pursuant to this Agreement prior to the mailing to shareholders of the Director Election Proxy Statement relating to such election (or, if earlier, the filing of the definitive Director Election Proxy Statement with the U.S. Securities and Exchange Commission), the Compensation, Nominating and Governance Committee of the Board shall be entitled to nominate individuals in lieu of such Nominees for inclusion in the Board's Slate and the applicable Director Election Proxy Statement with respect to the election for which such failure occurred and such Sponsor shall be deemed to have waived its rights hereunder with respect to such election; <u>provided</u>, <u>further</u>, <u>however</u>, that any such waiver shall only be effective if the Company has provided written notice to such Sponsor of such Director Election Proxy Statement no less than 20 business days, and no more than 40 business days, prior to the earlier of the mailing or filing date of such Director Election Proxy Statement. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

6.    <u>Benefit of Parties</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns. Notwithstanding the foregoing, the Company may not assign any of its rights or obligations hereunder without the prior written consent of each Sponsor that Beneficially Own shares of Common Stock representing at least 5% of the Original Amount. Except as otherwise expressly provided in <u>Section 7</u>, nothing herein contained shall confer or is intended to confer on any third party or entity that is not a party to this Agreement any rights under this Agreement.

7.    <u>Assignment</u>. Upon written notice to the Company, each Sponsor may assign to any Affiliate (other than a portfolio company) all of its rights hereunder and, following such assignment, such assignee shall be deemed to be a "<u>Sponsor</u>" for all purposes hereunder.

8

8.    Indemnification.

(a)    The Company shall defend, indemnify and hold harmless the Sponsors, their respective Affiliates, partners, employees, agents, directors, managers, officers and controlling Persons (collectively, the "Indemnified Parties") from and against any and all actions, causes of action, suits, claims, liabilities, losses, damages, costs, expenses, or obligations of any kind or nature (whether accrued or fixed, absolute or contingent) in connection therewith (including reasonable attorneys' fees and expenses) incurred by the Indemnified Parties before or after the date of this Agreement (each, an "Action") arising directly or indirectly out of, or in any way relating to, (i) any Sponsor's or its respective Affiliates' Beneficial Ownership of Common Stock or other equity securities of the Company or control or ability to influence the Company or any of its subsidiaries (other than any such Actions (x) to the extent such Actions arise out of any breach of this Agreement by an Indemnified Party or its Affiliates or the breach of any fiduciary or other duty or obligation of such Indemnified Party to its direct or indirect equity holders, creditors or Affiliates or (y) to the extent such Actions are directly caused by such Person's willful misconduct), (ii) the business, operations, properties, assets or other rights or liabilities of the Company or any of its subsidiaries or (iii) any services provided prior, on or after the date of this Agreement by any Sponsor or its respective Affiliates to the Company or any of its subsidiaries. The Company shall defend at its own cost and expense in respect of any Action which may be brought against the Company and/or its Affiliates and the Indemnified Parties. The Company shall defend at its own cost and expense any and all Actions which may be brought in which the Indemnified Parties may be impleaded with others upon any Action by the Indemnified Parties, except that if such damage shall be proven to be the direct result of gross negligence, bad faith or willful misconduct by any of the Indemnified Parties, then such Indemnified Party shall reimburse the Company for the costs of defense and other costs incurred by the Company in proportion to such Indemnified Party's culpability as proven. In the event of the assertion against any Indemnified Party of any Action or the commencement of any Action, the Company shall be entitled to participate in such Action and in the investigation of such Action and, after written notice from the Company to such Indemnified Party, to assume the investigation or defense of such Action with counsel of the Company's choice at the Company's expense; provided, however, that such counsel shall be reasonably satisfactory to the Indemnified Party. Notwithstanding anything to the contrary contained herein, the Company may retain one firm of counsel to represent all Indemnified Parties in such Action; provided, however, that the Indemnified Party shall have the right to employ a single firm of separate counsel (and any necessary local counsel) and to participate in the defense or investigation of such Action and the Company shall bear the expense of such separate counsel (and local counsel, if applicable), if (x) in the opinion of counsel to the Indemnified Party use of counsel of the Company's choice could reasonably be expected to give rise to a conflict of interest, (y) the Company shall not have employed counsel satisfactory to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of the assertion of any such Action or (z) the Company shall authorize the Indemnified Party to employ separate counsel at the Company's expense. The Company further agrees that with respect to any Indemnified Party who is employed, retained or otherwise associated with, or appointed or nominated by, the Sponsors or any of their respective Affiliates and who acts or serves as a director, officer, manager, fiduciary, employee, consultant, advisor or agent of, for or to the Company or any of its subsidiaries, that the Company or such subsidiaries, as applicable, shall be primarily liable for all indemnification, reimbursements, advancements or similar payments (the "Indemnity Obligations") afforded to such Indemnified Party acting in such capacity or capacities on behalf or at the request of the Company, whether the Indemnity Obligations are created by law, organizational or constituent documents, contract (including this Agreement) or otherwise. The Company hereby agrees that in no event shall the Company or any of its subsidiaries have any right or claim against any Sponsor for contribution or have rights of subrogation against any Sponsor through an Indemnified Party for any payment made by the Company or any of its subsidiaries with respect to any Indemnity Obligation. In addition, the Company hereby agrees that in the event that any Sponsor pay or advance an Indemnified Party any expenses with respect to an Indemnity Obligation, the Company will, or will cause its subsidiaries to, as applicable, promptly reimburse any such Sponsor, respectively, for such payment or advance upon request; subject to the receipt by the Company of a written undertaking executed by the Indemnified Party and the Sponsors, as applicable, that makes such payment or advance to repay any such amounts if it shall ultimately be determined by a court of competent jurisdiction that such Indemnified Party was not entitled to be indemnified by the Company. The foregoing right to indemnity shall be in addition to any rights that any Indemnified Party may have at common law or otherwise and shall remain in full force and effect following the completion or any termination of the engagement. If for any reason the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold it harmless as and to the extent contemplated by this Section 8, then the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such Action in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and the Indemnified Party, as the case may be, on the other hand, as well as any other relevant equitable considerations.

9

7/15/24, 5:04 PM                    sec.gov/Archives/edgar/data/1834376/000110465921033328/tm2037889d18 ex10-1.htm

(b)      The Company hereby acknowledges that the certain of the Indemnified Parties have certain rights to indemnification, advancement of expenses and/or insurance provided by investment funds managed by Apax Partners and WCAS and certain of their Affiliates (collectively, the "Fund Indemnitors"). The Company hereby agrees with respect to any indemnification, hold harmless obligation, expense advancement or reimbursement provision or any other similar obligation whether pursuant to or with respect to this Agreement, the organizational documents of the Company or any of its subsidiaries or any other agreement, as applicable, (i) that the Company and its subsidiaries are the indemnitor of first resort (i.e., their obligations to the Indemnified Parties are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for claims, expenses or obligations arising out of the same or similar facts and circumstances suffered by any Indemnified Party are secondary), (ii) that the Company shall be required to advance the full amount of expenses incurred by any Indemnified Party and shall be liable for the full amount of all expenses, liabilities, obligations, judgments, penalties, fines, and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, the organizational documents of the Company or any of its subsidiaries or any other agreement, as applicable, without regard to any rights any Indemnified Party may have against the Fund Indemnitors, and (iii) that the Company, on behalf of itself and each of its subsidiaries, irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all Actions against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of any Indemnified Party with respect to any Action for which any Indemnified Party has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of any Indemnified Party against the Company. The Company agrees that the Fund Indemnitors are express third-party beneficiaries of the terms of this Section 8(b).

9.      Headings. Headings are for ease of reference only and shall not form a part of this Agreement.

10.      Governing Law. This Agreement shall be construed in accordance with and governed by the law of the State of Delaware without giving effect to the principles of conflicts of laws thereof.

11.      Jurisdiction. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement may be brought against any of the parties in any federal court located in the State of Delaware or any Delaware state court, and each of the parties hereby consents to the exclusive jurisdiction of such court (and of the appropriate appellate courts) in any such suit, action or proceeding and waives any objection to venue laid therein. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each of the parties agrees that service of process upon such party at the address referred to in Section 18, together with written notice of such service to such party, shall be deemed effective service of process upon such party.

10

https://www.sec.gov/Archives/edgar/data/1834376/000110465921033328/tm2037889d18 ex10-1.htm

12.     WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

13.     Entire Agreement. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, both written and oral among the parties with respect to the subject matter hereof.

14.     Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts, each of which shall be deemed an original. This Agreement shall become effective when each party shall have received a counterpart hereof signed by each of the other parties. An executed copy or counterpart hereof delivered by facsimile shall be deemed an original instrument.

15.     Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

16.     Further Assurances. Each of the parties hereto shall execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purpose of this Agreement.

17.     Specific Performance. Each of the parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in any federal or state court located in the State of Delaware, in addition to any other remedy to which they are entitled at law or in equity.

18.     Notices. All notices, requests and other communications to any party or to the Company shall be in writing (including telecopy or similar writing) and shall be given,

If to the Company:

InnovAge Holding Corp.
8950 E. Lowry Boulevard
Denver, Colorado 80230
Attention: Chief Legal Officer

11

<u>With a copy to (which shall not constitute notice)</u>:

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
Attention: Robert M. Hayward, P.C.
            Robert E. Goedert, P.C.
Facsimile: (312) 862-2200

<u>If to any member of Apax Partners or any of its Nominees</u>:

c/o Apax Partners, L.P.
601 Lexington Avenue
53rd Floor
New York, New York 10022
Attention: [***]
Email: [***]@apax.com

<u>If to any member of WCAS or any of its Nominees</u>:

c/o Welsh, Carson, Anderson & Stowe, L.P.
599 Lexington Avenue
Suite 1800
New York, New York 10022
Attention: [***]
Email: [***]@wcas.com

<u>With a copy to (which shall not constitute notice)</u>:

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
Attention: Robert M. Hayward, P.C.
            Robert E. Goedert, P.C.
Facsimile: (312) 862-2200

or to such other address or telecopier number as such party or the Company may hereafter specify for the purpose by notice to the other parties and the Company. Each such notice, request or other communication shall be effective when delivered at the address specified in this <u>Section 18</u> during regular business hours.

19.     <u>Enforcement</u>. Each of the parties hereto covenants and agrees that the disinterested members of the Board have the right to enforce, waive or take any other action with respect to this Agreement on behalf of the Company.

* * * * *

12

7/15/24, 5:04 PM    sec.gov/Archives/edgar/data/1834376/000110465921033328/tm2037889d18_ex10-1.htm

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

**INNOVAGE HOLDING CORP.**

By:/s/ Vanessa D. Walton
Name: Vanessa D. Walton
Title:   Secretary

*[Signature Page to Director Nomination Agreement]*

7/15/24, 5:04 PM                     sec.gov/Archives/edgar/data/1834376/000110465921033328/tm2037889d18_ex10-1.htm

**IGNITE AGGREGATOR LP**

By:  Ignite GP Inc., its general partner

By:/s/ Andrew Cavanna
Name:   Andrew Cavanna
Title:    President

[*Signature Page to Director Nomination Agreement*]

https://www.sec.gov/Archives/edgar/data/1834376/000110465921033328/tm2037889d18_ex10-1.htm                     14/16

**WELSH, CARSON, ANDERSON & STOWE XII, L.P.**

By: WCAS XII Associates LLC, its general partner

By: /s/ Thomas Scully
Name:   Thomas Scully
Title:    Managing Member

**WELSH, CARSON, ANDERSON & STOWE XII
DELAWARE, L.P.**

By: WCAS XII Associates Cayman, L.P., its general partner

By: WCAS XII Associates LLC, its general partner

By: /s/ Thomas Scully
Name:  Thomas Scully
Title:    Managing Member

**WELSH, CARSON, ANDERSON & STOWE XII DELAWARE
II, L.P.**

By: WCAS XII Associates LLC, its general partner

By: /s/ Thomas Scully
Name:  Thomas Scully
Title:    Managing Member

*[Signature Page to Director Nomination Agreement]*

7/15/24, 5:04 PM                    sec.gov/Archives/edgar/data/1834376/000110465921033328/tm2037889d18_ex10-1.htm

**WELSH, CARSON, ANDERSON & STOWE XII CAYMAN, L.P.**

By: WCAS XII Associates Cayman, L.P., its general partner

By: WCAS XII Associates LLC, its general partner

By: /s/ Thomas Scully
Name:    Thomas Scully
Title:      Managing Member

**WCAS XII CO-INVESTORS LLC**

By: /s/ Jonathan Rather
Name:    Jonathan Rather
Title:      Managing Member

**WCAS MANAGEMENT CORPORATION**

By: /s/ Jonathan Rather
Name:    Jonathan Rather
Title:      Treasurer

**WCAS CO-INVEST HOLDCO, L.P.**

By: WCAS Co-Invest Associates LLC, its general partner

By: /s/ Jonathan Rather
Name:    Jonathan Rather
Title:      Managing Member

*[Signature Page to Director Nomination Agreement]*