UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, and INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>INNOVAGE HOLDING CORP., et al.,<br><br>    Defendants. | Case No. 21-cv-02770-WJM-SKC<br><br>CLASS ACTION |

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PHD

October 9, 2024

**Table of Contents**

I.     Introduction.......................................................................................................................1

II.    Summary of Opinions.....................................................................................................2

III.   Background on the Fraud-on-the-Market Theory and Stock Prices.............................5

IV.    The Out-of-Pocket Methodology is Widely Accepted by Courts at the Class
       Certification Stage and Dr. Hutton's Concerns Will Be Addressed at the Merits
       Stage ...............................................................................................................................7

       A.  Damages Methodology Accords with Lead Plaintiffs' Theory of Liability ................10

       B.  Inflation Can Be Reasonably Calculated for Each Day of the Class Period ..............13

       C.  Determining the Value of Corrective and Confounding Information Is Standard
           Practice in Loss Causation Analyses and is Performed on a Class-Wide Basis.........15

V.     Conclusion .....................................................................................................................17

Appendix A ...............................................................................................................................19

Appendix B ...............................................................................................................................26

## I.    Introduction

1.    On May 8, 2024, I submitted an expert report in this matter (my "Opening Report"), in which I concluded that the market for shares of InnovAge Common Stock was efficient throughout the Class Period. I also concluded that damages under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Sections 11 and 12(a)(2) of the Securities Act of 1933, can be calculated on a class-wide basis subject to a common methodology in this matter.[1]

2.    Following the submission of my Opening Report, Counsel for Plaintiffs provided me with the August 23, 2024 Expert Report of Dr. Amy Hutton ("Hutton Report"). I have been asked to review, evaluate, and respond to the opinions in that report.

3.    My qualifications and rate of compensation for work in this matter were identified in my Opening Report and I do not repeat them here. I have attached an updated version of my curriculum vitae as **Appendix A**.

4.    In formulating my opinions set forth in this Expert Reply Report, I have relied upon the analyses already described in my Opening Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. All of the materials I have considered in forming my opinions are identified in **Appendix B** to this Reply Report, in addition to those previously identified in Appendix B to my Opening Report.

---

[1] *See* Opening Report, ¶¶ 3, 97, and Sections VI.A, VI.B, and VI.C. I continue to hold the opinions expressed in my Opening Report and reiterate them here. Capitalized terms in this report have the same meaning as in my Opening Report.

5. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## II. Summary of Opinions

6. Nothing in the Hutton Report disturbs the opinions expressed in my Opening Report.

7. There are a number of important opinions I express in my Opening Report that Dr. Hutton does not dispute. First, Dr. Hutton does not dispute my conclusion that InnovAge Common Stock traded in an efficient market throughout the entirety of the Class Period. In my Opening Report, I tested InnovAge Common Stock market efficiency by evaluating 11 separate factors (including the *Cammer* and *Krogman* factors).[2] Dr. Hutton does not dispute my analyses of or my conclusions regarding *any* of these 11 factors.

8. Second, Dr. Hutton does not offer any criticism of the event study regression specified in my Opening Report. Dr. Hutton does not perform her own event study, nor does she dispute that I performed a valid event study regression that controls for market and industry effects and accurately measures the abnormal returns exhibited by InnovAge Common Stock during the Class Period and on the alleged corrective disclosure dates. She also does not dispute that an event study regression, like the one I conducted in my Opening Report, is one of the economically valid methods for conducting a loss causation and damages analysis.

---

[2] Opening Report, Section V.

2

9.  Third, Dr. Hutton does not dispute my description of the calculation of damages on Lead Plaintiffs' Section 11 and Section 12 claims. Dr. Hutton does not opine on negative causation damages under Section 11 or Section 12. I understand that Defendants bear the burden of proof for any departure from statutory damages calculations under these claims. Additionally, I understand, and Dr. Hutton does not dispute, that damages under Section 15 would be covered by damages under Section 11 and/or Section 12 and I do not discuss these damages separately.[3]

10.  Fourth, Dr. Hutton does not offer an opinion related to price impact, and therefore she has not established a lack of price impact from Defendants' alleged misrepresentations and omissions on InnovAge Common Stock.

11.  Fifth, Dr. Hutton does not dispute that the general damages framework and methodology (*i.e.*, the out-of-pocket method) that I detail in my Opening Report is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act.[4] Nor does she put forward any alternative approach that would be more suitable in this matter.

12.  However, Dr. Hutton claims that I have failed to provide the methodology that I will use to measure how inflation changed throughout the Class Period and was revealed through corrective disclosures. Dr. Hutton claims that I have not explained how I would address certain "economic complexities" in a Section 10(b) damages analysis, in particular, how I would: (1) measure the dissipation of artificial inflation due to the

---

[3] *See* Opening Report, footnote 2.

[4] Opening Report, Section VI.A.

materialization of concealed risks separate from other known risks; (2) account for changes in artificial inflation during the Class Period; and (3) isolate damages attributable to actionable allegations versus dismissed alleged misstatements and omissions.[5]

13.    Each of Dr. Hutton's concerns are unpersuasive. What Dr. Hutton describes as "economic complexities" have nothing to do with how the out-of-pocket damages framework fits Lead Plaintiffs' liability theory or its uniform applicability to all class members. Rather, her questions relate to circumstances that may later implicate the precise amount of artificial inflation that a jury or finder of fact attributes to Defendants' misconduct, and thus determines was present in InnovAge Common Stock throughout the Class Period. These concerns are not unique to this case, but rather are common in securities litigation matters and are addressed in a loss causation analysis following merits discovery. As I detail below, the "complexities" can all be handled on a class-wide basis with common information within the out-of-pocket damages framework, and there are well-accepted valuation techniques that regularly and effectively address these questions at the merits stage.[6] As a result, Dr. Hutton's "economic complexities" do not grapple with, much less defeat, my opinion that every aspect of damages in this case can be calculated on a class-wide basis.

---

[5] Hutton Report at ¶¶ 19-25.

[6] Opening Report, at ¶¶ 84-87.

### III.    Background on the Fraud-on-the-Market Theory and Stock Prices

14.    In my Opening Report, I explained how the fraud-on-the-market theory relates directly to the price of a given security.[7] This theory posits that if a company's stock price reflects all public widely-available information, then all purchasers of that company's stock implicitly rely on any misrepresentations or omissions because those statements or omissions have distorted the value of each investor's purchase price. I further explained how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to claims made under Section 10(b) of the Exchange Act and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

15.    I analyzed the *Cammer*, *Krogman*, and other relevant factors relating to InnovAge Common Stock in my Opening Report, and I ultimately found that these factors support a conclusion of market efficiency.[8] Thus, it follows that purchasers of InnovAge Common Stock implicitly relied on Defendants' alleged misrepresentations and/or omissions because the value of that information was impounded into the price of InnovAge Common Stock at which their trades were made. Dr. Hutton does not dispute my analyses of any of these 11 factors or my conclusion that InnovAge Common Stock traded in an efficient market during the entirety of the Class Period.

16.    As part of the analysis in my Opening Report, I performed an event study to analyze the stock price movements for InnovAge Common Stock throughout the Class Period. To perform the event study, I used a regression analysis to measure the relationship

---

[7] Opening Report, Section IV.

[8] Opening Report, Section V.

5

between InnovAge's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in InnovAge's industry. By modeling how InnovAge's stock price returns moved relative to an overall market index and an industry index, I am able to measure its "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

17.     Dr. Hutton offers no criticisms of my event study analysis. Nor does she dispute that it accurately measures the abnormal returns exhibited by InnovAge Common Stock during the Class Period and on the alleged corrective disclosure dates. As a result, there is no dispute as to the finding from my event study analysis that the market price of InnovAge Common Stock declined in a statistically significant manner in the wake of multiple corrective disclosures alleged by Lead Plaintiffs. Specifically, my event study shows that there were statistically significant price declines in InnovAge Common Stock – after controlling for market and industry effects, at the 95% confidence level or greater – following the alleged corrective disclosures on September 22, 2021 and December 23, 2021.[9]

---

[9] I note that Dr. Hutton states that "[I do] not even clearly specify on which days [I] would perform an event study to measure inflation" (Hutton Report at ¶ 52). While it is premature to opine on what a loss causation analysis would demonstrate, I would identify, review, evaluate, and empirically analyze all of the events that were alleged in the Complaint as revealing corrective information (including by conducting an event study analysis). This, along with an analysis of the alleged misstatements and omissions in this matter, would allow me to determine the amount of artificial inflation impounded into the stock on each day of the class period that subsequently dissipated out of the price when the market began to learn of the truth. This amount of artificial inflation would apply to every member of the class who purchased on a given day in the same amount.

**IV.    The Out-of-Pocket Methodology is Widely Accepted by Courts at the Class Certification Stage and Dr. Hutton's Concerns Will Be Addressed at the Merits Stage**

18.    In addition to not challenging my opinions of market efficiency or my event study methodology or analysis, Dr. Hutton does not challenge the opinion in my Opening Report that the out-of-pocket method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act. As I explain in my Opening Report, the out-of-pocket method calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale.[10] Rather than taking issue with the out-of-pocket methodology, Dr. Hutton expresses concerns that I have not provided the specific approach that I will use to calculate the artificial inflation per share, which is an input to this formula.

19.    Specifically, Dr. Hutton criticizes the damages methodology described in my Opening Report by claiming that I have not explained how I would appropriately: (1) measure the dissipation of artificial inflation due to the materialization of concealed risks separate from other known risks; (2) account for changes in artificial inflation during the Class Period; and (3) isolate damages attributable to actionable allegations versus dismissed alleged misstatements and omissions.[11]

20.    At this point, it is important to draw a distinction between two concepts that are part of a damages methodology: the damages formula itself and the inputs to the

---

[10] Opening Report, Section VI.

[11] Hutton Report at ¶¶ 19-25.

damages formula. In my Opening Report, I presented the standard well-accepted damages formula. Further, I make clear in my Opening Report that quantifying artificial inflation per share for each day in the Class Period and the dissipation of artificial inflation through corrective disclosures – the inputs to the damages formula – are questions separate and apart from whether there is a common, class-wide method for computing damages. As discussed in my Opening Report,[12] there are a number of valuation techniques that can be employed to conduct such an evaluation of inputs. For example, if investors learn new information that would imply a change in company value due to allegedly concealed risks, there are valuation models (including, but not limited to, discounted cash flow analysis or multiples analysis) that can measure how Company value would change based on such changes in the information available to investors.

21.    Furthermore, Dr. Hutton mischaracterizes part of my Opening Report when she states the following:

> Moreover, Dr. Cain appears to contradict himself regarding the extent to which his damages methodology is catered to the specific set of facts and circumstances in this case. On one hand, Dr. Cain acknowledges that "any of the [] approaches" in the Cain Report for "the calculation of artificial inflation"—the input for calculating damages under the "out-of-pocket" method—must be "based on the specific set of facts and circumstances in a given case." On the other hand, Dr. Cain states that "the opinions [he] reach[es] … regarding … the calculation of damages are not tied to any specific allegations" in this case, which I understand would be part of the facts and circumstances that his damages methodology would need to account for so that it would be consistent with Plaintiffs' theory of liability.[13]

---

[12] Opening Report at ¶¶ 84-87.

[13] Hutton Report at ¶ 31.

22.     In the first part of my Opening Report that she cites above, I discuss how the calculation of artificial inflation is a fact-intensive process that can only be performed based on what is learned in discovery.[14] In the second part of my report that she cites, I state that my opinions regarding market efficiency and the applicability of the out-of-pocket damages methodology in the context of class certification are not tied to any specific allegations of this case – that is because the out-of-pocket methodology is not dependent on any one specific allegation but rather can accommodate any outcome related to artificial inflation per share from the allegations.[15] The second quote is taken out of context in the Hutton Report in an attempt to make my words seem contradictory, when each quote is in fact referring to a different concept.

23.     Thus, Dr. Hutton's assertions regarding the need for a methodology that "can reliably address the [] economic complexities arising in this matter,"[16] concern whether case-specific adjustments may ultimately be needed at the *merits* stage and not at the class certification stage of litigation. While Dr. Hutton states that "[I] fail to explain, even in general terms, how the techniques and resources that [I] reference would be used to accomplish these necessary tasks,"[17] she fails to provide any foundation for her assertion that such a methodology must be specified at an earlier stage of litigation and she certainly does not argue that the methodology could not be applied consistently to all class members.

---

[14] *See* Opening Report at ¶ 86.

[15] *See* Opening Report footnote 7.

[16] Hutton Report at ¶ 18.

[17] Hutton Report at ¶ 25.

Her questions relate to loss causation issues that are addressed in the merits stage of a case – including whether a jury or trier of fact determines that artificial inflation was caused by Defendants' misconduct, and if so, calculating the amount of artificial inflation present in InnovAge Common Stock throughout the Class Period.

24.     Below I explain how each of Dr. Hutton's three main criticisms are flawed, and even so, how the out-of-pocket methodology described in my Opening Report is adaptable to accommodate such concerns.

### A.     Damages Methodology Accords with Lead Plaintiffs' Theory of Liability

25.     Lead Plaintiffs' theory of liability alleges that Defendants concealed and understated the foreseeable risk that audits by state and federal regulators of InnovAge's centers would result in costly CAPs, monetary penalties, or suspension of enrollment, compromising the Company's revenue.[18] Allegedly, the concealed risks were later revealed to the market on the corrective disclosure dates identified in the Complaint, resulting in price declines of InnovAge's Common Stock.[19] This is a theory of liability that can be – and regularly is – addressed through the out-of-pocket methodology.

26.     Dr. Hutton posits that the final calculation of damages will need to measure inflation arising from allegedly concealed risks separate and apart from other known risks that may have also materialized upon the alleged corrective disclosure events.  Specifically, Dr. Hutton states:

> I understand Plaintiffs claim that Defendants concealed the true nature of InnovAge's staffing challenges, which contributed to the allegedly concealed

---

[18] *See, e.g.,* Complaint at ¶ 251.

[19] *Id.* at ¶¶ 281-290.

heightened Audit and Sanctions Risk. According to Dr. Cain, "the disclosures ***materialized the 'risk*** that the audits would result in costly CAPs, monetary penalties, or suspension of enrollment, thus compromising InnovAge's revenue' that Defendants had concealed." However […] under this claim, the stock price declines following the announcements on September 21, 2021 and December 23, 2021 of the audit findings and the resulting sanctions do not reliably measure, and may overestimate, inflation, if any, that was dissipated by the announcements. This is because the stock price reactions following the announcements of the audit findings and the resulting sanctions would reflect both the valuation impact of the correction of the allegedly concealed portion of the risk (which allegedly could and should have been disclosed earlier) and the valuation impact of the materialization of the true risk. That materialization could not have been disclosed earlier given that the outcomes had not happened, and were uncertain.[20]

27.    Dr. Hutton's view relates to questions about the need to separate fraud-related revelations from non-fraud-related information (*i.e.*, confounding information), and thus is unpersuasive. As I discuss further below, this dynamic raises questions about isolating corrective information from confounding information, if any, on alleged corrective disclosures and how to measure artificial inflation. In my experience, answering these questions requires an exhaustive loss causation analysis, which I understand is not required at the class certification stage of litigation. These more nuanced issues regarding loss causation (*i.e.*, disaggregating the impact of confounding information) are present in virtually every certified securities class action matter, are routinely the subject of expert discovery during the merits phase of the litigation, and in any event, such analyses are determined based upon proof that is common to all class members. In other words, the out-of-pocket methodology – which can rely on an event study (such as the one presented in

---

[20] Hutton Report at ¶ 19 (emphasis in original).

11

my Opening Report, and which Dr. Hutton does not dispute is reliable) or other valuation techniques – can accommodate artificial inflation that controls for any confounding information. I have not and need not have done a robust analysis of loss causation factors because that analysis is not necessary to conclude that there is a reasonable methodology of calculating damages on a class-wide basis.

28.     Additionally, Dr. Hutton's general description of certain events in the Class Period does not disturb my opinion that the out-of-pocket method can be used to calculate damages in this matter. Dr. Hutton claims that her "review of the public mix of information reveals in the current matter that relevant risks were not entirely concealed. At least some portion of the true risk was known to the market as information regarding InnovAge's staffing issues and regulatory audits was publicly available through a number of sources before the alleged corrective disclosures." [21] Dr. Hutton posits that the proposed damages methodology would need to consider what risks were known versus what risks were concealed during the Class Period. Again, there is nothing unique about this in the context of securities class action matters – all matters involve an evaluation of what information was known and not known to investors, including in regulated industries. The out-of-pocket method is flexible enough to account for potentially time-varying amounts of artificial inflation per share values based on the evaluation of that information.

29.     In summary, the fact that Lead Plaintiffs' theory of liability potentially includes the materialization of risks that were disclosed to the market through a series of

---

[21] Hutton Report at ¶ 42.

corrective disclosure events does not prevent me from quantifying artificial inflation throughout the Class Period and measuring damages on a class-wide basis at the merits stage. The out-of-pocket methodology has been regularly relied upon at the class certification stage (and beyond) as a method for calculating class-wide damages in matters involving corrective disclosure events, including materialization of risks.[22]

**B.    Inflation Can Be Reasonably Calculated for Each Day of the Class Period**

30.    Dr. Hutton purports that "Plaintiffs' own claims point to changes in the information available to InnovAge and the market regarding both the at-issue staffing challenges and the status of the audits that could have resulted in changes in alleged inflation during the Class Period," and as a result I have "failed to provide a reliable methodology capable of estimating changes in information […] in a manner consistent with Plaintiffs' theory of liability."[23]

31.    Dr. Hutton presents a hypothetical example involving the potential payment of a $100 million fine for a company with 10 million shares outstanding.[24] The true risk of incurring this loss is 60%, for an expected value loss of $6 per share. But if the company misrepresents this risk, for example, as a 30% probability, then the price may reflect an

---

[22] *See, e.g.,* Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*, p. 34. *See also,* Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, Civil Action No. RDB-17-0388 filed October 14, 2020, *In Re Under Armour Securities Litigation*, at ¶ 377: "The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the ***risk caused by Defendants' fraud materialized, through partial revelations of truthful information***," and at ¶ 404: "These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very ***risks they sought to warn of began to materialize***" (emphasis added). *See also,* Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

[23] Hutton Report at ¶¶ 22-23.

[24] Hutton Report at ¶¶ 37-41.

expected loss of only $3 per share. However, if this risk materializes, the actual value loss equals $10 per share ($100 million loss * 100%, divided by 10 million shares). She raises the concern that one could incorrectly measure artificial inflation as $7 per share when in fact the misrepresented risk was only $3 per share. But her concern is unpersuasive: a merits-based loss causation analysis would simply measure artificial inflation as the difference between the true risk (*i.e.*, $6 per share) minus the misrepresented risk (*i.e.*, $3 per share) in order to correctly calculate artificial inflation of $3 per share. The out-of-pocket method can easily incorporate the appropriate measure of artificial inflation in this instance to address Dr. Hutton's concern.

32.     Dr. Hutton's hypothetical examples also demonstrate how the out-of-pocket methodology is equipped to handle *changes* in information over time, for example, via partial corrective disclosures. Consider her hypothetical example in which a company misrepresents the $100 million loss probability as 30% when the true probability is 60%, resulting in artificial inflation of $3 per share (60% minus 30%, multiplied by $100 million loss, divided by 10 million shares).[25]   If corrective information increases investors' perception of the loss probability to 40%, then the stock price will drop by $1 per share and the remaining artificial inflation will be $2 per share (60% minus 40%, multiplied by $100 million loss, divided by 10 million shares).

33.     The out-of-pocket methodology can reasonably be applied to such a scenario, and will result in the proper measure of class-wide damages: $3 per share for those who

---

[25] Hutton Report at ¶¶ 58-59.

purchased before the corrective information was released and held through the final corrective disclosure, and \$2 per share for those who purchased after the first partial corrective disclosure and held through the final corrective disclosure.[26] Thus, Dr. Hutton's hypothetical scenarios, even those involving changing information during the Class Period, do not disturb the class-wide applicability of the standard out-of-pocket methodology, nor my opinion on its appropriateness in this case.

### C. Determining the Value of Corrective and Confounding Information Is Standard Practice in Loss Causation Analyses and is Performed on a Class-Wide Basis

34.    Dr. Hutton does not challenge my opinion that any estimate of artificial inflation in this matter may appropriately involve an event study specifically designed to isolate stock price movements resulting from the alleged corrective disclosures. Instead, Dr. Hutton points out that such an analysis may have to exclude price movements resulting from allegations that were dismissed in this matter:

> Thus, in order to reliably measure inflation and damages in this matter in a manner consistent with Plaintiffs' theory of liability, Dr. Cain's proposed damages methodology would need to be capable of (i) reliably determining to what extent the dismissed alleged misrepresentations caused the heightened Audit and Sanctions Risk to be obscured on each day of the Class Period separately from the extent to which the At-Issue Staffing Statements concealed the heightened Audit and Sanction Risk on each day of the Class Period, and (ii) on each alleged corrective disclosure date, reliably measuring the dissipation of inflation arising from the At-Issue Staffing Statements separately from the stock price impact of the dismissed alleged misrepresentations.[27]

---

[26] The out-of-pocket methodology can be similarly applied to the other hypothetical scenarios presented by Dr. Hutton.

[27] Hutton Report at ¶ 25.

35.     In other words, a damages analysis may need to address any potential confounding information.[28] Similar to Dr. Hutton's concerns around how inflation per share may have changed during the Class Period, addressing potential confounding information is a loss causation issue that is standard practice in economic analysis. There are many possible ways one might disaggregate such confounding information – one can utilize a variety of well-accepted valuation techniques including, but not limited to, event studies, valuation analysis, published academic research studies, analyst research, or other case-specific documents. This is clearly an issue of fact that would need to be considered as part of any loss causation analysis. However, Dr. Hutton, without support, is suggesting that such an analysis needs to be designed and/or explained without regard to what evidence may become available in discovery. If such a disaggregation analysis becomes necessary, the standard damages model can readily incorporate such issues and would be dependent on the same analysis conducted on a class-wide basis.[29]

36.     As a purely hypothetical example, suppose it is determined at the loss causation stage that the price of InnovAge Common Stock declined by $5.00 per share, after controlling for market and industry effects, on an alleged corrective disclosure date. Further assume that a loss causation analysis determines that 20% of that price decline was due to confounding factors and therefore needs to be disaggregated from the total abnormal price decline.  Thus, $4.00 of the abnormal price decline (80% of $5.00) could be attributed

---

[28] Hutton Report at ¶¶ 66, 70.

[29] *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S. Ct. 2179, 2183 (2011) (holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

to the alleged corrective information on that date and thus one could reasonably conclude that $4.00 of artificial inflation dissipated from the price of InnovAge Common Stock on that date. Whether a disaggregation analysis at the loss causation stage determines that 0%, 20%, or some other percentage of a price decline is due to confounding factors, the result artificial inflation can easily be updated and incorporated into the out-of-pocket methodology.

37.    I further note that, even if one were to encounter a corrective disclosure event in which disaggregation is impossible, the out-of-pocket model can easily handle such an outcome on a class-wide basis by assigning 0% inflation as a result of the alleged newly disclosed corrective information.

## V.    Conclusion

38.    In summary, Dr. Hutton's opinions are flawed and unpersuasive. In direct contrast to the arguments raised in the Hutton Report, not only have I provided a reasonable and concrete damages methodology, but I have explained how the out-of-pocket damages methodology is widely employed in cases like this one precisely because it is capable of reliably calculating damages on a class-wide basis in a manner consistent with Lead Plaintiffs' theory of liability. The out-of-pocket damages methodology is flexible enough to consider and incorporate all of the concerns raised by Dr. Hutton.

17

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Matthew D. Cain

18

## Appendix A

**Matthew D. Cain, Ph.D.**                                                    October 2024

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

**Education**

Ph.D., Finance, August 2007                         Purdue University, West Lafayette, IN
B.S., Finance, May 2001                              Grove City College, Grove City, PA

**Professional and Academic Experience**

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

**Publications**

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway

- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024

    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023


University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

22

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

23

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

24

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

25

## Appendix B

## Documents Considered

**Court Documents:**

- Expert Report of Matthew D. Cain, Ph.D., dated May 8, 2024, including all data and documents included in the Appendices of that report.
- Expert Report of Amy Hutton, Ph.D., dated August 23, 2024.
- Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification, in *re EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, AND INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated v. INNOVAGE HOLDING CORP., et al*., Case No. 1:21-cv-02770-WJM-SBP, filed August 23, 2024.
- Amended Class Action Complaint for Violations of the Federal Securities Laws, in *re EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, and INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated v. INNOVAGE HOLDING CORP., et al.*, Case 1:21-cv-02770-WJM-SKC, filed June 21, 2022.
- Order Granting in Part and Denying in Part Defendants' Joint Motion to Dismiss Amended Class Action Complaint, in *re EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, and INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated v. INNOVAGE HOLDING CORP., et al*, Case 1:21-cv-02770-WJM-SKC, filed December 21, 2023.
- Order Granting in Part and Denying in Part and Denying in Part Underwriter Defendants' Motion to Dismiss Amended Class Action Complaint, in *re EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, and INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated v. INNOVAGE HOLDING CORP., et al*, Case 1:21-cv-02770-WJM-SKC, filed January 18, 2024.

**Court Decisions and Securities Law:**

- *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011), 131 S. Ct.
- Memorandum Opinion and Order, *WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated v. WALGREEN CO., GREGORY D. WASSON, and WADE MIQUELON*, 2018, Case No. 15-cv-03187 (N.D. Ill.), filed March 29, 2018.

26

- Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, *In Re Under Armour Securities Litigation*, Civil Action No. RDB-17-0388, filed October 14, 2020.
- Memorandum Opinion, *in re UNDER ARMOUR SECURITIES LITIGATION*, Case No. RDB-17-0388 filed September 29, 2022.

27