IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-2770-WJM-SJP

EL PASO FIREMEN & POLICEMEN'S PENSION FUND,
SAN ANTONIO FIRE & POLICE PENSION FUND, and
INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

 Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
JOHN ELLIS BUSH,
ANDREW CAVANNA,
CAROLINE DECHERT,
EDWARD KENNEDY, JR.,
PAVITHRA MAHESH,
THOMAS SCULLY,
MARILYN TAVENNER,
SEAN TRAYNOR,
RICHARD ZORETIC,
WCAS MANAGEMENT CORPORATION,
WCAS MANAGEMENT, L.P.,
WCAS MANAGEMENT, LLC,
APAX PARTNERS US LLC,
TCO GROUP HOLDINGS, L.P.,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY, L.L.C.,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO., LLC, and
ROBERTS & RYAN INVESTMENTS, INC.,

 Defendants.

1

**ORDER DENYING MOTION TO DISMISS**

Before the Court is Defendants WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC's (collectively, the "WCAS Defendants") motion to dismiss ("Motion") Lead Plaintiffs El Paso Fireman & Policemen's Pension Fund, San Antonio Fire & Police Pension Fund, and Indiana Public Retirement System's (collectively, "Lead Plaintiffs") second amended complaint ("SAC"). (ECF No. 175.) Lead Plaintiffs filed a response, to which the WCAS Defendants filed a reply. (ECF Nos. 181, 185.)

For the following reasons, the Motion is denied.

## I. BACKGROUND

The Court assumes the parties' familiarity with the general background of this case from its Order Granting in Part and Denying in Part Defendants' Joint Motion to Dismiss Amended Class Action Complaint. (ECF No. 102 at 2–31.) The Court incorporates that background here and adds the following pertinent facts.

In its first dismissal order, the Court denied Welsh, Carson, Anderson & Stowe ("WCAS") and Apax Partners, L.P.'s ("Apax") motion to dismiss with respect to Lead Plaintiffs' control person liability claims against them under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a). (*Id.* at 84–87.) The Court observed that "[c]ontrol is defined as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" (*Id.* at 85 (quoting 17 C.F.R. § 230.405).) In considering whether Lead Plaintiffs had

2

sufficiently pleaded their control person liability claims against WCAS and Apax, which the Court remarked "is a contextual inquiry," the Court reasoned and concluded as follows:

> The context of this case is that 86% of the Company's voting stock was owned by TCO Group Holdings, L.P. ("TCO"). (ECF No. 74-1 at 28.)  'Voting and dispositive power with respect to the common stock held by [TCO] is exercised by a committee of limited partners.' (*Id.*)  That committee, referred to as the 'LP Board' in the S-1, 'is to be comprised of up seven persons.' (*Id.*)  Of these seven people, three were designated by WCAS and two by Apax. (*Id.*)  Because the LP Board 'exercises the voting and dispositive power [of TCO] by majority vote,' WCAS and Apax acting together could 'cause the direction of the management and policies' of InnovAge without input from anyone else. (*Id.*; 17 C.F.R. § 230.405.)  Not only that, should either WCAS or Apax disagree with one another about the direction of the Company, each wielded veto power. (ECF No. 74-1 at 28 ('The LP Board exercises its voting and dispositive power by majority vote, so long as one WCAS Designee and one Apax Designee comprise the majority.') (emphasis added).)  Therefore, the Court without significant effort concludes the Amended Complaint adequately alleges control person liability against WCAS and Apax.

(*Id.* at 86–87.)

In September 2024, Lead Plaintiffs obtained leave to file the SAC after learning from the WCAS Defendants that WCAS "did not actually exist and was simply a trade name." (ECF No. 170; ECF No. 181 at 2.)  Accordingly, the SAC drops WCAS as a defendant and asserts the control person liability claims against the WCAS Defendants, among other changes.  (ECF No. 171.)  Those amended factual allegations include the following.

The SAC alleges that WCAS "operates through a series of multiple, interconnected entities under common control and led by individuals identified on its

3

website as General Partners, including WCAS Management Corporation and two other management entities that employ and compensate the people who work on behalf of Welsh, Carson, Anderson & Stowe." (*Id.* at 14.)

The SAC alleges that WCAS Management Corporation "is a registered investment adviser that employs and compensates investment professionals, including WCAS's 'partners,' who serve as the officers, directors, and managers of WCAS Management Corporation, as well as more junior investment professionals, whom the partners supervise and direct." (*Id.* at 14–15.) The SAC continues: "WCAS Management Corporation is a party to the Director Nomination Agreement pursuant to which, in consideration of WCAS and Apax causing InnovAge to effect the IPO, InnovAge agreed to permit WCAS and Apax to [sic] designate directors to InnovAge's Board." (*Id.* at 15.) Lastly, the SAC asserts that, "[i]n its most recent Form ADV, Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers, filed March 29, 2024, WCAS Management Corporation stated that it has 100 employees, 65 of whom perform investment advisory functions including research and portfolio management for pooled investment vehicles, and that it has over $15 million in regulatory assets under management in 22 pooled investment vehicles." (*Id.*)

The SAC alleges that WCAS Management, L.P. "performs back-office and administrative services for WCAS." (*Id.*) The SAC asserts that "WCAS describes WCAS Management Corporation and WCAS Management, L.P. collectively as 'the Firm,' which, according to WCAS Management Corporation's most recent Form ADV, collectively conduct a single advisory business." (*Id.*) The SAC further posits that

4

"WCAS Management, L.P. is controlled by the WCAS Management Corporation Board and by WCAS's partners in their capacity as officers, directors, and limited partners and as managing members of Defendant WCAS Management, LLC." (*Id.* at 15–16.)

As to WCAS Management, LLC, the SAC simply alleges that "[i]t runs WCAS Management, L.P. in its role as the sole general partner of that entity." (*Id.* at 16.)

The SAC alleges that Welsh, Carson, Anderson & Stowe XII, L.P., a nonparty to this action, "holds InnovAge stock along with other 'parallel' funds controlled by WCAS," and that, "[a]ccording to Form ADV, WCAS Management Corporation and WCAS Management, L.P. sponsor or manage WCAS XII." (*Id.* at 16–17.) It also alleges that Defendants "serve as investment managers for the WCAS XII Funds." (*Id.* at 17.)

Collectively, the SAC alleges that "[t]he entities that comprise WCAS all operate under a common identity and purpose. They use common trademarks "WCAS" and "Welsh, Carson, Anderson & Stowe," which are registered to Defendant WCAS Management Corporation; all operate from the same principal place of business . . . and share the same website . . . ." (*Id.*) Finally, the SAC alleges that "WCAS's General Partners serve as officers, directors, and managers of—and thus ultimately control—the WCAS Management Entities, and in turn, control the WCAS XII Funds." (*Id.*)

## II. PERTINENT PRINCIPLES

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct

5

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true.  *Iqbal*, 556 U.S. at 681.  So long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, they have met the threshold pleading standard.  *See, e.g., Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

"The two most pertinent cases from the Tenth Circuit" on the issue of control person liability are *Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998), and *Adams* v. Kinder-Morgan, Inc., 340 F.3d 1083 (10th Cir. 2003).  *Medina v. Clovis Oncology, Inc.*, 215 F.Supp.3d, 1132 (D. Colo. 2017).  The *Medina* court succinctly summarized those decisions as follows:

> In *Maher*, the Circuit applied the following definition of control: 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' *Maher*, 144 F.3d at 1305 (quotation omitted).  The Tenth Circuit concluded that the alleged facts that the defendant had (1) access to a company's non-public information, (2) acquired stock in the company, and (3) the option to acquire a controlling interest in the company, were insufficient to plead control, especially when there was no allegation that the defendant had threatened to exercise its right to acquire a controlling interest.  *Id.* at 1305–06.  In *Adams*, the Tenth Circuit, applying the same definition of control, concluded that the plaintiffs had failed to allege sufficient facts that one of the defendants was a control person because it was alleged that the defendant was 'simply a member of the board of directors,' without any allegation that he exerted control or influence over the day-to-day running of the company. *Adams*, 340 F.3d at 1108.

6

*Id.* at 1132–33.

"'Control' for purposes of the prima facie case in this circuit does not require plaintiff to show the defendant actually or culpably participated in the primary violation." *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F.Supp.2d 1148, 1180 (D. Colo. 2012) (citing *Maher*, 144 F.3d at 1305). "Rather, control person liability under the 1933 and 1934 Acts in the Tenth Circuit is 'remedial' in nature and to be 'liberally construed,' requiring only 'some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable.'" *Id.* (quoting *Richardson v. MacArthur*, 451 F.2d 35, 41–42 (10th Cir.1971)). The Tenth Circuit has described the definition of the term "control" in this context as "broad." *Maher*, 144 F.3d at 1305.

Importantly, "the control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss"; still, "dismissal is appropriate when . . . a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Id.*; *see also Alpha Capital Anstalt v. Schwell Wimpfheimer & Associates LLP*, 2018 WL 1627266, at *20 (S.D.N.Y. Mar. 30 2018) (observing that "determining whether an individual defendant is a 'controlling person' is 'a fact-intensive inquiry that generally should not be resolved on a motion to dismiss'") (quoting *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015))).

## III. ANALYSIS

The WCAS Defendants move to dismiss the control person liability claims against them, arguing that Lead Plaintiffs "fail to allege any facts demonstrating that any individual WCAS Defendant actually had the ability to control InnovAge." (ECF No. 175 at 5.) The Court disagrees.

7

As mentioned, Lead Plaintiffs amended their complaint to drop WCAS from this lawsuit, in seeming acknowledgment that WCAS is merely a trade name—*i.e.*, not a legally-recognized corporate entity—and is therefore not capable of being sued.  *See Santa Fe Goldworks, Inc. v. Bella Jewelry, LLC*, 2024 WL 3161893, at *8 n.13 (D.N.M. June 25, 2024) (collecting cases recognizing that a trade name is not a separate legal entity capable of being sued).  Hence, the Court disregards allegations pertaining to the fictitious "WCAS," which is no longer a party in this action, and focuses its inquiry on whether the SAC includes facts alleging that the WCAS Defendants herein—WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC—individually exerted or had the means of exerting control over InnovAge.

With that framing in mind, the Court initially concludes that the SAC sufficiently pleads a *prima facie* control person liability claim as to WCAS Management Corporation.  There are two primary reasons for this conclusion.  First, the SAC alleges that WCAS Management Corporation "is a party to the Director Nomination Agreement." (ECF No. 171 at 15.)  As the Court explained in its first dismissal order, the Director Nomination Agreement is important because it vests significant authority in the seven limited partners of TCO, "a shell entity formed by WCAS and Apax," which owned 86% of InnovAge's voting stock.  (ECF No. 102 at 86; ECF No. 74-1 at 28.)  Specifically, the limited partners of TCO—including WCAS Management Corporation (and other non-party WCAS affiliates)—have "dispositive power with respect to the common stock held by TCO," so long as they comprise the majority.  (ECF No. 74-1 at 28.)  In other words, WCAS Management Corporation allegedly has dispositive power with respect to at least a portion of the 86% of common stock held by TCO when it comprises the majority.

8

Moreover, only "one WCAS Designee" need "comprise the majority" in order to veto a decision reached by the other limited partners, so, as alleged, it appears that WCAS Management Corporation effectively holds veto power over the board's decisions in certain circumstances as well.  (*Id.*)

Second, and relatedly, the SAC alleges that WCAS Management Corporation's participation in the Director Nomination Agreement is the means by which it helped facilitate InnovAge going public.  (ECF No. 171 at 15 (alleging that that InnovAge "effect[uated] the IPO" "pursuant to" the Director Nomination Agreement).)  As another court in this District has recognized, a plaintiff can sufficiently plead a control person liability claim by alleging, among other things, "participat[ion] in facilitating the IPO process."  *Correa v. Liberty Oilfield Services, Inc.*, 548 F.Supp.3d 1069, 1084 (D. Colo. 2021).  And while this Court found in its first dismissal order that "facilitat[ing] the IPO process alone" is not "enough to be subject to joint and several liability under the securities laws," that finding is not at all in tension with the Court's conclusion here, since the SAC alleges control person liability based on WCAS Management Corporation allegedly facilitating the IPO *and* that entity having the authority to influence TCO's decisions by nominating directors to InnovAge's board.  (ECF No. 102 at 83–84.)

Thus, the Court concludes that the SAC alleges "some indirect means of discipline or influence short of actual direction to hold a controlling person liable," *Richardson*, 451 F.2d at 41–42, and is therefore minimally sufficient to survive a motion to dismiss.  *See id.* (recognizing that control-person allegations can be sufficient under Tenth Circuit case law when the allegations support an inference that a person had the potential to exercise control, even if there are no allegations that they did in fact do so).

9

Resisting this conclusion, the WCAS Defendants argue that "none of these entities is alleged to have held InnovAge stock at any point in time." (ECF No. 175 at 8.) And with respect to the Director Nomination Agreement, the WCAS Defendants acknowledge that signators to that agreement "are entitled to nominate a certain number of nominees for election to InnovAge's board" but maintain that the agreement "does not provide any detail concerning the rights of any individual party to the agreement with respect to nominating directors." (*Id.*) The WCAS Defendants add: "That WCAS Management Corporation and seven non-defendant entities shared the ability to nominate up to two directors on a ten-member board comes *nowhere* close to showing that the WCAS Defendants—much less any individual WCAS Defendant—exercised the requisite level of control over InnovAge's operation to support a Section 20 claim." (*Id.* at 13.)

As the Court implicitly found in its first dismissal order, however, whether the WCAS Defendants personally held InnovAge stock is not solely dispositive on the issue of control. Instead, it is sufficient that Lead Plaintiffs allege that WCAS Management Corporation had the authority to control TCO, which held an overwhelming percentage of InnovAge's voting stock, by serving as limited partners on its board. (ECF No. 102 at 86.) Importantly, it is not disputed that the seven board members wield significant voting and veto power over InnovAge's decision-making, as outlined above.

For this same reason, the Court is not swayed—at least at this juncture of the case—by the WCAS Defendants' claim that WCAS Management Corporation's authority to nominate certain directors to InnovAge's board does not show a sufficient "level of control over InnovAge's operation." (ECF No. 175 at 13.) It is simply not clear,

based on the SAC and the parties' arguments, exactly how much power WCAS Management Corporation had over InnovAge pursuant to the Director Nomination Agreement. The WCAS Defendants acknowledge as much. (*See, e.g.*, ECF No. 175 at 8 (acknowledging that the Director Nomination Agreement "does not provide any detail concerning the rights of any individual party to the agreement with respect to nominating directors").) In the Court's view, this sort of fact-intensive inquiry is better saved for a later stage of this litigation. *See Maher*, 144 F.3d at 1305 (making clear that "the control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss"). Hence, Lead Plaintiffs' control person liability claim against WCAS Management Corporation may proceed.

The SAC's allegations with respect to WCAS Management, L.P. and WCAS Management, LLC, however, are weaker. Unlike WCAS Management Corporation, the SAC does not allege that either of those corporate entities was a signator to the Director Nomination Agreement, or that they directly facilitated InnovAge's IPO. At most, the SAC alleges that WCAS Management, LP "is controlled by the WCAS Management Corporation" and that WCAS Management LLC "runs WCAS Management, L.P." (ECF No. 171 at 15–16.) While control person liability claims must be construed liberally, the Court has not located any case blessing a control liability theory based on such a tenuous connection between the alleged primary violator (InnovAge), the alleged control entity (WCAS Management Corporation), and the alleged control entity's affiliates (WCAS Management, L.P. and WCAS Management, LLC). *See Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1222 (D.N.M. 2011) ("A corporate affiliation or a corporate-subsidiary relationship, without

11

additional facts demonstrating a practical ability to direct the actions of the primary violator, do not make out a claim of control."); *see also Konopasek v. Ten Assocs., LLC.*, No. 2018 WL 6177249, at *4 (C.D. Cal. Oct. 22, 2018) (dismissing control person claim where allegations "fail to identify specific conduct" by each defendant); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1202 (D. Or. 2015) (dismissing control person liability claims where "allegation improperly lumps together all Defendants").  And Lead Plaintiffs have not pointed the Court to any such cases either.[1]

Nevertheless, Lead Plaintiffs insist that dismissal is not appropriate because "there is no real dispute that WCAS controls InnovAge." (ECF No. 181 at 9.)  Relying on the "Offering Documents," Lead Plaintiffs assert that Apax and WCAS "beneficially own . . . 86% of InnovAge's outstanding common stock" and "together control the vote of all matters submitted to a vote of our shareholders, which enables them to control the election of the members of the Board and all other corporate decisions." (*Id.*)  They further assert that "[t]he Offering Documents state that Apax and WCAS's ownership makes InnovAge a 'controlled company' . . . and they will have significant influence with respect to [the] management, business plans and policies . . . ." (*Id.* (emphasis omitted).)  In response to the WCAS Defendants' argument that they are distinct corporate entities, Lead Plaintiffs posit that "[t]he WCAS Management Entities *are* WCAS, operating under a common identity and purpose, using common trademarks,

---

[1] Not only do Lead Plaintiffs fail to cite to authority indicating that such a tenuous connection is sufficient to plead a control person liability claim, they also do not meaningfully distinguish the WCAS Defendants' caselaw, instead relegating much of that discussion to a footnote.  (ECF No. 181 at 8 n.4.)

12

operating from the same principal place of business, and sharing the same website." (*Id.* at 8 (emphasis in original).)

It appears to the Court that Lead Plaintiffs' arguments are based on the conclusory assumption that WCAS is necessarily one and the same as its numerous corporate affiliates. This assumption runs headlong against the copious body of caselaw recognizing the general rule that a corporate entity retains separate legal status absent extenuating circumstances demonstrating that it should be treated as a single unit along with its affiliate entities, such as in an alter ego situation. *See Abeyta v. Progressive Specialty Ins. Co.*, 2008 WL 170535, at *6 (D. Colo. Jan. 16, 2008) ("Colorado law recognizes that corporate distinctions may be disregarded and the corporate veil pierced where corporate entities are merely alter egos of each other and the corporate structure is used to perpetuate a wrong."); *see also Billings v. Manorcare of Wichita, KS LLC*, 2021 WL 5888584, at *4 (D. Kan. Dec. 13, 2021) ("[I]n limited circumstances, one corporation can be held liable as the alter ego of another corporation."); *Nationwide Telecom Inc. v. Dollar Phone Corp.*, No. 2017 WL 4123938, at *3 (D. Colo. Sept. 18, 2017) ("Besides being unsupported factually, [plaintiff's argument] fails to present the sort of thorough, fact-intensive analysis that is necessary when parties seek to set aside corporate formalities and deem one entity to be the mere alter-ego of another."); *Boughton v. Cotter Corp.*, 65 F.3d 823, 836 (10th Cir.1995) ("[C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities."); *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (observing that each entity defendant "has a separate corporate

13

existence and is treated separately from [the other, related entities] in the absence of circumstances justifying disregard of the corporate entity"); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 170 (D. Mass. 2002) ("Several courts have declined to treat different firms as a single entity . . . simply because they shared an associational name and/or collaborated on certain aspects of the relevant transaction.").

Notably, Lead Plaintiffs do not explicitly argue—either in the SAC or their response to the Motion—that alter ego or some other legal theory applies here. *See Kennedy v. Mountainside Pizza, Inc.*, 2020 WL 4454897, at *6 (D. Colo. May 14, 2020) ("Here, Plaintiff has not articulated any theory—such as agency, alter ego, or piercing the corporate veil—that would justify disregarding each Moving Defendant's separate corporate identify."); *see also E.E.O.C. v. Roark-Whitten Hosp. 2, LP*, 2016 WL 10587968, at *7 n.7 (D.N.M. Mar. 31, 2016) (finding single employer theory of liability insufficient and irrelevant where plaintiff "ma[de] no mention of, nor d[id] it assert, th[e] alter-ego theory or agency case law in either its Complaint or its brief"). Indeed, the terms "alter ego" and "piercing the corporate veil" do not appear anywhere in Lead Plaintiffs' papers.

Despite all this, Lead Plaintiffs' failure to mention these legal theories by name is not fatal to their control person liability claims. This is because "[t]he Court is not constricted to consider only the labels or legal theories that Plaintiffs have put on a claim; what is important is the substance of the claim and what cognizable legal theory it actually states." *In re Alstom SA*, 454 F. Supp. 2d 187, 214 (S.D.N.Y. 2006); *see also Stolow v. Greg Manning Auctions, Inc.*, 258 F.Supp.2d 236, 242 (S.D.N.Y.2003) (noting that a complaint need not state the legal theory underlying the claim in most instances).

14

The substance of Lead Plaintiffs' arguments clearly evokes an alter ego theory. Even Defendants readily detect in their Reply that Lead Plaintiffs' "control arguments are premised on . . . alter ego allegations." *See Marbury Mgmt. Inc. v. Kohn*, 629 F.2d 705, 712 (2d Cir.1980) ("Generally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim.") (ECF No. 185 at 6.) Hence, the Court will consider whether the SAC plausibly states a control person liability claim based on an alter ego theory.

The Tenth Circuit has observed that "the Colorado Supreme Court prescribes a fact-intensive, eight-part analysis to determine 'whether such unity of interest exists as to disregard the corporate fiction and treat the corporation and shareholder[s] as alter egos.'" *In re Stone Pine Inv. Banking, LLC*, 2023 WL 8758947, at *17 (10th Cir. Dec. 19, 2023) (quoting *Connolly v. Englewood Post No. 322 Veterans of Foreign Wars of the U.S., Inc.*, 139 P.3d 639, 644 (Colo. 2006)). Those factors include

> whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a 'mere shell,' (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*Connolly*, 139 P.3d at 644.

At the outset, the Court notes that Lead Plaintiffs come close to giving the game away (or at least the first *Connolly* factor) by conceding that the WCAS Defendants "are formally incorporated as distinct bodies." *See NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993) (concluding that the alter ego theory necessitates

15

"such unity of interest *and disregard for the separate corporate identity*" so that "the personalities and assets of the two entities are indistinct") (emphasis added); *see also Eim v. CRF Frozen Foods LLC*, 2019 WL 1382790, at *6 n.11 (D. Colo. Mar. 26, 2019) ("While it is not clear whether plaintiff is attempting to establish jurisdiction under a direct availment, agency, or alter ego theory, plaintiff's failure to show that the . . . defendants exercised control over [the separate entity] is fatal to her ability to establish jurisdiction under any of these theories").  (ECF No. 181 at 7–8.)

At the same time, the Court observes that the SAC alleges that WCAS "operates through a series of multiple, interconnected entities under common control and led by individuals identified on its website as General Partners, including WCAS Management Corporation and two other management entities that employ and compensate the people who work on behalf of Welsh, Carson, Anderson & Stowe."  (ECF No. 171 at 14.)  The SAC further alleges that

> [t]he entities that comprise WCAS all operate under a common identity and purpose.  They use common trademarks 'WCAS' and 'Welsh, Carson, Anderson & Stowe,' which are registered to Defendant WCAS Management Corporation; all operate from the same principal place of business, 599 Lexington Avenue, Suite 1800, New York, New York 10022; and share the same website, www.wcas.com.  WCAS's General Partners serve as officers, directors, and managers of—and thus ultimately control—the WCAS Management Entities, and in turn, control the WCAS XII Funds.

(*Id.* at 17.)  And as to WCAS Management Corporation and WCAS Management, L.P., specifically, the SAC alleges that they "sponsor or manage WCAS XII," which, as mentioned, is also a signator the Director Management agreement.  (*Id.*)

Viewing these allegations in the light most favorable to Lead Plaintiffs, the Court

16

concludes that they pertain to at least some of the alter ego factors outlined by the Colorado Supreme Court. The Court therefore declines the WCAS Defendants' invitation to decide the fact-intensive alter ego question through the vehicle of their motion to dismiss. *See Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549, at *9 (D. Utah Oct. 30, 2007) ("Alter ego is a highly fact intensive issue and inappropriate to resolve at the motion to dismiss stage. Even if it is not specifically pled in the Complaint as a cause of action, the facts allege such an assertion."); *Allen v. H.R. Wagstaff Co., Inc.*, 2000 WL 33347723, at *4 (D. Utah Feb. 27, 2000) ("Alter ego claims, by their nature, are highly fact intensive.").

Indeed, some courts have declined to resolve alter ego issues even at the summary judgment stage, preferring such factual disputes to be resolved by a jury at trial. *See Preferred Prod. Placement Corp. v. Right Way Nutrition, LLC*, 2015 WL 667894, at *4 (D. Utah Feb. 17, 2015) ("The alter ego analysis is fact intensive and factor heavy and is not often amenable to summary judgment."); *see also McWhinney Holding Co., LLLP v. Poag*, 2018 WL 4680342, at *13 (D. Colo. Sept. 28, 2018) ("Once a court finds that a party has properly alleged supportive facts, the ultimate trier of fact should determine the alter ego issue."); *Trueforce Glob. Servs., Inc. v. Trueffect, Inc.*, 2023 WL 4624902, at *8 (D. Colo. July 19, 2023) (recognizing that "the alter ego inquiry is highly fact intensive and better left as an issue reserved for trial").

Given all this, the Court will give Lead Plaintiffs the opportunity to establish by a preponderance of the evidence in the course of these proceedings that the WCAS Defendants—particularly, WCAS Management, L.P., and WCAS Management, LLC— are subject to control person liability under an alter ego (or some other applicable)

17

theory.[2]  *Berrios-Bones, LLC*, 2007 WL 3231549, at *9 ("The complexities of the relationships between the parties preclude a determination as a matter of law with respect to which parties should remain in the case for given claims.  These issues can be resolved through discovery.").

### IV. CONCLUSION

For the foregoing reasons, the Court DENIES the Motion.  (ECF No. 175.)

Dated this 31st day of March, 2025.

BY THE COURT:

William J. Martinez
Senior United States District Judge

---

[2] It is worth noting that the Court is unconvinced by Lead Plaintiffs' argument that "a ruling in [the WCAS] Defendants' favor would upend the prior ruling and create a wholly inconsistent result."  (ECF No. 181 at 8.)  More specifically, Lead Plaintiffs say that, "[t]o side with [the WCAS] Defendants on this motion would mean that, despite the [Apax and WCAS] having identical relationships to and control over InnovAge, one would be a defendant and one would evade liability."  (*Id.* at 9.)  They continue that granting the Motion "would mean that TCO is a defendant along with only one of the two private equity firms that runs it, even though the two private equity firms jointly created and run TCO."  (*Id.*)

For one, granting the WCAS Defendants' Motion would not upend the Court's first dismissal order since these Defendants were not even parties at that stage of this case.  To reiterate, that order pertained to the trademark WCAS, not its separate corporate affiliates.  And, in any event, the Court fails to see why Apax and TCO's decisions to file an answer to the SAC instead of a motion to dismiss should affect the Court's analysis here.  The Court can only decide the issues placed by the parties before it, based on the facts alleged and legal arguments asserted in their briefs.  *See United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022) (citing *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("[I]n both civil and criminal cases, in the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (ellipsis and internal quotation marks omitted))); *see also Castro v. United States*, 540 U.S. 375, 381–383 (2003) (explaining that the judicial system "is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief").