# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 21-cv-02770-WJM-SBP

EL PASO FIREMEN & POLICEMEN'S PENSION FUND, SAN ANTONIO FIRE & POLICE PENSION FUND, and INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
JOHN ELLIS BUSH,
ANDREW CAVANNA,
CAROLINE DECHERT,
EDWARD KENNEDY, JR.,
PAVITHRA MAHESH,
THOMAS SCULLY,
MARILYN TAVENNER,
SEAN TRAYNOR,
RICHARD ZORETIC,
WCAS MANAGEMENT CORPORATION,
WCAS MANAGEMENT, L.P.,
WCAS MANAGEMENT, LLC,
APAX PARTNERS US LLC,
TCO GROUP HOLDINGS, L.P.,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY LLC,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO. LLC,
ROBERTS & RYAN INVESTMENTS, INC.

      Defendants.

---

**DECLARATION OF MOLLY J. BOWEN IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

---

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ...........................................................................................1

II.   THE PROSECUTION OF THE ACTION ........................................................................7
      A.    The Commencement of the Action and Appointment of Lead Plaintiffs.....................7
      B.    Lead Counsel's Investigation and Filing of the Amended Complaint...........................8
      C.    Defendants' Motion to Dismiss the Complaint and the Court's Order........................9
      D.    Expansive Discovery Conducted by Lead Plaintiffs and Lead Counsel ......................12
            1.    Discovery Obtained from Defendants ................................................................13
            2.    Discovery Obtained from Third Parties..............................................................15
            3.    Discovery Collected, Reviewed, and Produced by Lead Plaintiffs .................15
            4.    Lead Plaintiffs' and Lead Counsel's Document Review Efforts .....................16
            5.    Depositions...........................................................................................................17
      E.    Lead Plaintiffs' Motion for Class Certification .................................................................18
      F.    Lead Plaintiffs' Second Amended Complaint and WCAS Defendants'
            Motion to Dismiss........................................................................................................20

III.  THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
      ADEQUATE .........................................................................................................................22
      A.    Arm's-Length Mediation Process Overseen by Robert A. Meyer...............................22
      B.    The Settlement Agreement and Preliminary Approval...................................................24
      C.    The Settlement Is Reasonable...........................................................................................24
      D.    Notice to the Class ............................................................................................................27
      E.    The Plan of Allocation......................................................................................................28

IV.   LEAD PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND
      EXPENSES...........................................................................................................................29
      A.    Lead Plaintiffs' Request for Reasonable Costs and Expenses Under the
            PSLRA...............................................................................................................................29
      B.    Lead Plaintiffs' Fees and Expenses Request on Behalf of Counsel.............................30
      1.    Time and Labor Expended by Counsel and Preclusion of Other
            Employment (Factors 1 and 4)...........................................................................32
      2.    Novelty and Difficulty of Questions Raised by the Litigation (Factor 2)....................32
      3.    Skill Required to Perform the Legal Service Properly and the Experience,
            Reputation, and Ability of the Attorneys (Factors 3 and 9)..........................................34
      4.    Customary Fees and Awards in Similar Cases (Factors 5 & 12)....................................34
      5.    Amount Involved and Results Obtained (Factor 8).........................................................36
      6.    The Contingent Nature of the Fee and the Undesirability of the Action
            (Factors 6 and 10)................................................................................................37
      7.    The Reaction of the Class to the Fee and Expense Application..................................37
      8.    Counsel's Request for Expenses .......................................................................................38

V.    CONCLUSION ....................................................................................................................39

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Declaration of JAMS Mediator Robert A. Meyer In Support Of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation |
| B | Declaration of Gail A. Jensen In Support Of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Plaintiffs' Motion for Award of Attorneys' Fees and Expenses |
| C | Declaration of Jeffrey M. Gill In Support Of: (I) Lead Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (II) Lead Plaintiffs' Motion for Award of Attorneys' Fees and Expenses |
| D | Declaration of Tyler Grossman In Support Of: (I) Lead Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (II) Lead Plaintiffs' Motion for Award of Attorneys' Fees and Expenses |
| E | Schedule of Lodestar and Expenses For All Plaintiffs' Counsel |
| F | Declaration of Molly J. Bowen In Support Of Lead Plaintiffs' Motion for Award of Attorneys' Fees and Expenses, Filed On Behalf Of Cohen Milstein Sellers & Toll PLLC |
| G | Declaration of Adrian P. Castro In Support Of Lead Plaintiffs' Motion for Award of Attorneys' Fees and Expenses, Filed On Behalf Of Fairfield and Woods, P.C. |
| H | Declaration of Josephine Bravata Concerning: (A) CAFA Notice Mailing; (B) Mailing/Emailing of Notice; (C) Publication of the Summary Notice; and (D) Report on Requests for Exclusion and Objections |

Pursuant to 28 U.S.C. § 1746, I, Molly J. Bowen, declare as follows:

1. I am a Partner of the law firm Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein" or "Lead Counsel"). I respectfully submit this declaration in support of (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Final Approval Motion"), and (II) Lead Plaintiffs' Motion for Award of Attorneys' Fees and Expenses (the "Fee and Expense Motion").[1]

2. Cohen Milstein is Lead Counsel for Lead Plaintiffs El Paso Firemen & Policemen's Pension Fund ("El Paso"), San Antonio Fire & Police Pension Fund ("San Antonio"), and Indiana Public Retirement System ("INPRS" and, collectively, "Lead Plaintiffs") in the above-captioned action (the "Action"). I declare the following based on my personal knowledge of the matters set forth herein, based on my active participation in the litigation and settlement of the Action.

3. As the Court is already familiar with the Action, this Declaration does not endeavor to detail comprehensively every event during the span of the litigation. Instead, it seeks to summarize the key facts relating to Lead Plaintiffs' prosecution of the Action, the events leading to and resulting in the Settlement, the reasons why Lead Counsel and Lead Plaintiffs recommend the Settlement's approval as highly favorable and reasonable, and the basis for Lead Counsel and Liaison Counsel's request for attorneys' fees and expenses.

## I.    **PRELIMINARY STATEMENT**

4. After three years of vigorous litigation, Lead Plaintiffs and Lead Counsel secured a recovery of $27,000,000 on behalf of the Class of InnovAge common stock investors. Significantly, the Settlement recovers more than double the median recovery for cases alleging Rule 10b-5 violations

---

[1] All capitalized terms herein shall have the same meanings as in the Stipulation and Agreement of Settlement, dated June 2, 2025 (ECF No. 199-2), unless otherwise stated.

in the Tenth Circuit from 2015 to 2024, which was $13.4 million.[2]

5.  This case stems from allegedly false and misleading misstatements and omissions made by InnovAge, a healthcare company focused on providing all-inclusive medical and social services for certain frail seniors, and certain of its executives, regarding the Company's operational capabilities and regulatory compliance. InnovAge's business proposition relied on significant, steady growth of its patient population, and during and following its March 2021 IPO, InnovAge and its executives touted the Company's ability to scale nationally while maintaining appropriate staffing levels and a legally compliant level of care. In reality, Lead Plaintiffs allege, from even before the IPO, InnovAge knew it was not able to scale sustainably or maintain necessary staffing levels and, as a result, it was providing non-compliant care. This truth emerged primarily in the form of regulatory action, when CMS suspended enrollment first at InnovAge's Sacramento center in September 2021, and then at its Colorado centers in December of the same year. When these facts came to light, InnovAge's stock price plummeted far enough to render the Company's IPO among the five worst-performing IPOs of 2021.

6.  Lead Plaintiffs brought this lawsuit against InnovAge; its former CEO, Maureen Hewitt, and CFO, Barbara Gutierrez; its then-board of directors;[3] the private equity firms[4] that controlled InnovAge at the relevant time; and the eleven underwriters[5] that facilitated the Company's IPO. Lead

---

[2] Laarni T. Bulan and Eric Tam, *Securities Class Action Settlements—2024 Review & Analysis* 20, Cornerstone Research (2025), https://www.cornerstone.com/wp-content/uploads/2025/03/Securities-Class-Action-Settlements-2024-Review-and-Analysis.pdf (last visited Oct. 9, 2025).

[3] This includes John Ellis Bush, Andrew Cavanna, Caroline Dechert, Edward Kennedy, Jr., Pavithra Mahesh, Thomas Scully, Marilyn Tavenner, Sean Traynor, and Richard Zoretic.

[4] This includes WCAS Management Corporation, WCAS Management, L.P., WCAS Management, LLC, Apax Partners US LLC, and TCO Group Holdings, L.P.

[5] This includes J.P. Morgan Securities LLC, Barclays Capital Inc., Goldman Sachs & Co. LLC, Citigroup Global Markets Inc., Robert W. Baird & Co. Incorporated, William Blair & Company LLC, Piper Sandler & Co., Capital One Securities, Inc., Loop Capital markets LLC, Siebert Williams Shank & Co. LLC, and Roberts & Ryan Investments, Inc.

Plaintiffs brought claims under § 10(b) of the Exchange Act against InnovAge, Hewitt, and Gutierrez; and § 20(a) of the Exchange Act against Hewitt, Gutierrez, and the private equity Defendants. As to the Securities Act, Lead Plaintiffs brought claims against InnovAge, Hewitt, Gutierrez, the director Defendants, and the underwriters.

7. During the litigation of the Action, and prior to resolution, Lead Plaintiffs and Lead Counsel diligently advanced the Class's claims to ensure that Lead Plaintiffs were in a position to maximize their recovery. Lead Plaintiffs and Lead Counsel investigated, drafted, and filed a detailed amended complaint; defeated, in large part, Defendants' repeated motions to dismiss; and engaged in substantial fact discovery, including exchange of document requests and interrogatories,[6] collection, review, and production of documents, dozens of meet and confers regarding discovery, service of public records requests and subpoenas on fourteen third parties, service of deposition subpoenas on two non-parties, and Rule 30(b)(6) depositions of the Lead Plaintiffs and fact witnesses—a total of eight individuals representing six different entities. Additionally, Lead Plaintiffs successfully moved for class certification, supported by an expert report on market efficiency and damages. As a result, the institutional investor Lead Plaintiffs and Lead Counsel had a well-developed understanding of the merits and risks of the claims when they agreed to the Settlement.

8. At the same time, Lead Plaintiffs and Lead Counsel embraced significant risks in pursuing this litigation. Indeed, at the pleading stage, while the Court sustained alleged misstatements pertaining to both Lead Plaintiffs' Exchange Act and Securities Act claims, the Court indicated that the six misstatements which survived could be vulnerable to additional attack once a full factual record had been developed.  Furthermore, Lead Plaintiffs faced challenges in establishing the surviving

---

[6] Lead Plaintiffs' interrogatories and document requests included a total of 74 requests across five different issuances.

misstatements were false and misleading and, in the case of the Exchange Act statements, that Defendants had the requisite state of mind when making them. While Lead Plaintiffs believe that they had the better arguments on these issues, Defendants' positions could still have been accepted at summary judgment and/or trial. If the Court or jury ultimately found the alleged misstatements inactionable, or determined that all or most of the stock price declines corresponding to Lead Plaintiffs' alleged corrective disclosures were attributable to non-fraudulent factors, the Class's recovery would be reduced or eliminated altogether. Indeed, even if Lead Plaintiffs succeeded at each of those stages, any favorable verdict could have been subjected to a lengthy appeals process that could further eliminate or prolong any recovery.

9. Beyond the typical challenges of establishing liability and damages, the Settlement here is especially notable in light of the ability-to-pay concerns regarding InnovAge, and the unique complexity (and, thus, costliness) of further litigating this case. As to the former, at the time of settlement, InnovAge's stock was trading at or near an all-time low of just $2.60 per share, down nearly 90% from its IPO price of $21 per share. As to the latter, the sheer scope of this Action—which involved 28 Defendants, ranging from the Company to directors to allegedly controlling private equity firms, the vast majority of whom would have been deposed—would have made it very costly to bring this case to a verdict. That costliness is further illustrated by the factual complexity underlying the controlling person claims as to the private equity firms, against whom establishing liability would have required navigating layers of complex corporate arrangements of management and holding companies and wholly owned subsidiaries.

10. The robust settlement process supports the fairness, reasonableness, and adequacy of the Settlement. Arm's-length negotiations occurred between the parties, including a full-day mediation session, held on October 29, 2024, before JAMS mediator Robert A. Meyer, an experienced and highly respected mediator. In preparation for that mediation session, the parties submitted

mediation statements regarding key legal and factual disputes and engaged in vigorous debate about the strengths and weaknesses of their positions. While that mediation was unsuccessful, Lead Plaintiffs' continued prosecution of their case—including by surviving a third motion to dismiss, successfully certifying the Class, and continuing to develop the factual record through discovery, which clarified the risks of further litigation for each side—ultimately brought the parties closer together after months of continued dialogue. Mediation efforts resumed in February 2025 and after numerous additional meetings, in early April 2025, the parties accepted a mediator's proposal to settle this Action. Significantly, Mr. Meyer has endorsed the Settlement as fair, reasonable, and adequate, and has also endorsed the attorneys' fee request as fair and consistent with fees in similar cases. *See* Ex. A ("Meyer Decl.").

11. As set forth in the Final Approval Motion, Lead Plaintiffs, Lead Counsel, and Liaison Counsel respectfully submit that the Settlement represents a highly favorable recovery for the Class and is supported by the factors that courts in the Tenth Circuit consider when deciding whether to finally approve a class action settlement. *See* Fed. R. Civ. P. 23(e)(2); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). Given the uncertain and risky nature of prolonging this Action, the immediate recovery the Settlement provides the Class underscores its basis for approval.

12. Lead Plaintiffs and Lead Counsel also seek approval of the proposed Plan of Allocation (or "Plan") as fair, reasonable, and adequate. Under the Plan, the Net Settlement Fund is distributed, *pro rata*, to members of the Class who timely submit valid proofs of claim based on their "Recognized Loss" amount, as calculated pursuant to the Plan. This methodology is standard in securities fraud class action settlements and has been approved by this and other courts nationwide.

13. Lead Plaintiffs fully complied with all aspects of the Notice program set forth in the Preliminary Approval Order. 11,390 Notices have been disseminated to potential Class Members. *See* Ex. H

("Claims Administrator Decl."). In addition, the Summary Notice was published in *Investor's Business Daily* and over the *Globe Newswire*. The Notice explains the Settlement and that Lead Counsel would seek fees of up to 20% of the Settlement, and expenses of up to $800,000 (far lower than the actual expenses now sought). Significantly, no members of the Class have objected or requested exclusion. Moreover, Lead Plaintiffs—three sophisticated institutional investors who have actively overseen the prosecution of this Action and who fully understand their fiduciary duty to act in the best interest of the Class—endorse the Settlement and Lead Counsel's requested fee award. *See* Exs. B–D ("Lead Plaintiff Decls.").

14. Additionally, in accordance with the PSLRA, Lead Plaintiffs and Lead Counsel seek reimbursement of Lead Plaintiffs' reasonable costs and expenses incurred directly in connection with their representation of the Class, in the amount of $15,000 for each Lead Plaintiff, totaling $45,000. That amount is well precedented in this Circuit, and is warranted in light of the dedication, time, expenses, and resources that Lead Plaintiffs dedicated to the Action.

15. Finally, Lead Plaintiffs—each a sophisticated institutional investor that endorses the Settlement— and Lead Counsel also request an award of attorneys' fees and expenses. Specifically, Lead Plaintiffs are applying for an attorneys' fee award of 20% of the Settlement (*i.e.*, 20% of the Settlement Amount, plus interest earned thereon), and for reimbursement of litigation expenses in the amount of $339,100.07. The requested fee is well within the range of fees routinely approved by courts in this District and the Tenth Circuit in comparable securities and other complex class actions. *See, e.g.*, *Or. Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*, No. 19-CV-0124-WJM-SKC, 2024 WL 98387 (D. Colo. Jan. 9, 2024) (Martínez, J.) (approving 30% fee request); *Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*, No. 17-cv-0304-WJM-NRN, 2021 WL 1387110, at *3 (D. Colo. Apr. 13, 2021) (Martínez, J.) (courts in the Tenth Circuit have repeatedly found 30% fee award reasonable); *Diaz v. Lost Dog Pizza, LLC*, No. 17-cv-2228-WJM-NYW, 2019

WL 2189485, at *5 (D. Colo. May 21, 2019) (Martínez, J.) ("33% fee award falls within the norm"); *In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02351-PAB-KLM, 2014 WL 4670886, at *3 (D. Colo. Sept. 18, 2014) ("Courts in the Tenth Circuit have noted that the typical fee award in complex cases is around one third of the common fund.").

16. The reasonableness of Lead Plaintiffs' requested 20% fee is confirmed by a lodestar cross-check, which yields a multiplier of just 0.772—considerably lower than multipliers routinely approved within the Tenth Circuit. *See, e.g.*, *Maxar*, 2024 WL 98387, at *7 ("it is common in this District to approve contingency fees resulting in fee awards that are multiples of the lodestar amount"); *Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1266 (10th Cir. 2023) ("The district court correctly observed that 'a multiplier of 2.8x' is 'consistent with the typical range of multipliers routinely approved by courts in this District and the Tenth Circuit.'").

17. For all of the reasons discussed in this Declaration, its attached exhibits, and the legal memoranda submitted herewith, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Counsel respectfully submits that their request for attorneys' fees and expenses is also fair, reasonable, and adequate and should be approved.

## II.    THE PROSECUTION OF THE ACTION

### A.    The Commencement of the Action and Appointment of Lead Plaintiffs

18. On October 14, 2021, a class action complaint was filed in the U.S. District Court for the District of Colorado, styled *Randy McLeod v. InnovAge Holding Corp., et al.*, Case No. 1:21-cv-02770-SKC (D. Colo. 2021), alleging violations of the federal securities laws. ECF No. 1. On December 13, 2021, Lead Plaintiffs moved to be appointed Lead Plaintiff and have Cohen Milstein appointed Lead Counsel. ECF No. 6. On April 11, 2022, the Court granted the motion, appointing El Paso, San Antonio, and Indiana as Lead Plaintiffs, and approving their selection of Cohen Milstein as Lead Counsel and Fairfield and Woods, P.C. ("Fairfield") as Liaison Counsel. ECF No. 44.

7

**B.     Lead Counsel's Investigation and Filing of the Amended Complaint**

19. Prior to filing the amended complaint, Lead Counsel further investigated the possible claims. Lead Counsel's investigation included review of, among other things: (i) public filings made by InnovAge with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements issued by Defendants; (iii) research reports issued by securities and financial analysts; (iv) media and news reports and other publicly available information concerning InnovAge and Defendants; (v) transcripts of InnovAge's earnings and other conference calls with investors and analysts; (vi) publicly available presentations, press releases, and interviews of InnovAge and its employees; (vii) public reports by state and federal regulators about investigations and audits of InnovAge; (viii) economic analyses; (ix) other public documents readily obtainable on the internet; and (x) interviews with and information from former employees of InnovAge ("FEs"). Lead Plaintiffs' interviews of InnovAge's former employees—which required identifying, contacting, interviewing, and drafting allegations for each former employee— is particularly notable as, in its initial motion to dismiss ruling, this Court credited allegations offered by five of the six former employees in denying in part InnovAge's motion to dismiss.

20. On June 21, 2022, Lead Plaintiffs filed their Amended Class Action Complaint (the "CAC") asserting claims under the Exchange Act and Rule 10b-5 promulgated thereunder, including against InnovAge, CEO Maureen Hewitt, and CFO Barbara Gutierrez (the "Officer Defendants") under Section 10(b); and against the Officer Defendants and private equity firms Welsh Carson, Anderson & Stowe, and Apax Partners, L.P., under Section 20(a). Lead Plaintiffs also asserted claims under the Securities Act against InnovAge, the Officer Defendants, the Director Defendants, and the Underwriter Defendants under Section 11; against InnovAge and the Underwriter Defendants under Section 12(a)(2); and against the Officer Defendants, the Director Defendants, Welsh, Carson, Anderson & Stowe, and Apax Partners, L.P., under Section 15. ECF

8

No. 54. The CAC alleged that Defendants made false and misleading statements and omissions regarding, *inter alia*, InnovAge's ability to provide individualized care plans, maintain continuity of care, enable participants to live independently at home, and maintain adequate staffing levels, all of which caused the price of InnovAge common stock to be artificially inflated during the Class Period, thereby damaging investors when the truth was revealed.

21. Lead Counsel's investigation—which resulted in the 179-page CAC as compared with the originally filed 14-page complaint—significantly bolstered the strength of investors' claims. For instance, the CAC expanded the discussion of InnovAge's business model and operations, and the regulatory environment in which the PACE program operates. The CAC also included both Securities Act and Exchange Act claims (whereas the original complaint included only of Securities Act claims) and expanded the list of defendants to include InnovAge's board of directors and the private equity firms which allegedly controlled InnovAge. While the original complaint was narrowly focused on allegations of non-compliance in Sacramento only, the CAC developed allegations across the Company's geographic footprint, including as to Colorado and New Mexico. Furthermore, by continuing to investigate investors' claims, Lead Counsel discovered allegations resulting in an expansion of the class period by more than three months, to capture relevant disclosures and potential damages in the Action. Thus, Lead Counsel's comprehensive investigation greatly benefited the Class.

### C. Defendants' Motion to Dismiss the Complaint and the Court's Order

22. On September 13, 2022, InnovAge, the Officer Defendants, the Director Defendants, Welsh, Carson, Anderson & Stowe, and Apax Partners, L.P., moved to dismiss the CAC (the "Company's Motion to Dismiss"), as did the Underwriter Defendants (the "Underwriters' Motion to Dismiss"). ECF Nos. 73–76.

23. Among other things, Defendants aside from the Underwriter Defendants (the "InnovAge

Defendants") argued that Lead Plaintiffs' allegations amounted to no more than mere mismanagement, which is not actionable under the federal securities laws; the statements identified by Lead Plaintiffs were not actionable, either because they amounted to statements of corporate optimism, or they were not false or misleading when made; and Lead Plaintiffs failed to allege any material omissions. ECF No. 73. The InnovAge Defendants also argued that Lead Plaintiffs had failed to adequately plead scienter, as required under the Exchange Act. As to Lead Plaintiffs' control person claims, the InnovAge Defendants argued that, with respect to the Director Defendants, Lead Plaintiffs failed to show control over the day-to-day operations of the company and, as to the private equity firms, those firms are not shareholders of the Company and, even if they were, minority shareholders are not control persons merely because they hold board-nomination power.

24. Separately, the Underwriter Defendants argued that Lead Plaintiffs lacked standing to assert a Section 12(a)(2) claim against the Underwriters and that Lead Plaintiffs had not alleged with sufficient particularity actionable misstatements and omissions under Rule 9(b).

25. Lead Plaintiffs filed their opposition to Defendants' motions on November 14, 2022. ECF Nos. 79–81. In their papers, Lead Plaintiffs addressed, first, Defendants' claims that the alleged misstatements in the Offering Documents were not false or misleading, arguing that the alleged misstatements regarding InnovAge's care model were false and misleading because the Company suffered from systemic deficiencies and noncompliance. As to the alleged misstatements regarding the Company's growth, Lead Plaintiffs argued that InnovAge never developed a scalable business model.

26. Lead Plaintiffs made similar arguments as to the alleged misstatements that post-dated the Offering Documents. First, as to the statements regarding InnovAge's growth strategy, Lead Plaintiffs argued that InnovAge's growth was not driven by "capacity within existing centers" and

10

was not "organic" because it relied on improper enrollment and disenrollment practices; InnovAge had refused requests to increase the capacity necessary to provide adequate and compliant care; and state and federal regulators' had begun or were scheduled to begin audits because of noncompliance that placed the participants' health at serious risk. Second, as to staff shortages and turnover, Lead Plaintiffs argued that InnovAge's staffing problems were due to working conditions and growth strategy causing high turnover and an inability to fill positions that could ensure proper staffing levels. Third, as to regulatory compliance, Lead Plaintiffs argued that internal and external audits consistently identified InnovAge's compliance failures. Fourth, as to InnovAge's statements about its government relationships, Lead Plaintiffs argued that InnovAge consistently violated regulatory standards, failed to remedy identified deficiencies, and directed its staff to obstruct and conceal evidence from government auditors.

27. As to scienter, Lead Plaintiffs argued that that element was satisfied through a combination of Defendant Hewitt's and other executives' own admissions about the results of audits and inspections; evidence obtained by *The Capitol Forum*; allegations from former employees; later admissions by InnovAge executives; and timely resignations of Defendant Hewitt and Chief Medical Officer Melissa Welch following the issuance of regulatory sanctions.

28. As to Lead Plaintiffs' control person claims, they argued that the Director Defendants are controlling persons because they consented to be named as director nominees in the Offering Documents and facilitated InnovAge's IPO.

29. Finally, in responding to the Underwriter Defendants' motion, Lead Plaintiffs argued, *inter alia*, that their allegations that they bought InnovAge stock directly from the Underwriter Defendants satisfied the applicable pleading standard.

30. On December 21, 2023, the Court granted in part and denied in part the Company's Motion to Dismiss, sustaining three misstatements arising under the Exchange Act and three statements

11

arising under the Securities Act. ECF No. 102. The statements the Court sustained pertained to InnovAge's individualized and coordinated care; continuity of care during the COVID-19 pandemic; in-home care capabilities; and staffing and turnover. The Court held that the other alleged false statements were not viable, either because they were inactionable puffery, the allegations of falsity were insufficient, or because the allegations of scienter were inadequate.

31. Likewise, on January 18, 2024, the Court granted in part and denied in part the Underwriters' Motion to Dismiss, dismissing the Section 12(a)(2) claims except as to J.P. Morgan, and otherwise denying the motion. ECF No. 108.

32. On March 4, Defendants filed and served their Answers to the CAC. ECF No. 125.

### D.    Expansive Discovery Conducted by Lead Plaintiffs and Lead Counsel

33. Following the Court's denial of Defendants' motion to dismiss, Lead Plaintiffs and Lead Counsel began a comprehensive discovery effort. On February 26, 2024, the parties participated in a telephonic scheduling conference before Magistrate Judge Prose, in which deadlines were determined for the parties' initial disclosures, joinder of parties, fact discovery, expert discovery, and dispositive motions. On March 4, 2024, Defendants filed their answers to the CAC. ECF Nos. 125–128. Lead Plaintiffs served document requests on Defendants, and subpoenaed documents from fourteen non-parties, including state and federal regulators, InnovAge's consultants, and a former InnovAge employee. Over 600,000 pages of documents were collected, reviewed, and produced by the parties or non-parties. Additionally, eight Rule 30(b)(6) depositions of six corporate entities took place, with another two third-party depositions pending at the time the parties settled the case.

34. The extensive work completed by Lead Plaintiffs and Lead Counsel during this phase easily demonstrates their diligent prosecution of and commitment to this Action, as set forth below.

### 1. Discovery Obtained from Defendants

35. Lead Plaintiffs served the InnovAge Defendants with their first Request for Production on March 8, 2024. These thirteen requests sought, among other things, documents concerning: (i) medical care at InnovAge, including specifically as to the topics discussed in the misstatements sustained by the Court; (ii) internal or external audits or investigations at the Company; (iii) market-related analysis of the Company's earnings, specifically as to its IPO, Offering Documents, investor calls, and stock price; and (iv) the performance, compensation, resignation and/or termination of key InnovAge executives. The InnovAge Defendants served their responses and objections on April 8, 2024.

36. On March 11, 2024, the parties exchanged their initial disclosures.

37. On March 18, 2024, Lead Plaintiffs served their first Request for Production on the Underwriter Defendants. These thirteen requests sought, among other things, documents concerning: (i) the terms of the underwriting agreements and decision to engage as underwriters with InnovAge; (ii) the InnovAge Offering Documents and other documents related to the Company's IPO and the Underwriter Defendants' due diligence thereof; (iii) medical care at InnovAge, including specifically as to the topics discussed in the misstatements sustained by the Court; and (iv) purchases of InnovAge common stock. The Underwriter Defendants served their responses and objections to these requests on April 24, 2024.

38. In response to Lead Plaintiffs' requests, the Underwriter Defendants made 24 separate document productions, beginning on July 24, 2024, and concluding on January 28, 2025, which collectively contained approximately 78,604 pages of information across 5,947 documents.

39. From February 2024 onward, the parties exchanged over sixty letters and held at least thirty meet-and-confer calls to negotiate the appropriate scope and substance of discovery. Those interactions involved disputes about the length of the relevant time period, which involved complex

13

negotiations given the large number and range of types of defendants. For instance, Lead Plaintiffs' position was that the relevant time period for InnovAge and the executive Defendants extended years before the IPO, given audits and investigations that had taken place years prior to the Company's going public, but the appropriate time period for the Underwriter Defendants, the parties agreed, would begin only when they were engaged to facilitate the Company's IPO.

40. The parties also negotiated Lead Plaintiffs' specific requests in light of the Court's motion to dismiss opinions; namely, whereas Lead Plaintiffs took the position that the statements sustained by the Court implicated InnovAge's regulatory compliance, staffing, and quality of care nationally and over at least the period of time implicated by the alleged audits and investigations transpiring prior to the IPO, Defendants took the position that a far narrower geographic and temporal scope was appropriate. Other topics of negotiation included the number of custodians whose e-mail accounts would be searched, what search terms to use, whether the Individual Defendants personally possessed discoverable information, and a protocol for handling sensitive patient-specific information.

41. A number of discovery issues arose and required negotiation with the Underwriter Defendants, specifically concerning accessing complete deal files without respect to time period or custodian.

42. The parties negotiated at length an ESI protocol, including questions of whether a Technology Assisted Review ("TAR") protocol would be adopted, how TAR results would be validated, what metrics would be used to train the artificial intelligence that powers TAR, how documents attached by hyperlink would be identified and produced, email threading, confidentiality designations, cell phone collections, and privilege logging.

43. Conflicts also arose regarding InnovAge's production of its insurance policies and indemnification agreements and negotiations over whether and when said documents would be produced, and discussion of apparent spoliation of evidence for certain Defendant custodians.

14

### 2. Discovery Obtained from Third Parties

44. Beginning in April 2024, Lead Plaintiffs also served fourteen subpoenas and public records requests on third parties believed to have information relevant to the Action. These requests were served on entities such as the Department of Justice, the Centers for Medicare & Medicaid Services, state agencies and regulators in California, Colorado, and New Mexico, and consultants engaged by InnovAge.

45. Lead Plaintiffs reviewed 46,261 pages from 11,754 documents produced by third parties. Certain third parties were on the brink of producing documents when the parties reached settlement.

46. Lead Plaintiffs also served deposition subpoenas on the former Colorado PACE Ombudsman and ICR Inc., InnovAge's then-public relations advisory firm on March 5 and 18, 2025, respectively. Lead Plaintiffs were actively negotiating the scheduling of those depositions at the time the Action was settled.

### 3. Discovery Collected, Reviewed, and Produced by Lead Plaintiffs

47. On April 25, 2024, the InnovAge Defendants served their first Request for Production on Lead Plaintiffs, seeking across thirteen requests, among other things, documents regarding the CAC; communications with InnovAge personnel; documents pertaining to the IPO; and other documents related to the Action. On May 13, 2024, the InnovAge Defendants served a second Request for Production for materials underlying the expert opinion of Matthew D. Cain, PhD., whom Lead Plaintiffs had retained to opine on damages and market efficiency in this Action, in support of their motion for class certification. That same day, Underwriter Defendants served their first Requests for Production, seeking across ten requests documents pertaining to InnovAge and communications between Lead Plaintiffs and the Underwriter Defendants concerning the InnovAge IPO. Lead Plaintiffs served their responses and objections to these requests on May 28, and June 11, respectively.

15

48. Defendants' requests prompted several meet-and-confer conferences between parties, who ultimately agreed on the appropriate scope and manner of Lead Plaintiffs' document collection, review, and production of documents, which transpired subsequently over the course of multiple months.

49. Collectively, Lead Plaintiffs made a total of 16 productions, between May 23, 2024, and September 17, 2024, which contained approximately 80,106 pages of information in 1,960 documents.

### 4.  Lead Plaintiffs' and Lead Counsel's Document Review Efforts

50. The Defendants and third parties together produced approximately 538,210 pages contained in 68,461 documents to Lead Plaintiffs in discovery, with the first production on May 14, 2024, and the last production on January 28, 2025. Lead Counsel devoted substantial time to reviewing and analyzing these documents, including in preparation for depositions and mediation and further negotiations that resulted in the resolution of the Action. As a result of this review, Lead Plaintiffs also noticed two fact depositions, which were pending when the parties reached settlement.

51. Lead Counsel's discovery plan involved supervision of a dedicated team of attorneys with experience in electronic document review with an eye towards deposition, summary judgment, and trial preparation. Among the responsibilities this dedicated team bore were continuously updating a detailed document review coding manual and protocol to ensure proper tagging of documents. Document reviewers were trained to code documents for level of responsiveness or importance to the case (*e.g.*, "Hot," "Warm," "Not Relevant"), for case issues (*e.g.*, "Staffing," "Due Diligence," "Private Equity Control").

52. Senior attorneys at Cohen Milstein regularly met with hired contract attorneys and discovery counsel to discuss key facts uncovered by this review effort. Discovery counsel and the contract attorneys also circulated regular "hot" document reports to keep the team apprised of any key documents uncovered during the review.

53. A substantial portion of the documents produced to Lead Plaintiffs involved complex healthcare and regulatory issues, which necessitated regular discussion between the document review team and senior attorneys on the litigation team to work through jargon and industry-specific concepts. Lead Counsel also developed and continuously updated a set of reference resources to aid members of the document review team, including a factual timeline, a "cast of characters" document summarizing the key individuals in the Action, and a glossary of technical terms and acronyms utilized in the healthcare industry.

### 5. Depositions

54. On July 19, 2024, InnovAge served Lead Plaintiffs with Notices of Deposition, seeking to schedule Rule 30(b)(6) depositions of each. These Notices sought testimony on the topics of each Lead Plaintiff's trading activity in InnovAge common stock and analysis of the Company's IPO and representations to investors; their relationship with their investment manager; their investment policies; knowledge of the issues in the case; and oversight of Lead Counsel.

55. That same day, the InnovAge Defendants served two of Indiana's investment managers, RhumbLine Advisers LP ("RhumbLine") and TimesSquare Capital Management, LLC ("TimesSquare"), with deposition and document subpoenas. On July 24, the InnovAge Defendants served a similar subpoena on El Paso's and San Antonio's investment manager, William Blair Investment Management, LLC ("WBIM"). Those subpoenas sought documents related to the managers' trading activity; analysis of, and communications with InnovAge; relationships and communications with Lead Plaintiffs; and testimony on the same.

56. On August 8, 2024, the Underwriter Defendants cross-noticed depositions of Lead Plaintiffs and TimesSquare and RhumbLine.

57. In preparation for Lead Plaintiffs' depositions, Lead Counsel closely reviewed hundreds of relevant documents that had been produced to date and met multiple times with Lead Plaintiffs

to prepare for deposition. In addition to virtual meetings, Lead Counsel traveled to El Paso, San Antonio, and Indiana from the east coast and the Midwest and conducted full-day preparation sessions with each Lead Plaintiff deponent.

58. El Paso was deposed on August 9, 2024, Indiana was deposed on August 13, and two individuals representing San Antonio, the Executive Director and General Counsel, were deposed on August 14, 2024. Each deposition lasted several hours and was defended in person by multiple attorneys from Lead Counsel. The deposition of San Antonio's Executive Director was also attended by San Antonio's General Counsel, and the deposition of INPRS was attended by INPRS's General Counsel.

59. As to the investment managers, two individuals representing RhumbLine were deposed on August 8, 2024, TimesSquare was deposed on August 12, 2024, and WBIM was deposed on August 16, 2024. Those depositions also lasted several hours, and each included questioning from Lead Counsel.

### E.    Lead Plaintiffs' Motion for Class Certification

60. On May 8, 2024, Lead Plaintiffs filed their motion for class certification. ECF No. 140.

61. In support of that motion, Lead Plaintiffs submitted the expert report of Matthew D. Cain, PhD., who opined on market efficiency and damages. *See* ECF No. 141-1.

62. Dr. Cain, a Senior Fellow at the Berkeley Center for Law and Business at the University of California – Berkeley, provided opinions on the complex securities-litigation-specific issues of market efficiency, loss causation, and damages. His report opined that: (i) InnovAge's common stock traded in an efficient market throughout the Class Period; and (ii) damages in this matter could be calculated on a class-wide basis utilizing a common methodology. Dr. Cain's 48-page opening report was based on event studies he conducted and was supported by twelve exhibits and two appendices totaling 71 pages. *Id.*

18

63. Following the depositions of Lead Plaintiffs and their investment managers, on August 23, 2024, Defendants filed their opposition to Plaintiffs' motion for class certification along with the expert report of their rebuttal expert, Amy Hutton, PhD., a professor at the Carroll School of Management at Boston College. ECF No. 161-1.

64. Defendants challenged class certification on two grounds: first, as to the Exchange Act claims only, that Lead Plaintiffs' proposed damages methodology was not suitable to be applied class-wide under the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); and, second, that Lead Plaintiffs did not demonstrate sufficient familiarity with the case so as to satisfy the adequacy requirement of Rule 23(a)(4). ECF No. 160.

65. In reply, on October 9, 2024, Lead Plaintiffs argued, first, that courts regularly accept Dr. Cain's proposed methodology in securities class actions. ECF No. 172. In so arguing, Lead Plaintiffs explained that Defendants' primary authorities to the contrary were readily distinguishable or actually supported Lead Plaintiffs' damages proposal. Second, Lead Plaintiffs argued that—as sophisticated institutional investors who manage billions in assets—they easily surmounted the adequacy standard. In so arguing, Lead Plaintiffs highlighted key portions of their depositions which showcased their familiarity with the details of this Action.

66. Dr. Cain also authored a report that was submitted in support of Lead Plaintiffs' reply. That report opined that, despite Defendants' expert's opinions to the contrary, Dr. Cain's proposed out-of-pocket damages methodology was flexible enough to consider and incorporate any concerns pertaining to confounding factors that might complicate a damages analysis. ECF No. 173-1. The documents Dr. Cain relied upon in his expert report were produced to Defendants on May 23, 2024.

67. On January 8, 2025, the Court granted Lead Plaintiffs' motion for class certification. ECF No. 186. In so doing, as to Defendants' damages argument, the Court concluded that "it appears to be

19

settled among courts that the 'out-of-pocket' methodology *is* able to separate the effects of actionable misrepresentations from non-actionable confounding factors." *Id.* at 8. As to Defendants' adequacy challenge, the Court concluded that "each Lead Plaintiff has thus far capably demonstrated their understanding of this action by testifying as to the occurrence of key events . . . ; the cause of their alleged losses . . . ; and the causes and effects of Defendants' alleged conduct . . . ." *Id.* at 10.

**F.    Lead Plaintiffs' Second Amended Complaint and WCAS Defendants' Motion to Dismiss**

68. Following the commencement of discovery and numerous meet and confers regarding the identity of the corporate entities of the private equity firms named as defendants in the Action, on September 11, 2024, Lead Plaintiffs filed a Second Amended Class Action Complaint (the "SAC") for the limited purpose of renaming and identifying certain private equity defendants and adding one additional defendant. ECF No. 171. In response, on November 15, 2024, TCO Group Holdings, L.P. answered the SAC. ECF No. 179. WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC (the "WCAS Defendants"), however, moved to dismiss the SAC, asserting that Lead Plaintiffs had failed "to allege any facts demonstrating that any individual WCAS Defendant actually had the ability to control InnovAge." ECF No. 175 at 5. Lead Plaintiffs opposed on December 3, 2024 (ECF No. 181), and the WCAS Defendants replied on December 24, 2024 (ECF No. 185).

69. On March 31, 2025, the Court denied the WCAS Defendants' motion. ECF No. 195.

70. In so doing, the Court started with its finding that Lead Plaintiffs had adequately pled a *prima facie* control person liability claim as to WCAS Management Corporation. The Court reasoned thusly, first, because Defendant WCAS Management Corporation was a party to InnovAge's director nomination agreement, which "vests significant authority in the seven limited partners" of Defendant TCO Group Holdings, "'a shell entity formed by WCAS and Apax,' which owned 86%

20

of InnovAge's voting stock." *Id.* at 8. Through this agreement, reasoned the Court, "the limited partners of TCO . . . have 'dispositive power with respect to the common stock held by TCO,' so long as they comprise the majority." *Id.* Second, the Court found that WCAS Management Corporation's participation in the director nomination agreement helped it facilitate InnovAge's going public which, under this District's precedent, suffices to establish a control person liability claim. *See id.* at 9 (citing *Correa v. Liberty Oilfield Servs., Inc.*, 548 F.Supp.3d 1069, 1084 (D. Colo. 2021)). Taken together, the Court concluded that these facts establish WCAS Management Corporation had "some indirect means of discipline or influence short of actual direction to hold a controlling person liable." *Id.*

71. That said, the Court acknowledged that WCAS Management Corporation might successfully defend against these claims at a later stage in litigation. Responding to WCAS Management Corporation's argument that the director nomination agreement does not provide any detail concerning the rights of any individual party to the agreement with respect to nominating directors, the Court reasoned that, while it was not swayed "at least at this juncture of the case" by that argument, "this sort of fact-intensive inquiry is better saved for a later stage of this litigation." *Id.* at 10–11.

72. As to the other WCAS-affiliated entities, the Court sustained Lead Plaintiffs' claims as to these entities on the grounds that they pled control person liability claims on an alter ego theory. Specifically, the Court found that Lead Plaintiffs' allegations that the entities that comprise WCAS all operate under a common identity and purpose, combined with the fact that WCAS Management Corporation and WCAS Management, L.P., sponsor or manage WCAS XII, another signatory to the director nomination agreement, adequately support certain alter ego factors outlined by the Colorado Supreme Court and sustained the controlling person claims at the pleading stage.

21

73. There, too, however, the Court acknowledged that it might revisit that conclusion with the benefit of a full factual record, noting that it declined at this juncture to "decide the fact-intensive alter ego question through the vehicle of [a] motion to dismiss." *Id.* at 17.

## III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

74. As set forth in accompanying briefing filed herewith, the proposed Settlement should be finally approved because it is fair, reasonable, and adequate in light of: the highly favorable recovery for the Class, particularly in light of the risks and difficulties that the Action presented to Lead Plaintiffs; the time and effort spent by Lead Plaintiffs and Lead Counsel over the course of three years of litigation; the arm's-length nature of the mediation and subsequent negotiations conducted by the parties, with the assistance of an esteemed JAMS mediator; and the positive reaction of the Class. As set forth below and in the accompanying briefing, Lead Plaintiffs and Lead Counsel respectfully submit that the proposed Settlement easily satisfies all of the factors that courts in the Tenth Circuit consider under Rule 23(e)(2) and *Rutter & Wilbanks Corp.*, 314 F.3d 1180.

### A.    Arm's-Length Mediation Process Overseen by Robert A. Meyer

75. The Settlement is the product of a full-day mediation and subsequent negotiations among experienced and well-informed counsel, overseen by a highly respected JAMS mediator with experience mediating securities class actions and derivative and stockholder actions, among other forms of complex litigation. Over several months, the parties engaged in extensive dialogue regarding resolution of the Action, described in further detail below, along with InnovAge's directors and officers liability insurers ("Insurers").

76. During briefing on Lead Plaintiffs' motion for class certification, the parties agreed to begin exploring the possibility of resolving the Action. To that end, the parties engaged mediator Robert A. Meyer. *See* Meyer Decl. Mr. Meyer has extensive experience overseeing negotiations of complex securities class actions. For example, Mr. Meyer assisted in the successful resolution of securities

22

class actions involving *In re Priceline.com, Inc. Securities Litigation*, No. 3:00-CV-1884(AVC), 2007 WL 2115592, at *2 (D. Conn. July 20, 2007) ($80 million settlement), *Willis v. Big Lots, Inc.*, No. 2:12-cv-00604 (S.D. Ohio) ($38 million settlement); *Weston v. RCS Capital Corp.*, No. 1:14-cv-10136 (S.D.N.Y.) ($31 million settlement); and *In re Ubiquiti Networks, Inc. Securities Litigation*, No. 1:18-cv-01620 (S.D.N.Y.) ($15 million settlement), among many others.

77. On October 29, 2024, Lead Plaintiffs and InnovAge met virtually for a full-day mediation session with Mr. Meyer. In preparation for that mediation, detailed mediation briefs were exchanged—including dozens of exhibits—detailing respective positions as to the facts of the case and analyses concerning falsity, scienter, loss causation, and damages.

78. During the October 29, 2024, mediation session, Lead Plaintiffs argued to Mr. Meyer their position as to the strengths and weaknesses of their claims and corresponding defenses, and concerns about Defendants' ability to pay a judgment or verdict at a later point in time. At the conclusion of that session, the parties had not reached a resolution.

79. The case progressed in the subsequent months, clarifying the risks of continued litigation for all parties—including by way of the certification of the Class and denial of the WCAS Defendants' motion to dismiss, further document discovery, and the noticing of two fact depositions—and, in February 2025, settlement negotiations resumed. Ultimately, Mr. Meyer proposed that the parties provide a confidential monetary range within which to negotiate settlement. Based on those proposals, Mr. Meyer proposed a new settlement range within which to negotiate, which both sides accepted, double-blind (*i.e.*, without knowing whether the other side had also accepted the new range). In early April 2025, the parties agreed to the Settlement Amount as the result of a proposal by Mr. Meyer. The parties thereafter negotiated a term sheet, executed on April 25, 2025.

80. Significantly, the Settlement is not only comprised of proceeds from Defendants' insurance, but also includes monetary contributions from Defendants, underscoring the tenacity of Lead

23

Counsel's advocacy to achieve the best possible result for the Class.

### B.    The Settlement Agreement and Preliminary Approval

81. Once a settlement was reached in principle, the parties negotiated in further detail the material terms of the Stipulation; a supplemental agreement under which Defendants could terminate the Settlement if requests for exclusion from the Class surpassed a certain threshold—known as a "blow provision"; and various supporting documents such as proposed Class notices and proposed settlement approval orders for the Court.

82. On June 2, 2025, Lead Plaintiffs filed their motion for preliminary approval of the proposed Settlement, along with the Stipulation and its exhibits. ECF No. 199. On June 17, the Court granted Lead Plaintiffs' motion for preliminary approval of the Settlement and authorized Notice for the proposed Settlement to be disseminated (the "Preliminary Approval Order," ECF No. 200).

### C.    The Settlement Is Reasonable

83. Rather than subject InnovAge investors to months and possibly years of drawn out, uncertain litigation, the Settlement provides the Class with an immediate and certain cash benefit of $27 million, which represents a recovery that is nearly double that of typical cases in this Circuit.

84. Lead Plaintiffs—sophisticated institutional investors who have actively supervised this Action for three years and have stated and demonstrated a commitment to their fiduciary duty to act in the best interest of the Class—fully endorse the Settlement. *See* Lead Plaintiff Decls. ¶ 9.

85. Counsel also endorse the settlement. Lead Counsel, Cohen Milstein, specializes in complex securities class action litigation, and is highly experienced in such litigation. *See* Ex. F ("Cohen Milstein Decl.") at Ex. 3 (Cohen Milstein firm resume). Liaison Counsel, Fairfield and Woods, P.C., likewise have expertise in the practice of law in Colorado federal court and have provided valuable counsel in the litigation and resolution of the Action. *See* Ex. G ("Fairfield Decl.") at Ex. 3 (Fairfield firm resume). Based on their experience and knowledge of the facts and applicable law

24

in this Action, Lead Counsel, Liaison Counsel, and Lead Plaintiffs respectfully submit that this Settlement is in the best interest of the Class.

86. Despite Lead Plaintiffs' sound basis to believe that they could and ultimately should prevail on the merits of their claims, continued litigation here posed significant risks that made recovery for the Class uncertain. For example, the InnovAge Defendants raised significant challenges in their motions to dismiss and mediation statements on the key issues of falsity, scienter, loss causation, and damages. The Underwriter Defendants also would raise an affirmative defense that they conducted reasonable due diligence in their engagement with InnovAge. And, although Lead Plaintiffs were initially successful at the motion to dismiss stage, the Court explicitly noted that certain of Defendants' arguments were fact-specific in nature and thus may be re-argued later in the Action. *See, e.g.*, ECF No. 102 at 55 (on materiality, noting that while caselaw "may prove useful to Defendants at a later stage, such arguments require an 'intensely fact-specific' inquiry that is 'rarely an appropriate basis for dismissing a § 10(b) complaint") (quoting *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, No. 2:20-cv-00368-JNP-DBP, 2022 WL 716653, at *5 n.2); *see also* ECF No. 195 (regarding Lead Plaintiffs' control person claims, noting "the Court is not swayed—at least at this juncture of the case—by the WCAS Defendants' claim that WCAS Management Corporation's authority to nominate certain directors to InnovAge's board does not show a sufficient 'level of control over InnovAge's operation.'").

87. Similarly, Defendants also had colorable arguments as to scienter, wherein they would claim that the nature and severity of the regulatory sanctions were unexpected, and thus the statements at issue were not made with an intent to deceive investors.

88. If any of these arguments had prevailed, the recovery for InnovAge investors could have been cut short or eliminated entirely.

89. Moreover, Defendants were prepared to argue, by way of a damages expert, that much of the

25

stock drop alleged in this Action was attributable to other non-fraudulent factors or even that the Class had suffered no cognizable damages as a result of Plaintiffs' allegations. This undoubtedly would have resulted in a "battle of the experts" at summary judgment and trial with no certainty of which expert the Court or a jury would credit and the quantum of damages might be sustained. *See, e.g.*, *Woodard v. Labrada*, No. EDCV 16-189 JGB (SPX), 2022 WL 18397633, at \*5 (C.D. Cal. July 7, 2022).

90. And, of course, even if Lead Plaintiffs prevailed on each of these arguments before this Court, the risk of reversal or severe delay in appeals further support approval of this Settlement.

91. Finally, even if Lead Plaintiffs succeeded as a matter of law and fact in this Court and at the appellate level, the potential risks to recoverability of an award at a later stage of litigation favor approval in light of InnovAge's limited insurance coverage and uncertain financial state. *See Paulson v. McKowen*, No. 19-cv-02639-PAB-NYW, 2023 WL 2528783, at \*6 (D. Colo. Mar. 15, 2023) ("The value of immediate recovery outweighs the mere possibility of future relief because further litigation would deplete the insurance fund that the class now will obtain recovery from"). During the Action, InnovAge's stock price fell from its IPO price of $21 per share to as low as $2.60 per share, creating a risk that InnovAge, which indemnified the other Defendants, could become unable to fund a settlement or verdict. *See Gottlieb v. Wiles,* 11 F.3d 1004 (10th Cir. 1993) (considering defendants' financial condition in approving settlement); *Lowery v. City of Albuquerque*, No. CIV 09-0457 JB/WDS, 2013 WL 1010384, at \*30 (D.N.M. Feb. 27, 2013); *Lane v. Page,* 862 F. Supp. 2d 1182, 1247 (D.N.M. 2012).

92. Thus, there were very significant risks to the continued prosecution of the Action against Defendants. The Settlement replaces these risks with an immediate, guaranteed recovery and, accordingly, Lead Plaintiffs and Lead Counsel firmly believe that final approval of the Settlement is in the best interest of the Class.

### D.    Notice to the Class

93. The Court-approved Notice advises members of the Class of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the final approval hearing.

94. The Notice also contains information regarding Lead Plaintiffs' application for attorneys' fees and expenses and the proposed Plan of Allocation. As explained in the Final Approval Motion, the Notice fairly apprises members of the Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23 of the Federal Rules of Civil Procedure, and due process.

95. Finally, the Notice requires brokers/nominees, within seven business days, to either (i) request additional copies of the Notice to send to the beneficial owners of the securities, or (ii) to provide to SCS the names and addresses of such persons.

96. As described in further detail in the accompanying claims administrator declaration, and as required by the Court's Preliminary Approval Order, beginning on June 30, 2025, Lead Plaintiffs, through the Court-approved Claims Administrator Strategic Claims Services, Inc. ("SCS"), notified potential members of the Class of the Settlement through multiple methods.

97. First, information regarding the Settlement, including copies of the Notice and Claim Form, was posted on a website established by SCS specifically for this Settlement. *See* Claims Administrator Decl. ¶¶ 17–18. This method of giving notice was approved by the Court and is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by" the proposed judgment. Fed. R. Civ. P. 23(e)(1)(B).

98. Second, on July 21, 2025, the Summary Notice was published through *Investor's Business Daily* and over *Globe Newswire*. Claims Administrator Decl. ¶ 15.

99. Third, beginning on July 1, 2025, SCS also mailed a copy of the Notice to potential members of

27

the Class and their nominees, having used several resources of data to identify members of the Class. *See* Claims Administrator Decl. ¶¶ 5–14. For example, under the Preliminary Approval Order, InnovAge was required to provide SCS records reasonably available to InnovAge or its transfer agent concerning the identity and last known address of Class Members; SCS mailed the postcard notice to these Class Members on July 1, 2025. *Id.* at ¶ 11. SCS also sent the Notice to entities identified on a proprietary list maintained by SCS of the most common banks, brokers, and other nominees. *See id.* ¶ 8. In total, 2,464 copies of the Notice Packet were mailed or email based on that list. *See id.* ¶ 9.

100.    In the aggregate, as of October 22, 2025, SCS has disseminated 11,390 copies of the Notice to potential members of the Class and their nominees. *See id.* ¶ 13.

101.    As discussed in the Final Approval Motion, the deadline for objections to, or exclusions from, the Settlement is only three weeks away, and to date no Class Member has objected to any aspect of the Settlement, nor requested to be excluded. This overwhelmingly positive response from the Class wholly supports final approval.

### E.    The Plan of Allocation

102.    As part of their final approval submission, Lead Plaintiffs have enclosed a proposed plan of allocation for the proceeds of the Settlement among members of the Class who submit valid proofs of claim. As this Plan of Allocation (the "Plan") distributes the Settlement proceeds on a *pro rata* basis to those members of the Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions, it is equitable and should be approved.

103.    Lead Plaintiffs engaged Dr. Cain, whose credentials were not challenged by Defendants at class certification, to assist in formulating the details of the Plan. In that work, Dr. Cain applied the statutory formula for Securities Act damages and, for Exchange Act damages, calculated the amount of estimated artificial inflation in the per share closing price of InnovAge common stock

28

that was allegedly proximately caused by Defendants' false and misleading statements. Dr. Cain considered price changes in InnovAge common stock as a result of the alleged corrective disclosures in putting forth these calculations, while also adjusting for any changes attributable to inactionable market forces or industry-wide patterns in trading.

104.    In the Notice, this proposed Plan of Allocation was described, and the underlying methodology explained, to potential Class members. Because it was prepared by a well-regarded expert, tracks the theory of damages set forth by Lead Plaintiffs' claims, and is substantially similar to plans that have been approved in this District and around the country, it is fair, reasonable, and adequate to the Class as a whole. The reasonableness of the Plan is further demonstrated by the fact that it, too, has received no objections despite its description being included in the Notice circulated to potential Class members.

## IV.    LEAD PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

### A.    Lead Plaintiffs' Request for Reasonable Costs and Expenses Under the PSLRA

105.    The PSLRA authorizes courts to grant an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class . . . ." *See* 15 U.S.C. § 78u-4(a)(4). Lead Plaintiffs accordingly seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Class, in the amount of $15,000 for each Lead Plaintiff, for a total of $45,000—an amount less than the total estimated value of the time that the Lead Plaintiffs spent in overseeing and participating in the Action.

106.    The time devoted to this Action by Lead Plaintiffs—who actively supervised the litigation for three years, including by reviewing key filings, collecting, reviewing, and producing thousands of pages of documents, preparing and sitting for depositions, and participating in mediation and negotiations—is detailed in the accompanying Lead Plaintiff Declarations. *See* Lead Plaintiff Decls., ¶¶ 5–8.

29

107. The reimbursement requested is consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional plaintiffs to take an active role in bringing and supervising securities class actions. As set forth in the accompanying declarations, each of the Lead Plaintiffs has, throughout the lifespan of the Action, understood and remained fully committed to representing the Class and seeking resolution in the Class's best interest. Lead Plaintiffs' active engagement throughout the years of this Action embodies exactly the type of contributions that courts in this Circuit and elsewhere have found to warrant reimbursement to class representatives.

### B.    Lead Plaintiffs' Fees and Expenses Request on Behalf of Counsel

108. Lead Plaintiffs also request approval, on behalf of Lead Counsel and Liaison Counsel, for an award of attorneys' fees and reimbursement of reasonable expenses incurred as a result of the prosecution of this Action. Specifically, Lead Plaintiffs seek a fee of 20% of the Settlement, including any interest accrued thereon, to be paid to Lead Counsel and Liaison Counsel and reimbursement of $339,100.07 in litigation expenses, also to be paid from the Settlement. *See generally* Ex. E (Schedule of Lodestar and Expenses for All Plaintiffs' Counsel).

109. Counsel has submitted the attached declarations of Molly J. Bowen and Adrian P. Castro, on behalf of Cohen Milstein and Fairfield & Woods P.C. ("Fairfield"), respectively, in support of these requests. *See* Cohen Milstein Decl.; Fairfield Decl.

110. These declarations describe generally the categories of work provided by Lead Counsel and Liaison Counsel during the Action, as well as a detailed accounting of the lodestar generated by each firm. That accounting includes the amount of time spent by each attorney and professional support staff member on the case, as well as their applicable hourly rates and corresponding lodestar calculations. In accordance with D.C.COLO.LCivR 54.3, the declarations also include descriptions of the principal tasks that each attorney performed, and biographies for each attorney currently employed by each firm, including information about their position, education, and

30

relevant experience.

111.    The declarations also describe the expenses for which Lead Counsel and Liaison Counsel seek reimbursement. These expenses are described at a categorical level for both firms.

112.    Lead Plaintiffs support these requests, *see* Lead Plaintiff Decls., ¶¶ 16–18, and that support weighs heavily in favor of approval of a fee request. *See, e.g.*, *DaVita*, 2021 WL 1387110, at \*4 ("Lead Plaintiffs played an instrumental role in the settlement negotiations, closely evaluated the proposed settlement, and recommended that it be approved."); *In re Veeco Instruments Inc. Sec. Litig.*, No. 05-MD-01695, 2007 WL 4115808, at \*8 (S.D.N.Y. Nov. 7, 2007) (noting that endorsement by a sophisticated institutional investor justifies a presumption of its reasonableness); *In re Genworth Fin. Sec. Litig.*, No. 3:14-cv-682-JAG, 2016 WL 7187290, at \*2 (E.D. Va. Sept. 26, 2016) (same).

113.    Lead Plaintiffs' request that fees be granted based on a percentage of the Settlement is in concert with typical fees requests in securities and other complex class actions in this Circuit and nationally, because it aligns counsel's financial interest in the case with the interest of the Class.

114.    As explained in the accompanying briefing, district courts in the Tenth Circuit apply the *Johnson* factors to evaluate fee requests. Those factors include: (1) the time and labor required by counsel; (2) the novelty and difficulty of the legal question presented; (3) the skill required to represent the class appropriately; (4) the preclusion of other employment by the attorneys due to the acceptance of this case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*, No. 17-CV-0304-WJM-NRN, 2021 WL 2981970, at \*1 (D. Colo. July 15, 2021) (Martínez, J.) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974)). Application of those factors here weigh

heavily in favor of granting the request. *See generally* ECF No. 202 ("Fee Memorandum").

### 1. Time and Labor Expended by Counsel and Preclusion of Other Employment (Factors 1 and 4)

115.    As described further *supra*, Lead Counsel engaged in an exhaustive and comprehensive investigation and drafted a 179-page amended complaint; successfully opposed Defendants' three motions to dismiss; engaged in extensive discovery negotiations, including many meet-and-confer conferences with Defendants and third parties and exchanged substantial amounts of contentious correspondence; reviewed and analyzed over 600,000 pages of documents, and consulted with industry insiders and a market efficiency and damages expert to better understand the issues in the case; successfully achieved certification of its class of investors; defended depositions of Lead Plaintiffs; participated in depositions of Lead Plaintiffs' non-party investment managers. In total, Lead Counsel and Liaison Counsel expended over 8,784.65 hours litigating this matter. That investment of time came at the exclusion of other income-generating work in which Lead Counsel and Liaison Counsel might have otherwise engaged.

116.    Accordingly, these extensive litigation efforts fully support the requested fee.

### 2. Novelty and Difficulty of Questions Raised by the Litigation (Factor 2)

117.    The risks undertaken and difficulties presented in a complex securities class action such as this one—which included 28 different Defendants, including former executives, directors, and underwriters, and complex questions of control person liability spanning intricate corporate entity arrangements as to private equity firms—favor approval of the requested fee award.

118.    Indeed, as discussed in the Fee Memorandum, while the Court sustained alleged misstatements arising under both Lead Plaintiffs' Securities Act and Exchange Act claims, of the statements and claims that it sustained, in its orders, the Court made clear that at least some were vulnerable to more fact-specific argument by Defendants at a later stage in the litigation.

119.    Moreover, Defendants had legitimate arguments as to why the statements that survived

32

motion to dismiss—involving InnovAge's: (i) ability to provide individualized care plans; (ii) ability to maintain continuity of care; (iii) ability to enable participants to live independently at home; and (iv) staffing levels and the reasons for any staffing shortages—were highly fact intensive. As to the first three categories of statements, Defendants would argue that these statements could not be taken as assurances that InnovAge would operate perfectly and are not false simply because InnovAge encountered operational challenges, and that any issues were isolated. As to the staffing statements, Defendants would argue that they disclosed the fact of staffing shortages and that such shortages were the result of the COVID-19 pandemic and were well-known to investors.

120.    The Underwriter Defendants would also raise the affirmative defense that they conducted reasonable due diligence in underwriting the IPO of InnovAge. In support, Lead Plaintiffs and Lead Counsel anticipate that Defendants would point to an extensive record developed through the underwriting process, including emails, earnings projections, and conversations with industry insiders.

121.    Third, as to scienter, Defendants would argue that the nature and severity of the sanctions was unexpected, particularly in light of the complications of operating during COVID-19, Company's Motion to Dismiss at 40; that Hewitt's knowledge of complaints about staffing issues at certain centers was not sufficiently particularized, *id.* at 35; that the timing of Hewitt's resignation does not support a finding of scienter, *id.* at 38; and that the timing of Hewitt and Gutierrez's compensation awards did not support a motive to inflate InnovAge's stock price, *id.* at 39.

122.    In addition, as discussed above, with respect to damages and loss causation, the parties would have resorted to a "battle-of-the-experts" which creates significant uncertainty and risks to recovery. Accordingly, these issues posed a significant risk that could have dramatically reduced the value and ultimate recovery in the Action. Combined with the concerns discussed above regarding InnovAge's ability to pay a judgment or settlement and the immense factual complexity

33

that establishing liability would entail, the risks and difficult questions of fact and law presented in this litigation firmly support the requested fee award.

### 3. Skill Required to Perform the Legal Service Properly and the Experience, Reputation, and Ability of the Attorneys (Factors 3 and 9)

123.    In light of the complex nature of this litigation, Lead Plaintiffs and the Class benefitted tremendously from Lead Counsel and Liaison Counsel's expertise in litigating similar types of actions. Lead Counsel specializes in securities class actions and other complex litigation, and has recovered historic awards for investors, including recently securing a $1 billion settlement in a securities fraud action, *In re Wells Fargo & Co. Securities Litigation*, No. 1:20-cv-04494-JLR-SN (S.D.N.Y. Sept. 9, 2023), ECF No. 207. In light of that work, Lead Counsel's Securities & Investor Protection Group was named a practice group of the year by Law360. *Law360 Names Practice Groups of the Year*, Law360 (Jan. 21, 2024), https://www.law360.com/articles/1781974/law360-names-practice-groups-of-the-year; *see also* Cohen Milstein Decl. at Ex. 3. Liaison Counsel is also highly regarded in the District of Colorado and ably supported the litigation, particularly by ensuring compliance with local rules and norms, as well as navigating state regulatory issues in discovery. *See* Fairfield Decl. at Ex. 3.

124.    Counsel's performance, described by mediator Robert A. Meyer as "of the highest caliber" in his endorsement of the fee request (Meyer Decl. ¶ 19) further demonstrates the importance of counsel's skill in achieving resolution here. And, that Defendants were represented by two highly respected defense firms—Sullivan & Cromwell LLP and Freshfields US LLP—further underscores that Lead Counsel and Liaison Counsel possessed skill sufficient to support the fee award. *E.g.*, *Crocs*, 2014 WL 4670886, at *3 (noting fact that "Defendants' counsel is equally skilled" favored approval of 30% fee award); *Maxar*, 2024 WL 98387, at *6 (same).

### 4. Customary Fees and Awards in Similar Cases (Factors 5 & 12)

125.    A request for 20% of a settlement is well below the norm in this District and Circuit. As set

forth more fully in the Fee Memorandum, "[c]ourts in the Tenth Circuit have noted that the typical fee award in complex cases is around one third of the common fund." *Crocs*, 2014 WL 4670886, at *3; *see also Maxar*, 2024 WL 98387, at *7 (approving 30% fees award); *DaVita*, 2021 WL 2981970, at *3 (courts in Tenth Circuit have repeatedly found 30% fee award reasonable); *Davis v. Crilly*, 292 F. Supp. 3d 1167, 1174 (D. Colo. 2018) (finding 37% fee is "well within the normal range"); *In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 997 F.3d 1077, 1095 (10th Cir. 2021) (33% award "well within the range" of reasonable); *Ind. Pub. Ret. Sys. v. Pluralsight*, No. 19-cv-00128 (D. Utah Feb. 5, 2025), ECF No. 293 (approving request for 20% attorneys' fees); *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 2014 WL 12768451, at *2 (D. Colo. July 31, 2014) (granting 30% of $89.5 million settlement).

126.    Furthermore, a lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request. As set forth in each firm's declaration, counsel expended approximately 8,784.65 hours in the investigation, prosecution, and resolution of this Action from inception up through June 17, 2025, the day the Court granted preliminary approval of the Settlement. The resulting lodestar is $6,992,264.75. In light of this, the requested fee of 20% of the Settlement Fund yields a multiplier of less than one, only 0.772—which is far lower than multipliers awarded by courts in this Circuit and around the country in comparable contingent securities class actions. *See, e.g.*, *Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1262 (10th Cir. 2023) (finding no abuse of discretion in granting fee representing 2.8 times lodestar); *DaVita*, 2021 WL 2981970, at *5 (granting fees representing 2.75 times lodestar); *Crocs*, 2014 WL 4670886, at *4 (referencing District cases approving multipliers ranging from 2.5 to 4.6).

127.    Finally, that lodestar is calculated assuming prevailing hourly rates which are comparable to the rates submitted by similar firms for lodestar cross-checks in other securities class action fee applications that have been granted in this District, Circuit and others. *See, e.g.*, *Maxar*, 2024 WL

98387, at *7 (approving fees with rates ranging from $450 to $1,250 for attorneys, and noting counsel's low lodestar in doing so); *Ramos v. Banner Health*, 15-cv-2556, 2020 WL 6585849 (D. Colo. Nov. 10, 2020) (Martínez, J.) (approving rates ranging from $490 to $1,060 per hour); *Chieftain Royalty Co. v. Marathon Oil Co.*, No. CIV-17-334-SPS, 2019 WL 7758915, at *12 (E.D. Okla. Mar. 8, 2019) (recognizing partner rates ranging from $850 to $1,150 per hour).

128.    Counsel's overall blended rate of $795.96 is also in line with the prevailing rates for firms of their caliber—and were approved as recently as last month. *See* Order Granting Plf.'s Mot. for Attorneys' Fees, *Pac. Steel Grp. v. Com. Metals Co.*, No. 20-cv-07683-HSG, ECF No. 562 at 37 (N.D. Cal. September 29, 2025) (finding Cohen Milstein's rates "reasonable and generally in line with prevailing hourly rates of comparable attorneys").

129.    That counsel's request for fees is squarely in line with the precedent of this District and Circuit further supports approval.

### 5.    Amount Involved and Results Obtained (Factor 8)

130.    The $27 million Settlement achieved in this Action is an outstanding result for the Class by any measure. As elaborated further in the Fee Memorandum, the $27 million Settlement represents nearly double the median securities class action recovery in this Circuit of $13.4 million, and, as a recovery of more than 9% of likely recoverable damages, exceeds the median recovery in similarly sized securities cases (*i.e.* those alleging $250–$499 million in damages) nationwide.[7]

131.    And, as mentioned above, this recovery includes contributions from Defendants in addition

---

[7] *See* Bulan & Tam, *supra* Note 2 at 4 (median settlement of 5.9% of likely recoverable damages for securities cases alleging $250–$499 million in damages from 2015 to 2023). Courts readily approve class action settlements representing similar or lower percentages of recoverable damages. *See, e.g., Crocs*, 306 F.R.D. at 691 (finding recovery of 1.3% of damages as "in line with the median…"); *Ferreira v. Funko, Inc.*, No. 2:20-CV-02319-VAP-MAAX, 2022 WL 22877154, at *6 (C.D. Cal. Dec. 13, 2022) (finding courts in Ninth Circuit approve settlements on order of 8.7% of damages); *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (affirming approval of settlement recovery of 6.1% of potentially recoverable damages).

to their insurers—a rare occurrence in securities litigation that further supports the requested fee award. *See supra* ¶ 80; *DaVita*, 2021 WL 1387110, at *4 ("The recovery for investors not only includes the proceeds of Defendants' insurance tower, but also includes a substantial monetary contribution by DaVita."); *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 842 (E.D. Va. 2016) (corporate defendant's contribution "of its own cash to the Settlement" "strongly demonstrated the adequacy of the Settlement amount").

132.    Accordingly, as elaborated more fully in the Fee Memorandum, the outstanding recovery obtained in the Settlement supports the requested fee.

### 6. The Contingent Nature of the Fee and the Undesirability of the Action (Factors 6 and 10)

133.    "To date, Lead Counsel has received no compensation for its prosecution of this case, and the primary focus of this factor is to acknowledge this incongruence by permitting a higher recovery to compensate for the risk of recovering nothing." *Maxar*, 2024 WL 98387, at *8. By proceeding under a contingency fee arrangement, counsel faced a risk of incurring a considerable investment of time and money without any compensation. As explained above, the risk of a diminished recovery—or no recovery whatsoever—was particularly acute here. Thus, the contingent nature of the fee supports approval here.

134.    Additionally, because complex securities class actions require significant time and expense expended without any guarantee of success, they "are often seen as undesirable." *In re Spectranetics Corp. Sec. Litig.*, 2011 WL 13238696, at *2 (D. Colo. Apr. 4, 2011). Because this case—with 28 defendants, claims arising under multiple federal statutes, and intricate factual questions regarding control person liability and a complex state and federal regulatory regime—was especially challenging, this factor also supports approval.

### 7. The Reaction of the Class to the Fee and Expense Application

135.    The reaction of the Class to the Settlement, including the fee request (which was described in

the Notice) has been uniformly positive, a fact that supports approval of the request. To date, just three weeks before the objection and opt-out deadline, not one member of the Class has filed an objection to counsel's request for fees or opted out. Claims Administrator Decl., ¶¶ 20–21. That fact is particularly notable in light of the large number of sophisticated institutional investors invested in InnovAge who have the resources to object to the requested fee if they felt it was justified. *See* ECF No. 141-1 at 36 (noting InnovAge is between 50th and 75th percentile of New York Stock Exchange- and NASDAQ-traded companies in terms of institutional ownership as a percent of publicly trading shares); *see also Crocs*, 2014 WL 4670886, at *5 (noting the lack of objections in approving fees request); *McKeon v. Integrity Pizza LLC*, 2020 WL 6782238, at *2 (D. Colo. Nov. 18, 2020) (same).

136.    Accordingly, all relevant factors support the fee request here.

### 8.    Counsel's Request for Expenses

137.    Finally, Lead Counsel and Liaison Counsel seek reimbursement of $339,100.07 in litigation expenses. Counsel respectfully submit—as laid out in detail in the accompanying memorandum and firm declarations—that these expenses were reasonable and necessary in light of the length and complexity of the litigation.

138.    As courts in this District and elsewhere have observed, plaintiffs' counsel should be reimbursed for reasonable expenses such as "expert fees, mediation expenses, discovery-related costs, and investigation expenses." *Maxar*, 2024 WL 98387, at *8. *See also DaVita*, 2021 WL 2981970, at *4 ("[A]n attorney who has created a common fund for the benefit of the class is entitled to reimbursement of . . . reasonable litigation expenses from that fund."). As set forth in the accompanying declarations, those are exactly the sort of expenses for which counsel seeks reimbursement here. *See also Oppenheimer*, 2014 WL 12768451, at *3 (finding approximately $3.5 million of expenses reasonable).

38

139.    Notably, the requested expense reimbursement of $339,100.07 is significantly less than the $800,000 upper limit set forth in the Notice, and no Class Member has objected to the reimbursement request. Tacit Class approval of a figure far lower than the actual expense reimbursement further counsels in favor of approval.

## V.    **CONCLUSION**

140.    For the foregoing reasons, the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate; and Lead Plaintiffs' request for an award of attorneys' fees and expenses should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 22nd day of October, 2025, at Washington, D.C.

/s/ Molly J. Bowen

Molly J. Bowen