**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-2770-WJM-SBP

EL PASO FIREMEN & POLICEMEN'S PENSION FUND,
SAN ANTONIO FIRE & POLICE PENSION FUND, and
INDIANA PUBLIC RETIREMENT SYSTEM, individually and on behalf of all others
similarly situated,

      Plaintiffs,

v.

INNOVAGE HOLDING CORP.,
MAUREEN HEWITT,
BARBARA GUTIERREZ,
J.P. MORGAN SECURITIES LLC,
BARCLAYS CAPITAL INC.,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
WILLIAM BLAIR & COMPANY, L.L.C.,
PIPER SANDLER & CO.,
CAPITAL ONE SECURITIES, INC.,
LOOP CAPITAL MARKETS LLC,
SIEBERT WILLIAMS SHANK & CO., LLC, and
ROBERTS & RYAN INVESTMENTS, INC.,

      Defendants.

---

**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND
AWARDING ATTORNEY FEES AND EXPENSES**

---

Before the Court are two motions filed by Lead Plaintiffs El Paso Fireman &

Policemen's Pension Fund, San Antonio Fire & Police Pension Fund, and Indiana

Public Retirement System's (collectively, "Lead Plaintiffs"): (1) Plaintiffs' Unopposed

MOTION for Order to Finally Approve Class Action Settlement and Plan of Allocation

(ECF No. 201); and (2) Plaintiffs' MOTION for Attorney Fees and Expenses (jointly,

"Motions") (ECF No. 202).  Defendant InnovAge Holding Corp. ("InnovAge") and the various other defendants listed in the caption of this Order (collectively, "Defendants") do not oppose the relief sought by Lead Plaintiffs.[1]

The Court held a settlement fairness hearing ("Fairness Hearing") on December 5, 2025.  (ECF No. 206.)  After considering the arguments raised at the Fairness Hearing and in the papers, the Court orally granted the Motions from the bench and advised that a written order would follow.  (*Id.*)  This is that order.

## I. BACKGROUND

Lead Plaintiffs are pension funds operated to benefit public employees and retirees (*e.g.*, firefighters, police officers, and teachers and professors of public schools and universities) in Texas and Indiana.  (ECF No. 54 ¶ 22–24.)

InnovAge is a healthcare company focused on providing Program of All-Inclusive Care for the Elderly ("PACE") services.  (*Id.* ¶ 26.)  PACE "is a joint Medicare and Medicaid program that provides comprehensive community-based medical and social services to certainly elderly individuals."  (Fairness Hearing, Transcript, p. 4.)[2] InnovAge was incorporated as a nonprofit corporation in Colorado from May 2007 until May 2016.  (*Id.*)  In May 2016, it reincorporated as a Delaware for-profit corporation while maintaining its principal place of business in Colorado.  (*Id.*)  InnovAge accomplished this transition into a for-profit business with assistance from Defendants

---

[1] The Court notes, moreover, that Defendants asserted that they "support the fee application" "in light of the litigation that occurred in this case, and the efforts by plaintiffs' counsel."  (Fairness Hearing Transcript, p. 24.)

[2] The Court cites to the unofficial transcript, which has not been edited by the court reporter.

WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC's (collectively, the "WCAS"), private equity firms that bought a $196 million stake in the Company in May 2016.  (*Id.* ¶ 27.)  In July 2020, Defendant Apax Partners, L.P. ("Apax"), another private equity firm, and WCAS entered an agreement for Apax to acquire a 49% stake in the Company and for the two firms to cause InnovAge to become a public company.  (*Id.* ¶ 28.)

In the IPO's Offering Documents and throughout the Class Period, InnovAge represented to investors that it was delivering compliant healthcare to its participants and had sufficient staff to provide necessary, government-mandated care (*id.* ¶¶ 252–73).  But according to Lead Plaintiffs, InnovAge was actually delivering substandard care due to inadequate staffing, which resulted in multiple state and federal regulators sanctioning InnovAge and suspending patient enrollment (*Id.* ¶¶ 212–41).  After a series of corrective disclosures, InnovAge's stock price decreased by 78%.  (*Id.* ¶ 12.)

In October 2021, Lead Plaintiffs brought claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and §78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5 (the "Exchange Act"), Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o (the "Securities Act") against InnovAge, certain current and former officers and directors ("Director Defendants"),[3]  and the underwriters[4] in InnovAge's IPO, challenging certain statements

---

[3] These Director Defendants included John Ellis Bush, Andrew Cavanna, Caroline Dechert, Edward Kennedy, Jr., Pavithra Mahesh, Thomas Scully, Marilyn Tavenner, Sean Traynor, and Richard Zoretic.

[4] In January 2024, the Court granted in part and denied in part the underwriters'—J.P. Morgan Securities LLC, Barclays Capital Inc., Goldman Sachs & Co. LLC, Citigroup Global

regarding InnovAge's operations as misleading.  (*See generally id.*)  They also brought

control person liability claims against WCAS and Apax Partners, L.P.  (*Id.*)  All

Defendants moved to dismiss in September 2022.  (ECF Nos. 73, 83.)

In December 2023, the Court granted in part and denied in part Defendants'

motion to dismiss.   (ECF No. 102.)  The Court concluded that six of Defendants' 43

allegedly misleading statements were actionable, dismissing Plaintiffs' claims with

respect to the remaining 37 statements.  (*Id.*)  The Court also dismissed Plaintiffs'

control person liability claims against the Director Defendants, finding that "Lead

Plaintiffs have failed to adequately allege control person liability against the Director

Defendants" because, "'if being a director is not sufficient [to support an allegation that

the person is a control person], then neither is agreeing to become one.'"  (*Id.* at 83.)

But the Court permitted the control person liability claims to proceed against

Apax and WCAS.  The Court reasoned that these two entities could, either by voting

together or by exercising the veto that each held, control an LP Board of TCO Group

Holdings, L.P., which in turn could exercise "voting and dispositive power" over a

majority of InnovAge shares.  (*Id.* at 86 (quoting ECF No. 74-1 at 28).)

In September 2024, Plaintiffs filed a second amended complaint ("SAC").  (ECF

No. 171.)  The SAC is substantially identical to the original complaints but drops the

fictitious "Welsh, Carson, Anderson & Stowe" entity (which was merely a trade name) as

a defendant and adds as a defendant TCO Group Holdings L.P., which Plaintiffs allege

to be a "shell entity" that is "the investment vehicle through which Apax and WCAS hold

---

Markets Inc., Robert W. Baird & Co. Incorporated, William Blair & Company, L.L.C., Piper
Sandler & Co., Capital One Securities, Inc., Loop Capital Markets LLC, Siebert Williams Shank
& Co., LLC, and Roberts & Ryan Investments, Inc.—motion to dismiss.  (ECF No. 108.)

their investment InnovAge common stock and exercise their voting and dispositive power with respect to that stock." (*Id.* ¶ 36.) The SAC also adds three new defendants that the SAC alleges are "interconnected entities": WCAS Management Corporation; WCAS Management, L.P.; and WCAS Management LLC. (*Id.* ¶ 28.)

In October 2024, WCAS moved to dismiss the control person liability claims against them in the SAC, arguing that there were no alleged facts "demonstrating that any individual WCAS Defendant actually had the ability to control InnovAge." (ECF No. 175.) Contrary to this position, however, the Court concluded "that the SAC sufficiently pleads a prima facie control person liability claim as to WCAS Management Corporation." (ECF No. 195 at 8.) The Court also concluded that the "factual disputes precluded dismissal of plaintiffs' claims against WCAS Management LP, and WCAS Management LLC, under an alter ego theory." (Fairness Hearing Transcript, p. 7.) Hence, the Court permitted the control person liability claims to proceed against WCAS. (*Id.*)

In January 2025, Lead Plaintiffs moved to certify a class of persons and entities who: "(i) purchased or otherwise acquired the publicly traded common stock of InnovAge between May 11, 2021, and December 22, 2021, inclusive; and/or (ii) purchased or otherwise acquired publicly traded InnovAge common stock either in or traceable to InnovAge's March 4, 2021, IPO and were damaged thereby." (ECF No. 140 at 8.) Lead Plaintiffs also asked the Court to appoint them as Class Representatives and Cohen Milstein Sellers & Toll PLLC as Class Counsel. (*Id.*) The Court granted the motion and certified the class as defined above, finding that "Lead Plaintiffs have satisfied each of Rule 23(a)'s requirements." (ECF No. 187 at 5.)

In May 2025, the parties notified the Court that they had "agreed to settle all claims in this Action in exchange for a $27 million all-cash payment."  (ECF Nos. 196. ECF No. 201 at 5.)  In June 2025, they filed an Unopposed MOTION for Order to Preliminarily Approve Class Action Settlement.  (ECF No. 199.)  Later that month, the Court granted the motion, preliminarily approving the settlement and setting a fairness hearing for December 5, 2025.  (ECF Nos. 200, 204.)

In that Order, the Court authorized Lead Plaintiffs "to retain Strategic Claims Services (the 'Claims Administrator') to supervise and administer the notice procedure in connection with the proposed Settlement, as well as the processing of Claims . . . ." (ECF No. 200 at 3.)  Class Members who wanted to be excluded from the Settlement or object to any aspect of the Settlement, the Plan of Allocation, or motion for an award of attorneys' fees and expenses had until November 5, 2025 to do so.  (*Id.* ¶ 11.)  To date, however, no Class Member has objected to any aspect of the Settlement, and out of the 11,390 Notice Packets that have been mailed to potential Class Members, no requests for exclusion have been received.  (ECF No. 201 at 17.)

In October 2025, Lead Plaintiffs moved for final approval of the settlement (ECF No. 201), and for attorneys' fees, reimbursement of expenses, and approval of service awards to the Lead Plaintiffs (ECF No. 202).

## II. APPROVAL OF SETTLEMENT AGREEMENT

In deciding whether to approve a class action settlement, a court must determine whether the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). Courts consider four factors in evaluating the settlement:

> (1) whether the proposed settlement was fairly and honestly negotiated;

(2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(4) the judgment of the parties that the settlement is fair and reasonable.

*Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993), *abrogated on other grounds by Devlin v. Scardelletti*, 536 U.S. 1 (2002).  The Court may also consider the fact that no objections were filed by any class members.  *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 372 (S.D. Ohio 1990) ("No timely objection was raised by any Class Member to the proposed settlement, and less than 5% of all Class Members have chosen to opt out.  One untimely objection, improper in other regards, was filed and subsequently withdrawn prior to the fairness hearing.  No objection was raised at the fairness hearing.  The Court gives these factors substantial weight in approving the proposed settlement.").

Having thoroughly reviewed the Motions, the Court finds that the settlement agreement negotiated by counsel is fair, reasonable, and adequate.  Regarding the four *Gottlieb* factors, the parties have demonstrated that the settlement agreement was negotiated at arms' length by counsel experienced in these types of cases.  As noted at the Fairness Hearing, the Court has been particularly impressed by the lawyers litigating this case, and most notably the exceptional results achieved by Plaintiffs' counsel in this litigation. The briefs and arguments from all parties were particularly well-written and were very helpful to the Court in resolving this complex case.  (*See* Fairness Hearing Transcript, p. 28 (commenting that "[t]his was a very hard fought and very well-litigated

7

case").)

The parties have also shown that serious and disputed questions of fact and law exist, particularly concerning the control person liability claims and the underwriter defendants' due diligence affirmative defense, the latter of which likely would have presented novel legal issues.  (Fairness Hearing Transcript, pp. 10, 18.)

Further, the Court finds that the value of the Settlement Agreement outweighs the possibility of recovery after protracted litigation.  As outlined by the Settlement Agreement, Defendants have agreed to pay a total of $27,000,000 to settle this action. (ECF Nos. 196; ECF No. 201 at 5.)  The individual settlement payments for which Class Members are eligible will be calculated on a *pro rata* basis based on what date and at what price Class Members purchased InnovAge stock.  (ECF No. 199-1.)  Thus, the Settlement Agreement provides a significant and immediate benefit to all Class Members.  It also ensures the Class Members will receive reasonable compensation in light of the uncertainties of litigating this case to judgment.

Finally, both parties have represented their view that the Settlement Agreement is fair, reasonable, and adequate.  The fact that no class member has objected to the proposed settlement is additional evidence that the class also considers this settlement fair and reasonable.  *See In re Dun & Bradstreet*, 130 F.R.D. at 372.

As set forth above, the Court finds that each *Gottlieb* factor weighs in favor of finding that the Settlement Agreement is fair, reasonable, and adequate.

### III. ATTORNEYS' FEES AND EXPENSES

Lead Plaintiffs' counsel seeks an all-in award of $5,400,000, or 20% of the settlement amount, plus actual expenses of $339,100.07 for litigating the case.  (ECF

No. 202 at 9.)  Counsel asserts that they have recorded 8,784.65 hours litigating this case, which counsel calculates as constituting $795.96/hour and "equat[ing] to a multiplier of 0.772, which—at less than 1.0—is far lower than multipliers routinely approved by courts in this District and the Tenth Circuit."

When considering the appropriateness of an attorney's fees award, the Court considers the "*Johnson* factors": (1) the time and labor required by counsel; (2) the novelty and difficulty of the legal question presented; (3) the skill required to represent the class appropriately; (4) the preclusion of other employment by the attorneys due to the acceptance of this case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1979); *see also Chieftain Royalty Co. v. Enervest Energy Inst. Fund XIII-A., L.P.*, 888 F.3d 455, 458 (10th Cir. 2017) (recognizing that courts within the Tenth Circuit utilize the *Johnson* factors to determine the appropriate fee award).

The Court finds that the requested amount of fees is reasonable considering the effort expended on this case by class counsel, the risks and difficulties inherent in securities fraud litigation, the discovery undertaken, and the skill required and dedication displayed over the litigation of this matter.  The fee request also fits comfortably within, if not below, ranges of contingency fee awards approved in other cases.  *See, e.g., Prim v. Ensign U.S. Drilling Inc.*, 2020 WL 4539630, at *4 (D. Colo.

Aug. 6, 2020) (recognizing that 35% contingency fee was within the customary range for attorney's fees); *Swanson v. Cathedral Energy Servs., Inc.*, 2019 WL 4858453, at *3 (D. Colo. Oct. 2, 2019) (finding 36% contingency payment is reasonable in FLSA action); *Whittington v. Taco Bell of Am., Inc.*, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) ("Together the fees and costs amount to approximately 39% of the fund as a whole. This is within the normal range for a contingent fee award."); *Vaszlavik v. Storage Tech. Corp.*, 2000 WL 1268824, at *4 (D. Colo. Mar. 9, 2000) (finding that the "requested fee of 30% of the settlement is well within the ordinary range of common fund awards," and that "[a] 30% common fund award is in the middle of the ordinary 20%–50% range and is presumptively reasonable").

Moreover, counsel states that "the Settlement represents a recovery that is more than double the median recovery in this Circuit of $13.4 million and is nearly double the median recovery, as a percent of likely recoverable damages, in similarly sized securities cases between 2015 and 2023 (*i.e.*, those alleging $250–$499 million in damages)." (*Id.* at 14.) Courts have described "[t]he degree of success" as being "critical" when determining fees. *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *7 (D. Colo. Apr. 22, 2015).

As referenced earlier, under the Settlement Agreement negotiated by counsel, Defendant has agreed to pay $27,000,000 to settle this action. The negotiated Settlement Agreement will benefit all Class Members, not just Lead Plaintiffs. This is a good result for the Class Members and weighs heavily in favor of approving the amount of fees requested. *See In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 630 (D. Colo. 1976) (noting that "the amount of the recovery, and end result achieved are of primary

10

importance" when considering what constitutes a reasonable attorney fee).

Having considered the applicable *Johnson* factors, the Court finds that Plaintiffs'
counsel's request for attorney's fees is fair and reasonable.

The Court also grants Lead Plaintiffs' litigation expenses, sought in the amount of
$339,100.07.  (ECF No. 202 at 16.)  The Court finds this amount to be reasonable in
light of the expenses incurred, including with respect to issues involving "experts,
mediation, document hosting platform, and investigatory services."  (*Id.*)  Significantly,
moreover, it is far less than the $800,000 set forth in the settlement notice distributed to
the Class Members, which again, no one objected to or opted out from.  *See Teodosio
v. DaVita*, 2021 WL 2981970, at *5 (D. Colo. Dec. 6, 2024) (granting $547,409.27 in
expenses in securities class action).

The Court therefore grants the Motion requesting attorneys' fees and expenses
in full, and awards to Plaintiffs $5,400,000 in attorney fees, and $339,100.07 in litigation
expenses.

## IV. INCENTIVE AWARDS

When considering the appropriateness of an incentive award for class
representatives, the Court should consider: (1) the actions the class representative took
to protect the interests of the class; (2) the degree to which the class has benefitted
from those actions; and (3) the amount of time and effort the class representative
expended in pursuing the litigation.  *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir.
1998); *Lucken Family Ltd. P'ship, LLLP v. Ultra Res., Inc.*, 2010 WL 5387559, at *6 (D.
Colo. Dec. 22, 2010).

Under the Settlement Agreement, the parties propose that Lead Plaintiffs will

each receive $15,000 as an incentive payment.  (ECF No. 108 at 23.)  Lead Plaintiffs

spent time and effort working on the case with counsel over the course of four years.

Lead Plaintiffs' commitment to the case, the personal sacrifices of their time while

pursuing this litigation, and the outcome achieved warrant an incentive award in this

case.  *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (noting

that service awards are especially appropriate in employment litigation where "the

plaintiff is often a former or current employee of the defendant, and thus, by lending his

name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk

of adverse actions by the employer or co-workers").

For the reasons set forth above, the Court finds the awards to be reasonable and

approves a $15,000 incentive award for each Lead Plaintiff.

## V. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.    The Motions are GRANTED as more fully set forth above. (ECF Nos. 201,

202); and

2.    The Clerk of Court is directed to terminate this action.

Dated this 10th day of December, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge