IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-2770-WJM

RANDY McLEOD et al,

　　　　Plaintiffs,

　　　　vs.

INNOVAGE HOLDING CORP et al,

　　　　Defendants.

-----------------------------------------------------------------

REPORTER'S TRANSCRIPT

Fairness Hearing

-----------------------------------------------------------------

　　　　Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing on the 5th day of December, 2025, in Courtroom A801, United States Courthouse, Denver, Colorado.


APPEARANCES

For the Plaintiffs:
MOLLY J. BOWEN and JULIE G. REISER, Cohen Milstein Sellers & Toll PLLC, 1100 New York Avenue NW, Suite 800, Washington, DC 20005
AND
CECIL E. MORRIS, JR., Fairfield & Woods PC, 1801 California Street, Suite 2600, Denver, CO 80202

For the Defendants:
DIANE L. McGIMSEY, Sullivan & Cromwell LLP, 1888 Century Park East, Suite 2100, Los Angeles, CA 90067
AND
NICHOLAS A. CASELLI, Freshfields US LLP, 3 World Trade Center, 175 Greenwich Street, 51st Floor, New York, NY 10007


Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver, CO 80294, (303)335-2358


Proceedings reported by mechanical stenography; transcription produced via computer.

2

21-cv-2770-WJM     Fairness Hearing     12-05-2025

P R O C E E D I N G S

(Proceedings commenced at 1:02 p.m.)

THE COURT:  All right.  We are on the record in civil action number 21-cv-2770, El Paso Firemen and Policemen Pension Fund et al, plaintiffs, versus InnovAge Holding Corporation et al, defendants.  I will take appearances of counsel for the plaintiffs.

MS. BOWEN:  Good afternoon, Your Honor.

THE COURT:  Can you stand, please.

MS. BOWEN:  Good afternoon, Your Honor.  My name is Molly Bowen on behalf of the plaintiffs, with Cohen Milstein.  I'm joined by my colleague Julie Goldsmith Reiser of Cohen Milstein, and our liaison counsel Cecil Morris of Fairfield & Woods.

THE COURT:  Good to see you again, Mr. Morris, back in my courtroom.

MR. MORRIS:  Likewise.

THE COURT:  It's been a few years.  I can tell you I've been quite impressed by your work in this case.

MS. McGIMSEY:  Good afternoon, Your Honor.  Diane McGimsey of Sullivan & Cromwell on behalf of InnovAge, the individual defendants, and the private equity defendants.

MR. CASELLI:  Good afternoon, Your Honor.  Nicholas Caselli from Freshfields LLP on behalf of the underwriter defendants.

Kevin P. Carlin, RMR, CRR

3

21-cv-2770-WJM    Fairness Hearing    12-05-2025

THE COURT:  All right.  Good afternoon to all of you.
The motions I have before me are the following two: plaintiffs'
unopposed motion for order to finally approve class action
settlement and plan of allocation, which was filed at ECF 201,
and the plaintiffs' motion for attorneys' fees and expenses
filed at ECF 202.

The purpose of today's fairness hearing in my view is
for the Court to consider and rule on the question of whether
the proposed settlement is fair, reasonable, and adequate, to
consider and rule on the reasonableness of plaintiffs' motion
for attorneys' fees and costs, and to rule on any objections.

Importantly, I note that the case law is crystal clear
that the power -- or my power to approve or reject a class
action settlement does not authorize me to require the parties
to accept a settlement to which they have not agreed.  Thus, I
may not modify the settlement, but must either approve or
disapprove it in total.

In considering the parties' proposed class settlement,
I must consider the following four factors in reviewing a
proposed class action settlement.  And I'm taking this from the
*Jones v. Nuclear Pharmacy* case, a 1984 decision of our Circuit.
Whether the proposed settlement was fairly and honestly
negotiated, whether serious questions of law and fact exist
placing the ultimate outcome of the litigation in doubt, whether
the value of an immediate recovery outweighs the mere

4

21-cv-2770-WJM    Fairness Hearing    12-05-2025

possibility of future relief after protracted and expensive

litigation, and the judgment of the parties that the settlement

is fair and reasonable.

When considering the appropriateness of an attorney fee

award, I consider some or all of the familiar 12 factors set

forth in the landmark Fifth Circuit decision in *Johnson v.*

*Georgia Highway Express*.  When considering the appropriateness

of an award for class representation, I will consider the

actions the class representative took to protect the interests

of the class, the degree to which the class has benefited from

those actions, and the amount of time and effort the class

representative expended in pursuing the litigation.

All right.  In my fairness hearings, and I've done

several of these over the years, I proceed as follows:  What I'm

going to do is put on the record a summary of some of the

material background points of the litigation.  Then I'm going to

call on plaintiffs' counsel -- Ms. Bowen, are you going to be

the one handling this this afternoon?

MS. BOWEN:  Yes, Your Honor.

THE COURT:  I'm going to ask Ms. Bowen to summarize

from the plaintiffs' perspective why the settlement in her view

is reasonable, fair, and adequate, and also why the attorney fee

and cost request is reasonable.  I will ask Ms. McGimsey to give

me her perspective from the defendants' point of view.

Mr. Caselli, do you also wish to be heard on the position of

Kevin P. Carlin, RMR, CRR

5

21-cv-2770-WJM    Fairness Hearing    12-05-2025

your clients on the settlement?

MR. CASELLI:  Just very briefly, Your Honor.

THE COURT:  All right.  I will give you both the opportunity to do that.  We will then discuss whether it remains a fact that all objections have been received, and we will proceed in that fashion.

So, let me read into the record my summary of the pertinent material matters that have happened in the course of this litigation.  Lead plaintiffs are pension funds operated to benefit public employees and retirees such as firefighters, police officers, teachers, and professors of public schools and universities in Texas and Indiana.  InnovAge is a healthcare company focusing on providing PACE services.  PACE is a joint Medicare and Medicaid program that provides comprehensive community-based medical and social services to certain elderly individuals.

InnovAge was incorporated as a nonprofit corporation in Colorado from May 2007 until May of 2016.  In May of 2016, however, it reincorporated as a Delaware for-profit corporation while maintaining its personal place of business in Colorado.  InnovAge accomplished this transaction into a for-profit business with assistance from the WCAS Management Corporation, WCAS Management LP, and WCAS Management LLC, which I will collectively refer to this afternoon as WCAS, those being private equity firms that sought a 1.96 -- which bought a 9.6 --

Kevin P. Carlin, RMR, CRR

6

21-cv-2770-WJM     Fairness Hearing     12-05-2025

196-million-dollar stake in InnovAge in May of 2016.

In July of 2020, Apax Partners LP, another private equity firm, and WCAS entered into an agreement for Apax to acquire a 49 percent stake in InnovAge, and for the two firms to cause InnovAge to become a public company.

In the IPO's offering documents and throughout the class period, InnovAge represented to investors that it was delivering compliant healthcare to its participants and had sufficient staff to provide necessary government-mandated care, but according to lead plaintiffs, InnovAge was actually delivering substandard care due to inadequate staffing, which resulted in multiple state and federal regulators sanctioning InnovAge and suspending patient enrollment. After a series of corrective disclosures, InnovAge's stock price decreased by 78 percent.

In October of 2021, plaintiffs -- lead plaintiffs bought -- brought Section 11 and 10(b) claims against InnovAge, certain current and former officers and directors, and the underwriters in InnovAge's IPO challenging certain statements regarding InnovAge's operations as misleading.

They also brought control person liability claims against WCAS and Apax Partners LP. All defendants moved to dismiss in September of 2022. In December of 2023, the Court granted in part and denied in part the defendants' motions to dismiss -- motion to dismiss. The Court concluded that six of

Kevin P. Carlin, RMR, CRR

7

21-cv-2770-WJM     Fairness Hearing     12-05-2025

defendants' 43 alleged misleading statements were actual, dismissing plaintiffs' claims with respect to the remaining 37 statements.

The Court also dismissed plaintiffs' control person liability claims against the director of defendants, finding that lead plaintiffs had failed to adequately allege control person liability against the director defendants because, quote from the order, if being a director is not sufficient to support an allegation that the person is a control person, then neither is agreeing to become one, end quote.

But the Court permitted the control person liability claims to proceed against Apax and WCAS.  The Court reasoned that these two entities could either by voting together or by exercising the veto that each held, control an LP board of TCO Group Holdings LP, which in turn would exercise voting and dispositive power over a majority of InnovAge shares.

In September of 2024, plaintiffs filed a second amended complaint, which alleged as a defendant TCO Group Holdings, which plaintiffs allege to be a shell entity that is the investment vehicle through which defendant Apax Partners and the three WCAS entities hold their investment in InnovAge common stock and exercise their voting and dispositive power with respect to that stock.

The second amended complaint added these three defendants which were alleged to be interconnected entities,

Kevin P. Carlin, RMR, CRR

21-cv-2770-WJM     Fairness Hearing     12-05-2025

those being WCAS Management Corporation, WCAS Management LP, and WCAS Management LLC.  In October of 2024, WCAS collectively moved to dismiss the control person liability claims against all three entities in the second -- in the second amended complaint, arguing that there were no alleged facts demonstrating that any individual CAS -- WCAS defendant actually had the ability to control InnovAge.

Contrary to this position, however, the Court concluded that the second amended complaint sufficiently pled a prima facie control person liability claim as to WCAS Management Corporation.  The Court also concluded that the factual disputes precluded dismissal of plaintiffs' claims against WCAS Management LP and WCAS Management LLC under an alterego theory.  Hence, the Court permitted the control person liability claims to proceed against the three WCAS defendants.

In January of 2025, lead plaintiffs moved to certify a class of persons and entities who, one, purchased or otherwise acquired the publicly traded common stock of InnovAge between May 11, 2021, and December 22, 2021, inclusive, and/or, two, purchased or otherwise acquired publicly traded InnovAge common stock, either in or traceable to InnovAge's March 4th, 2021, IPO and were damaged thereby.

Lead plaintiffs also asked the Court to appoint them as class representatives and Cohen Milstein firm as class counsel.  The Court granted the motion and certified the class as defined

9

21-cv-2770-WJM    Fairness Hearing    12-05-2025

above, finding that lead plaintiffs had satisfied each of Rule 23(a)'s requirements.

In May of 2025, the parties notified the Court that they had agreed to settle all claims in this action for a 27-million-dollar all-cash payment.  In June of 2025, they filed an unopposed motion for order to preliminarily approve the class action settlement filed at ECF 199.  Later that month, the Court granted the motion preliminarily approving the settlement and setting a fairness hearing for today, December 5th, 2025.

In that order, the Court authorized lead plaintiffs to retain Strategic Claims Services as the claims administrator to supervise and administer the notice procedure in connection with the proposed settlement as well as the processing of claims. Class members who wanted to be excluded from the settlement or object to any aspect of the settlement had until November -- or any aspect of the settlement, the plan of allocation, or motion for an award of attorneys' fees and expenses had until November 5th, 2025, to do so.

To date, however, it is my understanding, I will ask counsel to confirm it in a moment, no class member has objected to any aspect of the settlement, and out of the 11,390 notice packets that have been mailed to potential class members, no requests for exclusion have been received.

Ms. Bowen, is that -- are those statements still accurate as of today?

Kevin P. Carlin, RMR, CRR

21-cv-2770-WJM    Fairness Hearing    12-05-2025

MS. BOWEN:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  In October of 2025, lead plaintiffs moved for final approval of the settlement at ECF 201, as I referenced earlier, and also for attorneys' fees, reimbursement of expenses, and approval of service awards to the lead plaintiffs, again, as I referenced earlier, at 202.

All right.  Ms. Bowen, if you will take the lectern, please.  At this time, I would like you to do an -- a number of things.  First, I'd like you to recap the material terms of the proposed settlement.  Secondly, to explain to me why in the plaintiffs' perspective such a resolution is fair, reasonable, and adequate for the class.  And then I would like you to separately address the reasonableness of the motion for attorneys' fees and costs and the service award payments to the lead plaintiffs.

MS. BOWEN:  Thank you, Your Honor, for allowing us to be here today to present our motions.  First, the material terms of the settlement involve a 27-million-dollar cash payment that will be disbursed to the class on a pro rata basis in exchange for releases of the claims set forth in our case for all defendants.  We believe that the settlement is fair, reasonable, and adequate.

We reached a 27-million-dollar settlement, which is an excellent result for the class.  As Your Honor noted, there have been no objections or opt outs.  This was reached after three

11

21-cv-2770-WJM     Fairness Hearing     12-05-2025

years of hard-fought litigation, and is twice the median recovery in securities class actions in the Tenth Circuit.

Going through the factors that Your Honor identified and that the Tenth Circuit considers, the first factor, the settlement was negotiated at arm's length under the supervision of an experienced mediator.  This case was mediated by Robert Meyer, who is an experienced mediator who works with JAMS and has mediated many complex securities and other class actions, including those approved in this court.

Mr. Meyer oversaw all aspects of the mediation, starting with the initial mediation session in October of 2024, which was not successful, through negotiations that resumed in the spring of 2025 and ultimately culminated in the settlement, at which point he had made a mediator's proposal.  Mr. Meyer has submitted a declaration, which is at ECF 203-1, attesting to the vigor of the process and supporting the settlement.

On the second factor, there were serious questions of law and fact that created risk to the class from continued litigation.  As Your Honor noted, this was a highly fact-intensive case, issues that were overcome at the motion to dismiss phase Your Honor predicted could be open to factual dispute later on.  So, it was unlikely this case would resolve at summary judgment, and would be headed towards trial had it gone that far, which is inherently risky.

Some of the significant issues in this case included

Kevin P. Carlin, RMR, CRR

21-cv-2770-WJM    Fairness Hearing    12-05-2025

the underwriter defendants raising a due diligence affirmative defense that could have eliminated them as parties, InnovAge's colorable defense and scienter given the lack of precedent in the industry for the type of sanctions alleged, and the inevitable battle of the experts on damages and loss causation.

An additional issue that created risk was InnovAge's limited insurance coverage and concerns about the company's financial position.  The IPO was at $21, and the stock price was down as low as 260 during the course of the litigation, obviously a significant drop that created concern about viability of recovery should the litigation continue for many years through trial and appeals.

The third factor, the benefit of an immediate recovery relative to potential future relief, the settlement that we reached provides significant immediate benefit to the class and avoids the delay of further litigation, trial, and appeals, which was particularly noteworthy given the concerns about ability to recover down the road.

This case presented significant complexity and cost for discovery, given the 28 different defendants, most or all of whom would have been deposed, and complicated factual questions about control person claims as to the private equity defendants who had a very complicated corporate structure.

We achieved a recovery that includes insurance proceeds from InnovAge as well as a contribution from defendants, further

13

21-cv-2770-WJM     Fairness Hearing     12-05-2025

underscoring the strength of the recovery.  And finally, the reaction from the class and the plaintiffs has been uniformly positive.  There have been no opt outs or objections to date. And the lead plaintiffs, who are three sophisticated institutional investors, all supported the settlement.

The lead plaintiffs vigorously represented the class throughout the case, as noted at class certification, and there is no conflict of interest between the lead plaintiffs and the rest of the class.  They were harmed in the same manner, and their claims are based on the same conduct, so their ability to recover rises and falls with the class's claims, and all class members are treated equitable through the settlement.  The plan of allocation was developed with lead plaintiffs and with our expert Dr. Matthew Cain, who is also the expert that served the class certification stage, and it ensures that all authorized claimants who have submitted a timely claim and gone through the process will receive their pro rata share of the recovery based on their recognized loss amount.

THE COURT:  Can you, for the record, summarize the material terms of the plan of allocation.

MS. BOWEN:  Certainly, Your Honor.  The plan of allocation was designed, again, in coordination with Dr. Matthew Cain, a well-regarded economist and former adviser to the FCC commissioner.

As Your Honor noted, there are two sets of claims in

Kevin P. Carlin, RMR, CRR

14

21-cv-2770-WJM    Fairness Hearing    12-05-2025

this case.  There are Securities Act claims, and there are Exchange Act claims.  Claimants may have one or the other or both, and the plan of allocation is designed to examine that and ensure a fair recovery.

For the Securities Act claims, the determination of damages is modeled after the statutory formula.  So, depending on the date of purchase and sale, the artificial inflation is determined and will be distributed pro rata.  For the Exchange Act claims, there is an examination of timing of purchase and sales relative to the corrective disclosures, which occurred on September 21st, 2021, and December 23rd, 2021.

THE COURT:  Do you have a sense of an average recovery per class member?

MS. BOWEN:  We do not at this time.  I was in touch with the claims administrator this week, and the -- they have received at this point approximately 7,000 claims.  They're in the process of the quality control and audit.  So, they at this time do not have an exact number of how many claims are authorized and will ultimately receive a recovery.  So, we at this time are not able to estimate the recovery.

THE COURT:  Okay.  I don't need an exact number.  I'm just asking, do you have a ballpark, order of magnitude number?

MS. BOWEN:  Sure.  Yeah.  So, as we note -- put in the notice, we estimate, I believe 66 cents per share as the average expected recovery for plaintiff -- for class members.

Kevin P. Carlin, RMR, CRR

15

21-cv-2770-WJM    Fairness Hearing    12-05-2025

THE COURT:  Okay.  So, as I recall, I saw one of the exhibits to the stipulation was a 90-day look-back table.  The history -- historical price quote of the stock for 90-day period.  Was it triggered off that delta from high to low, or is it the class definition dates, which is more like seven months?

MS. BOWEN:  It's triggered off the class definition dates.

THE COURT:  Okay.  So, what was the significance of that 90-day look-back table?

MS. BOWEN:  The 90-day look-back period is designed to ensure that an individual suffered a loss.  So, it examines whether they had additional trades subsequent to the class period.

THE COURT:  All right.  And so do you know off the top -- do you recall off the top of your head how -- how far the stock price fell between May 11th and December 22 of 2021?

MS. BOWEN:  Ms. Reiser will speak to that question.

MS. REISER:  Julie Reiser on behalf of the plaintiffs. Your Honor, is it okay for me to speak from here?

THE COURT:  Sure.

MS. REISER:  The 78 percent stock drop that Your Honor noted in the beginning about how far the stock had fallen is correct.  What happened is that in March of 2021, it was trading at 21.  Around June, the stock price had fallen to, let's say about $14 a share.  And then in September, the sanctions were

Kevin P. Carlin, RMR, CRR

21-cv-2770-WJM    Fairness Hearing    12-05-2025

announced, and the stock price dropped even further.

So, what that means is that an investor who purchased, say, in June or an investor who purchased in July would have purchased well below the 21-dollar high, but still could have damages.  And so I think in our class notice we said that this was -- was it nine percent or eight percent of the -- okay.  So, when we notified the class, we are saying this is the percentage of damages that our expert can calculate, but how that then translates to a particular individual, I think the best that we can say is it is that nine percent of their -- of the losses for the class.  And then it would depend on the timing of their purchase as to what that number looks like.

THE COURT:  What was the stock price on December 22nd when the class definition period concluded?

MS. REISER:  Three dollars --

MS. BOWEN:  If I may, Your Honor?  Your Honor, I'm just reviewing in the complaint where it will be.

MS. REISER:  Okay.  On December 22nd, the close price was $8.25.  It went to $5.31 on December 23rd.  Then, subsequently, Maureen Hewitt, who had been the CEO, announced she was resigning, and the stock price fell again.

THE COURT:  Right.  Okay.  So, the nine percent of losses, I understand it's quite difficult to describe and articulate what an average loss is for an average investor even in such a short class period as seven months, because really in

17

21-cv-2770-WJM    Fairness Hearing    12-05-2025

terms of securities, these type of securities fraud cases, it all depends on when the stock was purchased and where it ended up. But what I understand, Ms. Bowen, you're representing to me is that through the methodology that's reflected in the plan of allocation that you worked out with your expert, that very roughly -- and I understand very roughly speaking, the average investor or class member will receive approximately nine percent of his or her or its loss?

MS. BOWEN: Your Honor, the overall settlement, $27 million, reflects nine percent of damages. How that maps onto a particular investor is a little tricky, as you noticed. We -- the notice included an estimated per share recovery of 66 cents. So, I think that might be the best way to think about what it means for any individual investor.

THE COURT: I think that's right. That's probably right. So, the nine percent was for a number off of the -- the full 27 million-dollar settlement amount?

MS. BOWEN: Exactly. So, the 27 million-dollar settlement that we recovered is approximately 9.3 percent of what we deemed total potential damages --

THE COURT: Okay. Got it.

MS. BOWEN: -- in the case.

THE COURT: All right. Thank you. Thank you, Ms. Bowen.

MS. BOWEN: Thank you. And part of the -- obviously

Kevin P. Carlin, RMR, CRR

18

21-cv-2770-WJM    Fairness Hearing    12-05-2025

folks who purchased on the IPO at the highest price were

significantly harmed, and others who purchased later in the

class period may have smaller relative damages.

THE COURT:  Right.

MS. BOWEN:  Your Honor, I am happy to proceed to

speaking about fees and expenses, unless you have any other

questions about the settlement itself or the plan of allocation?

THE COURT:  Give me a second here.  No.  I think you

answered -- my primary question was how exactly this plan of

allocation was going to work in reality with respect to these

class members.  I think I have a good understanding now of that.

So, go ahead and address the attorneys' fees and costs motion.

MS. BOWEN:  Thank you, Your Honor.  We will go through

the *Johnson* factors that are considered by Courts in this

Circuit for analyzing fee requests.  Our request was for

20 percent of the settlement for attorneys' fees, which was

obviously included in the notice disseminated to class members,

and has also received no objections or comment from the class.

So, considering factors one and four together, counsel

expended significant time and labor on this matter that

precluded work on other matters.  So, together, plaintiffs'

counsel, both Mr. Morris' firm and Cohen Milstein spent over

8,000 hours litigating this complex case.  We conducted an

extensive investigation resulting in witness statements from six

former employees, many of whom were credited by the Court in the

Kevin P. Carlin, RMR, CRR

19

21-cv-2770-WJM    Fairness Hearing    12-05-2025

first motion to dismiss order.

We reviewed hundreds of thousands of pages of documents produced by the many defendants, as well as eight third parties. We also collected and produced about 80,000 pages in response to defendants' document requests to the three plaintiffs. We had a robust meet and confer and discovery debate process with our counsel on the other side, exchanging over 60 letters and holding at least 30 meet and confers with counsel for the various defendants about issues like timeframe, search terms, substantive responses, and so on.

We conducted extensive third-party discovery of regulators at the state and federal level, as well as consultants and other individuals and companies with information about InnovAge and the defendants. Finally, we were successful on multiple key motions, the first motions to dismiss, the subsequent motion to dismiss by the private equity defendants, and class certification ultimately resulting in a successful certification of the class, and preserving the full class period at the motion to dismiss stage.

And finally, we engaged in extended settlement negotiations over many months, including the submission of detailed mediation statements and exhibits, mediation meetings and subsequent presentations and calls.

Considering factor two, the litigation raised novel and difficult questions. As discussed in the presentation of

20

21-cv-2770-WJM    Fairness Hearing    12-05-2025

settlement, this case had highly complex factual and legal issues. It involved a regulated industry at a time of significant change during the COVID-19 pandemic, required examination of internal and external audits of InnovAge across multiple states and regulators, and conducting discovery from the 28 defendants.

There were novel legal issues that we confronted related to private equity defendants as controllers, an issue that has not been explored in many securities fraud cases to date. Additionally, there was, you know, significant legal issues around the falsity claims about a healthcare company during a period of well-documented stress on that industry. So, we faced risk and litigated the case vigorously.

Factors three and nine, the case required skillful counsel with strong experience, reputation, and abilities. Counsel on both sides come from well-regarded national firms. Everyone was represented by skilled and experienced lawyers who vigorously litigated the case. Lead counsel is highly experienced in prosecuting securities class actions and other complex litigation, and our liaison counsel is well-regarded in the district, and ably supported our litigation and compliance with local rules and norms, as well as navigating certain issues in discovery. Mediator Robert Meyer described the prosecution in this case as of the highest caliber in his endorsement of the settlement.

Kevin P. Carlin, RMR, CRR

21-cv-2770-WJM     Fairness Hearing     12-05-2025

Factors five and twelve, the request is consistent with fees customarily awarded in similar cases.  Our request for a 20 percent fee falls below the customary award in this and other cases and this and other districts within the Tenth Circuit and similar cases.  One recent example, Oregon Laborers versus Maxar Technologies, 19-cv-0124, awarded a 30 percent fee on a 27 million-dollar settlement.  Similarly, Peace Officers versus DaVita, 17-cv-0304, awarded 30 percent on a larger settlement.

Factor six, this case was litigated on a contingency basis, which creates extra risk for counsel prosecuting the case for many years with no guarantee of recovery.

Factor eight, a significant amount of work was required and excellent and results were achieved.  As we've noted, a 27 million-dollar cash recovery is double the median recovery in similar cases in the Circuit over the last ten years, and includes both insurance proceeds and a contribution from defendants.

And finally, just to emphasize, the lead plaintiffs and the class have reacted uniformly positively to the fee.  The notice included information about our intended request, and did not yield any objections.  And the sophisticated lead plaintiffs also supported our request.

I'm happy to answer any questions Your Honor may have.

THE COURT:  Actually, I don't have any questions about the fees and costs.  If you can address for the record the

22

21-cv-2770-WJM    Fairness Hearing    12-05-2025

service award to the lead plaintiffs.

MS. BOWEN: Certainly. So, we have requested an award pursuant to the PSLRA statute, which allows awards for reasonable costs and expenses, including lost wages. We've requested an award of $15,000 for each of the three lead plaintiffs. Each of them undertook significant time and effort to participate in and oversee this litigation, including regular contact with counsel, reviewing comment and court filings, collecting and producing hundreds or thousands of documents, preparing for and sitting for multi-hour depositions, and being very engaged in the mediation process, including reviewing submissions, consulting with counsel on strategy, and assessing the offers that came in over a multi-month period.

This work was performed by high-level professional staff, including the general counsel of Indiana, the executive director and general counsel of San Antonio, and the executive director and chief investment officer of El Paso, along with, as appropriate, their investment, IT, and administrative staff. And so that work kept them from their day-to-day responsibilities they could have done during that time instead. The notice informed class members of the intended award request, and again, there were no objections.

THE COURT: All right. Anything else you want to put on the record in support of either of the two motions in front of me?

Kevin P. Carlin, RMR, CRR

23

21-cv-2770-WJM     Fairness Hearing     12-05-2025

MS. BOWEN:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you, ma'am.  You may return to counsel table.  All right.  I will hear from whichever defense counsel wants to go first.  All right.  Ms. McGimsey?

MS. McGIMSEY:  Thank you, Your Honor.  I will be brief.  I will start off by concurring in everything that Ms. Bowen stated about the fairness and reasonableness of this settlement, and I just want to emphasize a few points about that.  While the case was narrowed somewhat on a motion to dismiss, it still involved very complex factual allegations that touched on virtually every aspect of InnovAge's business, as well as unique questions of law that related not only to the misstatements and the nature of the misstatements that were challenged, but as Ms. Bowen raised, various private equity control issues where there was not an abundance of controlling law.

In light of the nature of the misstatements and the number of parties involved, this case would have been very, very expensive and difficult to litigate through summary judgment, and as Ms. Bowen assessed, would have been very difficult to resolve at summary judgment because of the factual issues.

THE COURT:  Let me just interject.  I agree with you, and I know Ms. Bowen touched on this before, but I just want to put on the record, I have had several securities class action cases in the course of my career on the bench.  Obviously you're

Kevin P. Carlin, RMR, CRR

24

21-cv-2770-WJM   Fairness Hearing   12-05-2025

citing back to me some of those. I would say this: By a significant margin, it was the most factually and legally complex of all the securities class action cases I've had. And the control person -- control party liability question was really a thorny one.

And as I've -- and as I said throughout the orders, that factual disputes that were not conducive to being resolved at a Rule 12 stage, while appropriate for resurrecting those arguments on a 56, possibly could not have been resolved there either, and that we would have been looking at a trial in this case, which would have been several weeks in length. Go ahead, Counsel.

MS. McGIMSEY: I concur in those statements, Your Honor. On top of that, there were significant patient privacy concerns and other issues relating to just the nature of InnovAge's business that would have made this case very difficult to litigate through summary judgment and through trial, which ultimately resulted in real risks to both sides.

As a result, we think that this settlement, as Ms. Bowen noted, was above the median recovery. More than double of the median recovery in this district is more than fair and reasonable, and we think the fact of that is supported by the fact that there is not a single objector or opt out. Unless the Court has any questions?

THE COURT: Not with respect to the motion to -- for

Kevin P. Carlin, RMR, CRR

25

21-cv-2770-WJM    Fairness Hearing    12-05-2025

final approval of the settlement. With respect to the fee motions, I understand defendants don't oppose. Do you wish to take no position beyond that, or do you want to make some kind of statement on the record?

MS. McGIMSEY: We support the fee application. We think it's reasonable in light of the litigation that occurred in this case and the efforts by plaintiffs' counsel.

THE COURT: All right. Thank you. All right. Mr. Caselli, I will give you an opportunity to put on the record your comments and observations.

MR. CASELLI: Thank you, Your Honor. Very briefly.

THE COURT: Can you just restate again -- and I should have asked Ms. McGimsey, can you, Ms. McGimsey, state again the specific defendants that you represent?

MS. McGIMSEY: I represent InnovAge, the individual defendants, and the private equity defendants, Your Honor.

THE COURT: Okay. Because I think we got 20 some defendants in this case. So, Mr. Caselli, back to you. Let's put on the record who it is that you're speaking on behalf of.

MR. CASELLI: Thank you, Your Honor. My clients are JP Securities LLC, Barclays Capital Inc., Goldman Sachs & Company LLC, Citigroup Global Markets Inc., Robert W. Baird & Company Incorporated, William Blair & Company LLC, Piper Sandler & Company, Piper Sandler & Company, Capital One Securities Inc., Loop Capital Markets LLC, Siebert Williams Shank & Company LLC,

Kevin P. Carlin, RMR, CRR

21-cv-2770-WJM    Fairness Hearing    12-05-2025

and Roberts & Ryans Investments Inc.

THE COURT:  All right.  Thank you, sir.

MR. CASELLI:  And, Your Honor, very briefly, the underwriter defendants do not oppose the approval motion and take no position on the fee application.  I would reinforce for the record that if the matter were to proceed, the underwriter defendants would vigorously litigate the claims against them, including the affirmative defenses they advanced, which as Your Honor heard this afternoon could have resulted in removal of the underwriter defendants as parties in this action.

And unless the Court has further questions for the underwriter defendants, we would like to thank the Court for its time and attention to this matter.

THE COURT:  I don't have any further questions.  Thank you, sir.

MR. CASELLI:  Thank you, Your Honor.

THE COURT:  I will give you an opportunity to recover your documents there.

MR. CASELLI:  Thank you.

THE COURT:  Do you have them all?

MR. CASELLI:  Yes, sir.

THE COURT:  Okay.  All right.  I intend to enter a written order fully setting forth the basis for my decision, but I will briefly summarize my intended rulings.  I find that the settlement negotiated by counsel is fair, reasonable, and

Kevin P. Carlin, RMR, CRR

21-cv-2770-WJM    Fairness Hearing    12-05-2025

adequate, and it will be approved.  And I will grant the plaintiffs' unopposed motion for final approval of class action settlement filed at ECF 201.

The parties have shown that the settlement agreement was negotiated at arm's length by counsel that is experienced in these types of security fraud class action cases.  The settlement assures that the class members will receive reasonable compensation in light of the uncertainties of litigating this case to a judgment.  It also provides a significant immediate benefit to the class and avoids protracted litigation over these disputes.

And the fact that no class member -- to my mind, the fact that no class member objects to the settlement in my view demonstrates that the class also considers the settlement to be fair, reasonable, and adequate.

Taken together, all these factors support my finding that the settlement agreement is fair, reasonable, and adequate, and it will be approved.

Before I go on to the fees motion, let me just ask, I know that the deadline for objections have come and gone 30 days ago.  Let me just state, is there any objector in -- let me ask, is there any objector in the courtroom?  All right.  Let me go on to the fee motion.

I also intend to grant plaintiffs' unopposed motion for attorneys' fees and reimbursement of expenses.  I find that the

28

21-cv-2770-WJM    Fairness Hearing    12-05-2025

requested amount of fees and costs is reasonable, considering the exceptional results achieved by plaintiffs' counsel in this case, the effort expended on this case by class counsel, the risks and difficulties inherent in securities litigation, the discovery and detailed review thereof, the skill required and the dedication displayed over the litigation in this matter. Class counsel spent approximately 8,700 hours on this matter, which is reasonable considering the complexities of these types of cases.

In my view, the requested attorney fee award of 20 percent of the full 27 million-dollar settlement fund, or $5.4 million, is in line with fee awards granted in other securities class contingent fee cases in this Circuit, and is otherwise reasonable given the factors that I have fully considered. For all these reasons, I will approve plaintiffs' attorneys fee and costs request in full, and as requested.

Finally, I intend to approve a service award payment of $15,000 to each of the lead plaintiffs in this case: El Paso Firemen and Policemen Pension Fund, San Antonio Fire and Police Pension Fund, and the Indiana Public Retirement System. The Court finds these amounts to be reasonable given each plaintiff's relative participation in the case. I also find that the requested service awards are also reasonable as compared to the size of the overall recovery.

All right. I have covered everything I need to address

Kevin P. Carlin, RMR, CRR

29

21-cv-2770-WJM     Fairness Hearing     12-05-2025

at this hearing.  From the plaintiffs' perspective, is there any other matter that we need to address before we adjourn?

MS. BOWEN:  Nothing further.  We would just like to thank Your Honor and counsel on both sides for their time and attention to this case.

THE COURT:  All right.  Thank you.  Any matter for -- from either of the two defense counsel that needs to be addressed in this case?

MS. McGIMSEY:  Nothing here either, Your Honor.  And we also thank the Court and counsel.

THE COURT:  All right.  Mr. Caselli?

MS. McGIMSEY:  Nothing, Your Honor.  And we concur in those sentiments as well.  Thank you.

THE COURT:  All right.  Thank you, folks.  Good job. This was a very hard-fought and very well-litigated case.  As I referenced to Mr. Morris before, I was impressed -- my law clerks and I were impressed by the briefing in this case.  It's really a pleasure when we don't have to deal with the complexities of the case plus counsel who don't quite get it and are not doing their jobs, and that we have to figure everything out back in chambers.  So, thank you for that.  All right.  As I referenced before, a written order will be issued sometime in the near future.  All right.  Thank you.  That will be all.

     (Proceedings concluded at 1:49 p.m.)

Kevin P. Carlin, RMR, CRR

REPORTER'S CERTIFICATE

I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 17th day of December, 2025.

_____
Kevin P. Carlin, RMR, CRR
Official Court Reporter

Kevin P. Carlin, RMR, CRR